UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIEGO AGUILAR, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>BATON CORPORATION LTD, d/b/a PUMP.FUN, ALON COHEN, DYLAN KERLER, and NOAH BERNHARD HUGO TWEEDALE,<br><br>        Defendants. | Case No.: 1:25-cv-00880<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................................ 1

II.    PARTIES ........................................................................................................... 3

III.   JURISDICTION AND VENUE ........................................................................ 4

IV.    FACTUAL ALLEGATIONS ............................................................................. 6

       A.    Overview of Memecoins and Their Role in Cryptocurrency Markets ................. 6

       B.    The Role of Trading Platforms in Memecoin Speculation ................................... 7

       C.    Market Manipulation and Fraudulent Practices .................................................... 7

       D.    Impact on Retail Investors and Market Integrity .................................................. 8

       E.    The Tokens Purchased by the Plaintiff .................................................................. 9

             1.    The First Convicted Raccoon (FRED) Token ............................................ 9

             2.    The FWOG Token ...................................................................................... 12

             3.    The GRIFFAIN Token................................................................................ 15

       F.    Pump.Fun's Standardized Infrastructure Creates Uniformity Across All
             Tokens ................................................................................................................... 17

             1.    Technical Infrastructure ............................................................................. 17

             2.    Universal Marketing Framework ............................................................... 18

             3.    Uniform Economic Model .......................................................................... 19

       G.    Howey Test Analysis For Platform-Wide Token Classification .......................... 20

             1.    Investment of Money ................................................................................. 20

             2.    Common Enterprise .................................................................................... 21

             3.    Expectation of Profits ................................................................................ 24

             4.    Efforts of Others ........................................................................................ 26

       H.    Baton Corporation's and Pump.Fun's Role As Issuer And Statutory Seller ........ 27

             1.    Issuer Status ............................................................................................... 27

             2.    Statutory Seller Position ............................................................................ 28

V.     CLASS ACTION ALLEGATIONS ................................................................ 29

VI.    CAUSES OF ACTION .................................................................................... 31

VII.   PRAYER FOR RELIEF .................................................................................. 34

VIII.  JURY DEMAND ............................................................................................. 34

Plaintiff Diego Aguilar ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation, review and analysis of press releases, new articles, websites, blockchain forensic analysis, and other publicly available information concerning the Defendants (as defined herein), the website Pump.Fun, which is, and was, owned, operated, and/or controlled by the Defendants (defined below), and cryptocurrency memecoins or tokens that were issued by, promoted by, or sold by the Defendants through Pump.Fun, or for which the Defendants solicited the sale of through Pump.Fun (collectively, the "Tokens" or the "Securities").

## I.    NATURE OF THE ACTION

1.    This is a federal securities action on behalf of a Class of all purchasers of the Tokens alleging claims against the Defendants for offering and/or selling the Tokens, which are and were unregistered securities.

2.    At all relevant times, the Tokens were securities as defined by Section 2(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1).

3.    However, no registration statement was ever filed with the U.S. Securities and Exchange Commission ("SEC") to register any of the Tokens for sale.

4.    The Defendants therefore issued, sold, promoted, solicited the sale of, and/or solicited Plaintiff and the Class to purchase unregistered securities in violation of Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77l(a)(1), 77o.

5.    Pump.Fun, which is, and was, owned, operated and/or controlled by the Defendants, issued, sold, promoted, solicited the sale of, and/or solicited Plaintiff and the Class to purchase, the Tokens in violation of Sections 5 and 12(a)(1) of the Securities Act.

6.     Pump.Fun's core function is to work alongside influencers to co-issue and market unregistered securities. Inherent to its operations are a novel evolution in Ponzi and pump and dump schemes. A description of relevant Pump.Fun Ponzi schemes is attached as Exhibit A.

7.     Pump.Fun has extracted nearly half a billion dollars in fees from investors by selling highly-volatile unregistered securities.

8.     In reality, Pump.Fun has experienced rapid growth through a novel marketing technique driven by what is benignly termed the attention economy, which includes memetic themes, and internet culture. This guerrilla marketing has supported the mass adoption of unregistered security memecoins, including those that are the subject of this case.

9.     Pump.Fun also captures attention and attracts users by providing the technical tools, infrastructure, and interfaces to manage a marketplace of other digital asset unregistered securities that promote child abuse, potentially underage pornography, antisemitism, racism, self-harm, advocating violence, the continued and ongoing use of unlicensed intellectual property, including likenesses of law firms, or any other means of pumping a Token's price, hence the name Pump.Fun. A description of select examples of such other unregistered securities launched on Pump.Fun is attached as Exhibit B, Exhibit B Addendum, and Exhibit J.

10.    Since January 19, 2024, the Defendants have orchestrated this scheme by providing automated tools that allow anyone to create and sell nearly worthless digital Tokens in minutes. A description of the process of account creation and Token launch on Pump.Fun is attached as Exhibit C.

11.    In addition to Pump.Fun's unique marketing techniques, the platform enables minors to both issue and purchase unregistered securities. A description of an example of the sale to minors is attached as Exhibit D.

12.    Pump.Fun omits basic investor protections, including Know Your Customer procedures, anti-money laundering protocols, and risk disclosures. *See* Exhibit E.  This is exemplified by the ease in which any person regardless of age can create an account and purchase a Token in less than 5 minutes. A description of the process to purchase a Token is attached as Exhibit F.

## II.    PARTIES

13.    Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token, all of which are Tokens, and was damaged thereby.

14.    Defendant Baton Corporation Ltd. ("Baton Corporation" or the "Company") is a private limited company organized under the laws of the United Kingdom. Its principal business address is located in Mildenhall, Bury Saint Edmunds England, United Kingdom.

15.    At all times relevant to this complaint, Baton Corporation owned and operated Pump.Fun and the Pump.Fun website (collectively, "Pump.Fun"), and/or conducted business as or through Pump.Fun.

16.    Defendant Alon Cohen ("Cohen") is, and at all times relevant to this complaint was, a founder of Baton Corporation, the Chief Operating Officer ("COO") of the Company, and the owner of between 25% and 50% of Baton Corporation shares. Cohen is a resident of Germany.

17.    Defendant Dylan Kerler ("Kerler") is, and at all times relevant to this complaint was, a founder of Baton Corporation, the Chief Technology Officer ("CTO") of the Company, and the owner of between 25% and 50% of Baton Corporation shares. Kerler is a resident of England.

18.    Defendant Noah Bernhard Hugo Tweedale ("Tweedale") is, and at all times relevant to this complaint was, a founder of Baton Corporation, the Chief Executive Officer ("CEO") of the Company, the owner of between 25% and 50% of Baton Corporation shares, and

the owner of more than 75% of the voting rights in Baton Corporation. Tweedale is a resident of England.

