UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIEGO AGUILAR, KENDALL CARNAHAN and MICHAEL OKAFOR on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BATON CORPORATION LTD, d/b/a PUMP.FUN, ALON COHEN, DYLAN KERLER, and NOAH BERNHARD HUGO TWEEDALE, SOLANA LABS INC., SOLANA FOUNDATION, JITO LABS INC., JITO FOUNDATION, ANATOLY YAKOVENKO, RAJ GOKAL, DAN ALBERT, AUSTIN FEDERA, LILY LIU, LUCAS BRUDER, BRIAN SMITH <br><br> Defendants. | Case No.: 1:25-cv-00880-CM-BCM <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

NATURE OF THE ACTION ........................................................................................ 4

PARTIES ..................................................................................................................... 10

JURISDICITION AND VENUE ................................................................................. 14

BACKGROUND ......................................................................................................... 16

I.  BLOCKCHAINS, SOLANA, THE ROLE OF THE SOL TOKEN AND CRYPTO
WALLETS .................................................................................................................. 16

    A.  Introduction to Blockchain ............................................................................ 16

    B.  The Solana Blockchain & The SOL Token ................................................... 17

    C.  Crypto Wallets and Accessing Blockchain Software .................................... 18

    D.  Solana's History of Regulatory Evasion: ...................................................... 19

    a.  Arbitrage in the Crypto Industry ................................................................... 19

    E.  Solana's Dual-Entity Structure: Labs and Foundation .................................. 20

    F.  Avoiding Securities Laws from Day One ....................................................... 20

    G.  How This Setup Enabled FTX, NFTs, and Pump.fun ................................... 21

    H.  Legal Relevance: Foreseeability, Enterprise Intent, and Continuity ............ 22

II. SOLANA'S HISTORY OF SPECULATIVE SCHEMES AND RETAIL HARM ... 22

    A.  The 2021 NFT Boom and Bust: A Precursor to Pump.fun's Model .............. 23

    B.  The FTX/Alameda Collapse and Solana's Role ............................................ 25

    C.  A Pattern of Conduct and Systemic Incentives ............................................. 26

III. THE MEMECOIN MACHINE ............................................................................. 27

    A.  Introduction to Pump.fun ............................................................................... 27

    B.  Pump.fun's Retail Trading Interface .............................................................. 29

    C.  Pump.fun's Meme coin Marketing: Venture Like Investments ...................... 35

    D.  Pump.fun and Pump.fun's Founders Describe Pump.fun as a Casino ........... 38

    E.  Pump.fun Marketing: Celebrity Meme Coins ................................................ 39

    F.  Anonymous Access and the Pseudonymous Casino: No KYC, No Oversight, No
Accountability .......................................................................................................... 42

    G.  Meme coin Slot Machine: Exit Liquidity Gambling .................................... 44

IV. THE FALSE "FAIR LAUNCH" NARRATIVE AND WIRE FRAUD SCHEME ... 45

V. INTELLECTUAL PROPERTY THEFT AND PLATFORM-AIDED IMPERSONATION . 48

    A.  Impersonation of Registered Publicly Traded Companies and Privately Held
Corporations ............................................................................................................ 48

    B.  Unlicensed Use of Celebrity and Politician Meme coins ............................. 51

    C.  Pump.fun Launches, Sells, and Exchanges Counterfeit Digital Assets ........ 52

    D.  Pump.fun Launched, Exchanged and Managed Meme Coins That Harass Law Firms,
Lawyers, Plaintiffs, And Act To Intimidate Lawyers' Families ...................... 53

E.    Pump.fun's Trademark Policy and Knowing Facilitation of Infringement .............. 55

VI. PUMP.FUN, JITO LABS, AND SOLANA LABS OPERATE AN UNLICENSED MONEY

TRANSMISSION BUSINESS ........................................................................................ 56

A.    Use of Pump.fun to Launder Sanctioned Funds by the Lazarus Group .................. 56

B.    Unlicensed Operation of Money-Transmitting Business ........................................ 58

VII. OPERATION OF AN ILLEGAL GAMBLING ENTERPRISE ........................................ 60

VIII. THE ROLES OF SOLANA LABS AND JITO LABS IN THE RICO ENTERPRISE ...... 62

A. Solana Labs and the Solana Foundation: ...................................................... 62

I. Organizational Structure and Purpose .......................................................... 62

II. Solana's SPL Token Standard ....................................................................... 63

III. Interdependence Between Solana Labs, Jito Labs, and Pump.fun ............................ 64

B. Defendant Jito Labs, Inc. ............................................................................... 65

I.    The Role of Jito Labs in the Pump Enterprise: Formation, Control, and Alignment

with Solana Labs ........................................................................................... 65

II.    Jito Labs' Infrastructure and MEV Execution Engine ........................................ 66

III. Integration with and Enablement of Pump.fun .................................................. 67

IV. Revenues and Profits from Pump.fun-Related Activity ........................................ 68

V. Co-Dependence on Solana Labs and Participation in the Enterprise ......................... 69

C.    A Coordinated and Profitable Racketeering Enterprise ...................................... 70

IX. THE PROFITEERS AND THE VICTIMS ................................................................... 71

A. Investor Losses ............................................................................................ 71

B. Solana Labs and the Solana Foundation: Direct Financial Gains ............................... 71

C. Jito Labs: MEV Extraction and Windfall Profits ................................................. 72

D. Pump.fun: Platform Revenues and Windfall Profits ............................................. 75

E. Solana Insiders: Who Profited and How .......................................................... 76

F. Retail Trader Estimated Losses ..................................................................... 78

X. PUMP.FUN SOLD CERTAIN UNREGISTERED SECURITIES ....................................... 83

A. Pump.fun's Role as Issuer and Seller ............................................................. 83

B. Plaintiffs Do Not Contend That All Pump.fun Issued Tokens Are Securities ............. 83

C. Pump.fun Sold as Investment Contract Securities ............................................... 84

D. Pump.fun's Fees, and Structural Exploitation .................................................... 85

CLASS ACTION ALLEGATIONS ................................................................................. 86

CAUSES OF ACTION ................................................................................................. 89

COUNT I ................................................................................................................. 89

Violation of Section 12(a)(1) of the Securities Act of 1933 (Against Defendants Pump.fun

Alon Cohen, Dylan Kerler, and Noah Bernhard Hugo Tweedale) on Behalf of the Pump

Tokens Subclass .......................................................................................... 89

A.    No Exemption from Registration is Applicable ................................................. 96

COUNT II ............................................................................................................... 97

Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) & 1962(d) (Against All Defendants As To All Tokens and the Class, And In The Alternative, With Respect To The Pump Tokens and the Pump Tokens Subclass).. 97

COUNT III ................................................................................................................ 107

Violation of New York General Business Law §§ 349 & 350 (Deceptive Acts and False Advertising) (Against All Defendants on Behalf of New York Residents of the Class) 107

PRAYER FOR RELIEF ............................................................................................... 109

Appointment of a Federal Equity Receiver .................................................. 110

Injunctive & Declaratory Relief ................................................................... 111

Ancillary Relief ............................................................................................ 112

JURY DEMAND ......................................................................................................... 113

Plaintiffs Diego Aguilar, Kendall Carnahan, and Lead Plaintiff Michael Okafor (collectively, the "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsels' investigation, which includes, without limitation, review and analysis of press releases, news articles, websites, blockchain forensic analysis, and other publicly available information concerning the Defendants (as defined herein), the platform Pump.fun, and cryptocurrency meme coins or tokens that were issued by, promoted by, or sold by the certain of the defendants through Pump.fun, or for which certain of the defendants solicited the sale of through Pump.fun (collectively, the "Tokens").

## NATURE OF THE ACTION

1.      This action is brought by, and on behalf of, victims of a coordinated racketeering enterprise designed to simulate the functions of a digital casino operated illegally under the guise of meme coin creation and trading. At the center of this enterprise is Pump.fun, a platform presented to users as a fair and decentralized system for launching and trading meme coins on the Solana blockchain. In truth, Pump.fun is merely the front-facing slot machine cabinet, operated as part of a broader illegal gambling and money transmission scheme engineered and maintained jointly by Pump.fun, Jito Labs, Inc. ("Jito Labs"), Jito Foundation, Solana Labs, Inc. ("Solana Labs"), and the Solana Foundation (collectively, with the Individual Defendants set forth below, the "Meme Coin Casino" or the "Pump.fun Casino").

2.      The Meme Coin Casino, with certain exceptions described below, was not investment opportunity, nor financial innovation—it was gambling.

3.      Exit liquidity gambling is a digital wagering scheme in which users buy speculative meme coins not for their underlying value, but in hopes of reselling them at a higher price before the price collapses. The game depends entirely on timing: participants who enter early may sell at a profit to later buyers, while those who enter late are left holding worthless tokens. The token's price increases as more users buy in and collapses when early holders "exit" by selling, making the new entrants the "liquidity" for those exits. These transactions typically occur within minutes of a token's launch, and in nearly all cases the token's value evaporates within 24 hours.

4.      The structure mimics a rigged slot machine where the first few players win by dumping their tokens on later ones. There is no underlying project, product, or revenue—only a fast-moving cycle of buying, dumping, and collapse. Platforms like Pump.fun automate this dynamic through bonding-curve pricing, anonymous wallet access, and priority trading for insiders and bots, turning the process into a form of unlicensed, zero-sum gambling where the odds are overwhelmingly against the average participant.

5.      Each defendant contributed technology and business expertise to the Meme Coin Casino.[1]

6.      Pump.fun built and operated the interactive, user-facing slot machine—the public interface that allowed users to "pull the handle" by depositing SOL currency in exchange for newly launched tokens. Pump.fun designed their prize to be a non-deterministic, nearly-impossible-to-predict outcome, most often resulting in their initial wager becoming valueless.  Pump.fun designed the gambling mechanics to be structurally exploitable, and Jito Labs served the role of rigging the games.

---

[1] https://defillama.com/chain/solana

7.      Jito Labs monitored the spins and intercepted profitable transactions – the "winning spins" – and sent them to whoever bribed them the most.

8.      Solana Labs and the Solana Foundation provided the venue—the Solana blockchain itself—and monetized each wager through the sale of block space, validator fees, and SOL token appreciation.

9.      The entire Solana ecosystem is monetized not on utility or economic productivity but on driving transaction volume. More transactions mean more bribing opportunities, higher SOL prices, and more speculative capital inflows. Defendants thus created a business model premised on flooding the crypto market with junk assets designed only to provoke speculative trading and churn. The Pump.fun Casino was the most efficient implementation of this vision to date.

10.      As of July 2025, the top 19 revenue-generating apps on Solana are operated by Pump.fun, Jito Labs, or are trading tools, bots, or wallets that exist to facilitate exit liquidity gambling in Pump.fun meme coins.

11.      Pump.fun has generated $722.85 million from the illegal gambling enterprise.

12.      The illegal casino has earned more than $3.18 billion in revenue across the Solana technologies responsible for facilitating the gambling operation. *Id.* Pump.fun and Jito Labs have become the dominant economic engines of the Solana blockchain.

13.      In contradiction to public narratives, during 2024 82% of all tokens traded on the Solana blockchain software were attributed to the Pump.fun Casino operations. At times earning Pump.fun more than $5 million per day in fees.[2]

---

[2] https://cointelegraph.com/news/solana-dex-volume-record-high-sol-price-to-300

14.     Jito's front-running technology, aka, MEV-enabled validator client, captured over $633 million in user-paid tips—of which Jito retained 5%-6%—as traders paid bribes to prioritize their transactions amid the gambling frenzy.

15.     Pump.fun and Jito earn revenue by charging fees on trades or swaps enabling the exit liquidity gambling, making their business models directly dependent on the volume and velocity of Pump.fun meme coin trading.

16.     Similar to branded slot machines in casino, Pump.fun offered, at a minimum four recurring categories: (i) certain tokens (specified herein) that amounted to unregistered securities, promising or implying profit-sharing or investment return; (ii) celebrities or influencers meme coins, often created and monetized without their consent or disclosure; (iii) tokens that blatantly infringed on intellectual property rights, using copyrighted content, trademarks, and brand likenesses to attract attention; and (iv) tokens marketed as pure speculative "memes".

17.     Transaction volume is critically important to Solana Labs and the Solana Foundation because it directly determines the value of blockspace on the Solana network, which in turn drives demand for SOL, the network's native token. All transactions on Solana require users to pay fees in SOL to access blockspace—a finite and monetized resource allocated to validators.

18.     As transaction volume rises, so does competition for blockspace, increasing the fees paid to validators and boosting staking yields. Solana Labs and the Solana Foundation benefit financially from this mechanism: they control large SOL reserves, operate validators, and earn direct rewards and appreciation as SOL becomes more valuable. Higher blockspace demand not only increases protocol revenues but also inflates the market price of SOL, enabling these

Defendants to extract outsized returns from retail activity, even when such activity involves unregistered securities, scams, or gambling mechanics.

19.     Creating artificial transaction volume to inflate the value of blockspace and drive SOL demand is not new for the Solana Defendants. In 2021, Solana Labs and the Solana Foundation orchestrated the NFT boom on Solana by promoting a frenzy of tokenized JPEGs they branded as "art" or "community" assets.

20.     In substance, these NFTs operated as pseudo-securities: investors bought them based on promotional promises of future value, exclusive benefits, or roadmap-based gains—classic hallmarks of an investment contract. Yet Solana avoided regulatory scrutiny by rebranding them as culture or collectibles. The result was a manufactured secondary market that exploded in volume, enriched Solana insiders through validator fees and token appreciation, and collapsed as quickly as it rose. Just like with meme coins, Solana Labs and the Foundation made a killing by selling blockspace; and just like with meme coins, retail investors lost their shirts.

21.     The illegal nature of the scheme is not limited to its gambling operations. Defendants also violated multiple state and federal laws in executing their enterprise. Pump.fun routinely facilitated the creation and sale of unregistered securities, as defined under the Howey test and described below, without registration statements, risk disclosures, or compliance with securities laws. The interface misrepresented the fairness of launches and concealed the economic mechanics of token distributions, including the risks and asymmetries built into the system.

22.     The transactional routing model employed by Jito Labs qualifies as an unlicensed money transmission system under federal and state law. Funds were received from users, transferred via smart contracts and validator systems, and delivered to project creators, LP pools,

or early sellers—without registration as a money transmitter and without compliance with Bank Secrecy Act obligations.

23.     Defendants operated an illegal gambling business under federal law, offering a game of chance—meme coin outcomes—where users paid for the chance to profit, and the Defendants took rake in the form of launch fees, transaction fees, validator fees, and ecosystem incentives. This conduct meets the statutory elements of illegal gambling under 18 U.S.C. § 1955.

24.     Plaintiffs and class members were funneled into an exploitative gambling mechanism disguised as innovation or, in certain instances, legitimate securities. They contributed real value—SOL, brand equity, and platform engagement—into a system designed to extract maximum fees while offering no transparency, no protections, and no meaningful chance of gain.

25.     Defendants' actions were not isolated or accidental. The Pump.fun Casino enterprise operated continuously across hundreds of millions of transactions and tens of millions of discrete token launches, with each Defendant entity contributing infrastructure, marketing support, technological development, and economic routing essential to the scheme. This constitutes a continuous pattern of racketeering activity under 18 U.S.C. § 1961(5).

26.     Plaintiffs now seek to hold Defendants accountable. This action alleges violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c) and (d)), through operation of an unlicensed money transmitting business (18 U.S.C. § 1960), illegal gambling (18 U.S.C. § 1955), wire fraud (18 U.S.C. § 1343), false advertising, copyright and trademark infringement, and right of publicity violations, as well as the sale of certain unregistered securities, and deceptive acts and practices under New York law all unjustly enriching the Defendants.

27.    The conduct at issue here is not just a failure of crypto regulation—it is the reintroduction of casino gambling under the false pretense of decentralized technology. Defendants sold that illusion to the public, and they must now answer for it.

## PARTIES

28.    Lead Plaintiff Michael Okafor purchased and sold multiple "fair-launch" tokens created on the Pump.fun platform between March 2024 and January 2025. Plaintiff Okafor suffered substantial monetary losses when those tokens collapsed within days or weeks of issuance, and paid for priority blockspace via transaction and bundling fees ("priority fees") charges that flowed to Defendants Solana Labs, Pump.fun, and Jito Labs. Lead Plaintiff Okafor is a natural person and resident of the United States who purchased "Pump Tokens" during the Class Period (both defined below) and suffered financial losses totaling approximately $242,076.74. He brings this action individually and in a representative capacity on behalf of all others similarly situated.

29.    Plaintiff Diego Aguilar purchased and sold multiple "fair-launch" tokens created on the Pump.fun platform, including the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token, all of which are Pump Tokens, and was damaged thereby.

30.    Plaintiff Kendall Carnahan purchased and sold PNUT Tokens created on the Pump.fun platform and was damaged thereby.

31.    Defendant Solana Labs, Inc. ("Solana Labs") is a Delaware corporation formed in 2018 with offices in New York and San Francisco. Solana Labs develops and licenses the core Solana validator and runtime software, sells "priority blockspace" to order-flow partners such as Pump.fun and Jito Labs, and holds substantial reserves of the native SOL token. Defendants Anatoly Yakovenko (Chief Executive Officer) and Raj Gokal (President/Chief Operating Officer)

are co-founders and controlling officers of Solana Labs. Solana Labs also directs and knowingly participates in the affairs of the "Pump Enterprise" (defined below) at all relevant times hereto, as detailed herein.

32.     Defendant Solana Foundation is a not-for-profit foundation organized under the laws of the Canton of Zug, Switzerland, with its registered office at Industriestrasse 47, 6300 Zug. The Foundation funds companies that grow user demand for Solana blockspace, markets Solana blockspace, and stewards a multibillion-dollar SOL treasury. Defendants Dan Albert, Executive Director of the Foundation, Austin Federa, former Head of Strategy of the Foundation, and Lily Liu, President of the Management of the Foundation, are each named in their individual capacity for directing and supervising the Foundation's grants, marketing campaigns, and relationships with Pump.fun, Jito Labs, and Solana Labs. Solana Foundation also directs and knowingly participates in the affairs of the Pump Enterprise at all relevant times hereto, as detailed herein.

33.     Defendant Baton Corporation, LTD ("Pump.fun") is a private company organized under the laws of England and Wales (Company No. 14743013), with its registered office at 82A James Carter Road, Mildenhall, Bury St Edmunds, Suffolk IP28 7DE, United Kingdom, and its principal place of business in Brighton & Hove, United Kingdom. Pump.fun operates the eponymous web application that mass-produces "meme-coins," imposes a 1% transaction rake, and routes every order to Solana's priority-fee market. Pump.fun also directs and knowingly participates in the affairs of the Pump Enterprise at all relevant times hereto, as detailed herein. Its three co-founders are:

- Defendant Alon Cohen, a resident of London, United Kingdom and Pump.fun's public-facing Chief Executive;

- Defendant Noah Tweedale, a resident of Brighton & Hove, United Kingdom; and

- Defendant Dylan Kerler (a/k/a "Dylan Phoon"), a resident of London, United Kingdom, who has a documented history of prior "rug-pull" schemes.[3]

34.    Each founder exercised operational control over Pump.fun and personally promoted the platform as a trading venue and casino, thereby luring retail users into unlawful wagering.

35.    Defendant Jito Labs, Inc. ("Jito Labs") is a Delaware corporation formed in 2021 with offices in Arlington, Virginia and Austin, Texas. Jito Labs builds the "Jito-Solana Block Engine," an off-chain order-routing system that sells preferential block-inclusion rights and captures maximal-extractable-value ("MEV") on behalf of Solana stakers. Jito Labs also directs and knowingly participates in the affairs of the Pump Enterprise at all relevant times hereto, as detailed herein. Defendant Lucas Bruder, a resident of Austin, Texas, is Jito Labs' Chief Executive Officer and co-founder.

36.    Defendant Jito Foundation is a Cayman Islands foundation company with its registered office at Harbour Centre, 159 Mary Street, George Town, Grand Cayman KY1-9006. The Foundation holds the intellectual property for Jito's validator fork, administers the native governance token ("JTO"), and finances grants that expand Jito-controlled MEV infrastructure. Jito Foundation also directs and knowingly participates in the affairs of the Pump Enterprise at all relevant times hereto, as detailed herein.  Defendant Brian Smith, a resident of the United States, is the former Chief Operating Officer of Jito Labs, Inc. and the current Executive Director of Jito Foundation.

