UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIEGO AGUILAR, KENDALL CARNAHAN and MICHAEL OKAFOR on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BATON CORPORATION LTD, d/b/a PUMP.FUN, ALON COHEN, DYLAN KERLER, NOAH BERNHARD HUGO TWEEDALE, SOLANA LABS INC., SOLANA FOUNDATION, JITO LABS INC., JITO FOUNDATION, ANATOLY YAKOVENKO, RAJ GOKAL, DAN ALBERT, AUSTIN FEDERA, LILY LIU, LUCAS BRUDER, BRIAN SMITH<br><br>Defendants. | Case No.: 1:25-cv-00880-CM-BCM |

**PLAINTIFFS' RICO CASE STATEMENT PURSUANT TO THE COURT'S RICO STANDING ORDER**

Pursuant to the Court's RICO Case Standing Order, Plaintiffs Diego Aguilar, Kendall Carnahan, and Michael Okafor on behalf of themselves and all others similarly situated (collectively, "Plaintiffs") hereby submit this RICO Case Statement in support of their action against Defendants: (i) Baton Corporation LTD, d/b/a Pump.fun; (ii) Alon Cohen; (iii) Dylan Kerler; (iv) Noah Bernhard Hugo Tweedale; (v) Solana Labs Inc.; (vi) Solana Foundation; (vii) Jito Labs Inc.; (viii) Jito Foundation; (ix) Anatoly Yakovenko; (x) Raj Gokal; (xi) Dan Albert; (xii) Austin Federa ; (xiii) Lily Liu; (xiv) Lucas Bruder; and (xv) Brian Smith.

**1.  State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b), (c), and/or (d).**

1.        Plaintiffs allege violations of 18 U.S.C. § 1962(c) and § 1962(d).

**2. List each defendant and state the alleged misconduct and basis of liability of each defendant.**

2.        Defendant Baton Corporation LTD ("Pump.fun") is a private company organized under the laws of England and Wales (Company No. 14743013), with its registered office at 82A James Carter Road, Mildenhall, Bury St Edmunds, Suffolk IP28 7DE, United Kingdom, and its principal place of business in Brighton & Hove, United Kingdom (¶ 33).[1] Pump.fun also directs and knowingly participates in the affairs of the "Pump Enterprise" (defined below) at all relevant times hereto, as detailed herein.

3.        Pump.fun marketed "fair launch" tokens while implementing no meaningful anti-bot or equal-access protections (¶ 188) and transmitted those representations via interstate wires, including websites, smart-contract interfaces, social media, Discord, and videos (¶¶ 189–190). The solicitations were not passive; Defendants sent messages to hundreds of thousands of crypto users on X and in other channels, urging them to join the platform thereby inducing participation in a system rigged by validator tips and bundles (¶¶ 155–157, 185–190). The trading UI presented "Fast/Turbo/Ultra" speed tiers and an optional validator "Tip," alongside a "front-running protection" toggle, reinforcing the false impression of parity (¶ 130). Pump.fun and its leaders amplified the message through sustained social and channel promotions (¶ 189).

---

[1] References to specific paragraphs in the Consolidated Amended Class Action Complaint ("CAC" or the "Complaint") (ECF No. 34) are cited to herein as "¶__."

4.          Pump.fun operated a chance-based wagering system using SOL (the native token of the Solana blockchain used as currency for all transactions)[2] stakes and a bonding-curve mechanism in which outcomes depended on chance (¶¶ 254–255), paid creator bounties at speculative thresholds which caused explosive market movements (¶¶ 121–123, 256–257), and permitted participation by minors due to the absence of age controls (¶ 260).

5.          Pump.fun received SOL, converted it into newly minted tokens, and transmitted tokens/solvency back out through automated contract pathways while lacking any FinCEN or state money-transmitter license and without KYC/AML controls (¶ 244).

6.          Pump.fun integrated Jito's bundle-and-tip priority pathway into token launches and instructed creators how to "construct a Jito bundle" and "add a bribe ('tip')" to guarantee earliest inclusion (¶ 291), enabling insider capture of bonding-curve spreads at launch (¶ 292). For example, in one of many similar instances, Pump.fun's CEO publicly touted the platform as a "casino," corroborating knowledge of the gambling-style mechanics (¶ 155).

7.          Pump.fun is a §1961(3) "person" that conducted and participated in the conduct of the Pump Enterprise's affairs through a pattern including wire fraud, illegal gambling, and unlicensed money transmission as pleaded in Count II (¶¶ 451). Pump.fun also agreed that enterprise members would commit at least two predicate acts to advance the scheme (¶ 442). Pump.fun should be held liable for the damage incurred by purchasers.

8.          Defendant Solana Labs is a Delaware corporation formed in 2018 with offices in New York and San Francisco (¶ 31). It develops and licenses the core validator software and SPL token program and sells "priority blockspace" to order-flow partners such as

---

[2] As of August 21, 2025, one SOL (the native token of the Solana blockchain) trades at approximately $181 USD, providing context to the wagering and speculative thresholds described herein.

Pump.fun and Jito Labs (¶ 31). Solana Labs also directs and knowingly participates in the affairs of the Pump Enterprise at all relevant times hereto, as detailed herein.

9.        Solana Labs authored and maintains the SPL Token Program used for all Pump.fun tokens (¶ 271) and built the network-level throughput features that enabled rapid "fair-launch" token churn (¶ 277), while publicly engaging with Pump.fun activity (¶ 276).

10.       Solana Labs coordinated with Jito and Pump.fun in a unified, interdependent structure, supplying the infrastructure through which the chance-based bonding-curve "casino" operated at scale (¶ 278). Solana Labs depended on that flow for technical and economic success (¶ 279).

11.       Solana Labs maintained the validator software and system programs that enabled Pump.fun's receipt, conversion, and transmission of value without holding a money-transmitter license (¶ 245).

12.       For nearly a year, over 80–90% of revenue on Solana and Jito has come from Pump.fun through token issuance, secondary trading of pump tokens, and the infrastructure that enables their trading.[3] (¶ 297). In effect, Solana is Pump.fun. A casino that earns 90% of its revenue from the gaming floor is fundamentally a casino, even if it also has a restaurant. Solana is no different where Pump.fun accounts for nearly all revenue.

13.       Solana Labs is a §1961(3) "person" that conducted or participated in the enterprise by supplying and monetizing the technical rails (SPL program, validator stack, and priority-fee market) integral to the pattern alleged in Count II (¶ 451). Solana Labs also agreed that enterprise members would commit at least two predicate acts to advance the scheme (¶ 442). Solana Labs should be held liable for the damage incurred by purchasers.

---

[3] https://defillama.com/chain/solana

14.     Defendant Solana Foundation is a not-for-profit foundation organized under the laws of the Canton of Zug, Switzerland, with its registered office at Industriestrasse 47, 6300 Zug (¶ 32).

15.     Solana Foundation funds demand for Solana blockspace and stewards a large SOL treasury (¶ 32). Solana Foundation also directs and knowingly participates in the affairs of the Pump Enterprise at all relevant times hereto, as detailed herein.

16.     Although styled as separate entities, the Solana Foundation and Solana Labs operate in tight coordination (¶ 268). Together they control and manage the Solana blockchain, including the core architecture, system programs, token distribution, and monetization ( ¶ 270). The Complaint pleads that the two-entity structure was adopted not to decentralize power but to create a legal buffer against U.S. securities regulation (¶ 80–85). It further alleges that Labs handles technical development and SOL economics, while the Foundation manages token allocation and serves as the nominal issuer from its Swiss base to avoid U.S. securities obligations (¶¶ 81–82). Their common New York presence reinforces this functional unity, including a shared location at 141 East Houston Street and related operations and events in this District (¶¶ 49-56).

