UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIEGO AGUILAR, KENDALL CARNAHAN and MICHAEL OKAFOR on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BATON CORPORATION LTD, d/b/a PUMP.FUN, ALON COHEN, DYLAN KERLER, NOAH BERNHARD HUGO TWEEDALE, SOLANA LABS INC., SOLANA FOUNDATION, JITO LABS INC., JITO FOUNDATION, ANATOLY YAKOVENKO, RAJ GOKAL, DAN ALBERT, AUSTIN FEDERA, LILY LIU, LUCAS BRUDER, and BRIAN SMITH<br><br>Defendants. | Case No.: 1:25-cv-00880-CM-BCM |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION .................................................................................................1

II.     ARGUMENT ......................................................................................................4

   A.   Plaintiffs Establish the Existence of A Pump Enterprise, As An Association-In-Fact Enterprise ..............................................................................................4

        1.   Introduction ............................................................................................4

        2.   Plaintiffs Have Established RICO Standing.................................................9

        3.   Domestic Injury Is Sufficiently Alleged Under § 1964(c) ......................16

   B.   The PSLRA Securities Bar Does Not Foreclose Plaintiffs' RICO Claim............17

   C.   Plaintiffs Adequately State RICO Claims Under 18 U.S.C. §§ 1962(c) and (d) ..19

        1.   Wire Fraud Predicates Are Sufficiently Pleaded Under 18 U.S.C. § 1343 ...............................................................................................19

        2.   Plaintiffs Plead an Illegal Gambling Business Under N.Y. Penal Law § 225.00 ..............................................................................................25

        3.   Operation of An Unlicensed Money-Transmitting Business Under 18 U.S.C. § 1960 Is Sufficiently Pleaded. ......................................................32

        4.   The Remaining Predicate Acts Are Sufficiently Pleaded.........................36

        5.   RICO § 1962(c) Operation/Management Is Adequately Pleaded. ............39

        6.   RICO § 1962(d) Conspiracy Claim Is Independently Adequate..............43

   D.   Causation Is Adequately Pleaded ....................................................................44

        1.   Wire-fraud causation under 18 U.S.C. § 1343. ........................................44

        2.   Mosaic And But-For Causation...............................................................47

        3.   Directness and foreseeability narrative.....................................................48

        4.   Rebuttal To Expectancy Interest ...............................................................49

   E.   The Motions to Dismiss for Lack of Personal Jurisdiction Should be Denied .....50

   F.   The Motions to Dismiss the Securities Claims Must Be Denied .........................53

        1.   The SEC Staff Statement on Meme Coins Does Not Bar These Claims ..53

        2.   The Twenty Meme Coins Satisfy the *Howey* Test as Investment Contracts...............................................................................................54

        3.   The Twenty Specified Coins Were Securities Under the Federal Securities Laws......................................................................................57

        4.   The Securities Claims Satisfy Domestic Transaction Requirements Under Morrison .....................................................................................67

        5.   The Baton Defendants Are Statutory Sellers Under the Securities Act ....69

   G.   The Motion to Dismiss the Unjust Enrichment Claims Must Be Denied ............72

1.    Each Defendant Received Measurable Benefits from the Coordinated Scheme ............................................................................72

2.    Defendants' Retention of Benefits Would Be Inequitable Given their Unlawful Conduct ...................................................................74

H.    The Motion to Dismiss the GBL § 349 Claims Must Be Denied .........................76

1.    The Complaint Alleges Consumer-Oriented Conduct Affecting the Public Interest ....................................................................76

2.    Defendants Engaged in Materially Misleading Acts and Practices ...........78

3.    The Claims Satisfy New York's Jurisdictional Requirements .................80

III.    CONCLUSION ...............................................................................81

# TABLE OF AUTHORITIES

**Cases**

18 U.S.C. § 1956 ................................................................................................................39

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ...........................................................................................71

*Alix v. McKinsey & Co.*,
    23 F.4th 196 (2d Cir. 2022) ..........................................................................................11

*Allstate Ins. Co. v. Benhamou*,
    190 F. Supp. 3d 631 (S.D. Tex. 2016) ...........................................................................8

*Allstate Ins. Co. v. Plambeck*,
    802 F.3d 665 (5th Cir. 2015) .........................................................................................7

*Anderson v. Unilever United States, Inc.*,
    607 F. Supp. 3d 441 (S.D.N.Y. 2022) .........................................................................83

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) .........................................................................................12, 48, 50, 51

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................................................47

*Balestra v. ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) .............................................................59, 60, 62

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................................47

*Bible v. United Student Aid Funds, Inc.*,
    799 F.3d 633 (7th Cir. 2015).........................................................................................7

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
    3 N.Y.3d 200 (2004)......................................................................................................79

*Bongiorno v. Baquet*,
    2021 WL 4311169 (S.D.N.Y. Sept. 20, 2021) ...........................................................17

*Boyle v. United States*,
    556 U.S. 938 (2009) ....................................................................................................4, 7

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
    373 F. 3d 296 (2d Cir. 2004)........................................................................................75

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ...............................................................................................passim

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) ........................................................................................................5

*Chaset v. Fleer/Skybox Int'l,* LP,
   300 F.3d 1083 (9th Cir. 2002) ........................................................................14, 52

*City of Providence, R.I. v. BATS Global Markets, Inc.,*
   878 F.3d 36 (2d Cir. 2017) ...................................................................................19

*Colangelo v. Champion Petfoods USA, Inc.,*
   No. 18-CV-1228 LEK/ML, 2020 U.S. Dist. LEXIS 26919 (N.D.N.Y. Feb. 18, 2020) ...........82

*Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,*
   271 F.3d 374 (2d Cir. 2001) .................................................................................10

*Cooper v. Anheuser-Busch, LLC,*
   553 F. Supp. 3d 83 (S.D.N.Y. 2021) ......................................................................81

*Cruz v. FXDirectDealer, LLC,*
   720 F.3d 115 (2d Cir. 2013) ...............................................................................5, 84

*DeFalco v. Bernas,*
   244 F.3d 286 (2d Cir. 2001) .............................................................................42, 43

*Dettmering v. VBit Techs. Corp.,*
   2023 WL 4824955 (D. Del. July 27, 2023) .............................................................18

*Dubin v. United States,*
   599 U.S. 110 (2023) ............................................................................................41

*Edmar Fin. Co., LLC v. Currenex, Inc.,*
   No. 21-CV-6598 (LAK), 2023 U.S. Dist. LEXIS 87620 (S.D.N.Y. May 18, 2023). ...............79

*Elsevier Inc. v. W.H.P.R., Inc.,*
   692 F. Supp. 2d 297 (S.D.N.Y. 2010) ....................................................................56

*Empire Merchs., LLC v. Reliable Churchill LLLP,*
   902 F.3d 132 (2d Cir. 2018) ........................................................................48, 49, 50

*Entretelas Americanas S.A. v. Soler,*
   2020 U.S. Dist. LEXIS 20692 (S.D.N.Y. Feb. 3, 2020) .............................................39

*Fezzani v. Bear, Stearns & Co.,*
   2005 WL 500377 (S.D.N.Y. Mar. 2, 2005)..............................................................18

*Flexborrow LLC v. TD Auto Fin. LLC,*
   255 F. Supp. 3d 406 (E.D.N.Y. 2017) .....................................................................6

*Garcia De León v. N.Y. Univ.,*
   No. 21 Civ 05005 (CM), 2022 U.S. Dist. LEXIS 10723 (S.D.N.Y. Jan. 20, 2022).................72

*Gugick v. Melville Cap., LLC,*
   2014 WL 349526 (S.D.N.Y. Jan. 31, 2014) .............................................................58

*Hemi Grp., LLC v. City of New York,*
   559 U.S. 1 (2010) .........................................................................................passim

*Hermès Int'l v. Rothschild,*
   603 F. Supp. 3d 98 (S.D.N.Y. 2022) ......................................................................41

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*,
37 N.Y.3d 169 (2021) ........................................................................................................80

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258, 112 S. Ct. 1311 (1992) ............................................................................11, 51

*In re EthereumMax Investor Litig.*,
No. CV 22-00163-MWF (SKx), 2022 U.S. Dist. LEXIS 220968 (C.D. Cal. Dec. 6, 2022) ...14,
52

*In re J.P. Jeanneret Assocs., Inc.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2011) ........................................................................58, 59

*In re JP Morgan Chase Securities Litigation*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................................................................18

*In re Longfin Corp. Sec. Class Action Litig.*,
No. 18cv2933(DLC), 2019 U.S. Dist. LEXIS 62758 (S.D.N.Y. Apr. 11, 2019) ....................54

*Kaye v. Grossman*,
202 F. 3d 611 (2d Cir. 2000) .............................................................................................75

*Kottler v. Deutsche Bank AG*,
607 F. Supp. 2d 447 (S.D.N.Y. 2009) ................................................................................17

*La Vigne v. Costco Wholesale Corp.*,
284 F. Supp. 3d 496 (S.D.N.Y. 2018), aff'd, 772 F. App'x 4 (2d Cir. 2019) ........................82

*Licht v. Binance*,
2025 WL 625303 (D. Mass. Feb. 5, 2025), report and recommendation adopted, 2025 WL
624025 (D. Mass. Feb. 26, 2025) .......................................................................................17

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019) ......................................................................................................22

*Marini v. Adamo*,
812 F. Supp. 2d 243 (E.D.N.Y. 2011) ................................................................................59

*Matter of Pace-o-matic, Inc. v. N.Y. State Liquor Auth.*,
72 A.D.3d 1144, 898 NYS2d 295 (App. Div. 3rd Dept.) ..............................................27, 28

*Matter of People v. JUUL Labs, Inc.*,
212 A.D.3d 414 (N.Y. App. Div. 1st Dept. 2023) ...............................................................53

*Matter of Plato's Cave Corp. v. State Liquor Auth.*,
68 N.Y.2d 791 (1986) ........................................................................................................28

*Mayfield v. Asta Funding*, Inc.,
95 F. Supp. 3d 685 (S.D.N.Y. 2015) ...................................................................................6

*McCall v. Frampton*,
81 A.D.2d 607 (2d Dept. 1981) ..........................................................................................77

*Mezzonen, S.A. v. Wright*,
1999 U.S. Dist. LEXIS 17625 (S.D.N.Y. Nov. 15, 1999)......................................................17

*MLSMK Inv. Co. v. JPMorgan Chase & Co.*, |651 F.3d 268 (2d Cir. 2011) ............................17

*Moore v. It's All Good Auto Sales, Inc.*,
  907 F. Supp. 2d 915 (E.D. Pa. 2012)..................................................................26

*Moore v. PaineWebber, Inc.*,
  189 F.3d 165 (2d Cir. 1999) ...............................................................................24

*Morrison v. National Australia Bank Ltd.*,
  130 S. Ct. 2869 (2010) ........................................................................................70

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012)................................................................................72

*Neder v. United States*,
  527 U.S. 1 (1999) ................................................................................................20

*Norman v. Salomon Smith Barney, Inc.*,
  350 F. Supp.2d 382 (S.D.N.Y. 2004) .................................................................77

*Orlander v. Staples, Inc.*,
  802 F.3d 289 (2d Cir. 2015) ...............................................................................83

*OSRecovery, Inc. v. One Groupe Int'l, Inc.*,
  354 F. Supp. 2d 357 (S.D.N.Y. 2005) ................................................................17

*Picard v. Kohn*,
  907 F. Supp. 2d 392 (S.D.N.Y. 2012) ................................................................19

*Pino v. Cardone Cap., LLC*,
  55 F.4th 1253 (9th Cir. 2022).............................................................................74

*Pinter v. Dahl*,
  486 U.S. 622 (1988) ......................................................................................73, 75

*Price v. Pinnacle Brands*, Inc.,
  138 F.3d 602 (5th Cir. 1998)..........................................................................14, 52

*PT United Can Co. v. Crown Cork & Seal Co.*,
  138 F.3d 65 (2d Cir. 1998) .................................................................................54

*Regalado Cuellar v. United States*,
  553 U.S. 550 (2008).............................................................................................40

*Reich v. Lopez*,
  858 F.3d 55 (2d Cir. 2017) ................................................................................19

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2d Cir. 1994).................................................................................58, 66

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) .....................................................................................5, 8, 42

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
  630 F.3d 866 (9th Cir. 2010) ..............................................................................18

RJR *Nabisco, Inc. v. European Cmty.*,
  579 U.S. 325 (2016).........................................................................................9, 16

*Rosner v. Bank of China*,
  528 F. Supp. 2d 419 (S.D.N.Y. 2007) ......................................................................6

*Safe Streets All. v. Hickenlooper*,
  859 F.3d 865 (10th Cir. 2017) ............................................................................11

*Salinas v. United States*,
  522 U.S. 52 (1997) ...............................................................................................46

*Schwartz v. Lawyers Title Ins. Co.*,
  970 F. Supp. 2d 395 (E.D. Pa. 2013) .....................................................................7

*SEC v. Ficeto*,
  839 F. Supp. 2d 1101 (C.D. Cal. 2011) ...............................................................70

*SEC v. Goldman Sachs & Co.*,
  790 F. Supp. 2d 147 (S.D.N.Y. 2011) ..................................................................70

*SEC v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020) .......................................................60, 63, 67

*SEC v. LBRY, Inc.*,
  2022 WL 16744741 (D.N.H. Nov. 7, 2022) ...............................................58, 66, 67

*SEC v. Morton*,
  10 Civ. 1720 (LAK)(MHD), 2011 U.S. Dist. LEXIS 36487 (S.D.N.Y. Mar. 31, 2011) ..........54

*SEC v. Mut. Benefits Corp.*,
  408 F.3d 737 (11th Cir. 2005) ............................................................................60

*SEC v. Telegram Grp.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) ..................................................................60

*SEC v. Terraform Labs Pte. Ltd.*, F. Supp. 3d,
  No. 23 Civ. 1346 (JSR), 2023 U.S. Dist. LEXIS 230518, 2023 WL 8944860 (S.D.N.Y. Dec.
  28, 2023) ..............................................................................................................63

*SEC v. W. J. Howey Co.*,
  328 U.S. 293, 66 S. Ct. 1100 (1946) .......................................................57, 58, 67

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) .........................................................................................72

*Stevenson v. Thornburgh*,
  2024 WL 645187 (S.D.N.Y. Feb. 14, 2024) .........................................................19

*Sykes v. Mel S. Harris & Assocs., LLC*,
  780 F.3d 70 (2d Cir. 2015) ..................................................................................42

*Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc.*,
  2021 WL 1199430 (S.D.N.Y. Mar. 30, 2021) .......................................................75

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007) ................................................................................81

*Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech.*,
  886 F. Supp. 1134 (S.D.N.Y. 1995) .....................................................................11

*U1it4less, Inc. v. FedEx Corp.*,
    871 F.3d 199 (2d Cir. 2017) ...................................................................5

*United States v. Arrington*,
    941 F.3d 24 (2d Cir. 2019) ....................................................................5

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) .................................................................20

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) .................................................................21

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994) .................................................................23

*United States v. DiCristina*,
    726 F.3d 92 (2d Cir. 2013) ...................................................................26

*United States v. e-Gold, Ltd.*,
    550 F. Supp. 2d 82 (D.D.C. 2008) .......................................................36

*United States v. Faiella*,
    39 F. Supp. 3d 544 (S.D.N.Y. 2014) ...............................................36, 38

*United States v. Gershman*,
    31 F.4th 80 (2d Cir. 2022) .....................................................................5

*United States v. Harmon*,
    474 F. Supp. 3d 76 (D.D.C. 2020) ..................................................36, 38

*United States v. Huezo*,
    546 F.3d 174 (2d Cir. 2008) .................................................................40

*United States v. Johnson*,
    945 F.3d 606 (2d Cir. 2019) .................................................................53

*United States v. Kousisis*,
    145 S. Ct. 1382 (2025) ...........................................................20, 22, 23

*United States v. Pizzonia*,
    577 F.3d 455 (2d Cir. 2009) .................................................................44

United States v. Schwartz,
    924 F.2d 410 (2d Cir. 1991) .................................................................21

*United States v. Tuchinsky*,
    703 F. Supp. 3d 1337 (S.D. Fla. 2023) .................................................53

*United States v. Turkette*,
    452 U.S. 576 (1981) ..........................................................................4, 7

*United States v. Zemlyansky*,
    908 F.3d 1 (2d Cir. 2018) .....................................................................46

*Williams v. Binance*,
    96 F.4th 129 (2d Cir. 2024) .................................................................71

*Yegiazaryan v. Smagin*,
    599 U.S. 533 (2023) ............................................................................................16

*Zanghi v. Ritella*,
    2021 WL 4392756 (S.D.N.Y. Sept. 24, 2021) ....................................................17

**Statutes**

18 U.S.C § 1960 ........................................................................................................passim

18 U.S.C. § 1028 ..........................................................................................18, 40, 44

18 U.S.C. § 1343 ..........................................................................................18, 19, 20

18 U.S.C. § 1955 ......................................................................................................passim

18 U.S.C. § 1956 ....................................................................................................18

18 U.S.C. § 1961(4) ..................................................................................................4

18 U.S.C. § 1962(c) ........................................................................................5, 8, 17

18 U.S.C. § 1965 ..................................................................................................54

18 U.S.C. § 2318 ..................................................................................................40

18 U.S.C. § 2320 ..........................................................................................18, 40, 44

*Demaree v. Castro*,
    2023 WL 6465881 (S.D.N.Y. Oct. 4, 2023)....................................................6, 17

New York GBL §§ 349-350 ......................................................................................79

I.    __INTRODUCTION__

This case is not a referendum on meme-coins or blockchains. The claims are against people, companies, choices, and conduct. Specifically, the developers and decision-makers at Solana Labs and Pump.fun, using Jito Labs software[1] coordinated to build, market, and profit from an enterprise that, as alleged, operated through fraud, illegal gambling, unlicensed money transmission, and related unlawful acts. Like most sophisticated frauds, Defendants employed obfuscation and manipulative tactics for spectacular personal enrichment. Furthermore, the Pump.fun Defendants issued unregistered securities that promised to share profits earned by the promoters with the investors.

At issue in this case are three words: permissionless, open-source, and decentralized. Permissionless means that anyone can use the technology without credentials, KYC, or age verification. Open-source allows anyone to use the code to create new applications for free. Decentralization means multiple people host the network (similar to having an internet server in your house).

This novel and industry specific language were initially developed to describe a futuristic banking and currency system designed to allow anyone, anywhere access to modern finance. Unfortunately, Defendants through fancy legal maneuvering use these words to shift blame to their victims.

The two defendant groups, through the use of another group's software, alleged to be

---

[1] "Defendants" are Baton Corporation, Ltd, d/b/a Pump.fun, along with its officers Alon Cohen, Dylan Kerler, and Noah Bernhard, Hugo Tweedale (collectively, the "Baton Defendants" or "Pump.fun"), Solana Labs Inc., Solana Foundation, Dan Albert, and Austin Federa (collectively, the "Solana Defendants"), Lily Liu, Anatoly Yakovenko, and Raj Gokal. Jito Labs Inc., Jito Foundation, Lucas Bruder, and Brian Smith are referred to herein as (the "Jito Entities" or "Jito").  The Plaintiffs and the Jito Entities have filed a Stipulation dismissing the claims against the Jito Entities without prejudice.

members of a conspiracy operate three unique and disconnected companies. Solana Labs, builds and updates the Solana Blockchain software. Jito Labs, builds and updates the Jito client Software, and Pump.fun operates the Pump.fun website.

Like all software, to run new applications, the developers need to make updates, and the Solana Blockchain[2] and Jito Software have radically advanced since their inception. These advancements should have promoted expansive use cases of the Solana and Jito technologies. However this was not the case. Rather one dominant use emerged: the Pump.fun meme coin.

How technologies are used, and by whom is not a coincidence, it is the outcome of careful, and well considered design choices. Pump.fun required a technology with specific functionality. According to the founder of Pump.fun, the Solana Blockchain made the Pump.fun meme coin mania possible. Conversely, the founder of Solana warmly stated that the Solana Blockchain had finally found a fit for their technology in meme coins.

Defendants Solana Labs, and Pump.fun, using software of Jito Lab, enjoyed unprecedented financial success that reflects an interconnected relationship. Defendants assert that this occurred spontaneously, without coordination, but the facts say otherwise.

