UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

DIEGO AGUILAR, KENDALL CARNAHAN
AND MICHAEL OKAFOR, and on Behalf of All
Others Similarly Situated,

            Plaintiffs,

  -against-

BATON CORPORATION LTD., d/b/a PUMP.FUN,
ALON COHEN, DYLAN KERLER, NOAH
BERNHARD HUGO TWEEDALE, SOLANA LABS
INC., SOLANA FOUNDATION, ANATOLY
YAKOVENKO, RAJ GOKAL, DAN ALBERT,
AUSTIN FEDERA, and LILY LIU,

            Defendants.

---------------------------------------------------------------x

25-cv-00880 (CM)

## DECISION AND ORDER GRANTING PLAINTIFFS LEAVE TO FILE A SECOND AMENDED COMPLAINT

McMahon, J.:

Plaintiffs Diego Aguilar, Kendall Carnahan, and Lead Plaintiff Michael Okafor (together, "Plaintiffs") bring this action against Solana Labs, Inc. ("Solana") and its co-founders Anatoly Yakovenko and Raj Gokal; the Solana Foundation ("Solana Foundation"), and its executives Dan Albert, Austin Federa, and Lily Liu; Baton Corporation, Ltd. ("Pump.fun"); and its co-founders, Alon Cohen, Noah Tweedale, and Dylan Kerler (collectively, the "Defendants").[1] Plaintiffs allege that Defendants coordinated a scheme, referred to as the "Pump Enterprise," to profit from cryptocurrency token launches by secretly granting insiders priority access to buy

---

[1] The suit was initially also brought against Jito Labs, Inc., the Jito Foundation, and its executives Lucas Bruder and Brian Smith, but these defendants were voluntarily dismissed from the case. *See* Dkt. No. 108, Stip. and Order of Partial Dismissal.

newly issued tokens while misleading ordinary users into believing those launches were fair. Dkt. No. 24, at ¶¶ 116–123, 125–133.

Plaintiffs seek to represent a class of all persons who purchased any tokens sold through Pump.fun during the Class Period, defined as March 1, 2024, through the filing of the First Amended Complaint on July 23, 2025, and who suffered an out-of-pocket loss on those investments (the "Class"). Dkt. No. 34, at 87–88. They also seek to represent a narrower Pump Tokens Subclass, consisting of all persons who purchased twenty specific tokens ("Pump Tokens"). *Id.* at 87.

On behalf of these groups, Plaintiffs assert four claims against the Defendants. *First,* they bring a claim under Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(1), on behalf of the Pump Tokens Subclass against Pump.fun and its co-founders Alon Cohen, Dylan Kerler, and Noah Tweedale, based on their alleged sale and solicitation of the sale of unregistered securities. *Second,* they bring claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), alleging violations of 18 U.S.C. §§ 1962(c) and 1962(d) against all Defendants on behalf of the Class with respect to all tokens, and alternatively with respect to the Pump Tokens Subclass, based on several predicate acts. *Third,* they assert claims under New York General Business Law §§ 349 and 350 for deceptive acts and false advertising on behalf of New York residents of the Class. *Fourth,* they assert a claim for unjust enrichment against all Defendants.

Before the Court is Plaintiffs' motion for leave to file a Second Amended Complaint ("SAC"). Dkt. No. 102.

I. **Background**

### A. Overview of the Pump Enterprise

Central to the alleged Pump Enterprise was Solana Labs's blockchain, a decentralized network that allows users to create, transfer, and trade digital tokens without any central authority, *id.* at ¶ 8, and which served as the technical backbone of the alleged scheme. Solana Labs relies on computers called validators, which process transactions and maintain the integrity of the network. *Id.*, at ¶¶ 81, 445. Because validators control the order and speed of transaction processing, Solana's validator system allegedly enabled Defendants to provide insiders priority trading access. *Id.*, ¶¶ 239, 337, 445. Solana Labs develops and maintains the core software, including the Solana validator client and the Solana Program Library, which contains the SPL Token Program and the Token-2022 standard that govern how tokens are created and traded. *Id.*, ¶¶ 242, 444–45. As alleged, Solana Labs provided the infrastructure that made the Pump Enterprise possible. *See id.*, ¶¶ 337, 445.

