# BURWICK LAW
## *1 World Trade Center, 84th Fl.*
## *New York, NY 10007*

January 8, 2026

**VIA ECF**
Honorable Colleen McMahon
Senior United States District Judge
United States District Court, S.D.N.Y.
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 2550
New York, New York 10007

**Re:**   *Aguilar v. Baton Corp. Ltd., et al.;* **Case No. 1-25-cv-880 (CM)**
      **Plaintiffs' Notice of Defendant Pump.fun Misconduct**

Dear Judge McMahon:

Plaintiffs respectfully oppose Defendant Baton Corp. Ltd. d/b/a Pump.fun's request to cancel the hearing currently scheduled for January 13, 2026, regarding Plaintiffs' Notice of Defendant Misconduct (ECF No. 120). Having reviewed Defendants' letter submission and the Declaration of Alexander Golubitsky (ECF No. 125), Plaintiffs write to bring the following matters to the Court's attention.

On December 29, 2025, Plaintiffs' counsel received a letter from defense counsel, attached hereto as Exhibit B, asserting in conclusory fashion that Plaintiffs' filings regarding the ongoing misconduct by Pump.fun and its affiliates "lack[] any good faith and factual basis" and demanding their withdrawal. On December 30, 2025, Plaintiffs' counsel responded privately with a comprehensive ten-page letter accompanied by corroborating exhibits that detail the acts of intimidation, harassment, and incitement to violence perpetrated by Defendants against Plaintiffs, Plaintiffs' counsel, and their employees. That response is attached as Exhibit C.

Among the documented threats was one issued by an official Pump.fun affiliate operating under the handle "@onchainrapist," who posted a direct threat of sexual violence against Plaintiffs' counsel. A screenshot of this threat is included as Exhibit E. The affiliate status of @onchainrapist is well-documented: the account displays a Pump.fun affiliate badge—a green pill—issued by Twitter on behalf of Pump.fun. Alon Cohen, Pump.fun's CEO, has publicly acknowledged this badge as the platform's official affiliate designation. *See* Exhibit D. Following these postings and the Court's intervention, @onchainrapist posted that his affiliation with Pump.fun was terminated. *See* Exhibit E.

Subsequent to Plaintiffs' letter notice to the Court, other Pump.fun affiliates began engaging in similar attacks. One such affiliate posted an image depicting the ISIS-style hostage taking of Plaintiffs' counsel, Max Burwick, accompanied by a threat to kidnap the firm's young female interns. *See* Exhibit A**.**

Plaintiffs' now-filed Second Amended Consolidated Class Action Complaint ("SAC") (ECF No. 126) sets forth additional factual allegations bearing on the nature of the relationship between Pump.fun and affiliates such as @onchainrapist. Plaintiffs' allegations are now supported by counsel's receipt and review of a formal Pump.fun promoter agreement, signed by Defendant Alon Cohen, governing how, when, and what affiliates post on social media platforms—while requiring them to conceal the existence of that contractual relationship from the public.

This information raises serious questions concerning the representations contained in defense counsel's submissions to this Court. Plaintiffs believe these questions are best addressed at the scheduled conference. Plaintiffs are also prepared to submit a more fulsome briefing on the issues identified in Exhibit C should the court prefer. Although Plaintiffs previously requested a meet-and-confer privately with defense counsel to address these issues and avoid the need for Court intervention, no response was received.

Plaintiffs respectfully submit that the hearing should proceed as scheduled in the interest of safeguarding the integrity of these proceedings. Plaintiffs thank the Court for its time and attention to this matter.

Respectfully submitted,

/s/ *Max Burwick*
Max Burwick, Esq.
**BURWICK LAW, PLLC**
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
max@burwick.law

/s/ *Chet B. Waldman*
Chet B. Waldman
**WOLF POPPER LLP**
845 3rd Avenue – 12th Floor
New York, NY 10022
212-759-4600
cwaldman@wolfpopper.com

*Counsel for Plaintiffs*

cc:    *All counsel of record (via ECF)*

# Exhibit A

9:19

♡ 1    44

**Twon | 00.sol** ✅ 🔗 @TwonXBT · 15m    𝕏
🎭 Parody account
Today we (Pumpfun) file a notice
@BurwickLaw @burwick_max

This is your last warning. Cease and desist these attacks against us or we will be forced to take matters into our own hands. We (pumpfun) have funded ISIS militants to infiltrate your law firm and are working from within to dismantle your egregious claims and put an end to them once and for all!