19.     Defendants Baton Corporation/Pump.Fun, Alon Cohen, Dylan Kerler, and Noah Bernhard Hugo Tweedale are referred to herein collectively as the "Defendants."

20.     Defendants Alon Cohen, Dylan Kerler, and Noah Bernhard Hugo Tweedale are referred to herein as the "Control Person Defendants" or the "Individual Defendants"

### III.     <u>JURISDICTION AND VENUE</u>

21.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 77v, which vests jurisdiction for claims under the Securities Act in U.S. District Courts.

22.     This Court has personal jurisdiction over the Defendants because all Defendants, in person or through an agent transact business within New York State, contract to supply goods or services within New York State, sold the unregistered securities that are the subject of this action in New York state, and/or caused injury to persons in this state and regularly conduct or solicit business, engage in a persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered, in New York State. For example, each of the Defendants transacts substantial cryptocurrency business in this District through Baton Corporation/Pump.Fun's extensive use of the Solana blockchain network, which maintains significant operations, infrastructure, and technical development in this District through Solana Labs' office at 141 East Houston Street, New York NY. Specifically, Pump.Fun was reliant on the Solana network, which is managed in significant part by the Solana Labs offices in this District, to execute transactions on the Pump.Fun platform and to launch and manage liquidity for Tokens. In essence Pump.Fun's operations were significantly dependent on the technical contributions and hosting of Solana Labs and the associated technical contributions to the Solana Network. Therefore, a substantial portion of the acts giving rise to the violations alleged herein occurred in

this District through the Defendants' use of Solana's blockchain infrastructure and network resources centered in this District.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v because a substantial portion of the acts, conduct, and transactions constituting violations of the Securities Act occurred within this District through the Defendants' use of the Solana blockchain network, whose critical technical operations and infrastructure are based in this District. The Defendants conduct significant business through Solana blockchain transactions processed and validated within this District, where substantial Solana network staking and validation activities occur. The Defendants avail themselves of Solana's New York-based blockchain infrastructure and development resources to conduct their memecoin offerings and transactions. The effects of the Defendants' unlawful conduct were felt in this District by investors who transacted in memecoins through Solana's New York-based blockchain network.

24.    The Defendants' activities in creating, promoting, and selling unregistered securities in the form of memecoins through the Solana blockchain network, which is substantially operated and developed from this District, constitutes systematic and continuous business contacts with this District sufficient to support jurisdiction and venue.

25.    In connection with the acts, transactions, and conduct alleged herein, Defendants:

a)    Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell the unregistered securities at issue in this litigation through the use or medium of any prospectus or otherwise;

b)    Carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, the unregistered securities at issue in this litigation for the purpose of sale or for delivery after sale; and/or

5

c)    Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise the unregistered securities at issue in this litigation.

## IV.    FACTUAL ALLEGATIONS

### A.    Overview of Memecoins and Their Role in Cryptocurrency Markets

26.    Memecoins are a category of cryptocurrency that derive their perceived value primarily from internet culture, social media promotion, and speculative trading rather than any underlying utility or technological innovation. Unlike traditional cryptocurrencies designed to serve specific technological, utility, or economic functions, memecoins are created and marketed purely for speculative trading purposes.

27.    These digital assets are typically promoted through viral marketing campaigns on social media platforms such as Twitter, Instagram, and TikTok. Their marketing deliberately targets individuals with minimal experience in cryptocurrency trading or financial literacy, specifically focusing on younger and less affluent individuals who may be more susceptible to promises of extraordinary returns.

28.    The promotional strategies for memecoins heavily emphasize the potential for exponential returns, often described in terms such as "100x" or "1000x" gains. These marketing claims exploit the "fear of missing out" (FOMO) psychology, creating artificial urgency and encouraging impulsive investment decisions without proper consideration of risks.

29.    Memecoin creators and promoters frequently exploit harmful stereotypes, cultural symbols, or inflammatory themes to generate attention and viral spread. The tokens often feature names, imagery, or branding rooted in controversial or offensive content, capitalizing on shock value to drive speculative trading volume.

30.     The marketing of memecoins frequently incorporates explicit or inappropriate content in their branding to attract attention and engage speculative investors. This content often lacks age verification mechanisms for its production, distribution, or consumption, raising significant concerns about the protection of minors and vulnerable individuals.

31.     Despite their popularity, memecoins generally lack any substantive economic value or underlying assets. Their price movements are driven almost entirely by speculation, marketing hype, and the continuous influx of new investors, creating an inherently unstable and high-risk investment environment.

**B.     The Role of Trading Platforms in Memecoin Speculation**

32.     Trading platforms that facilitate memecoin transactions, such as Pump.Fun, play a central role in enabling and promoting speculative trading. These platforms typically employ gamified interfaces and simplified trading mechanisms that downplay the inherent risks while emphasizing potential returns.

33.      Pump.Fun minimized or omitted crucial investor protections, such as: Know Your Customer (KYC) verification; Anti-Money Laundering (AML) compliance; age verification requirements; and risk disclosures trading limits or other protective mechanisms. *See, e.g.*, Exhibit E.

34.     The platforms often employ sophisticated marketing strategies that create the impression of legitimacy and security while facilitating highly speculative and risky trading activities. This includes the use of technical terms and complex trading mechanisms that mask the fundamentally speculative nature of memecoin investments.

**C.     Market Manipulation and Fraudulent Practices**

35.     Memecoins are frequently subject to coordinated market manipulation, particularly through "pump-and-dump" schemes. In these schemes, early investors or insiders artificially

7

inflate token prices through coordinated buying and promotional campaigns, then sell their holdings at peak prices, causing the token's value to collapse and leaving later investors with substantial losses. *See* Exhibit A.

36.     Trading platforms facilitate these manipulative practices by providing tools and infrastructure for rapid token creation, promotion, and trading. Features such as automated market makers, liquidity pools, and "burning" mechanisms (a process in which tokens are permanently removed from circulation) are often used to create artificial scarcity and drive up prices.

37.     The combination of minimal regulatory oversight, the absence of investor protections, and sophisticated manipulation techniques creates an environment where retail investors face substantial risks of financial harm. The rapid price movements and coordinated selling activities often result in significant losses for inexperienced investors who purchase tokens at inflated prices.

### D.     Impact on Retail Investors and Market Integrity

38.     The proliferation of memecoins and their associated trading platforms has led to widespread financial losses among retail investors, particularly affecting younger and less experienced individuals who are attracted by promises of quick wealth and social media promotion.

39.     The speculative nature of memecoin trading and the prevalence of market manipulation have eroded trust in legitimate cryptocurrency markets and blockchain technology, damaging the credibility of the broader digital asset ecosystem.