---

[3] https://protos.com/pump-fun-co-founder-dylan-kerler-linked-to-2017-ico-scams-report/

37.     Plaintiffs also name the following officers and directors (collectively, the "Individual Defendants"), each of whom directed and exercised decision-making authority over the Pump Enterprise that gave effect to the racketeering scheme alleged herein:

38.     Defendant Anatoly Yakovenko is, and at all times relevant to this complaint was, the Chief Executive Officer of Solana Labs. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

39.     Defendant Raj Gokal is, and at all times relevant to this complaint was, the President and Chief Operating Officer of Solana Labs. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

40.     Defendant Dan Albert is, and at all times relevant to this complaint was, the Executive Director of Solana Foundation. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

41.     Defendant Austin Federa is, and at all times relevant to this complaint was, the former Head of Strategy of Solana Foundation. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

42.     Defendant Lily Liu is, and at all times relevant to this complaint was, the President of the Management of Solana Foundation. She also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

43.     Defendant Alon Cohen is, and at all times relevant to this complaint was, the Chief Executive Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

44.     Defendant Noah Tweedale is, and at all times relevant to this complaint was, the Chief Product Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

45.     Defendant Dylan Kerler is, and at all times relevant to this complaint was, the Chief Technology Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

46.     Defendant Lucas Bruder is, and at all times relevant to this complaint was, the Chief Executive Officer of Jito Labs. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

47.     Defendant Brian Smith is, and at all times relevant to this complaint was, the former Chief Operating Officer of Jito Labs, and current Executive Director of Jito Foundation. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

48.     Each Individual Defendant is sued in both his/her individual and official capacities for acts undertaken in the course and scope of the Enterprise.

## JURISDICITION AND VENUE

49.     Solana Labs and the Solana Foundation both maintain a physical presence at 141 East Houston Street, New York, NY, located in the Southern District of New York.

50.     In or around 2022, Solana Labs signed a 10-year commercial lease for the 6th through 9th floors of 141 East Houston Street, converting the former Sunshine Cinema into its New York headquarters.

51.     The Solana Foundation operates from the same location and publicly refers to its presence as the "Solana Event Space." On August 6, 2024, the Foundation hosted its "DePIN Day"

event on the 8th floor of the building and issued a press advisory listing Executive Director Defendant Dan Albert as host, alongside elected officials from New York City.

52.     Multiple business publications, including Crain's New York Business, Decrypt, and Empire Report, confirm that both Solana Labs and the Solana Foundation operate and maintain regular business activities from this location.

53.     In addition to occupying office space in Manhattan, Solana Labs employs a large team of engineers working from New York. Open-source analysis of Solana Labs' public GitHub repository reveals that at least 32 Solana Labs engineers list New York as their employment location and collectively authored over 8,100 Git commits, accounting for 39% of the total code contributions to the Solana protocol.

54.     GitHub is a platform used by software engineers to host code repositories and track updates to open-source software. A "Git commit" is a time-stamped and cryptographically verifiable record of code written or updated by a contributor.

55.     These commit records confirm that a substantial portion of Solana's protocol development is performed by engineers employed by Solana Labs and physically located in the Southern District of New York.

56.     Because Solana Labs and the Solana Foundation both operate, maintain staff, host events, and manage infrastructure from New York City, a substantial portion of the enterprise alleged herein was conducted within this judicial district.

## BACKGROUND

I.    **BLOCKCHAINS, SOLANA, THE ROLE OF THE SOL TOKEN AND CRYPTO WALLETS**

A.  **Introduction to Blockchain**

57.    Blockchain networks are decentralized digital ledgers that maintain a tamper resistant record of transactions across a distributed network of nodes. Each block of data is cryptographically linked to the prior block, forming a continuous chain of records that cannot be altered retroactively without invalidating the entire sequence.

58.    Unlike centralized databases, public blockchains achieve consensus through collective agreement among network participants. New transactions are verified, ordered, and confirmed according to an open consensus protocol, without the need for a central operator. Once a block is finalized, it becomes a permanent part of the blockchain's transaction history.

59.    Blockchains can be designed founders and developers to be "permissioned" or "permissionless", distinctions that fundamentally shape their accessibility and governance. Permissioned blockchains restrict participation to authorized entities, enabling networks with controlled access for enhanced compliance. In contrast, permissionless blockchains, such as Bitcoin, allow anyone to join as a user, validator, or developer without prior approval, targeting censorship resistance.

60.    Retail participants on a blockchain submit transactions using a cryptocurrency wallet ("wallet"). A wallet functions as the digital equivalent of a combined bank account and signature card, permitting the controller of the wallet to easily receive, hold, and transfer digital assets on a blockchain network.

**B.  The Solana Blockchain & The SOL Token**

61.    The Solana blockchain is a high-performance, smart contract–enabled protocol built to support scalable software applications hosted on the Solana network. Solana was designed to be a permissionless blockchain where users do not require permissioning or whitelisting to submit transaction to create applications, transfer assets, or validate transactions. Any person with an internet connection and compatible hardware can join the network, participate in consensus, or deploy smart contracts. This open-access architecture eliminates gatekeeping akin to traditional finance.

62.    Solana's native token, "SOL", is required for all core network functions. Introduced in March 2020, SOL serves as the primary medium for paying transaction fees, staking, and interacting with decentralized applications built on the network. Every transaction executed on Solana incurs a fee paid in SOL. These fees are distributed to validators as compensation for processing and confirming network activity. In addition, users may delegate their SOL to validators in Solana's PoS system, earning staking rewards while contributing to the network's security.

63.    SOL also functions as a unit of account across Solana's DeFi protocols, NFT marketplaces, and decentralized applications. It is used to settle trades, purchase digital assets, and post collateral. In some implementations, SOL may be used to participate in governance decisions, including votes on protocol upgrades and parameter adjustments.

64.    SOL's value is derived from its role as the gateway to blockspace. As more applications launch on Solana, and as transaction volume increases, demand for priority blockspace rises proportionally, as do the fees paid to holders of staked SOL. SOL's value is

further reinforced by staking incentives, supply-limiting token burns, and a declining inflation schedule designed to reduce annual issuance over time.

### C. Crypto Wallets and Accessing Blockchain Software

65.     A cryptocurrency wallet functions as the digital equivalent of a combined bank account and signature card, permitting the holder to receive, hold, and transfer digital assets on a blockchain network.

66.     Creating a wallet on Solana is instantaneous. The process typically involves downloading a browser extension or mobile application (such as Phantom or Solflare), clicking "Create Wallet," and saving a system-generated 12- or 24-word recovery phrase, also known as a seed phrase.

67.     This phrase functions as a master password; anyone who possesses it gains access and control over the associated wallet's pairs of private keys and public keys.

68.     There is no Know Your Customer ("KYC") screening, no age verification, and no record of real-world identity. A user can generate unlimited wallets pseudonymously, from any internet-connected device, with no oversight or restriction.

69.     Once created, a wallet acts as the user's digital identity on the blockchain. The public keys are used to receive funds—comparable to providing an account number and routing instructions—while the private key authorizes transfers, trades, and other transactions that are initiated by the wallet.

70.     On the Solana blockchain, wallets are the primary mechanism for retail investors to access and interact with the network and initiate any form of financial or transactional activity.

71.     Similar to using a Gmail account to log-in on a website, a wallet can be used to access "blockchain applications", like the Pump.fun slot machine.

72.     Minors using the Pump.fun software have launched tokens, receive SOL contributions from others, and extract value from the system without ever verifying their age, identity, or capacity to contract.

73.     Users can initiate trades, create tokens, or conduct financial transactions without any of the standard protections found in regulated finance.

74.     Platforms like Pump.fun rely on this system to operate at scale. Because wallet-based access requires no screening or documentation, anyone with a wallet can launch a token, contribute liquidity, or engage in speculative trading.

75.     Pump.fun does not verify who is using its services. It cannot distinguish between an adult investor, a minor, a convicted fraudster, or a foreign actor operating under a false identity. All users appear on-chain only as wallet addresses.

76.     Pump.fun, Solana Labs, and Jito Labs together designed this system architecture. At no point did they implement, recommend, or require KYC checks, identity verification, or usage restrictions based on user status, jurisdiction, or legal capacity.

77.     The consequence is that trillions of dollars in speculative token activity have flowed through wallet-based systems without oversight.

**D.  Solana's History of Regulatory Evasion:**

**a.  Arbitrage in the Crypto Industry**

78.     From the earliest days of the blockchain industry, certain projects have deliberately exploited jurisdictional gaps in financial regulation to avoid scrutiny from U.S. authorities. Known as "regulatory arbitrage," this strategy involves structuring operations, token issuance, and fundraising activities to appear outside the reach of American securities laws—while still targeting American capital and investors.

79.     These entities sought to insulate themselves from liability by formally separating the token-issuing foundation (offshore) from the development company (onshore), even though both worked toward the same commercial ends. The result was a legal fiction: U.S.-based teams marketing, developing, and profiting from token-based ecosystems, while claiming that the actual offering occurred outside the SEC's jurisdiction.

### E.  Solana's Dual-Entity Structure: Labs and Foundation

80.     Solana is architected with this playbook in mind. The project operates through two intertwined entities: Solana Labs, Inc., a Delaware-registered corporation, and the Solana Foundation, a Swiss nonprofit based in Zug. From its inception, this bifurcated structure was designed not to decentralize power—but to create a legal buffer against U.S. securities regulation.

81.     Solana Labs is responsible for most technical development, protocol upgrades, developer tooling, validator software, and network infrastructure. It employs the engineers, hosts the GitHub repositories, coordinates with validators, and oversees the economic design of Solana's native token, SOL.

82.     Meanwhile, the Solana Foundation purports to "decentralize" the network, grow demand for blockspace, and manage the token supply. In practice, the Foundation serves as the nominal issuer of SOL tokens and the central node for fundraising and token allocation. The Foundation's Swiss jurisdiction, with historically lax crypto enforcement, enables Solana to sell or distribute tokens while claiming exemption from U.S. securities laws.

### F.  Avoiding Securities Laws from Day One

83.     From the beginning, Solana's dual-entity model was used to raise capital, incentivize insiders, and distribute SOL to early investors without registering the tokens or complying with U.S. securities law. Solana sold substantial amounts of SOL to entities such as

Alameda Research and Multicoin Capital, both based in or targeting the United States. These sales were structured to avoid triggering SEC oversight by routing the transactions through the Swiss-based Foundation.

84.     Solana Labs and the Foundation worked in tandem to promote the value and adoption of SOL while disclaiming liability for its offering. This arrangement allowed Solana to extract capital from U.S. markets and investors—while arguing that any regulation of SOL fell outside the SEC's reach.

85.     Solana's founders and executives knew or should have known that the economic reality of the SOL token—its centralization, promotional activity, and investment-driven marketing—meant that it would be treated as a security under U.S. law. Nevertheless, they proceeded to distribute, market, and facilitate trading of SOL while maintaining the legal fiction of foreign issuance.

### G.  How This Setup Enabled FTX, NFTs, and Pump.fun

86.     The consequences of this architecture were predictable and devastating. The same legal evasions that enabled Solana's early fundraising would later facilitate the rise of decentralized finance (DeFi) on Solana, the non-fungible token (NFT) boom, the FTX/Alameda Research ecosystem collapse, and the unchecked proliferation of fraudulent Pump.fun tokens.

87.     The Solana Foundation's role as a token issuer allowed entities like FTX and Alameda to acquire massive SOL positions through opaque deals that were never registered or disclosed under U.S. law. Solana Labs' ongoing technical control meant that these entities could build on the network with privileged access, creating projects like Serum and Sollet that relied on Solana's infrastructure while amplifying risk to retail investors.

88.    Likewise, Pump.fun leveraged this same structure: Solana Labs provided the token tooling, network speed, and validator integrations that made mass meme coin launches feasible. Yet because Solana's token environment remained unregulated, there were no investor protections, disclosure obligations, or legal accountability for the systemic losses that followed.

### H.  Legal Relevance: Foreseeability, Enterprise Intent, and Continuity

89.    Solana's architecture supports the elements of a civil Racketeer Influenced and Corrupt Organizations ("RICO") Act claim. It shows continuity of purpose: from initial fundraising to NFT wash trading to the Pump.fun rug-pull factory, Solana's operators have consistently built infrastructure designed to exploit U.S. markets while evading their legal protections. It shows knowledge and foreseeability: Solana's leadership knew how their tools would be used and embraced that usage as a strategy for growth.

## II. SOLANA'S HISTORY OF SPECULATIVE SCHEMES AND RETAIL HARM

90.    Pump.fun did not arise in a vacuum. It is the most recent and most sophisticated iteration of a pattern of conduct by Solana Labs and its ecosystem partners, who have repeatedly promoted, enabled, and profited from speculative manias that disproportionately harm retail participants.

91.    Anatoly Yakovenko, the CEO and co-founder of Solana Labs discussed the role of Solana Labs in NFT and meme coin transactions: "As with NFTs...we're blessed to solve a whole bunch of engineering problems with meme coins. It just makes the network and all the systems more robust."

A.    **The 2021 NFT Boom and Bust: A Precursor to Pump.fun's Model**

92.    Solana's first speculative asset frenzy centered on NFTs. Beginning in mid-2021, Solana positioned itself as a "fast, cheap alternative to Ethereum" and exploited this technical framing to fuel a rapid explosion in NFT trading volume.[4]

93.    Unlike genuine decentralized innovation, this boom served a singular institutional motive: to monetize block space. By encouraging high-frequency speculation in low-utility assets, Solana Labs and the Solana Foundation were able to extract increasing validator fees, grow their SOL token valuations, and justify inflated ecosystem metrics to investors and the public.

94.    This strategy was not theoretical. Solana Labs and its affiliated investment arm, Solana Ventures, directly financed and promoted the NFT ecosystem, including by taking significant equity stakes in the entities that would become central to NFT speculation.

95.    Chief among these was Magic Eden, the dominant NFT marketplace on Solana, and a portfolio company of both Solana Labs and the Solana Foundation.

96.    Similar to Pump.fun, Magic Eden served as the primary distribution and trading platform for NFTs launched on Solana, regularly accounting for over 95% of all NFT transaction volume on the network.

97.    Solana Labs also supported Metaplex, which developed and maintained the dominant NFT minting protocol, responsible for over 99% of NFT deployments on Solana.

98.    Together, these platforms—financed, promoted, and controlled through Solana's core entities—created the conditions for a speculative explosion. NFTs were marketed as digital art, cultural community tokens, or early-access gaming assets.

---

[4] https://www.theblock.co/post/329669/solanas-founder-on-how-memecoins-help-make-the-network-more-robust

99.     But in truth, they functioned as unregistered securities: assets whose value was derived entirely from speculative price movement, promoted with the promise of future profit, and backed by centralized development teams, roadmaps, and commercial narratives designed to encourage investment.

100.    Marketing campaigns for Solana-based NFTs borrowed heavily from traditional capital-raising tactics. Projects frequently released "whitepapers" that mimicked private placement memoranda, detailing the management team's qualifications, market opportunity, monetization strategies, and speculative upside.

101.    In many instances, project founders recruited marketers and influencers to amplify these messages in private investor chats, NFT alpha groups, and online communities, presenting these purchases not as collectibles but as early-stage investment opportunities.

102.    The result was a textbook asset bubble. NFT floor prices surged amid artificially inflated volume and aggressive promotional tactics. Then, as retail demand exhausted, floor prices collapsed, leaving most NFTs illiquid and valueless. By mid-2023, over 95% of Solana-based NFT collections were functionally worthless—despite having generated millions of dollars in block-space transaction fees and platform revenue during their ascent.

103.    Solana Labs' leadership publicly embraced the NFT boom during its ascent, touting it as proof of Solana's utility and speed, and promoting NFT collections through usage of the NFT intellectual properties as the profile pictures of their social media accounts. Yet when the market crashed, neither Solana Labs nor its backers offered meaningful disclosures or investor protections, despite having facilitated and directly benefited from the frenzy.

B.     **The FTX/Alameda Collapse and Solana's Role**

104.    Solana's exposure to FTX and Alameda Research deepened the chain's association with speculative abuse. Sam Bankman-Fried's firms were early and outsized investors in Solana, acquiring an initial stake of approximately 58 million SOL—over 11% of the token's supply. At the time of their bankruptcy, FTX and Alameda Research held approximately 47.5 million SOL.

105.    FTX, Alameda Research, and Solana entities and persons together used their influence and capital to develop projects on Solana, launch and promote corresponding tokens for those projects, allocate large or majority token allocations to their own wallets, and then sell those promoted tokens to unsuspecting retail investors. These tokens were colloquially known as "Sam-coins" by insiders of Solana. Examples include Solana-based projects like Serum, Sollet, Oxygen, Maps.me, Bonfida, Jet Protocol, and others.

106.    These projects, often tightly controlled by FTX personnel, were propped up through token supply manipulation, insider transactions, and mark-to-market accounting that artificially inflated their value. Alameda Research, as the developers and seed investors in many of these Sam-coins, would negotiate allocations often 50-95% of the total token supply.

107.    FTX, Alameda Research, and Solana entities and persons also developed and promoted bridged assets on-chain – soBTC and soETH – which were promoted as 1:1 backed assets via their token equivalents BTC and ETH. When FTX declared bankruptcy, soBTC and soETH de-pegged and became nearly worthless, as the promoted 1:1 backing behind these bridged assets turned out to be yet another lie by Solana.

108.    Solana Labs benefited from this ecosystem through token appreciation, retail investor inflows, and venture capital inflows. Meanwhile, retail participants were left holding assets that lost most of their value during the collapse.

109.    When FTX imploded in November 2022, SOL's price plummeted from over $30 to under $10 in a matter of weeks—more than a 90% decline from its prior high. Retail users on Solana were devastated, particularly those who had been encouraged to buy into the ecosystem based on credibility derived from FTX's involvement.

110.    Despite its deep integration with Alameda-backed infrastructure and its substantial exposure to the collapse, Solana Labs disclaimed responsibility and took no action to compensate harmed users, introduce safeguards, or correct the structural dependencies that had fueled the boom.

## C.    A Pattern of Conduct and Systemic Incentives

111.    The Pump.fun phenomenon is not an aberration—it is the predictable next phase in Solana's ecosystem evolution. Solana Labs and its technical partners, including Jito Labs, have continually architected their blockchain and ecosystem to maximize throughput, speculation, and transaction volume, knowing that these metrics drive SOL's price and public perception.

112.    This design strategy, which prioritizes raw on-chain activity over user protections or fundamental value, has repeatedly enabled speculative cycles: first with NFTs, then with FTX-related DeFi tools, and now with meme coins. In each case, Solana Labs and its partners have reaped reputational, economic, and venture capital benefits from the surging activity—while distancing themselves from the inevitable fallout.

113.    The harms caused by Pump.fun were entirely foreseeable given this history. Indeed, Solana's technical upgrades, such as the Solana Program Library (SPL) token program and validator optimizations, directly enabled the mass launch of meme coins at scale. Jito Labs' MEV tooling further allowed insiders to profit from extractive order flow at retail users' expense.

114.    Neither Solana Labs nor Jito Labs took any steps to limit or mitigate the abuse. Despite prior experience with the NFT crash and FTX collapse, and despite full visibility into Pump.fun's operations via on-chain data and public discourse, they continued to promote and support the underlying infrastructure, prioritizing ecosystem growth over investor protection.

115.    In sum, the Pump Enterprise is not a deviation from Solana's prior behavior—it is its culmination. The tools have changed, but the tactics remain the same. In every case, Solana Labs built the rails, Jito Labs extracted the value, and retail users were left to absorb the losses.

## III. THE MEMECOIN MACHINE

### A.    Introduction to Pump.fun

116.    "Solana succeeded for the same reason that Pump.fun succeeded, they lowered the barrier to entry to create these (meme coins), play in this ecosystem; to buy and sell these coins" Defendant Alon Cohen, founder of Pump.fun.[5]

117.    At the heart of this gambling system is Pump.fun, which functions as the casino's public-facing slot machine cabinet. Its interface is sleek, colorful, and deceptively simple—designed to entice users to "pull the handle" by launching or buying a new token with a single click. Behind this simplicity, however, lies a complex and coordinated system powered by Solana Labs, Jito Labs, and the Solana Foundation—each playing a distinct role in running the house.

118.    Pump.fun is positioned as a "meme token launchpad," but in operation it performs the core function of a slot machine: it invites users to place value at risk (in the form of SOL) in exchange for a chance at rapid financial gain via a themed, randomized outcome. The "game" is not skill-based, and the outcomes are rigged by structural mechanics. Each token is effectively a different cabinet skin on the same house-favoring game engine.

---

[5] https://www.youtube.com/watch?v=u6lowwye4mo

119.    Technically, Pump.fun serves as the user interface of the casino—comparable to a gaming terminal at the front of a slot machine bank. But the machine itself only runs because of Jito Labs and Solana Labs. Jito Labs provides the back-end software: the validator infrastructure, transaction routing, and MEV optimization logic that determine how and when trades are executed. Solana Labs and the Solana Foundation provide the hardware—the Solana blockchain—which processes every wager, every trade, and every payout, and monetizes each step by selling block space and collecting transaction fees.