17.     The Foundation is alleged to have facilitated token issuance and network operations without a money-transmitter license (¶ 246).

18.     The Foundation is a §1961(3) "person" that participated in directing the enterprise by financing and coordinating the rails that effectuated the pattern, as pleaded in Count II (¶¶ 451); it agreed that enterprise members would commit at least two predicate acts to advance the scheme (¶ 442). The Solana Foundation should be held liable for the damage incurred by purchasers.

19.        Jito Labs is a Delaware corporation formed in 2021 with offices in Arlington, Virginia and Austin, Texas (¶ 35). Jito Labs was founded in or around 2021 by Lucas Bruder and Zanyar Sherwani and was funded by entities and individuals closely associated with Solana Labs, including Solana Ventures and Defendant Anatoly Yakovenko (¶ 281). Jito Labs also directs and knowingly participates in the affairs of the Pump Enterprise.

20.        Jito Labs built the "Jito-Solana" validator client and off-chain Block Engine, enabling priority inclusion via "tips" and private bundles (¶¶ 285–288). Pump.fun integrated Defendant Jito Lab's essential bundling and tip system into coin launches and instructed creators to "construct a Jito bundle" and add a "bribe ('tip')" to guarantee earliest execution (¶¶ 289–294).

21.        Jito's fee-for-priority model allowed insiders to capture bonding-curve spreads at launch, materially enabling the chance-based, high-velocity token churn alleged as illegal gambling (¶¶ 288–293). Jito Labs had actual knowledge of this integration (¶ 294). As stated, Pump.fun tokens constituted a dominant share of all Jito bundle activity on the network. Public documentation and API endpoints made explicit reference to the use of Jito bundling for Pump.fun tokens. Jito Labs took no steps to restrict or moderate this usage. (¶ 294).

22.        Jito Labs lacked any money-transmitter license while operating the priority-routing path that facilitated Pump.fun's receipt, conversion, and transmission of value and earned "tips" from that flow (¶ 247).

23.        Jito Labs is a §1961(3) "person" that conducted and participated in the enterprise by operating the execution layer that effectuated the gambling, §1960 transmissions, and wire-fraud scheme (¶¶ 451–455). Jito also agreed that enterprise members would commit

at least two predicate acts to advance the scheme (¶ 442). Jito Labs should be held liable for the damage incurred by purchasers.

24.         Jito Foundation is a Cayman Islands foundation company with its registered office at Harbour Centre, 159 Mary Street, George Town, Grand Cayman KY1-9006 (¶ 36). The Foundation holds IP for Jito's validator fork, administers the JTO governance token, and finances grants that expand Jito-controlled MEV infrastructure (¶ 36).  Jito Foundation also directs and knowingly participates in the affairs of the Pump Enterprise at all relevant times hereto, as detailed herein.

25.         Through governance, funding, and control of the Jito validator fork, the Foundation supported and sustained the same tip-and-bundle execution layer integrated into Pump.fun launches (¶ 36) and is alleged as a participating member of the association-in-fact enterprise whose affairs were conducted through the pleaded predicates (¶¶ 450–464).

26.         Jito Foundation is a §1961(3) "person" that participated in directing the enterprise via funding and governance that supported the predicate-act execution layer; it also agreed that enterprise members would commit at least two predicate acts to advance the scheme (¶ 451). Jito Foundation should be held liable for the damage incurred by purchasers.

27.         Defendant Anatoly Yakovenko is, and at all times relevant to this action was, the Chief Executive Officer of Solana Labs (¶ 38). He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.

28.         Yakovenko led core infrastructure development and publicly supported Pump.fun activity (¶ 276), and Solana Labs was an early investor in Jito, which he personally backed (¶ 273).

29.        Public fundraising disclosures show that Solana Ventures and Solana Labs co-founder Anatoly Yakovenko invested in Jito Labs' $10M Series A, and Solana Foundation executive Austin Federa participated as an angel investor[4] (¶ 273).

30.        He thereby directed and knowingly participated in the enterprise's use of SPL/validator rails and Jito priority routing that executed the "fair-launch" wire scheme and enabled the gambling and §1960 transmissions (¶¶ 270-279).

31.        Yakovenko also acted as the public arm of Solana Labs, supporting and publicly engaging with Pump.fun activity (¶ 276). For example, he publicly equated "memecoins" with "lootboxes," a random-reward mechanic commonly associated with gambling, corroborating that the enterprise marketed and operated chance-based wagering rather than utility tokens.[5] The statement evinces his knowledge that the bonding-curve launches and rapid-churn dynamics functioned as gambling.



---

[4] https://cryptorank.io/ico/jito-labs
[5] https://x.com/aeyakovenko/status/1767932827608482301

32.     In another tweet, Yakovenko takes credit for the record-breaking revenue of Solana

applications, including Pump.fun (whose 'pill' logo is pictured as an image in the post),

and offered to help other companies "scale their revenue" as he did for Pump.fun.[6]



33.     Yakovenko is liable as a §1961(3) "person" who participated in the enterprise's

affairs through his direction of core infrastructure integral to the pattern, and under

§1962(d) for agreeing to its commission (¶ 442). Yakovenko should be held liable for the

damage incurred by purchasers.

---

[6] https://x.com/aeyakovenko/status/1956379495868543188

34.      Defendant Raj Gokal is, and at all times relevant to this action was, the President

and Chief Operating Officer of Solana Labs. He also directed and knowingly participated

in the affairs of the Pump Enterprise as detailed in the CAC (¶¶ 338–349, *passim*.).

35.      Gokal publicly acknowledged "casino" activity on Solana in a post on X,

evidencing knowledge of and participation in the gambling mechanics described in the

Complaint.[7]



36.      In a tweet on January 29, 2025, Gokal admitted to and reduced the scheme to a

sequence: more throughput, more transactions, call it 'capital markets,' invite

permissionless founders, apps, and tokens, then cash in on the churn.[8]

---

[7] https://x.com/rajgokal/status/1736441874502828221
[8] https://x.com/rajgokal/status/1884779258658148760



37.    On July 12, 2025, while the $PUMP public sale was underway, Gokal publicly

framed it as rapid fundraising by posting "where else can you raise $400m in 13 minutes?"

on X, evidencing knowledge of and participation in solicitations disseminated over

interstate wires and the scale of the offering.[9]



38.    Gokal is liable as a §1961(3) "person" who participated in the enterprise's affairs

through direction of integral infrastructure, and under §1962(d) by agreement (¶ 442).

Gokal should be held liable for the damage incurred by purchasers.

---

[9] https://x.com/rajgokal/status/1944043050835026248

39.          Defendant Dan Albert is, and at all times relevant to this action was, the Executive Director of Solana Foundation. He also directed and knowingly participated in the affairs of the Pump Enterprise (¶ 32, 51, 269, *passim*).

40.          While Albert serves as Executive Director of the Solana Foundation, he also contributed to and co-authors work in Solana Labs' core codebases, including issues and commits in the solana-labs/solana validator client and stewardship of token-program components which are housed in the Solana Program Library that Solana Labs maintained.[10] These overlapping roles and Labs-owned repositories for the token stack support Plaintiff's allegation that the two-entity structure was tightly coordinated and functionally unified.

41.          Albert is liable under § 1962(c) as a "person" who participated in directing the enterprise through Foundation resources that advanced the pattern, and under § 1962(d) for agreeing to its commission. Albert should be held liable for the damage incurred by purchasers.

42.          Defendant Austin Federa is, and at all times relevant to this complaint was, the former Head of Strategy of Solana Foundation. Federa directed and knowingly participated in the affairs of the Pump Enterprise (¶¶ 32, 41).

43.          Federa is liable under § 1962(c) as a "person" who participated in the enterprise through strategy and promotion that advanced the pattern, and under § 1962(d) for agreeing to its commission. Federa should be held liable for the damage incurred by purchasers.