Defendants want this court, and the public more broadly, to believe they are powerless to update their technology to prevent fraud. They intentionally overcomplicate the functioning of the blockchain to make it appear that Solana Labs, the engineers who built the Solana Blockchain, cannot provide the technical updates to protect users from their co-conspirators.

The only thing that cannot be changed, or hopefully cannot be changed, on a blockchain is

---

[2] Unless otherwise indicated, capitalized terms have the same definition as in the Consolidated Amended Class Action Complaint (ECF No. 34) (the "Complaint" or "CAC"), all emphasis is added, and all internal citations and quotations are omitted.  Citations to "¶__" are to specific paragraphs in the Complaint.

the data recorded in their ledger. The rest of the system is the product of careful and thorough design decisions.

Plaintiffs allege three core propositions that defeat dismissal. First, Defendants set the scheme in motion. Solana Labs, using Jito Lab software, did not merely publish neutral code; it worked with Pump.fun to make a "meme-coin machine" operate at scale by supplying the token rails, a priority-execution pathway, and promotional lift necessary to mass-produce and sell Pump.fun tokens.

Second, Defendants knew what was happening. For well over a year, they had unmistakable notice of the platform's unlawful conduct and real-world harms—including a UK ban, public documentation of widespread counterfeiting and impersonation (including of law firms and public figures), data showing massive retail losses, underage participation and gambling, and episodes of laundering by sanctioned actors. None of the Defendants took action, although they had the power to do so. The misconduct was not hidden; it was the business model. Third, these actors alone could meaningfully stop or mitigate the harms but chose not to. As architects and maintainers of the platform, they controlled the token standard, validator behavior, priority routing, and front-end mechanics that induced and executed the trades. Basic gatekeeping—e.g., KYC/age checks for launch tools, blacklisting known impersonations, curbing priority routing for launch bundles, or disabling deceptive "fair-launch" toggles—was available. When pressed, they made selective tweaks, confirming control, but never adopted fixes that would impede the churn that generated their revenues.

The enterprise they helped build was not a neutral marketplace. It was a high-velocity revenue engine that ran on deception (touting "fair-launch" parity while insiders bought first), illegal gambling (chance-driven bonding-curve wagering), unlicensed money transmission

(receiving and routing value without required registration or controls), and related misconduct (counterfeiting, identity abuse, and use by sanctioned actors). Pump.fun cannot shift blame to "users": the platform designed the mechanics, and Solana Labs and Jito Labs provided and optimized the rails that made those mechanics bite.

Finally, motive underscores plausibility. During the Pump.fun period, Defendants reaped unprecedented revenues—more than at any prior time—precisely because the unlawful scheme maximized transactions, tips, fees, and token-linked gains. Defendant knew something was wrong; they saw it in real time; they could act; and they did not—because the money was too good. This case is about unlawful conduct sustained by greed, not about attacking technology. The motions to dismiss should be denied.[3]

## II.    ARGUMENT

### A.    Plaintiffs Establish the Existence of A Pump Enterprise, As An Association-In-Fact Enterprise

#### 1.    Introduction

Defendants' enterprise challenge fails. The Complaint and RICO Case Statement (the "RCS") (ECF No. 78) plead a classic association-in-fact enterprise among Pump.fun (Baton), Solana Labs, the Solana Foundation, and the Baton officers (the "Pump Enterprise"), with a common purpose, defined relationships, and continuity. *See* 18 U.S.C. § 1961(4); *Boyle v. United States*, 556 U.S. 938, 944, 946, 948 (2009); *United States v. Turkette*, 452 U.S. 576, 583 (1981);

---

[3] Defendants have filed four separate motions to dismiss: (1) Defendants Solana Labs, Inc., Solana Foundation, Dan Albert and Austin Federa's Motion to Dismiss (ECF No. 87); (2) Baton Corporation Ltd, d/b/a Pump.fun's Motion to Dismiss the Consolidated Amended Class Action Complaint (ECF No. 89); (3) Jito Labs, Inc.'s Motion to Dismiss the Consolidated Amended Complaint (ECF No. 94); and (4) The Baton Officers' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint (ECF No. 97) (each, an "MTD" or a "Motion," and collectively, the "Motions").

*United States v. Arrington*, 941 F.3d 24, 37 (2d Cir. 2019); *United States v. Gershman*, 31 F.4th 80, 96 (2d Cir. 2022). From January–April 2024, these actors aligned around a single commercial objective: scale the sale and rapid trading of Pump.fun meme-tokens and monetize each transaction through a 1% platform rake, paid priority tips, and validator-side commissions. The pleadings detail a tight sequence: (1) the public bundle mempool used for priority submission was removed in March (privatizing launch-priority lanes); (2) Solana recommended a software update (v1.17.31) in April to "alleviate ongoing congestion," increasing reliability for fee-tipped launch bursts; and (3) Pump.fun's share of all Solana trading jumped from ~0% (March) to 1.7% (April) to 25.2% (May), sustaining ~34–58% thereafter, tracking contemporaneous surges in network-fee/validator revenue and priority-tip revenues. ¶¶ 438–468; RICO Case Statement (or "RCS") (ECF No. 78) §§ 4-7. Those allegations plead purpose, concrete relationships, and longevity.

The enterprise alleged is an association-in-fact among separate legal persons, Baton/Pump.fun, Solana Labs, the Solana Foundation, and natural-person officers, satisfying distinctness. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120–21 (2d Cir. 2013); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001); *U1it4less, Inc. v. FedEx Corp.*, 871 F.3d 199, 206–07 (2d Cir. 2017).

Section 1962(c) requires that each RICO person take "some part in directing" the enterprise's affairs, not top-down control. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). The Amended Complaint pleads precisely that. Baton/Pump.fun designed and ran the bonding-curve engine and 1% rake; built the launch flow that exposed "speed" tiers and an optional "Tip"; and wired transaction ordering to the priority pathway. ¶¶ 130, 271–272, 289–94, 329–37. Solana Labs and the Solana Foundation authored and maintained the SPL token/validator stack on which every launch/trade executed; tuned network behavior (including the v1.17.31 recommendation) during

the Pump.fun surge; and coordinated validator/fee mechanics that monetized inclusion. ¶¶ 271–79, 309–17. These are role-specific, managerial choices about how the enterprise's transactions would be executed and monetized, far from the "failure to act" in *Demaree v. Castro*, 2023 WL 6465881, at *10 (S.D.N.Y. Oct. 4, 2023), or the routine vendor services in *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 415 (E.D.N.Y. 2017), and *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007). Courts sustain participation where defendants play operational parts that make the scheme work. *See Mayfield v. Asta Funding*, Inc., 95 F. Supp. 3d 685, 700–01 (S.D.N.Y. 2015).

The Baton officers' conduct independently satisfies *Reves*. The Amended Complaint identifies Alon Cohen, Noah Tweedale, and Dylan Kerler (a/k/a Dylan Phoon), alleges each exercised operational control over Pump.fun, personally promoted "fair launch," and directed and knowingly participated in the enterprise's affairs, including the bonding-curve engine, 1% fee, "front-running protection," and "no presale/no insider allocations" messaging that drove orders into the extraction rails. ¶¶ 37-48, 121–24, 155-172, 329–37, 465–68.

### (a)    The Pump Enterprise Operated with Common Purpose, Organization, And Continuity

Pump.fun manufactured the product and took a cut at checkout. Jito sold the fast lane that decided who got in first. Solana authored and tuned the rails every transaction ran on, while monetizing the throughput those launches created. The steps rolled out in sequence, the traffic followed, and the fees landed where the design put them. That is not parallel conduct; it is a working machine with complementary parts and a single commercial aim. *Boyle* asks whether the parts function as a continuing unit with a common purpose. These allegations meet that test.

The Complaint and RICO Case Statement plead a classic association-in-fact enterprise among Pump.fun, Solana Labs, the Solana Foundation, and Jito Labs (the "Pump Enterprise") with

(i) a common purpose, (ii) relationships/organization, and (iii) longevity sufficient to pursue the purpose. *Boyle*, 556 U.S. at 946; *Turkette*, 452 U.S. at 583. The shared objective is pleaded explicitly: to operate a pseudonymous online gambling system disguised as a token-launch platform and monetize every trade via platform rake, validator economics, and priority "tips." ¶¶ 443–449.

The relationships and organization are not abstract. Pump.fun ran the one-click token factory, collected a uniform 1% fee on each trade, and surfaced the "Tip/Speed" control in the order ticket; Jito engineered and monetized the private bundle-and-tip priority lane and integrated it into Pump launches; and Solana authored/maintained the SPL token program and validator stack that processed every Pump transaction and linked throughput to fee revenue. ¶¶130, 271–272, 289–294, 329–337.

The longevity/continuity allegations are concrete: continuous operation from at least January 2024 through filing—tens of millions of transactions and billions in volume—repeating the same launch mechanics and monetization across thousands of tokens. RCS ¶¶ 110, 85–86.

Courts credit enterprises where interdependence and complementary roles show a functioning unit rather than routine contracting. *See Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) (allegations of unusual economic interdependence and coordinated operations sufficient at 12(b)(6)); *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673–74 (5th Cir. 2015) (distinct roles working in concert constitute an enterprise); *Schwartz v. Lawyers Title Ins. Co.*, 970 F. Supp. 2d 395, 403–06 (E.D. Pa. 2013) (allegations of reciprocal dealing and coordinated conduct among defendants plausibly alleged an association-in-fact enterprise under *Boyle*; formal structure or fixed leadership not required); *see also Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 648–50 (S.D. Tex. 2016) (applying *Boyle*, participants functioned as a

continuing unit and satisfied person/enterprise distinctness). That is exactly what is pleaded here.

### (b) Pump.Fun, Jito, And Solana Were Not Neutral Infrastructure

Defendants also argue that Plaintiffs target "passive" infrastructure. The pleadings say otherwise. This is not passive publication of software. The pleadings describe specific managerial choices—who sees the fast lane, how to buy it, where the rake lands, and when to tune throughput for tipped bursts. Those choices directed ordering, inclusion, and revenue. That is "operation or management," not neutral tooling.

Jito removed the public mempool and ran the private bundle lane that privileged fee-tipped orders at launch; Solana maintained and tuned the validator client and system programs that processed the burst traffic; Pump.fun designed the one-click launch, the rake, and the user-facing priority-fee control. ¶¶ 130, 271–272, 289–94, 329–37. That is more than mere facilitation; it is the direction of the enterprise's affairs. *Reves*, 507 U.S. at 179 (establishing the "operation or management" test – that § 1962(c) reaches those with "some part in directing" an enterprise's affairs).

The MTDs' "we just build tools" refrain also fails because Plaintiffs sue persons for commercial conduct, not "code." The pleadings draw person/enterprise distinctness and tie liability to human decisions (product design, priority-path integration, messaging, and fee capture), not to the abstract existence of software.

### (c) The Pump Enterprise Saw the Red Flags, Had Fixes At Hand, And Kept The Engine Running

Scienter and conspiracy are reinforced by notice and posture. Warnings piled up. Simple gatekeeping—KYC/age checks for launch tools, blacklisting imposters, disabling priority bundling for launches, removing the "fair-launch" veneer—was available to the people who built and tuned the system. What changed? Selective tweaks that preserved the fee engine and the fast

lane. The business model stayed intact.

The "Fair Launch" narrative continued even after a foreign regulator's ban; insiders publicly embraced a "crime is legal/it's crime season" ethos while the scheme ran; and Defendants kept the priority path and fee extraction live throughout. ¶¶ 191–192.

Those allegations—paired with detailed role allocation and overt acts (including instructions to "construct a Jito bundle" and add a "tip" for earliest execution)—plausibly plead agreement that participants would commit racketeering predicates to advance the common objective.

### (d)    U.S. Buyers Lost U.S. Money At Execution Satisfying Domestic Injury

Money left U.S. wallets when users clicked "buy." The platform took its rake then; the priority tip flowed then. That is a domestic, direct injury to business or property, not a derivative after-market complaint.

Plaintiffs also plead a domestic injury to business or property, satisfying the extraterritoriality requirements set out in RJR *Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 346 (2016). Lead Plaintiff Okafor is a U.S. resident; his transactions/payments were transmitted via interstate wires; and the losses are cash-denominated and incurred in the United States. RCS ¶ 154. The same is true class-wide. RCS ¶¶ 143–154.

### 2.    Plaintiffs Have Established RICO Standing

### (a)    Plaintiffs Suffered Direct, Out-of-Pocket Losses – Not a "Baseball Card" Expectancy.

The Complaint pleads a scheme that immediately extracted value from users at the point of each transaction, by design. ¶¶ 329–337, 377–383; RCS ¶ 149. Every time a Plaintiff bought a Pump.fun token, the platform took a 1% "house" rake off the top, siphoning SOL cryptocurrency straight to Defendants' coffers. ¶¶ 329–336, 377; RCS ¶ 149. In many cases Plaintiffs also paid

additional priority "tip" fees to Defendants (via Jito) just for the chance to have their purchase processed faster. ¶¶ 289–294, 130; RCS ¶ 149. In return for spending their SOL, Plaintiffs received what amounted to a gambling slip with no intrinsic utility: a newly minted Pump.fun token that would have value only if a future threshold event ("graduation") occurred. ¶¶ 128, 250–257. If the token failed to graduate – as most did – it became virtually worthless and the user's stake was lost. ¶¶ 254–255, 351–359; RCS ¶¶ 146–147. Those pleaded, quantified diminutions of SOL at execution are classic "business or property" injuries under § 1964(c). *See Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 383 (2d Cir. 2001).

Defendants' attempt to recharacterize Plaintiffs' injuries as mere "gambling losses" or "expectancy interests" misstates both the allegations and the governing law. Unlike cases where plaintiffs complained that speculative investments failed to appreciate in value, here the Complaint pleads concrete, out-of-pocket losses directly inflicted by Defendants' racketeering scheme. Plaintiffs were not investing in a lasting asset or a legitimate project, they were "pooling funds" in a common enterprise where outcomes turned on platform-controlled bonding-curve mechanics. ¶¶ 250–257, 373. In substance, they wagered SOL in this closed-loop casino and received nothing of durable value in return. ¶¶ 128, 250–257; RCS ¶ 118.

Thus, when the overwhelming majority of tokens inevitably did not graduate and instead crashed, Plaintiffs' money didn't merely fail to appreciate – it disappeared into Defendants' pockets via the rake and tip fees, leaving Plaintiffs holding near-worthless tokens. ¶¶ 254–255, 329–336; RCS ¶ 149. This is not a case of post hoc disappointment about a hoped-for rarity or resale value; it is a case of actual funds taken from Plaintiffs at the moment of purchase. ¶¶ 329–336; RCS ¶ 149. That is exactly the type of direct monetary loss § 1964(c) recognizes and RICO's remedy is designed to restore. *See Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v.*

*Transworld Mech*., 886 F. Supp. 1134, 1146 (S.D.N.Y. 1995) (purpose is to return plaintiff to the position absent the illegal conduct). Plaintiffs need not plead a final damages amount at this stage. Uncertainty in amount does not defeat proximate cause or standing at the Rule 12 stage. *Alix v. McKinsey & Co*., 23 F.4th 196, 207–08 (2d Cir. 2022); *see Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 885 (10th Cir. 2017).

### (b)    The Scheme's Design Directly Caused Plaintiffs' Injuries

The causal link between Defendants' conduct and Plaintiffs' harm is direct and unbroken. Defendants induced Plaintiffs to stake their SOL into Pump.fun's rigged token pools, immediately skimmed a portion of that stake via fees and tips, and exposed the remainder to an almost certain collapse in value within the closed system. ¶¶ 125–134, 184–195, 329–337, 254–255, 351–359; RCS ¶¶ 72–78, 146, 149.  In other words, the very same conduct that violated the law (each fraudulent, gambling-laced token sale) also directly extracted money from Plaintiffs. ¶¶ 329–336; RCS ¶ 63.

Here, each Pump.fun sale was itself a predicate racketeering act (wire fraud and illegal gambling), and Plaintiffs' losses were the immediate, built-in result of that act. ¶¶ 329–337; RCS ¶¶ 63, 72–78. There was no further contingency or third-party action needed – when Defendants carried out the scheme on a given transaction, Plaintiffs were injured then and there. ¶¶ 329–337; RCS ¶ 149.

This case thus stands in stark contrast to scenarios where RICO claims fail for want of proximate cause. In *Holmes v. Sec. Inv'r Prot. Corp.,* 503 U.S. 258, 112 S. Ct. 1311 (1992) and its progeny, the courts required a "direct relation" between the wrongful conduct and the injury, cautioning against RICO liability where the harm is derivative or filtered through layers of intermediary steps. *Id.* at 268.

Here, the "direct relation" could not be closer: Defendants dealt face-to-face with Plaintiffs (through the online platform) and took Plaintiffs' money in the sale itself. ¶ 329; RCS ¶ 149. Unlike in *Anza* or *Hemi*, where the plaintiffs' loss resulted from some third party's independent decision (*e.g.,* customers lured away by a competitor's tax fraud, or smokers failing to pay a city tax), Plaintiffs' loss here was the foreseeable and intended outcome of Defendants' own transaction with them. There is no "gap" in the causal chain (*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10 (2010)).

Moreover, Defendants' suggestion that Plaintiffs needed to allege specific reliance on misrepresentations is misplaced. The Supreme Court in *Bridge v. Phoenix Bond* held that first-party reliance is not required for a RICO claim predicated on mail or wire fraud; what matters is that the fraudulent scheme directly caused the plaintiff's injury, even if the plaintiff never personally relied on the falsehood (*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656–57 (2008)).

Here, the success of Defendants' scheme (convincing users to buy into the "fair launch" token offerings) directly produced Plaintiffs' losses, satisfying this standard. RCS ¶¶ 72–78, 149. Indeed, the Pump.fun enterprise was structured such that Plaintiffs would be harmed by the fraud even if they didn't individually read or believe every promotional word – the nature of the product itself (a rigged token sale) ensured the loss. RCS ¶ 149.

In any event, the pleadings do include an allegation of reliance: Lead Plaintiff Okafor relied on Defendants' "fair-launch" and anti-manipulation misrepresentations when purchasing Pump.fun tokens. ¶ 470.

But even absent that explicit reliance, Plaintiffs were injured as a "direct and natural consequence" of Defendants' fraudulent conduct, which is all RICO requires. In sum, there is a

straight line from Defendants' actions to Plaintiffs' pocketbooks – precisely the scenario §1964(c) contemplates.

(c)    Not a *Price, Chaset or EthereumMax* Scenario: Plaintiffs Lost Money at the Point of Sale.

Defendants' expectancy-interest analogy comparing digital assets to "baseball cards" is misplaced. Baseball cards and Beanie Babies do not trade on Nasdaq-like exchanges, nor do they have trading volumes in the billions of dollars. Collectibles are priced in outside markets and carry value as objects. Pump.fun was the market. It set the price path, sold line-jumping, and skimmed a fee at execution. Plaintiffs' losses were cash losses at the counter, not disappointed hopes that an independent secondary market might later appreciate an object. The analogy fails because the platform itself controlled the steps that extracted value the moment users paid.

Defendants' "collectibles" analogy turns on the idea that value is established externally by independent market forces. That is not what happened here. On Pump.fun, the platform itself priced every token purchase along a platform-coded bonding curve that "rapidly increases the cost of the token with each purchase and decreases it upon sales," advantaging earliest fills and disadvantaging later buyers by design. Users bought directly "through bonding-curve contracts" on the platform, not on an external marketplace. ¶¶ 116–134, 372; 377.

Defendants heavily invoke cases like *Price*, *Chaset*, and the *EthereumMax l*awsuit, implying that Plaintiffs here, like the unhappy buyers in those cases, "got what they paid for" and merely regret that their tokens later declined in value. This analogy collapses under scrutiny. In the trading-card cases, purchasers paid a fixed price for a pack of cards and received that pack – which included some chance of a valuable insert – at the time of sale; there was no out-of-pocket loss at, or after purchase. *See Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1087 (9th Cir. 2002); *Price v. Pinnacle Brands*, Inc., 138 F.3d 602, 607 (5th Cir. 1998). Similarly, in

*EthereumMax*, the court viewed the RICO allegations as post-purchase disappointment about market decline. *See In re EthereumMax Investor Litig.*, No. CV 22-00163-MWF (SKx), 2022 U.S. Dist. LEXIS 220968, at *25 (C.D. Cal. Dec. 6, 2022).