Jito Labs, a software and infrastructure provider for the Solana blockchain, developed tools that influenced the order in which transactions are processed. According to Plaintiffs, these tools allowed insiders to pay for priority execution, ensuring their transactions were confirmed ahead of ordinary users. *Id.*, ¶¶ 101–102. Jito Labs's ability to control transaction priority allegedly gave insiders early access to new tokens before the public could purchase them. *Id.*, ¶ 239. In short, Plaintiffs contend that Jito Labs's priority-ordering mechanisms enabled insiders to jump ahead of ordinary users in the transaction queue, executing advantageous trades that helped generate billions of dollars in revenue for the enterprise. *Id.*, ¶¶ 123, 337.

And finally, Pump.fun served as the public-facing platform where new tokens were launched. *Id.*, ¶ 444. Pump.fun charged a 1% platform fee on all trades, *id.*, ¶ 114, and marketed

its launches as "fair" and "rug-pull proof," suggesting that everyone, regardless of technical sophistication, had an equal chance to buy in early, *id.*, ¶ 184–87. Plaintiffs allege that the system worked very differently in practice. They allege that Solana's validator infrastructure and Jito Labs' priority-execution tools allowed Pump.fun to process the buy orders of insiders ahead of the general public, meaning insiders acquired a large share of new tokens at the lowest possible prices. *Id.*, ¶¶ 188, 288, 290. Pump.fun's design then amplified this advantage using a "bonding curve," an automated pricing mechanism that rapidly increased token prices as more people tried to buy in. *Id.*, ¶¶ 236, 254, 272, 290. Because insiders purchased first, their early buys triggered the start of rapid price escalation. By the time ordinary users placed their orders, they were pushed to the back of the processing queue, forced to buy tokens only after prices had already spiked upward, and left exposed when those prices inevitably collapsed once insiders sold their holdings at a profit. *Id.*, ¶¶ 290, 444.

According to Plaintiffs, this created a rigged launch environment: insiders faced low risk and high, near-guaranteed upside, while ordinary investors bore almost all the downside. *Id.*, ¶ 121, 155. Ordinary users who deposited SOL into these launches believed they were competing on equal footing but were in fact repeatedly funneled into buying at artificially inflated prices, only to watch token values crash moments later. *Id.*, ¶¶ 290, 444. What appeared to be a fair, automated marketplace was, Plaintiffs say, structurally tilted to extract value from ordinary users while rewarding those with privileged access to Solana's infrastructure and Jito Labs's transaction-ordering tools. *Id.*, ¶¶ 122, 378.

Plaintiffs further allege that the interdependence of these roles was essential to the alleged scheme. *Id.*, ¶ 447. Pump.fun could not operate without Solana Labs' validator framework and token infrastructure; Jito Labs could not profit without the speculative traffic generated by

Pump.fun's rapid-fire token launches; and Solana Labs would not have benefitted from the increased ecosystem metrics and network traffic produced by both. *Id.* According to the complaint, each Defendant had a defined role and visibility into the others' conduct. *Id.* They also shared a financial interest in maintaining a high-frequency cycle in which new tokens were created, quickly purchased by insiders, and rapidly resold to the public at rising prices. Plaintiffs describe this pattern as a system designed to "launch" tokens and immediately "churn" through waves of buyers. *Id.*, ¶¶ 171, 447–448.

### B. Procedural History

On January 30, 2025, Plaintiffs filed their initial complaint. Dkt. No. 1. On July 23, 2025, after the Court consolidated an earlier-filed case, *Carnahan v. Baton Corporation Ltd.*, No. 25-cv-00490, with this action, Dkt. No. 32, Plaintiffs filed the operative Consolidated Amended Complaint ("CAC"), Dkt. No. 34. In response, three motions to dismiss were filed on September 5, 2025. *See* Dkt. Nos. 86, 88, 96 (collectively, the "MTDs"). These motions remain pending.

On September 24, 2025, Plaintiffs filed a motion for leave to file a Second Amended Complaint ("SAC"), Dkt. No. 102. In connection with that motion, Plaintiffs reported that in early September 2025, a confidential informant ("CI") – who had initially provided information used in the CAC – re-contacted counsel after several months of unavailability. The CI provided nearly 5,000 internal chat logs involving Pump.fun personnel, Solana Labs engineers, Jito Labs executives, and other third parties. These materials were not available when the CAC was filed and bear directly on the operation and management of the alleged Pump Enterprise, as well as venue and personal jurisdiction in the Southern District of New York.