If these attacks continue we will KIDNAP the two very beautiful interns and convert them to Islam!



Duel.com

جيمز رايت فولي
**Max Burwick**
وعائلتي وأحبّائي أن يقوموا على الحكومة الأمريكية التي قتلتني حقاً

**Burwick Law** 🏅 @BurwickLaw · 15h

Pumpdotfun Legal Update

Today we filed a Notice of Defendant Misconduct in Aguilar v. Baton Corp. Ltd., e...

💬    ⟲ 2    ♡ 6    📊 337    ⊕

*janea* ✅ @heyyitsjanea · 19h    𝕏
y'all have ~~GOT to raise your~~ standards

# Exhibit B

**brown**rudnick

STEPHEN D. PALLEY

direct dial: +1.202.536.1766

spalley@brownrudnick.com

December 29, 2025

**VIA EMAIL:  maxb@burwick.law**

Max Burwick
BURWICK LAW, PLLC
43 West 43rd Street, Ste. 114
New York, NY 10036

    **Re: <u>Aguilar v. Baton Corporation Ltd. d/b/a Pump.Fun et al.</u>**

Counsel:

Your correspondence lacks any good faith factual basis. The same is true of the frivolous "Notice" you filed with the Court.  There is not a shred of evidence that our clients had anything to do with the social media posts about which you are complaining. If you had evidence to the contrary, you surely would have provided it (and contacted us first).

As for your personal claims about the use of your name or brand on the pump.fun platform, even if they had any merit (which they do not) they have nothing to do with this litigation.  You are not the plaintiff here.  You cannot purport to represent a class of plaintiffs while trying to press your own personal claims of alleged injury to yourself or your law firm.

We also note your illegal and improper threat of reporting our clients and us to law enforcement and the bar if we do not comply with your demands.  Setting aside the malicious prosecution, defamation, and extortion claims that you open yourself up to, Rule 3.4(e) of the New York Rules of Professional Conduct prohibits a lawyer from "threaten[ing] to present criminal charges solely to obtain an advantage in a civil matter."  You are using this filing for publicity and in an attempt to seek an advantage in this litigation.  That is undoubtedly why you immediately posted about it on social media and contacted the court before you contacted us.

Withdraw the Notice immediately.  If you fail to do so, we will proceed with the Rule 11 sanctions process (and seek our fees for doing so).

Finally, if you continue to make reckless statements about our clients on social media we will ask the Court to place a gag order on this case and preclude you from making any extra-judicial statements about it.  We are not going to litigate this case on Twitter.

**Brown Rudnick LLP** | brownrudnick.com | 1900 N Street NW, Washington, D.C. 20036 | T: 1.202.536.1700 | F: 1.202.536.1701

Max Burwick
December 29, 2025
Page 2

Be governed accordingly.

Stephen D. Palley
**BROWN RUDNICK LLP**


Samson Enzer
**Cahill Gordon & Reindel LLP**
32 Old Slip
New York, NY 10005

# Exhibit C

# BURWICK LAW
### *1 World Trade Center, 84th Fl.*
### *New York, NY 10007*

December 30, 2025

**VIA EMAIL:** SPalley@brownrudnick.com

Brown Rudnick LLP
1900 N Street NW, Suite 400
Washington, DC 20036

**Re: *Aguilar v. Baton Corp. Ltd., et al.*; Case No. 1-25-cv-880-CM-BCM**

Counsel:

We write in response to your recent correspondence and related submissions concerning the Notice of Defendant Misconduct. We do so to correct several material misstatements of law and fact, to place the relevant events in their proper factual context, and to ensure that the record accurately reflects the basis for the actions taken by Plaintiffs' counsel in response to escalating intimidation and safety concerns.

As set forth below, the Notice was not a merits filing and did not seek substantive relief. It was submitted to preserve a record of conduct that included repeated impersonation, doxxing, monetized harassment, and explicit threats of physical and sexual violence, which foreseeably threatens the integrity of these proceedings and chills participation by Plaintiffs, putative class members, witnesses, and counsel. The steps taken by Plaintiffs' counsel were measured, proportionate, and grounded in events corroborated with evidence and which have been documented in multiple police reports.