40.     The absence of meaningful investor protections and regulatory compliance has created an environment where vulnerable individuals are exposed to substantial financial risks without adequate disclosure or safeguards, undermining the fundamental principles of securities regulation and market integrity.

### E.    The Tokens Purchased by the Plaintiff

41.    The Defendants actively promoted the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token through systematic campaigns and actions that were designed to drive speculative investment. These campaigns included regular social media posts combined with claims about record-breaking market capitalization achievement, and were designed to create expectations of profit among potential investors.

42.    Baton Corporation/Pump.Fun is a statutory seller of the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token under Section 12(a)(1) of the Securities Act through direct solicitation of investments and substantial participation in sales of the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token. Baton Corporation/Pump.Fun maintained centralized control over the marketing, exchange listings, and market activities for the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token. This control is evidenced by the coordination of exchange listings, including futures trading listings for the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token, management of First Convicted Raccoon Token, FWOG Token, and GRIFFAIN Token economics, and orchestration of promotional campaigns that regularly reached tens of thousands of viewers per post.

### 1.    The First Convicted Raccoon (FRED) Token

43.    The First Convicted Raccoon Token (the "FRED Token") is a Solana-based memecoin created and distributed by Baton Corporation/Pump.Fun and a nominal creator under the social media identity "@FRED_CTO_SOL." The FRED Token is a Token as defined herein.

44.    The FRED Token was first issued, marketed, and sold by Baton Corporation/Pump.Fun on October 31, 2024. Through an aggressive marketing campaign combining professional artwork, meme culture, and promises of exponential returns, the FRED

Token achieved substantial market traction, evidenced by multiple exchange listings including KuCoin, CoinInn, and Tothemoon. The Defendants' marketing strategy leveraged sophisticated visual content and coordinated social media promotion to drive investor interest. A description of the FRED Token marketing on X / Twitter is attached as Exhibit G.

45.    The Defendants actively promoted the FRED Token through a systematic campaign designed to drive speculative investment. This campaign included regular social media posts featuring professional artwork depicting the FRED Token's mascot in various scenarios implying market dominance and trading success, including images of a muscular raccoon lifting weights with captions like "No pain, no gain," and a warrior raccoon with the caption "Taking the bull by its horns." These promotional materials consistently emphasized potential returns while minimizing or omitting disclosure of investment risks. These promotional materials were designed to create expectations of profit among potential investors.

46.    Baton Corporation/Pump.Fun is a statutory seller of the FRED Token under Section 12(a)(1) through direct solicitation of investments via social media and substantial participation in FRED Token sales. Baton Corporation/Pump.Fun maintained centralized control over FRED Token marketing, exchange listings, and market activities. This control is evidenced by the coordination of multiple exchange listings, and strategic partnership announcements with significant market players like "@AhmetCrypto42" as "Fred's Ambassador." Their marketing efforts consistently reached large audiences, with individual posts regularly receiving between 20,000 and 60,000 views.

47.    The FRED Token satisfies all elements of the Howey test for classification as a security. Investors exchange cryptocurrency for the FRED Token in transactions that clearly constitute investments of money. The FRED Token lacks any practical utility beyond speculative

trading, with marketing materials focusing exclusively on exchange listings, trading volumes, and community growth rather than any functional use case.

48.    A common enterprise exists through both horizontal commonality of investor fortunes tied to the FRED Token's market performance and vertical commonality through dependence on Defendants' ongoing promotional efforts. The success of each investor's stake relies entirely on the issuer's ability to secure exchange listings and maintain market interest through coordinated marketing campaigns, as evidenced by announcements like "10,000 Telegram Members" and "Back to back listings!"

49.    The Defendants created clear expectations of profits through systematic marketing efforts between November 2024 and January 2025. These posts show a coordinated campaign emphasizing potential returns through messaging like "Fred's not just gazing at the moon, He's aiming for it" and "Win big or die trying!" This messaging was reinforced by regular updates about exchange listings, trading pairs, and community growth milestones.

50.    The success of the FRED Token relied predominantly on the efforts of others, specifically the Defendants' continuous marketing efforts and strategic partnerships. Investors had no role in driving FRED Token value beyond basic buy and sell decisions, while Defendants maintained full control over all aspects of FRED Token promotion and market development through their sophisticated artwork production, exchange listing coordination, and community management initiatives.

51.    The Defendants demonstrated their central role through professional marketing materials including high-quality digital artwork, coordinated exchange listing announcements, and strategic partnership reveals. Their promotional efforts consistently reached large audiences, with

individual posts receiving tens of thousands of views, demonstrating the broad reach of their unregistered securities marketing.

52.     Throughout late 2024 and early 2025, Defendants increased their marketing intensity with additional images suggesting imminent price appreciation, including "Taking off" and "Squid Game motto: Win big or die trying!" These promotional materials consistently emphasized potential returns while omitting disclosure of investment risks, demonstrating a clear focus on driving speculative trading without regard for investor protection.

### 2.     The FWOG Token

53.     The FWOG Token is a Solana-based memecoin created and distributed by Baton Corporation/Pump.Fun and a creator operating under the social media identity "@itsafwog." The FWOG Token was first issued, marketed, and sold by Baton Corporation/Pump.Fun on July 29, 2024. The FWOG Token is a Token, as defined herein.

54.     Through an extensive marketing campaign employing high-quality artwork, meme culture, and promises of exponential returns, the FWOG Token achieved substantial market valuation, reaching what Defendants promoted as a $500 million market capitalization. The Defendants orchestrated their marketing strategy through sophisticated visual content featuring the FWOG Token character in various scenarios designed to imply inevitable price appreciation. A description of the FWOG Token marketing on X / Twitter is attached as Exhibit H.

55.     Baton Corporation/Pump.Fun and @itsafwog deliberately positioned themselves as both the issuer and statutory seller of the FWOG Token through their comprehensive control over FWOG Token distribution, marketing, and exchange listings. As issuers, they created and deployed the smart contract governing FWOG Token's "tokenomics," while as statutory sellers, they actively promoted and facilitated FWOG Token sales through: direct promotion of leveraged trading opportunities up to 12.5x on Bybit; organization of a $1 million trading reward pool with

Crypto.com; coordination of multiple exchange listings including Drift Protocol; management of social media marketing reaching audiences of 20,000-100,000 viewers per post; and regular updates on holder growth from 24,000 to over 70,000 holders.

56.     A detailed Howey analysis confirms the FWOG Token's status as an investment contract.

57.     With respect to the first element, investment of money, investors exchanged cryptocurrency for FWOG Tokens through multiple trading platforms. The FWOG Token offers no utility beyond speculative trading. The Defendants promoted various trading pairs and leverage options, and multiple exchange listings facilitated easy purchase access. The FWOG Token's marketing focused exclusively on trading and price appreciation potential.