120.    Pump.fun's defining product feature is its "one-click" token launch system. This is not a development tool—it is a gambling lever. With no knowledge of programming, no submission of identification, and no disclosure of intent, any user can spin up a fully tradable financial asset in under sixty seconds. This is made possible through the SPL smart contract standard, introduced by Solana Labs and deployed immediately prior to Pump.fun's January 2024 launch. That standard added modular token properties—such as programmable transfer fees and bonding curves—designed to maximize transactional complexity and speculative dynamics.

121.    Pump.fun exploits this upgraded smart contract system to create what amounts to programmable slot machine odds. Upon launch, each token is bound to a bonding curve, a pricing algorithm that rapidly increases the cost of the token with each purchase and decreases it upon sales. Ostensibly marketed as a liquidity solution, the curve in fact creates a volatile pump-and-dump structure where the earliest players are heavily advantaged, and late entrants are effectively guaranteed to lose.

122.    This architecture strongly favors bots, insiders, and entities using Jito Labs' MEV tools, which can front-run token purchases and arbitrage bonding curve dynamics within milliseconds of launch. Retail users arriving even seconds later pay exponentially more for the

same asset—often multiples higher—with no warning, recourse, or understanding of the speed-based asymmetry. The design ensures that the profitable "jackpots" are already claimed by the time most users participate, reproducing the house advantage inherent in traditional gambling systems.

123.    This pump-and-dump mechanism is not a byproduct—it is the central engine of the Pump.fun Casino. Between January 2024 and mid-2025, over 11 million tokens were launched on the platform. Of those, more than 98% lost virtually all value and liquidity within 24 hours. Yet each launch was a spin of the slot machine: a rush of trades, swaps, and fees generating activity for the house. Over this period, Pump.fun processed tens of billions of dollars in transaction volume and extracted hundreds of millions of dollars in launch and platform fees.

124.    Every trade, win or lose, consumed Solana block space, executed validator logic, and paid fees to the house. This was not innovation—it was an industrialized gambling circuit cloaked in financial pseudoscience. The result was a fully integrated, always-on, unlicensed casino offering slot-style games with branded wrappers and no oversight—designed not to deliver value to users, but to maximize throughput for the house and its operators.

B.    **Pump.fun's Retail Trading Interface**

125.    The Pump.fun customer-facing slot machine is designed to simulate a trading terminal. The terminal is designed to look, feel, and function like the screen of a regulated online broker-dealer—only stripped of the disclosures, safeguards, and supervisory controls that govern traditional securities exchanges. A real-time candlestick chart dominates the center of the screen

(*See* Ex. C-F)[6], complete with selectable intervals (1 m, 10 m, 1 h, 1 D) and color-coded volume bars.



126.    This graphic visualization of price action is indistinguishable from the charting modules offered by FINRA-member platforms such as E*TRADE or TD Ameritrade and signals to the ordinary purchaser that he is viewing a bona fide market in which historical pricing, depth, and liquidity can be inferred and traded upon. The chart updates tick-for-tick as new blocks are confirmed on the Solana blockchain, reinforcing the fiction that the token enjoys a continuous secondary market supported by price discovery mechanisms analogous to those of the NYSE or Nasdaq.

127.    Flanking the chart is a "quote box" that reports Market Cap, Supply, and Holders in real time. (*See* Ex. C-F). Market Cap—calculated as outstanding supply times last price—mimics the public-company valuation metric familiar to any equity investor and is displayed down to the dollar. Supply is the total number of tokens outstanding, mimicking the share float of a traditional equity. Holders resembles the shareholder register, conveying how widely dispersed—

---

[6] Citations to Exhibits attached to this Consolidated Class Action Complaint ("CAC") are cited to herein as "Ex. __."

or tightly concentrated—the float may be. By importing this lexicon verbatim from regulated equity markets, Pump.fun invites users to benchmark meme coins against listed securities and to treat the data as a reliable proxy for investment fundamentals.

128.    A perpetual ticker tape stretches across the very top of the Pump Advanced screen. Each scrolling symbol is color-flashed with its one-minute, ten-minute, and twenty-four-hour percentage moves, reproducing the ubiquitous Bloomberg or CNBC price crawl and priming users to chase momentum. Beneath that ribbon the page auto-sorts the universe of tokens into three league-table columns: **"Newly Created," "About to Graduate,"** and **"Graduated."** The taxonomy evokes the lifecycle of a corporate issuer—*seed*, *road-show*, *IPO/listing*—and supplies a running "pipeline" that permits users to toggle seamlessly between nascent offerings and those deemed mature enough for external DEX trading.

129.    Each row inside these columns contains a miniature due-diligence dashboard rendered through four badge-style indicators: **(i) total holders, (ii) sniper wallets still holding, (iii) developer-held percentage, and (iv) concentration of the top ten wallets.** Hover text discloses the meaning of each glyph ("Snipers Holding," "Dev Held," "Top 10 Holders %") and converts them into quick-read risk metrics that parallel insider-ownership tables, float analyses, and institutional-ownership summaries found in SEC filings. A user can therefore—at a glance— "size up" a token's insider concentration, circulating float, and susceptibility to manipulation, just as one would consult Form 13F data before purchasing an equity.

130.    Trade execution is initiated through the adjacent order ticket, which mirrors a modern equities blotter. The user sets Max Slippage %, selects a Speed tier (Fast, Turbo, Ultra— each with rising priority fees), toggles "front-running protection," and may optionally add a Tip to bribe validators for even earlier inclusion (*See* Ex. C-F). These parameters replicate the

limit/market order types, ISO flags, and non-displayed liquidity settings of sophisticated equities venues, convincing retail participants that they possess the same execution quality enjoyed by professional traders.

131.    Collectively, the interface furnishes every hallmark of a regulated securities market—live price discovery, market capitalization reporting, float analysis, holder concentration, and order-entry customization—while omitting the countervailing disclosures (issuer financials, audited statements, risk factors), surveillance (best-execution, FINRA Rule 5320), and investor protections (SIPC, customer asset segregation) that make those metrics meaningful in traditional finance. By cloaking speculative bonding-curve wagers in the analytic vernacular of traditional finance sales and trading, Pump.fun further induces retail users to transact as if they are putative shareholders analyzing ostensibly material market data—data that, in reality, is no more than a cosmetic façade affixed to an unregistered, insider-rigged casino.

132.    Like any casino, the Pump Enterprise does not offer a single product, but rather a themed array of games that all function identically beneath the surface. Each "game" is a meme coin launch—visually distinct, sometimes marketed with its own narrative or imagery—but economically indistinguishable from the others. These tokens, regardless of theme, are pre-coded with bonding curves, liquidity locks, and exit dynamics that mirror one another and offer the same essential proposition: deposit real value in exchange for a fleeting chance at speculative profit.

133.    In practice, each meme coin theme operates like a re-skinned slot machine cabinet. The branding changes, but the mechanism remains fixed. The bonding curve is the random number generator. The trading interface is the flashing lights. The payout odds are rigged through timing asymmetries, front-running bots, and manipulated liquidity conditions. No matter the aesthetic, the house retains the edge—and Defendants monetize every pull of the handle.

134.    Pump.fun does not conceal this strategy. On the contrary, it presents its casino floor openly. Users are encouraged to explore "trending" tokens, each with its own image, name, and theme—many deliberately designed to evoke a specific narrative, emotion, or cultural association. The only functional difference between them is marketing.

135.    These slot machine variants fall into several recurring categories:

136.    (1) The Venture-Investment Game (Unregistered Securities): These tokens are marketed using the language of traditional venture capital or startup investing. Creators imply or state that the token is part of a project with future upside, and that early buyers will benefit financially from development milestones, product releases, or network effects. They frequently feature "whitepapers," roadmaps, Discord announcements, and social campaigns that mimic startup launches. These tokens qualify as unregistered securities, as they are sold with a reasonable expectation of profit based on the efforts of others—without registration, disclosures, or regulatory compliance.

137.    (2) The Celebrity Endorsement Game: These tokens exploit the likeness, name, or public persona of celebrities, influencers, or media personalities. Sometimes these individuals are directly involved, receiving pre-allocated tokens or promotional deals. Other times, they are impersonated or used without consent. In both cases, the token's value proposition is derived from the public's familiarity with the individual and the assumption of their endorsement or involvement. These tokens create false association, capitalize on parasocial trust, and often violate right-of-publicity laws.

138.    (3) The Nonsense Speculation Game (e.g., FartCoin): These tokens are openly marketed as valueless, chaotic, or absurd—examples include "FartCoin," "TwoToesToken," or "NothingBurger." The message is clear: there is no utility, no project, and no roadmap, only vibes.

Yet despite this admission, users are encouraged to speculate, buy early, and chase temporary price spikes. The absence of pretense does not absolve the gambling structure; instead, it is embraced as part of the entertainment aesthetic, akin to novelty slots with clown or cartoon themes.

139.    (4) <u>The Fortune 500 Lookalike Game</u>: These tokens imitate or parody household brand names—e.g., "GoogleCoin," "NikeToken," "AmazonPay." The visual branding, ticker names, and social messaging create the false impression of affiliation with legitimate Fortune 500 companies. Whether framed as parody or homage, these tokens routinely exploit consumer confusion, dilute trademark value, and implicate false designation of origin under the Lanham Act.

140.    (5) <u>The Stolen IP Game (Unauthorized Copyright/Trademark Use)</u>: These tokens incorporate protected intellectual property—characters from Disney, Nintendo, or anime franchises; logos of sports teams; copyrighted phrases or songs—without license or authorization. The goal is to piggyback on preexisting fanbases, draw speculative capital from collectors or enthusiasts, and convert attention into trading volume. These tokens violate intellectual property law, mislead consumers, and form the core of the meme coin enterprise's "artificial value via infringement" strategy.

141.    While each token category may appeal to a different demographic or psychological trigger—whether greed, nostalgia, humor, or trust—the economic mechanics are identical. The bonding curve structure, timing dynamics, and instant tradability are constant. The outcome is also constant: a temporary surge in on-chain volume, a transfer of value from late entrants to early actors, and a guaranteed rake for the Defendants in the form of block space consumption, MEV extraction, and token launch fees.

142.    This engineered illusion of choice—presenting dozens of "different" token types that are all bound to the same game logic—is what gives the Pump.fun Casino Enterprise both its

scalability and its legal character. These are not legitimate financial products. They are digital gambling instruments, skinned for marketing appeal, designed for maximum churn, and operated without regulation or oversight.

### C.    Pump.fun's Meme coin Marketing: Venture Like Investments

143.    Within the Pump.fun Casino Enterprise, one of the most aggressively marketed "slot machine variants" was the Venture Investment Game—a meme coin format packaged and promoted as early-stage startup equity. While identical in economic structure to every other token launched on the platform, these tokens were branded as investment opportunities, drawing in users with promises of outsized financial returns and narrative framing lifted from the world of venture capital and early-stage technology finance.

144.    Pump.fun's marketing strategy systematically updated and recontextualized its meme coin messaging to attract new waves of users, each drawn to different psychological triggers—including gambling, celebrity affiliation, and speculative investment. As relevant here, Pump.fun repeatedly characterized meme coins as startup-like investment vehicles capable of producing exponential returns. (*See* Ex. A.)

145.    These messages were distributed via viral marketing campaigns, visual memes, and Twitter/X posts that blurred the line between parody and investor solicitation. In one widely circulated campaign, Pump.fun asserted that its platform was "better than venture capital"—an invitation for retail users to bypass traditional startup investing and participate in speculative meme coin launches instead. (*See* Exs. A, C–E.)

146.    Many of these "venture coins" were promoted in association with celebrities or influencers—frequently without authorization, and often without disclosure of compensation or affiliation—further blurring the lines between endorsement, investment, and parody. This

confusion resulted in widespread consumer misunderstanding, exacerbated intellectual property violations, and deepened investor losses when tokens collapsed shortly after launch.

147.    Pump.fun's marketing efforts were targeted toward a young, male, retail-speculation audience whose exposure to financial products is heavily shaped by internet culture and social media—paralleling the demographic surge seen during the GameStop and "meme stock" era. The primary medium for these campaigns was Crypto Twitter, a colloquial name for the Twitter/X subculture where most meme coin commentary, speculation, and promotion occurs.

148.    In its social posts, Pump.fun regularly framed its platform as a generator of "AI unicorns," "early-stage winners," and "billion-dollar meme coins." The rhetoric mimicked the language of Silicon Valley fundraising—replacing due diligence and SEC-compliant disclosures with gifs, emojis, and hyperbole. For example:

- "Pumpfun has incubated more AI Unicorns than your favorite VC"[7]. Unicorns are billion-dollar startups, no data supports these statements.[8]

- "Market is nuking but the trenches are HOT, there are endless opportunities on pump fun, no matter what the market says"[9]

149.    Pump.fun also celebrated specific tokens that had reached billion-dollar market capitalizations after launching through its platform, reinforcing the idea that users could discover "the next unicorn" by participating in meme coin launches:

---

[7] https://x.com/pumpdotfun/status/1876399475733725579
[8] https://x.com/pumpdotfun/status/1856655071922041327
[9] https://x.com/pumpdotfun/status/1877047824258331023

- "another day, another billion dollars 🤠peanut has just become the 2nd pump fun coin to hit $1bn marketcap after launching just 13 days ago 🤠memes are accelerating faster than ever - which coin is next[10]?"

- "congratulations to the $GOAT 🐐@truth_terminal is officially the first pump fun coin to hit a $1bn market cap 🤠that's around 222,222x in just 1 month!!!!this begs the question... who's next[11]?

- "remember when they told you that it's impossible to win in the meme coin trenches? that you're retarded for "gambling" when the winners were "already chosen"? since then 2 new coins went from 0 to $300m, over 50 went to $10m, and over 100 touched $5m I hope you didn't listen."[12]

150.    The narrative was clear: retail users could beat the market, bypass venture gatekeepers, and find "next-generation" technology projects by launching or buying Pump.fun tokens. Many tokens were accompanied by whitepaper-style narratives, roadmaps, and product-development claims. Users were told they were not just gambling—they were "early investors."

151.    In reality, these meme coins shared no meaningful distinction from gambling instruments. Most produced no products, had no revenue plans, and delivered no services. They were simply themed tickets to a digital slot machine designed to churn transactions and enrich the house. Nonetheless, these tokens were offered to the public without SEC registration, investor disclosures, or compliance with securities laws, despite satisfying the elements of an investment contract under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

---

[10] https://x.com/pumpdotfun/status/1856655071922041327
[11] https://x.com/pumpdotfun/status/1856362235574042774
[12] https://x.com/a11on9/status/1846628249746477361

152.    Every transaction—whether at launch or in secondary trading—was executed through the Solana blockchain and relied upon validator infrastructure developed and operated by Jito Labs and Solana Labs. Those entities directly benefited from the token's trading activity through validator rewards, MEV extraction, and rising network fees—all enabled by the speculative frenzy stoked by Pump.fun's venture-style messaging.

153.    In addition to unregistered securities, Pump.fun facilitated the sale of thousands of counterfeit publicly traded securities—tokens designed to mimic Apple, Microsoft, Tesla, Disney, and other Fortune 100 companies. (See Ex. F.) These tokens used official logos, stock tickers, and corporate language to simulate affiliation or endorsement, despite having no connection to the underlying businesses. The tokens offered no shareholder rights, dividends, or equity—but were branded to imply they were digital analogs of blue-chip investments.

154.    These knockoff securities were not mere parodies. They were deployed at scale, offered to the public through the same one-click token creation system, and monetized through the same launch-fee and transaction-fee infrastructure. For Defendants, they were just another skin on the same machine—another slot cabinet on the casino floor, designed to provoke trading volume and drive up block-space monetization.

**D.  Pump.fun and Pump.fun's Founders Describe Pump.fun as a Casino**

155.    Defendant Alon Cohen openly acknowledges that Pump.fun is a Casino. For example, on August 8, 2024 he tweeted "you guys came to the greatest CASINO in the world and are complaining when your txns RANDOMLY drop? what did you expect??? it's part of the experience, a rite of passage, a PRIVILEGE don't like it? LEAVE."[13]

---

[13] https://x.com/a11on9/status/1777395989479051772

156.    In an effort to bring multicultural users to the Pump.fun casino Defendant Cohen states "not an expert but I feel like trading shitcoins is HALAL; not gambling, but investing and contributing to the propagation of social trends imagine activating BILLIONS of people who couldn't gamble before, including the SAUDIS my lord we're all gonna get so rich."[14]

157.    Defendant Cohen explains that meme coin gambling is superior to traditional gambling due to its social nature. He states "meme coins are also far more socially engaging than gambling. most people just want to have fun with their friends, and meme coins can hit the right spot 100x better than gambling could ever."[15]

158.    Mert Mumtaz, the founder to Helius.Dev, a Solana contractor explains that Solana is built to simulate a Casino "few understand that the solana fee model is stochastic on purpose to naturally simulate a casino environment". Defendant Cohen agrees, stating that it is a "Gambling supercycle".[16]

### E.    Pump.fun Marketing: Celebrity Meme Coins

159.    Another major variant of the Pump.fun Casino was the Celebrity Slot Machine—a format where tokens were themed around real-world celebrities, using either direct endorsements or unauthorized likenesses to induce retail speculation. These tokens were central to Pump.fun's growth strategy and were repeatedly promoted by the platform, its executives, and its affiliates as legitimate opportunities for outsized returns.

160.    As part of this scheme, celebrities—including Caitlyn Jenner ($JENNER), Usher ($USHER), Hulk Hogan ($HULK), Doja Cat ($DOJA), Iggy Azalea ($MOTHER), and Andrew Tate ($DADDY)—launched, promoted, or were associated with tokens that traded through the

---

[14] https://x.com/a11on9/status/1778150960956678275
[15] https://x.com/a11on9/status/1769476547658887435
[16] https://x.com/a11on9/status/1861421412927356987

Pump.fun platform. (*See* Ex. D.) These token launches were widely publicized across Crypto Twitter, incorporating memes, livestreams, tweets, and provocative marketing messages designed to attract attention and speculative capital.

161.    Pump.fun and its affiliated individuals actively supported these token launches. They tweeted to their audiences, featured the tokens prominently on the website's trending sections, and elevated celebrity-linked coins through their user interface and social engagement. (*See* Ex. A.) These efforts positioned celebrity tokens as elite slot machine variants on the Pump.fun casino floor—branded experiences that appeared more "legitimate," more exciting, and more likely to pay out.

162.    Defendant Cohen, one of Pump.fun's most prominent public promoters, personally supported the $MOTHER token linked to Iggy Azalea, describing it as a model for the "social token narrative" and defending alleged insider activity by calling the participants "Pump.fun sleuths." He tweeted:

- "this past week, there have been some wins for example, Iggy seems genuine in her intentions with $MOTHER. she actually gets it and is seriously kicking off the social token narrative. (also worth mentioning that the "insider wallets" were pump fun sleuths)."[17]

163.    In a since-deleted promotional tweet, Pump.fun's official account directly advertised a livestream featuring Iggy Azalea, writing:

- "RT @IGGYAZALEA: GUYSSS I'm LIVE right now playing on Motherland on @pumpdotfun livestream!! Pull up, send me that good luck energy, or just…"[18]

---

[17] https://x.com/a1lon9/status/1796956472275877985
[18] https://twitter.com/pumpdotfun/status/1917668089447022900

164.    Likewise, to promote the $JENNER token, Pump.fun published a meme-style tweet intended to challenge doubters and encourage engagement:

- "Caitlyn Jenner: launches pump fun coin you: too scared you: "surely she's hacked" Caitlyn Jenner: cope and seethe loser. Send it. Caitlyn Jenner: strong and beautiful you: WEAK AND POOR."[19]

165.    These promotional tactics created the false appearance of validation, implying that the involvement of known celebrities elevated the legitimacy and investment potential of these tokens. This in turn drew thousands of new users to the Pump.fun interface, increased launch activity, and dramatically expanded transaction volume, thereby benefitting Defendants financially through fees, MEV extraction, and block space consumption.

166.    The marketing surrounding celebrity tokens was materially misleading. By highlighting celebrity involvement, Pump.fun conveyed that these tokens were safer, more legitimate, or more likely to succeed than others—despite having the same structural characteristics, bonding curves, and near-total lack of investor protections. (*See* Exs. D, E.)

167.    In reality, these celebrity-themed tokens performed no better than the rest. On average, they declined by over 99% from their peak market value. The presence of celebrity names did not alter the outcome; it only widened the pool of victims drawn into the gambling system.

168.    Despite the attention given to celebrity coins, Pump.fun failed to implement any safeguards to prevent impersonation or counterfeit token launches. Any user—anonymous and unverified—could create a token with the same name, image, or branding as a celebrity. This allowed for widespread unauthorized token launches, including fake versions of high-profile names that were indistinguishable from the purportedly "official" ones. (*See* Ex. D.)