---

[10] https://github.com/danpaul000?tab=overview&from=2021-12-01&to=2021-12-31, *see also* https://github.com/solana-labs/solana

44.        Defendant Lily Liu is, and at all times relevant to this complaint was, the President of the Management of Solana Foundation. She also directed and knowingly participated in the affairs of the Pump Enterprise (¶¶ 32, 42).

45.        Liu is liable under § 1962(c) as a "person" who participated in directing the enterprise through governance supporting the pattern, and under § 1962(d) for agreeing to its commission. Liu should be held liable for the damage incurred by purchasers.

46.        Defendant Alon Cohen is a resident of London, United Kingdom and at all times relevant to this complaint was the Chief Executive Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Pump Enterprise. (¶¶ 116, 155-158, 162).

47.        He publicly characterized Pump.fun as a "casino," which the Complaint pleads as corroborating the gambling mechanics, scienter, and inducement (¶¶ 155-157). As another example Cohen tweeted inducing users to trade memecoins as "the only thing in the world that provides this much opportunity on a random saturday[sic]."[11]

48.        Cohen is liable under § 1962(c) as a "person" who conducted and participated in the enterprise through his direction of Pump.fun's front-end and launch flow that effectuated the pattern, and under § 1962(d) for agreeing to its commission. Cohen should be held liable for the damage incurred by purchasers.

49.        Defendant Noah Tweedale is a resident of Brighton & Hove, United Kingdom, and at all times relevant to this complaint was the Chief Product Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Pump Enterprise (¶¶ 33, 44).

---

[11] https://x.com/a1lon9/status/1852796144386007185

50.        Tweedale is liable under § 1962(c) as a "person" who participated in the enterprise through product decisions that advanced the pattern, and under § 1962(d) for agreeing to its commission. Tweedale should be held liable for the damage incurred by purchasers.

51.        Defendant Dylan Kerler is a resident of London, United Kingdom, who has a documented history of prior "rug-pull" schemes, and at all times relevant to this complaint was the Chief Technology Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Pump Enterprise (¶¶ 33, 45).

52.        Kerler is liable under § 1962(c) as a "person" who participated in the enterprise through technical implementation that advanced the pattern, and under § 1962(d) for agreeing to its commission. Kerler should be held liable for the damage incurred by purchasers.

53.        Defendant Lucas Bruder is a resident of Austin, Texas, and is Jito Labs' Chief Executive Officer and co-founder (¶¶ 35, 46). He also directed and knowingly participated in the affairs of the Pump Enterprise (¶¶ 35, 46, 281).

54.        Bruder is liable under § 1962(c) as a "person" who participated in the enterprise through his direction of the execution layer that effectuated the pattern, and under § 1962(d) for agreeing to its commission. Bruder should be held liable for the damage incurred by purchasers.

55.        Defendant Brian Smith is, and at all times relevant to this complaint was, the former Chief Operating Officer of Jito Labs, and current Executive Director of Jito Foundation. He also directed and knowingly participated in the affairs of the Pump Enterprise (¶¶ 36, 47).

56.         Defendant Smith publicly advocated increasing transaction volume on Solana to grow validator and application fee revenue[12], and says that casino games are durable forms of entertainment.[13]



57.         In another tweet, Defendant Smith provides direct admission that JTO's staking yield and the Jito treasury are funded by Solana MEV flows routed through Jito's restaking stack. Smith acknowledges that JTO (the governance token for the Jito Network) value is

---

[12] https://x.com/brian_smith_0/status/1896237198179221878
[13] https://x.com/brian_smith_0/status/1594199528898371585

tied directly to maximizing MEV and priority-fee capture that surged with Pump.fun launches. [14]



58.        Smith is liable under § 1962(c) as a "person" who participated in the enterprise through operational and governance roles that advanced the pattern, and under § 1962(d) for agreeing to its commission. Smith should be held liable for the damage incurred by purchasers.

**3. List the alleged victims and state how much each victim was allegedly injured.**

59.        Lead Plaintiff Michael Okafor is a natural person and United States resident who purchased and sold multiple "fair-launch" tokens created on the Pump.fun platform between March 2024 and January 2025 (¶ 28). Those tokens, launched and traded under the bonding-curve structure pleaded in the complaint, collapsed within days or weeks of issuance, causing substantial monetary losses (¶ 28). Okafor also paid "priority blockspace" charges via transaction and bundling fees that were routed to and monetized

---

[14] https://x.com/brian_smith_0/status/1919110855158796532

by Defendants Solana Labs, Pump.fun, and Jito Labs (¶ 28). His total financial losses during the Class Period were approximately $242,076.74 (¶ 28).

60.        Plaintiff Diego Aguilar purchased and sold multiple "fair-launch" tokens on the Pump.fun platform, including the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token (¶ 29). He was damaged thereby (¶ 29).

61.        Plaintiff Kendall Carnahan purchased and sold multiple "fair-launch" tokens on the Pump.fun platform, including PNUT tokens (¶ 30). He was damaged thereby (¶ 30).

62.        In addition to the named plaintiffs, the proposed Class consists of all persons who purchased any tokens sold through Pump.fun during the Class Period, defined as March 1, 2024, through the date of the Amended Complaint, and who had an out-of-pocket loss on those investments (¶ 386). A proposed Subclass consists of all persons who purchased any of the twenty Pump Tokens during the Class Period and sustained an out-of-pocket loss on those investments (¶ 386). Plaintiffs reserve the right to modify or refine the definitions of the Class or Pump Tokens Subclass based on discovery or to address manageability concerns (¶ 387).

**4. Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.**

**A. List the alleged predicate acts and the specific statutes that were allegedly violated.**

63.        The pattern comprises acts indictable under 18 U.S.C. § 1961(1): operation of an illegal gambling business, 18 U.S.C. § 1955, and promotion of gambling in the first degree under New York Penal Law § 225.10 (¶¶ 452–453); transmission of wagering information, 18 U.S.C. § 1084 (¶ 454); operation of an unlicensed money-transmitting business, 18

U.S.C. § 1960 (¶ 455); money-laundering offenses, 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1957 (¶ 456); wire fraud, 18 U.S.C. § 1343 (¶ 457); trafficking in counterfeit goods, 18 U.S.C. § 2320 (supported by Lanham Act § 1114 allegations) (¶¶ 458–460); trafficking in counterfeit labels, 18 U.S.C. § 2318 (¶ 461); and identity theft, 18 U.S.C. § 1028(a)(7) (¶ 462). The complaint also pleads UIGEA violations and Lanham Act § 1125(a)/(c) conduct as part of the same gambling and counterfeiting scheme, which further evidences method and scienter. (¶ 454, 459).

64.    <u>Predicate Acts (18 U.S.C. § 1961(1)):</u>

65.    <u>(a) Wire Fraud — 18 U.S.C. § 1343 (pled with particularity below).</u>

Defendants devised and executed a scheme to defraud Pump.fun users by falsely marketing "fair-launch" mechanics, concealing insider priority and MEV bundling, and inducing purchases of tokens through interstate wire communications—including the Pump.fun web application, social-media promotions, and smart-contract interfaces—thereby obtaining money and property by means of materially false and misleading statements.

66.    <u>(b) Illegal Gambling Business — 18 U.S.C. § 1955, and New York Promoting Gambling in the First Degree — N.Y. Penal Law § 225.10.</u>

Defendants conducted an unlicensed gambling enterprise in which users staked SOL on chance-driven outcomes embedded in bonding-curve launches and slot-like trading mechanics. The business involved five or more persons, operated continuously, and generated well over $2,000 per day. The same conduct constitutes a felony "act involving … gambling" chargeable under New York law and punishable by more than one year, qualifying as a state-law predicate under § 1961(1)(A).

67.    (c) Transmission of Wagering Information — 18 U.S.C. § 1084.