Here, by contrast, Plaintiffs' injury was immediate and inherent in the transaction itself, not contingent on any future market outcome with the exception of the twenty Pump Securities. Plaintiffs did not get the benefit of any bargain at the time of purchase – they paid for a "fair launch" token but were placed in a house-controlled game that extracted a fee immediately and required additional tipping to participate while insiders jumped the line. ¶¶ 329–337, 285–294; RCS ¶ 149. The order interface exposed speed tiers and an optional "Tip" for validator priority, and the launch flow integrated Jito's bundles such that preloaded insider transactions executed first. ¶¶ 130, 289–294.

Unlike a baseball card or antique, which at least carries independent value as an object, a pre-graduation Pump.fun token has no intrinsic value or use apart from the speculative "graduation" gamble. ¶¶ 128, 250–262. Plaintiffs were not investing in a lasting asset or a legitimate project – they were "pooling funds" in a common enterprise where outcomes turned on platform-controlled bonding-curve mechanics. ¶ 373; see also ¶¶ 250–262. In substance, they wagered SOL in this closed-loop casino and received nothing of durable value in return. ¶ 128; ¶¶ 250–257; RCS ¶ 118.

The "value shortfall" therefore occurred at purchase, not later: SOL was diminished by rake and tips immediately, and the token received had only speculative value inside a collapse-prone pool unless later buyers arrived to trigger graduation. ¶¶ 330–337, 351–357

The *EthereumMax* situation is equally inapposite. There, the plaintiffs' theory was that celebrity promotions artificially inflated a token's price and that they were harmed when, *after*

purchase, the price fell. The court saw that as a speculative grievance about market fluctuation. Here, Plaintiffs' loss related to their RICO claim did not depend on the token's post-sale market performance at all – it was locked in by the platform's mechanics at the moment of sale. Each Plaintiff's SOL was partly drained by fees immediately, and the remainder converted into a token that was doomed by design. That kind of direct, contemporaneous economic injury is worlds apart from the scenarios invoked by Defendants is fully cognizable under RICO.

(c)    <u>**A Cohesive Enterprise United by a Common Purpose to Defraud Pump.fun Users.**</u>

Defendants argue there is no RICO "enterprise" here, casting the complaint as a grab-bag of unrelated actors. The facts prove otherwise.  The Complaint and RICO Case Statement lay out a classic association-in-fact enterprise: Pump.fun, Solana Labs, and the Solana Foundation, using Jito Lab software, operated interdependently, shared proceeds, and had visibility into one another's conduct. ¶¶ 263–299.  This enterprise had a well-defined common purpose – to launch and sell Pump.fun "meme coins" through a house-run system and reap illicit profits from unsuspecting users – and each participant played a structured role in pursuit of that goal. ¶¶ 443–447 RCS ¶¶ 98–106.  Far from a series of isolated transactions, the Pump.fun operation was an orchestrated venture involving continuous cooperation among the Defendants over many months. RCS ¶¶ 85.

(d)    <u>**Each Pump.fun Sale Was a Racketeering Act That Injured Plaintiffs by Design.**</u>

It bears emphasizing how closely Plaintiffs' injury is tied to Defendants' pattern of racketeering. The very act of selling a Pump.fun token to a user consummated the scheme: Defendants executed their fraudulent, gambling-based model and immediately obtained the user's money. ¶¶ 308–366. Plaintiffs enumerate the predicates (including wire fraud, illegal gambling, and unlicensed money transmission) and ties them to this launch-and-trade pipeline. RCS ¶¶ 63–

15

72. The enterprise's common purpose was selling Pump.fun coins through this house-run system, and "the pattern of racketeering activity was the product being sold." When Defendants sold that product, the designed and inevitable result was immediate extraction from purchasers (via the rake and tips) and rapid-collapse risk for the tokens' value. ¶¶ 308–366. In short, Plaintiffs' losses flow directly from the successful operation of the scheme. RCS ¶¶ 149–154.

This alignment of predicate act and injury is precisely what RICO contemplates. In Pump.fun's case, every sale consummated the illegal gambling mechanic, falsified parity, and unlicensed transmission and immediately transferred value to enterprise members. RCS ¶¶ 84. No downstream event needed to occur; the harm was done and the illicit profit made at the instant of the transaction. ¶¶ 308–366; RCS ¶ 149–154.  The result is that Plaintiffs' damages are neither remote nor speculative – they are the money Defendants wrongfully extracted at the point of sale. ¶¶ 334; RCS ¶¶ 149–154.

### 3.  Domestic Injury Is Sufficiently Alleged Under § 1964(c)

Section 1964(c) requires a domestic injury to business or property; it does not add the extra hurdles Defendants propose (e.g., proving that cryptocurrency "originated in the United States"). *See RJR Nabisco*, 579 U.S. at 354. The Supreme Court also rejects bright-line rules keyed to residence and instead calls for a context-specific assessment focused on the injury's character, the racketeering conduct that directly caused it, and that conduct's aims and effects. *See Yegiazaryan v. Smagin*, 599 U.S. 533, 543–45 (2023). Plaintiff Okafor alleges U.S. residence, interstate-wire purchases through the Pump.fun interface, and immediate, out-of-pocket deductions at execution (the 1% rake and priority tips). RCS ¶¶ 59, 149–154. Those facts plausibly plead a domestic injury. *Licht v. Binance* involved foreign scams and post-theft laundering with no comparable U.S. locus. *See* 2025 WL 625303, at *41–42 (D. Mass. Feb. 5, 2025), report and recommendation adopted, 2025 WL 624025 (D. Mass. Feb. 26, 2025). And *Demaree's* footnote about "foreigners"

transacting with a foreign website is inapposite to Okafor's U.S. transactions. *See* 2023 WL 6465881, at *1 n.3 (finding "at least some" domestic injury when some of the plaintiffs were domestic).

### B.    The PSLRA Securities Bar Does Not Foreclose Plaintiffs' RICO Claim

Section 1964(c), as amended by the PSLRA, prevents a plaintiff from "rely[ing] upon any conduct that would have been actionable as fraud in the purchase or sale of securities" to establish a RICO violation. 18 U.S.C. § 1964(c). The statute removes securities fraud as a RICO predicate, but it does not immunize racketeering schemes simply because securities appear somewhere in the background.[4] Courts have consistently refused to extend the bar to conduct that is not independently actionable under § 10(b). *See OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 368–71 (S.D.N.Y. 2005) (banking and debit-card services not securities fraud and thus viable RICO predicates); *Mezzonen, S.A. v. Wright*, 1999 U.S. Dist. LEXIS 17625, at *12–15 (S.D.N.Y. Nov. 15, 1999) (post-investment looting and laundering not securities fraud and properly pled as RICO predicates). In *Kottler v. Deutsche Bank AG*, 607 F. Supp. 447, 457 n.9 (S.D.N.Y. 2009), the court declined to apply the bar where securities trades "performed exactly as planned and marketed" and the actual fraud lay in a tax scheme. Likewise, the Ninth Circuit in *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 872–73 (9th Cir. 2010), rejected application of the bar where the pledge of securities was "a happenstance cog in the scheme" and

---

[4] The Solana Defendants' reliance on *Bongiorno v. Baquet*, 2021 WL 4311169, at *13 (S.D.N.Y. Sept. 20, 2021) and *Zanghi v. Ritella*, 2021 WL 4392756, at *16 (S.D.N.Y. Sept. 24, 2021) is misplaced. Those cases apply the PSLRA bar only where the alleged racketeering predicates are themselves actionable under § 10(b) and the complaint pleads a single securities-fraud scheme; they don't create a per se rule that any reference to "securities" kills a RICO claim. Likewise Baton's cite to *MLSMK Inv. Co. v. JPMorgan Chase & Co.*, 651 F.3d 268, 277–78 (2d Cir. 2011) is inapposite. There, the plaintiff just re-pleaded a classic § 10(b) scheme as mail/wire fraud, and the Second Circuit held the PSLRA bar applies when the racketeering conduct itself would be actionable as securities fraud, even if styled otherwise.

not the source of the fraud.

The Solana Defendants' reliance on *In re JP Morgan Chase Securities Litigation*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) and *Fezzani v. Bear, Stearns & Co*., 2005 WL 500377, at *6 (S.D.N.Y. Mar. 2, 2005) is misplaced. *In re JPMorgan* policed attempts to dodge Rule 9(b)/PSLRA within securities claims; it dismissed a § 10(b) complaint for failing to plead scienter and particularity, not because a separately pled RICO count relied on non-§ 10(b) predicates. *Fezzani* denied leave to add a RICO claim where the claim "incorporat[ed] over 300 paragraphs of alleged securities fraud" and simply repackaged the very stock-manipulation scheme already pled as § 10(b) fraud. Similarly, *Dettmering v. VBit Techs. Corp*., 2023 WL 4824955, at *8 (D. Del. July 27, 2023) applied the PSLRA bar because the complaint itself alleged the mining "packages" were unregistered securities and predicated RICO on that sales scheme. Here, by contrast, the RICO claim stands on detailed, non-securities predicates and expressly carves out the limited "Pump Securities" allegations.

Here, the Complaint separates two categories: (i) a discrete set of "Pump Securities" relevant only to the Securities Act claim against the Baton Defendants only (a non-fraud claim); and (ii) the far larger universe of non-security "meme"/impersonation tokens and the transaction-level racketeering apparatus that extracted value through illegal gambling (18 U.S.C. § 1955), unlicensed money transmission (§ 1960), money laundering (§§ 1956–57), trademark counterfeiting/false designation (§ 2320), identity fraud (§ 1028), and repeated wire fraud (§ 1343). ¶¶ 368–76, 440–63. None of those predicates is "actionable as securities fraud," and Plaintiffs do not rely on any 10(b) theory to prove them.  The Securities Act claim only applies to the twenty Pump Securities and, the RICO claim is plead in the alternative against these instruments if the Court determines that they are not "Securities" within the meaning of the federal securities laws.

Baton's reliance on *City of Providence, R.I. v. BATS Global Markets, Inc.*, 878 F.3d 36, 49 (2d Cir. 2017) and *Stevenson v. Thornburgh*, 2024 WL 645187, at *18 (S.D.N.Y. Feb. 14, 2024) attempts to recast the theory in this case as securities fraud. However, calling blockchain ordering-fee auctions "front-running" does not convert non-securities conduct into § 10(b) fraud. To the extent defendants argue the PSLRA bar extends to non-security tokens because some "front-running" allegations overlap with "Pump Securities," that extension conflicts with the statute's "relies upon" requirement and with courts' disaggregation approach. *See Picard v. Kohn*, 907 F. Supp. 2d 392, 398–401 (S.D.N.Y. 2012) (excluded securities-fraud allegations, then assessed remaining RICO predicates); *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017) (RICO permits "mix-and-match" of predicates). The proper course, if anything, is to carve out any § 10(b)-based allegations and allow the independent non-securities predicates to proceed.

## C. Plaintiffs Adequately State RICO Claims Under 18 U.S.C. §§ 1962(c) and (d)

### 1. Wire Fraud Predicates Are Sufficiently Pleaded Under 18 U.S.C. § 1343

The pleadings set forth a clear and continuous wire-fraud scheme affecting thousands of victims. Defendants knowingly devised and carried out a plan to defraud users by misrepresenting the fairness and neutrality of Pump.fun's token launches, with the intent and result of obtaining users' money under false pretenses. ¶ 193. The injuries to Plaintiffs and the class were the direct consequence of the scheme's success. ¶¶ 467–68 (proximate cause and direct monetary extraction); RCS ¶¶ 149–154. By repeatedly using interstate wires to perpetuate the fraudulent "fair launch" narrative and induce payments, Defendants violated 18 U.S.C. § 1343. ¶ 457.

The statute's focus is the scheme to defraud and the use of interstate wires. First-party reliance is not required to establish proximate causation for a RICO claim premised on mail or wire fraud; it suffices that the injury bears a direct relation to the alleged fraudulent scheme.

*Bridge*, 553 U.S. at 653–59. Likewise, RICO's proximate-cause requirement demands a "direct relation" between the injurious conduct and the asserted injury; attenuated, multi-step chains fail. *Hemi*, 559 U.S. at 9–15.

Here, the misrepresentations and omissions targeted the bargained-for quality of execution and the process/price users paid for, depriving them of money and the benefit of their bargain. The object of the scheme was users' money (SOL) and the paid-for execution quality. See *United States v. Kousisis*, 145 S. Ct. 1382, 1391 (2025) (rejecting any "net-loss" requirement; wire fraud is satisfied where falsehoods induce a transaction to obtain the victim's money or property and obtaining money/property is the fraud's "aim," not an "incidental byproduct").

The Pump.fun scheme—lies about fairness, sustained through online communications—epitomizes wire fraud under § 1343 and amply supports the RICO claim here.

**(a)    Scheme to Defraud – The False "Fair Launch Narrative"**

Pump.fun's website and promotions touted an "even playing field," proclaiming "Fair Launch," "no presales," "no insider allocations," and "rug-pull proof," conveying that no one could obtain a structural first-access advantage. Those are specific, falsifiable representations about process integrity—not vague puffery—and they were false given the secret priority lane. ¶¶ 184–195, 289–294. Statements framed as concrete assurances about fairness, safety, or reliability are actionable and not puffery. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) (representations that projections were "good" and "credible," despite known contrary facts, were material misrepresentations); see *Neder v. United States*, 527 U.S. 1, 16, 25 (1999) (materiality required for federal fraud).

In reality, no such protections existed—no randomized entry windows, no anti-bot throttles, and no guardrails for retail buyers. ¶ 188. And while Defendants say "no presales/no

insider allocations" were technically true, that half-truth was materially misleading because the bundle-and-tip lane functioned as a de facto presale that let insiders buy first in practice. ¶¶ 289–94. Misrepresentations that go to "an essential element of the bargain" support fraud liability. United States v. Schwartz, 924 F.2d 410, 421 (2d Cir. 1991) (affirming wire-fraud conviction where deceit induced sales on terms they otherwise would not accept).

### (b) Misrepresentations vs. Reality – A Rigged Launchpad

The contrast between Defendants' promises and the platform's reality confirms the fraudulent artifice. Pump.fun was marketed as a safe, transparent launchpad engineered to eliminate the very risks it in fact made material. ¶ 185. Users were invited to believe this token casino was uniquely fair and built to give everyone the same odds. RCS ¶ 72. In truth, Pump.fun integrated Jito Labs' bundle-and-tip mechanism that allowed insiders to jump the line by privately submitting tipped transactions for priority execution. ¶¶ 289–94. The interface included a "Front-Running Protection" toggle that was illusory—implying users could avoid being front-run, when no such protection existed. ¶ 130.

The UI also mimicked a regulated market—candlestick charts, quote boxes, ticker tapes, risk badges—to reinforce a false impression of fairness. ¶¶ 125–33. In SDNY and the Second Circuit, misstatements that alter method of performance or price formation are material because they strike an essential term of the bargain. See United States v. Binday, 804 F.3d 558, 570–75 (2d Cir. 2015) (affirming mail/wire-fraud convictions where lies induced counterparties to enter transactions they otherwise would not, thereby obtaining money and imposing risk)

As a result of these misrepresentations, what users received was qualitatively different from what was promised—a platform designed to favor a priority lane—classic property fraud. Kousisis, 145 S. Ct. at 1392 (2025) (fraudulent inducement that secures the victim's money is actionable even if something of value is given in return; the statute is "agnostic about economic loss")

### (c)    <u>Defendants' Roles in the Scheme</u>

Each Defendant played a knowing and necessary role in executing this fraudulent scheme. Pump.fun crafted and disseminated the false "fair launch" narrative through its website, user interface, and social media. RCS ¶¶ 76, 139.

Liability for wire fraud does not require the same defendant to author every false word; participants in a scheme who knowingly facilitate and profit from the misrepresentations are culpable even if others were the speakers (see, by analogy, securities fraud case *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101–02 (2019)).

Jito Labs engineered and operated the priority "bundle-and-tip" system that secretly defeated any notion of fairness, enabling insiders to obtain first inclusion; Jito also monetized this system by collecting tips and fees from those seeking priority. ¶¶ 285–99. Each Defendant had the capacity to halt the fraud, yet did not. ¶¶ 194, 306.

All Defendants benefited financially: Pump.fun took a 1% rake on every trade, validators and Jito captured large tip revenues, and Solana realized increased network-fee income as throughput rose. ¶¶ 309–349.

This common economic design explains why none of them imposed the obvious fixes (randomized windows, real anti-bot throttles, or disabling the tip lane for launches) despite the capacity to do so.

This concerted allocation of roles and willful failure to intervene confirms that the "fair launch" was not a good-faith mistake or isolated bad act, but a deliberate, enterprise-wide artifice to defraud. RCS § 4.

Legally, RICO does not require first-party reliance to establish wire-fraud causation; the standard is direct relation between the scheme and injury, and that is exactly what is pleaded here:

uniform misrepresentations that induced purchases which immediately generated fees and tip revenue. *Bridge*, 553 U.S. at 647–49; *see* RCS ¶¶ 149–154 (direct transfers of money to Defendants from each transaction).

>           **(d)**       **Specific Intent to Defraud – Knowledge and Deception**

The pleadings allege specific intent. Defendants made factual claims about fairness and safety that they knew were false to induce spending. ¶¶ 189–190; RCS ¶ 75. Pump.fun's own documentation instructed token creators to use Jito bundles with a "tip" to guarantee earliest inclusion—even to buy their own token first (¶ 291)—flatly incompatible with a fair launch.

Design-level deception supports the inference of intent, especially where system architecture is calibrated to mislead about process integrity. See *United States v. D'Amato*, 39 F.3d 1249, 1256–57 (2d Cir. 1994) ("Essential to a scheme to defraud is fraudulent intent"; must show a conscious, knowing intent to defraud).

The sham "Front-Running Protection" toggle (¶ 130) is further circumstantial evidence of purposeful inducement. And because the lies targeted users' money and execution quality, this fits comfortably within traditional property fraud after *Ciminelli* and is fully consistent with *Kousisis*' articulation of the fraudulent-inducement theory. *Kousisis,* 145 S. Ct. at 1382.

>           **(e)**       **Brazen Continuation and "Fraud-Friendly" Culture**

Defendants' conduct after launch further evidences willfulness and intent. In 2024, U.K. regulators banned Pump.fun for deceptive practices and lack of consumer protections. ¶ 191; RCS ¶ 82. Rather than remediate, Defendants operated as before, with Solana Labs and Jito Labs continuing to support token launches. ¶ 192. Continuing to induce purchases after a regulator's ban notice supports scienter. Pump.fun executives and community influencers embraced a fraud-celebrating posture— "Crime is Legal," "It's Crime Season". ¶ 192; RCS ¶ 77—confirming that "fairness" was a marketing façade and the scheme's point was extraction.

### (f)  <u>Use of Interstate Wires</u>

Defendants executed this scheme through extensive interstate wire communications. Pump.fun's false "fair launch" promises and related misrepresentations were transmitted on the Pump.fun website/app, Twitter/X, Discord, and livestreams. ¶ 190; RCS ¶¶ 76, 139. Plaintiffs plead Rule 9(b) particulars—what, who, when, where, and why false (¶¶ 184–90, 130, 289–94)—which satisfies the Second Circuit's specificity requirements for fraud-based RICO predicates. See *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999) (Rule 9(b) requires specifying statements claimed to be false or misleading, the speaker, and the who/what/when/ where/why).

Defendants' use of interstate wires to advance this scheme and to induce customers was prolific. Defendants used interstate wires to flood X/Twitter with casino-style prompts that framed participation as betting and promised daily winners, including the Pump.fun Official exhortations that "Pumpfun has incubated more AI Unicorns than your favorite VC" and "Market is nuking but the trenches are HOT, there are winners every day." ¶148.

Pump.fun's official channels layered on credibility cues and spectacle to drive traffic, boasting "Pumpfun has incubated more AI Unicorns than you've ever met" (¶ 148) and staging celebrity tie-ins, including a since-deleted promotional tweet for a Pump.fun livestream with Iggy Azalea and meme-style pushes for the $JENNER token, all couched in "public wins" messaging that presented huge gains as commonplace. ¶¶ 160–164.