Plaintiffs assert that incorporating the CI materials would allow them to add approximately 40–50 paragraphs of specific factual matter and one or two tailored causes of action, without altering the core theory of the case. They also request a corresponding schedule modification to allow sufficient time to process the new materials and incorporate them into the SAC. For the reasons stated below, Plaintiffs' motion for leave to file a Second Amended Complaint is GRANTED.

## II.     Legal Standards

### A. Leave to Amend Under Federal Rule of Civil Procedure 15(a)

Rule 15(a) provides that a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "When justice so requires necessarily implies justice to both parties." *See Pollux Marine Agencies, Inc. v. Louis Dreyfus Corp.*, 455 F.Supp. 211, 215 (S.D.N.Y.1978). It is within the court's sound discretion to grant or deny leave to amend under Rule 15(a)(2). *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 421, 330 (1971). The court may deny leave to amend for "good reason," including for undue delay, bad faith, futility of amendment, or undue prejudice to the opposing party. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Without a showing of bad faith or undue prejudice, mere delay, without more, is not a basis for the court to deny the right to amend. *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).

### B. Modification of Scheduling Order under Federal Rule of Civil Procedure 16(b)(4)

Rule 16(b) requires the court to issue a scheduling order that sets, among other deadlines, a cutoff for amending the pleadings. Fed. R. Civ. P. 16(b)(3)(A). The purpose of Rule 16(b) is "to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties

and the pleadings will be fixed." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339–40 (2d Cir. 2000). Once that deadline has passed, the scheduling order "may be modified only for good cause." Fed. R. Civ. P. 16(b)(4).

In applying Rule 16(b), courts must balance Rule 15(a)'s instruction that leave to amend "shall be freely given" with the stricter requirement that the moving party demonstrate good cause for missing the court-ordered deadline. *See Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003). Good cause turns on the diligence of the party seeking amendment: the movant must show that, despite its diligent efforts, the amendment deadline could not reasonably have been met. *Parker*, 204 F.3d at 340.

The Second Circuit has made clear that Rule 16(b)'s good-cause standard – not Rule 15(a)'s more liberal amendment standard – governs motions to amend filed after the scheduling-order deadline. As the court explained in *Parker*, following the majority rule among the circuits, applying only Rule 15(a) "would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." 204 F.3d at 340 (quoting *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998)). Numerous circuits – and district courts within this Circuit – have similarly held that once the court has set an amendment deadline, a late motion must satisfy both Rule 16(b)'s good-cause requirement and Rule 15(a)'s amendment standard. *Id.* (collecting cases).

### III.   Discussion

#### A. Leave to Amend Under Rule 15(a)

Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave [to amend] when justice so requires." This liberal standard reflects the principle that cases should be decided on the merits, not on technicalities. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

7

Under *Foman*, leave to amend should be denied only where there is "undue delay, bad faith or dilatory motive," "repeated failure to cure deficiencies," "undue prejudice to the opposing party," or "futility." *Id.* None of these factors is present. Plaintiffs argue – and the record supports – that:

- The motion is timely and diligent: Plaintiffs learned in early September 2025 that the CI, previously unreachable for months, had resurfaced and provided approximately 5,000 internal chat logs. Plaintiffs moved expeditiously thereafter, filing this motion within weeks.

- The evidence is new and significant: The chat logs were not available when the CAC was filed. Plaintiffs assert that the logs contain contemporaneous discussions among Pump.fun, Solana Labs, Jito Labs, and others concerning the alleged scheme, and that they materially clarify the enterprise's management, coordination, and communications.

- The amendments are targeted, not transformative: Plaintiffs state that the SAC would include roughly 40–50 new factual paragraphs and two additional causes of action – claims under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a)&(c), and claims under the New York Right of Publicity statute, N.Y. Civ. Rights Law §§ 50–51. Plaintiffs expressly represent that these new causes of action are not new theories but are intended to align the counts with conduct already pled as RICO predicates – namely, the alleged counterfeiting, impersonation, and identity-misuse scheme described in Plaintiffs' CAC § V(C), CAC ¶¶ 204–12, and RICO Case Statement ¶¶ 70–71.