We also note, for the avoidance of doubt, that certain characterizations in your correspondence concerning ethical rules governing reporting and communications misstate the scope and application of those rules. In particular, Rules of Professional Conduct 8.1 and 4.3 do not prohibit good-faith reporting of threats, intimidation, or misconduct, nor do they impose any advance-notice or meet-and-confer obligation prior to such reporting. We raise this point solely to ensure clarity and to avoid any misunderstanding regarding the governing ethical framework, and not as an accusation or escalation.

Nothing in this response is intended as a waiver of any rights, claims, or remedies. All such rights are expressly reserved. We address your specific assertions below.

## I. Economic Incentive, Monetization, and Platform Control

Before addressing the procedural and ethical assertions in your correspondence, it is necessary to correct a foundational premise that appears repeatedly throughout it—namely, that the conduct at issue reflects isolated actions by unaffiliated third parties for which Defendants bear no responsibility.

Our analysis indicates otherwise.

1

The tokens at issue were created on the Pump.fun platform and they were monetized through it, both for the creators and for Pump.fun itself. The tokens identified to date, including tokens targeting our clients, our law firm, me personally, and members of my family, were created by addresses that received direct payments from Pump.fun in connection with token creation and related platform activity. Based on our current review, Pump.fun paid token creators approximately $662,000 in aggregate in connection with these tokens alone. That figure is not complete, as additional tokens, payment flows, and affiliated accounts remain under review.

We attach as Exhibit A a preliminary list of addresses that created relevant tokens and the amounts paid to those addresses by Pump.fun. This exhibit reflects only what has been identified to date and should not be understood as exhaustive.

The nature of the tokens monetized through the platform is also critical context. The tokens did not merely reference litigation in the abstract. They:
1. targeted named clients and used client identifiers;
2. impersonated our firm and used our firm's name and branding;
3. targeted me personally, including through tokens explicitly referencing sexual violence;
4. targeted members of my family and employees of the firm.

In each instance, Pump.fun both paid creators who launched these tokens, and derived revenue from token activity conducted on the platform.

These facts alone materially undermine the categorical assertions in your correspondence that there is "no evidence" connecting Defendants to the conduct at issue. At a minimum, Pump.fun's payment of creators and receipt of platform revenue establishes economic participation in, and benefit from, the activity that followed.

In addition, and independently, this conduct is corroborated by multiple witnesses and whistleblowers who have produced documents and communications confirming that the behavioral pattern described above, targeted impersonation, harassment, escalation, and monetized provocation, is not accidental or organic.

Rather, these actions were completed at the direction of Pump.fun's founders. These witnesses further confirm that payments were made to specific individuals for engaging in these activities, including the creation and promotion of tokens targeting litigants, counsel, and related parties.

We do not detail that evidence here, both because this correspondence is not a merits submission and because those materials are subject to ongoing review and preservation. But the existence of documentary corroboration from multiple independent sources further defeats any suggestion that the conduct was random, unaffiliated, or unknown to Defendants.

Taken together, the economic record and the whistleblower evidence establish, at a minimum, that:
1. The conduct was at the direction of Pump.fun leadership;
2. The conduct occurred within Pump.fun's ecosystem;
3. The conduct was financially incentivized by Pump.fun;
4. The conduct generated revenue for the platform; and,

5. The conduct followed a pattern consistent with direction or ratification, not coincidence.

At present, we do not ask you or the Court to accept any ultimate conclusions regarding liability. The point is narrower and procedural: Defendants cannot plausibly disclaim responsibility for conduct that they monetized, paid for, and, according to multiple witnesses, directed. This context explains why the steps we took (documentation, preservation demands, reporting of threats, and notice to the Court) were reasonable, necessary, and proportionate responses to escalating, monetized intimidation rather than the "improper threats" your correspondence suggests.

This economic and evidentiary context also informs the legal issues addressed below, including the inapplicability of Rule 3.4(e), the absence of any obligation to provide advance notice or meet-and-confer before addressing ongoing intimidation, and the objective reasonableness of preserving a record where platform-paid harassment was escalating rather than abating.

## II. Preliminary Procedural and Legal Corrections

Against the foregoing factual and economic backdrop, several assertions in your correspondence reflect material misstatements of law and procedure. We address them briefly and directly below.

### A. Rule 3.4(e) Is Not Implicated

Your correspondence characterizes our actions as an "illegal and improper threat" to report Defendants or their counsel to law enforcement and the bar, citing Rule 3.4(e) of the New York Rules of Professional Conduct. That characterization is incorrect.