58.     Second, in terms of the horizontal commonality aspect of the common enterprise, all FWOG Token holders share identical rights and risks. The FWOG Token's value was directly tied to collective trading activity. There were unified liquidity pools across exchanges, and shared benefits from exchange listings and marketing efforts. As to vertical commonality, the FWOG Token's success depends entirely on Defendants' promotional efforts. The FWOG Token's value is, and was, tied to the ability to secure exchange listings, and also to growth from 24,000 to 69,420 holders directly linked to marketing. Regular holder statistics updates that were issued by Baton Corporation/Pump.Fun and/or @itsafwog also demonstrate dependency on Defendants' promotional efforts. The FWOG Token's economics were controlled by Baton Corporation/Pump.Fun.

59.     Third, the expectation of profits was consistently emphasized through various marketing materials issued by the Defendants and/or @itsafwog. These materials included direct price comparisons with $PEPE, showing the FWOG Token outperforming a token with a multi-

billion-dollar market capitalization, suggesting potential for significant growth in the price of FWOG Tokens. Posts about "acceleration" and "going higher" were also prevalent. Images depicting rocket launches and space themes were used to convey the idea of rapid growth. Charts showing dramatic price increases were presented to potential investors. Motivational messages like "Yes you can" were paired with price graphics to encourage investment. Regular holder growth statistics were shared, implying value appreciation. The marketing also highlighted competition with other tokens.

60.    Fourth, the success of FWOG Token relied predominantly on the efforts of others, specifically the Defendants and/or @itsafwog. Their efforts included securing multiple major exchange listings to increase accessibility and trading volume. They maintained an active social media presence to engage with the community and attract new investors. They created professional marketing materials and artwork to promote the FWOG Token. They managed trading competitions and reward pools to incentivize participation and holding. They coordinated market making and liquidity to ensure smooth trading operations. They focused on building community through regular engagement with FWOG Token holders and potential investors. Lastly, they engaged in strategic partnership development with exchanges to expand the FWOG Token's reach and credibility.

61.    The Defendants and/or @itsafwog employed sophisticated marketing techniques focusing on potential returns, including: (a) high-quality artistic renderings of the FWOG character in aspirational scenarios; (b) regular updates showing rapid holder growth; (c) partnership announcements with major exchanges; (d) market cap milestone celebrations; (e) visual metaphors of growth and success; and (f) integration of leveraged trading promotions.

62.    Throughout late 2024 and early 2025, the Defendants and/or @itsafwog escalated their marketing intensity with increasingly aggressive promotions targeting rapid price appreciation. These promotions consistently emphasized potential returns while minimizing or omitting disclosure of investment risks, demonstrating a clear focus on driving speculative trading without regard for investor protection.

63.    The Defendants' and/or @itsafwog's marketing campaign maintained a unified theme of inevitable price appreciation through carefully crafted imagery and messaging including: astronomical imagery suggesting unlimited upside potential; "Acceleration" and growth-focused messaging; regular holder count updates showing rapid adoption; promotional partnerships with major exchanges; competition-focused content regarding other memecoins; and leveraged trading promotions up to 12.5x.

### 3.    The GRIFFAIN Token

64.    The GRIFFAIN Token is a Solana-based token created and distributed by Baton Corporation/Pump.Fun and a nominal creator operating under the social media identity "@griffaindotcom." The GRIFFAIN Token was first issued, marketed, and sold by Baton Corporation/Pump.Fun on November 2, 2024. The GRIFFAIN Token is a Token, as defined herein.

65.    Through a sophisticated marketing campaign combining AI technology demonstrations, automated trading promises, and coordinated social media promotion, the GRIFFAIN Token positions itself as both an investment vehicle and funding mechanism for an AI-powered trading platform. The rapid value appreciation was driven by Defendants' marketing campaign combining promises of automated profits, AI agent development, and coordinated social media promotion targeting retail investors. A description of the GRIFFAIN Token marketing on X / Twitter is attached as Exhibit I.

66.     Defendants actively promoted GRIFFAIN Token through a systematic campaign designed to drive speculative investment and platform adoption. This campaign included regular social media posts demonstrating increasingly sophisticated AI trading capabilities, including "Agent Sniper," which promises to "snipe tokens with less X SOL in the bonding curve," and "Agent Flipper," which advertises specific profit targets like "2x initials" and "10x take profit." These promotional materials consistently emphasized automated returns while minimizing investment risks.

67.     Baton Corporation/Pump.Fun is a statutory seller under Section 12(a)(1) through direct solicitation of investments via social media and substantial participation in GRIFFAIN Token development. Defendants maintained centralized control over both GRIFFAIN Token economics and platform development, evidenced by their coordination of AI agent releases, automated trading features, and development of increasingly sophisticated trading algorithms. Their marketing regularly reached massive audiences, with posts consistently achieving hundreds of thousands of views (*e.g.*, Exhibit I (202.5K views on X.com post comparing GRIFFAIN's offerings to Apple's App Store)).

68.     The GRIFFAIN Token satisfies all elements of the Howey test for classification as a security. Investors exchange cryptocurrency for the GRIFFAIN Token in transactions that constitute investments of money. While the GRIFFAIN Token provides access to the platform's AI agents, its marketing focuses predominantly on automated profit generation rather than utility, with features like "Agent Stake" promising passive returns and "Agent Flipper" advertising specific profit targets.

69.     A common enterprise exists through both horizontal commonality of investor fortunes tied to the GRIFFAIN Token's market performance and vertical commonality through

dependence on Defendants' ongoing platform development. The success of each investor's stake relies entirely on the issuer's ability to develop and maintain increasingly sophisticated AI trading capabilities, as evidenced by announcements like "Agent Sniper gets smarter" and the introduction of new automated trading features.

70.     Defendants created clear expectations of profits through systematic marketing efforts between December 2024 and January 2025. These posts show a coordinated campaign emphasizing automated returns through messages like "Hit your targets in 2025 with Agent Flipper" and specific profit metrics ("Initials at 2x, Take profit at 10x"). This messaging was reinforced by demonstrations of automated trading capabilities and AI agent development updates.

71.     The success of the GRIFFAIN Token relied predominantly on the efforts of others, specifically the Defendants' continuous platform development and AI agent deployment. Investors had no role in driving GRIFFAIN Token value beyond basic investment decisions, while Defendants maintained full control over all aspects of platform development, AI agent capabilities, and automated trading features. This control was demonstrated through regular updates about new AI agents, improved trading algorithms, and expanded platform functionality.

F.    **Pump.Fun's Standardized Infrastructure Creates Uniformity Across All Tokens**

1.    **Technical Infrastructure**

72.     Pump.Fun exercises complete control over the creation, launch, and trading of all memecoins Token on its platform through a mandatory standardized technical framework. This framework includes proprietary smart contract templates, unified pricing mechanisms, and centralized liquidity management that apply uniformly to all Tokens launched on the platform.