---

[19] https://x.com/pumpdotfun/status/1794848499869343924

169.    Counterfeit token operators took additional steps to create confusion, including launching copycat websites, social media pages, and marketing materials. Many retail users were unable to distinguish between legitimate and counterfeit celebrity tokens, and purchased the latter in error, paying launch fees and transaction costs to Pump.fun and its infrastructure partners—despite receiving valueless/counterfeit assets in return.

170.    At any time, Pump.fun could have implemented basic technical controls to prevent the creation of tokens with identical tickers, metadata, or images—particularly where the same branding had been used by another token within the system. These controls are trivial to implement and are standard in regulated environments. Yet Pump.fun chose not to.

171.    Similarly, Solana Labs and Jito Labs, who process every transaction and validate every token creation event, could have intervened to blacklist known counterfeits or delist manipulated token metadata from public APIs and indexers. They did not. Their refusal to act was not accidental—it was consistent with the Enterprise's financial interest in maximizing churn, confusion, and total transaction count.

172.    The result was a celebrity-branded gambling product line marketed through fraudulent association, launched without compliance, and allowed to flourish in an environment where fakes and real tokens were indistinguishable. Defendants profited from every spin of this machine—regardless of authenticity, legality, or harm to consumers.

**F.    Anonymous Access and the Pseudonymous Casino: No KYC, No Oversight, No Accountability**

173.    The Pump.fun Casino operates without traditional user accounts, identity verification, or onboarding procedures. Unlike regulated financial platforms—or even licensed gambling sites—there is no mechanism to establish who the user is, where they are located, or

whether they are legally permitted to participate. The only requirement is a Solana-compatible crypto wallet, such as Phantom or Solflare.

174.    A connected wallet serves as the user's slot card, payment method, and identity, all in one. When a user visits the Pump.fun website or mobile app, they are prompted to "connect wallet." Once connected, the user's public wallet address is automatically recognized as their "account," and all subsequent activity—including launching tokens, purchasing, selling, and interacting with the platform—is performed through cryptographic signatures from that wallet.

175.    No name, email address, government-issued ID, or other personal identifier is ever required. There are no KYC protocols, no geographic restrictions, and no technical guardrails to prevent minors, sanctioned individuals, or known bad actors from accessing the platform. Any user, anywhere in the world, can begin wagering in seconds, entirely anonymously.

176.    Similarly, buying and selling tokens on Pump.fun occurs via wallet-authorized transactions. When a user "plays," by buying a token, their SOL is deducted, and tokens are credited to their wallet. When they sell, tokens are returned to the platform's liquidity pool, and the resulting SOL—minus platform and validator fees—is sent back to their wallet. Pump.fun never takes custody of the funds; it simply routes and processes the wager through automated contracts and fee-splitting mechanisms.

177.    Any person with internet access and a wallet can engage in speculative trading or token creation with no friction, screening, or accountability.

178.    As a result, Pump.fun functions as a pseudonymous, permissionless financial casino—one where every spin of the slot machine is tied to a wallet address, not a person. Users are unverified, unlicensed, and untraceable, and Defendants have made no meaningful effort to impose oversight. By eliminating identity and compliance friction, Defendants maximized

transaction count and platform volume, driving validator fees, MEV revenues, and ecosystem growth metrics. This system also renders all user restrictions unenforceable. Even when violations occur, Pump.fun's architecture makes it impossible to impose bans. A wallet suspected of abuse can simply be discarded, and a new wallet created moments later—reentering the casino with a fresh identity. This revolving-door system enables a wide range of abuses, including repeat IP infringement, counterfeit token launches, and underage gambling, without consequence or detection.

179.    Solana Labs and Jito Labs were equally aware of the consequences of this structure. Every Pump.fun token launch, transaction, and wallet interaction is processed and confirmed using validator software maintained by Jito Labs and Solana Labs. These entities could have implemented restrictions or safeguards—blacklisting bad actors, limiting access by region or age, or disabling illegal token metadata—but chose not to. Their validator infrastructure is optimized not for compliance, but for volume, throughput, and MEV profitability.

180.    In sum, the Defendants did not build a fair or transparent financial system. They built a high-frequency, high-throughput gambling machine, accessible to anyone with a wallet, designed to monetize every possible transaction and extract maximum value from anonymity and chaos. The lack of identity controls was not an oversight—it was a feature of the casino.

### G.    Meme coin Slot Machine: Exit Liquidity Gambling

181.    A core experience for many Pump.fun users is an illegal and unregistered form of gambling known as exit liquidity gambling. Functionally, the game of chance operates by purchasing the meme coin at a lower price, and as more user purchase the meme coin the price increases.  However, if holders of that same meme coin sell their token, the price can decrease.

182.    In nearly all cases, sudden and often random sell-offs initiate large decreases in the token price, triggering more sell-offs. The objective is to hold the meme coin and appreciate as much value as possible before the crash.

183.    Terming the meme coin experience as social networking or a communal experience pump.fun explains that users should invite their friends to participate with a chance to earn significant wealth. In reality, this is little more than a ponzi scheme dressed as social media. The new entrants buy at an increased price, presenting gains for the past purchasers. Since these meme coins do not generate revenue, sell products, offer services, or conduct any business their entire value is dependent on the past buyer, and decreases in value when sold.

## IV. THE FALSE "FAIR LAUNCH" NARRATIVE AND WIRE FRAUD SCHEME

184.    At the core of the Pump.fun Casino Enterprise was a single unifying promise: that everyone had a fair shot at the game. The platform's defining marketing narrative centered on its "fair launch" model—an alleged innovation in meme coin tokenomics that guaranteed equality of opportunity, protection from insider manipulation, and a safeguard against rug pulls. This was not a secondary theme; it was the first message a user would encounter upon visiting the site and the most widely echoed phrase across Pump.fun's marketing channels.

185.    Pump.fun's homepage, interface design, and social media campaigns all emphasized "Fair Launch," reinforced by claims of "no presales," "no insider allocations," and "rug-pull proof launches." These messages promised a transparent, level playing field—inviting users to believe that this digital casino, unlike those before it, was built to give everyone the same odds.

186.    The message was carefully timed and strategically deployed. In the months preceding Pump.fun's launch, retail participants in crypto markets had been repeatedly burned by

fraudulent meme coin projects—tokens launched in Telegram groups or by anonymous developers who disappeared shortly after draining liquidity. These projects, often branded as "community tokens," became synonymous with financial harm. Pump.fun deliberately positioned itself as the solution, marketing its platform as a safe and transparent launchpad engineered to eliminate these risks.

187.    The promise of fairness was essential to attracting new players to the Pump.fun casino. Without it, the system would have looked like what it was: a high-speed meme coin slot machine designed to extract value through information asymmetry and transactional exploitation. Instead, the "fair launch" pitch gave the illusion of parity. It allowed users to believe they were participating in a democratized system where early engagement meant equal opportunity—not programmed losses.

188.    Despite marketing its interface as a fair launch environment, Pump.fun implemented no meaningful protections. There were no randomized entry windows, no anti-bot throttling, no guardrails for retail participation. The platform presented a single static screen to all users—while insiders used superior infrastructure to pull the handle first, every time.

189.    The deception was sustained and amplified through social media promotions, Discord threads, YouTube streams, and direct communications from Pump.fun's leadership. Developers and affiliated influencers repeatedly told the public that the system was fair, "anti-rug," and safe. These representations were material, specific, and knowingly false. They were designed to induce users to engage with the platform, to launch tokens, and to transact—thereby driving volume, validator fees, MEV capture, and launch charges for the Defendants.

190.    These messages were transmitted via interstate wire communications, including public websites, smart contract interfaces, social media posts, Discord updates, and marketing

videos—each of which constitutes a use of the wires for purposes of executing a fraudulent scheme under 18 U.S.C. § 1343. The fraud was continuous, systemic, and central to the business model of the Pump Enterprise.

191.    In 2024, Pump.fun was banned by financial regulators in the United Kingdom, citing consumer deception, regulatory noncompliance, and the risks inherent in anonymous token issuance. Despite this international rebuke, the enterprise did not pause. Solana Labs and Jito Labs continued to support the platform, enabling all technical operations and continuing to process token launches without modification or restriction.

192.    Rather than address the platform's misconduct, Defendants adopted a posture of open defiance. Executives and community leaders began to embrace the fraud narrative itself, adopting slogans like "Crime is Legal" and "It's Crime Season" on Twitter/X.[20] The false fair launch pitch evolved into a badge of cynicism, converting the original deception into a kind of insider joke—evidence not only of intent, but of deliberate normalization of wire fraud.

193.    These facts establish a clear and continuous wire fraud scheme under 18 U.S.C. § 1343. Defendants knowingly devised and executed a plan to defraud users by misrepresenting the fairness and neutrality of their token launch system. They transmitted false statements through interstate communication channels with the intent and effect of securing money or property under false pretenses. The pattern was essential to the enterprise's success.

---

[20] https://x.com/SolJakey/status/1887969246807801893
https://x.com/tofushit888/status/1880452074972082417?s=46&t=88wYKdq6YFRbDy63IGfkFw

194.    The conduct also constitutes conspiracy to commit wire fraud under 18 U.S.C. § 1349. Each Defendant played a necessary role: Pump.fun crafted the frontend illusion; Jito Labs enabled and monetized MEV exploitation; Solana Labs and the Solana Foundation processed, endorsed, and profited from the resulting volume. Each had both motive and capacity to intervene. None did.

195.    Instead, the Defendants operated as a unified gambling enterprise, where fairness was a marketing tool, fraud was a feature, and the house always won.

## V.    INTELLECTUAL    PROPERTY    THEFT    AND    PLATFORM-AIDED IMPERSONATION

### A.    Impersonation of Registered Publicly Traded Companies and Privately Held Corporations

196.    Pump.fun has enabled the creation and trading of hundreds of thousands of tokens that appropriate the names, branding, and messaging of publicly traded companies without authorization. These tokens often mirror the identity of real corporations—such as "Apple," "Tesla," "Meta," and others—and falsely imply affiliation, sponsorship, or endorsement by the underlying business entity. (*See* Ex. F).

197.    Many of these tokens explicitly claim to be the "official" or "community" token of a given company. They adopt corporate brand elements including product imagery, slogans, logos, and ticker symbols, and are marketed on the Pump.fun interface in a manner designed to create the impression of legitimacy or corporate backing. Id.

198.    Despite the clear and repeated misuse of trademarked names and proprietary assets, Pump.fun has taken no meaningful steps to prevent the creation or circulation of these counterfeit tokens. On the contrary, Pump.fun actively amplifies such misuse through its search and

recommendation functions, which suggest similar tokens based on the entered brand name—further confirming the platform's capacity to detect and algorithmically process infringing content.

199.    Pump.fun's automated interface allows any wallet to launch tokens instantly, without any identity verification, review, or moderation.

200.    The scale and visibility of this activity are such that Solana Labs and Jito Labs, as critical infrastructure providers to Pump.fun, knew or should have known that the platform was systematically enabling intellectual property theft. Solana Labs developed the token programs and transaction execution environment that make these tokens tradable on-chain, while Jito Labs facilitated transaction bundling, validator execution, and order routing for the tokens at issue.

201.    Rather than restrict or intervene in the proliferation of these unauthorized brand tokens, Solana Labs and Jito Labs continued to support and profit from the technical infrastructure that allowed these tokens to launch, gain liquidity, and be traded. Their ongoing support enabled Pump.fun to operate at scale while routinely hosting tokens that misappropriate brand identity and confuse the public.

202.    Pump.fun has also enabled the launch and circulation of counterfeit tokens impersonating Pump.fun itself. Multiple "Pump.fun" or "Pump" tokens have been created and traded on the platform, falsely implying official affiliation with the platform's developers or representing themselves as the legitimate native token of the site. These imitation tokens use the Pump.fun name and branding, sometimes directly copying the platform's logo or promotional language.

203.    In the weeks and days preceding the launch of Pump.fun's own official token, the platform permitted the proliferation of pre-sale tokens and unofficial "Pump.fun" token variants. These tokens capitalized on the anticipation surrounding the official token drop, misled users into

believing they were gaining early access, and extracted funds from buyers under false pretenses. Pump.fun's own infrastructure facilitated the marketing and sale of these tokens, while offering no warnings or disclaimers to distinguish genuine platform assets from fakes.

**B. Misappropriation and Unlicensed Use of Brands**

204.    In addition to enabling the creation of counterfeit tokens mimicking publicly traded companies, Pump.fun has systematically allowed users to launch tokens that infringe upon widely recognized intellectual property rights. These include tokens branded as the "official" Batman token, Superman token, Barbie token, and numerous others. These tokens exploit the social cachet and global brand recognition of iconic fictional characters and entertainment franchises, often using the associated names, images, or themes to imply endorsement or affiliation with the IP holder. (*See* Ex. D.) These tokens are frequently titled and marketed as if they were the legitimate digital extensions of copyrighted characters or product lines.

205.    Pump.fun also facilitates the unauthorized creation and trading of tokens that misuse the names and reputations of major academic institutions. Tokens bearing names such as "Harvard," "Harvard Blockchain," "Stanford Blockchain," "NYU Philanthropy," and similar identifiers have been launched and promoted through the Pump.fun platform. (*See* Ex. E).These tokens falsely suggest endorsement, sponsorship, or official affiliation with the named universities, and have been sold to the public for speculative purposes.

206.    In each of these cases, there is no indication that the token creators have any actual connection to the university, organization, or intellectual property they purport to represent. Nonetheless, these tokens are allowed to circulate freely on Pump.fun's platform, leveraging the prestige, trust, and identity of the real-world entities they impersonate in order to generate trading volume and platform fees.

**B. Unlicensed Use of Celebrity and Politician Meme coins**

207.    In addition to corporate brand and institutional impersonation, Pump.fun has facilitated the large-scale misappropriation of celebrity names, likenesses, and persona-related intellectual property. The platform has hosted and promoted hundreds of thousands—if not millions—of tokens falsely associated with well-known public figures. These tokens are often explicitly branded as the "official" meme coin of a celebrity, despite having no endorsement, involvement, or consent from the individual in question. (*See* Ex. D; Ex. E).

208.    These counterfeit celebrity tokens frequently use the celebrity's full name, stage name, or recognizable nickname in the token title. Many also feature profile pictures, publicity images, logos, or thematic references drawn directly from the celebrity's brand, public identity, or known affiliations. In some cases, they include fabricated promotional language suggesting direct involvement—for example, "endorsed by," "backed by," or "launched in collaboration with" a specific celebrity.

209.    For example, the Defendants launched two tokens titled "JUDGE KAPLAN ($JUDGE)" and "Lewis A. Kaplan (JUDGE)" through the Pump.fun platform, each using Judge Kaplan's full name, and images of him. (*See* Ex. E at 2-3.) The associated promotional language included statements such as "we like the judge," "SBF bad," and "judges have big chin. SBF have small one," in an apparent attempt to draw attention to the tokens by referencing a sitting federal judge.

210.    These tokens were publicly listed, priced, and traded through Pump.fun's interface, accompanied by real-time charts and user commentary, and were marketed using Judge Kaplan's identity as a selling point reflecting a broader pattern of the Defendants using the names and

likenesses of public figures to attract investor interest, generate trading activity, and profit from token sales.

211.    These impersonations span across categories of public figures, including musicians, athletes, actors, internet personalities, and political figures. The range is indiscriminate and vast— any name with cultural relevance, fan attention, or social media reach is a potential target for tokenization on the platform.

212.    In many cases, Pump.fun has allowed near-identical clones of actual celebrity tokens to proliferate across the site, often within days or even hours of the original launch, creating confusion among users and enabling bad actors to divert capital under false pretenses.

### C.  Pump.fun Launches, Sells, and Exchanges Counterfeit Digital Assets

213.    Pump.fun has also enabled the creation and circulation of counterfeit versions of existing digital assets, including well-established cryptocurrencies and blockchain projects.

214.    These fake tokens use the names and symbols of widely recognized crypto assets— such as "Ethereum," "Bitcoin," and "Solana"—in ways that create the clear impression of official affiliation. (*See* Ex. C).

215.    Some of these tokens adopt tickers that closely resemble the originals (e.g., "ETH," "SOL," "BTC") and replicate the logos, branding colors, or technical language used in connection with the real asset. In some cases, the tokens claim to be the "next generation" or "official v2" of the authentic asset, further misleading users into believing they are participating in a legitimate crypto project. (*See* Ex. C at 13-18).

216.    Beyond simply copying well-known tokens, Pump.fun has also enabled the launch of fraudulent tokens that falsely appear to be affiliated with official Solana-branded ventures. These include tokens purporting to represent "Solana Phone," "Solana Email," and other Solana

ecosystem products or infrastructure. These tokens are launched with no relation to the actual Solana Foundation or its affiliates, yet trade freely and are marketed as though they are sanctioned or backed by the Solana network.

217.    Retail users are unable to distinguish between genuine and spoofed assets on Pump.fun's pseudonymous and unregulated platform.

218.    As with the other categories of impersonation, Pump.fun has taken no meaningful action to prevent, flag, or remove these tokens. Despite the ease with which the platform could detect naming conflicts with existing top-market crypto assets, it has allowed such tokens to proliferate, drawing volume and trading activity that directly generate platform fees.

**D.  Pump.fun Launched, Exchanged and Managed Meme Coins That Harass Law Firms, Lawyers, Plaintiffs, And Act To Intimidate Lawyers' Families**

219.    Following the initial filing of federal complaints against Pump.fun, a disturbing pattern emerged. Users began creating tokens that targeted not only the law firms involved in this litigation but also the individual attorneys and plaintiffs. (*See* Exs. E, G, H & I).

220.    These tokens were created using full names, likenesses, and in some cases, photographs extracted from personal sources. The impersonations were not limited to name usage—they often included defamatory, threatening, or mocking content. (*See* Exs. G, H & I).

221.    Specifically, tokens were launched by Pump.fun that included the images, names, and personal information of the plaintiffs. *Id*.

222.    Additionally, tokens were launched impersonating the lead counsel in this case, Max Burwick, as well as members of his immediate family. These included his mother and his cognitively disabled sister, whose likeness and personal medical history were exploited for apparent ridicule and retaliation. (*See* Ex. I).

223.    Users went so far as to upload images taken from a legitimate fundraising campaign created by the Burwick family, including photos of the sister's mobility aids and a family dog. Pump.fun users then minted tokens purporting to be fake fundraisers for the disabled family member, further compounding the harm. *Id*.

224.    These actions were not isolated. Tokens impersonating Burwick Law and Wolf Popper continued to appear on Pump.fun into June 2025—months after public notice and legal action had been initiated. In January 2025, both law firms issued a joint press release regarding ongoing impersonation on Pump.fun and delivered cease-and-desist letters to the platform. Nonetheless, Pump.fun continued to allow the infringing tokens to be listed, traded, and monetized. (*See* Ex. H).

225.    Pump.fun's refusal to remove infringing content—despite repeated notices and ongoing misuse of real-world names, identities, and protected marks—constitutes willful blindness, if not active facilitation. Rather than take any meaningful corrective action, Pump.fun chose to leave infringing tokens active on the platform, continuing to collect trading fees on every transaction involving impersonated assets.

226.    In response to cease-and-desist communications issued in January 2025 by Burwick Law and Wolf Popper, Pump.fun took limited and selective action. Among other things, Pump.fun removed certain visual metadata associated with impersonating tokens, including the token images that had been copied from personal family materials.

227.    In doing so, Pump.fun demonstrated its technical ability to modify, suppress, or disable token content after deployment—refuting any claim that the platform was incapable of moderating abusive or infringing material. Despite this acknowledgment of control and capability,

Pump.fun continued to allow the creation and promotion of new tokens impersonating Burwick Law, Max Burwick, and members of his family well into mid-2025. (*See* Ex. I).

228.    These facts establish not only that Pump.fun had the means to prevent ongoing harm, but that it willfully chose not to act—continuing instead to monetize these abuses through trading fees, token listings, and engagement metrics.

### E.  Pump.fun's Trademark Policy and Knowing Facilitation of Infringement

229.    Pump.fun is aware that trademark infringement is a recurring and systemic issue on its platform. In response to this ongoing problem, Pump.fun has published a trademark policy that provides general guidance to users regarding the avoidance of trademark misuse, outlines a basic takedown procedure for rights holders, and states that users who repeatedly engage in trademark violations may have their access to the platform revoked.

230.    Notwithstanding the existence of this policy, Pump.fun openly acknowledges— both directly and through its operational structure—that it has no practical ability to prevent the ongoing distribution and trading of infringing tokens once they are deployed. When confronted with evidence of infringement, Pump.fun, along with infrastructure providers Solana Labs and Jito Labs, uniformly disclaims any capacity to halt the trading or visibility of such tokens, citing the immutability of the blockchain and the decentralized nature of smart contracts.