In operating and scaling the gambling enterprise, Defendants used interstate wire facilities to transmit bets, wagers, and information assisting in the placing of bets and wagers, including transaction-routing and validator-priority communications integral to Pump.fun launches and trading.

68.    (d) Operation of an Unlicensed Money-Transmitting Business — 18 U.S.C. § 1960.

Defendants received funds (SOL), converted those funds into tokens, and transmitted value between and among customer wallets and smart-contract pools without the licenses, registrations, or AML/KYC controls required by federal and state law.

69.    (e) Money Laundering — 18 U.S.C. §§ 1956 & 1957.

Defendants knowingly conducted and aided financial transactions involving criminally derived property exceeding $10,000—including facilitating and prioritizing flows linked to the Lazarus Group, a cybercrime unit of the Democratic People's Republic of Korea that FBI has identified as responsible for billions in losses—designed to conceal or disguise the nature, source, and ownership of those proceeds, and engaged in monetary transactions with such criminally derived property.

70.    (f) Trafficking in Counterfeit Goods and Services — 18 U.S.C. § 2320, and Trafficking in Counterfeit Labels — 18 U.S.C. § 2318.

Defendants knowingly facilitated the creation and sale of tokens bearing counterfeit marks (e.g., Fortune-500 brands, universities, and celebrity likenesses) and associated counterfeit digital labels/metadata to induce trading activity, thereby trafficking in counterfeit goods and labels as defined by §§ 2320 and 2318.

71.    (g) Fraud and Related Activity in Connection with Identification Documents/Means of

Identification — 18 U.S.C. § 1028(a)(7).

Defendants used and enabled the use of real persons' names and likenesses—

including Plaintiffs, their counsel, and family members—as "means of identification" in

connection with unlawful activity (impersonation tokens and related solicitations),

constituting identity-theft predicates under § 1028.

**B. If the RICO claim is based on the predicate offenses of wire fraud, or fraud in the
sale of securities, the circumstances of fraud or mistake shall be stated in
particularity;**
    1. Wire fraud particularity

72.    Pump.fun's core promise was a "Fair Launch" with "no presales," "no insider

allocations," and "rug-pull proof" launches where everyone had a fair shot at the game;

Pump.fun broadcast this as the first and dominant message on the site and in related

channels (¶¶ 184–195). In operation, Pump.fun implemented no randomized entry, no

anti-bot throttling, and no equal-access guardrails, while insiders with superior

infrastructure obtained first fills (¶ 188).

73.    The order ticket exposed "Fast/Turbo/Ultra" execution tiers and an optional "Tip"

to purchase validator priority, alongside a "front-running protection" toggle, reinforcing

the illusion of parity (¶ 130); *see also* interface mimicry of market fundamentals and risk

badges. (¶¶ 125–131). Pump.fun integrated Jito's bundle-and-tip pathway and instructed

creators to 'construct a Jito bundle' and 'add a bribe' to guarantee earliest inclusion at

launch (¶¶ 289–294). Jito's system allowed priority inclusion before public orders so

insiders could acquire supply at minimal bonding-curve prices (¶ 292–293).

74.    Technically, Pump.fun serves as the point of user interaction with the casino–

comparable to the gaming terminal at the front of a slot machine bank; but, the machine

itself only runs because of Solana Labs, the Solana Foundation, Jito Labs, and the Jito Foundation who provided the back-end software and the hardware. (¶ 119).

75.    The "fair launch" claim was material and necessary to attract new users who otherwise faced asymmetric execution dynamics. (¶ 187). The promise of fairness, "anti-rug," and safety was repeatedly stated by developers and affiliated promoters despite the absence of the represented protections. (¶ 189). Pump.fun further reinforced the illusion of a regulated, even playing field by presenting candlestick charts and real-time tickers that mimic FINRA-member trading platforms, thereby suggesting continuous, reliable price discovery. (¶ 126). The interface displayed Market Cap, Supply, and Holders as if they were investment fundamentals. (¶ 127). It sorted tokens into lifecycle stages such as "Newly Created," "About to Graduate," and "Graduated," evoking an issuer pipeline. (¶ 128). Badge-style indicators for "Snipers Holding," "Dev Held," and "Top 10 Holders %" presented risk metrics analogous to insider-ownership and float tables. (¶ 129). The order ticket offered "Fast," "Turbo," and "Ultra" speed tiers and optional validator "tips," all while suggesting front-running protection, which heightened the impression of professional-grade execution. (¶ 130). Collectively, the interface cloaked a speculative, insider-advantaged game in the vernacular of a fair market. (¶ 131).

76.    Defendants disseminated the fairness representations, platform banners, and marketing through public websites, smart-contract interfaces, social-media posts, Discord updates, and videos, all transmitted over interstate wires. (¶ 190).

77.    Pump.fun maintained the fairness narrative while omitting basic protections and leaving a static launch screen that insiders could consistently defeat, which evidences knowing, purposeful deception. (¶¶ 184-195). Executives and community leaders later

embraced slogans such as "Crime is Legal" and "It's Crime Season," signaling conscious adoption of a fraud-tolerant ethos as the scheme continued. (¶ 192). The Complaint expressly alleges a continuous wire-fraud scheme built on these false fairness claims and their execution. (¶ 193).

78.     Plaintiffs incorporate by reference the "false fair-launch" and wire-fraud allegations (¶¶ 184–195) together with the pleaded loss and fee facts (e.g., ¶ 28, ¶¶ 329–336, 350–366) and allege that Defendants—acting with intent to defraud—engaged in a systematic, ongoing course of conduct by means of material misrepresentations and omissions disseminated through the Pump.fun interface and related interstate communications, thereby obtaining property (including SOL) from well more than ten persons and, at a minimum, property in excess of one thousand dollars from at least one person, in violation of N.Y. Penal Law § 190.65(1)(a)–(b).

### 2. Conspiracy to Commit Wire Fraud

79.     The Complaint alleges that a coordinated plan between Defendants to misrepresent Pump.fun's token launch mechanics as "fair," while concealing the role of MEV bundles and validator prioritization, and induce users to transmit SOL through a system rigged in favor of insiders (¶ 463). Pump.fun crafted and broadcast the illusion; Jito Labs enabled and monetized priority execution; Solana Labs and the Solana Foundation processed, endorsed, and profited from the resulting volume. (¶ 194).

80.     Jito's validator client and bundling engine were integrated specifically into Pump.fun launches and used to prioritize insider transactions at creation (¶¶ 289–293). Solana Labs' and the Solana Foundation's infrastructure and economic incentives were

tied to the same activity, and their conduct is alleged as coordinated and interdependent with Pump.fun and Jito (¶¶ 305–307).

81.         Overt acts in furtherance of the scheme include website claims, promotional tweets, Discord and Telegram communications, and smart-contract interactions, each a wire transmission used to induce purchases and route value (¶ 463).

82.         Pump.fun published the "Fair Launch" messaging on its homepage and marketing channels (¶ 185). Jito enabled preloaded insider bundles with tips at the moment of token creation (¶ 291). Pump.fun and its promoters amplified specific token promotions, including celebrity-linked launches, to draw retail participation into the same unfair mechanics (¶¶ 162–164). Defendants continued operating after a regulatory ban in the United Kingdom, maintaining the same launch mechanics and messaging (¶ 191).