Together, these wires spoke with one voice: bet now, everyone wins, gains are daily. They were designed to induce users to engage with Pump.fun's product and to transmit value through the platform, and they are pled as qualifying wires in furtherance of the scheme. ¶ 190; RCS ¶¶ 72–78.

These are plainly interstate wire communications with the purpose of inducing users to send SOL into a rigged system; they fit both the inducement element and the wires element. ¶ 190.

The pleadings describe Enterprise use of both outreach transmissions and on-platform executions, making the wires a necessary mechanism of both inducement and extraction. ¶¶ 457–68; RCS ¶¶ 150–153. Each communication is a qualifying wire in furtherance of the scheme. See Moore v. It's All Good Auto Sales, Inc., 907 F. Supp. 2d 915, 924 (W.D. Tenn. 2012) (wire-fraud predicate does not require that the electronic communication itself be fraudulent; it is enough that interstate wires are used in furtherance of the scheme).

Other specific overt acts which leveraged the use of interstate wires include the UI, homepage "Fair Launch" banner and social campaigns, as well as bundled transactions submitted via Jito's system to secure insider purchases. ¶¶ 184–195; 291.

## 2. Plaintiffs Plead an Illegal Gambling Business Under N.Y. Penal Law § 225.00

Pursuant to § 1955, Plaintiffs must demonstrate the existence of an "illegal gambling business" in violation of New York state law. *United States v. DiCristina*, 726 F.3d 92, 98 (2d Cir. 2013). Under N.Y. Penal Law § 225.00(2), "[a] person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." Contrary to Defendants' assertion, the Complaint sufficiently alleges illegal gambling under N.Y. Penal Law § 225.00. Moreover, by operating and profiting from such an unlicensed scheme, in violation of New York Law, Defendants conducted an "illegal gambling business" within the meaning of § 1955. *See* ¶ 453.

The Complaint pleads that Plaintiffs staked SOL in exchange for tokens in a closed, house-run bonding curve pool with the understanding their tokens would "graduate" if certain platform-defined thresholds were met. *See* ¶¶ 250–257. Plaintiffs risked their SOL with the understanding that if enough purchasers enter and the token graduates into open trading, they could sell their

token at an inflated price for a profit.  *See* ¶¶ 128, 250–257; RCS ¶¶ 4, 118.  If graduation doesn't occur, a token is effectively worthless and the user's stake is lost.  Pump.fun's interface made this clear by labeling tokens as "Newly Created," "About to Graduate," or "Graduated," reinforcing that graduation was the win-condition that unlocks value.  ¶128.

Defendants assert that a purchaser's skill controls their ability to turn a profit.  *See* ECF No. 87, MTD at 10-11.  This is incorrect.  Although the platform defines the conditions for a graduation event, whether or not tokens "graduate" depends entirely upon the outcome of a contest of chance or a future contingent event not under a participant's control or influence.  As stated more fully in the Complaint, whether a given token graduates depends on random, external factors no individual could influence, including virality on social media, trending memes, the influx of other buyers, the timing/ordering of transactions, and random sell-offs that trigger cascading declines.  *See* ¶¶ 181-183, 253, 255.  For example, the Complaint alleges that "success is dictated by external market hype [and] randomness," with most tokens crashing within hours – a classic "contest of chance" scenario where the result turns "in a material degree" on chance rather than skill.  ¶¶ 181-183, 254-255; *see Matter of Pace-o-matic, Inc. v. N.Y. State Liquor Auth.*, 72 A.D.3d 1144, 1146, 898 NYS2d 295, 297 (App. Div. 3rd Dept.) ("[Contest of chance] is defined as 'any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor.'") (citing N.Y. Penal Law § 225.00 [1]).  Indeed, Pump.fun's design actively magnified chance through mechanics like randomized transaction ordering and priority "tip" bidding that let insiders cut the line, meaning a user's fate could hinge on arbitrary blockchain ordering or insider interference.  *See* ¶¶ 256-257.

Defendants contend "that it is a purchaser's skill in, among other things, buying low …

and selling high that controls a purchaser's ability to turn a profit." ECF No. 87, MTD at 11. In doing so, Defendants misconstrue the limited scope of Plaintiffs' claim. Plaintiffs' claim does not seek to treat all memecoin trading as gambling. Rather, the claim is narrowly focused on Pump.fun's closed pre-graduation system with its binary graduation event and house rake. *See* ¶¶ 250-257; RCS ¶66. In other words, post-graduation activity – once a token graduates and trades freely on external exchanges – is not being challenged as gambling. It is the pre-graduation "meme coin casino" – the platform-run game of chance that Pump.fun administered – that violates New York's gambling laws.

The fact that Plaintiffs retained control over when to sell their tokens does not remove the element of chance involved in whether a given token graduates and increases in value. *See* ECF No. 87, MTD at 10. Indeed, Defendants do not cite any authority in support of this argument. In any event, New York courts have long held that even games involving some skill are gambling if chance materially affects the outcome. *See Matter of Plato's Cave Corp. v. State Liquor Auth.*, 68 N.Y.2d 791, 793 (1986); *Pace-O-Matic,* 72 A.D.3d at 1145 (even where skill is involved, a game is considered one of chance if chance is the dominating element).

Defendants further contend that buying Pump.fun tokens was akin to purchasing a product or collectible that might appreciate in value, not a wager. *See* ECF No. 87, MTD at 11. They analogize it to "[b]uying luxury watches, collectibles, and other commodities"– arguing that "hop[ing] supply and demand or other external factors will cause their value to go up is not gambling." *Id*. This analogy mischaracterizes Pump.fun's scheme. Indeed, other than the twenty Pump Securities, these tokens were not "investments," and Plaintiffs' purchases of them were not "business transactions." ECF No. 87, MTD at 10. Unlike a luxury watch or collectible, which has independent value as an item, a pre-graduation Pump.fun token has *no intrinsic value or use* apart

from the speculative "graduation" gamble. As stated in the Complaint, these tokens did not "generate revenue, sell products, offer services, or conduct any business." ¶ 183. Rather, "their entire value [was] dependent on the past buyer, and decreases in value when sold." *Id.* In other words, the value underlying these tokens depended almost entirely on the whims of a largely unregulated, trend-driven market.

Here, the essence is gambling, not bona fide investment. Even the ability for users to cash out before a total collapse does not save it: regulators treat "cash-out" style games (where a player tries to bail out before a crash) as gambling products subject to gambling laws. *See* ¶¶ 3-4, 181-182. Pump.fun's pre-graduation token launch system is a disguised gambling enterprise, not a bona fide investment platform. Pump.fun's model closely mirrors casino games – defining the rules and outcome, pooling all wagers, charging a 1% house fee on each buy and sell, and even selling priority "fast lane" access to insiders – confirming that its core elements are gambling, not legitimate trading. *See* ¶¶ 254, 329–336; RCS ¶66, ¶118.

Section 1955 requires that each defendant "conduct, finance, manage, supervise, direct, or own" all or part of the illegal gambling business. Defendants argue that, even if Pump.fun was gambling, the Complaint fails to allege *their* participation – for instance, Jito Labs claims it had no involvement in operating Pump.fun's platform.

Far from being bystanders, each Defendant is described as an active promoter or facilitator of the Pump.fun enterprise, i.e., one who "advanced" the gambling activity or "profited from" it other than as a player, which is exactly what New York's gambling laws prohibit. RCS § 5.

New York broadly defines *advancing* gambling to include any conduct that "materially aids any form of gambling activity," including maintaining the premises or equipment, inducing others to participate, conducting the play, or arranging any phase of operation. To *profit from*

gambling means knowingly sharing in the proceeds of the wagering activity (other than as a normal winner).

The Complaint pleads extensive facts showing that each Defendant met these criteria. Pump.fun's founders and platform did the obvious: they built and ran the public-facing "meme coin slot machine," i.e., the website and smart contracts that enabled users to "pull the handle" by depositing SOL and receiving the speculative token. ¶¶116-124, 250–257.

Pump.fun set all the game mechanics – it minted the tokens, created and controlled the bonding curve pool, defined the graduation thresholds, and imposed the uniform 1% fee rake on every transaction. It actively marketed the platform as a casino; indeed, Pump.fun's CEO publicly described it as a "casino," confirming the enterprise's understood nature. ¶155.

Pump.fun even allowed no-KYC, pseudonymous usage (including by minors) and made no effort to curb the rampant wagering. ¶¶260–262.

Jito Labs was equally integral. The Complaint details how Jito supplied and operated the special priority lane that was built into Pump.fun's launches. ¶¶289–294. Pump.fun's developers didn't create this in a vacuum; they integrated Jito's bundle-and-tip technology and even instructed token creators on how to use it. ¶292.

This mechanism sold insider priority access – users (often bots or insiders) could pay an extra tip to have their purchase bundled and executed ahead of others, letting them secure cheap tokens before prices spiked. Jito's system thus rigged the game's order of play and monetized each "spin" of the slot machine: every time someone paid a tip for priority, Jito collected a fee. ¶247; RCS ¶148.  The platform's explosive growth made this extremely lucrative – Jito earned what the Complaint describes as *ecosystem-leading* revenues from Pump.fun's activity. ¶¶318–327.

That is functionally indistinguishable from operating a service that receives and transmits

customers' CVC on their behalf, which courts have held "qualifie[d] as money transmission" under § 1960. *Harmon*, 474 F. Supp. 3d at 103.

And this was no passive, unintended use of Jito's software: Jito's leadership (Defendants Bruder and Smith) are alleged to have actively promoted and oversaw this integration, working hand-in-hand with the Pump.fun team. ¶¶46–47, 289–294; RCS ¶¶55–58.

In short, Jito Labs provided a specialized service essential to the gambling enterprise's operation and shared in its proceeds – conduct that squarely qualifies as "advancing or profiting from" unlawful gambling.

Solana Labs and the Solana Foundation likewise had a direct hand in the business. They controlled the underlying blockchain "rails" that Pump.fun ran on, and they profited immensely from the activity. ¶¶271–279, 309–317.

The pleadings allege that Solana Labs authored and maintained the Solana validator client software and token programs that every Pump.fun transaction relied upon. ¶¶272–276.

Together, the Labs and Foundation manage the Solana network's core infrastructure and economic parameters (transaction fees, validator incentives, etc.), and they permitted and even encouraged Pump.fun's casino-like usage of that infrastructure. ¶¶270–279, 338–349.

As Pump.fun's volume skyrocketed, Solana's network fees and validator rewards (including MEV tip revenue from Jito's system) surged, yielding a windfall for Solana insiders who hold large reserves of SOL and operate validators. ¶¶309–317, 338–347.

Solana's leadership (Defendants Yakovenko, Gokal for Labs; Albert, Federa, Liu for the Foundation) are alleged to have embraced and promoted this influx of activity – one Solana executive even acknowledged the "casino" on Solana – demonstrating knowing consent to and advancement of the gambling enterprise. RCS ¶¶ 34–37.

By supplying the premises and technology for Pump.fun's wagering and by deriving enormous profits from the increased usage and token price appreciation, the Solana entities "materially aided" the gambling operation and participated in its proceeds.

### (b) The Pump Casino Involved Five Or More Persons, Satisfying §1955.

An "illegal gambling business" under §1955 must involve five or more persons who conduct, finance, manage, supervise, direct, or own all or part of it. That element is easily met. The Pump.fun operation was a multi-party endeavor spanning multiple organizations and individuals – far more than five. The Amended Complaint names the three Pump.fun founders, two Jito Labs executives, at least five Solana leaders, and numerous other engineers, developers, and insiders who collectively participated in running the platform. ¶¶31–47. The RICO Case Statement further describes an extended "Pump Enterprise" involving coordinated roles for each entity. In all, the allegations enumerate well over a dozen persons intimately involved in keeping Pump.fun's gambling business going – well above the statutory threshold. RCS ¶66. Defendants do not (and cannot) seriously dispute this headcount. Here the collaborative enterprise far exceeds five people by any measure.

### (c) The Pump Casino's Period of Operation And Revenue Exceeded §1955 Threshold Requirements.

Section 1955 additionally requires that the gambling business be conducted for over thirty days or have a gross revenue of over $2,000 in a single day. Pump.fun blows past both benchmarks.

The Complaint alleges that Pump.fun's casino was not a one-off event but an ongoing operation running continuously for many months in 2023–24 (indeed, it launched in January 2024 and continued through the class period. ¶85. During that time, it facilitated nonstop token launches and trades daily. The revenue metric is even more clearly exceeded: Pump.fun's 1% fee rake on

the huge volume of SOL flowing through the platform yielded fee earnings in the millions of dollars per day at peak activity, orders of magnitude above the $2,000/day threshold. ¶¶329–337.

Thus, by any measure, Pump.fun operated as a large-scale, continuous gambling business – precisely the kind of operation §1955 was designed to reach. There is no plausible argument to the contrary, and Defendants notably do not deny the substantial duration or takings of the platform.

### 3.    Operation of An Unlicensed Money-Transmitting Business Under 18 U.S.C. § 1960 Is Sufficiently Pleaded.

Under Section 1960, it is unlawful to "knowingly [] 'conduct[ ], control[ ], manage[ ], supervise[ ], direct[ ], or own[ ] all or part of an unlicensed money transmitting business.'"  18 U.S.C. § 1960(a).  Courts construe the statute broadly; a business is a money-transmitting business if it transfers "funds on behalf of the public by any and all means." *United States v. e-Gold, Ltd.*, 550 F. Supp. 2d 82, 94 (D.D.C. 2008) (quotation marks omitted).

### (a)    The Pump Enterprise Was A Money-Transmitting Business Under 18 U.S.C. § 1960

Contrary to Defendants' contention, the Complaint alleges that Defendants operated an "unlicensed money transmitting business," within the meaning of 18 U.S.C. § 1960, by running a crypto transfer system with no oversight or approval.  *See* ECF No. 89, MTD. at 22; ECF No. 87, MTD at 14-15.  As stated in the pleadings, Defendants received funds (SOL), converted those funds into tokens, and transmitted value between and among customer wallets and smart-contract pools without the licenses, registrations, or AML/KYC controls required by federal and state law.  ¶¶ 244-249; RCS ¶¶ 5, 22, 68, 126-127.   Every time a user deposited Solana's native cryptocurrency (SOL) into Pump.fun's smart contract pool to buy tokens, Pump.fun was effectively receiving and transmitting monetary value on the user's behalf.  ¶¶ 244, 455; RCS ¶ 68.  Users' SOL went into the platform's custody and came back out either as newly minted tokens

delivered to the user or as refunded SOL upon a sale – constituting classic money transmission. ¶¶ 244, 252, 372, 377; RCS ¶ 126.  By avoiding the know-your-customer (KYC) and anti-money-laundering (AML) obligations that come with licensure, Defendants were able to operate an anonymous, high-volume financial exchange that no regulator was watching – reaping profits from user transactions without the compliance safeguards that might have protected those users.  ¶¶ 249, 329-336; RCS ¶¶ 99, 121-123.

Section 1960's reach is not limited to traditional banks or Western Union-style remitters; Congress defined "money transmitting" to include transferring "funds on behalf of the public by any and all means." *United States v. e-Gold, Ltd.*, 550 F. Supp. 2d 82, 94 (D.D.C. 2008).  Pump.fun fits that description: it received customers' SOL and, at the customers' direction, transmitted an equivalent value back to them in another form (new tokens or redeemed SOL).  ¶¶ 244, 455; RCS ¶¶ 5, 126.  Digital-asset value clearly qualifies as "funds" for § 1960 purposes. *See United States v. Murgio*, 209 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) ("[B]itcoins clearly qualif[y] as 'money' or 'funds'... because they can be easily purchased in exchange for ordinary currency, act[] as a denominator of value, and [are] used to conduct financial transactions) (quoting *United States v. Faiella*, 39 F. Supp. 3d 544, 545–47 (S.D.N.Y. 2014)).  Even novel mechanisms do not remove a service from § 1960's ambit.   In *United States v. Harmon*, a Bitcoin "mixer" that received customers' bitcoin and sent back different bitcoin to obscure origin still "qualifie[d] as money transmission." 474 F. Supp. 3d 76, 103 (D.D.C. 2020).  Moreover, intermediated or automated mechanisms still count as "transmitting" under § 1960. *See United States v. Harmon*, 474 F. Supp. 3d 76, 103 (D.D.C. 2020) (Bitcoin 'mixer' that received and sent customers' CVC was money transmission).

**(b)**    **The Pump Enterprise Operated Their Money-Transmitting Business Without Necessary State Licensing and Federal Registration in Violation Of 18 U.S.C. § 1960**

Under Section 1960(b)(1)(A), a money transmitting business is unlicensed if it operates without an appropriate state money-transmitter license. New York's "BitLicense" law requires a license from the State Department of Financial Services ("DFS") to engage in virtual currency business activity with New York residents. ¶¶ 244-249, 455

Neither Pump.fun nor its partners obtained any of the licenses or registrations that are required to operate a crypto transfer business under New York law and § 1960(b)(1)(A). ¶¶ 244-249. The lack of a DFS license is affirmatively alleged, establishing that the money-transmission enterprise was per se illegal under state law. .

Relatedly, Federal law independently requires money transmitting businesses to register with FinCEN. Section 1960(b)(1)(B) makes it a federal offense to operate a money-transfer business without registering as a Money Services Business. Here too, Defendants made no effort to comply. Pump.fun and its affiliates never registered with FinCEN and never implemented any AML program – the platform operated as a "no KYC" service. ¶ 244. Operating without this mandatory federal registration is explicitly prohibited by § 1960, and the Complaint pleads this omission clearly.

This was not an incidental or one-off occurrence – it was the core design of the platform. The absence of licensure was a but-for condition that enabled the scheme and exacerbated the harm. Unchecked by any regulator, Pump.fun allowed free and pseudonymous movement of funds – even permitting minors and sanctioned actors to participate due to the lack of any KYC/age controls. ¶¶ 68, 72. This unlicensed setup generated enormous revenues for insiders while leaving participants exposed. ¶¶ 329-336; RCS ¶ 122.

34

### (c)    Defendants' Arguments Are Incorrect

Defendants' attempts to minimize their respective roles are belied by the facts. Defendant Baton (Pump.fun's operator) argues that it "did not take custody" of user funds and thus was not a money transmitter.  Pump.fun controlled the pooled funds and unilaterally dictated what tokens or refunds users received in return.  ¶ 244.  In substance, Pump.fun functioned exactly like a centralized exchange or digital wallet service that custodies assets on behalf of users.

The fact that users could later sell their tokens back for SOL at the going rate does not negate Pump.fun's intermediary role – to the contrary, it underscores that all transactions had to pass through Pump.fun's mechanism and its 1% fee rake rather than peer-to-peer trading.  ¶¶ 377, 444; RCS ¶¶ 99, 122, 149.  At bottom, Baton cannot escape § 1960 by characterizing its system as "non-custodial" when the economic reality is that Pump.fun received and held user value during the exchange process.  ¶¶ 244, 252.

Solana Labs and Solana Foundation argue that they merely provided open-source software and did not themselves transmit any funds or direct the transmissions. This argument misconceives both the law and the facts.  Pump.fun's entire exchange mechanism depended on infrastructure provided by Solana Labs—who likewise carried out the money-transfer enterprise without any licenses—and Jito Labs.  ¶¶ 245-247.  Solana Labs maintained the network programs (the Solana token protocols and validator software) that enabled Pump.fun's value transfers, and the Solana entities "supplied the core infrastructure" on which the scheme operated.  ¶ 444.

Factually, the Solana Defendants were not passive bystanders. Solana Labs authored and maintains the validator client and token programs that every Pump.fun transaction relied upon, and it continued to upgrade and manage that infrastructure throughout the relevant period.  ¶ 445; RCS ¶¶ 9-11, 121. The Solana team benefited enormously from the transaction volume (validator and network-fee revenues and appreciation of SOL) and is alleged to have encouraged this use of their

35

network.  ¶¶ 338-349; RCS ¶¶ 121-123. In sum, Solana Labs materially aided and profited from

the transmissions, placing it squarely within § 1960's scope as a participant in the unlicensed

business.  ¶¶ 245, 444-446; RCS ¶¶ 9-11, 121, 126-127.