- There is no meaningful prejudice: No depositions have been taken; formal discovery has not begun; and the amendments will streamline the case by avoiding piecemeal briefing on now-moot issues raised in the pending motions to dismiss.

- The proposed amendments are not obviously futile: They rest on contemporaneous communications relevant to the alleged enterprise's operation.

Because Plaintiffs acted promptly, seek to incorporate newly available evidence, and do not impose undue prejudice or delay, Rule 15(a)(2)'s liberal standard favors granting leave.

Defendants respond that the motion should be denied outright because Plaintiffs failed to attach a proposed amended complaint as required by Local Civil Rule 15.1(b). According to Defendants, the rule is not a mere formality but a necessary tool for ensuring that the Court and the opposing party can understand the exact changes sought. Because Plaintiffs admittedly have

not drafted a proposed SAC and have not fully reviewed the newly produced materials, Defendants contend that the motion is speculative and must be denied.

But non-compliance with Local Rule 15.1 is neither fatal nor dispositive where the basis and scope of the amendment are clear and no undue prejudice would result. Courts in this District routinely excuse or cure a failure to attach a proposed amended complaint, particularly in cases at an early stage, focusing on the substantive factors under Rules 15 and 16. *See, e.g., Fei v. WestLB AG*, 2008 WL 594768, at *2 (S.D.N.Y. Mar. 5, 2008); *Cooper v. Trs. of Coll. of Holy Cross*, 2014 WL 2738545, at *10 (S.D.N.Y. June 17, 2014); *Sunwoo v. JPMorgan Chase & Co.*, 2021 WL 2443814, at *6–7 (S.D.N.Y. June 15, 2021). Here, the motion papers clearly articulate the anticipated amendments, including the nature of the chat logs, the scope of the new factual allegations, and the potential causes of action.

Moreover, the case remains at an early stage. Discovery has not commenced; Plaintiffs have not been dilatory in seeking leave to amend; and Defendants have not claimed that they would suffer undue prejudice from the filing of the amended complaint. *See* Dkt. No. 109, Pump.fun's Mem. Opp'n to Pls.' Mot. for Leave to Amend, at 2; Dkt. No. 110, Solana's Mem. Opp'n to Pls.' Mot. for Leave to Amend, at 5–14.[2] Plaintiffs' proposed amendments are narrowly tailored to incorporate new evidence, further particularize the existing allegations, and add causes of action aligned with previously pleaded RICO predicates, without altering the core theory of the case. Under these circumstances, defendant will not "be so unduly prejudiced by the proposed amendment." *See Christiana Gen. Ins. Corp. of New York*, 745 F. Supp. at 164. Accordingly, the

---

[2] Defendant Solana's only prejudice-based objection relates to Plaintiffs' request to file an additional supplemental declaration *in camera* and under seal, providing additional detail regarding the CI's unavailability. *See infra* Section III(C).

liberal spirit of Rule 15 and the principles articulated in *Foman*, which favor allowing Plaintiffs the opportunity to have their claims tested on the merits, support granting leave to amend.

### B. Good Cause Under Rule 16(b)(4)

Good cause depends on diligence: the moving party must show that, despite its diligent efforts, the amendment deadline could not reasonably have been met. *See Parker*, 204 F.3d at 340. Plaintiffs have made that showing. Plaintiffs represent – and Defendants do not meaningfully dispute – that:

- The CI was unreachable for several months despite Plaintiffs' reasonable efforts. Plaintiffs state that they had no access to the CI or to the evidence at issue during that period.

- The evidence only became available in early September 2025. Plaintiffs proffer that the CI "re-contacted us after having been unavailable for several months" approximately three weeks before the filing of this motion, and only then disclosed that he possessed thousands of internal chat messages. Dkt. No. 103, at 6. Plaintiffs assert that this dataset "was not available when the [Consolidated Amended Complaint] was filed" and could not have been obtained earlier through public sources or reasonable investigation. *Id.*

- Plaintiffs acted promptly upon receiving the first tranche of chat logs. Counsel immediately began triaging the approximately 5,000 messages to determine their significance, notified the Court of the issue, and filed the present motion in a reasonably expeditious fashion.