Rule 3.4(e) prohibits threatening to present criminal charges solely to obtain an advantage in a civil matter. It does not prohibit actual reporting of threats or criminal conduct, reporting undertaken for safety or evidentiary preservation, or reporting designed to protect the integrity of judicial proceedings.

Here, no "threat" was made. Two separate police reports were filed in response to credible and escalating threats, one in January of 2025 (Complaint # 2025-108-00789) and one in December of 2025 (Complaint #: 2025-1001-10610).

The first police report was filed immediately following the initiation of this litigation, after individuals associated with the conduct at issue made physical threats, visited my personal neighborhood, attempted to geolocate my movements, appeared at our law firm's address (which is also the address of the City Bar), and issued threats directed at me and the firm.

The second police report was filed immediately following the most recent round of threats, which included explicit threats of violence and sexual assault directed at me and at employees of the firm.

These reports were filed to address safety risks, document criminal conduct, and preserve evidence. No demand of any kind was made in connection with these reports.

Moreover, the existence of monetized, platform-paid harassment and corroborating whistleblower evidence independently defeats any suggestion that reporting was undertaken solely for leverage. Rule 3.4(e) is therefore inapplicable on its face.

3

### B.  Rule 11 Assertions Misstate Both Procedure and Standard

Your correspondence repeatedly threatens Rule 11 sanctions and demands immediate withdrawal of the Notice. Those assertions misstate both Rule 11's procedural requirements and its substantive standard.

As you know, Rule 11 requires service of a motion and a mandatory 21-day safe-harbor period before any filing with the Court. Demands for immediate withdrawal, unaccompanied by a served motion, are inconsistent with the Rule.

Substantively, Rule 11 sanctions require objective unreasonableness after reasonable inquiry. Where, as here, counsel documents repeated threats, physical intimidation, geolocation, impersonation, monetized harassment, multiple police reports, and corroborating witnesses, the filing of a notice to preserve rights and inform the Court cannot plausibly be characterized as frivolous or undertaken for an improper purpose.

### C.  Rule 3.6 and "Gag Order" Assertions Are Unsupported

Your suggestion that public discussion of these issues warrants a gag order or violates Rule 3.6 is similarly misplaced.

Rule 3.6 prohibits extrajudicial statements that pose a substantial likelihood of materially prejudicing an adjudicative proceeding. It does not prohibit accurately describing public filings, responding to reputational harm, or explaining safety-driven actions taken by counsel.

There is no jury, no imminent trial, and no identified statement that could plausibly taint adjudication. Public disclosure occurred only after prior experience demonstrated that private notice and silence resulted in escalation rather than cessation of the conduct.

### D.  The "You Are Not the Plaintiff" Argument Mischaracterizes the Filing

Your correspondence asserts that counsel "is not the plaintiff" and therefore may not raise the issues described. That assertion mischaracterizes the Notice.

The Notice did not assert personal causes of action, seek damages, or request merits relief on behalf of counsel. It notified the Court of retaliatory conduct directed at plaintiffs, putative class members, witnesses, and counsel that foreseeably chills participation in the litigation and undermines its integrity. Courts routinely permit and expect counsel to alert them to such conduct.

### E.  No Rule Required Prior Notice or Meet-and-Confer

Finally, your suggestion that we were obligated to contact defense counsel, meet and confer, or submit private takedown requests before addressing these issues has no basis in the Federal Rules or the Rules of Professional Conduct.

Defendants were already on notice of materially identical misconduct. Immediately following the initiation of this litigation, we issued a public statement and sent a cease-and-desist letter addressing your clients' impersonation, harassment, and misuse of our firm's name and likeness. That notice resulted in temporary removal of content—but did not prevent subsequent escalation.

Having previously warned Defendants and observed that such warnings were met with renewed and more aggressive conduct, no rule required us to repeat that process before

addressing renewed threats of violence and intimidation through appropriate channels.

### III.    Chronology of Misconduct and Escalation

#### A.    Public Doxxing and Incitement by a Pump.fun Investor

Shortly after this action was filed, a prominent Pump.fun investor, Mike Dudas, publicly disseminated identifying information concerning Max Burwick's home address in a manner reasonably understood as doxxing, and did so in a context that encouraged hostility toward Plaintiffs' counsel and the firm. This was not ordinary commentary on a public lawsuit; it was an effort to escalate the dispute from the courthouse to the real world by exposing counsel's personal location and inviting intimidation.