73.     Every Token launched on Pump.Fun must utilize the Pump.Fun's proprietary smart contract templates, which dictate the fundamental characteristics and operational parameters of the

Token. These templates are not customizable by individual developers, ensuring that all Tokens share identical technical characteristics and operational features that make them securities under federal law.

74.    Pump.Fun implements a uniform "bonding curve" pricing mechanism across all Tokens, which automatically determines Token prices based on supply and demand. This standardized pricing structure creates identical speculative characteristics across all Tokens, as early investors are incentivized by artificially low initial prices that rise automatically as more investors purchase the Token.

75.    The platform maintains centralized control over liquidity pools for every Token, determining how much liquidity is required, how it is managed, and when it can be accessed. This uniform liquidity structure ensures that all Tokens share identical trading dynamics and remain under Pump.Fun's direct control throughout their lifecycle.

76.    Token developers on Pump.Fun function merely as participants within Pump.Fun's rigid framework rather than independent issuers. These developers cannot modify the smart contract templates, alter the pricing mechanisms, or independently manage liquidity. Instead, they must operate within Pump.Fun's standardized system, which maintains uniform characteristics across all Tokens that qualify them as securities.

### 2.    <u>Universal Marketing Framework</u>

77.    Pump.Fun employs a unified marketing strategy that applies identically to all Tokens launched on its platform creating consistent expectations of profit across its entire ecosystem. Pump.Fun's promotional materials and statements are not Token-specific but rather present all Tokens as opportunities for extraordinary returns within Pump.Fun's ecosystem. However, once a Token achieves a certain level of success, as was the case with the First Convicted

Raccoon Token, the FWOG Token, and the GRIFFAIN Token, Pump.Fun issues Token-specific marketing.

78.    The platform consistently promotes specific profit metrics, such as "100x your money" and "222,222x growth," as representative possibilities for any Token launched on Pump.Fun. These statements are not presented as unique to particular Tokens but rather as inherent opportunities within the platform's ecosystem, creating uniform profit expectations across all Tokens.

79.    Pump.Fun's marketing materials emphasize platform-wide safety assurances, such as "Pump prevents rugs," which are presented as universal protections applying to all Tokens. These assurances create a unified perception of security and reliability that applies across the entire Pump.Fun platform.

80.    Pump.Fun's social media strategy amplifies this uniformity through standardized promotional tactics. Statements like "Don't miss the next 100x" and "Which coin is next?" reinforce the message that all Tokens on the platform share the same potential for explosive growth, creating identical speculative characteristics across the ecosystem.

81.    Success stories of individual Tokens achieving significant returns are consistently presented as representative examples of Pump.Fun's capabilities rather than unique occurrences. Pump.Fun explicitly frames these successes as demonstrative of what any Token on the platform can achieve, further reinforcing uniform profit expectations across all Tokens. A description of universal marketing is attached as Exhibit K.

### 3.    Uniform Economic Model

82.    Pump.Fun implements a standardized economic model that applies identical financial structures and incentives across all Tokens. This model includes a universal 1%

19

transaction fee, standardized liquidity pool requirements, and uniform Token burning mechanisms that create consistent economic characteristics across all Tokens.

83.    Pump.Fun's mandatory fee structure ensures that every Token transaction generates revenue for Pump.Fun and the Defendants, creating a direct financial interest in promoting and maintaining trading activity across all Tokens. This uniform fee collection system demonstrates Pump.Fun's and the Defendants' role as the central beneficiary of all Token trading activity.

84.    Pump.Fun employs standardized liquidity management practices, including automated liquidity pool creation, mandatory liquidity locks, and uniform Token burning schedules. These practices ensure that all Tokens maintain identical economic characteristics that make them dependent on Pump.Fun's ongoing management and support.

85.    The platform implements a uniform "graduation" process whereby Tokens meeting certain thresholds can access external exchanges. This standardized process demonstrates Pump.Fun's continued control over Token evolution and its central role in determining Token success metrics.

86.    Through this comprehensive standardization of technical, marketing, and economic elements, Pump.Fun creates an ecosystem where every Token, shares identical characteristics that qualify them as securities under federal law. Pump.Fun's uniform infrastructure ensures that all Tokens, regardless of their nominal creators, are fundamentally controlled and managed by Pump.Fun and the Defendants in a manner that satisfies the elements of the Howey test.

### G.    Howey Test Analysis For Platform-Wide Token Classification

#### 1.    Investment of Money

87.    Every transaction on Pump.Fun inherently involves an investment of money, as users must exchange cryptocurrency (typically Solana or U.S. Dollar Coin ("USDC")) for Tokens through Pump.Fun's standardized purchase mechanism. This exchange of value occurs identically

for every Token launched on Pump.Fun, creating uniform investment characteristics across all Tokens.

88.     Pump.Fun's mandatory technical framework ensures that all Token purchases follow the same process, requiring investors to commit funds through Pump.Fun's proprietary interface. This standardized purchase mechanism demonstrates that every Token transaction constitutes an investment of money under Howey, regardless of the specific Token being acquired.

89.     Significantly, Tokens launched on Pump.Fun lack any functional utility or real-world application. Pump.Fun's infrastructure and marketing exclusively emphasize speculative trading and profit potential, ensuring that all Token purchases are purely investments rather than acquisitions for use or consumption.

90.     Pump.Fun's centralized payment processing system further evidences the investment nature of all Token transactions. Pump.Fun controls the entire purchase process, collecting its mandatory 1% fee on every transaction and managing the distribution of Tokens through Pump.Fun's proprietary smart contracts.

### 2.     Common Enterprise

91.     Pump.Fun's ecosystem creates both horizontal and vertical commonality across all Tokens launched on its platform The standardized infrastructure ensures that the fortunes of all investors are inextricably linked through shared technical systems, unified marketing efforts, and centralized management of Token economics.

92.     Horizontal commonality exists through Pump.Fun's mandatory pooled liquidity system. Every Token's liquidity pool is managed according to identical rules and parameters, creating a unified framework where the success of each pool affects Pump.Fun's overall perceived stability and reliability. This shared dependency makes the fortune of each investor tied to the success of the broader Pump.Fun ecosystem.

93.     Pump.Fun's bonding curve mechanism further demonstrates horizontal commonality, as the price of each Token is determined by the collective buying and selling actions of all participants. This standardized pricing structure ensures that all investors in a given Token share in the risks and rewards created by aggregate trading activity.

94.     Further, Pump.Fun's infrastructure creates strict horizontal commonality through multiple integrated mechanisms that pool investor fortunes and create direct interdependence among all Token holders.