231.    This disclaimer renders the trademark policy effectively meaningless. Pump.fun has full knowledge that once a token is launched using its interface, that token cannot be recalled, deactivated, or materially suppressed without coordinated technical intervention. By maintaining a policy that purports to deter infringement while simultaneously disclaiming the ability to meaningfully enforce it, Pump.fun misleads users and rights holders into believing that remedies are available when they are not.

232.     Simple search filters, image similarity scans, or name-blocking protocols—tools that could be built by a single developer in a matter of hours or days—would be sufficient to eliminate the majority of known brand impersonations. Despite this, Pump.fun has never implemented such tools.

233.     Yet despite their visibility and ability to act, none of the Defendants have taken meaningful steps to prevent or mitigate the launch and propagation of infringing tokens. The Defendants' inaction reflects a conscious choice: addressing trademark abuse would reduce platform volume, speculative activity, and ultimately, fee revenue. The economic interests of Pump.fun, Solana Labs, and Jito Labs are aligned in maintaining the current structure, even if it enables ongoing and systemic intellectual property violations.

## VI. PUMP.FUN, JITO LABS, AND SOLANA LABS OPERATE AN UNLICENSED MONEY TRANSMISSION BUSINESS

### A.    Use of Pump.fun to Launder Sanctioned Funds by the Lazarus Group

234.     In or around February 2025, the Lazarus Group—a cybercrime unit operating on behalf of the Democratic People's Republic of Korea and subject to U.S. sanctions—used the Pump.fun platform to launder proceeds from what remains the largest known cryptocurrency theft in history: the theft of approximately $1.5 billion in digital assets from the Bybit exchange.

235.     Following the Bybit hack, Lazarus operatives bridged approximately $1.08 million in USDC from Ethereum to the Solana blockchain. They deposited approximately 60 SOL into a newly created Solana wallet and used Pump.fun's automated token creation tools to deploy a new meme coin named "QinShihuang."

236.     Using the Pump.fun interface, which requires no identity verification and imposes no restrictions on token creation, Lazarus was able to issue approximately 500,000 QinShihuang

tokens and immediately inject liquidity. The platform's integration with Solana Labs' SPL token program and smart contract infrastructure enabled rapid minting and automated pricing using bonding curve mechanics.

237.    To facilitate laundering, Lazarus injected tainted funds into the token's trading pool, stimulating organic interest from Pump.fun users. Over the course of several hours, the token reached a reported $26 million in total trading volume. This activity created a high-velocity market that effectively obscured the source of funds by blending illicit capital with that of retail traders.

238.    Once the liquidity pool was active and substantial, Lazarus operatives sold their token holdings back into the market, exchanging them for SOL and dispersing the proceeds across a network of pseudonymous wallets. This series of transactions was executed through the Solana blockchain using validator infrastructure maintained by Solana Labs and Jito Labs.

239.    Jito Labs' validator software—used by more than 80% of Solana validators—enabled insider wallets to prioritize transaction execution through the use of MEV (Maximal Extractable Value) bundling and tipping. The ability to insert high-priority transactions allowed the Lazarus-linked wallets to optimize their exit from the token while avoiding detection and slippage, maximizing the yield of the laundering scheme.

240.    The scheme was uncovered on or about February 23, 2025, when on-chain analyst "ZachXBT" publicly identified suspicious wallet activity related to the Bybit hack. These findings were corroborated by blockchain investigators including "Atlas," as well as by forensic analytics firms such as Merkle Science and Arkham Intelligence. These parties confirmed that the Pump.fun token had been deployed by actors tied to Lazarus and used as a laundering vehicle.

241.    Upon public disclosure, Pump.fun removed the QinShihuang token from its front-end platform. However, the proceeds had already been removed, dispersed, and rendered difficult to trace due to the high-frequency, pseudonymous transaction volume enabled by the platform.

242.    Solana Labs provided the blockchain infrastructure necessary for this operation to occur, including the validator client software, smart contract standards, and system programs that facilitated the execution of token issuance, price escalation, and transaction routing. Jito Labs enabled the bundling and prioritization of high-value transactions through its MEV-enabled validator infrastructure, which was instrumental in the efficient extraction of funds from the scheme.

243.    The success of the laundering operation was made possible by the complete absence of identity verification, financial controls, or compliance infrastructure on Pump.fun; and it was materially facilitated by the technical tools and infrastructure provided by Solana Labs and Jito Labs, both of which had the capacity to intervene or restrict such activity and declined to do so.

**B.    Unlicensed Operation of Money-Transmitting Business**

244.    At all relevant times, Pump.fun has offered a platform for receiving digital value (SOL) from users, converting it into newly minted tokens, and transmitting those tokens back to users or third-party wallets. Despite engaging in these money-transmitting activities on a global scale, Pump.fun has never applied for, held, or maintained a license from FinCEN or any state regulator authorizing it to operate as a money transmitter, nor has it instituted any KYC/AML or other regulatory compliance measures.

245.    Solana Labs, Inc., the Delaware corporation that develops and deploys the Solana blockchain software, has similarly never applied for or held any money transmitter license from FinCEN or any state. Solana Labs has continuously maintained, promoted, and operated the

validator software, token programs, and system infrastructure that enable Pump.fun's receipt, conversion, and transmission of digital assets—but has done so without any registration or licensing as a money transmitter under federal or state law.

246.    The Solana Foundation, a Swiss-based organization that plays an influential role in the development and governance of the Solana network alongside Solana Labs, likewise has no record of obtaining a U.S. money transmitter license. The Foundation's ongoing involvement in protocol governance and promotion of token issuance facilitated, but was not accompanied by, any licensing or regulatory compliance.

247.    Jito Labs, Inc., which operates high-priority transaction bundling and MEV-enhanced validator infrastructure on the Solana network, also lacks any money transmitter license from FinCEN or any state authority. Jito Labs benefits financially—via bundler fees or tips—from transactions that involve money transmission through Pump.fun. Nevertheless, Jito Labs has never applied for or obtained any MSB registration or transmitter licensing to facilitate these value transfers.

248.    None of Pump.fun, Solana Labs, the Solana Foundation, or Jito Labs have publicly represented that they are registered as money transmitters, nor have they disclosed any regulatory filings or compliance frameworks associated with such registration. Their public-facing web properties, documentation, and corporate disclosures are silent on any licensing or oversight.

249.    Given that each of these entities plays a key role in a system for receiving convertible digital currency (SOL), converting it into other tokens, and transmitting those tokens to end users or third parties, the absence of any formal licensing or regulatory compliance is a material fact with respect to the unlicensed operation of a money-transmitting business.

## VII. OPERATION OF AN ILLEGAL GAMBLING ENTERPRISE

250.    Pump.fun operates as an illegal gambling enterprise under both federal and New York law. The platform's design, economic mechanics, and reward structure closely mirror the core elements of a gambling operation: users stake value with the hope of winning outsized returns based on chance outcomes, absent any underlying skill, utility, or discernible economic purpose. (*See* Ex. B).

251.    The platform allows users to stake Solana's native cryptocurrency, SOL, in exchange for newly launched meme coins.

252.    The SOL is held in custody by pump.fun, and the transactions are processed using both the Solana Blockchain and Jito Labs software.

253.    These tokens are not issued pursuant to any disclosure-based registration, whitepaper, roadmap, or fundamental project value. Instead, they are launched anonymously, valued purely on speculation, and succeed or fail based entirely on whether they achieve virality on social media or briefly trend on the Pump.fun homepage.

254.    For the overwhelming majority of users, the experience is functionally indistinguishable from slot-machine gambling. Users "buy in" by sending SOL into a bonding curve, with the hopes that others will join shortly afterward—driving the price upward and enabling early buyers to sell for a gain.

255.    Tokens are not selected based on merit, and success is dictated by external market hype, memes, or randomness. Most tokens lose value within hours, and many go to zero before a user can exit.

256.    The platform's economic incentives amplify this dynamic. Pump.fun provides financial rewards—denominated in SOL—to token creators who achieve short-term speculative

milestones. For example, users who launch tokens that hit certain market capitalization thresholds receive direct bounties, often in the range of 0.5 SOL or more.

257.    These creator incentives are not based on substance or project longevity but are awarded solely for inciting rapid, high-volume speculative behavior. This bounty system creates a feedback loop, where token launches are engineered to generate explosive, short-term hype in order to qualify for rewards. (*See* Ex. B).

258.    Public statements by Pump.fun's founders and prominent Solana ecosystem executives have further normalized and embraced the platform's gambling nature. The term "Meme Coin Casino" is routinely used by both insiders and participants to describe the site, and memes such as "Crime is legal" and "It's crime season" are associated with the broader Pump.fun community.

259.    Solana ecosystem leaders, including validators and core developers, have publicly praised the site's engagement metrics while knowingly ignoring the fact that the platform invites and rewards unregulated financial wagering.

260.    The platform also permits minors to engage in this activity. There are no age verification mechanisms of any kind. Users as young as 13 have launched tokens, participated in trading, and accessed creator tools. In one documented case, a minor launched a token, extracted SOL profits, and boasted about the activity on social media. No action was taken to block this behavior or to retroactively remove the token, even after the minor's age became publicly known. (*See* Ex. D at 9).

261.    Users are induced into wagering digital assets based on the illusion of access, fairness, and financial opportunity. In reality, the overwhelming majority of participants lose their funds within minutes or hours, and only a handful of early entrants or insiders profit. The

platform's reliance on random hype cycles, misleading branding, and attention-based incentives strips users of any genuine investment opportunity and instead funnels their funds into a digital shell game operated for the benefit of its creators and infrastructure partners.

262.    Pump.fun's operation of this illegal gambling business is not incidental to its core functionality—it is its core functionality. The business model is premised on speculative wagering and the monetization of rapid trading volume. All of it occurs in violation of federal and state gambling statutes and without any of the compliance obligations that would otherwise attach to a licensed gaming or trading platform.

## VIII. THE ROLES OF SOLANA LABS AND JITO LABS IN THE RICO ENTERPRISE

263.    Solana Labs and Jito Labs were not passive infrastructure providers to Pump.fun—they were integral participants in the racketeering enterprise described in this Complaint. Through technical development, infrastructure management, profit-sharing arrangements, and public promotion, these entities enabled, facilitated, and benefited from Pump.fun's systemic fraud, unlicensed financial operations, gambling violations, intellectual property theft, and wire fraud. Their conduct constitutes direct participation in a racketeering enterprise, as well as contributory liability for the predicate acts committed through the platform.

### A. Solana Labs and the Solana Foundation:

#### I. Organizational Structure and Purpose

264.    Defendant Solana Labs, Inc. ("Solana Labs") is a Delaware corporation and the primary engineering and software development entity responsible for designing, maintaining, and upgrading the Solana blockchain protocol.

265.    Solana Labs was co-founded by Anatoly Yakovenko, who serves as its Chief Executive Officer, and Raj Gokal, who serves as its Chief Operating Officer. Yakovenko is the

lead architect of Solana's core design features, including its consensus mechanism, validator software, account model, and token infrastructure.

266.    Solana Labs developed and currently maintains the Solana validator client, the Solana Program Library ("SPL"), the system and token programs used in every Solana transaction, and the smart contract architecture upon which all token creation and trading is executed on the network.

267.    Defendant The Solana Foundation (the "Foundation") is a Swiss nonprofit organization based in Zug, Switzerland, formed to promote decentralization, validator expansion, and developer engagement on the Solana blockchain.

268.    The Solana Foundation claims to operate independently from Solana Labs. However, in practice, the Foundation and Solana Labs operate in tight coordination. Solana Labs builds and maintains the network infrastructure, while the Solana Foundation allocates funds, distributes SOL tokens, and manages grant-based ecosystem development.

269.    The Foundation is led by Dan Albert, who serves as Executive Director and has appeared in public events and press releases representing the Foundation's operations in the United States.

270.    Together, Solana Labs and the Solana Foundation control and manage the Solana blockchain, including the design of its core architecture, the development of its token programs, and the distribution and monetization of its native token, SOL.

## II. Solana's SPL Token Standard

271.    Solana Labs authored and maintains the SPL Token Program, which serves as the foundational infrastructure for all fungible and non-fungible tokens on the Solana blockchain.

272.    They also enabled Pump.fun to implement a "one-click" token factory that allowed any user to launch a token with automated bonding curve pricing and integrated fee extraction. Pump.fun's core functionality relies on the SPL token program to generate tokens that trade in the Pump.fun bonding curve.

### III. Interdependence Between Solana Labs, Jito Labs, and Pump.fun

273.    Solana Labs is a known early investor in Jito Labs. Its CEO, Anatoly Yakovenko, personally backed the company and has publicly promoted its infrastructure as essential to Solana's validator ecosystem.[21]

274.    Jito Labs' flagship product, the Jito-Solana validator client, is a modified version of Solana Labs' validator software. It would not function without Solana Labs' base code, runtime environment, and transaction architecture.

275.    Pump.fun tokens are created using Solana Labs' SPL token program and are executed through Solana's transaction pipeline. Every transaction on Pump.fun invokes Solana Labs' System Program, Token Program, and associated loader programs.

276.    Solana Labs' CEO has publicly supported and engaged with Pump.fun activity. Yakovenko has tweeted in response to Pump.fun memes, commented on specific token launches, and shared promotional content related to the platform.

277.    Solana Labs also built the network-level enhancements—Sealevel parallelism, Gulf Stream transaction forwarding, and QUIC-based networking—that made low-latency, high-throughput meme coin speculation on Pump.fun feasible.

---

[21] https://www.jito.wtf/blog/announcing-our-10m-raise/

278.    Together, Solana Labs, Jito Labs, and Pump.fun operate as a coordinated ecosystem in which Solana Labs supplies the infrastructure, Jito Labs controls transaction priority, and Pump.fun monetizes speculative token issuance.

279.    Each entity depends on the others for technical feasibility, economic scalability, and financial success. Their interdependence is not incidental—it is deliberate, designed, and profitable.

**B. Defendant Jito Labs, Inc.**

**I.    The Role of Jito Labs in the Pump Enterprise: Formation, Control, and Alignment with Solana Labs**

280.    Defendant Jito Labs, Inc. ("Jito Labs") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the United States. Jito Labs is a software development firm that designs and operates transaction execution infrastructure for the Solana blockchain.

281.    Jito Labs was founded in or around 2021 by Lucas Bruder and Zanyar Sherwani. From its inception, Jito Labs was funded by entities and individuals closely associated with Solana Labs, including Solana Ventures and Anatoly Yakovenko, the co-founder and CEO of Solana Labs.

282.    Jito Labs raised approximately $10 million in early venture capital to develop MEV ("Maximal Extractable Value") infrastructure for the Solana ecosystem. The company publicly stated that its objective was to "democratize MEV," but in practice it built software systems that enabled insiders, validators, and automated bots to manipulate transaction sequencing in exchange for monetary compensation.

283.     Jito Labs operates exclusively within the Solana ecosystem. Its validator software runs only on Solana's blockchain. Its MEV products are engineered to work with the Solana transaction pipeline. Its revenue model is entirely dependent on the volume of transactions occurring on the Solana network, including those initiated through Pump.fun.

284.     Throughout the relevant period, Jito Labs maintained a close financial and strategic relationship with Solana Labs. Solana Labs contributed code, funding, and ecosystem support to Jito's operations. Jito Labs' technology stack is a derivative of the validator software authored and maintained by Solana Labs. The companies' founders and core engineers maintained direct lines of communication, and coordinated on the technical development of the Solana network.

## II.     Jito Labs' Infrastructure and MEV Execution Engine

285.     Jito Labs is the developer and maintainer of the "Jito-Solana" validator client—a modified version of the Solana Labs core validator software. Jito-Solana introduces custom functionality that enables Solana validators to reorder transactions, process private transaction bundles, and receive additional fees known as "tips" in exchange for transaction priority.

286.     Jito-Solana incorporates three core components: (i) a bundling system that allows up to five transactions to be executed automatically; (ii) a tip mechanism that allows the submitter of a transaction bundle to include a monetary incentive to the block producer; and (iii) an off-chain "Block Engine" auction platform that simulates incoming transaction bundles and forwards the most profitable bundle to the validator node for execution.

287.     Validators running Jito's software are able to process "Jito bundles" submitted by third parties. Each bundle may include multiple transactions from multiple wallets, all executed in the same block. These bundles are prioritized based on the amount of SOL included as a "tip" to the validator.

288.    These features allow sophisticated users to pay for front-of-line access to Solana blockspace, enabling them to front-run retail users and extract value from public transactions. The result is a fee-for-priority model of block production in which access to early trades is auctioned off to the highest bidder.

### III. Integration with and Enablement of Pump.fun

289.    Jito Labs' validator infrastructure was essential to the operation of Pump.fun. Pump.fun integrated Jito's bundling and tip system as a core component of its meme coin launch platform.

290.    Pump.fun allows any user to create a token on Solana using a simplified web interface. Upon creation of the token, the Pump.fun platform automatically launches a bonding curve pricing mechanism, in which the token price increases as more tokens are purchased. Early buyers receive the token at the lowest price, and prices escalate rapidly within seconds of launch.

291.    To guarantee early access to the bonding curve, token creators are instructed—via official documentation, third-party tutorials, and developer guides—to construct Jito bundles that include preloaded transactions from insider wallets. These bundles are submitted at the exact moment of token creation, and are accompanied by a Jito tip—described in developer guides as a "bribe"—to ensure validator inclusion.

292.    Jito's infrastructure guarantees that these insider transactions are included in the block before any public purchases. As a result, token creators and affiliated wallets obtain a disproportionate share of the token supply at the minimum price, before other users are even able to interact with the token.

293.    Pump.fun's economic model depends on this mechanism. The ability to front-run public participants and capture the bonding curve spread is the central profit engine for token creators, and is only available through the use of Jito's validator software.

294.    Jito Labs had actual knowledge of this integration. Pump.fun tokens constituted a dominant share of all Jito bundle activity on the network. Public documentation and API endpoints made explicit reference to the use of Jito bundling for Pump.fun tokens. Jito Labs took no steps to restrict or moderate this usage.

**IV. Revenues and Profits from Pump.fun-Related Activity**

295.    Jito Labs earned substantial revenues from the use of its infrastructure to facilitate Pump.fun token launches. These revenues were derived from validator tips attached to transaction bundles submitted through the Jito-Solana client and prioritized by the Jito Block Engine.

296.    In July 2024 alone, validators running the Jito-Solana client earned over $36 million in MEV tips, including $3.2 million in a single day. These fees were paid primarily by users attempting to gain early access to Pump.fun token launches.

297.    By mid-2025, Pump.fun tokens accounted for more than 90% of transaction volume on the Solana blockchain. Because Jito's validator client was in use on over 80% of network stake, the overwhelming majority of its fee revenue during this period was derived from Pump.fun token activity.

298.    Jito Labs became one of the most profitable entities in the Solana ecosystem, with earnings rivaling decentralized exchanges. These earnings came directly from MEV tips paid by insiders and token creators launching and front-running Pump.fun tokens.

299.    At no point did Jito Labs implement safeguards, moderation tools, or access controls to prevent the use of its software for these purposes. Jito Labs knowingly enabled and

monetized the use of its infrastructure to execute front-running trades on a platform that issued unregistered, anonymous, and valueless tokens in violation of federal securities laws.

**V. Co-Dependence on Solana Labs and Participation in the Enterprise**

300.    Jito Labs' software products are entirely dependent on the base infrastructure authored and maintained by Solana Labs. The Jito-Solana client is a fork of Solana Labs' validator code. It uses the transaction pipeline, memory model, rent mechanism, and system programs developed by Solana Labs.

301.    The tokens launched on Pump.fun are created using the Solana Program Library token program, a smart contract framework designed and released by Solana Labs for advanced token programmability. Jito's bundling engine depends on this standard to function properly.

302.    Jito Labs and Solana Labs operate in economic and technical coordination. They share investors, co-develop infrastructure, and rely on the same transaction volume and speculative mania to drive their revenue. The success of Pump.fun, and the resulting surge in MEV tip volume, directly increased the market value of SOL, from which Solana Labs and its affiliates derived substantial financial benefit.

303.    Jito Labs had actual knowledge of how its software was being used. It had the capacity to restrict or disable MEV tips or bundle auctions for Pump.fun tokens. It did not do so. Instead, it chose to profit from transaction ordering that systemically disadvantaged retail users.

304.    Jito Labs was not a neutral infrastructure provider. It was a central actor in the execution layer of the Pump Enterprise. It built and maintained the tools necessary to front-run meme coin launches, earned millions in fees by facilitating those trades, and aligned itself with the same ecosystem actors who designed, promoted, and profited from the scheme.

### C.    A Coordinated and Profitable Racketeering Enterprise

305.    Pump.fun, Solana Labs, and Jito Labs together formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). Their actions were not isolated or incidental—they were coordinated, economically symbiotic, and sustained over a period of years. Pump.fun provided the interface and deceptive marketing; Solana Labs provided the token programs, throughput, and developer infrastructure; and Jito Labs provided the MEV tooling and validator execution necessary to scale the operation.