**C. Describe how the predicate acts form a "pattern of racketeering activity"**

83.         Horizontal relatedness is shown by shared purposes—inducing token purchases and wagers while monetizing transmission and priority—through common methods that the pleading spells out with particularity: the uniform "fair launch / no insider advantage" marketing and "venture-like" solicitations (including the "better than VC"/"early investor" pitch and celebrity-coin pushes) that primed retail demand (¶¶ 125–133, 143–151, 160–165, 181–190); the interface mimicry that surfaced "front-running protection" and exposed a user "Tip" to purchase priority; and the integrated Jito tip-bundling path that operationalized that priority at launch (¶ 130; ¶¶ 286–291, including ¶ 291's "construct a Jito bundle" and "add a bribe ('tip')"; ¶¶ 289–294). The same paragraph set also pleads the bonding-curve wagering mechanics and creator bounties that drove repeated, slot-like churn (¶¶ 250–257), and the counterfeit branding/identity-misuse "skins" that harvested

attention to feed that flow (¶¶ 196–201, 211–218, 219–233, 229–233). Those methods were executed by the same set of participants—Pump.fun (front-end slot and fee rake), Jito (priority-selling engine and MEV capture), and Solana Labs/Solana Foundation (validator and system-program rails)—against the same victims: retail token buyers whose transactions and losses the complaint quantifies (¶¶ 440, 443–447; ¶¶ 308–359).

84.        Vertical relatedness is satisfied because each predicate is alleged to be enabled by, and to further, the enterprise's affairs as it actually operated: Pump.fun's "one-click" front-end slot with a fixed 1% take on every trade (¶ 444); Solana's SPL/token-program and validator stack that validated each wager and monetized blockspace/MEV (¶¶ 271–279, 444–446); and Jito's client/Block Engine that sold launch-priority via bundles and tips, surfaced to users in the very UI through the "Tip"/speed controls (¶ 130; ¶¶ 286–294). Those rails are tied directly to the revenue streams (platform fees, validator commissions, MEV/tips) alleged to be the enterprise's raison d'être (¶¶ 329–337).

85.        Continuity is pleaded as a sustained series across the class period: Count II alleges thousands of occasions over roughly eighteen months (January 2024 to filing), with repeated launches, recurrent wire fraud inducements, and the ongoing gambling/money-transmission mechanics, all causing large-scale losses to the class (¶¶ 440–441, 449, 451; ¶¶ 308–359). Open-ended continuity is alleged because these same acts are pleaded as defendants' regular way of doing business—an ongoing, scalable "Meme Coin Casino" built into the front end and the validator/priority rails—and as persisting, reflected in the revenue/volume metrics and the integrated priority-sale pathway (¶¶ 188–190, 271–294, 329–336, 363).

**D. State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe.**

86.         The acts relate as parts of a single plan executed over shared rails. Pump.fun supplied the public-facing slot-like interface and bonded-curve launch that induced and processed purchases under the "Fair Launch" script while exposing speed and "Tip" controls (¶¶ 116–123, 125–133, 184–189). Jito engineered and monetized the bundle-and-tip pathway that guaranteed priority at launch and integrated that path with Pump.fun (¶¶ 289–294). Solana's token and validator stack validated and routed every transaction and monetized the same throughput (¶¶ 271–279, 309–317). The same rails also hosted counterfeit-branded and impersonation tokens to draw volume and fees and were used in a pleaded laundering episode tied to the DPRK-sanctioned Lazarus Group, which seeded and exited a Pump.fun token using prioritized execution (¶¶ 196–243). The plan extracted value directly from each transaction in the form of platform rakes, validator fees, and MEV tips while producing rapid collapses that left retail purchasers with losses quantified at scale (¶¶ 295–359).

**5. Describe in detail the alleged enterprise for each RICO claim.**

**A. State the names of the individuals, partnerships, corporations, associations, or other legal entities that allegedly constitute the enterprise;**

87.         Plaintiffs allege an association-in-fact "Pump Enterprise" composed of Pump.fun, Solana Labs Inc., the Solana Foundation, and Jito Labs Inc. Pump.fun provided the public-facing interface, bonding-curve launch, and trading mechanics (¶¶ 116–123, 125–133). Solana Labs and the Solana Foundation provided the SPL token program and validator stack on which the launches and trades executed (¶¶ 271–279). Jito Labs developed and operated the modified validator client and off-chain Block Engine that

enabled private bundles and "tip"-based priority inclusion, and integrated those rails with Pump.fun (¶¶ 289–294).

88.    Anatoly Yakovenko is the Chief Executive Officer of Solana Labs and is alleged to have directed and participated in the enterprise through that role. (¶ 38; ¶ 440.)

89.    Raj Gokal is the President and Chief Operating Officer of Solana Labs and is alleged to have directed and participated in the enterprise through that role. (¶ 39; ¶ 440.)

90.    Dan Albert is the Executive Director of the Solana Foundation and is alleged to have directed and participated in the enterprise through that role. (¶ 40; ¶ 440.)

91.    Austin Federa served as Head of Strategy for the Solana Foundation and is alleged to have directed and participated in the enterprise through that role. (¶ 41; ¶ 440.)

92.    Lily Liu is President of the Management of the Solana Foundation and is alleged to have directed and participated in the enterprise through that role. (¶ 42; ¶ 440.)

93.    Alon Cohen is the Chief Executive Officer of Pump.fun and is alleged to have directed and participated in the enterprise through that role. (¶ 43; ¶ 440.)

94.    Noah Tweedale is the Chief Product Officer of Pump.fun and is alleged to have directed and participated in the enterprise through that role. (¶ 44; ¶ 440.)

95.    Dylan Kerler is the Chief Technology Officer of Pump.fun and is alleged to have directed and participated in the enterprise through that role. (¶ 45; ¶ 440.)

96.    Lucas Bruder is the Chief Executive Officer of Jito Labs and is alleged to have directed and participated in the enterprise through that role. (¶ 46; ¶ 440.)

97.    Brian Smith served as Chief Operating Officer of Jito Labs and serves as Executive Director of the Jito Foundation and is alleged to have directed and participated in the enterprise through those roles. (¶ 47; ¶ 36; ¶ 440.)

**B. Structure, purpose, function, and course of conduct of the enterprise.**

98.  The common purpose of the Pump Enterprise was to operate a pseudonymous gambling system disguised as a decentralized token-launch platform, to monetize high-frequency token churn through platform fees, validator fees, and MEV tips, and to avoid licensing and consumer protections while doing so. (¶ 443.)  This purpose was articulated publicly and often, for example in Cohen's 'casino' characterization (¶156).

99.  Pump.fun supplied the public-facing interface and one-click token factory that implemented a bonding-curve mechanism, charged a fixed 1% platform fee on trades, and engineered tokens to rise and collapse rapidly, thereby driving continuous churn. (¶ 444.)

100.  Solana Labs authored and maintains the Solana validator client and the Solana Program Library, including the SPL Token Program and Token-2022 standard, which processed every launch and trade and linked throughput to network-level economics. (¶ 445.)

101.  The Solana Foundation controlled large SOL holdings and maintained a significant validator presence, and together with Solana Labs monetized increased transaction volume and validator-side revenues tied to the same activity. (¶ 445.)

102.  Jito Labs operated a modified validator client and block-bundling infrastructure that accepted private bundles accompanied by tips, was installed on more than 90% of Solana consensus stake by late 2024, and generated substantial MEV-linked revenues from priority inclusion. (¶ 446.)

103.  For nearly a year, over 80–90% of revenue on Solana and Jito has come from Pump.fun through token issuance, secondary trading of pump tokens, and the infrastructure that enables their trading (¶ 297). When nearly all of an enterprise's revenue comes from a

single gambling engine, peripheral offerings do not change its character. Pump.fun drives the overwhelming share of Solana's revenue, making Solana, in substance, the casino itself.

104.     Jito publicly markets itself as infrastructure built for Solana's validators and searchers and operates a fork of the Solana validator with an off-chain block-engine auction that selects the highest-paying bundles for atomic inclusion, with tips paid to validators and stakers.[15]

105.     Plaintiff alleges interdependence among Pump.fun, Solana Labs, the Solana Foundation, and Jito Labs, including defined roles, shared proceeds, and visibility into one another's conduct (¶¶ 447–449).