Using Jito Labs' software, Defendants were able to run the specialized "priority lane"

transaction relays that actively processed Pump.fun's token trades (bundling user transactions and

re-ordering them for a fee.  ¶¶ 285-288, 289-294; RCS ¶¶ 20-23.  Pump.fun instructed token

creators on how to utilize Jito's system for launches.  ¶¶ 285-293; RCS ¶¶ 20-21.

This conduct is precisely the sort of "conducting or managing" of an unlicensed

money-transmitting business that § 1960 covers. ¶¶ 247, 295–297; RCS ¶¶ 22–23, 126–127, 148–

149.

As the Complaint alleges, Defendants' unlawful operation directly caused Plaintiffs'

losses: it induced them to purchase tokens through this illicit pipeline and then left them to suffer

millions in losses when the scheme collapsed.  ¶¶ 440-441, 465-468; RCS ¶¶ 122-123, 148-153.

### 4.    The Remaining Predicate Acts Are Sufficiently Pleaded.

#### (a)    Money Laundering under 18 U.S.C. §§ 1956 & 1957

"To state a claim for money laundering under RICO, a plaintiff must plead: '(1) that the

defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds

of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7); (3) that the defendant knew

that the property involved in the financial transaction represented the proceeds of some form of

unlawful activity; and (4) that the defendant knew that the financial transaction was designed in

whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds.'"

*Entretelas Americanas S.A. v. Soler*, 2020 U.S. Dist. LEXIS 20692, at *22-23 (S.D.N.Y. Feb. 3,

2020) (citation omitted).  Plaintiffs have done so here. ¶ 456. As stated more fully in the Complaint,

in February 2025, DPRK's Lazarus Group laundered proceeds of a ~$1.5 billion Bybit hack

through Pump.fun by bridging funds to Solana and launching a counterfeit "QinShihuang" token to mask source and ownership.  *See* ¶¶ 234-243.

Defendants argue that the AC does not allege that their actions "resulted in promoting the carrying on of specified unlawful activity."  ECF No. 87, MTD at 14.  This is not true.  The Complaint pleads that Pump.fun operated the platform without any regulatory processes, or any other KYC/AML checks, to prevent money laundering, fraud, and any other financial crime. ¶¶ 243-247.  Moreover, the Complaint pleads that Solana materially facilitated the laundering by offering its infrastructure.  *Id.*  Notably, Pump.fun only delisted the token after on-chain analysts publicly flagged the activity on or about February 23, 2025.  ¶¶ 240–241.  By this time, the proceeds had been withdrawn and dissipated.  *Id*.

Defendants knew that Pump.fun's anonymous nature would enable illicit transactions to be concealed and was purposely built to offer an unregulated platform. ¶¶ 173-180.  The Supreme Court's instruction that "designed to conceal" focuses on purpose, not mere effect, fits the pleaded MEV-prioritized exit and liquidity-mixing mechanics. *See Regalado Cuellar v. United States*, 553 U.S. 550, 567-68 (2008). The Second Circuit permits concealment intent to be inferred from complex, surreptitious routing and structuring; the pleaded high-velocity, priority-routed dispersals are of that kind. *United States v. Huezo*, 546 F.3d 174, 180-81 (2d Cir. 2008).

The enterprise-level summary in the RICO Case Statement situates the Lazarus episode within a broader pattern of interstate and foreign commerce affected by the scheme. *See* RCS ¶ 127.

Courts in this District hold that the § 1956 "knowledge" element is satisfied by willful blindness or conscious avoidance—it is enough to plead facts showing the defendant strongly suspected the illicit nature of the funds and deliberately avoided confirming it. *See United States*

*v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 74–75 (S.D.N.Y. 2015) (knowledge for § 1956 may be proved by willful blindness/conscious avoidance, and it is sufficient that the defendant knows the funds are proceeds of some crime, even if not which one). *Prevezon* also identifies the kinds of red flags that permit an inference of knowledge or conscious avoidance: transfers from shell entities, false or pretextual payment descriptions that conflict with public explanations, sham paperwork, and the acceptance of large wires without inquiry. *Id*. Measured against that standard, the pleadings here allege at least conscious avoidance at the platform level: Defendants received and routed value through structures designed to obscure source, sequencing, and advantage, and ignored inconsistencies their own systems generated. That is more than enough at the pleading stage to attribute platform-level scienter to the Pump Enterprise.

### (b)    Counterfeiting And Identify Theft Under 18 U.S.C. § 2320, 18 U.S.C. § 2318, And 18 U.S.C. § 1028(A)(7)

The complaint pleads trademark counterfeiting as a RICO predicate: Pump.fun hosted and monetized tokens using exact replicas or colorable imitations of registered marks (Apple, Tesla, Meta, Microsoft) and profited from the traffic and fees such confusion generated. ¶ 458.

Interface features clustered look-alike tokens and promoted "official/community" versions, heightening confusion and forming the trafficking channel for counterfeit goods under § 2320. ¶ 458.   The pleadings also allege trafficking in counterfeit labels under § 2318: copied logos, celebrity images, and fake tickers embedded in token metadata and hosted on IPFS/Arweave functioned as counterfeit labels designating origin. ¶ 461.   The platform further enabled widespread impersonation of universities, public figures, and existing digital assets, reinforcing confusion and monetizing the activity through transaction fees and validator tips. ¶¶ 213–218, 214–218, 459–460.

Courts treat NFTs and similar digital tokens as "goods" in commerce for Lanham Act and

§ 2320 purposes where the items are marketed and sold to consumers under source-identifying marks. *Hermès Int'l v. Rothschild*, 603 F. Supp. 3d 98, 111–12 (S.D.N.Y. 2022).

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd*., 2016 WL 6110565, at *4–*9 (S.D.N.Y. Aug. 4, 2016) (dismissing RICO counts where allegations showed only a hub-and-spoke marketplace, not a functioning RICO enterprise).

Identity theft is pled as a predicate: tokens impersonated named plaintiffs and their counsel, using names and photos to draw trading and harassment. ¶¶ 219–224, 462. The pleading details two tokens using Judge Kaplan's name and image, illustrating broader use of real-world identities to promote trading on Pump.fun. ¶¶ 209–212.

Section 1028(a)(7) reaches identity-based deception where the use of another's identification is the crux of the fraud; that is the role the complaint assigns to the name-and-image uses here. *Dubin v. United States*, 599 U.S. 110, 124–26 (2023).

The RICO Case Statement lists these IP and identity predicates—§ 2320, § 2318, and § 1028(a)(7)—as part of the pattern. RCS ¶¶ 70–71.

**5.    RICO § 1962(c) Operation/Management Is Adequately Pleaded.**

Section 1962(c) requires that each RICO person "conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs." In *Reves*, the Supreme Court held this is satisfied by participation in the "operation or management" of the enterprise—i.e., playing "some part in directing" its affairs; the Second Circuit has repeatedly emphasized that top-down control is unnecessary and even limited, role-specific direction suffices. See *Reves*, 507 U.S. 170; *DeFalco v. Bernas*, 244 F.3d 286, 309–10 (2d Cir. 2001); *Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 83–84 (2d Cir. 2015) (coordinated corporate actors directing an integrated extraction mechanism meet *Reves*).

Measured against that standard, the Complaint and RICO Case Statement plead that

Pump.fun, Solana Labs, the Solana Foundation, and Jito Labs each "played some part in directing" the Pump Enterprise's affairs, not simply their own. The pleadings describe a single commercial system in which Pump.fun's one-click token factory and 1% rake, Solana's SPL token/validator rails, and Jito's bundle-and-tip priority lane were engineered and coordinated to monetize each transaction in the same way, at the same moment. ¶¶ 440–449 (enterprise and roles).

Those allegations plead Pump.fun's direction of the enterprise's core process—how the product was sold, in what order transactions executed, and where the immediate fee extraction occurred—well beyond mere facilitation. See *DeFalco*, 244 F.3d at 309–10 (upholding liability where outsider leveraged influence and conditioned official approvals to steer the enterprise's decisions).

Jito Labs likewise is alleged to have directed the enterprise's affairs by operating the execution pathway that determined inclusion and ordering at launch. The Complaint pleads that by late-2024 Jito's modified validator client and Block Engine were installed across more than 90% of Solana stake; that Jito privatized the "fast lane," accepted off-chain bundles with user-paid "tips," and took a cut of every such tip; and that Pump.fun's launch flow was wired to construct Jito bundles, "add a bribe ('tip')," and obtain earliest inclusion. ¶¶ 281–294, 318–328. These are pleaded as managerial choices—privatizing the priority channel, integrating it into Pump.fun's UI, and scaling the Block Engine during Pump.fun surges—that dictated how enterprise transactions would be executed and monetized. RCS ¶¶ 98–111; see also coordinated timing and JIP-16 fee-sharing allegations.

Solana Labs and the Solana Foundation are pleaded as directing, not passively hosting, the enterprise's transactional rails and economics. The Complaint alleges Solana authored and maintained the SPL Token Program and validator stack that processed every Pump.fun launch and

trade; that the Labs/Foundation ran substantial validator operations and aligned fee/treasury economics with increased Pump.fun volume; and that they implemented and recommended network changes during the surge (e.g., v1.17.31 to ease congestion) while promoting the throughput-driven "growth." ¶¶ 271–279, 309–317, 313–317.Those role-specific allegations plead that Solana entities supplied and actively tuned the rails on which the enterprise's flow executed and from which they shared proceeds—"some part in directing" the enterprise's affairs under *Reves* and its Second Circuit gloss. See *DeFalco*, 244 F.3d at 309–10 (informal, loosely structured coordination among distinct actors that operates as a continuing unit can form an enterprise).

This is "conduct of the enterprise's affairs," not simply each defendant's own business. The RICO Case Statement maps the roles and the cross-visibility/reciprocal proceeds that tie them together: Pump.fun's interface, Solana's system programs and validator economics, and Jito's tip-based priority lane operating interdependently to sell the same product (the launch-and-trade pipeline) and to extract value at execution. RCS ¶¶ 113–116, 130–134. The Complaint likewise pleads the enterprise's common purpose—"a pseudonymous gambling system disguised as a token-launch platform," monetized by rake, validator fees, and tips—alongside the concrete mechanics that implement it. ¶¶ 443–449.

The pleadings also satisfy pattern continuity and duration. Plaintiffs allege continuous operation from at least January 2024 through filing—"tens of millions of transactions, billions of dollars in trading volume, and thousands of token launches"—with the same monetization mechanics, which is classic closed- and open-ended continuity. . ¶ 25; RCS ¶ 110.

The economic arc is pleaded in detail: Pump.fun volume surged in Q3–Q4 2024; Solana's network fees and validator rewards spiked in tandem; and Jito's monthly tip revenue jumped to record levels as its client captured >90% of stake—facts that show the pattern was the enterprise's

41

*regular way of doing business*, not isolated or sporadic conduct. ¶ 297 (80% Jito adoption). See *United States v. Pizzonia*, 577 F.3d 455, 463–64 (2d Cir. 2009) (recognizing that proof of enterprise and pattern may coalesce; continuity is required for the pattern and may be open-ended where the acts threaten repetition or arise from a long-term criminal association).

Finally, the Complaint and RICO Case Statement plausibly allege "at least two predicate acts" as to each defendant. The predicates are enumerated—wire fraud (§ 1343), illegal gambling (§ 1955 and N.Y. Penal Law § 225.10), operation of an unlicensed money-transmitting business (§ 1960), money-laundering (§§ 1956/1957), trafficking in counterfeits (§§ 2320/2318), and identity theft (§ 1028(a)(7)).

As pleaded: Pump.fun directly committed repeated wire-fraud acts by broadcasting the "Fair Launch/no presales/no insider allocations" script while integrating a de facto insider priority lane, and it extracted a uniform 1% rake on each trade; it also operated an unlicensed money-transmitting business by receiving and transmitting users' value through its smart-contract system. Jito Labs repeatedly committed § 1960 predicates by operating the off-chain bundle/priority pathway and taking a cut of each tip, and it participated in the wire-fraud scheme by integrating and promoting the "construct a Jito bundle/add a bribe" launch instructions that induced payments. RCS ¶¶ 73, 131–133. Solana Labs and the Solana Foundation are alleged to have repeatedly committed § 1960 and § 1955 predicates by supplying, coordinating, and monetizing the validator/token rails on which the unlicensed transmission and gambling mechanics ran—while publicly encouraging the very throughput that drove fee extraction. RCS ¶¶ 98–106, 100–101.

These allegations amply clear the "two predicates per defendant" pleading threshold at this stage. See also the role-specific mapping in RCS ¶¶ 130–134. Those allegations—together with

the detailed pattern, continuity, and per-defendant predicate showings—are more than sufficient to plead "operation or management" under *Reves*.

### 6.    RICO § 1962(d) Conspiracy Claim Is Independently Adequate

A § 1962(d) claim turns on agreement. It is enough to plausibly allege that each conspirator knew about and agreed to facilitate the racketeering scheme; a conspirator need not personally agree to commit two predicate acts, and no overt act is required. *See Salinas v. United States*, 522 U.S. 52, 63–65 (1997) ("There is no requirement of some overt act or specific act in the statute before us. … It makes no difference that the substantive offense under subsection (c) requires two or more predicate acts."); *United States v. Zemlyansky*, 908 F.3d 1, 10–11 (2d Cir. 2018) (RICO conspiracy "proscribes a defendant's knowing *agreement* to a racketeering scheme," and "the government need not establish that the defendant 'committed or agreed to commit two predicate acts himself'" (quoting *Salinas*, 522 U.S. at 63) (emphasis in original)).

The "two-acts" requirement is satisfied where the conspiracy involved, or was intended to involve, two or more predicate acts by any member of the conspiracy. *Zemlyansky*, 908 F.3d at 11. The pleadings do exactly that: they enumerate multiple predicates (wire fraud, illegal gambling, unlicensed money transmission, money laundering, and related IP predicates) and detail the coordinated roles by which the enterprise executed them. *See* ¶¶ 452–462; RCS ¶¶ 63–72, 130–134. Plaintiffs also allege concrete, execution-time monetary losses, uniform 1% rake and priority-fee extractions on each transaction, which suffices. Defendants' "conclusory add-on" cases are inapposite because, unlike complaints that merely recite an agreement, the allegations here spell out who did what, how the pieces interlocked, and how the scheme was executed and monetized. *See*, *e.g.*, ¶¶ 32–36, 43–47, 121–124, 152–158, 166, 280–294, 308, 329–336, 361–362, 376–386, 440–448, 465–468; RCS ¶¶ 63–72, 84–86, 98–106, 108–111, 113–116, 130–134, 149–153.

**D.**    **Causation Is Adequately Pleaded**

**1.**    **Wire-fraud causation under 18 U.S.C. § 1343.**

**(a)**    **Misrepresentations And Deceptive Interface Induced Plaintiffs' Payments (But-For Causation)**

The Amended Complaint makes plain that absent Defendants' false "fair launch" narrative and misleading interface, Plaintiffs would not have transferred their funds into the Pump.fun platform. Defendants plastered the site and promotions with assurances of an "even playing field," touting "Fair Launch," "no presales," and "no insider allocations," while the interface mimicked protections (candlestick charts, quote boxes, a "Front-Running Protection" toggle, speed tiers, etc.) to convey a safe, equitable trading environment ¶¶ 184–195; RCS ¶¶ 72–75.

These uniform misrepresentations were designed to induce users to part with their SOL at the moment of each token purchase The pleadings allege that this "fair launch" lie was the core promise driving user participation (not a peripheral detail), such that users would not have paid into the token sales but for the belief that no one had a structural advantage (¶¶ 185–87; RCS ¶ 75). In other words, Defendants' misrepresentations and omissions were the direct but-for cause of each Plaintiff's decision to send money through the platform (¶¶ 189–90, 457; RCS ¶¶ 149–50). Notably, the Complaint even pleads that Plaintiffs did rely on Defendants' false claims when buying tokens (¶ 470), a factual allegation that should be taken as true at this stage.

At the motion-to-dismiss stage, the Court must credit such well-pled causal allegations and draw all reasonable inferences in Plaintiffs' favor. Rule 8 requires plausible factual content that nudges causation from possibility to plausibility; courts disregard bare conclusions but credit well-pleaded, non-remote causal allegations. See *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–57 (2007); *Ashcroft v. Iqbal, 556 U.S. 662*, 678–79 (2009).

Defendants' attempt to re-cast the losses as self-inflicted or due to market forces ignores

44

the pleaded reality: the only reason users made these payments was the platform's deceptive promise of fair, unmanipulated launches. But-for the "fair launch" fraud, Plaintiffs simply would not have transmitted their assets to Defendants' system That but-for story aligns with RICO's proximate-cause requirement because the misrepresentations directly induced the very transfers that produced the fee and tip losses. See *Bridge*, 553 U.S. 639 (2008).

### (b)    The Scheme Extracted Money at the Point of Sale

The theory of harm here is not speculative post-purchase price movement; it is immediate, transaction-level extraction. Pump.fun imposed a uniform 1% platform fee on every buy and sell, deducted at execution (¶ 377; RCS ¶ 149), and users also paid priority tips to obtain validator inclusion—fees that flowed to Jito and validators through the integrated bundle-and-tip pathway ¶¶ 130, 286–94, 295–97, 318–26; RCS ¶¶ 148–49.

These extractions occurred contemporaneously with each induced purchase; they are cash-denominated losses directly traceable to the wires that carried the false "fair launch" inducements and the transactions themselves ¶¶ 189–91, 457; RCS ¶¶ 148–51.

This is the kind of direct, transaction-level injury that satisfies RICO proximate cause: the scheme induces the very transactions that transfer money to defendants. See *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). By contrast, proximate cause fails when injuries depend on intervening market choices or other parties' conduct. See *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458–61 (2006); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9–12 (2010); *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 142–45 (2d Cir. 2018).

For the named Plaintiff, the further pleads that he "paid for priority blockspace via transaction and bundling fees," i.e., he personally incurred the tip/priority charges that Defendants monetized ¶ 28; RCS ¶ 143. The proximate-cause chain alleged is thus as direct as it gets: misrepresentation led to an induced transaction which inherently involved fee/tip extraction at

execution RCS ¶¶ 149–53; ¶¶ 465–68.

> **(c)** **Proximate Cause Under RICO Does Not Require First-Party Reliance (Bridge)—And the Pleads Both Direct Relation and Actual Reliance**

RICO wire-fraud proximate cause turns on direct relation, not first-party reliance. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647–49 (2008). The pleadings meet Bridge's standard by alleging (i) uniform inducements that were the engine of participation and (ii) transaction-level fee/tip transfers that occurred because of those inducements.

Our allegations mirror *Bridge* because defendants' uniform inducements directly produced transactions that diverted fees and tips to them, without independent steps by third parties. See Bridge, 553 U.S. 639.

This case looks like *Bridge*, not *Empire Merchants*, because the loss here occurs at execution and through the same wires that carried the inducements, there are no independent retailer or physician decisions to break the chain, and there is no more directly injured party better situated to sue. See *Empire Merchs.*, 902 F.3d at 142–45.

In any event, the also pleads reliance explicitly for consumer-protection counts and describes reliance-laden inducements for the RICO scheme.

> **(d)** **Defendants' Intervening-Cause/Market-Forces Theories Misfire**

The Complaint alleges that the object of the deception was to obtain users' money at the point of execution and to route it through a tip-and-fee mechanism that insiders could exploit first; that is the proximate cause of Plaintiffs' direct, out-of-pocket losses. RCS ¶¶ 149–54.

Those allegations do not depend on downstream trading swings. Nor do they rely on independent third-party acts: the launch flow itself integrated Jito's bundle-and-tip path so privileged orders were included before public orders, while the interface simultaneously marketed

"front-running protection"—a one-two punch of deception and extraction designed and executed by Defendants.

*Anza*, *Hemi*, and *Empire Merchants* cut off causation only when a plaintiff's loss turns on independent third-party choices or complex market contingencies. Here no such step intervenes; the extraction is contemporaneous with the induced transaction itself. See *Anza*, 547 U.S. at 458–61; *Hemi*, 559 U.S. at 9–12; *Empire Merchs*., 902 F.3d at 142–45.