- The volume and alleged complexity of the materials (nearly 5,000 messages) required time to process and integrate. The short interval between receipt of the materials and the filing of the motion likely reflects assessment, not gamesmanship. Plaintiffs explain that they conducted an initial review to ascertain the materiality of the logs before burdening the Court with a motion to amend. On this record, the minimal time taken to evaluate the evidence does not suggest bad faith or a lack of diligence.

These factual representations – which Plaintiffs have given the Court no reason to disbelieve – satisfy Rule 16(b)'s good-cause requirement because Plaintiffs acted diligently and because the deadline could not reasonably have been met earlier, precisely the circumstances Rule 16(b) contemplates. *See Lawrence v. Starbucks Corp.*, 2009 WL 4794247, at *3 (S.D.N.Y. Dec. 10, 2009) (granting plaintiffs leave to amend in part because "the delay in requesting amendment was

out of their control and that they acted as quickly as possible"). Accordingly, Plaintiffs have demonstrated good cause to modify the scheduling order and to permit the filing of a Second Amended Complaint.

### C. Plaintiffs' Request for *In Camera* Review

Plaintiffs ask to submit a "supplemental declaration in camera and under seal to provide the Court with additional detail regarding the CI's unavailability and the retrieval plan." Dkt. No. 103, at 15–16. Plaintiffs' rationale is that protecting the identity of the CI and the sensitive logistics of retrieving the evidence is essential to ensure safety and preserve the chain of custody.

Courts in this District generally disfavor reviewing *ex parte*, *in camera* declarations. *See New York Times Co. v. U.S. Secret Serv.*, 2018 WL 722420, at *6 (S.D.N.Y. Feb. 5, 2018); *Pearlstein v. BlackBerry Ltd.*, 2019 WL 13525091, at *3 (S.D.N.Y. Sept. 27, 2019). Such review is typically permitted only in narrow circumstances, including when statutory schemes require secrecy – such as FOIA exemptions – or when national security or state secrets are implicated. *Id.* Outside the governmental context, courts have occasionally permitted ex parte, in camera submissions, but these instances are rare and generally involve unique circumstances where the court "would have no basis upon which to resolve" the issue otherwise. *Schiller v. City of New York*, 2008 WL 1777848, at *5–6 (S.D.N.Y. Apr. 14, 2008). Even when permitted, to preserve open and public adjudication, courts emphasize that *ex parte* submissions should be allowed only where strictly necessary. *United States v. Bin Laden*, 126 F. Supp. 2d 264, 287 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157 (2d Cir. 2008) (collecting cases).

Plaintiffs, however, have not demonstrated that these narrow, exceptional circumstances apply. Their stated rationale – "[p]rotecting the identity of the CI and the sensitive logistics of

11

retrieving the evidence," Dkt. No. 103, at 15 – does not adequately explain why *ex parte*, *in camera* review is necessary or how disclosure would cause actual harm. Without additional factual enhancement or justification, Defendants are entitled to know the source of Plaintiffs' information. Because Plaintiffs fail to articulate a compelling basis to allow an *ex parte*, *in camera* submission, the request is denied.

## Conclusion

For the foregoing reasons, Plaintiffs' motion for leave to file a second amended complaint is GRANTED. Given that Plaintiffs filed their motion for leave on September 24, 2025, they have had more than ample time to review and process the materials supporting their amendments. Accordingly, Plaintiffs' request that they have 35 more days to file the Second Amended Complaint is unwarranted. The following deadlines reflect the time reasonably necessary to complete the amendment.

Plaintiffs must file their Second Amended Complaint on or before December 19, 2025. Defendants must file their motions to dismiss on or before January 23, 2026. Plaintiffs must file their oppositions on or before February 13, 2026. Defendants must file their replies on or before February 20, 2026.

The Clerk of Court is directed to remove the motions located at Docket Entry Numbers 86, 88, 93, 96, and 102 from the Court's list of open motions.

This constitutes the decision and order of the Court. It is a written decision.

Dated: December 9, 2025

_____
U.S.D.J.

BY ECF TO ALL COUNSEL