In the same timeframe, Mr. Dudas amplified that message by publicly framing Plaintiffs' counsel as "chasing lawyers" and urging his audience to "reject" them, accompanied by imagery invoking the Spartan battle at Thermopylae—an unmistakable call for coordinated resistance and intimidation rather than lawful disagreement with the merits of the action. The clear purpose and foreseeable effect was to deter prosecution of this case through fear of retaliation and reputational harm.

We attach as Exhibits B and C screenshots of these public posts.

#### B.    Token Impersonation and Offline Intimidation Campaign

During the same initial post-filing period, Pump.fun's platform was used to mint and promote a series of tokens impersonating Plaintiffs' counsel and targeting private individuals. This included tokens using the Burwick Law name and branding, tokens referencing co-counsel Wolf Popper, tokens purporting to raise funds for Rachel Burwick, and tokens targeting Neila Burwick. This also included tokens created that doxxed the lead plaintiff Kendall Carnahan, including his business address, Instagram, location, and educational history. The same was done to the other lead plaintiff Diego Aguilar. These tokens exploited the platform's token-creation and promotion mechanics to create false associations, fuel harassment, and intimidate through reputational harm and personal targeting. Additionally, pump.fun promoted these tokens to increase revenue and visibility of the tokens.

In parallel, a website was launched ostensibly to "save" Pump.fun, which was used to organize and amplify intimidation efforts offline. As part of that campaign, individuals traveled to Max Burwick's neighborhood, took photographs identifying the area where he resides, and disseminated those images online. Individuals also appeared at Plaintiffs' counsel's law firm address (located at the City Bar) where they left documents, photographed those materials, and circulated the photographs publicly, in each instance with the evident intent to intimidate counsel and disrupt the firm's operations.

We attach as Exhibits D, E, F and G screenshots of these public posts.

#### C.    Burwick Law's Response and Resulting Takedowns

As a direct result of the IP misappropriation and the physical intimidation described above, Burwick Law responded in three ways.

First, Burwick Law sent a cease-and-desist letter to Defendants demanding that they cease the unauthorized use of the firm's name, branding, and related identifying materials, and

that they take steps to remove and prevent further impersonation and targeted harassment through the Pump.fun platform.

Second, because prior experience demonstrated that Defendants and their ecosystem often do not respond unless the conduct is made public, Burwick Law issued a public statement, including through PR, reflecting the cease-and-desist demands and disclaiming any affiliation with the impersonation tokens.

Third, Max Burwick filed a police report with the NYPD's 108th Precinct arising from the physical threats and real-world intimidation activity directed at him and the firm.

Following these actions, Defendants removed the Burwick Law impersonation tokens and the tokens associated with Wolf Popper and Max Burwick's family members, confirming both that the platform had the ability to mitigate this conduct and that Defendants were on notice of the nature and seriousness of the misconduct.

We attach as Exhibits H a copy of that prior letter and the public statement by Burwick Law.

### D. Re-Emergence of Targeted Token Activity Following the First Amended Complaint

When Plaintiffs filed the First Amended Complaint, the same retaliatory pattern re-emerged. At or immediately following that filing, new tokens were created on the Pump.fun platform that again targeted plaintiffs in this matter, Burwick Law, Max Burwick personally, and co-counsel Wolf Popper.

The recurrence of the same categories of impersonation and targeting (after prior takedowns, prior notice, and prior law enforcement involvement) demonstrates that this conduct was not accidental, isolated, or unavoidable. Rather, it reflects a repeated and predictable response to milestone events in litigation.

It is also worth noting that this recurrence was entirely preventable. A basic platform safeguard, such as restricting the use of specific words or names previously identified as abusive or impersonating, would have immediately prevented the creation of additional tokens using Plaintiffs' names, firm name, and client identifiers. The failure to implement even minimal keyword restrictions following earlier incidents and takedowns allowed the same conduct to resume unabated.

This renewed activity further confirmed that Defendants had both notice of the misconduct, and the technical ability to mitigate it. Defendants failed to take reasonable steps to prevent repetition, even after the issue had already escalated to real-world intimidation and law enforcement involvement.

We attach as Exhibit I screenshots of that activity.