95.     Mandatory Unified Liquidity Pool Structure: Every Token on Pump.Fun operates through a single Token specific centralized liquidity pool that Pump.Fun exclusively controls and manages. All investors' funds for each Token are pooled into a Token-specific pool, with returns directly determined by the aggregate trading activity within that shared Token pool. This creates classic horizontal commonality where investors' fortunes are tied together through pooling arrangements.

96.     Integrated Price Impact Mechanisms: Pump.Fun's proprietary bonding curve algorithms create direct mathematical relationships between all holders of a specific Token, as every purchase or sale automatically affects the Token price for all other holders of that Token through the same unified price calculation mechanism. This automated price dependency creates the exact type of pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors that courts have recognized as horizontal commonality.

97.     Platform-Wide Liquidity Dependencies: Pump.Fun's centralized control over liquidity creates systemic interdependence, as: (a) all Token holders share the same liquidity constraints and withdrawal limitations; (b) trading activity in any Token affects the platform's overall liquidity metrics for that Token; (c) platform-wide liquidity rules and restrictions apply

uniformly to all participants and all Tokens; and (d) changes to liquidity parameters affect all Token holders simultaneously.

98.    Unified Economic Framework: Pump.Fun's mandatory economic model ensures that: (a) all Token holders are subject to the same fee structure; returns are distributed proportionally based on Token pooled trading activity; (b) Token burning mechanisms affect all holders of that Token's positions simultaneously; and (c) platform revenues directly impact all Tokens' trading parameters.

99.    This comprehensive pooling of economic interests through Pump.Fun's infrastructure creates horizontal commonality because returns were inextricably tied to the success of the common enterprise. Pump.Fun's centralized control over these pooled mechanisms further strengthens the horizontal commonality, as investors have no ability to affect their individual returns independent of the collective pool.

100.    The Pump.Fun ecosystem's horizontal commonality is further reinforced through interconnected groups on the Telegram messaging platform operated by Token developers, where: (a) developers launching Tokens through Pump.Fun consistently establish dedicated Telegram channels; (b) these groups funnel potential investors back to Pump.Fun's platform for Token purchases; (c) successful Token launches are showcased to drive additional trading volume on Pump.Fun; (d) Marketing strategies and Token developments are broadcast to drive collective trading activity; and (e) group members' fortunes are tied together through coordinated buying and selling waves.

101.    These Telegram groups function as critical components of the Pump.Fun ecosystem by: (a) creating unified market expectations among Token holders; (b) driving synchronized trading patterns on Pump.Fun's platform; (c) promoting "graduated" Tokens to secondary markets

in ways that affect all holders; (d) coordinating community actions that impact Token values platform-wide; and (e) generating network effects that influence all participants' returns.

102.    The combination of these community coordination mechanisms with Pump.Fun's closed-source, proprietary infrastructure ensures that every aspect of Token economics and holder participation is governed by unified mechanisms that create direct interdependence between all participants. This systematic integration of investor fortunes through both technical and social pooling mechanisms establishes clear horizontal commonality.

103.    Vertical commonality is established through the complete dependence of all Tokens on Pump.Fun's and/or the Defendants' ongoing efforts and management. Pump.Fun's control over technical infrastructure, marketing support, and economic parameters means that the success or failure of every Token is directly tied to Pump.Fun's efforts rather than those of individual developers.

104.    All Tokens benefit from Pump.Fun's unified promotional framework, creating additional vertical commonality. The platform's marketing efforts, including success stories and growth metrics, are presented as representative of all Tokens' potential, making every Token's success dependent on Pump.Fun's continued promotional activities. *See* Exhibit K.

### 3.    Expectation of Profits

105.    Pump.Fun creates uniform expectations of profit across all Tokens through its standardized marketing approach and technical infrastructure. Pump.Fun's promotional materials consistently emphasize extraordinary returns, with statements like "100x your money" and "222,222x growth" presented as realistic possibilities for any Token launched on the platform. *See* Exhibit K.

106.    Pump.Fun deliberately cultivates these profit expectations through a systematic marketing strategy that highlights successful Tokens as representative examples rather than

outliers. When Tokens achieve significant returns or reach large market capitalizations, Pump.Fun promotes these outcomes as demonstrative of Pump.Fun's inherent potential, encouraging investors to expect similar results from any Token. *See* Exhibit K.

107.    Pump.Fun's bonding curve mechanism is specifically designed to create profit expectations by offering lower prices to early investors and automatically increasing prices as more purchases occur. This standardized pricing structure creates identical speculative characteristics across all Tokens, as investors are uniformly incentivized by the prospect of price appreciation.

108.    The complete absence of utility across all Tokens launched on Pump.Fun further demonstrates that profit expectations are the sole motivation for investment. The platform neither requires nor encourages Tokens to have any functional purpose, instead focusing exclusively on their potential for price appreciation through speculative trading.

109.    Pump.Fun reinforces these profit expectations through platform-wide assurances about safety and reliability, such as "Pump prevents rugs." These universal guarantees are designed to create confidence in Pump.Fun's ability to generate returns across all Tokens, rather than addressing specific Token characteristics. Anti-rug statements from Pump.Fun's official account and Defendant Cohen's X / Twitter account are illustrated here:



### 4.    Efforts of Others

110.    The success of every Token launched on Pump.Fun depends on the ongoing efforts of Pump.Fun's ecosystem, which includes the inherent relationship between the technical infrastructure and the influencers or "devs," rather than the actions of individual investors. This dependency is created through Pump.Fun's mandatory technical framework, centralized control over Token economics, and unified marketing approach.

111.    Until a memecoin graduates from Pump.Fun, the nominal creators are restricted to using Pump.Fun's standardized templates and tools, remaining entirely dependent on Pump.Fun's continued operation of its technical infrastructure, management of liquidity pools, and maintenance of trading systems.

112.    Pump.Fun's centralized control extends to all aspects of Token operations, including: management of smart contract functionality; control over liquidity pools and trading parameters; implementation of Token burning mechanisms; oversight of Token graduation to external exchanges; and execution of platform-wide marketing initiatives.

113.    Investors in Pump.Fun Tokens have no meaningful control over or impact on Token success beyond basic buy and sell decisions. Pump.Fun's standardized infrastructure ensures that Token performance depends entirely on Pump.Fun's ongoing efforts to maintain its technical systems, manage liquidity, and generate trading activity through promotional efforts.

114.    Pump.Fun's marketing consistently emphasizes its role in driving Token success rather than the efforts of individual developers or investors. Success stories and profit projections are attributed to Pump.Fun's infrastructure and ecosystem rather than to specific development efforts or Token characteristics. *See* Exhibit K.

115.    Through this comprehensive control over all aspects of Token operations, Pump.Fun ensures that the success of every Token depends predominantly on Pump.Fun's and/or the Defendants' efforts rather than those of developers or investors, satisfying the final prong of the Howey test.