306.    Each entity benefited financially from the racketeering scheme. Pump.fun extracted fees on every trade and token launch. Solana Labs profited from increased token velocity and appreciation in SOL's price. Jito Labs extracted MEV from high-traffic launches and earned commissions on validator throughput. All three had the capacity to halt or limit the abuse and did not—because doing so would have interrupted their revenue streams and the public perception of Solana's "ecosystem growth."

307.    The relationship between these parties satisfies the criteria for a RICO enterprise: a common purpose (the growth and monetization of Solana-based speculative activity), continuity of structure and operation, and the commission of multiple predicate acts in furtherance of the enterprise. At every level—from token design to fee extraction, to infrastructure maintenance and validator orchestration—Solana Labs and Jito Labs were knowing, intentional participants in the conduct at issue. They are not bystanders to fraud. They are its architects, beneficiaries, and co-conspirators.

## IX. THE PROFITEERS AND THE VICTIMS

### A. Investor Losses

308.    The Pump Enterprise generated extraordinary profits for its creators and infrastructure partners, even as it inflicted catastrophic losses on retail participants like Plaintiffs. This disparity was not incidental—it was intrinsic to the platform's design. Pump.fun, Solana Labs, and Jito Labs created and maintained a financial system where insiders extracted hundreds of millions of dollars, while ordinary users, misled by false representations and structural asymmetries, lost substantial sums at scale.

### B. Solana Labs and the Solana Foundation: Direct Financial Gains

309.    Between January 2024 and mid-2025, Solana Labs and the Solana Foundation experienced a substantial financial windfall as a result of the spike in on-chain activity driven by the launch and usage of Pump.fun.

310.    The Solana blockchain's native token, SOL, appreciated significantly during this period. After falling below $10 in late 2022 following the collapse of FTX, SOL recovered and surged in value throughout 2024. By the end of that year, SOL had risen to over $120, reflecting an increase of more than 1,000% from its 2022 lows.

311.    This price appreciation directly benefited both Solana Labs and the Solana Foundation. As of April 2020, Solana Labs held approximately 50 million SOL, and the Solana Foundation controlled approximately 240 million SOL, representing roughly 49% of the genesis token supply.

312.    In addition to gains on their token holdings, Solana Labs and the Foundation also benefited from a dramatic increase in network fee revenue. Solana's fee model includes a base transaction fee, half of which is burned and half of which is paid to validators. Solana Labs and

the Foundation each maintain substantial validator operations and earn significant rewards through direct staking and validator commissions.

313.    In early 2024, Solana's base transaction fees averaged approximately 60,000 SOL per day. By October 2024, daily fee volume had climbed to more than 150,000 SOL, an increase of 150% in less than a year. At prevailing market prices, this translated to several million dollars per day in fee income distributed across the validator set, of which Solana Labs and the Foundation are major beneficiaries.

314.    During a single 30-day window in late 2024, Solana recorded approximately $88.2 million in transaction fees, compared to just a fraction of that amount months earlier.

315.    The fee spike corresponded directly with the rise of Pump.fun and meme coin speculation, which drove transaction volume and congestion on the network.

316.    Solana Labs and the Solana Foundation did not merely benefit from this activity— they actively supported and enabled it. Neither entity took any steps to restrict or moderate the tools, standards, or infrastructure being used to facilitate the launch of speculative tokens at scale. On the contrary, both entities promoted the resulting "growth" as a sign of ecosystem success.

317.    As a result, Solana Labs and the Solana Foundation realized nine-figure gains through token appreciation, validator rewards, and increased transaction fees, all of which were tied to retail speculation and user losses occurring through the Pump.fun platform.

**C. Jito Labs: MEV Extraction and Windfall Profits**

318.    Jito's software allows block-producing validators on Solana to accept "bundled" transactions submitted off-chain and prioritized based on user-submitted "tips"—monetary incentives paid by searchers and traders to ensure early execution. These tips are a direct source

of profit for validators and for Jito Labs, which takes a percentage cut of each tip executed through its system.

319.    In 2023, total MEV tips paid to Solana validators through Jito's infrastructure amounted to approximately $3.5 million. This figure represented negligible activity compared to Ethereum and highlighted the limited adoption of MEV strategies on Solana during that year.

320.    In 2024, following the rise of meme coin and DeFi trading activity—driven in large part by Pump.fun—MEV extraction on Solana exploded. By year-end, total MEV tips paid to Solana validators through Jito's infrastructure exceeded $674 million, an increase of nearly 200× year-over-year.

321.    Jito Labs' own revenues, derived from its share of MEV tips, increased at a similar pace. In May 2024, Jito Labs collected approximately $39.5 million in fee revenue. By October 2024, Jito's revenue had doubled to $78.9 million for that month alone. In November 2024, Jito reached a peak of $210 million in monthly revenue, making it one of the highest-earning protocols in all of crypto during that period[22].

322.    During the fourth quarter of 2024, Jito Labs facilitated over $400 million in validator tip payouts, reflecting a 504% increase over the previous quarter. These revenues were tied directly to speculative retail trading activity, especially in connection with meme coins launched and traded via the Pump.fun platform.

323.    By December 2024, over 93% of Solana validators were running Jito's MEV-optimized software client. Jito became the de facto infrastructure standard for the Solana network, with Solana Labs formally integrating Jito's bundle relay into the official validator client beginning in 2023.

---

[22] https://defillama.com/protocol/jito-mev-tips?groupBy=monthly

324. This integration resulted in nearly all Solana blocks including MEV bundles. Validators running Jito's software reported staking yields 15–30% higher than baseline. In certain periods of extreme on-chain activity, MEV earnings exceeded even Solana's native inflation-based rewards.

325. Jito's success generated growing concerns within the Solana community about validator centralization, equity, and extractive economics. Nevertheless, Jito Labs retained control over a supermajority of validator coordination, while continuing to earn substantial monthly revenues from retail-driven trading surges.

326. By year-end 2024, Jito's infrastructure was responsible for facilitating over $700 million in MEV tip volume, positioning it as a top revenue-generating actor in the Solana ecosystem and the primary extraction mechanism for transaction-level value across the chain.

327. These earnings were made possible by the speculative token launches and transaction velocity enabled by Pump.fun and executed using infrastructure built by Solana Labs. Jito did not merely facilitate this activity; it monetized and scaled it, taking a percentage of every priority trade that front-ran retail users and converted high-frequency trading into validator and protocol profit.

328. At no time did Jito Labs implement restrictions on the use of its infrastructure to exploit meme coin launches. On the contrary, it promoted its product as the essential execution engine for capturing "value" from Solana's rapid-fire token economy. This economic model depended entirely on continued retail trading , from which Jito extracted revenue at scale.

**D. Pump.fun: Platform Revenues and Windfall Profits**

329.    Solana's low base transaction costs allowed Pump.fun to structure this 1% platform fee as a turnkey model for massive on-chain fee extraction. Every trade on Pump.fun incurred the fee, regardless of token quality, project validity, or user experience.

330.    As the meme coin craze accelerated in 2024, Pump.fun experienced exponential growth in transaction volume and fee revenue. By year-end, over 5.3 million new tokens had been launched through the platform.

331.    During the 2024 calendar year, Pump.fun generated over $400 million in fee revenue, entirely from speculative token creation and trading activity. This figure was confirmed by on-chain analytics, which reported that the platform had accrued more than 2 million SOL in total fees since inception as of January 1, 2025.

332.    The majority of this revenue was earned in the second half of the year. As of mid-2024, Pump.fun's cumulative revenue was only approximately $47 million, but a parabolic surge in token activity during Q3 and Q4 drove that number more than eightfold, reaching over $400 million by year-end.

333.    Average daily revenue on Pump.fun rose from approximately $900,000/day in Q3 2024 to roughly $2.5 million/day in Q4. On peak trading days, Pump.fun earned in excess of $10 million in platform fees in a single 24-hour period, driven by rapid token launches and speculative buying frenzies.

334.    This revenue was collected automatically and non-discriminatorily, meaning Pump.fun extracted fees whether or not the underlying token was a scam, impersonation, or rug pull. Every token launched and traded on the platform generated fees for the protocol and its operators.

335.    By late 2024, Pump.fun had become one of the highest-earning decentralized applications in the crypto ecosystem. During its peak month, Pump.fun's revenue exceeded that of major Ethereum protocols such as Uniswap, which earned approximately $100 million/month during the same period.

336.    Analysts and media outlets widely noted the phenomenon, with some referring to Pump.fun as having gone "from memes to $500M in revenue."[23] Others criticized the platform for "plundering" the Solana ecosystem by extracting massive fees without contributing to sustainable growth or user protections.[24]

337.    The revenue generated by Pump.fun was made possible only because of infrastructure built and maintained by Solana Labs (including the Solana Library token program) and because of priority execution mechanisms provided by Jito Labs' validator bundling engine.

**E. Solana Insiders: Who Profited and How**

338.    The Pump.fun scheme generated billions of dollars in transactional fees and validator tips. Much of that value ultimately accrued to Solana's inner circle—including the Solana Foundation, Solana Labs, and its executive leadership (*i.e.*, the Individual Defendants), who collectively controlled the largest SOL token holdings and staking infrastructure on the network.

339.    The Solana Foundation, based in Switzerland, was allocated approximately 10.46% of all SOL tokens at genesis, with discretionary control over an additional 38.9% designated as community reserves. Combined, the Foundation controlled tens of millions of SOL tokens throughout the relevant period.

---

[23] https://www.forbes.com/sites/boazsobrado/2025/02/22/from-memes-to-500-million-in-revenue-the-pumpfun-phenomenon/
[24] https://www.aicoin.com/en/news-flash/2428912

340.    At SOL's late-2024 price of approximately $190, the Foundation's treasury was valued at over $18 billion, making it one of the wealthiest entities in the crypto industry. At that valuation, the Solana Foundation held more than ten times the liquid treasury of the Ethereum Foundation.

341.    In addition to unrealized token gains, the Foundation earned annual staking rewards of approximately 4 million SOL based on public staking yields and reported treasury size—translating to $700–$800 million in recurring annual income during 2024–2025.

342.    These gains coincided directly with the meme coin explosion on Pump.fun. The surge in network usage drove transaction fee volume to over 150,000 SOL per day, boosting SOL demand, raising token prices, and inflating the value of the Foundation's holdings. The Foundation did not intervene to slow or restrict the activity. It profited from it.

343.    Solana Labs, a privately held company, likewise saw enormous financial upside. In June 2021, Solana Labs raised $314 million from a private token sale. The company retained significant SOL reserves and equity stakes in ecosystem projects built on Solana—including those that benefited from the Pump.fun trading frenzy.

344.    As SOL appreciated in 2024, Solana Labs' treasury and investment portfolio ballooned in value. The company earned indirect revenues through its validator positions and direct token holdings, which appreciated 10× from their 2022 lows as Pump.fun drove record on-chain activity.

345.    The executives and co-founders of Solana Labs—including defendants CEO Anatoly Yakovenko and COO Raj Gokal—also realized or stood to realize extraordinary personal wealth. Yakovenko's estimated net worth reached $500 million to $1 billion in 2024, largely based

on SOL holdings and early token allocations. Gokal's net worth was estimated in the nine-figure range.[25]

346.    While some executive holdings were subject to vesting, many early insiders had already liquidated significant positions during prior cycles and retained enough tokens to see renewed upside during the 2024 price rally.[26]

347.    This wealth was not generated from product revenue, long-term value creation, or ecosystem fundamentals. It was driven by a Meme Coin Casino operated through Pump.fun, using infrastructure maintained by Solana Labs and monetized by Jito Labs. The more scams, pump-and-dumps, and speculative trades launched on Pump.fun, the higher the transaction volume, SOL price, and validator rewards.

348.    The Foundation, Solana Labs, and their executives did not act to stop it. They benefited from it—passively by holding appreciating assets, and actively by continuing to operate, promote, and support the underlying infrastructure without restriction.

349.    These defendant insiders—through token allocations, validator commissions, staking yields, and protocol-linked price action—extracted billions of dollars in direct and indirect value from a system that inflicted widespread losses on ordinary retail users through directing the Pump Enterprise.

**F. Retail Trader Estimated Losses**

350.    While the Solana Foundation, Solana Labs, Jito Labs, and Pump.fun collectively realized billions of dollars in platform fees, token appreciation, staking rewards, and validator

---

[25] https://www.valuewalk.com/net-worth/anatoly-yakovenko/
[26] https://solana.messari.io/token-unlocks

commissions, the vast majority of individual users who interacted with the Pump.fun ecosystem lost money—and in many cases, suffered severe and unrecoverable financial losses.

351.    Between January and December 2024, more than 4.25 million unique wallets traded at least ten tokens through the Pump.fun platform. Public blockchain data and Dune Analytics reports confirm that over 60% of those wallets ended in a net negative position. Approximately 2.4 million wallets posted losses of up to $1,000, with estimated average losses of $500 each, resulting in approximately $1.2 billion in aggregate losses across that bracket alone.

352.    Another 221,800 wallets suffered losses between $1,000 and $10,000. Applying a conservative average of $5,500 per wallet, users in this category incurred approximately $1.22 billion in total losses. An additional 30,000 wallets lost between $10,000 and $100,000. Based on an average estimated loss of $55,000 per wallet, this bracket accounted for another $1.65 billion in losses.[27]

353.    At the higher end, 1,700 wallets experienced losses in excess of $100,000, with conservative estimates placing average losses at $200,000, for a combined loss of $340 million. At least 46 wallets reported losses exceeding $1 million, resulting in a minimum of $46 million in additional realized losses, not including those whose losses exceeded that figure substantially.

354.    In total, aggregate user losses across Pump.fun's core platform and related trading venues are estimated between $4 billion and $5.5 billion. These losses were not speculative projections but based on realized outcomes from closed trading positions and on-chain settlement history.

355.    By contrast, very few users profited. Fewer than 5,000 wallets generated profits in excess of $100,000, and only 311 wallets realized more than $1 million in cumulative gains. A

---

[27] https://beincrypto.com/pump-fun-trading-data-majority-lose-money/

user who earned more than $10,000 in profit on Pump.fun ranked in the top 0.412% of all users. The overwhelming majority of wallets—well over 95%—never cleared $10,000 in gains.

356.    These disparities highlight the core extraction dynamic built into the Pump.fun platform. While trading activity was framed as open and democratized, in practice, profits were reserved for a small cohort of early insiders and high-frequency traders, while retail users consistently absorbed losses.

357.    Losses were not limited to token purchases made on the Pump.fun interface. After token "graduation," most assets were listed on decentralized exchanges such as Raydium, where prices collapsed almost immediately. Between 81% and 97% of all tokens launched through Pump.fun lost more than half their value post-graduation, with many falling 90% or more. This secondary phase of speculation—driven by liquidity pulls, insider dumping, and thin markets—produced an additional estimated $1.2 billion to $2 billion in retail losses.

358.    These outcomes occurred in the absence of any safeguards. The Pump.fun platform implemented no KYC, no disclosures, and no restrictions on token creation or relisting. There were no fraud filters, verification processes, or enforcement mechanisms. Each token launched—regardless of legitimacy or design—was subject to the same monetization pipeline: transaction fees to Pump.fun, validator tips to Jito Labs, network load to Solana Labs, and upward pressure on SOL token value.

359.    Pump.fun earned an estimated $600 to $700 million in platform fees during the same time period. This figure is dwarfed by the losses borne by users—confirming that user capital not only funded the platform, but also operated as the exit liquidity for insiders who designed and benefited from the system. Those insiders earned millions while retail participants were left holding valueless tokens.

360. At every stage—launch, graduation, secondary listing—the financial design of Pump.fun ensured that each transaction extracted value from retail users and rerouted it through validator commissions, fee flows, and token appreciation to the benefit of the Defendants and their affiliates.

361. Between January 2024 and mid-2025, Pump.fun's founders and insiders moved over $700 million in profits off-chain, with large portions funneled to centralized exchanges such as Kraken during peak market periods. These funds were accumulated through the platform's fee mechanisms—primarily a 1% transaction tax applied to every buy and sell across tens of millions of tokens—and from early access trading strategies deployed through bots, developer wallets, and privileged smart contract interactions.

362. The imbalance between gains and losses further underscores the fraudulent and unjust nature of the enterprise. While retail users were induced into transacting based on false promises and asymmetric information, the Defendants engineered a system in which they were always guaranteed to win. Fees accrued whether a token succeeded or failed. Bots and MEV infrastructure gave insiders early access to every token. Solana Labs and Jito Labs extracted validator and MEV rewards from the resulting trading activity—capturing systemic value from every transaction, regardless of outcome.

363. The scale of Pump.fun's dominance on the Solana blockchain confirms its centrality to the economic engine of the ecosystem. By Q2 2025, Pump.fun tokens accounted for more than 90% of all transaction volume on the Solana blockchain. This volume included both primary bonding curve trades and secondary DEX transactions, much of which passed through validator nodes running Jito Labs software. As a result, Jito Labs collected a substantial portion of

MEV rewards, validator tips, and staking commissions derived from Pump.fun's speculative activity.

364.    Solana Labs also benefited enormously. The dramatic increase in transaction throughput and user activity drove demand for SOL, the native token of the Solana network. As SOL became the required medium for launching and purchasing Pump.fun tokens, its price surged, hitting multi-year highs in early 2025. Solana Labs and its affiliated entities, which collectively hold a large share of the SOL token supply, realized enormous paper gains and liquid profits from this appreciation.

365.    This was not the first time Solana Labs had profited from a retail-driven speculative boom. During the 2021–2022 NFT bubble, Solana Labs and its investment vehicle, Solana Ventures, backed Magic Eden, the primary marketplace for NFT speculation. That boom saw similar structural patterns: artificial hype, rapid asset inflation, insider trading advantages, and a devastating collapse that wiped out retail value while enriching core infrastructure participants. Pump.fun represents the continuation of that same model, now repackaged for meme coins instead of NFTs. The result is the same: retail investors suffer; Solana and its closest partners prosper.

366.    These dynamics support both the intent and continuity elements of the civil RICO claims asserted in this Complaint. The enterprise created by Pump.fun, Solana Labs, and Jito Labs was not a short-lived fraud—it was the second iteration of a proven playbook. By leveraging viral marketing, architectural complexity, and structural opacity, these entities created a self-sustaining machine for wealth extraction—one that depended on the consistent sacrifice of retail participants to generate exponential returns for the insiders.

## X. PUMP.FUN SOLD CERTAIN UNREGISTERED SECURITIES

### A. Pump.fun's Role as Issuer and Seller

367.    Pump.fun does not operate as a passive token launch exchange where users independently deploy tokens. Instead, people who want to create tokens submit code through the Pump.fun interface. That code is stored on Pump.fun's smart contracts and is not live on the blockchain. Only when another user purchases the code does Pump.fun execute the launch. At that point, Pump.fun mints the token, creates the liquidity pool, and manages trading through its bonding-curve system. Pump.fun controls this entire process—it executes the launch, sets the economics, and routes fees. It is not a passive platform.

### B. Plaintiffs Do Not Contend That All Pump.fun Issued Tokens Are Securities

368.    Pump.fun has launched more than eleven million tokens. Many were joke coins, memes, or impersonations of celebrities and companies without consent. These included tokens using corporate logos, stock tickers, and public figures' names, often with no functionality or roadmap. Plaintiffs do not claim that all of these tokens were securities.

369.    The tokens: StakeCoin ("STC"), QuStream ("QST"), BunkerCoin ("BUNKER"), DeepCore AI ("DPCORE"), AgentPy (APY), Apex AI (APEX), Verse World (VERSE), BAYC AI (BAYCI), Alchemist AI (ALCH), CINO (CINO), Swarms (SWARMS), Collaterallize (SCOLLAT), XSPA (XSPA), Hive AI (BUZZ), SwarmNode.ai (SNAI), Codec Flow (CODEC), PVS (PVS), Convergent (CVGT), First Convicted Raccoon (FRED), and GRIFFAIN (GRIFFAIN) (collectively, the "Pump Securities") are securities and were promoted as having real-world utility and value tied to the future success of specific projects.

370.    They included references to revenue-generating platforms, tokenized assets, artificial intelligence tools, and staking systems. Purchasers were invited to "get in early," before

the projects were built or released, and profit from future developments. These are the offerings that form the basis of Plaintiffs' securities claims. The broader class of tokens launched on Pump.fun remains relevant to the RICO and other claims in this Complaint.

### C. Pump.fun Sold as Investment Contract Securities

371.    Each of the Pump Tokens was offered and sold as an investment contract. Across all twenty tokens, the following characteristics were present:

372.    Investment of Money: Purchasers used SOL to buy the tokens directly from Pump.fun's system. These were paid transactions through bonding-curve contracts.