106.     The enterprise's course of conduct included routing projects and token issuance through foreign foundations to limit U.S. regulatory exposure while continuing to market and launch tokens to U.S. users. A public admission by Defendant Austin Federa, in an X reply to Defendant Lily Liu, confirms this routing strategy as part of the enterprise's plan to shield liability while extracting U.S. flow and fees.[16] The Defendants are clear on the Solana ecosystem's deliberate and coordinated regulatory posture; U.S.-facing launches paired are with foreign foundation wrappers to shield liability. It corroborates the pleaded wire-fraud inducements, chance-based gambling mechanics, and unlicensed value transfers directed at U.S. users, and supports that Solana Labs and the Solana Foundation operated with functional unity and agency in setting, approving, and disseminating that posture, regardless of nominal corporate lines (¶¶ 80–85).

---

[15] https://www.youtube.com/watch?v=3XIWVJJK7p4
[16] https://x.com/Austin_Federa/status/1946692308008612274



107.    The enterprise further operated through its individual leaders and agents, including Anatoly Yakovenko and Raj Gokal at Solana Labs, Dan Albert, Austin Federa, and Lily Liu at the Solana Foundation, Alon Cohen, Noah Tweedale, and Dylan Kerler at Pump.fun, and Lucas Bruder and Brian Smith at Jito Labs and the Jito Foundation, each of whom, in addition to other unnamed individuals, directed and knowingly participated in the conduct of the enterprise's affairs (¶ 440).

108.    These entities functioned as a unified and interdependent enterprise in which Pump.fun could not operate at scale without Solana's validator framework and token

infrastructure, Jito's priority pathway shaped transaction ordering and value extraction, and each entity shared proceeds and visibility into the conduct of the others. (¶ 447).

109.        Public admissions by Solana Foundation leadership align with this motive, including Lily Liu's statement that "validators make money from transaction count [especially priority-fee transactions], [and] apps make money from transaction volume," confirming that fee and revenue capture scale with the very throughput the enterprise sought to maximize.[17]



110.        The enterprise operated continuously from at least January 2024 through filing, across national borders, using interstate wire facilities, spanning tens of millions of

---

[17] https://x.com/calilyliu/status/1922283975218806823

transactions, billions of dollars in trading volume, and thousands of token launches, and causing widespread and foreseeable losses to retail participants (¶ 449).

111.     Public statements by leadership corroborate this association and ongoing coordination. On July 24, 2025, Anatoly Yakovenko (Solana Labs), Austin Federa, and Lucas Bruder (Jito Labs) jointly authored 'The Internet Capital Markets Roadmap,' setting out a shared execution agenda for Solana's market microstructure.[18]

**C. Whether any defendants are employees, officers, or directors of the enterprise.**

112.     Because the enterprise is pleaded as an association-in-fact among separate corporate actors, the individuals through whom it operated served as officers or agents of the constituent entities, including Anatoly Yakovenko and Raj Gokal at Solana Labs, Dan Albert, Austin Federa, and Lily Liu at the Solana Foundation, Alon Cohen, Noah Tweedale, and Dylan Kerler at Pump.fun, and Lucas Bruder and Brian Smith at Jito Labs and the Jito Foundation, as identified in the fact sections describing their roles and statements (¶¶ 265, 269, 281; ¶¶ 116, 155, 440).

**D. Whether any defendants are associated with the alleged enterprise.**

113.     The complaint pleads association across the constituent entities through shared infrastructure, coordinated launch and execution mechanics, and reciprocal fee streams, including Solana system programs, Jito's bundle-and-tip pathway, and Pump.fun's interface and token factory, all operating interdependently rather than as isolated tools (¶¶ 263–307). Defendants Pump.fun, Inc., Solana Labs, Inc., Solana Foundation and Jito Labs, Inc., are all associated as independent components making up the Enterprise.

**E. Whether defendants are separate from the enterprise or the enterprise itself**

---

[18] https://www.anza.xyz/blog/the-internet-capital-markets-roadmap

114.        Plaintiffs plead person–enterprise distinctness by alleging that each defendant is a distinct § 1961(3) "person," while the "Pump Enterprise" is the association-in-fact among Pump.fun, Solana Labs, the Solana Foundation, and Jito Labs; the enterprise is not any single defendant and is operated through shared but distinct roles (¶¶ 440; 443).

115.        The Complaint describes a unified structure with defined roles, shared proceeds, and coordinated conduct among separate corporate actors, which underscores that the § 1962(c) persons are distinct from the enterprise entity (¶ 447).

**6. Describe the alleged relationship between the activities of the enterprise and how the pattern of racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

116.        Pump.fun's one-click token factory creates a token and immediately launches a bonding-curve market that moves within seconds (¶¶ 117–124; ¶ 290). The enterprise integrates Jito's bundle-and-tip system into that launch flow so that users can pay to obtain priority inclusion at creation (¶¶ 286–294). The complaint alleges this priority path allows sophisticated users to obtain earliest fills ahead of public orders and is central to Pump.fun's economics (¶¶ 288–299). Each Pump.fun transaction invokes Solana's system programs and SPL token standard, which Solana authored and maintains, and those rails process every token creation and trade (¶¶ 271–279).

117.        The wire-fraud narrative is not incidental marketing. The platform's defining message was "Fair Launch," including claims of no presales, no insider allocations, and rug-pull-proof launches, and that message was disseminated across the website, interface, and social channels (¶¶ 184–185, 190). The Complaint alleges that these representations continued to be used after a foreign regulator's ban without changing the launch mechanics (¶ 191).

118.       The gambling mechanics are pleaded as core business, not as side effects. (¶ 262). Users stake SOL into bonding-curve mechanisms where outcomes depend on virality and timing rather than underlying utility (¶¶ 251–253). The Complaint alleges that for most users the experience is functionally indistinguishable from slot-machine gambling and that most tokens rapidly lose value (¶¶ 254–255). The platform runs without age-verification controls and permits minors to participate (¶ 260).

119.       The money-transmission function is alleged to be unlicensed and to operate through the same daily pipeline. Pump.fun receives SOL from users, converts it into newly minted tokens, and transmits tokens and SOL back through automated contracts without money-transmitter licensure or KYC/AML controls (¶ 244). The Complaint pleads that Solana Labs and the Solana Foundation provide validator software and token programs that enable those transfers, and that Jito monetizes transaction tips tied to this flow, without money-transmitter licenses (¶¶ 245–248). None of these entities represents that it is registered as a money transmitter or that it maintains an associated compliance program (¶ 248). The pleading alleges the absence of licensure is material given these defendants' roles in receiving, converting, and transmitting value (¶ 249).

120.       The same day-to-day pipeline is alleged to host routine impersonation and counterfeit tokens that generate trading and fees. The interface allows any wallet to launch tokens instantly without identity verification or pre-launch review (¶ 199). The Complaint pleads that the platform facilitated counterfeit versions of well-known assets and widespread brand and celebrity misappropriation and took no meaningful steps to remove them while monetizing trading (¶¶ 214, 218, 229–233). Where the pleading discusses

Solana and Jito in this context, it alleges they continued to provide and benefit from the rails on which this activity ran (¶¶ 200–201).

121.     The roles of Solana and Jito are pleaded as integrated with, and indispensable to, Pump.fun's daily operations. Solana authored and maintains the validator client, token standards, and system programs used by every Pump.fun transaction, and its network-level enhancements enabled high-throughput speculation tied to Pump.fun traffic (¶¶ 111, 124, 179-180, 277–279, 305–306). The Complaint pleads interdependence among Solana, Jito, and Pump.fun, including Solana's relationship with Jito and the integration of Jito's tip-driven, bundle-based priority pathway at the moment of token creation (¶¶ 273–294).