**(e)     The Wire-Fraud Causation Thread Ties the Predicate-Act Story Together**

The same wires that carried the false "fair launch" inducements carried the transactions and the immediate, monetary injuries: platform rake and validator tips. That is a straightforward, direct causal chain—made even more concrete by allegations that the priority-lane mechanism guaranteed regular users' disadvantage on every trade while Defendants captured value at execution ¶¶ 289–94; RCS ¶ 149.

The alleged chain is short and administrable, with no risk of duplicative recovery and no need to disentangle third-party behavior, which places this within *Bridge* rather than *Hemi* or *Anza*. See *Bridge*, 553 U.S. 639 (2008); *Hemi*, 559 U.S. at 9–12; *Anza*, 547 U.S. at 458–61.

The Complaint thus pleads but-for and proximate causation for the wire-fraud predicates in a manner fully consistent with Bridge and the direct-relation requirement. And because the deception concerned the process/price users paid for—"front-running protection," speed tiers, and a supposed "fair launch"—the injuries alleged are classic, property-based harms cognizable under § 1343 (¶¶ 126–31, 130; RCS ¶¶ 75–76, 150–51).

**2.     Mosaic And But-For Causation.**

The pleadings describe a unified, enterprise-wide "mosaic" in which wire-fraud inducements, a house-run gambling mechanic, and an unlicensed transmission pipeline worked

47

together to extract money from users at the instant of each token sale RCS ¶¶ 63–72, 84–85.

The "fair-launch" message and interface cues were the trigger for participation (¶¶ 184–90; RCS ¶¶ 72–76); the platform then skimmed value through a uniform 1% rake and priority-tip charges (¶¶ 329–36, 377; RCS ¶ 149), and it locked the remainder into a closed, contingent pool where most tokens predictably failed (¶¶ 250–57, 254–55, 351–59; RCS ¶¶ 146–47).

Plaintiffs plead that but for the uniform "fair launch" misrepresentations and parity-by-design interface, they would not have transmitted their SOL into this system (¶¶ 189–90, 457; RCS ¶¶ 149–50).

This "but-for" theory aligns with *Bridge*, which holds that first-party reliance is not required where the scheme's success directly produces the plaintiff's loss. 553 U.S. at 647–49 (emphasis on direct relation rather than reliance). *See* ¶¶ 465–68; RCS ¶¶ 149–53.

### 3.    Directness and foreseeability narrative

RICO proximate cause asks for a direct relation between the violation and the injury. *Holmes,* 503 U.S. at 268–70.

*Anza* and *Hemi* cut off claims where independent third-party decisions or tax dynamics stood between the misconduct and the plaintiff's harm. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 458–61 (2006); Hemi Grp., LLC v. City of New York, 559 U.S. 1, 9–12 (2010).

The allegations here are the opposite of *Anza/Hemi/Empire*. Plaintiffs' money flowed straight to enterprise members at the moment of sale by design: the platform took a 1% rake on each transaction and the system routed optional "tip" fees for priority inclusion, all contemporaneous with the induced purchase.

No separate regulator, retailer, or taxpayer stands in the causal chain; the same online flow of wires that carried the inducements also carried the payments and the immediate extraction That is the direct relation Holmes requires.

The injuries were also foreseeable and intended. The business model was to sell the pattern of racketeering itself: every pre-graduation sale consummated a fraudulent fair-launch pitch, a house-run gambling game, and an unlicensed transfer, and it immediately sent value to Defendants.

As Sedima explains, the compensable injury is "the harm caused by the predicate acts" in the enterprise's conduct. 473 U.S. 479, 497 (1985).

No damages apportionment problem or double-recovery risk exists because Plaintiffs are the direct payors into the scheme and the only parties who suffered the immediate transactional loss.

*Bridge* confirms that where a uniform scheme directly produces the plaintiff's payment, proximate cause is satisfied: there are "no independent factors that account for the injury" and "no more immediate victim better situated to sue." 553 U.S. at 647–49, 658–59 (cleaned up).

### 4.    Rebuttal To Expectancy Interest

Defendants recast this case as disappointed speculation, leaning on the trading-card line (Price/Chaset) and EthereumMax. *See Price*, 138 F.3d at 607; *Chaset*, 300 F.3d at 1087; *In re EthereumMax*, 2022 WL 20804358, at *13 (relied on in MTD). That analogy misses the pleaded economics. In the card cases, the buyer paid a fixed price and received that value at purchase; any later disappointment turned on resale hopes.

Here, Plaintiffs suffered out-of-pocket loss at the point of sale: the platform skimmed a 1% house fee immediately and often collected a priority "tip," leaving users with less value than they paid from the first moment.

The token received was a contingent slip that would hold value only if a platform-defined graduation event occurred; when it did not, the token became effectively worthless.

That is not a "lost expectancy"; it is a completed taking of money in a transaction engineered to deprive buyers of the bargained-for quality of execution and parity.

This distinction is embedded in the pleadings: Plaintiffs allege uniform misrepresentations about fairness and parity that induced their payments (¶¶ 184–90, 189–90, 457), and they allege the *direct monetary extraction* that followed immediately from those payments (1% rake, priority fees). ¶ 377; RCS ¶ 149.

Under *Bridge*, RICO causation does not hinge on first-party reliance so long as the scheme directly produced the transfers, which is exactly what is pleaded here. 553 U.S. at 647–49. RCS ¶¶ 149–53.

And to the extent the defense suggests "no property harm," courts recognize that deceit about the method of performance and price formation deprives victims of money and of the benefit of their bargain. *See United States v. Johnson*, 945 F.3d 606, 614–16 (2d Cir. 2019); *United States v. Tuchinsky*, 703 F. Supp. 3d 1337, 1347–50 (S.D. Fla. 2023).

### E.    The Motions to Dismiss for Lack of Personal Jurisdiction Should be Denied

Contrary to the Defendants' argument that they had no connections to the United States, the Complaint and its exhibits allege specific facts evidencing their contacts through social media promotion directed at US markets and their active control over platform operations that systematically targeted US investors.  *See, e.g.*, *Matter of People v. JUUL Labs, Inc.*, 212 A.D.3d 414, 415 (N.Y. App. Div. 1st Dept. 2023) (finding personal jurisdiction over out of state defendants who, *inter alia*, "personally attended JUUL's launch party in New York City" and were involved with "advertising on billboards in Times Square").[5]  These minimum contacts provide jurisdiction

---

[5] Plaintiffs believe that the Complaint sufficiently alleges a basis for specific jurisdiction. However, if the Court is not inclined to find specific jurisdiction over Baton Defendants and Solana Defendants, Plaintiffs respectfully request that the motions to dismiss be denied without prejudice in order to conduct discovery into the issues supporting general jurisdiction.  *See, e.g.*, *Cerovene, Inc. v. Fukuzyu Pharm. Co.*, No. 24-CV-464 (RA), 2025 U.S. Dist. LEXIS 43236, at *8-9 (S.D.N.Y. Mar. 10, 2025) (denying Defendants' pending motions to dismiss without prejudice and with leave to renew after jurisdictional discovery is completed).

based on the nation-wide service of process under both the Securities Act and RICO claims.  As

the Court in *SEC v. Morton* explained,

> [w]hen the jurisdictional issue flows from a federal statutory grant that authorizes
> suit under federal-question jurisdiction and nation-wide service of process,
> however, the Fifth Amendment applies, and the Second Circuit has consistently
> held that ***the minimum-contacts test in such circumstances looks to contacts with
> the entire United States rather than with the forum state***. If the plaintiff shows
> that defendants had substantial contacts with the United States, the court next must
> determine whether the assertion of personal jurisdiction comports with "traditional
> notions of fair play and substantial justice"— that is, whether it is reasonable under
> the circumstances of the case. In this analysis the defendant bears the burden to
> show that the assertion of jurisdiction in the forum will make litigation so gravely
> difficult and inconvenient that he unfairly is at a severe disadvantage in comparison
> to his opponent. As a general matter, ***such unfairness will rarely be found***, and
> such a result is still less likely in a federal-question case coupled with nationwide
> service of process.

*SEC v. Morton*, 10 Civ. 1720 (LAK)(MHD), 2011 U.S. Dist. LEXIS 36487, at *37-40 (S.D.N.Y. Mar.

31, 2011) (cleaned up; emphasis added); *see also In re Longfin Corp. Sec. Class Action Litig.*, No.

18cv2933(DLC), 2019 U.S. Dist. LEXIS 62758, at *23 (S.D.N.Y. Apr. 11, 2019) (finding jurisdiction

in Securities Act claims over foreign defendants based on their "contacts throughout the United States

and not just those contacts with the forum"); 18 U.S.C. § 1965(b) (allowing nationwide service of

process under RICO on defendants outside of the district when "the ends of justice" require it); *PT

United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998).

Personal jurisdiction is pleaded generally as to all the Defendants with additional

jurisdictional facts pleaded to each of them at ¶¶ 31-56.  Here, Pump.fun conducted "viral

marketing campaigns" via TwitterX posts targeting US users.  ¶¶ 144-145, 147.  The platform also

promoted itself as "better than venture capital" to attract retail US investors, and used common

Silicon Valley terms such as "unicorns" and "billion-dollar meme coins."  ¶¶ 145, 148.  There also

were no KYC or other effective methods to prevent participation by American investors like

Plaintiff Okafor.  ¶¶ 28, 173-180.  Specifically, the Complaint alleges that the three Baton

Individual Defendants—Alon Cohen (CEO), Dylan Kerler (CTO), and Noah Tweedale (Chief Product Officer)—exercised operational control over the Pump.fun platform and personally promoted it as a trading venue and casino to lure retail users into unlawful wagering. ¶ 34. Each founder "directed and knowingly participated in the affairs of the Pump Enterprise" and is sued in both individual and official capacities for acts undertaken in the course and scope of the enterprise. ¶¶ 43-45, 48; and Exhibit A.

The Solana Defendants' jurisdictional challenges fail because they have established substantial, continuous, and purposeful business operations within the Southern District of New York, and have systematically directed their activities toward United States markets.

The Complaint also alleges that Solana Labs and Solana Foundation maintained extensive physical operations in New York. Contrary to Defendants' attempts to minimize their US connections, Solana Labs (Delaware corporation) and Solana Foundation (Switzerland) both maintain extensive physical presence and operations at 141 East Houston Street, New York, NY, located directly within New York. ¶¶ 31, 49-56. In 2022, Solana Labs signed a 10-year commercial lease for the 6th through 9th floors, converting the former Sunshine Cinema into its New York headquarters—demonstrating a substantial, long-term commitment to conducting business within this jurisdiction. ¶ 50. The Solana Foundation operates from the same Manhattan location and publicly refers to its presence as the "Solana Event Space." ¶ 51. Dan Albert, the Executive Director and individual defendant, personally hosted Foundation events on the 8th floor alongside New York City elected officials, establishing his direct supervisory role over New York operations. *Id.* Multiple business publications confirm that both entities "operate and maintain regular business activities from this location." ¶ 52. Finally, every transaction had a connection with New York: "every transaction on Pump.fun invokes Solana Labs' System Program, Token

Program." ¶ 275.

Furthermore, because of the diverse locations of the Defendants, the "ends of justice" are achieved here because there is not a single location where the claims could be tried. *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 315 (S.D.N.Y. 2010).

**F.      The Motions to Dismiss the Securities Claims Must Be Denied**

**1.      The SEC Staff Statement on Meme Coins Does Not Bar These Claims**

Defendants' reliance on the February 2025 SEC Staff Statement[6] fundamentally mischaracterizes its scope and application to this case.  ECF No. 89, MTD at 6.  The SEC Staff Statement explicitly carves out exceptions for meme coins that fall outside its narrow safe harbor, stating that the Statement "does not extend to the offer and sale of meme coins that are inconsistent with the descriptions set forth above, or products that are labeled 'meme coins' in an effort to evade the application of the federal securities laws by disguising a product that otherwise would constitute a security."  SEC Division of Corporation Finance, Staff Statement on Meme Coins (Feb. 27, 2025) (available at ECF 89-1).  Moreover, the SEC Staff Statement requires case-by-case analysis, emphasizing in footnote 4 that "a definitive determination requires analyzing the specific facts relating to the meme coin and the manner in which it is offered and sold," and that "the Division will evaluate the economic realities of the particular transaction."  *Id*. at n.4.

The SEC Staff Statement implicitly recognizes that meme coins can constitute securities when they involve the precise factual elements present here—pooled investment and entrepreneurial efforts by promoters.  ¶¶ 372-375.  The Statement distinguishes traditional meme coins specifically because "their funds are not pooled together to be deployed by promoters or

---

[6] Available at https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins (the "SEC Staff Statement").

other third parties for developing the coin or a related enterprise," and because "the promoters of meme coins are not undertaking (or indicating an intention to undertake) managerial and entrepreneurial efforts from which purchasers could reasonably expect profit." *Id*. By negative implication, the SEC Staff Statement acknowledges that when funds are pooled for development and promoters undertake substantial managerial and entrepreneurial efforts—as alleged here—the standard analysis set forth in *SEC v. W. J. Howey Co.,* 328 U.S. 293, 66 S. Ct. 1100 (1946) applies. The Complaint alleges that the 20 Pump Securities (defined below) involved systematic fund pooling through Pump.fun bonding curve mechanisms where "users funds were pooled" and "every buyer's outcome depended on the success of the project as a whole." ¶ 373. The Baton Defendants undertook extensive entrepreneurial efforts including platform development, technical infrastructure creation, and ongoing enterprise management. ¶¶ 264-278, 305-307, 444-449.

Furthermore, the SEC Staff Statement provides only a narrow safe harbor for purely promotional activities, noting that securities law implications may not arise only when "the promoters' efforts are limited primarily to hyping the meme coin on social media and online forums and getting the coin listed on crypto trading platforms." *Id*. at n.9. The Pump Securities clearly fall outside the SEC Staff Statement's limited scope because they involve precisely the pooled investment, coordinated promotional activities, and substantial entrepreneurial efforts that the Statement identifies as distinguishing securities from mere meme coins.

### 2.    The Twenty Meme Coins Satisfy the *Howey* Test as Investment Contracts

Federal courts consistently apply the *Howey* test to determine whether digital tokens constitute investment contracts, focusing on whether there is an investment of money in a common enterprise with a reasonable expectation of profit to be derived from the efforts of others. *See SEC v. LBRY, Inc.*, 2022 WL 16744741, at *5 (D.N.H. Nov. 7, 2022). The *Howey* requires: (1) an

investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others. *See SEC. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

**(a)**    **Plaintiffs and the Class Invested Money in a Common Enterprise**

"In the Second Circuit, to establish the existence of a 'common enterprise,' a plaintiff must show either 'horizontal commonality' or 'strict vertical commonality.'" *Gugick v. Melville Cap., LLC*, 2014 WL 349526, at *4 (S.D.N.Y. Jan. 31, 2014). Plaintiffs have pleaded strict vertical commonality by showing that the fortunes of the investors are linked to the fortunes—not merely the efforts—of the promoter/issuer. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87-88 (2d Cir. 1994); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 359-60 (S.D.N.Y. 2011).

The Baton Defendants' argument that no common enterprise exists because funds were not pooled ignores the systematic coordination alleged in the Complaint with respect to the 20 Pump Securities at issue. ECF No. 89, MTD at 7. The Baton Defendants misread the caselaw and overcomplicate the distinction between strict and broad vertical commonality. *Id.*

In *Revak*, the Second Circuit explained that courts have developed different concepts of commonality for the purposes of the common enterprise prong of the *Howey* test. *See Revak*, 18 F.3d at 87-88. Vertical commonality focuses on the relationship between the promoter and the body of investors. *Id.* Vertical commonality comes in two types: "broad vertical commonality" and "strict vertical commonality." *Id.* While "broad vertical commonality" requires that the fortunes of the investors are linked only to the efforts of the promoter, "strict vertical commonality" requires that the fortunes of the investors are linked to the fortunes of the promoter. *Id.* Where strict vertical commonality exists, 'the fortunes of plaintiff and defendants are linked so that they rise and fall together.'" *See In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d at 359-60. An explicit link between the fortunes of the investor and the promoter is the key to strict vertical commonality,

55

and numerous courts have found that the link exists where the promoter takes a fee that is based—
even in part—on the ultimate performance of the investment. *Id*.; *Marini v. Adamo*, 812 F. Supp.
2d 243, 260 (E.D.N.Y. 2011) (noting that "courts have found that, where an investment manager,
such as Adamo, earns a fee based on the ultimate performance of an investment, strict vertical
commonality does exist").

    As here, strict vertical commonality exists because the fortunes of Plaintiffs and the Class
are directly tied to the financial success of the Pump Securities, with their profits and losses rising
and falling together through performance-based fee structures and shared economic incentives.
The enterprise operates through coordinated profit-sharing arrangements where Pump.fun's
compensation is directly linked to the volume and success of Pump Securities trading activity.
¶¶ 305-307. Pump.fun extracts a fixed 1% platform fee on every trade, meaning its revenues
increase directly with trading volume and token performance, and the longer the security performs
well the longer Pump.fun directly benefits. ¶¶ 329, 444.

    Further, in "horizontal commonality," "'the fortunes of each investor in a pool of investors'
are tied to one another and to the 'success of the overall venture.'" *Balestra v. ATBCOIN LLC*,
380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019). A formalized profit-sharing mechanism or pro-rata
distribution of profits is not required. *Id*. at 354. Rather, plaintiffs show horizontal communality
when a promoter sells crypto assets to investors and uses the proceeds to strengthen its ecosystem
and blockchain—which in turn supports the value of the crypto asset. *Id*., *SEC v. Kik Interactive
Inc.*, 492 F. Supp. 3d 169, 178-79 (S.D.N.Y. 2020); *SEC v. Telegram Grp.*, 448 F. Supp. 3d 352,
369-70 (S.D.N.Y. 2020).

    As here, the Pump.fun enterprise operates through its bonding curve contracts where "users
funds were pooled" and "the price increased or decreased depending on the total level of

participation," with "every buyer's outcome depend[ing] on the success of the project as a whole." ¶ 373. The pooled nature of the investment is further demonstrated by Pump.fun's automated smart contract system where "purchasers used SOL to buy the tokens directly from Pump.fun's system" through its "bonding-curve contracts." ¶ 372. Rather than requiring formal profit-sharing agreements, the enterprise created economic interdependence through its unified fee structure where "Pump.fun extracted fees on every trade and token launch." ¶ 306.

<b>(b)     Plaintiffs and the Class Reasonably Expected Profits<br>from the Efforts of Others</b>

"The [*Howey* test] considers whether the expectation of profit stems from the efforts of another." *Telegram*, 448 F. Supp. 3d at 375. While *Howey* refers to "profits to be derived solely from the efforts of others," the Second Circuit has instructed that "the word 'solely' should not be construed as a literal limitation" and that the test is met where the promoter's efforts are the "undeniably significant ones[.]" *See ATBCOIN*, 380 F. Supp. 3d at 354-55 (citations omitted). "The efforts of promotors, undertaken either before or after gaining control over investor funds, are relevant considerations due to *Howey*'s focus on economic realities." *Telegram*, 448 F. Supp. 3d at 375; *see also SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 743-44 (11th Cir. 2005) (explaining that "investment schemes may often involve a combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration in determining whether *Howey's* test is satisfied[.]").

The Complaint details specific managerial and entrepreneurial efforts by the creators of the Pump Securities and the Baton Defendants that created reasonable expectations of profit. ¶¶ 136, 144-145, 150, 374-375, 407, 409-429, 431.

<b>3.     The Twenty Specified Coins Were Securities Under the Federal<br>Securities Laws</b>

Of the eleven million-plus sold coins on Pump.fun, ***twenty*** specific coins were offered and

sold that are alleged to have constituted unregistered securities. The "Pump Securities" were "promoted as having real-world utility and value tied to the future success of specific projects." ¶369. These twenty "included references to revenue-generating platforms, tokenized assets, artificial intelligence tools, and staking systems" and purchasers "were invited to 'get in early,' before the projects were built or released, and profit from future developments." ¶370. It is undisputed that none of the Pump Securities were registered with the S.E.C.