### E. Post-15(a)(2) Ruling Escalation: Renewed Token Targeting and Threats of Physical and Sexual Violence

Most recently, following the Court's ruling granting leave to amend pursuant to Rule 15(a)(2), the retaliatory pattern escalated both in volume and severity:

#### 1. Renewed Token Targeting of Clients and Counsel

After the 15(a)(2) ruling, additional tokens were created on the Pump.fun platform again targeting Burwick Law, Max Burwick, and Plaintiffs' clients in this matter (including two identifiable clients). This renewed activity mirrored prior retaliation following earlier litigation milestones and further reinforced that the conduct was recurring, predictable, and tied to developments in this case.

### 2.   Escalation to Explicit Threats of Physical and Sexual Violence

Unlike prior episodes which centered primarily on impersonation, doxxing, and reputational targeting, this post 15(a)(2) episode escalated to explicit threats of physical and sexual violence.

These threats were made by accounts displaying Pump.fun affiliate badges on X/Twitter. As we will allege, these affiliate actors form part of the broader enterprise conduct at issue in this litigation, including conduct we will plead as part of the Pump.fun RICO enterprise.

The threats included, among other things:

1. Threats of physical harm directed at Max Burwick, including posts depicting or brandishing firearms;
2. Threats explicitly referencing the rape of Max Burwick, including posts containing images purporting to depict sexual violence against him;
3. Threats directed at female employees of Burwick Law, who are young women in their twenties, with the threats focusing primarily on sexual violence toward those employees; and,
4. Images and posts depicting Max Burwick facing extreme violence, including imagery of beheading, coupled with further threats of sexual enslavement directed at the firm's young female employees.

This was not rhetorical invective or ordinary criticism of litigation. It was targeted, identity-based intimidation aimed at counsel, employees, and litigants, with an obvious and foreseeable chilling effect on participation in this case.

### 3.   Safety Reporting and Court Notice

In response to this escalation, Max Burwick filed a second police report with the NYPD 1st Precinct. Plaintiffs also submitted documentation to the Court to preserve the record and to ensure the Court was aware of conduct that threatens the integrity of these proceedings.

We attach as Exhibit J screenshots documenting this conduct.

## IV.   Direct Responses to Letter Based Allegations

### A. Allegation That the Notice Lacked a Good-Faith Factual Basis or Was "Frivolous"

Your assertion that the Notice lacked any good-faith factual basis is incorrect.

The Notice was grounded in a documented pattern of conduct that includes real-world intimidation, impersonation, doxxing, monetized harassment, and explicit threats of physical and sexual violence. That record includes multiple police reports filed in response to escalating threats, repeated creation of impersonation tokens targeting clients, counsel, and family members, economic payments by Pump.fun to token creators responsible for that conduct, and

corroboration from witnesses and whistleblowers who have produced documents confirming that the behavior observed here is neither random nor unaffiliated.

A filing that documents repeated intimidation tied to litigation milestones, safety reporting to law enforcement, monetized impersonation through Defendants' platform, and corroborating evidence cannot plausibly be characterized as frivolous or lacking a good-faith basis.

### B. Assertion That There Is "Not a Shred of Evidence" Connecting Defendants to the Conduct

The categorical claim that there is "not a shred of evidence" connecting Defendants to the conduct at issue is unsupportable.

At a minimum, the conduct occurred on Defendants' platform, was economically incentivized through payments made by Pump.fun to token creators, and generated revenue for Pump.fun through token activity. In addition, threats were issued by accounts operating as Pump.fun affiliates, including accounts displaying Pump.fun affiliate badges. Further, multiple witnesses and whistleblowers have produced documentary evidence confirming that this pattern of impersonation, harassment, and escalation was encouraged and directed at the founder level, with payments made to individuals for engaging in similar conduct.

The Notice did not ask the Court to adjudicate ultimate liability; it preserved a record of conduct that is economically connected to Defendants, repeatedly timed to litigation milestones, and corroborated by independent sources.

### C. Claim That Counsel Was Obligated to Contact Defense Counsel or Meet and Confer First

There is no procedural or ethical rule that requires prior notice to defense counsel, a meet-and-confer, or submission of private takedown requests before addressing the conduct described.

Defendants were already on notice. Immediately following the initiation of this litigation, Burwick Law issued a cease-and-desist addressing impersonation and harassment, which was also disseminated publicly. Defendants responded by removing certain impersonation tokens, demonstrating both notice and capability. Despite that notice, the same conduct resumed, escalated, and ultimately culminated in explicit threats of physical and sexual violence.