### H.    Baton Corporation's and Pump.Fun's Role As Issuer And Statutory Seller

#### 1.    Issuer Status

116.    Baton Corporation/Pump.Fun functions as a joint issuer of all Tokens launched on its platform by exercising comprehensive control over their creation, distribution, and ongoing operations. As alleged above, Pump.Fun's standardized infrastructure and centralized management establish it as the entity fundamentally responsible for the issuance of these securities, regardless of the nominal involvement of individual developers or influencers.

117.    Pump.Fun's role as an issuer is demonstrated through its mandatory technical framework, complete control over the economic parameters of every Token, and standardized marketing efforts as alleged above in ¶¶ 72-86, including: initial pricing and supply determinations; liquidity pool requirements and management; fee structures and distribution mechanisms; Token burning schedules and implementation; and graduation criteria for external exchange listing. *See* Exhibit K.

118.    Individual developers or influencers who launch Tokens on Pump.Fun serve merely as agents within the platform's ecosystem rather than independent issuers. These developers must use Pump.Fun's mandatory templates and tools; cannot modify core Token characteristics or economics; rely entirely on Pump.Fun's infrastructure and systems; have no control over key Token parameters or operations; and function within strict limitations set by the platform.

2.     **Statutory Seller Position**

119.    Pump.Fun qualifies as a statutory seller under Section 12(a)(1) of the Securities Act through its direct solicitation of investments and substantial participation in the sale of every Token on its platform. Pump.Fun's involvement extends far beyond providing basic infrastructure, as it actively promotes, facilitates, and profits from all Token sales.

120.    Pump.Fun directly solicits investments through comprehensive marketing campaigns that promote its entire ecosystem as a source of extraordinary returns. These solicitation efforts include: (a) platform-wide promotional statements about profit potential; (b) universal claims about Token safety and reliability; (c) consistent messaging about exponential growth opportunities; (d) strategic use of success stories to drive investment; and (e) coordinated social media campaigns and influencer partnerships.

121.    Pump.Fun's marketing creates uniform expectations of profit through statements that apply to all Tokens, such as: (a) "100x your money" and "222,222x growth" projections; (b) "Endless opportunities on Pump.Fun;" (c) "Don't miss the next 100x;" (d) "Pump prevents rugs;" and (e) regular highlighting of Tokens reaching billion-dollar valuations. *See* Exhibit K.

122.    Pump.Fun's substantial participation in Token sales is evidenced by its: (a) control over the entire purchase and sale process; (b) management of all technical aspects of transactions; (c) operation of mandatory liquidity pools; (d) implementation of bonding curve pricing; and (e) collection of transaction fees on all trades.

123.    Pump.Fun maintains direct financial interest in all Token sales through: (a) mandatory 1% transaction fee on all trades; (b) control over liquidity pool management; (c) benefits from increased trading volume; (d) profits from secondary market activity; and (e) revenue from Token graduation processes.

124.    Pump.Fun's systematic approach to solicitation and sales demonstrates that it functions as a statutory seller for every Token, as evidenced by: (a) unified marketing approach across all Tokens; (b) standardized sales processes and mechanisms; (c) centralized control over trading parameters; (d) consistent fee collection and revenue generation; and (e) ongoing involvement in secondary market activities.

125.    Pump.Fun's role extends beyond initial Token sales to include substantial participation in secondary market trading through: (a) management of ongoing liquidity provisions; (b) control over Token burning mechanisms; (c) implementation of graduation criteria; (d) facilitation of external exchange listings; and (e) continued marketing and promotional efforts.

126.    Pump.Fun's status as a statutory seller is further confirmed by its active role in: (a) setting and adjusting Token prices through bonding curves; (b) managing trading parameters and restrictions; (c) implementing platform-wide trading rules; (d) controlling Token supply through burning mechanisms; and (e) determining Token availability and accessibility.

127.    Through this comprehensive involvement in Token issuance and sales, Baton Corporation/Pump.Fun establishes itself as both the issuer and statutory seller of every Token launched on its platform. Pump.Fun's centralized control, active solicitation efforts, and substantial participation in all aspects of Token operations satisfy the legal requirements for both issuer and statutory seller liability under federal securities laws.

## V.    **CLASS ACTION ALLEGATIONS**

128.    The Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of the Tokens and who were damaged thereby (the "Class"). Defendants and Defendants' immediate families, legal representatives, agents, directors, officers, heirs, successors, or assigns, and any entity in which any of the foregoing have or had a controlling interest are excluded from the Class.

129.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. For example, several blockchain analysis websites show that more than 174,000 crypto wallets hold just the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token.[1] Members of the Class may be identified by Defendants' own databases, cryptocurrency exchange databases, and blockchain data. Upon information and belief, Tokens were held by hundreds or thousands of individuals located geographically throughout the United States and the world. Joinder would be highly impracticable.

130.    Plaintiff's claims are typical of those of the Class because Plaintiff purchased the Tokens which are and were unregistered securities, and sustained damages from Defendants' wrongful conduct complained of herein.

131.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel who are competent and experienced in securities class action litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

132.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

  a)    Whether the Tokens are securities under the Securities Act;

---

1 *See* https://solscan.io/token/CNvitvFnSM5ed6K28RUNSaAjqqz5tX1rA5HgaBN9pump; https://solscan.io/token/A8C3xuqscfmyLrte3VmTqrAq8kgMASius9AFNANwpump; and https://solscan.io/token/KENJSUYLASHUMfHyy5o4Hp2FdNqZg1AsUPhfH2kYvEP. (Last accessed January 30, 2025).

b)    Whether Defendants' offerings and sales of the Tokens violated the Securities Act;

c)    Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

133.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

134.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

135.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action as a class action.

## VI.    CAUSES OF ACTION

### COUNT I
**For Violations of Sections 5 and 12(a)(1) of the Securities Act
Against Baton Corporation**

136.    Plaintiff and the Class repeat and reallege each and every allegation contained above as if fully set forth herein.

137.    This Count is asserted against Baton Corporation, who conducts business and operates as Pump.Fun, and is based upon Sections 5 and 12(a)(1) of the Securities Act.

138.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

139.    For purposes of asserting this Count, Plaintiff do not allege that Baton Corporation acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(1) claim.

140.    The Tokens are, and were, securities as defined by the Securities Act.

141.    The Tokens were never registered as securities with the SEC, and no registration statement has ever been filed with the SEC for the Tokens.

142.    Baton Corporation is a statutory seller of the Tokens because Pump.Fun, which it owns, controls, and does business as, sold, promoted, or solicited the sale of the Tokens and/or passed titled to the Tokens to the Plaintiff and the Class.