373.    Common Enterprise: The tokens were structured so that users' funds were pooled. The price increased or decreased depending on the total level of participation. Every buyer's outcome depended on the success of the project as a whole establishing horizontal or vertical commonality.

374.    Expectation of Profits: Buyers were told that the token would increase in value over time as future steps were completed. This included promises of platform launches, product rollouts, or integration into larger ecosystems. The tokens were described as reasonable opportunities for return on investment.

375.    Efforts of Others: The future value of the token depended on the issuer or platform doing work after the sale. This included building apps, launching services, completing integrations, or managing staking systems. Purchasers were not buying completed products—they were investing in projects that had yet to be built.

376.    These common features show that the Pump Tokens were not digital collectibles or memes. They were positioned as financial assets sold to the public with the promise of future gains.

**D. Pump.fun's Fees, and Structural Exploitation**

377. At the center of Pump.fun's economic model is a platform-wide 1% fee applied to every transaction. This fee is collected automatically from all buys and sells conducted through the bonding curve, as well as from tokens that "graduate" to external decentralized exchanges (DEXs). Graduation occurs when a token achieves sufficient trading volume and meets arbitrary platform-defined thresholds. While framed as a reward for success, graduation has itself become a vector for exploitation: tokens that graduate are often used to promote the platform's viability, while simultaneously being dumped by insiders who received early allocations or exploited the bonding curve for artificial gains.

378. Pump.fun's revenue extraction model is structurally predatory. The platform, which has no age restrictions, KYC checks or AML protocols, is not merely a tool for token deployment; it is a financial product whose primary function is to manufacture and capitalize on rapid cycles of speculative buying and collapse.

379. Every token launched generates fee income for Pump.fun, regardless of whether it retains value, fulfills any stated purpose, or results in investor loss. In this respect, Pump.fun is economically aligned with volatility, not long-term value creation.

380. Solana Labs and Jito Labs played indispensable roles in enabling this scheme. Solana Labs developed and maintained the SPL token program and the validator infrastructure that allows Pump.fun to operate at scale. Jito Labs, for its part, provided the tools for maximum extractable value (MEV) harvesting, enabling early buyers and bundle-senders to front-run new token launches.

381.    Together, their infrastructure facilitated real-time token creation, instantaneous liquidity, and arbitrage opportunities that insiders could exploit before retail users even had the chance to transact.

382.    Pump.fun exercises comprehensive control over every token launched on its platform. All tokens are built using standardized smart contract templates authored or controlled by Pump.fun, with no deviation allowed from the platform's design choices.

383.    Pump.fun sets the economic parameters for token issuance, manages the bonding curve liquidity pools, governs graduation conditions, and profits directly from every trade. Token creators are not independent developers—they are participants in a turnkey system entirely operated by Pump.fun and its corporate parent.

384.    As such, Pump.fun qualifies as both the issuer and the statutory seller of every token generated through its platform. Its direct role in designing, deploying, marketing, and monetizing the tokens, combined with its collection of fees on every transaction and its central control over the underlying smart contract infrastructure, renders it liable under federal securities laws. Far from being a neutral tool provider, Pump.fun actively solicits investment, facilitates token speculation, and profits from the unlawful offering and sale of unregistered securities.

## CLASS ACTION ALLEGATIONS

385.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, and seek certification of the following Class and Pump Tokens Subclass.

386.    Plaintiffs seek to represent the following "Class" and "Pump Tokens Subclass" (collectively, "the Classes"):

(1)    The Class: All persons who purchased any Tokens sold through Pump.fun during the "Class Period" (from March 1, 2024 through the date of this Complaint) and had an out-of-pocket loss on their investment in Pump.fun Tokens.

(2)    Pump Tokens Subclass: All persons who purchased the twenty Pump Tokens.

387.    Plaintiffs reserve the right to modify or refine the definitions of the Class or Pump Tokens Subclass based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

388.    Excluded from the Classes are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

389.    The members of the Class and Subclass are so numerous that joinder of all members is impracticable. While the exact number of Class and Subclass members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class and tens of thousands of members in the Subclass. For example, several blockchain analysis websites show that more than 174,000 crypto wallets hold just the First Convicted Raccoon Token and the GRIFFAIN Token.[28]

390.    Members of the Class and Subclass are readily ascertainable and identifiable. Members of the Class and Subclass may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or their agents.  They may be notified of the

---

[28] *See* https://solscan.io/token/CNvitvFnSM5ed6K28RUNSaAjqqz5tX1rA5HgaBN9pump
https://solscan.io/token/A8C3xuqscfmyLrte3VmTqrAq8kgMASius9AFNANwpump
https://solscan.io/token/KENJSUYLASHUMfHyy5o4Hp2FdNqZg1AsUPhfH2kYvEP.
(Last accessed July 22,  2025).

pendency of this action by electronic mail using a form of notice customarily used in securities class actions or by sending notice directly to the wallets themselves.

391.    Plaintiffs' claims are typical of the claims of the Class and Subclass members as all Class and Subclass members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiffs do not have any interests that are in conflict with the interests of the members of the Class or the Subclass.

392.    Plaintiffs and members of the Class and Subclass sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

393.    Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and Subclass and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to those of the Class and Subclass.

394.    Common questions and answers of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class and Subclass, including, but not limited to, the following:

a)    Whether the Tokens are securities under the Securities Act; 268;

b)    Whether Defendants' offerings and sales of the Tokens violated the Securities Act;

c)    Whether the Defendants violated RICO;

d)    Whether Defendants violated NY G.B.L. §§349 and 350;

e)    Whether Defendants were unjustly enriched;

f)    Whether the members of the Classes have sustained damages and, if so, the proper measure of damages; and

g)      Whether the Class and Subclass are entitled to injunctive relief, restitution and/or rescission.

395.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some of the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class and Subclass to individually redress the wrongs done to them.

396.    Class treatment will also permit the adjudication of claims by many Class and Subclass members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class and Subclass would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

397.    Plaintiffs are unaware of any significant difficulties that are likely to be encountered in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I

**Violation of Section 12(a)(1) of the Securities Act of 1933 (Against Defendants Pump.fun Alon Cohen, Dylan Kerler, and Noah Bernhard Hugo Tweedale) on Behalf of the Pump Tokens Subclass**

Plaintiffs incorporate by reference the allegations in the proceeding paragraphs 1 through 397.

398.    This Count is asserted on behalf of Plaintiffs and the Pump Token Subclass against Defendants pursuant to Section 12(a)(1) of the Securities Act, 15 U.S.C. §77l(a)(1).

399.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that the Defendant named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(1) claim.

400.    This Count is asserted against Defendant Baton Corporation, who conducts business and operates as Pump.fun, and is based upon Sections 5 and 12(a)(1) of the Securities Act.

401.    The Pump Tokens are, and were, securities as defined by the Securities Act.

402.    The Pump Tokens were never registered as securities with the SEC, and no registration statement has ever been filed with the SEC for the Pump Tokens.

403.    Baton Corporation is a statutory seller of the Tokens because Pump.fun, which it owns, controls, and does business as, sold, promoted, or solicited the sale of the Pump Tokens and/or passed titled to the Pump Tokens to the Plaintiffs and the Subclass.

404.    Baton Corporation and Pump.fun began operating and issuing Tokens on January 19, 2024. Baton Corporation has issued, offered, promoted, sold, and/or solicited the sale of Pump Tokens within the last year. For example, Baton Corporation and Pump.fun began offering the FRED Token and the GRIFFAIN Token for sale on October 31, and November 2, 2024, respectively.

405.    Baton Corporation is therefore liable to the Plaintiffs and the Class for rescission and/or rescissory or compensatory damages in an amount to be determined at trial for Plaintiff and the Subclass's purchases of the Pump Tokens.

406.    Plaintiffs and the Subclass hereby tender their Pump Tokens back to Baton Corporation and/or Pump.fun.

407.    Each of the Pump Tokens was offered and sold as an investment contract. Across all twenty tokens, the following characteristics were present:

A.    Investment of Money: Purchasers used SOL to buy the tokens directly from Pump.fun's system. These were paid transactions through bonding-curve contracts.

B.    Common Enterprise: The tokens were structured so that users' funds were pooled. The price increased or decreased depending on the total level of participation. Every buyer's outcome depended on the success of the project as a whole establishing horizontal or vertical commonality.

C.    Expectation of Profits: Buyers were told that the Pump Tokens would increase in value over time as future steps were completed. This included promises of platform launches, product rollouts, or integration into larger ecosystems. The Pump Tokens were described as reasonable opportunities for return on investment.

D.    Efforts of Others: The future value of the Pump Tokens depended on the issuer or platform doing work after the sale. This included building apps, launching services, completing integrations, or managing staking systems. Purchasers were not buying completed products—they were investing in projects that had yet to be built.

408.    These common features show that the Pump Tokens were not digital collectibles or memes. They were positioned as financial assets sold to the public with the promise of future gains.

**D. Pump Tokens are Unregistered Securities Under Howey**

409.    StakeCoin ("STC") — Real-World-Asset pass-through. A screenshot of this token's trading page on Pump.fun describes StakeCoin as "integrating Real World Assets with

91

blockchain to bridge TraFi and DeFi." Investors purchased STC using SOL through a bonding-curve mechanism, with returns allegedly tied to revenue from tokenized off-chain assets. The roadmap includes the tokenization of real-estate deeds, which are to be managed by the issuer. (*See* Ex. C at 2).

410.    QuStream ("QST") — Quantum-Safe L1. QST is marketed as a Layer-1 blockchain utilizing "patented post-quantum encryption." Launch materials indicate that future validator staking rewards will be distributed, and purchasers are led to expect that appreciation in token value will follow successful research and deployment of the referenced technology. Proceeds are pooled in a genesis contract. (*See* Ex. C at 2).

411.    BunkerCoin ("BUNKER") — Crisis-Shelter Finance. BUNKER marketing claims ownership of "the world's biggest private bunker near Berlin" and discusses future sales of panic-room memberships and additional developments in The Gambia. Purchasers contribute funds with the expectation that the issuer will construct, operate, and monetize these facilities and related services. (*See* Ex. C at 3).

412.    DeepCore AI ("DPCORE") — Web3 AI Agent Hub. DPCORE materials describe a platform for "MCP-powered next-gen AI agents," and promote token staking to earn rewards from agent-task transactions. The projected token value is presented as dependent on the issuer's ability to deliver a functioning marketplace and AI infrastructure. (*See* Ex. C at 3).

413.    AgentPy ("APY") — Python AI-on-Solana Framework. APY purports to serve as a connector between AI agents and Solana-based applications, offering "early adopter token rewards" upon full launch. The commercial viability of the token is directly tied to the successful development and implementation of the issuer's software product. (*See* Ex. C at 4).

414.    Apex AI ("APEX") — Medical-Diagnostics Coin. APEX is presented as a token for early detection of gastrointestinal cancers using high-accuracy diagnostic tools. Token value is linked to pending FDA approvals and future integration with healthcare providers, all controlled by the issuer. (*See* Ex. C at 4.)

415.    Verse World ("VERSE") — Hyper-Realistic Metaverse. VERSE is marketed as the native token of an "evolutionary metaverse" offering: land parcels, storefronts, and creator monetization. Investors contribute SOL and rely on the issuer's future development and hosting of the platform to derive potential returns. No registration statement or exemption has been filed. (*See* Ex. C at 5.)

416.    BAYC AI ("BAYCI") — Mars-Ape Storyline Token. BAYCI purports to tie its value to a comic-themed metaverse and "time-space portal" game narrative built around mutated ape NFTs. These creative and gaming assets are under the exclusive control of the issuer. Promotional materials use BAYC imagery without authorization (see Counterfeit section). (*See* Ex. C at 5.)

417.    Alchemist AI ("ALCH") — No-Code AI-App Builder. ALCH promotes the concept that users will be able to "manifest any idea into a living application" through its no-code AI framework. Marketing suggests future profit-sharing mechanisms for stakers. The anticipated value of the token is based on the successful launch of the platform. (*See* Ex. C at 6.)

418.    CINO ("CINO") — Private-Aviation Finance Coin. CINO's promotional materials state that the token will finance private jet acquisitions and distribute charter profits to holders. The investment is structured around a pro-rata share in future operational income from a proposed jet fleet. (*See* Ex. C at 6.)

419.    Swarms ("SWARMS") — Agentic Payments Coin. Swarms is marketed as the "default payment currency" for an emerging on-chain "agent ecosystem." The token is designed to facilitate transactions within that ecosystem, implying future utility contingent on development of the broader platform. (*See* Ex. C at 7).

420.    Collaterallize ("SCOLLAT") — RWA App Token. SCOLLAT promotes itself as a project to "bring RWAs to the masses," directing users to download an app from a mobile store. The issuer's roadmap and control over RWA integration suggest reliance on its efforts for token value appreciation. (*See* Ex. C at 7).

421.    XSPA ("XSPA") — AI Blockchain Platform Token. XSPA is described as a next-generation token powering a decentralized AI platform. The whitepaper outlines amulti-phase roadmap including smart contract deployment, an AI marketplace, DAO governance, and cross-chain functionality. Token value is linked to the issuer's ability to execute on these milestones, including monetization of AI models, staking programs, and strategic partnerships. The public sale is scheduled for September 2025. (*See* Ex. C at 8). Hive AI ("BUZZ") — DeFi Automation Token. BUZZ is promoted as a solution to "simplify DeFi through on-chain agents." The platform's functionality, and any value derived by token holders, depends on future deployment and agent activity controlled by the issuer. (*See* Ex. C at 8).

422.    SwarmNode.ai ("SNAI") — Serverless AI Infrastructure Token. SNAI markets itself as a token for "serverless AI infra," suggesting a planned infrastructure layer for AI operations. Token value appears tied to delivery of technical functionality not yet available to purchasers. (*See* Ex. C at 9).

423.    Codec Flow ("CODEC") — AI Desktop Infrastructure Token. CODEC advertises itself as powering on-demand "cloud desktops for AI agents" using MCP and trusted execution

environments (TEE). Purchasers rely on issuer-delivered infrastructure to give the token value or utility. (*See* Ex. C at 9).

424.    PVS ("PVS") — Paraverse Utility Token. PVS is presented as the utility token for the "Paraverse" ecosystem, used to pay for rendering services, receiving airdrops, and access to 3D applications. Value to purchasers is tied to the development and rollout of that ecosystem under issuer control. (*See* Ex. C at 10).

425.    Convergent ("CVGT") — Collateralized Stablecoin Protocol Token. CVGT is described as the governance and fee-share token for a protocol that allows users to mint the stablecoin $USV by depositing staked Solana ($JitoSOL) collateral. The platform promises yield retention and liquidity access, while distributing all protocol fees to CVGT stakers. Purchasers rely on the issuer's technical development and ongoing operations. (*See* Ex. C at 10).

426.    The "First Convicted Raccoon" Token (ticker: FRED). Launched on Pump.fun on 31 October 2024, FRED promised investors "222,222× upside" and featured a five-step "Road-Map" culminating in centralized exchange ("CEX") listings and branded merchandise. Buyers paid SOL into the bonding-curve pool, and their profit prospects depended entirely on the promoter's promised listings and influencer marketing.

427.    The GRIFFAIN Token. Marketed as "AI-driven trading in meme form," GRIFFAIN debuted on Pump.fun on December 5, 2024. Promotional tweets embedded in the token tile claimed "0 → $10 M in 24 h" and teased future staking rewards of 300% APY—features wholly dependent on smart-contract code the promoter controlled. Purchasers clearly expected passive returns from the issuer's technical efforts.

428.    All Pump Tokens created on the Pump.fun platform necessarily postdate its founding on January 19, 2024.

A.        No Exemption from Registration is Applicable

429.    In each of the token launches listed above—including STC, QST, BUNKER, DPCORE, APY, APEX, VERSE, BAYCI, ALCH, CINO, SWARMS, SCOLLAT, XSPA, BUZZ, SNAI, CODEC, PVS, and CVGT—and as reflected on Pump.fun's trading platform, purchasers contributed capital in the form of SOL, in exchange for digital tokens whose value was represented as dependent on the managerial or entrepreneurial efforts of the issuer.

430.    Each purchase sent SOL into a bonding-curve contract that automatically minted tokens; when sold, the contract burned the tokens and returned SOL—pooling funds and linking returns to the token's market activity.

431.    These offerings uniformly involved the pooling of investor funds, promises of future functionality or profit-sharing, and an expectation that token value would increase based on development milestones under the issuer's exclusive control.

432.    Under the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), these Pump Tokens constitute "investment contracts" and therefore qualify as securities. None of the Pump Tokens were registered with the SEC, and no valid exemption from registration was claimed.

433.    Absent an applicable exemption, the Securities Act prohibits the offer and sale of securities unless a registration statement is filed or in effect. At the time of each Pump Token's launch, no such registration statement had been filed or was in effect with respect to the offer or sale of these Pump Tokens.

434.    Accordingly, Defendant Pump.fun offered and sold the Pump Tokens identified in violation of 12(a)(1) of the Securities Act of 1933, without registering the offerings or qualifying for any exemption.

435.    Pump.fun acted as the issuer and statutory seller of each Pump Token by executing the token launches, setting the economic structure, and transferring tokens directly to purchasers through its platform.

436.    Plaintiffs purchased Pump Tokens directly from Pump.fun.

437.    Plaintiffs are entitled to rescission or damages under Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(1).

**COUNT II**

**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) & 1962(d) (Against All Defendants As To All Tokens and the Class, And In The Alternative, With Respect To The Pump Tokens and the Pump Tokens Subclass)**

Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 through 397.

438.    This Count is asserted against all Defendants regarding all tokens sold on Pump.fun and, with respect to the Pump Tokens in the event the Court determines that the Pump Tokens sold through Pump.fun are not "Securities" within the meaning of the federal securities laws, in the alternative to Count I.

439.    Plaintiffs seek relief under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§1961 et seq.  Nothing contained in this Count shall be construed to incorporate or adopt any allegation that the twenty Pump Tokens are "Securities".  If the Court finds that the Tokens are Securities, Count I (Section 12(a)(1)) fully states Plaintiffs' entitlement to relief and this RICO Count need not be reached as to the Pump Tokens Subclass.

440.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3). From January 2024 to the present, Pump.fun Inc., Solana Labs Inc., Solana Foundation, and Jito Labs Inc. formed an association-in-fact enterprise (the "Pump Enterprise") with the common purpose of launching, promoting, and profiting from "Pump Tokens." Defendants directed,

conducted, and participated, directly and indirectly, in the affairs of the Pump Enterprise through a pattern of racketeering activity—including repeated acts of wire fraud (18 U.S.C. § 1343), and operation of an unlicensed money-transmitting business (18 U.S.C. § 1960)—that affected interstate and foreign commerce.

441.    The racketeering acts were related and continuous, occurring on thousands of occasions over an eighteen-month period, and directly caused Plaintiffs and the Class to purchase Pump Tokens at artificially inflated prices and suffer millions of dollars in losses when prices collapsed.

442.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, costs of suit, and reasonable attorneys' fees. In furtherance of the same unlawful purpose, each Defendant agreed that members of the Pump Enterprise would commit at least two predicate acts; all Defendants are therefore also liable for RICO conspiracy under 18 U.S.C. § 1962(d).

### The Enterprise

Plaintiffs reallege and incorporate by reference paragraphs 1 through 397 of the Complaint as though fully set forth herein.

443.    At all relevant times, Defendants Pump.fun, Solana Labs, the Solana Foundation, and Jito Labs constituted an association-in-fact enterprise (the "Pump Enterprise") within the meaning of 18 U.S.C. § 1961(4). This Pump Enterprise was formed and operated for the common purpose of deploying a pseudonymous online gambling system disguised as a decentralized token-launch platform, monetizing that system through high-frequency speculative activity, and extracting maximum fee-based and validator-derived revenue from retail participants while evading financial regulation, intellectual property protections, and consumer safeguards.

444.    Pump.fun provided the public-facing interface of the enterprise, designed to simulate a digital slot machine through which users could gamble SOL in exchange for algorithmically priced tokens. Through its "one-click" token launch mechanism and bonding-curve liquidity model, Pump.fun enabled anonymous users to instantly mint tradable digital assets, priced to reward early entry and engineered to collapse shortly after launch. Every token launch was automatically routed through Pump.fun's smart contract system, and every trade incurred a fixed 1% platform fee payable to Pump.fun and its insiders. Solana Labs and the Solana Foundation, acting in concert, supplied the core infrastructure upon which the Pump Enterprise operated. Solana Labs authored and maintained the SPL Token Program and the Token-2022 upgrade, which formed the technical basis for every token issued through Pump.fun.