122.     The pleaded revenue and loss figures are tied to these routine activities. Pump.fun generated very large recurring fee revenues from the uniform 1% take on buys and sells and from continuous launch-and-trade activity (¶¶ 329–336; *see also* ¶ 444). Validators and Jito captured large tip revenues over the same period, and the Complaint attributes those revenues to the same priority-inclusion pathway used at launches (¶¶ 295). Solana realized increased validator-fee and network-fee income as throughput from this activity rose. (¶¶ 338–349). The pleading quantifies widespread retail losses in the billions from launches and rapid post-graduation collapses (¶¶ 351–359).

123.     On these allegations, the pattern does not differ from the enterprise's usual and daily activities. The Complaint pleads that the gambling mechanics, the "Fair Launch" inducements over interstate wires, the unlicensed receipt, conversion, and transmission of value, and the counterfeit-friendly launch flow *are* the business model and the means of profit (¶¶ 262, 293, 306).

**7. Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

124.     Defendants marketed "fair-launch" tokens and induced purchases through public websites, the smart-contract interface, social media, Discord, and livestreams, all of which are interstate wire channels (¶¶ 184–189, 190). The resulting purchases and sales were executed and settled over interstate wire communications on the Solana network (¶ 190).

125.     Users connected wallets and staked SOL into a chance-driven bonding-curve mechanism that the pleading describes as functionally indistinguishable from slot-machine wagering (¶¶ 250–255). Those wagers executed on Solana using validator infrastructure that includes Jito's client and bundle-and-tip pathway (¶¶ 286–294). Minors could and did participate, which underscores the breadth of the interstate activity (¶¶ 260–262).

126.     The enterprise received SOL from users, converted it into newly minted tokens, and transmitted value to wallets as part of ordinary operations (¶¶ 244–245), while the pleading alleges the absence of federal and state money-transmitter licensure for those transmissions (¶¶ 248–249).

127.     Foreign commerce was directly affected. The Solana Foundation is a Swiss nonprofit that, together with Solana Labs, supplied the core infrastructure on which Pump.fun transactions ran (¶¶ 267–279). The Complaint also details a cross-border laundering episode in which the DPRK-sanctioned Lazarus Group bridged hack proceeds into Solana, launched a Pump.fun token, generated trading volume, and exited funds using prioritized execution (¶¶ 234–243).

128.     The scale of domestic economic activity reinforces the commerce nexus. Pump.fun activity materially increased Solana network-fee volume and demand for blockspace (¶¶ 309–317). Validator and MEV-tip revenues expanded in lockstep with that traffic

(¶¶ 318–328). Pump.fun generated very large, recurring fee revenues from launches and trades during the same period (¶¶ 329–336).

129.        Count II expressly alleges that each defendant conducted or participated in the enterprise's's affairs "through a pattern of racketeering activity…that affected interstate and foreign commerce" (¶¶ 440–441). These interstate solicitations and executions, unlicensed transmissions of value, cross-border actors and flows, and national-scale transaction and revenue effects together demonstrate a substantial effect on interstate and foreign commerce.

**8. If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

**A. State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**
**B. Describe the use or investment of such income.**

**<u>N/A</u>**

**9. If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe the acquisition or maintenance of any interest in or control of the alleged enterprise.**

**<u>N/A</u>**

**10. If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

**A. State who is employed by or associated with the enterprise.**

130.        Plaintiffs allege an association-in-fact "Pump Enterprise" reflected in the coordinated operations among Baton Corporation Ltd. d/b/a Pump.fun, Solana Labs Inc., the Solana Foundation, and Jito Labs Inc., as described in the Complaint's developed factual sections.

131.    Pump.fun supplied the public-facing one-click token-launch interface and bonding-curve trading mechanics that drove the transaction flow (¶¶ 117–133). The order ticket exposed speed tiers and a user "Tip" that purchased priority inclusion (¶ 130). Those mechanics were integrated with Jito's bundle-and-tip pathway at launch (¶¶ 289–294). These facts plead Pump.fun's participation in the operation and management of the enterprise's affairs by orchestrating launches and routing transactions through the shared rails (¶¶ 117–133, 289–294).

132.    Solana Labs authored and maintains the SPL token program and validator stack used for every Pump.fun launch and trade (¶¶ 271–279). The Foundation funded and coordinated ecosystem infrastructure and resources that supported the same rails (¶¶ 267–270). The Complaint pleads that network-level economics tied throughput to fee revenues and treasury effects (¶¶ 309–317). These facts plead Solana Labs' and the Foundation's participation in the operation and management of the enterprise's affairs by supplying and coordinating the transaction-validation rails on which the enterprise's flow executed (¶¶ 267–279, 309–317).

133.    Jito Labs developed and operated the modified validator client and off-chain Block Engine that enable private bundles and user "tips" for priority inclusion, and it integrated those rails with Pump.fun's launch flow (¶¶ 281–294). These facts plead Jito's participation in the operation and management of the enterprise's affairs by running the execution pathway that determined inclusion and ordering at launch (¶¶ 281–294).

134.    Individuals acting through those entities include Anatoly Yakovenko and Raj Gokal at Solana Labs (¶¶ 38–39), Dan Albert, Austin Federa, and Lily Liu at the Solana Foundation (¶¶ 40–42), Alon Cohen, Noah Tweedale, and Dylan Kerler at Pump.fun (¶¶

43–45), and Lucas Bruder and Brian Smith at Jito Labs and the Jito Foundation (¶¶ 46–47). Each of these individual defendants alleged to have directed and knowingly participated in the enterprise's affairs through the roles described in the factual sections cited above.

**B. State whether the same entity is both the liable "person" and the "enterprise" under Sec 1962(c).**

135.     Each defendant is pleaded as a distinct "person" for § 1962(c) purposes, and the enterprise is the association-in-fact among Pump.fun, Solana Labs, the Solana Foundation, and Jito Labs, not any single defendant. Person–enterprise distinctness is supported by the factual allegations showing separate entities performing different roles on shared rails: Pump.fun's front-end launch engine (¶¶ 116–133, 289–294), Solana Labs' and the Foundation's validator and token-program infrastructure and economics (¶¶ 267–279), and Jito Labs modified validator client and off-chain Block Engine (¶¶ 281-294).

**11. If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe the alleged conspiracy.**

136.     The Complaint pleads a § 1962(d) conspiracy, alleging that Pump.fun, Solana Labs, the Solana Foundation, and Jito Labs agreed that members of the enterprise would commit multiple racketeering offenses to implement and profit from the scheme (¶ 442). The common objective was to run and monetize a high-velocity token-wagering system by inducing purchases with a uniform "fair launch" message while deploying priority-execution rails and operating unlicensed value-transfer functions (¶¶ 184–195, 244–262, 285–294).

137.        The agreement's methods are pleaded with particularity. First, defendants disseminated "Fair Launch," "no presales," and "no insider allocations" messages over interstate wires, while omitting meaningful equal-access protections (¶¶ 184–195). Second, the launch flow integrated Jito's bundle-and-tip pathway and exposed a user "Tip" and speed controls in the order interface so that insiders and tip-payers could obtain priority inclusion at creation (¶ 130; ¶¶ 285–294). Third, the enterprise received SOL, converted it into new tokens, and routed proceeds without money-transmitter licensure (¶¶ 244–249). Fourth, participation functioned as chance-based gambling on a bonding curve with creator bounties and rapid churn (¶¶ 250–262).

138.        Role allocation is pleaded in detail. Pump.fun operated the public-facing interface and one-click casino token factory, broadcast the "fair launch" message, exposed speed and "Tip" controls, and implemented the bonding-curve mechanism without equal-access safeguards (¶¶ 120–134, 185–190). Jito Labs engineered and monetized the priority pathway through its validator client and Block Engine and integrated that pathway with Pump.fun launches (¶¶ 281–294). Solana Labs and the Solana Foundation supplied and promoted the token programs and validator stack that processed each transaction and linked usage to fee and treasury economics (¶¶ 271–279, 309–317).