Each of the twenty Pump Securities was offered to the public through Pump.fun's "one-click token launch system," a standardized offering process where purchasers contributed SOL tokens directly into bonding-curve contracts that automatically minted new tokens and pooled investor funds. ¶¶ 120, 372, 429-430. After each launch, the Pump Securities were immediately listed and tradable on Pump.fun's platform, with their values tied to future development milestones, product rollouts, platform launches, and other entrepreneurial efforts controlled exclusively by their respective promoters. ¶¶ 371-376, 407, 429-431. As detailed above, the Pump.fun trading interface deliberately mimics regulated securities markets to create the false impression that users are engaging in legitimate securities investment activity. Supra, p. XX.

Instead of providing detailed offering documents pursuant to securities laws, the token/coin issuers released promotional materials, whitepapers, and roadmaps describing future utility, revenue-sharing mechanisms, staking rewards, and technological development plans designed to create expectations of profit from the efforts of others. ¶¶ 409-427.

Each of the twenty Pump Securities satisfy all prongs of the *Howey* test for investment contracts.

### 1. StakeCoin

StakeCoin (STC) was offered as a Real-World-Asset pass-through that purports to integrate

Real World Assets with blockchain technologies.   ¶ 409.   Purchasers invested SOL through Pump.fun's bonding-curve mechanism with the expectation of returns tied to revenue from tokenized off-chain assets managed by the promoter.   *Id*.   The token's roadmap specifically includes the tokenization of real-estate deeds, which are to be managed exclusively by the promoter, creating investor reliance on the entrepreneurial efforts of others.   *Id*.   *See ATBCOIN*, 380 F. Supp. 3d at 354 (finding digital tokens were securities where "purchasers of ATB Coins reasonably believed that those coins would increase in value based primarily on Defendants' entrepreneurial and managerial efforts.")

### 2. QuStream

QuStream (QST) was marketed as a Quantum-Safe Layer-1 blockchain utilizing patented post-quantum encryption technology.   ¶ 410.   Launch materials indicated that future validator staking rewards would be distributed to token holders, and purchasers were led to expect that appreciation in token value would follow successful research and deployment of the supposed quantum encryption technology.   *Id*.   Investor proceeds were pooled in a "genesis contract," establishing the common enterprise element of the *Howey* test.   *Id*.   The token's value proposition was entirely dependent on the issuer's ability to successfully develop and deploy post-quantum encryption infrastructure, making purchasers' returns contingent on the entrepreneurial efforts of others.   ¶ 429.   *See Kik*, 492 F. Supp. at 175-80 (the court found that tokens constituted securities because the defendants told investors that rising demand would drive up the value of tokens, and that defendants would undertake crucial work to spur that demand.").

### 3. BunkerCoin

The marketing materials for BunkerCoin ("BUNKER") claimed ownership of "the world's biggest private bunker near Berlin" and discussed future sales of panic-room memberships and

additional facility developments in The Gambia. ¶ 411. Purchasers contributed SOL funds with the expectation that the issuer would construct, operate, and monetize these crisis-shelter facilities and related services. *Id*. The investment structure created investor reliance on the issuer's future efforts to develop and commercialize physical bunker infrastructure, with returns tied to the success of these entrepreneurial activities. ¶ 429. The token offering pooled investor capital through the Pump.fun bonding-curve mechanism while promising future revenue streams from facility operations that were entirely dependent on the issuer's construction and management efforts. ¶ 431. *See SEC v. Terraform Labs Pte. Ltd.*, F. Supp. 3d, No. 23 Civ. 1346 (JSR), 2023 U.S. Dist. LEXIS 230518, 2023 WL 8944860, at *4 (S.D.N.Y. Dec. 28, 2023) (holding that tokens are securities when purchasers are "led to expect profits solely from the efforts of the promoter.")

### 4. DeepCore AI

DeepCore AI (DPCORE) materials described a platform for "MCP-powered next-gen AI agents" and promoted token staking to earn rewards from agent-task transactions. ¶ 412. The projected token value depending on the promoter's ability to deliver a functioning AI marketplace and infrastructure platform. *Id*. The offering structure pooled investor funds through Pump.fun's bonding-curve contracts while promising future platform functionality and revenue-sharing mechanisms controlled exclusively by the issuer. ¶ 431. The token clearly satisfied the *Howey* test elements, as purchasers expected profits derived from the issuer's entrepreneurial efforts to develop AI agent infrastructure and generate platform revenues. ¶ 407.

### 5. AgentPy

AgentPy (APY) purported to serve as a connector between AI agents and Solana-based applications, offering early adopter token rewards upon full launch of the platform, and the its commercial viability was directly tied to the successful development and implementation of the

project.  ¶ 413.  The offering involved pooling of investor funds with promises of future functionality and early adopter rewards that were contingent on development milestones under the issuer's exclusive control.  ¶ 431.  This structure created the fundamental investment contract relationship where token holders expected returns based on the efforts of others to build and deploy the AI connector platform.  ¶ 407.

### 6. Apex AI

Apex AI (APEX) was presented as a token for early detection of gastrointestinal cancers using high-accuracy diagnostic tools.  ¶ 414.  Token value was explicitly linked to pending FDA approvals and future integration with healthcare providers, all controlled by the issuer.  ¶ 414. Purchasers contributed capital expecting that the issuer would successfully navigate the FDA approval process and establish healthcare provider integrations, creating returns dependent on regulatory and business development efforts.  ¶ 429.  The investment structure pooled funds through bonding-curve contracts while promising future medical technology commercialization under the issuer's exclusive control.  ¶ 431.  The token offering clearly established an investment contract where purchasers expected profits from the issuer's entrepreneurial efforts to develop, approve, and commercialize medical diagnostic technology, consistent with the holding in *Terraform Labs* that promotional materials promising future development create reasonable expectations of profit.  *See Terraform Labs* 684 F. Supp. 3d at 197.  *See also* ¶ 407.

### 7. Verse World)

Verse World (VERSE) was marketed as the native token of an "evolutionary metaverse" offering land parcels, storefronts, and creator monetization opportunities.  ¶ 415.  Purchasers expected that token value would increase based on the promoter's successful development and operation of virtual world infrastructure, creating reliance on their entrepreneurial efforts.  ¶ 429.

### 8. BAYC AI

BAYC AI (BAYCI) purported to tie its value to a comic-themed metaverse and time-space portal game built around mutated ape NFTs. ¶ 416. Purchasers contributed SOL expecting that the issuer would develop and operate the gaming and metaverse platform, with token value tied to the success of these creative projects. ¶ 429. The investment structure pooled funds through Pump.fun's bonding-curve mechanisms while promising future gaming and entertainment functionality controlled exclusively by the promoter. ¶ 431.

### 9. Alchemist AI

Alchemist AI (ALCH) promoted the concept that users would be able to "manifest any idea into a living application" through its no-code AI framework. ¶ 417. Marketing materials suggested future profit-sharing mechanisms for stakers, and the anticipated value of the token was based on the successful launch of the AI platform. *Id*. Purchasers invested SOL expecting returns dependent on the issuer's ability to develop and deploy the no-code AI framework and implement profit-sharing systems. ¶ 429. The offering involved pooling investor capital with promises of future platform functionality and revenue-sharing mechanisms under the promoter's exclusive control. ¶ 431. This established the essential investment contract elements where token holders expected profits derived from the entrepreneurial efforts of others to build AI development tools, as recognized in *LBRY* where the court found tokens to be securities based on promised future utility and development efforts. 2022. WL 16744741, at *8. ¶ 407.

### 10. CINO

Promotional materials for CINO (CINO) stated that the token would finance private jet acquisitions and distribute charter profits to holders. ¶ 418. The investment was structured around a pro-rata share in future operational income from a proposed jet fleet. *Id*. Purchasers contributed

capital expecting returns from the issuer's acquisition and operation of private aircraft, creating clear reliance on entrepreneurial efforts. ¶ 429. The offering pooled investor funds through Pump.fun's bonding-curve contracts while promising future aviation business revenues under the issuer's exclusive management and control. ¶ 431. This structure created a textbook investment contract where token holders expected profits from the efforts of others to acquire, operate, and monetize private jet charter services, consistent with the Second Circuit's holding in *Revak* that profit-sharing arrangements based on the promoter's business operations constitute investment contracts. 18 F.3d at 87; ¶ 407.

### 11. Swarms

Swarms (SWARMS) was marketed as the default payment currency for an emerging on-chain agent ecosystem. ¶ 419. The token was designed to facilitate transactions within that ecosystem, implying future utility contingent on development of the broader platform controlled by the issuer. *Id*. Purchasers invested SOL expecting that token value would increase based on the promoter's successful development and deployment of the agent ecosystem infrastructure. ¶ 429. The investment structure involved pooling funds with promises of future platform functionality and transaction utility that were entirely dependent on the issuer's development efforts. ¶ 431. This created the investment contract relationship where purchasers expected returns based on the entrepreneurial efforts of others to build and operate the on-chain agent ecosystem, satisfying the *Howey* test as applied in *Kik Interactive* where tokens were found to be securities based on promised ecosystem development. 492 F. Supp. 3d at 175-80; ¶ 407.

### 12. Collaterallize

Collaterallize (SCOLLAT) promoted itself as a project to "bring RWAs to the masses," directing users to download an app from a mobile store. ¶ 420. The issuer's roadmap and control

63

over real-world asset (RWA) integration suggested reliance on its efforts for token value appreciation. *Id*. Purchasers contributed capital expecting that the issuer would successfully develop and deploy RWA integration technology and mobile applications. ¶ 429. The offering structure pooled investor funds while promising future RWA functionality and mobile platform development under the promoter's exclusive control. ¶ 431. This established an investment contract where token holders expected profits derived from the issuer's entrepreneurial efforts to develop real-world asset tokenization infrastructure, consistent with this court's holding in *Terraform Labs* that tokens tied to future technology development are securities under *Howey*. 684 F. Supp. 3d at 177; ¶ 407.

### 13. XSPA

XSPA (XSPA) was described as a next-generation token powering a decentralized AI platform. ¶ 421. The whitepaper outlined a multi-phase roadmap including smart contract deployment, an AI marketplace, DAO governance, and cross-chain functionality. *Id*. Token value was linked to the promoter's ability to execute on these milestones, including monetization of AI models, staking programs, and strategic partnerships, with a public sale scheduled for September 2025. *Id*. Under *Howey*, detailed roadmaps promising future functionality create reasonable expectations of profit derived from the issuer's efforts. *LBRY*, 2022 WL 16744741, at *8.

### 14. Hive AI

Hive AI (BUZZ) was promoted as a solution to simplify decentralized finance through on-chain agents. ¶ 421. The platform's functionality, and any value derived by token holders, depended on future deployment and agent activity controlled by the promoter. *Id*. Purchasers contributed SOL expecting that the promoter would successfully develop and deploy DeFi automation technology to generate platform utility and value. ¶ 429. The investment structure

pooled funds through Pump.fun's bonding-curve contracts while promising future automation functionality under the issuer's exclusive development and control.  ¶ 431.

### 15. SwarmNode.ai

SwarmNode.ai (SNAI) marketed itself as a token for "serverless AI infra," suggesting a planned infrastructure layer for AI operations.  ¶ 422.  Token value appeared tied to delivery of technical functionality not yet available to purchasers at the time of the offering.  *Id*.  Purchasers invested SOL and pooled their capital expecting returns dependent on the promoter's ability to develop and deploy serverless AI infrastructure technology.  ¶ 429.

### 16. Codec Flow

Codec Flow (CODEC) advertised itself as powering on-demand cloud desktops for AI agents using MCP and trusted execution environments.  ¶ 423.  Purchasers relied on issuer-delivered infrastructure to give the token value or utility.  *Id*.  Investors contributed capital expecting that the issuer would successfully develop and deploy cloud desktop infrastructure for AI applications. ¶ 429.  The investment structure pooled funds through Pump.fun's bonding-curve mechanisms while promising future cloud infrastructure functionality under the issuer's exclusive technical control.  ¶ 431.

### 17. PVS

PVS (PVS) was presented as the utility token for the Paraverse ecosystem, used to pay for rendering services, receiving airdrops, and access to 3D applications.  ¶ 424.  Value to purchasers was tied to the development and rollout of that ecosystem under the promoter's control.  *Id*.  Purchasers invested SOL expecting that token utility and value would increase based on the successful development of the Paraverse platform and 3D applications.  ¶ 429.  The offering involved pooling investor capital with promises of future ecosystem functionality and utility that

were entirely dependent on the issuer's development efforts.  ¶ 431.

### 18. Convergent

Convergent (CVGT) was described as the governance and fee-share token for a protocol that allows users to mint the stablecoin USV by depositing staked Solana collateral.  ¶ 425.  The platform promised yield retention and liquidity access, while distributing all protocol fees to CVGT stakers.  *Id*.  Purchasers relied on the promoter's technical development and ongoing operations to generate the fee-sharing revenues.  *Id*.  The investment structure pooled funds while promising future protocol functionality and revenue distribution mechanisms under the issuer's exclusive control.  ¶¶ 429, 431.

### 19. First Convicted Raccoon

The First Convicted Raccoon Token (FRED) launched on Pump.fun on October 31, 2024, promising investors "222,222x upside" and featured a five-step roadmap culminating in centralized exchange (CEX) listings and branded merchandise.  ¶ 426.  Buyers paid SOL into the Pump.fun bonding-curve pool, and their profit prospects depended entirely on the promoter's promised listings and influencer marketing efforts.  *Id*.  Purchasers invested expecting returns based on the issuer's ability to execute exchange listings and marketing campaigns outlined in the roadmap.  ¶ 429.  The offering pooled investor capital through Pump.fun's bonding-curve contracts while promising future exchange listings and promotional activities under the promoter's exclusive control.  ¶ 431.

### 20. GRIFFAIN

The GRIFFAIN Token (GRIFFAIN) was marketed as "AI-driven trading in meme form" and debuted on Pump.fun on December 5, 2024.  ¶ 427.  Promotional tweets embedded in the token tile claimed "0→10M in 24h" and teased future staking rewards of "300% APY"—features

wholly dependent on smart-contract code the promoter controlled. *Id*. Purchasers clearly expected passive returns from the issuer's technical efforts to implement AI trading functionality and staking reward systems. *Id*. The investment structure involved pooling funds through Pump.fun's bonding-curve mechanisms while promising future AI trading capabilities and staking rewards under the promoter's exclusive technical control. ¶¶ 429, 431.

### 4. The Securities Claims Satisfy Domestic Transaction Requirements Under Morrison

The Baton Defendants seek dismissal under *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010). ECF No. 89, MTD at 10. In *Morrison*, the Supreme Court held that § 10(b) applies to: (1) "transactions in securities listed on domestic exchanges" and (2) "domestic transactions in other securities." *Id*. at 2884. In an alternative formulation of this test, the Court stated that § 10(b) applies to "the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id*. at 2888. Notably, because the stock at issue in *Morrison* was traded only on foreign exchanges, the Court did not discuss trading in domestic markets. *See SEC v. Ficeto*, 839 F. Supp. 2d 1101, 1108-09 (C.D. Cal. 2011). And, as to the second prong of the transactional test, the Court "was largely silent regarding how lower courts should determine whether a 'purchase or sale is made in the United States.'" *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 157 (S.D.N.Y. 2011). The Second Circuit has identified two methods of locating a securities transaction: "a securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012).

The Second Circuit applied the *Morrison* domestic transaction test to a Section 12(a)(1) claim in *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024). The court found that the plaintiffs had

"plausibly alleged that the transactions at issue were domestic transactions and that therefore the application of federal and state securities laws here was not impermissibly extraterritorial"; "[a]lthough Morrison involved the Exchange Act, we have applied a similar framework to Securities Act claims as well as claims under state Blue Sky laws." *Williams*, 96 F.4th at 136.  On a technological basis, *Williams* found domestic transactions where "irrevocable liability attached when the transactions were matched on U.S. servers" and plaintiffs "placed orders on the electronic platform from their state or territory of residence."[7]

Here, the Complaint establishes systematic targeting and solicitation of U.S. investors that satisfies *Morrison*'s test for extraterritorial application of U.S. securities laws.  Pump.fun was specifically designed to target U.S. retail investors like Lead Plaintiff Michael Okafor, without implementing any geographic restrictions, with "no KYC screening, no age verification, and no record of real-world identity," enabling "widespread participation by US users."  ¶¶ 68, 75-76. The Baton Defendants conducted coordinated marketing campaigns specifically targeting U.S. demographics, with marketing efforts "targeted toward a young, male, retail-speculation audience whose exposure to financial products is heavily shaped by internet culture and social media— paralleling the demographic surge seen during the GameStop and meme stock era."  ¶ 147.  The primary marketing medium was "Crypto Twitter," described as "the Twitter/X subculture where most meme coin commentary, speculation, and promotion occurs," demonstrating purposeful direction toward U.S. markets.  *Id*.  Additionally, Defendants crafted marketing messages specifically mimicking "US venture capital culture," using phrases like "AI unicorns" and "early-stage winners" that specifically resonate with US technology investors.  ¶ 148.  This extensive

---

[7] *Morrison* allegations are subject only to Rule 8(a)(2)'s "short and plain statement" standard. *See, e.g., Absolute Activist*, 677 F.3d at 68.

targeting of U.S. investors like Lead Plaintiff Okafor, through coordinated marketing campaigns satisfies *Morrison*'s tests for domestic application of securities laws where defendants systematically directed their conduct toward U.S. markets.

      **5.**      **The Baton Defendants Are Statutory Sellers Under the Securities Act**

      **a)**      **The Baton Defendants Solicited Purchasers and Successfully Sold Securities**

Section 12(a)(1) of the Securities Act imposes liability on the person who passed title or other interest in the security to the buyer for value, or on the person who successfully solicits a purchase of securities so long as he is motivated at least in part by a desire to serve his own financial interests or those of the securities owner.[8] *See Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988). The Complaint contains detailed factual support for the assertion that the Baton Defendants are sellers under Section 12(a)(1).

The launch of the Pump Securities could not have occurred without utilizing Pump.fun's bonding curve mechanism and coordinated infrastructure efforts. As stated supra, all tokens launched (or issued and sold) on Pump.fun are "pre-coded with [Pump.fun's] bonding curves, liquidity locks, and exit dynamics that mirror one another" and utilize standardized smart contract

---

[8] The Baton Defendants' arguments that Plaintiffs lack standing to pursue the Pump Securities that they did not purchase is a distraction. Plaintiffs' monetary damages satisfy the "injury in fact" standing requirements under Article III. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). But the scope of their representation on a class of similar investors in the Pump Securities is a question that is best reserved for class certification. In *NECA-IBEW*, the Second Circuit allowed plaintiffs to represent purchasers of securities that they did not purchase when the plaintiff "personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant," and "that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (internal quotations omitted); *see also Garcia De León v. N.Y. Univ.*, No. 21 Civ 05005 (CM), 2022 U.S. Dist. LEXIS 10723, at *14 (S.D.N.Y. Jan. 20, 2022). Here, Plaintiffs have alleged that the Pump Securities are the product of the same consistent Pump.fun platform controlled by the Baton Defendants, and thus implicated the same set of concerns.

templates controlled by Pump.fun.  ¶ 132.  Pump.fun exercises "comprehensive control over every token launched on its platform," setting "the economic parameters for token issuance" and managing "the bonding curve liquidity pools" through its turnkey system.  ¶¶ 382-83.   The platform's core functionality depends entirely on Solana Labs' SPL Token Program, which serves as "the foundational infrastructure for all fungible and non-fungible tokens on the Solana blockchain," and Pump.fun's integration with this system enables its "one-click token factory that allowed any user to launch a token with automated bonding curve pricing."   ¶¶ 271-72.   Furthermore, the launch process is facilitated through Jito Labs' validator infrastructure, which enables "early access to the bonding curve" through bundled transactions that guarantee "these insider transactions are included in the block before any public purchases," allowing "token creators and affiliated wallets [to] obtain a disproportionate share of the token supply at the minimum price."  ¶¶ 291-92.  It would have been impossible to issue or even create the Pump Securities without the Baton Defendants' control over the infrastructure.