Under those circumstances, no further private warning was required before reporting threats to law enforcement, preserving evidence, or notifying the Court of conduct threatening the integrity of the proceedings.

### D. Assertion That Counsel Improperly Raised "Personal Claims" or Acted as a Plaintiff

The assertion that counsel improperly raised personal claims or attempted to act as a plaintiff mischaracterizes the Notice.

The Notice did not assert causes of action on behalf of counsel, seek personal damages, or request merits relief. It documented retaliatory conduct directed at plaintiffs, putative class members, witnesses, and counsel that foreseeably chills participation in the litigation and

undermines its integrity. Courts routinely expect counsel to alert them to such conduct, particularly in putative class actions where intimidation can distort participation and evidence gathering.

### E. Allegation That Reporting to Law Enforcement or the Bar Was an "Illegal or Improper Threat"

No threat was made.

Two police reports were filed in response to real-world intimidation and escalating threats: one immediately following initiation of the litigation, and a second following the most recent escalation that included explicit threats of physical and sexual violence. Those reports were filed to address safety risks, document criminal conduct, and preserve evidence. No demand was conditioned on reporting, and no concession was sought in exchange for silence. Reporting credible threats of violence is not prohibited, and the existence of repeated intimidation, monetized harassment, and corroborating evidence independently defeats any suggestion that reporting was undertaken "solely" to obtain litigation advantage.

### F. Claim That the Notice Was Filed for Publicity or Improper Purpose

The Notice was filed to preserve a record of escalating intimidation, to ensure the Court was aware of conduct threatening the integrity of the proceedings, and to reserve rights should that conduct continue.

Public explanation of the filing occurred only after prior experience demonstrated that silence and private notice resulted in escalation rather than cessation. Accurately describing a public filing and disclaiming affiliation with impersonation tokens does not transform safety-driven conduct into a public relations exercise.

### G. Threats of Rule 11 Sanctions and Demands for Immediate Withdrawal

Your repeated threats of Rule 11 sanctions and demands for immediate withdrawal misstate both Rule 11 procedure and its substantive standard.

Rule 11 requires service of a motion and a mandatory 21-day safe-harbor period. Substantively, sanctions require objective unreasonableness after reasonable inquiry. Given the documented pattern of intimidation, multiple police reports, monetized impersonation, affiliate involvement, and corroborating witnesses, the Notice cannot plausibly be characterized as frivolous or sanctionable.

### H. Threats to Seek a Gag Order

There is no basis for a gag order.

There is no jury that could be tainted, no imminent trial, and no identified statement that could materially prejudice adjudication. Publicly describing court filings and safety-driven actions is not prohibited. Threats of a gag order invert the real concern presented here: intimidation of litigants, witnesses, and counsel, not speech about that intimidation.

## V. Request for Withdrawal and Reservation of Rights

In light of the factual record summarized above and the material mischaracterizations of law and fact contained in your correspondence and court submission, we respectfully request that

9

Defendants withdraw their recent filings that characterize the Notice as frivolous, sanctionable, or improper.

Those filings were submitted without acknowledgment of the documented history of intimidation, multiple police reports, monetized impersonation, and corroborating evidence now known to exist, and they unnecessarily escalate a matter that implicates safety and litigation integrity rather than motion practice.

We remain willing to address these issues professionally and without further burdening the Court. At the same time, we expressly reserve all rights on behalf of Plaintiffs and counsel, including the right to seek appropriate relief should the conduct described above continue or should further mischaracterizations be advanced.

Nothing herein is intended as a waiver of any rights, claims, or remedies, all of which are expressly reserved.

/s/ Max Burwick
Max Burwick
1 World Trade Center, *84th Fl.*
New York, NY 10007
(646) 762-1080
max@burwick.law

10

# Exhibit D



# Exhibit E

ocr 🟥 ✅ 🟩
@onchainrapist

"my law fir...

i'm going to rape you max



Max Burwick ✅ @burwick_max · 2m
Replying to @onchainrapist
My law firm, Burwick Law, represents plaintiffs in pending federal litigation involving Pumpdotfun.

Personal attacks directed at counsel are not appropriate. This communicatio...

2:53 PM · Dec 22, 2025 · **10** Views