143.    Baton Corporation and Pump.Fun began operating and issuing Tokens on January 19, 2024. Baton Corporation has issued, offered, promoted, sold, and/or solicited the sale of Tokens within the last year. For example, Baton Corporation and Pump.Fun began offering the FRED Token, the FWOG Token, and the GRIFFAIN Token for sale on October 31, July 29, and November 2, 2024, respectively.

144.    Baton Corporation is therefore liable to the Plaintiff and the Class for recission and/or rescissory or compensatory damages in an amount to be determined at trial for Plaintiff and the Class's purchases of the Tokens.

145.    Plaintiff and the Class hereby tender their Tokens back to Baton Corporation and/or Pump.Fun.

## COUNT II
### For Violations of Sections 15 of the Securities Act
### Against Alon Cohen, Dylan Kerler, and Noah Bernhard Hugo Tweedale

146.    Plaintiff and the Class repeat and reallege each and every allegation contained above as if fully set forth herein.

147.    This Count is asserted against the Control Person Defendants Alon Cohen, Dylan Kerler, and Noah Bernhard Hugo Tweedale, and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

148.    Section 15 of the Securities Act provides that:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

149.    Due to the Control Person Defendants' ownership interest in and control over Baton Corporation, the Control Person Defendants acted as controlling persons of Baton Corporation within the meaning of Section 15 of the Securities Act. By virtue of their positions as executives, founders, and/or controlling shareholders of Baton Corporation and their participation in and/or awareness of the Company's operations, the Control Person Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making relating to the issuance, sale, marketing, and solicitation of the sale of the Tokens and the failure to register the Tokens with the SEC.

150.    By virtue of the foregoing, the Control Person Defendants are jointly and severally liable with Baton Corporation to Plaintiff and the Class as control persons under Section 15 of the Securities Act.

151.    As such, the Control Person Defendants are liable to Plaintiff and the Class for recission and/or rescissory or compensatory damages in an amount to be determined at trial for Plaintiff and the Class's purchases of the Tokens.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.    Declaring this action to be a proper class action under Rule 23, certifying Plaintiff as a class representative under Rule 23, and designating Counsel as class counsel;

B.    Awarding Plaintiff and the Class damages in an amount that may be proven at trial, together with interest thereon;

C.    Awarding Plaintiff and the Class their reasonable attorneys' and experts' witness fees and other costs;

D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest; and

E.    Awarding such other relief as this Court deems appropriate.

## VIII.    JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.


Dated: January 30, 2025                    Respectfully submitted,

**WOLF POPPER LLP**

By:    _/s/ Chet B. Waldman_
Chet B. Waldman
cwaldman@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Terrence Zhang
tzhang@wolfpopper.com
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: (212) 759-4600

*Attorneys for Plaintiff*

Max Burwick (*Pro Hac Vice* application forthcoming)
max@burwick.law
BURWICK LAW, PLLC
43 West 43rd Street, Suite 114
New York, NY 10036

*Attorneys for Plaintiff*

## <u>PLAINTIFF CERTIFICATION</u>
## <u>UNDER THE FEDERAL SECURITIES LAWS</u>

I, Diego Aguilar, hereby state:

1.      I have reviewed a draft of the foregoing Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") asserting, *inter alia*, violations of the Securities Act of 1933, and I have authorized my counsel Wolf Popper LLP and Burwick Law PLLC to file that Complaint.

2.      I did not purchase the securities that are the subject of the Complaint at the direction of my counsel or to participate in any private action arising under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.      A list of my transactions in the securities that are the subject of the Complaint are set forth in the chart attached hereto. The prices are listed in United States Dollars ($).

5.      I have not been appointed or served as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this __ 2025-01-28 _____ day of January, 2025


*Diego Aguilar*

By: _____
       Diego Aguilar

1

## <u>TRANSACTIONS IN<br>THE FIRST CONVICTED RACCOON TOKEN, THE FWOG TOKEN, AND THE<br>GRIFFAIN TOKEN</u>

| Token | Date | Transaction Type | USD Value |
|-------|------|------------------|-----------|
| FRED | 2024-12-03 | Sell | 450 |
| FRED | 2024-12-03 | Buy | 452 |
| FRED | 2024-12-02 | Sell | 1408 |
| FRED | 2024-12-02 | Buy | 1348 |
| FRED | 2024-11-27 | Sell | 13236 |
| FRED | 2024-11-23 | Buy | 383 |
| FRED | 2024-11-23 | Buy | 11480 |
| FRED | 2024-11-21 | Sell | 9975 |
| FRED | 2024-11-14 | Buy | 28243 |
| FRED | 2024-11-14 | Sell | 28341 |
| FRED | 2024-11-14 | Buy | 30322 |
| FRED | 2024-11-14 | Sell | 30432 |
| FRED | 2024-11-14 | Buy | 30288 |
| FRED | 2024-11-14 | Sell | 30260 |
| FRED | 2024-11-14 | Buy | 30760 |
| FRED | 2024-11-13 | Sell | 30853 |
| FRED | 2024-11-13 | Buy | 27836 |
| FRED | 2024-11-13 | Sell | 10964 |
| FRED | 2024-11-13 | Buy | 10662 |
| FRED | 2024-11-13 | Sell | 824 |
| FRED | 2024-11-13 | Buy | 847 |
| FRED | 2024-11-02 | Sell | 1533 |
| FRED | 2024-11-02 | Buy | 1465 |
| FWOG | 2024-10-12 | Sell | 2889 |
| FWOG | 2024-10-12 | Buy | 2920 |
| Griffain | 2024-12-11 | Sell | 1806 |
| Griffain | 2024-12-11 | Buy | 1752 |
| Griffain | 2024-12-06 | Sell | 10611 |
| Griffain | 2024-12-06 | Buy | 6544 |
| Griffain | 2024-12-06 | Buy | 4943 |
| Griffain | 2024-12-06 | Sell | 4966 |
| Griffain | 2024-12-06 | Buy | 4943 |

2

# Audit trail

## Details

| | |
|---|---|
| FILE NAME | DA_Pump Fun_Plaintiff PSLRA Certification form.docx - 1/28/25, 9:04 PM |
| STATUS | ● Signed |
| STATUS TIMESTAMP | 2025/01/29 02:33:46 UTC |

## Activity

| | | |
|---|---|---|
| ⟶ SENT | pete@burwick.law **sent** a signature request to:<br>• Diego Aguilar (aguilardiego5781@gmail.com) | 2025/01/29 02:04:45 UTC |
| SIGNED | **Signed** by Diego Aguilar (aguilardiego5781@gmail.com) | 2025/01/29 02:33:46 UTC |
| ⊘ COMPLETED | This document has been signed by all signers and is **complete** | 2025/01/29 02:33:46 UTC |

The email address indicated above for each signer may be associated with a Google account, and may either be the primary email address or secondary email address associated with that account.