445.    These system programs, validated by Solana's global network of validators and executed through the Solana runtime environment, enabled instantaneous token creation, programmable pricing curves, and wallet-based distribution—all without oversight, age verification, or know-your-customer procedures. Solana Labs also authored the system-level validator software that processed each transaction, collected validator commissions, and monetized block space through the network's high-throughput architecture. Together with the Solana Foundation—which controlled more than 240 million SOL and maintained a significant validator presence—Solana Labs profited from the speculative activity initiated through Pump.fun by capturing validator fees, increasing SOL demand, and inflating the perceived usage of the Solana network.

446.    Jito Labs served as the execution layer of the enterprise, providing the modified validator software (Jito-Solana) and block-bundling infrastructure that enabled early buyers, bots, and insiders to manipulate transaction ordering and extract value from retail participants. The Jito

validator client, installed on over 90% of Solana's consensus stake, allowed private users to submit transaction bundles accompanied by "tips" that guaranteed block inclusion and execution priority. This mechanism allowed insider wallets to insert transactions milliseconds ahead of the public—acquiring tokens at the lowest bonding-curve price and immediately flipping them at a profit once retail demand materialized. Jito Labs collected a cut of each tip paid to its validator clients, earning hundreds of millions of dollars in MEV-derived revenue during the height of Pump.fun's activity.

447.    The enterprise's structure was unified and interdependent. Pump.fun could not operate without Solana Labs' validator framework and token infrastructure. Jito Labs could not profit without Pump.fun's token launches and speculative traffic. Solana Labs could not sustain SOL's appreciation or justify its ecosystem metrics without the throughput driven by Pump.fun and Jito. Each Defendant had a defined role, a share in the proceeds, and visibility into the conduct of the others.

448.    All three coordinated their operations to facilitate, promote, and extract value from the high-frequency launch and churn of valueless digital tokens, while disclaiming responsibility and avoiding licensing obligations.

449.    This enterprise functioned continuously from at least January 2024 through the present, operating through a stable set of relationships, shared infrastructure, and repeat conduct that spanned tens of millions of transactions, billions of dollars in trading volume, and thousands of token launches. It operated across national borders, used interstate wire facilities, and inflicted widespread and foreseeable losses on retail participants, who were misled into believing they were engaging in decentralized finance or early-stage investing, when in fact they were wagering in an unlicensed, rigged, and extractive gambling system. This structure satisfies the statutory definition of an enterprise under 18 U.S.C. § 1961(4).

## *Pattern Of Racketeering Activity*

450.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 397 of the Complaint as though fully set forth herein.

451.    From at least January 2024 through the present, Defendants Pump.fun, Solana Labs, the Solana Foundation, and Jito Labs conducted and participated in the affairs of the Pump.fun Casino Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). This pattern comprises numerous acts indictable under federal and state law, including predicate offenses specifically enumerated in § 1961(1), each committed with the common purpose of operating a pseudonymous gambling platform disguised as a decentralized token launchpad, laundering the proceeds of that scheme, and systematically deceiving retail participants into funding it.

452.    First, Defendants conducted, financed, managed, and profited from an illegal gambling business in violation of 18 U.S.C. § 1955. The enterprise operated without any gaming license and involved far more than five individuals, including the Individual Defendants, and Pump.fun's founders and engineers, Solana Labs' developers and executives, and Jito Labs' validator and MEV infrastructure teams. Operating continuously since January 2024, the enterprise generated gross revenues in excess of $2 million per day by inducing users to wager SOL in exchange for valueless meme coins, whose outcomes and market performance were dictated by the platform's bonding-curve mechanics and backend routing logic.

453.    These operations also violated New York Penal Law § 225.10, which criminalizes promotion of gambling in the first degree. Pump.fun's system allowed users—including minors and anonymous actors—to stake funds for chance-based outcomes, rewarded token creators for

reaching speculative milestones, and distributed bounties and platform fees based solely on user participation in games of chance.

454.    Second, Defendants transmitted wagering information and executed gambling transactions via interstate wires, in violation of 18 U.S.C. § 1084 (Wire Act). These included use of Solana's blockchain relay network, Pump.fun's hosted smart contract interfaces, and validator bundles processed through Jito's off-chain auction infrastructure. Each token launch, trade execution, and bonding-curve price movement was facilitated through wire-based communications and smart contract logic, constituting thousands of discrete violations. Additionally, Defendants knowingly accepted payments in connection with unlawful internet gambling in violation of the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361–5367. Pump.fun processed restricted transactions in SOL from U.S. users in furtherance of its wagering activities, without implementing any AML or compliance protocols.

455.    Third, Defendants operated an unlicensed money-transmitting business in violation of 18 U.S.C. § 1960. Pump.fun received SOL from users, converted that value into meme coins, and transmitted those tokens or returned SOL through automated smart contract pathways— constituting classic money transmission. Neither Pump.fun nor its infrastructure providers held a license from FinCEN or the New York Department of Financial Services ("DFS"). Solana Labs and Jito Labs knowingly facilitated these unlicensed transmissions through their maintenance of the system programs, validator software, transaction relays, and block producers responsible for every value transfer. The enterprise also violated New York Banking Law § 641 and 23 NYCRR Part 200, which independently require licensure to transmit or issue digital assets to New York residents.

456.    Fourth, Defendants knowingly conducted financial transactions involving criminally derived property in excess of $10,000, with the intent to conceal the nature, source, and ownership of those funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and § 1957. In February 2025, the North Korean Lazarus Group laundered proceeds from a $1.5 billion hack through the Pump.fun platform using a counterfeit meme coin and high-frequency trading to disguise the origin and recipients of stolen funds.[29] Jito Labs enabled the laundering by prioritizing the exit transactions through MEV bundling, while Solana Labs' infrastructure validated the trades. These acts also satisfy the international transportation prong of § 1956(a)(2)(B)(i), as the criminal proceeds were bridged into the United States and routed through domestic validator nodes.

457.    Fifth, Defendants committed repeated acts of wire fraud in violation of 18 U.S.C. § 1343. Through social media posts, platform banners, Discord announcements, and token metadata, Defendants misrepresented that Pump.fun token launches were "fair," "anti-rug," and free from insider manipulation. In reality, bonding-curve launches were front-run through Jito bundles, insiders captured token supply at minimal cost, and users were misled about their odds and rights. These deceptive communications were transmitted across state lines and induced the transfer of billions of dollars in SOL under false pretenses. Defendants acted with intent to defraud, and each wire transmission in furtherance of that scheme constitutes a separate predicate act.

458.    Sixth, Defendants committed trademark counterfeiting in violation of 15 U.S.C. § 1114(1), a predicate offense under 18 U.S.C. § 2320. Pump.fun hosted and monetized tokens that used exact replicas or colorable imitations of registered trademarks—including those belonging to Apple, Tesla, Meta, Microsoft, and others—without license or authorization. These tokens appeared in search results and trending lists, often styled as the "official" or "community" tokens

---

[29] https://x.com/solanafloor/status/1893737113327214863?s=46&t=7iQfScb60VP7ELsXUj2Bbg

of the referenced brands. Pump.fun's interface algorithmically clustered similar tokens together, reinforcing the likelihood of confusion. Defendants profited from transaction fees and validator tips generated by these counterfeit-mark-bearing tokens, knowingly facilitating the trafficking and sale of spurious goods in violation of § 2320(a)(1).

459.    Seventh, Defendants engaged in false designation of origin and passing off in violation of 15 U.S.C. § 1125(a), which constitutes an additional RICO predicate under § 2320. Pump.fun enabled the launch and trading of tokens that impersonated well-known universities (e.g., Harvard, NYU), blockchain infrastructure projects (*e.g.*, Solana Phone), and high-profile public figures. These tokens falsely implied sponsorship or affiliation with the named entities, creating consumer confusion and misappropriating goodwill. Pump.fun's failure to restrict use of such marks, combined with its promotion of these tokens through its platform and social feeds, supports liability for knowing facilitation of Lanham Act violations.

460.    Eighth, Defendants diluted the value of famous marks through tarnishment and blurring in violation of 15 U.S.C. § 1125(c), thereby committing another predicate act under § 2320. Tokens launched through Pump.fun routinely exploited the brand equity of globally recognized marks, including Barbie, Batman, Harvard, and Apple, associating them with gambling, pump-and-dump schemes, or defamatory token themes. These uses diminished the distinctiveness and reputation of the marks and caused reputational injury to the rights holders. Defendants made no effort to prevent or remove such uses and continued to profit from their circulation.

461.    Ninth, Defendants trafficked in counterfeit labels and documentation in violation of 18 U.S.C. § 2318, a distinct predicate act. Tokens launched via Pump.fun carried digital metadata that included copied brand logos, impersonated celebrity photos, and fake ticker symbols

that functioned as counterfeit "labels" designating origin. These were hosted on IPFS, Arweave, and other metadata stores, and served to falsely represent the tokens as affiliated with real-world individuals or companies. Defendants knowingly enabled the creation, hosting, and propagation of these digital identifiers and profited from their use.

462.    Tenth, Defendants engaged in identity theft and false personation in violation of 18 U.S.C. § 1028(a)(7) and N.Y. Penal Law §§ 190.78–.85. Pump.fun users launched tokens impersonating named Plaintiffs and their counsel, including Max Burwick, his law firm, and members of his immediate family. These impersonations included names, likenesses, and personal images—some derived from private family fundraising campaigns and social media accounts. Tokens included false claims of affiliation, defamatory branding, and invasive personal references. Despite receiving formal notice, Defendants refused to remove the impersonating tokens, and continued to monetize their trading. The use of these identities, coupled with commercial intent and deliberate refusal to act, constitutes knowing and repeated violations of both federal and state identity theft statutes and forms part of the racketeering pattern alleged herein.

463.    Eleventh, Defendants conspired to commit wire fraud in violation of 18 U.S.C. § 1349. This conspiracy involved a coordinated plan to misrepresent Pump.fun's token launch mechanics as "fair," conceal the role of MEV bundles and validator prioritization, and induce users to transmit SOL through a system rigged in favor of insiders. Overt acts in furtherance of the scheme included website claims, promotional tweets, Discord messages, smart contract deployments, and bundling protocols designed to front-run retail purchases. Each Defendant played a necessary role: Pump.fun crafted and disseminated the false "fair launch" narrative; Jito Labs engineered and monetized the priority-tipping architecture that defeated fairness; Solana

Labs validated, processed, and promoted the resulting transaction flow, profiting from its scale and frequency.

464.    Twelfth, Defendants conspired to operate an unlicensed money-transmitting business in violation of 18 U.S.C. § 371 and § 1960. The enterprise integrated Pump.fun's token-launch interface with Solana Labs' system programs and validator software, and routed all payments through Jito Labs' tip-based execution engine—all without state licensure or FinCEN registration. Defendants knew the business involved the receipt, conversion, and transmission of digital value across user wallets and smart contracts, and they agreed to continue operating it without compliance. Overt acts included launching the "no KYC" interface, deploying unlicensed token-factory contracts, validating SOL-to-token conversions, and monetizing the value flow through automated fee extraction and priority-tip payments.

### *Injury And Causation*

465.    Plaintiffs and the Class have been injured in their business and property by reason of Defendants' pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). These injuries were not incidental to the enterprise—they were its central objective. The Meme Coin Casino Enterprise was designed to extract value from retail participants by facilitating unlawful gambling transactions, laundering proceeds of unlawful activity, deploying counterfeit and fraudulent tokens, and processing unlicensed transmissions of digital value at scale. Defendants knowingly engineered, enabled, and profited from this structure, and the losses of Plaintiffs and the Class are the direct and foreseeable result of the predicate acts alleged herein.

466.    These harms flowed directly from Defendants' predicate acts. The wire fraud scheme induced users to deposit funds under false pretenses of fair launch and equal access. The illegal gambling enterprise extracted value from each token spin while structurally disadvantaging

late participants. The operation of an unlicensed money transmitting business stripped users of regulatory protections and facilitated widespread transactional loss. Counterfeit branding, identity misappropriation, and impersonation tactics created additional vectors for financial loss and confusion, enabling the circulation of fake or manipulated tokens that siphoned user capital. And the use of Jito Labs' MEV infrastructure ensured that privileged actors could repeatedly extract risk-free gains at the expense of unaware retail users.

467.    The causation between these unlawful acts and Plaintiffs' injuries is direct. Every SOL-based transaction processed through Pump.fun's smart contracts, validator relays, and token factory infrastructure was orchestrated by Defendants acting in concert. Theirmonetization strategy was predicated on volume, volatility, and information asymmetry—each of which increased user losses. Pump.fun earned more than $600 million in protocol fees during the Class Period; Solana Labs and the Solana Foundation earned validator commissions and staking income tied to the same transaction flow; and Jito Labs earned hundreds of millions in MEV tips extracted from front-run token trades. Each dollar of profit realized by the Defendants was made possible only because Plaintiffs and the Class incurred corresponding losses.

468.    Defendants' racketeering activity was thus the proximate cause of the economic harm to Plaintiffs and the Class. Under 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover treble damages, costs, and attorneys' fees, as well as equitable relief including restitution, disgorgement, and the imposition of a constructive trust over enterprise-derived proceeds.

### COUNT III

**Violation of New York General Business Law §§ 349 & 350 (Deceptive Acts and False Advertising) (Against All Defendants on Behalf of New York Residents of the Class)**

Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 through 468.

469.    In the course of business, Defendants engaged in consumer-oriented deceptive acts and practices, and disseminated materially false advertisements, by marketing Pump Tokens as "fair-launch," officially endorsed, and immune from manipulation, while concealing their ability to control liquidity, extract MEV profits, and dump tokens. The deception and false advertising originated from, and were disseminated through, Defendants' operations in New York, including content pushed from their SoHo headquarters and servers.

470.    Plaintiffs and Class Members reasonably relied on Defendants' misrepresentations, purchased Tokens, and suffered monetary injury when token prices collapsed.

471.    Under GBL §§ 349(h) and 350-d, Plaintiffs seek statutory or actual damages, treble damages for willful violations, injunctive relief, and attorneys' fees.

## COUNT IV

### Unjust Enrichment (Against All Defendants on Behalf of the Class)

Plaintiffs incorporate by reference the allegations in the preceding Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 through 471.

472.    Defendants were unjustly enriched by retaining platform fees, MEV profits, and token allocations generated at the expense of Plaintiffs and the Class through deceptive and unlawful conduct.

473.    It would be inequitable for Defendants to retain these ill-gotten gains.

474.    Plaintiffs are entitled to restitution or disgorgement in an amount to be determined at trial, together with interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs individually and on behalf of the Class respectfully request that judgment be entered in their favor and against all Defendants, and that the Court grant the following relief:

475.    Class Certification. Certify, pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), a nationwide damages, injunctive-relief, and equitable-relief class of all persons and entities that purchased or otherwise acquired Pump.fun tokens on or after 1 January 2024 and suffered a net loss; appoint the named Plaintiffs as class representatives and their counsel as class counsel.

476.    Compensatory Damages. Award the Class compensatory damages in an amount to be proven at trial—including: the difference between the consideration paid for Tokens and their value at the time of sale or collapse of the Tokens purchased together with pre- and post-judgment interest.

477.    Treble Damages. Treble all compensatory damages under 18 U.S.C. § 1964(c) for Defendants' violations of 18 U.S.C. §§ 1962(c)–(d).

478.    Statutory & Exemplary Damages.

a.    N.Y. GBL §§ 349–350 compensatory/statutory/treble damages. and

479.    Disgorgement & Restitution. Order equitable disgorgement of, and impose a constructive trust over, all ill-gotten gains—including platform fees, validator MEV tips, SOL-denominated appreciation, and any digital or fiat proceeds traceable to the racketeering enterprise.

480.    Accounting. Direct Defendants to make a full and complete accounting of (i) every Pump.fun wallet address, fee wallet, and validator tip address; (ii) every smart-contract

deployment; and (iii) every fiat off-ramp or CEX account used to cash-out enterprise proceeds, from January 2024 to the date of judgment.

**Appointment of a Federal Equity Receiver**

481.    Receivership Authority. Pursuant to 18 U.S.C. § 1964(a), Fed. R. Civ. P. 66, and this Court's inherent equitable powers, appoint a qualified, independent receiver (the "Receiver") over Defendants Pump.fun Inc., Solana Labs Inc., and Jito Labs Inc. (collectively, the "Receiver Entities").

482.    Scope of Control. The Receiver shall take exclusive custody, control, and possession of all assets, digital wallets (including hardware wallets and seed phrases), validator keys, smart-contract deployment keys, domain names, servers (on-prem and cloud), source-code repositories, books, and records of the Receiver Entities, wherever located, and shall marshal, secure, and safeguard the same against dissipation or concealment.

483.    Operational Mandate. The Receiver is empowered to:

a.    Maintain or wind down operations as necessary to preserve asset value;

b.    Suspend token launches, validator MEV-tip auctions, and fee withdrawals pending further order;

c.    Implement AML/KYC controls, obtain all missing state and federal money-transmitter and gaming licences, and bring business practices into compliance with applicable law;

d.    Retain blockchain-forensics experts, auditors, and information-security personnel;

e.    Identify, trace, and, where appropriate, repatriate digital assets transferred to insiders, affiliates, or third-party wallets;

    f.    Commence, defend, or settle legal actions in the name of the Receiver Entities to recover voidable transfers or fraudulent conveyances; and

    g.    Prepare and file periodic reports with the Court and distribute interim relief to victims pursuant to a Court-approved claims process.

484.    Asset Freeze & Turnover. Issue a preliminary and permanent injunction freezing the assets of the Receiver Entities and compelling Defendants and all persons in active concert with them to deliver the above-described assets, passwords, seed phrases, cold-storage devices, and two-factor-authentication devices to the Receiver forthwith.

485.    Co-operation Order. Order Defendants, their officers, employees, agents, accountants, auditors, attorneys, and service providers to cooperate fully with the Receiver—including by executing any documents, providing sworn financial statements, and granting access to premises and servers—to facilitate immediate control and preservation of assets.

486.    Stay of Other Proceedings. Enter an order staying, for the duration of the receivership, all civil litigation, arbitration, or administrative proceedings against the Receiver Entities, except with leave of Court, to prevent waste of receivership assets.

487.    Receiver's Fees. Authorize the Receiver to pay reasonable fees and expenses, subject to Court approval, from receivership assets.

### Injunctive & Declaratory Relief

488.    Permanent Injunction (Gambling & MSB). Enjoin Defendants from operating Pump.fun or any substantially similar platform unless and until they (i) obtain all required New-York and federal money-transmitter and gaming licenses, (ii) implement robust AML/KYC and age-verification procedures, and (iii) subject the platform to independent audit and regulatory oversight.

489.    IP-Based Injunction. Enjoin Defendants from minting, listing, validating, or otherwise facilitating any token, metadata, or promotional material that infringes Plaintiffs' or third-party intellectual-property rights; require takedown of existing infringing smart contracts and metadata, and transfer of contract authority to the Receiver or a court-appointed escrow.

490.    Consumer-Protection Notice. Order the publication—on Pump.fun's website, Discord, and social-media channels—of corrective statements disclosing the true historical failure rate of Pump.fun tokens, the existence of insider MEV front-running, and the pendency of this action.

491.    Declaratory Judgment. Declare that Defendants' conduct constitutes (i) racketeering under 18 U.S.C. §§ 1961-1964; (ii) operation of an illegal gambling business under 18 U.S.C. § 1955; (iii) operation of an unlicensed money-transmitting business under 18 U.S.C. § 1960; (iv) violations of the Lanham Act, Copyright Act, DMCA, and N.Y. GBL §§ 349-350.

**Ancillary Relief**

492.    Pre-judgment Interest. Award pre-judgment interest at the maximum lawful rate.

493.    Post-judgment Interest. Award post-judgment interest pursuant to 28 U.S.C. § 1961.

494.    Attorneys' Fees & Costs. Award reasonable attorneys' fees, expert-witness fees, and costs of suit as authorized by 18 U.S.C. § 1964(c), 15 U.S.C. § 1117(a), 17 U.S.C. § 505, N.Y. GBL § 349(h), and other applicable statutes.

495.    Such Other Relief. Grant such other and further legal or equitable relief—including interim asset freezes, expedited discovery, provisional process, or writs of attachment—as the Court deems just and proper in the circumstances.

## **JURY DEMAND**

496.    Plaintiffs demand a trial by jury on all issues so triable.


DATED: July 22, 2025                                  Respectfully submitted,
           New York, NY

**WOLF POPPER LLP**
By:  /**s**/ *Chet B. Waldman*
Chet B. Waldman
Terrence Zhang
845 3rd Avenue – 12th Floor
New York, NY 10022
212-759-4600
cwaldman@wolfpopper.com
tzhang@wolfpopper.com

**BURWICK LAW, PLLC**
Max Burwick
43 West 43rd Street, Ste. 114
New York, NY 10036
maxb@burwick.law


*Co-Lead    Counsel    for*
*Plaintiffs and the Proposed*
*Class*