139.        Overt acts evidencing agreement include the publication and repetition of "Fair Launch" messaging across the website and channels (¶ 185), the instruction to "construct a Jito bundle" and "add a bribe ('tip')" at launch (¶¶ 289–294), and the execution of the same through web, interface, social-media, Discord, and smart-contract transmissions—each a wire used to induce purchases and route value. (¶ 190). Count II also pleads

conspiracies to commit wire fraud and to operate an unlicensed money-transmitting business as facets of the same agreement. (¶¶ 463–464).

140.     The Complaint alleges scienter and circumstantial agreement through statements and posture consistent with knowing participation, including the CEO's public description of Pump.fun as a "casino" and the embrace of a "crime is legal/it's crime season" ethos while the scheme continued (¶¶ 155, 192).

141.     Plaintiffs further allege injury "by reason of" the § 1962(c) violation carried out through this agreement: the wire-fraud solicitations and unlicensed transmissions caused direct, out-of-pocket losses and fee/tip extractions at the point of transaction, as detailed for the named Plaintiffs and at scale for the class (¶¶ 28–30, 350–366; *see also* Count II's causation allegations at ¶¶ 465–468).

142.     Taken together with the express agreement allegation, these role-and-method-specific facts plead that defendants agreed enterprise participants would commit multiple racketeering predicates—including wire fraud (18 U.S.C. § 1343), operation of an illegal gambling business (18 U.S.C. § 1955), and operation of an unlicensed money-transmitting business (18 U.S.C. § 1960)—to advance a common objective, satisfying § 1962(d) at the pleading stage.

**12. Describe the alleged injury to business or property.**

143.     Lead Plaintiff Michael Okafor bought and sold multiple "fair-launch" tokens on Pump.fun between March 2024 and January 2025 and alleges total trading losses of about $242,076.74 (¶ 28). He also paid "priority blockspace" and bundling fees that were routed to and monetized by Defendants (¶ 28).

144.     Diego Aguilar bought and sold multiple Pump.fun tokens on Pump.fun, including First Convicted Raccoon, FWOG, and GRIFFAIN, and was damaged thereby (¶ 29). Kendall Carnahan bought and sold multiple Pump.fun tokens on Pump.fun, including PNUT tokens, and was damaged thereby (¶ 30).

145.     Plaintiffs seek to represent a Class of all persons who purchased Pump.fun tokens during the Class Period and had an out-of-pocket loss (¶ 386). A proposed Subclass covers twenty specified Pump Tokens (¶ 386).

146.     On-chain loss data show the scale of pecuniary harm. More than 4.25 million unique wallets traded at least ten Pump.fun tokens in 2024 (¶ 351). Over 60% of those wallets ended net negative (¶ 351). Approximately 2.4 million wallets lost up to $1,000 each, about $1.2 billion in aggregate (¶ 352). Another 221,800 wallets lost $1,000–$10,000, about $1.22 billion (¶ 352). About 30,000 wallets lost $10,000–$100,000, about $1.65 billion (¶ 352). About 1,700 wallets lost more than $100,000, about $340 million, and at least 46 wallets lost more than $1 million (¶ 353). The Complaint estimates aggregate user losses across Pump.fun's core platform and related venues of $4–$5.5 billion (¶ 354).

147.     Post-"graduation" losses are pleaded separately. After tokens moved to DEXs such as Raydium, 81%–97% of Pump.fun tokens lost more than half their value, generating another $1.2–$2 billion in retail losses (¶ 357).

148.     Fee-extraction injuries are direct and cash-denominated. The order ticket exposed a user "Tip" and speed controls to purchase priority inclusion (¶ 130). Validators running Jito's client captured large tip revenues paid by users seeking that priority (¶¶ 295–297). The Complaint pleads a surge in validator-side yield and MEV tip revenue tied to that path

(¶¶ 318–326). Pump.fun's platform-fee revenues rose with the same transaction flow. (¶¶ 329–336).

**13. Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

149.        Every transaction produced a direct transfer of money to Defendants. Each Pump.fun buy or sell incurred a uniform 1 percent platform fee that was deducted at execution and paid to Pump.fun (¶ 33). The order ticket exposed a user "Tip" and speed tiers that purchased inclusion priority, and the launch flow integrated Jito's bundle-and-tip pathway so privileged orders were included before public orders (¶¶ 130, 289–294). Validators then captured user-paid tips, and the Complaint pleads large tip revenues during the period (¶¶ 295–297, 318–326).

150.        Purchases were induced by uniform "Fair Launch" and "no presales/no insider allocations" messaging disseminated over interstate wires while Defendants implemented no meaningful protections against insider priority or bots (¶¶ 184–190). The interface reinforced the same message by mimicking professional market cues and by presenting "front-running protection" and the user "Tip" on the order ticket (¶¶ 125–133).

151.        Those inducements fed a chance-driven bonding-curve mechanism that extracted value from each token "spin." Users staked SOL into bonding curves with outcomes driven by timing and virality, and creator bounties accelerated churn (¶¶ 250–257). The Complaint quantifies widespread collapses and billions in net trading losses borne by retail wallets on these purchases, including post-graduation drops of more than fifty percent for the vast majority of tokens (¶¶ 350–366).

152.     At the same time, the enterprise received SOL, converted it to tokens, routed proceeds, and transmitted value without federal or state money-transmitter licensure, so the transfer of funds itself is part of the charged conduct and occurred through the same rails that caused the losses (¶¶ 244–249).

153.     Count II pleads proximate cause in these terms. Defendants' racketeering activity directly caused class members to purchase Pump Tokens and to suffer out-of-pocket losses when prices collapsed, and "each dollar of profit realized by the Defendants was made possible only because Plaintiffs and the Class incurred corresponding losses" (¶¶ 441, 467–468).

154.     The chain is domestic and direct. Lead Plaintiff Okafor is a United States resident, his purchases and payments were transmitted by interstate wires through the Pump.fun interface and Solana network, and his losses and fees are alleged in concrete amounts (¶ 28, 190).

**14. Provide any additional information that you feel would be helpful to the Court in trying the RICO claim.**

155.     This case alleges a single, integrated racketeering scheme. The platform publicly sold "fair-launch" parity and safety while operating what was in substance a house-advantaged gambling engine. The pleadings trace the scheme across three layers: the user interface that marketed fairness while exposing priority controls, the execution layer that sold priority through tips and private bundles, and coordinated off-platform communications that amplified the same message. Much of the decisive proof is in defendants' possession and control. Screenshots taken of the internal 'Pump Team' Telegram channel, featuring members of the Pump.fun team discussing fundraising,

technical strategy, and work with Bruder, Gokal, and Yakovenko are appended (Exs. A–D) to illustrate the scheme's operation and identify specific topics for targeted discovery. The accompanying extracts from UK police report witness statements (Exs. E–G) clarify the relationships of Cohen, Tweedale, and Kerler to Baton Corp LTD and Pump.fun.

DATED:      August 21, 2025                    Respectfully Submitted,
            New York, NY

                                               **BURWICK LAW, PLLC**
                                                By: /s/ Max Burwick
                                               Max Burwick
                                               43 West 43rd Street, Ste. 114
                                               New York, NY 10036
                                               maxb@burwick.law

                                               **WOLF POPPER LLP**
                                               Chet B. Waldman
                                               Terrence Zhang
                                               845 3rd Avenue – 12th Floor
                                               New York, NY 10022
                                               212-759-4600
                                               cwaldman@wolfpopper.com
                                               tzhang@wolfpopper.com

                                               *Co-Lead Counsel for Plaintiffs and
                                               the Proposed Class*