Contrary to the individual Baton Defendants' arguments about lack of direct solicitation, the Complaint and its Exhibits detail extensive activities specifically designed to induce purchases of the twenty Pump Securities.  These promotional activities included coordinated social media campaigns, public statements about platform profitability, and systematic promotion.  Further, these arguments are contradicted by Defendants' own public statements.  *See, e.g.*, Exs. A, C-E.  Defendant Cohen personally supported celebrity tokens, describing them as "models for investment narratives" and defending insider activity by calling participants "Pump.fun sleuths".  ¶ 162. Pump.fun's marketing strategy "systematically updated and recontextualized its meme coin messaging to attract new waves of users" and "repeatedly characterized meme coins as startup-like investment vehicles capable of producing exponential returns."  ¶ 144.   The platform

distributed viral marketing campaigns asserting "that its platform was better than venture capital—an invitation for retail users to bypass traditional startup investing and participate in speculative meme coin launches instead." ¶ 145. These promotional efforts were specifically "targeted toward a young, male, retail-speculation audience whose exposure to financial products is heavily shaped by internet culture and social media" through "Crypto Twitter," where the Baton Defendants actively framed the platform "as a generator of AI unicorns, early-stage winners, and billion-dollar meme coins." ¶¶ 147-148.

        **b)**      **The Baton Defendants Had Motivation and Financial Interest in the Sales**

Plaintiffs also allege that the Baton Defendants solicited the purchase of the Pump Securities. The *Pinter* Court recognized that although "the language of § 12 contemplates a buyer-seller relationship," the meaning of "seller" is interpreted to include more than mere owners to encompass those who engage in solicitation. *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1259-60 (9th Cir. 2022). That the Baton Defendants used social media rather than individually meeting with each Plaintiff to solicit is irrelevant. "In fact, if anything, the advertisements at issue in this case—Instagram posts and YouTube videos—are the types of potentially injurious solicitations that are intended to command attention and persuade potential purchasers to invest in the Funds during the 'most critical' first stage of a selling transaction, when the buyer becomes involved." *Id*. at 1260 (citing *Pinter* at 646-647). The Baton Defendants clearly used social media to persuade investors to purchase Pump Tokens.

The Complaint details extensive financial motivations of the Baton Defendants through coordinated fee structures, revenue sharing arrangements, and documented profits derived from increased trading volume and prices that establish their direct monetary interest in soliciting and completing securities transactions. Indeed, Pump.fun's business model centered on extracting "a

fixed 1% platform fee on every token trade," generating over $400 million in fee revenue during 2024 alone, with average daily revenue rising from $900,000 in Q3 2024 to $2.5 million in Q4, and peak trading days exceeding $10 million in platform fees in a single 24-hour period.  ¶¶ 331-333, 444. [9]

### G.    The Motion to Dismiss the Unjust Enrichment Claims Must Be Denied

Defendants remaining arguments as to Plaintiffs' state law claim are meritless, as Plaintiffs adequately allege their unjust enrichment claim.  The Complaint contains ample allegations that the Defendants have been unjustly enriched through their violations of the Securities Act and/or RICO.  Plaintiffs adequately allege the required elements.  Under New York law, a claim for unjust enrichment requires a showing that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F. 3d 296, 306 (2d Cir. 2004).  Additionally, defendant's benefit must be "specific" and "direct."  *Kaye v. Grossman*, 202 F. 3d 611, 616 (2d Cir. 2000).

#### 1.    Each Defendant Received Measurable Benefits from the Coordinated Scheme

Contrary to Defendants' arguments about lack of direct benefits, the Complaint details specific measurable benefits each defendant received through the coordinated enterprise.  Pump.fun has generated $722.85 million from the illegal enterprise.  ¶ 11.  The Complaint details that Pump.fun generated over $400 million in fee revenue during the 2024 calendar year, with the platform imposing a 1% transaction rake on every trade.  ¶¶ 33, 331.  During peak trading days,

---

[9] Defendants did not dispute that Plaintiffs' Section 12(a)(1) claims are timely, and they have therefore waived any arguments to the contrary.  *See Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc.*, 2021 WL 1199430, at *10 n.6 (S.D.N.Y. Mar. 30, 2021).

Pump.fun earned in excess of $10 million in platform fees in a single 24-hour period.  ¶ 333. Between January 2024 and mid-2025, Pump.fun's founders and insiders moved over $700 million in profits off-chain.  ¶ 361.

Solana Labs and Foundation made substantial financial gains.  Solana Labs and the Solana Foundation experienced substantial financial windfalls as a result of the spike in on-chain activity driven by Pump.fun.  ¶ 309.  The Solana Foundation controlled approximately 240 million SOL tokens, representing roughly 49% of the genesis token supply, and at SOL's late-2024 price of approximately $190, the Foundation's treasury was valued at over $18 billion.  ¶¶ 311, 340.  The Foundation earned annual staking rewards of approximately 4 million SOL, translating to $700-800 million in recurring annual income during 2024-2025.  ¶ 341.

Further, the daily fee volume climbed from approximately 60,000 SOL per day in early 2024 to more than 150,000 SOL per day by October 2024, an increase of 150% in less than a year, translating to several million dollars per day in fee income distributed across the validator set, of which Solana Labs and the Foundation are major beneficiaries.  ¶ 313.  During a single 30-day window in late 2024, Solana recorded approximately $88.2 million in transaction fees.  ¶ 314.

Jito's front-running technology captured over $633 million in user-paid tips—of which Jito retained 5-6%—as traders paid bribes to prioritize their transactions amid the gambling frenzy.  ¶ 14.  In 2024, total MEV tips paid to Solana validators through Jito's infrastructure exceeded $674 million, an increase of nearly 200% year-over-year.  ¶ 320.  Jito Labs' own revenues increased from approximately $39.5 million in May 2024 to $78.9 million in October 2024, reaching a peak of $210 million in monthly revenue in November 2024.  ¶ 321.  By year-end 2024, Jito's infrastructure was responsible for facilitating over $700 million in MEV tip volume.  ¶ 326.

The executives and co-founders of Solana Labs—including CEO Anatoly Yakovenko and

COO Raj Gokal—realized extraordinary personal wealth, with Yakovenko's estimated net worth reaching $500 million to $1 billion in 2024, largely based on SOL holdings and early token allocations, while Gokal's net worth was estimated in the nine-figure range.  ¶¶ 345-346.

### 2.    Defendants' Retention of Benefits Would Be Inequitable Given their Unlawful Conduct

Equity disfavors allowing Defendants to benefit from their unlawful acts—under Federal law—which occurred at Plaintiffs' expense.  *See, e.g., Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp.2d 382, 389 (S.D.N.Y. 2004) (discussing void *ab initio* contracts, concluding, that "restitution continues to be available as a remedy to a wronged party") (citing Restatement (Second) Contracts § 198); *McCall v. Frampton*, 81 A.D.2d 607, 608-09 (2d Dept. 1981) ("[W]here the agreement consists in part of an unlawful objective and in part of lawful objectives, under certain circumstances the illegality may be severed and the legal components enforced," with the final resolution looking towards the "prevent[ion] of unjust enrichment").

The coordinated unlawful scheme detailed in the Complaint makes retention of these benefits fundamentally inequitable. As alleged, Defendants operated "a coordinated racketeering enterprise designed to simulate the functions of a digital casino operated illegally under the guise of meme coin creation and trading."  ¶ 1.  Each defendant contributed technology and business expertise to the "Meme Coin Casino."  ¶ 5.  Pump.fun built and operated the interactive, user-facing slot machine, Jito Labs served the role of rigging the games by intercepting profitable transactions, and Solana Labs and the Solana Foundation provided the venue and monetized each wager through the sale of block space, validator fees, and SOL token appreciation.  ¶¶ 6-8. Defendants engaged in a systematic wire fraud scheme by misrepresenting Pump.fun's token launch mechanics as "fair," concealing the role of MEV bundles and validator prioritization, and inducing users to transmit SOL through a system rigged in favor of insiders.  ¶¶ 184-195.  The

"fair launch" narrative was knowingly false, as the platform implemented no meaningful protections against insider manipulation.  ¶ 188.

Further, Defendants operated an illegal gambling business under federal law, offering games of chance where users paid for the chance to profit, and Defendants took rake in the form of launch fees, transaction fees, validator fees, and ecosystem incentives.  ¶ 23.  The platform allowed users to stake SOL in exchange for newly launched meme coins whose success was dictated by chance outcomes absent any underlying skill, utility, or discernible economic purpose. ¶¶ 250-256.

The transactional routing model employed by Defendants qualified as an unlicensed money transmission system under federal and state law, with funds received from users, transferred via smart contracts and validator systems, and delivered to project creators without registration as money transmitters.  ¶ 22.  Neither Pump.fun nor its infrastructure providers held licenses from FinCEN or state authorities.  ¶¶ 244-248.

The enterprise was designed to extract value from retail participants by facilitating unlawful gambling transactions, laundering proceeds of unlawful activity, and processing unlicensed transmissions of digital value at scale.  ¶ 465.  Plaintiffs and class members were "funneled into an exploitative gambling mechanism disguised as innovation" and "contributed real value—SOL, brand equity, and platform engagement—into a system designed to extract maximum fees while offering no transparency, no protections, and no meaningful chance of gain."  ¶ 24.

The Complaint demonstrates that Pump.fun was not an aberration but "the predictable next phase in Solana's ecosystem evolution," following prior speculative cycles with NFTs and FTX-related DeFi tools where Solana Labs and its partners reaped benefits while retail investors suffered losses.  ¶¶ 111-115.  The enterprise created "a self-sustaining machine for wealth

extraction—one that depended on the consistent sacrifice of retail participants to generate exponential returns for the insiders." ¶ 366.

### H.    The Motion to Dismiss the GBL § 349 Claims Must Be Denied

Plaintiffs have adequately alleged a claim against Defendants under New York GBL §§ 349-350. New York GBL section 349 "is a consumer protection statute designed to protect against deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] state[.]" *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 205 (2004) (internal quotation marks omitted). "[T]he scope of the statute is intentionally broad, applying to virtually all economic activity." *Id.* (internal citations omitted). To state a claim under GBL Section 349, a plaintiff must allege (1) a defendant's act or practice was consumer-oriented; (2) the alleged act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result. *Edmar Fin. Co., LLC v. Currenex, Inc.*, No. 21-CV-6598 (LAK), 2023 U.S. Dist. LEXIS 87620, at *48 (S.D.N.Y. May 18, 2023). "The deceptive act may be a representation or omission[,]" *Rosendale v. Mr. Cooper Grp. Inc.*, No. 19-CV-9263 (NSR), 2021 U.S. Dist. LEXIS 169228, at *59 (S.D.N.Y. Sept. 7, 2021) (internal citation omitted), and the Second Circuit has held that GBL Section 349 actions do not require proof of reliance similar to common law fraud and thus are not subject to Rule 9(b). *See Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005); *see also Cosgrove v. Or. Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (noting the extension of the Second Circuit's reasoning to false advertising claims under GBL § 350).

### 1.    The Complaint Alleges Consumer-Oriented Conduct Affecting the Public Interest

Defendants' arguments about lack of consumer-oriented conduct ignore the systematic targeting of retail investors through coordinated promotional campaigns and platform design

specifically intended to attract consumer participation. The "consumer-oriented requirement is to be liberally construed[,]" *Rosendale*, 2021 U.S. Dist. LEXIS 169228, at \*59 (internal citation omitted), and New York's high court has established that whether an act or practice is "consumer-oriented" does "not depend on the use of a good or service. . . . Rather, 'what matters is whether the defendant's allegedly deceptive act or practice is directed to the consuming public and the marketplace.'" *Currenex, Inc.*, 2023 U.S. Dist. LEXIS 87620, at \*50 (citing *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 176-77 (2021)). Thus, the controlling law is that GBL Section 349 covers not only deceptive practices targeting household consumers, but deceptive practices "directed to the consuming public and the marketplace" generally. *Himmelstein*, 37 N.Y.3d at 177; *see also Currenex, Inc.*, 2023 U.S. Dist. LEXIS 87620, at \*49 (foreign exchange case rejecting pre- and post-*Himmelstein* cases holding that securities transactions were not "consumer-oriented").

Here, Defendants systematically targeted retail consumers through multiple channels, processing "hundreds of millions of transactions and tens of millions of discrete token launches," with "over 11 million tokens launched on the platform" between January 2024 and mid-2025. ¶ 123. The platform was specifically designed to eliminate barriers to entry for retail consumers, requiring only "a Solana-compatible crypto wallet, such as Phantom or Solflare" with "no name, email address, government-issued ID, or other personal identifier" required. ¶ 175. This design was intentional - as Pump.fun founder Alon Cohen himself stated: "Solana succeeded for the same reason that Pump.fun succeeded, they lowered the barrier to entry to create these (meme coins), play in this ecosystem; to buy and sell these coins." ¶ 116.

The massive scale of this consumer-targeted activity demonstrates conduct clearly affecting the public interest. By 2024, "82% of all tokens traded on the Solana blockchain software

were attributed to the Pump.fun Casino operations," earning "more than $5 million per day in fees" at times. ¶ 13.

### 2.    Defendants Engaged in Materially Misleading Acts and Practices

Contrary to Defendants' arguments about lack of specific false statements, the Complaint details systematic misrepresentations including false "fair launch" claims while concealing insider advantages, misrepresentations about platform security while enabling systematic manipulation, and coordinated promotional statements designed to create false impressions about equal trading opportunities.

Defendants argue that their misrepresentations were mere "puffery."  MTDs ECF No. 87 at 13, ECF No. 89 at 21.  They were not.  A materially misleading representation must be "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 108 (S.D.N.Y. 2021) (internal quotations omitted). "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) (internal quotation marks and citations omitted).  Statements constituting puffery must make "[s]ubjective claims about products, which cannot be proven either true or false." *Id.* (internal citation omitted). Whether a statement constitutes puffery cannot be determined by a viewing the statement in isolation, but can only be determined by viewing the statement "in light of its context" in a defendant's statements taken "as a whole." *La Vigne v. Costco Wholesale Corp.*, 284 F. Supp. 3d 496, 512 (S.D.N.Y. 2018), aff'd, 772 F. App'x 4 (2d Cir. 2019).  Here, Defendants only singled out words such as "fair," "safe," and "rug-pull proof" (MTDs, ECF No. 87, at 13; ECF No. 89, at 21).  However, Defendants' statements viewed as a whole, were specific, and they could be—and, in fact, were—proven false.  ¶¶ 198, 191-192.

Further, at the very least, Defendants' statements certainly were "not so obviously 'puffing'

that their significance should be determined as a matter of law." *Colangelo v. Champion Petfoods USA, Inc.*, No. 18-CV-1228 LEK/ML, 2020 U.S. Dist. LEXIS 26919, at *22 (N.D.N.Y. Feb. 18, 2020).  Courts rarely find representations to be non-actionable puffery—and thus rule that the representations cannot be deceptive as a matter of law—at the motion to dismiss stage.  *See id.; Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 209 (E.D.N.Y. 2010) ("[W]hen a statement is not obviously puffing, the question of whether it is fact or opinion is almost always a question of fact for a jury's resolution.")

Central to the Pump.fun enterprise was "a single unifying promise: that everyone had a fair shot at the game" through Pump.fun's "fair launch" model.  ¶ 184.  The Complaint alleges that "Pump.fun's homepage, interface design, and social media campaigns all emphasized 'Fair Launch,' reinforced by claims of 'no presales,' 'no insider allocations,' and 'rug-pull proof launches.'"  ¶ 185.  Whether (i) there were no presales, or (ii) no insider allocations, and (iii) adequate protections were put in place to make meme coins "rug-pull proof", can all be proven true or false.  In fact, these representations were materially false because "Despite marketing its interface as a fair launch environment, Pump.fun implemented no meaningful protections." Instead, the platform was rigged through systematic advantages allowing "insider wallets to insert transactions milliseconds ahead of the public acquiring tokens at the lowest bonding-curve price and immediately flipping them at a profit once retail demand materialized."  ¶ 122.  Defendants misrepresented the platform as secure while systematically enabling manipulation. Jito Labs' "modified validator software (Jito-Solana) and block-bundling infrastructure enabled early buyers, bots and insiders to manipulate transaction ordering and extract value from retail participants." ¶ 285. This infrastructure "allowed private users to submit transaction bundles accompanied by tips that guaranteed block inclusion and execution priority," creating systematic advantages for

insiders while retail users were misled about the fairness of the system. ¶ 287. The deception was sustained through coordinated marketing efforts. Pump.fun regularly framed its platform as a generator of "AI unicorns," "early-stage winners," and "billion-dollar meme coins," with statements like "Pumpfun has incubated more AI Unicorns than your favorite VC" despite no data supporting such claims. ¶ 148.

Moreover, "[c]ourts have generally held that since the materially misleading conduct factor requires a reasonableness analysis best suited for a jury, it cannot be resolved on a motion to dismiss." *Rosendale*, 2021 U.S. Dist. LEXIS 169228, at *63-64 (internal quotation marks and citation omitted); *Anderson v. Unilever United States, Inc.*, 607 F. Supp. 3d 441, 452 (S.D.N.Y. 2022). Therefore, Defendants' claim that consumers would not be misled by the alleged misrepresentations and omissions is not suitable for determination at this stage of the litigation.

Because Plaintiffs have adequately pled their GBL Section 349 claim, they also satisfy the pleading requirements for their GBL Section 350 claim. *See Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015). To the extent Defendants argue Plaintiffs must allege reliance—an element that is generally not required to be pled for Sections 349 and 350 claims (*see Pelman,* 396 F.3d at 511)—Plaintiffs plausibly plead that they purchased their coins "as a result of" Defendants' extensive national marketing and sales campaigns wherein Defendants made numerous and widespread public statements promoting the platform's fairness and equal trading opportunities while concealing systematic insider advantages and manipulation. *See, e.g.,* ¶¶ 144, 147-150, 165, 184-185.

### 3.    The Claims Satisfy New York's Jurisdictional Requirements

The GBL claims satisfy New York's territorial requirements through specific allegations of certain Defendants' New York operations, targeting of New York consumers, and injuries suffered by New York residents. Unlike Defendants' arguments about lack of New York nexus,

the Complaint details Defendants' coordinated operations affecting New York commerce, specific targeting of New York investors through digital marketing campaigns, and documented harm to New York residents participating in the platform.  In *Cruz*, 720 F.3d at 124, the Second Circuit found that it was sufficient to plead that "some part of the underlying transaction ... occur[red] in New York State," to confer standing under the GBL.

Here, Solana Labs and the Solana Foundation both maintain substantial physical presence in New York. "Solana Labs and the Solana Foundation both maintain a physical presence at 141 East Houston Street, New York, NY, located in the Southern District of New York." ¶ 49.  "In or around 2022, Solana Labs signed a 10-year commercial lease for the 6th through 9th floors of 141 East Houston Street, converting the former Sunshine Cinema into its New York headquarters." ¶ 50.  "The Solana Foundation operates from the same location and publicly refers to its presence as the 'Solana Event Space.'" ¶ 51.

Beyond office space, Solana Labs employs a substantial workforce in New York conducting core development activities. "Open-source analysis of Solana Labs' public GitHub repository reveals that at least 32 Solana Labs engineers list New York as their employment location and collectively authored over 8,100 Git commits, accounting for 39% of the total code contributions to the Solana protocol." ¶ 53.  "These commit records confirm that a substantial portion of Solana's protocol development is performed by engineers employed by Solana Labs and physically located in the Southern District of New York." ¶ 55.

## III.  <u>CONCLUSION</u>

For all the above stated reasons, Defendants' Motions should be denied. In the event the Court grants any portion of the Motion pursuant to Rule 12(b)(6), Plaintiffs respectfully request leave to amend, as the Motion does not request dismissal with prejudice and, as Plaintiffs' previously filed notice of motion to amend the Complaint and supporting papers requested. (ECF

Nos. 102-105).

Dated: September 26, 2025            Respectfully submitted,
      New York, NY

                             **BURWICK LAW, PLLC**
                             By: _**/s/** Max Burwick_____
                             Max Burwick
                             43 West 43rd Street, Ste. 114
                             New York, NY 10036
                             maxb@burwick.law

                             **WOLF POPPER LLP**
                             Chet B. Waldman
                             Terrence Zhang
                             845 3rd Avenue – 12th Floor
                             New York, NY 10022
                             212-759-4600
                             cwaldman@wolfpopper.com
                             tzhang@wolfpopper.com

                             *Co-Lead Counsel for*
                             *Plaintiffs and the Proposed*
                             *Class*