## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DIEGO AGUILAR, KENDALL CARNAHAN AND MICHAEL OKAFOR, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BATON CORPORATION LTD, d/b/a PUMP.FUN, ALON COHEN, DYLAN KERLER, NOAH BERNHARD HUGO TWEEDALE, SOLANA LABS INC., SOLANA FOUNDATION, ANATOLY YAKOVENKO, RAJ GOKAL, DAN ALBERT, AUSTIN FEDERA, LILY LIU and LEAD KOL DOES 1-25**<br><br>**Defendants.** | **Case No.: 1:25-cv-00880 (CM)**<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

**Table of Contents**

**PRELIMINARY STATEMENT**..................................................................................................5

**PARTIES**................................................................................................................................15

**JURISDICTION AND VENUE**..............................................................................................20

**FACTUAL ALLEGATIONS**.................................................................................................. 22

    **I. THE SOLANA-PUMP.FUN RACKETEERING ENTERPRISE**...............................22

        A. The Enterprise Operated Through a Chain of Command with Defined Roles, Layered Information Access, and Centralized Control.......................................................22

            1. Leadership.............................................................................................................24

            2. Operations Command............................................................................................ 25

            3. Operational Cells.................................................................................................. 25

            4. Operators...............................................................................................................26

            5. Associates: Friends and Family Networks............................................................26

        B. The Game: Rigged Exit Liquidity Gambling..............................................................28

            1. Exit Liquidity Gambling: The Underlying Game...................................................28

        2. What Makes It Rigged: The Structural Prerequisites for Guaranteed Insider Profit..... 30

            3. The Prerequisites Combined..................................................................................36

        C. Repeatable Operational Tactics of Rigged Exit Liquidity Gambling...........................37

            1. Phase One: Target Selection and Campaign Planning............................................37

            2. Phase Two: Bundling and Pre-Positioning........................................................... 40

            3. Phases Three Through Five: Promotional Deployment..........................................40

            4. Phase Six: Managed Exit...................................................................................... 44

            5. Repeatability........................................................................................................ 44

        D. Communications: How the Enterprise Coordinated in Private, Promoted in Public, and Enforced Compliance..................................................................................................45

            1. The Communication System..................................................................................45

            2. The Tools............................................................................................................. 46

            3. Information as Control...........................................................................................47

            4. Mutual Dependence: What Bound KOLs to the Enterprise....................................48

            5. Enforcement: The Power to Destroy What Made Participants Valuable.................50

        E. The Technical and Marketing Infrastructure Underlying the Enterprise's Operations..54

            1. Only Possible on Solana........................................................................................ 54

            2. Coordination........................................................................................................ 58

            3. The Solana Network............................................................................................. 60

            4. Jito Labs.............................................................................................................. 62

    **II. THE NOSTALGIA CAMPAIGN AND COPE TOKEN CASE STUDY**....................64

A. The Operations Structure in Action.................................................................64

1. Leadership Identified COPE as a Profit Opportunity and Authorized the Campaign...........................................................................................................64

2. The Developer Was Directed to Curate a False History Before Promotion Began.............................................................................................................. 65

3. Operations Command Translated the Directive into Wallet Assignments and Coordinated Pre-Positioning.........................................................................66

B. The Rigged Game in Action...........................................................................67

1. Supply Control: Insiders Bundled COPE Before Any Public Promotional Activity............................................................................................................ 67

2. Demand Manufacturing: Coordinated Promotion Created the Appearance of Organic Discovery........................................................................................ 67

C. The COPE Campaign Demonstrates the Enterprise's Core Fraud................81

**III. THE PREDICTABLE RESULT: PLAINTIFFS WERE INJURED TO THE TUNE OF BILLIONS..........................................................................................................82**

A. From Case Study to Systemic Fraud..............................................................82

B. Plaintiffs' Transactions Were the Enterprise's Only Revenue Source........... 83

C. Retail Suffered Billions in Losses..................................................................84

D. Billions Were Made as a Result of the Scheme............................................. 87

1. Pump.fun Collected Hundreds of Millions in Platform Fees and Moved Those Funds Off Chain.....................................................................................87

2. Solana's Token Holdings and Revenue Surged into the Billions.............. 88

3. Jito Made Hundreds of Millions in Tips....................................................89

**IV. THE COPE CAMPAIGN DOESN'T STAND ALONE: THE ENTERPRISE'S PATTERN OF FRAUD, MISREPRESENTATION, AND DELIBERATE DESIGN..... 90**

A. The Enterprise Made Consistent Misrepresentations and Omissions That Induced Participation..........................................................................................90

1. Marketing Promised Impossible Wealth Opportunities While the Enterprise's Design Guaranteed Retail Would Lose..........................................91

2. "Fair Launch" and "Rug-Pull Proof" Representations Were Pervasive While the Bundling System Made Fair Launches Structurally Impossible...............100

B. The Enterprise's Senior Operators Designed the Platform to Operate as a Rigged Casino................................................................................................... 103

C. Internal Team Chats Reveal the Platform Was Deliberately Designed to Maximize Addictive Trading and Fee Revenue...................................................104

1. The Slot Machine Variants.....................................................................107

2. Leadership Publicly Acknowledged the Platform Was a Casino............109

3. Solana Leadership Embraced the Gambling Narrative...........................111

4. Pump.fun's Bounty System Incentivized Explosive Short-Term Speculation.......114

D. The Trading Terminal Façade Disguised the Rigged Casino as a Regulated Market.114

E. The Interface Simulated Institutional Trading Platforms..............................................114

F. The Interface Displayed Market Data That Mimicked Regulated Securities Markets 115

    1. The Interface Provided Due-Diligence Metrics That Simulated Institutional Analysis....................................................................................................................115

    2. The Order Execution Interface Mirrored Sophisticated Equities Platforms..........116

    3. In Contrast to a Sophisticated Equities Platform, Pump.fun Offers No Meaningful Protections.........................................................................................116

**V. DELIBERATE COMPLIANCE FAILURES ENABLED THE ENTERPRISE'S ILLEGAL OPERATIONS.................................................................................................. 117**

A. Pump.fun Operated Without KYC/AML, Sanctions Screening, or Age Verification by Design..................................................................................................................... 117

    1. Anonymous Wallet-Based Access Required No Identity Verification.................. 117

    2. Minors Played on Pump.fun Without Age Checks................................................ 118

B. The Platform Hosted Unverified Pornographic Content Without Age-Gating or Identity Controls......................................................................................................... 118

C. High-Profile Laundering Episodes Demonstrated Capacity to Intervene and Choice Not To............................................................................................................ 124

D. Defendants Possessed Moderation Capabilities and Chose Not to Protect Users...... 125

E. Internal Communications Expose Leadership's Knowledge and Intent...................... 129

    1. Leadership Designed the Livestream Feature to Incentivize Dangerous Behavior.................................................................................................................129

    2. Leadership Developed and Implemented Features which Resembled a Multi-Level Marketing Scheme.................................................................................132

    3. Miscellaneous Evidence of Scienter from Team Chats......................................... 135

**VI. PUMP.FUN SOLD CERTAIN UNREGISTERED SECURITIES............................137**

A. Pump.fun's Role as Issuer and Seller.........................................................................137

B. Plaintiffs Do Not Contend That All Pump.fun Issued Tokens Are Securities............ 137

C. Pump.fun Sold as Investment Contract Securities...................................................... 138

D. Pump.fun's Fees, and Structural Exploitation............................................................ 139

**CLASS ACTION ALLEGATIONS......................................................................................141**

**CAUSES OF ACTION........................................................................................................ 144**

COUNT I: Conduct of Enterprise Affairs Through a Pattern of Racketeering Activity (18 U.S.C. § 1962(c)).................................................................................................144

COUNT II: Conspiracy to Violate RICO (18 U.S.C. § 1962(d)) .........................................168

COUNT III: Violation of Section 12(a)(1) of the Securities Act of 1933............................ 172

COUNT IV: Control Person Liability Under Section 15 of the Securities Act of 1933........180

COUNT V: Unjust Enrichment............................................................................................182

**PRAYER FOR RELIEF......................................................................................................182**

**JURY DEMAND.................................................................................................................186**

**PRELIMINARY STATEMENT**



1. The Solana-Pump.Fun Racketeering Enterprise is a coordinated criminal organization that constructed and operated a rigged, unlicensed gambling operation under the guise of a legitimate "memecoin" marketplace, secretly predetermined who would win and who would lose, and extracted enormous profits from retail participants who never had a fair opportunity to succeed.

2. Plaintiffs are not 'crying in the casino.' Rather, their injuries are the result of a calculated

and deliberate scheme.

3. Through meticulous planning, the defendants built the perception of an open and decentralized ecosystem in which anyone could participate and potentially profit.

4. In reality, defendants created a closed and centrally controlled rigged casino, which controlled the supply of tokens, manufactured artificial demand and timed their exits to maximize gains from unsuspecting victims.

5. The enterprise at the center of this case bears all the hallmarks of a traditional organized crime syndicate. Like modern corporate criminal enterprises routinely prosecuted under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), it was hierarchical, role-driven, and purpose-built to generate illicit profits through coordinated unlawful conduct. Also like modern criminal enterprises, defendants promoted violence, sexual violence, race-based discrimination, and drug use. It is unsurprising then that when Defendants appeared in public to promote this platform, for example on podcasts, they did so donning masks to conceal their identities or with requirements that their faces be blurred.

6. At the top of the enterprise sat a small group of decision-makers who designed the system, controlled its infrastructure, and determined which tokens would be promoted, and monetized. Beneath them operated layers of management and execution, including operational coordinators, wallet operators, promoters, and enforcement actors, each with defined responsibilities and access to information calibrated to their role.

7. The enterprise functioned through division of labor, information asymmetry, and strict control of timing. Strategic decisions flowed downward. Profits flowed upward. Participants at each level understood their function within the broader scheme, even as

the public was presented with a façade of decentralization, spontaneity, and organic market activity.

8.  The enterprise existed for a single overriding purpose: to operate an unlicensed rigged gambling operation disguised as a fair and open memecoin marketplace, and to extract wealth from retail participants by secretly controlling every material aspect of the game.

9.  The Enterprise leadership team made executive decisions determining the key business operations for the enterprise, including selection of winning tokens, retention and management of personnel, and the marketing narratives.

10. Lower-tiered members of the organization conducted sequenced marketing operations, recruited other promoters, managed online communities, and deployed tools to promote tokens across multiple internet platforms.

11. The Solana Defendants coordinated with and directly supported the Pump.fun leadership, built the technical infrastructure for rigged memecoin gambling, shaped the public narrative, and shared in the profits.

12. Beyond direct coordination, both Pump.fun and Solana were financially dependent on the other.

13. Solana was a languishing blockchain that had been severely damaged by the November 2022 collapse of FTX—a major cryptocurrency exchange whose affiliated entities had been among Solana's largest investors and supporters—and needed a new source of blockspace sales.

14. While marketing themselves as the future of finance, few beyond speculators supported Solana's technology; it was not until their relationship with Pump.fun that their technology found, in the words of the Solana founder, product-market fit.

7

15. Similarly, Pump.fun needed a blockchain with execution speed and specific functionalities like one-click purchases to operate its exit liquidity gambling scheme. Solana executives shifted development priorities to meet Pump.fun's needs.

16. Defendants publicly framed their activities as part of an emerging, decentralized financial ecosystem—one characterized by open access, spontaneous market interest, and speculative risk knowingly accepted by participants.

17. In practice, however, the enterprise functioned as a highly centralized and rigged casino. Tokens were created, launched, promoted, and abandoned in rapid succession, each cycle inviting participants to wager capital on short-term price movements driven not by independent market forces, but by the enterprise's own decisions.

18. The primary game offered by the casino was not the memecoins themselves; it was exit liquidity gambling, a combination of multi-level marketing and musical chairs.

19. The purpose, often called PvP or player vs. player, is to lure the next unsuspecting victim onto the merry-go-round, where each investor purchases at a higher price in the hope that another will follow.

20. Simple in form, this game produced dramatic returns for early investors.

21. Exit-liquidity gambling is plainly, on its face, gambling. However, operation of an unlicensed gambling business alone is not the gravamen of this action. The existence of a speculative or even unlawful wagering environment is not, by itself, the direct cause of Plaintiffs' injuries.

22. What matters is not merely that defendants ran a casino, but that they secretly controlled the conditions of play while representing to the public that outcomes were governed by chance and open competition. Participants believed they were engaging in risky but fair

8

speculation, where losses were possible but wins were attainable on equal footing. That belief was essential to the enterprise's success—and it was false.

23. The unlicensed gambling operation provided the entry point. The rigging of that operation, and the false representations used to sustain it, are what caused the harm.

24. The Enterprise rigged the game through three interlocking mechanisms.

25. First, the enterprise exercised supply control. Tokens were accumulated by insiders before public promotion, at prices and quantities unavailable to retail participants.

26. Leadership determined which tokens would be supported, when they would be introduced to the public, and how much circulating supply would be released at any given time. This advance positioning guaranteed insiders a structural advantage before any retail participation began.

27. Second, the enterprise engaged in demand manufacturing. What appeared to be organic interest—viral promotion, influencer enthusiasm, and spontaneous community excitement—was in fact coordinated, scripted, and often paid.

28. Promotional narratives were deployed according to plan, not passion, creating artificial momentum that induced retail participants to enter positions under the false belief that they were responding to genuine market demand.

29. Third, the enterprise executed timed and managed exits. Insiders did not sell haphazardly or independently. Sales were sequenced to avoid triggering immediate price collapse, allowing profits to be extracted gradually while maintaining the illusion of stability. By the time retail participants perceived downward movement, insiders had already exited or substantially reduced their exposure.

30. Together, these mechanisms ensured that outcomes were not uncertain to those running

9

the operation. Insiders knew when tokens would be promoted, when demand would peak, and when exits would occur. Retail participants knew none of this. They entered transactions believing they were wagering in a high-risk but fair environment, when in fact they were providing liquidity to a pre-orchestrated extraction scheme.

31. Separate and apart from the rigging of the gambling operation, defendants engaged in a sustained campaign of material misrepresentations and omissions designed to induce public participation in the enterprise.

32. These false statements were not peripheral marketing puffery; they went to the core question any reasonable participant faced before engaging in memecoin trading—whether the system was fair, whether insiders possessed undisclosed advantages, and whether retail participants had a genuine opportunity to profit.

33. Pump.fun marketed itself as the solution to the abuses that had plagued memecoin markets: insider trading, coordinated rug pulls, and sudden liquidity withdrawals. Defendants promised 'fair launches,' equal access, and protection from manipulation. Instead, the Enterprise industrialized the very practices it claimed to eliminate.

34. Defendants affirmatively represented that their launches were "fair," that insiders did not receive preferential access, that tokens were not subject to manipulation or coordinated dumping, and that the platform eliminated the very abuses that had made memecoin untrustworthy.

35. These representations were repeated across promotional materials, social media, influencer campaigns, and community communications, and they were central to the narrative that distinguished defendants' operation from prior scams.

36. Those representations were false. As described above, insiders did receive preferential

10

access. Supply was accumulated in advance. Promotion was coordinated. Exits were managed.

37. The very practices defendants claimed to have eliminated were embedded into the design of the system itself. The enterprise did not mitigate insider advantage; it institutionalized it.

38. These misrepresentations were material. A reasonable participant deciding whether to purchase a newly launched memecoin would consider it highly significant whether insiders controlled supply, coordinated promotion, and planned exits in advance.

39. Defendants' assurances of fairness, transparency, and equal opportunity were not ancillary; they were the reason participants believed engagement was worth the risk.

40. Plaintiffs and class members relied on these representations in entering transactions they otherwise would not have entered, or would not have entered on the same terms. The misstatements created a false sense of legitimacy and safety that masked the true nature of the operation and encouraged repeated participation across multiple token launches.

41. Importantly, this scheme does not depend on characterizing memecoin trading as gambling or on proving that the activity was unlawful per se.

42. Even if the enterprise had operated within a lawful speculative market, the deliberate misrepresentation of insider control, fairness, and launch mechanics independently constitutes actionable fraud. Participants were entitled to truthful information about whether the playing field was level. They were denied that truth.

43. The resulting harm flowed directly from that deception. Plaintiffs paid transaction fees, provided liquidity, and suffered losses in reliance on defendants' false assurances that the system was not rigged and that insiders were not exploiting undisclosed advantages.

44. Those losses were not the product of informed risk-taking; they were the foreseeable consequence of a scheme that depended on deception to function.

45. The enterprise did not rely solely on deception to sustain itself. Like traditional organized criminal operations, it employed intimidation, harassment, and coercive tactics to maintain discipline, suppress dissent, and protect the flow of profits.

46. As the operation scaled, the enterprise became increasingly dependent on secrecy and compliance. Insiders, promoters, and operational actors possessed information that, if disclosed, would have exposed the rigging of the system and undermined public participation.

47. Critics, whistleblowers, and dissatisfied participants likewise posed a threat to the enterprise's continued profitability. The response to those threats was not transparency or reform, but enforcement.

48. Defendants and their agents engaged in coordinated campaigns to silence or punish individuals who questioned the fairness of token launches, raised concerns about insider activity, or attempted to disclose internal practices.

49. These efforts included harassment, public shaming, doxxing, threats, and organized online attacks designed to intimidate critics into silence and to deter others from speaking out.

50. These enforcement actions were not isolated or spontaneous. They followed recognizable patterns, were executed by individuals associated with the enterprise, and were deployed when criticism risked disrupting ongoing or future token launches.

51. The timing and coordination of these actions demonstrate that they were undertaken in furtherance of the enterprise's objectives, not as personal disputes or unrelated

12

misconduct.

52. The intimidation served multiple functions. It discouraged internal defections by signaling the consequences of disloyalty. It suppressed external scrutiny by making critics targets. And it reinforced the false public narrative that the enterprise was legitimate, fair, and free from manipulation. In this way, coercion operated as the enforcement arm of the scheme, ensuring that deception could continue uninterrupted.

53. Such conduct mirrors the enforcement mechanisms historically associated with racketeering enterprises. While the tools differed—digital harassment instead of physical violence—the purpose was the same: to maintain control, preserve secrecy, and protect illicit revenue streams.

54. The use of intimidation and harassment further distinguishes this case from ordinary market misconduct. Legitimate businesses do not need to silence critics through coordinated attacks. Fair markets do not require threats to function. The presence of these enforcement mechanisms underscores that the enterprise understood its activities to be wrongful and took affirmative steps to prevent exposure.

55. These acts of intimidation constitute additional racketeering activity and form part of the pattern of unlawful conduct that gives rise to liability in this action.

56. The enterprise's core design choices—anonymity, lack of oversight, absence of safeguards, and deliberate evasion of regulatory constraints—did not merely enable the rigged gambling scheme described above. They also created an environment in which additional criminal conduct was foreseeable, recurrent, and, in some instances, affirmatively exploited by the enterprise.

57. Defendants chose to operate without meaningful identity verification, age restrictions, or

13

content controls. They facilitated anonymous participation at scale, encouraged rapid and repeated transactions, and prioritized growth and volume over compliance or user protection. These decisions were not incidental. They were essential to the enterprise's ability to attract liquidity, avoid scrutiny, and maintain operational flexibility.

58. As a predictable result, the platform became a vehicle for additional unlawful activity. Minors were able to participate in gambling-like transactions without restriction or oversight. Illicit and exploitative content circulated within channels associated with the enterprise, including content involving minors, without effective intervention despite defendants' knowledge and ability to act.

59. Financial flows through the system were structured to obscure source and destination, enabling money laundering and the movement of funds for illicit purposes, including support for criminal and terrorist organizations.

60. These activities were not aberrations committed by isolated bad actors operating at the margins of an otherwise legitimate system. They were the natural consequences of an enterprise that rejected safeguards as incompatible with its profit model. An operation designed to conceal insider control, suppress scrutiny, and evade regulation predictably becomes attractive to—and protective of—other forms of criminal conduct.

61. Moreover, the same mechanisms that sustained the core scheme sustained these additional crimes. Anonymity shielded wrongdoers. Intimidation discouraged reporting.

62. The absence of governance ensured that misconduct could persist without accountability. Where intervention occurred, it was selective and self-serving, aimed at preserving the enterprise rather than protecting participants or the public.

63. This broader pattern of criminal activity further demonstrates that defendants were not

operating a legitimate marketplace that occasionally failed to prevent misuse. They were running a system in which illegality was not a bug, but a feature—one that allowed the enterprise to grow rapidly, extract profits efficiently, and insulate itself from external control.

64. The presence of these additional crimes reinforces the existence of a cohesive racketeering enterprise, the continuity of its unlawful conduct, and the knowing participation of defendants in a scheme that extended well beyond mere market manipulation. It also underscores the need for comprehensive relief, including injunctive measures designed to dismantle the enterprise's infrastructure and prevent its reconstitution under a different name.

## PARTIES[1]

65. Lead Plaintiff Michael Okafor purchased and sold multiple "fair-launch" tokens created on the Pump.fun platform, including but not limited to the GRIFFAIN Token, between March 2024 and January 2025, in the United States. Lead Plaintiff Okafor suffered substantial monetary losses when those tokens collapsed within days or weeks of issuance, and paid for priority blockspace via transaction and bundling fees ("priority fees") charges that flowed to Defendants. Lead Plaintiff Okafor is a natural person and resident of the United States who purchased "Pump Tokens" during the Class Period (both defined below) and suffered financial losses totaling approximately $242,076.74.

---

[1] The factual allegations contained in Plaintiffs' Second Amended Consolidated Class Action Complaint are made upon information and belief, based on the investigation of counsel, except as to allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, counsels' investigation, which includes, without limitation, review and analysis of press releases, news articles, websites, blockchain forensic analysis, information and materials provided by three confidential whistleblowers, and other publicly available information concerning the Defendants (as defined herein), the platform Pump.fun, and cryptocurrency memecoins or tokens that were issued by, promoted by, or sold by certain of the Defendants through Pump.fun, or for which certain of the Defendants solicited the sale of through Pump.fun (collectively, the "Tokens.")

66. Plaintiff Diego Aguilar purchased and sold multiple "fair-launch" tokens created on the Pump.fun platform, including the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token, all of which are Pump Tokens, and was damaged thereby.

67. Plaintiff Kendall Carnahan purchased and sold PNUT Tokens (among others) in the United States, which were created on the Pump.fun platform, and was damaged thereby.

68. Defendant Solana Labs, Inc. ("Solana Labs") is a Delaware corporation formed in 2018 with offices in New York and San Francisco. Solana Labs develops and licenses the core Solana validator and runtime software, sells "priority blockspace" to order-flow partners such as Pump.fun and Jito Labs, and holds substantial reserves of the native SOL token. Defendants Anatoly Yakovenko (Chief Executive Officer) and Raj Gokal (President/Chief Operating Officer) are co-founders and controlling officers of Solana Labs. Solana Labs also directs and knowingly participates in the affairs of the "Pump Enterprise" (defined below) at all relevant times hereto, as detailed herein.

69. Defendant Solana Foundation is a not-for-profit foundation organized under the laws of the Canton of Zug, Switzerland, with its registered office at Industriestrasse 47, 6300 Zug. The Foundation funds companies that grow user demand for Solana blockspace, markets Solana blockspace, and stewards a multibillion-dollar SOL treasury. Defendants Dan Albert, Executive Director of the Foundation, Austin Federa, former Head of Strategy of the Foundation, and Lily Liu, President of the Management of the Foundation, are each named in their individual capacity for directing and supervising the Foundation's grants, marketing campaigns, and relationships with Pump.fun, Jito Labs, and Solana Labs. Solana Foundation also directs and knowingly participates in the affairs of the Solana-Pump.Fun Racketeering Enterprise at all relevant times hereto, as detailed

herein.

70. Defendant Baton Corporation, LTD ("Pump.fun") is a private company organized under the laws of England and Wales (Company No. 14743013), with its registered office at 82A James Carter Road, Mildenhall, Bury St Edmunds, Suffolk IP28 7DE, United Kingdom, and its principal place of business in Brighton & Hove, United Kingdom. Pump.fun operates the eponymous web application that mass-produces "memecoins," imposes a 1% transaction rake, and routes every order to Solana's priority-fee market. Pump.fun also directs and knowingly participates in the affairs of the Solana-Pump.Fun Racketeering Enterprise at all relevant times hereto, as detailed herein. Its three co-founders are:

- Defendant Alon Cohen (a/k/a "Alon," "a1lon9"), a resident of London, United Kingdom and Pump.fun's public-facing Chief Executive;

- Defendant Noah Tweedale (a/k/a "Sapijiju"), a resident of Brighton & Hove, United Kingdom; and

- Defendant Dylan Kerler (a/k/a "Out," "Dylan Phoon"), a resident of London, United Kingdom, who has a documented history of prior "rug-pull" schemes.[2]

71. Each founder exercised operational control over Pump.fun and personally promoted the platform as a trading venue and casino, thereby luring retail users into unlawful wagering.

72. Plaintiffs also name the following officers and directors (collectively, the "Individual Defendants"), each of whom directed and exercised decision-making authority over the

---

[2] A "rug pull" is a scheme in which a token creator promotes a new cryptocurrency to attract buyers, then sells off their holdings once the price rises, causing the token's value to collapse. Investors who purchased the token are left holding a near-worthless asset while the creator exits with the profits.

Solana-Pump.Fun Racketeering Enterprise that gave effect to the racketeering scheme alleged herein:

73. Defendant Anatoly Yakovenko is, and at all times relevant to this complaint was, the Chief Executive Officer of Solana Labs. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

74. Defendant Raj Gokal is, and at all times relevant to this complaint was, the President and Chief Operating Officer of Solana Labs. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

75. Defendant Dan Albert is, and at all times relevant to this complaint was, the Executive Director of Solana Foundation. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

76. Defendant Austin Federa is, and at all times relevant to this complaint was, the former Head of Strategy of Solana Foundation. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

77. Defendant Lily Liu is, and at all times relevant to this complaint was, the President of the Management of Solana Foundation. She also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

78. Defendant Alon Cohen is, and at all times relevant to this complaint was, the Chief Executive Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

79. Defendant Noah Tweedale is, and at all times relevant to this complaint was, the Chief Product Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

80. Defendant Dylan Kerler is, and at all times relevant to this complaint was, the Chief Technology Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

81. Each Individual Defendant is sued in both his/her individual and official capacities for acts undertaken in the course and scope of the Enterprise.

82. Defendants Does 1 through 25 (the "Lead KOL Doe Defendants") are individuals and entities whose identities and addresses are presently unknown to Plaintiffs. Some are known to Plaintiffs only by their online pseudonyms, social media handles, and associated cryptocurrency wallets. Plaintiffs sue the Lead KOL Doe Defendants by fictitious names and will seek leave to amend this Complaint to substitute their true names and capacities when discovered.

83. As alleged herein, the Lead KOL Doe Defendants served as lead key opinion leaders and token promoters for the Solana-Pump.fun Racketeering Enterprise. They were retained, directed, and compensated, directly or indirectly, by Pump.fun and other Enterprise participants to promote selected Pump.fun tokens to retail purchasers in the United States, including New York, while concealing their compensation, coordination, and pre-positioning. They received early token addresses and other nonpublic information through private channels, acquired token positions before their promotional pushes, coordinated promotional narratives, timing, and posting cadence with Enterprise leadership and operations, activated downstream secondary promoters and friends and family distribution networks, and executed managed exits into the retail demand their promotions generated. Each Lead KOL Doe Defendant knowingly directed and participated in the affairs of the Solana-Pump.fun Racketeering Enterprise at all relevant

19

times, as detailed herein.

## JURISDICTION AND VENUE

84. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962–1964, and, in the alternative, the Securities Act of 1933, 15 U.S.C. § 77l(a)(1).

85. This Court has personal jurisdiction over Defendants Solana Labs, Inc. ("Solana Labs") and Solana Foundation (the "Foundation") because they are found in, regularly transact business in, and maintain continuous operations within this District. Solana Labs and the Foundation maintain a physical presence at 141 East Houston Street, New York, New York within the Southern District of New York.

86. Solana Labs entered into a long-term commercial lease for substantial space at 141 East Houston Street and converted that location into its New York headquarters, from which it conducts ongoing business activities. The Foundation operates from the same location and publicly refers to that presence as the "Solana Event Space," including hosting in-person events there. Multiple publications have reported on Solana Labs' and the Foundation's New York operations.

87. Solana Labs' New York operations are not incidental. Solana Labs employs a substantial engineering workforce in New York, and open-source contribution records reflect that New York-based Solana Labs engineers authored a significant portion of the Solana protocol's code contributions; this operation is physically located in the Southern District of New York.

88. Because Solana Labs and the Solana Foundation both operate, maintain staff, host events,

20

and manage infrastructure from New York City, a substantial portion of the enterprise alleged herein was conducted within this judicial district. Accordingly, Solana Labs and the Foundation are subject to personal jurisdiction in this District and are "found" here and "transact [their] affairs" here within the meaning of 18 U.S.C. § 1965(a).

89. This Court also has personal jurisdiction over all Defendants for Plaintiffs' RICO claims pursuant to 18 U.S.C. § 1965(a)–(b). At least Solana Labs and the Foundation are found in and transact their affairs in this District, and the "ends of justice" require that the remaining Defendants—who are alleged to have participated in a single, coordinated enterprise and course of racketeering conduct—be brought before one court in a single action to avoid piecemeal litigation, inconsistent judgments, and the practical impossibility of litigating an integrated enterprise across multiple districts and countries.

90. Independently and in the alternative, this Court has specific personal jurisdiction over Defendants under New York's long-arm statute, N.Y. C.P.L.R. § 302(a), because Defendants (a) transacted business in New York by operating, promoting, and monetizing the Pump.fun platform and related infrastructure that was accessed by New York residents; (b) committed tortious acts causing injury in New York by transmitting into New York misrepresentations and omissions concerning 'fair launches,' 'even playing fields,' and purportedly organic promotions; and (c) derived substantial revenue from interstate and international commerce, including fees and other proceeds generated from transactions initiated by users located in New York and this federal district.

91. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because (i) Defendants Solana Labs and the Foundation reside in this District for venue purposes and are subject to personal jurisdiction here; and (ii) a substantial part of the events or

21

omissions giving rise to Plaintiffs' claims occurred in this District, including (a) the operation and management of Solana Labs' and the Foundation's New York offices and personnel; (b) enterprise-enabling protocol development and infrastructure support conducted by Solana Labs engineers working from New York; (c) New York-based events and promotional activities that supported and legitimized the enterprise; and (d) transactions and fee extraction from New York users who accessed Pump.fun from within this District.

92. Venue is independently proper under 18 U.S.C. § 1965(a) because this is a civil RICO action and at least Solana Labs and the Foundation are found in and transact their affairs from this District. Venue is also independently proper under 15 U.S.C. § 77v(a) because Defendants transacted business in this District and the challenged offers, solicitations, and sales were made to persons located in this District and/or were consummated through transactions initiated here.

## FACTUAL ALLEGATIONS

### I.     THE SOLANA-PUMP.FUN RACKETEERING ENTERPRISE

#### A.  The Enterprise Operated Through a Chain of Command with Defined Roles, Layered Information Access, and Centralized Control

93. Like other modern criminal organizations, the Solana-Pump.fun Racketeering Enterprise (the "Enterprise") operated through a hierarchical command structure designed to concentrate the proceeds of the fraud at the top while distributing the work of execution downward.[3]

94. Pump.fun; its founders Alon Cohen, Dylan Kerler, and Noah Tweedale; Solana Labs; the

---

[3] In support of the factual allegations set forth in this Second Amended Consolidated Class Action Complaint, Plaintiffs submit the attached Exhibits A - K, incorporated herein by reference.

Solana Foundation; their principals Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu collectively constituted an association-in-fact enterprise.

95. Defendants unfairly and unlawfully engineered a rigged game through a three part methodology: supply capture, demand manufacturing, and managed exits. A detailed explanation of these functions is provided in Section I.B.  The result of this fraud was billions in losses for millions of people.

96. At the most basic level, the leaders of the Enterprise identified a memecoin that would receive marketing support to create demand.

97. Following the identification of what would become a winning token, leadership circulated contract addresses or technical token information within the Enterprise before any public announcement, allowing members of the organization to purchase tokens at launch prices no retail participant would ever see.

98. Upon acquiring sufficient supply, Defendants orchestrated complex, multi-strategy marketing campaigns utilizing paid influencers.

99. The influencers' support and marketing appeared organic; their compensation was not disclosed to the public.

100.   The result was the appearance of seemingly independent discoveries, producing purchasers willing to pay inflated prices in an act of massive demand manufacturing.

101.   As demand increased, so did price. Defendants then sold in coordinated sequence, controlling liquidations to prevent the demand curve from collapsing.

102.   Simply put, Defendants determined the winners, convinced the public to buy these assets through calculated deception, and then carefully sold their inflated holdings to the public.

103. Predictably, after Defendants maximized their profits, these token prices collapsed, leaving investors with worthless assets.

104. In effect, the Enterprise were counterparties to their own customers, selling tokens to people who did not know they were buying from the very individuals who had rigged the market– who simultaneously were charging them a service fee for being defrauded.

105. Defendants also charged Plaintiffs fees for the service of defrauding them. Pump.fun collected a one-percent fee on every transaction through which retail participants were defrauded. Solana collected network fees on every transfer. Every dollar Defendants received originated in a retail participant's wallet.

### 1. Leadership

106. Leadership functioned as the core decision makers and lead strategists. Conceptually, leadership split into two distinct camps that functioned in unison to coordinate key operations.

107. The leaders of the Pump.fun organization managed marketing campaigns, engaged with lower-level contributors, and made product and feature decisions regarding the user interface.

108. Solana leadership designed the blockchain infrastructure to function according to the specifications required for memecoin trading at scale. They ensured transactions were executed, and the network could handle the casino's operational load.

109. Both the Solana and Pump.fun leaders used their social cache to move public sentiment towards tokens they had determined to be winners.

110. Leadership also received informational advantages from their lower tiered operators ensuring they had superior information, which informed decision making.

111. Those at the top of the organization also determined who within the organization would be punished for a failure to comply, and how they would be punished.

112. Leadership possessed total visibility. Information flowed upward from Operators and across entities through private channels. Leadership maintained direct lines of communication, exchanged technical guidance, met frequently concerning investment and operational support, and publicly endorsed one another's platforms. From this position of shared knowledge, Leadership devised a scheme to defraud by means of materially false representations transmitted via wire communication in interstate and foreign commerce.

### 2. Operations Command

113. Like Operations Command in a traditional criminal organization, this tier translated Leadership's direction into coordinated promotional and trading operations, serving as the bridge between strategic decisions and tactical execution.

114. This tier directly recruited and managed downstream KOLs through direct compensation and access to inside information, creating a network of promoters dependent on continued Enterprise favor.

115. Operations Command directed content themes, posting cadence, and narrative selection; coordinated pre-positioning and exit timing; and enforced compliance through harassment, intimidation, and reputational attacks on defectors.

### 3. Operational Cells

116. The Enterprise operated through small, persistent crews called Operational Cells. Cells launched tokens, ran direct to audience promotional pushes designed to create false impressions of buying interest.

25

117. These campaigns often circulated fabricated screenshots depicting fictitious trading profits, such as claims of transforming nominal investments into six- or seven-figure returns, to induce retail buying; deployed automated programs and fake accounts to simulate organic interest and execute coordinated trades; and conducted harassment campaigns against competitors or defectors.

### 4. Operators

118. Lower-tier Key Opinion Leaders were the Operators. Their job was simple: tell followers to buy, then sell to them. Operators promoted tokens across Twitter/X, YouTube, and TikTok.

119. What retail saw as strangers independently discovering a new token was a coordinated performance by the people selling them. Operators received instructions and early token addresses through Telegram, systematically concealed their identities through pseudonyms and multiple wallets, and maintained downstream distribution networks called Friends and Family groups.

### 5. Associates: Friends and Family Networks

120. Like the lowest tiers in a multi-level marketing scheme, Friends and Family networks served as the audience to whom insiders sold. But even here, hierarchy existed.

121. Inner Friends and Family groups received information early enough to profit; they bought alongside the promoter and sold when the promoter sold.

122. Outer Friends and Family groups, which included larger subscription groups and free public feeds, received alerts only after insiders had already bought. Their function was to buy what insiders needed to sell.

123.    Each tier believed it held a privileged position, but everyone below Leadership was positioned to lose when those above them sold.



*Figure 1. Organizational structure of the Solana-Pump.Fun Racketeering Enterprise. The left column depicts the command hierarchy; the right column illustrates how that hierarchy operated in practice. Each tier is described in detail below. Note: This diagram is a simplified representation. In practice, the network may include dozens of Operational Cells, hundreds of*

*Operators, and thousands of F&F (Friends & Family) groups operating simultaneously across various campaigns.*

### B. The Game: Rigged Exit Liquidity Gambling

#### 1. Exit Liquidity Gambling: The Underlying Game

124.  Exit liquidity gambling, played fairly, is a legitimate game of chance. But the game offered by the Enterprise in the Solana-Pump.fun Casino was not a fair game.

125.  The bargained-for exchange Plaintiffs sought was the opportunity to participate in a game of chance.

126.  Plaintiffs were injured because that bargained-for exchange was never completed: the Enterprise rigged the game by creating and maintaining three conditions that gave the Enterprise total control over the game's outcomes. But for these conditions, the game would not have been rigged. The Enterprise's creation and maintenance of these conditions was the but-for and proximate cause of Plaintiffs' injuries: the rigging ensured the Enterprise controlled who won and who lost. The winners were the Enterprise and its insiders. The losers were Plaintiffs and the data confirms this.



*Figure 2: The price pattern characteristic of exit liquidity gambling. The horizontal axis represents time; the vertical axis represents price. The entire sequence shown spans only a few hours. Participants who buy during the initial rise and sell before the peak (the left portion of the curve) extract profit. Participants who buy near or after the peak (the right*

*portion of the curve) find no one to sell to. "Exit liquidity" is the colloquial term for these late buyers: the people whose money funded everyone else's winnings.*

127.    In exit liquidity gambling, the participant risks their money by buying a meme coin. The participant profits only if a later person buys at a higher price. That later person profits only if an even later person does the same. The chain continues until it breaks. Whoever is left holding assets at the end loses. The profits of those who 'exit' the market by selling before the crash derive profit, dollar for dollar, from the losses of those who cannot.

128.    In effect, exit liquidity gambling is a high-stakes game of musical chairs. Participants compete to sell before buyers disappear. Players still holding assets when the music stops have nowhere to go but the floor.

129.    "Exit liquidity" is a colloquial term which refers to the buyers whose purchases allow sellers to cash out. In exit liquidity gambling, the question is: who will be positioned to sell, and who will be positioned to buy from them and lose.



*Figure 3: Post from pump.fun's official Instagram account (@pumpdotfun_), dated November 24, 2024, captioned "some of us will make it." The image depicts working-class individuals in what appears to be a retail environment, overlaid with the text: "How do I turn these people into exit liquidity?" Defendants' were not only aware that exit liquidity was at the core of their product but actually joked about it publicly.*

### 2. What Makes It Rigged: The Structural Prerequisites for Guaranteed Insider Profit

130. The preceding paragraphs describe exit liquidity gambling as it might function in a fair market, a market in which outcomes depend on chance. Defendants did not operate such a game. Defendants operated a system designed to ensure that retail participants would lose and the Enterprise would win.

131. The Enterprise designed and operated the promotional infrastructure that manufactured demand: they coordinated campaigns, compensated endorsers, and fabricated success narratives that created the appearance of organic interest where none

existed.

132. Solana Labs and Solana Foundation engineered and administered the network infrastructure and core functionalities that made this game playable.

133. Jito Labs developed the priority execution systems that guaranteed insiders favorable transaction ordering, ensuring insider purchases would settle before retail orders reached the network and insider sales would execute before retail ever understood that there was reason to sell.

134. The Enterprise rigged the game through the creation and maintenance of three structural prerequisites: supply control, demand manufacturing, and managed exits. Each was necessary; none alone was sufficient.

135. Each Defendant played a distinct role in creating and maintaining these conditions.

### a)    Supply Control

136. Supply control is both the ability and the act of acquiring disproportionate token supply before or at the moment of public availability, at lower prices than the general public will eventually pay.

137. Pump.fun uses a bonding curve to price every token launched on its platform. A bonding curve is a pricing formula that starts tokens at a fixed, minimal price and increases the price automatically as each successive purchase is made. Without Solana's technology, the bonding curve could not function.

138. The bonding curve was purpose-built for supply capture: insiders who bought first were guaranteed the lowest prices. The platform's no-KYC design allowed them to distribute these holdings across anonymous wallets.

139. This distribution served two fraudulent purposes: it disguised coordinated insider

accumulation, and it manufactured the appearance of organic buying interest. When retail

participants saw what appeared to be many independent wallets accumulating a token,

they interpreted this as a signal of genuine demand. In reality, this was insiders acquiring

tokens early to sell them at higher prices later.



*Figure 4: An X post from Bubblemaps showing what can happen when insiders are able to control the supply: Here, a small group of connected wallets controlled over 25% of a token launched on Pump.fun, then sold their holdings for ~$500,000.*

140.    Supply control creates the foundation for guaranteed insider profit: insiders who

control supply at the lowest prices can sell at any higher price the market reaches and

capture the difference.

141. That profit has one source: the retail participants who bought at higher prices. The insider's gain is the retail participant's loss.

142. Supply control required technical infrastructure that Solana Labs and Solana Foundation did not merely build but actively maintained, optimized, and supported in direct coordination with Pump.fun as explained more fully in Section I.E.

### b)    Demand Manufacturing

143. Demand manufacturing is coordinated promotional activity designed to create the false appearance of organic interest, leading retail participants to believe they have discovered a live game with high-stakes and a real chance to win. If the chart is not going up, there is no exit liquidity game being played.

144. Demand manufacturing served each defendant's financial interests. Each transaction generated platform fees for Pump.fun and network fees for Solana. Every revenue stream required retail participants to buy into a game of exit liquidity gambling.

145. Key Opinion Leaders are the primary vector by which demand is manufactured. When a KOL posts about a token, their audience sees someone they trust organically sharing an exciting opportunity.

146. In reality, the KOL received the address through a private channel hours earlier from a member of the Enterprise, has already acquired a position at prices their audience will never see, is posting on a schedule coordinated with other KOLs, and will sell into the purchases being generated by the Enterprise's campaign.

147. Pump.fun contracted and compensated KOLs via formalized contracts, with defined posting and operational schedules, tightly controlled.

148. The public was not aware that these KOLs were members of the Solana-Pump.fun Racketeering Enterprise. The public believed that these individuals were skilled traders and subject-matter experts. As such, members of the public who wanted to capitalize on memecoin trading followed their buy recommendations, much as retail investors follow analysts in traditional finance.

149. Unbeknownst to regular users, these KOLs succeeded on insider information fed to them by the Enterprise, the same information that would be used to deceive members of the public.

150. The campaigns were carried out on a variety of platforms. For example, Lead KOLs hosted public town-hall-style conference calls with secondary KOLs, Associates, and the public on Twitter/X. Listeners heard what sounded like real-time consensus forming around a live game they were about to miss. In fact, they were listening to an organized performance.

151. Demand manufacturing exploits the language and spirit of online communities. In 2021, retail investors openly coordinating on public internet forums drove up the price of GameStop stock, demonstrating that ordinary people acting collectively online could move markets. The Enterprise adopted that episode's language and spirit—the memes, the irreverence, the sense of collective action—but inverted its substance: coordination happened in private, among insiders, to manufacture buyers for their own profits.

152. Victims join groups on Telegram and Discord believing they are entering spaces of shared interest, where subject matter experts will provide information and training to help them trade successfully.

153. Groups are called "alpha groups," "inner circles," or "friends and family." Members

feel belonging and trust toward group operators. The leadership in the Solana-Pump.fun Racketeering Enterprise Pump.fun understood the victims desire for financial mobility and created a system to exploit this need using traditional Ponzi like methods and marketing language of financial and technologic innovation.

154. Demand manufacturing invited the retail participants whose purchases provided exit liquidity for insiders. Supply control meant insiders held tokens at the lowest prices. Without demand manufacturing, the Enterprise would have no one to sell to and no sales earning fees. The coordination described above (*e.g.* tiered information cascades, promotional calendars, narrative seeding) ensured that retail arrived after insiders had positioned and at prices higher than insiders had paid.

155. Because insiders manufactured the demand, they knew when buyers would arrive and could time their exits accordingly.

### c)    Managed Exit

156. Managed exit is a term which can be defined as the coordinated and sequenced selling by insiders timed to coincide with the apex of manufactured demand.

157. Due to the instability of demand curves and limited liquidity supporting tokens insider exits require careful management.

158. If too many insiders sell simultaneously, market participants may perceive the token as rugging, triggering panic selling—or the sheer volume of insider sales may itself crash the price.

159. If the price crashes too soon, all the efforts from the organization's demand creation will be lost. Consequently, managed sell-offs ensure demand and the associated higher prices exist for long enough to exit.

160.     The managed exit was the vehicle by which insiders converted their once-worthless coins into windfall profits. Typically, senior insiders sell first, capturing the best prices and junior insiders sell later. The hierarchical sequence prevents insiders from competing with each other and crashing the price prematurely.

161.     The managed exit is repeatable, even within the context of a singular token. After the initial wave of insider selling collapses the price, promotional activity can resume to induce a second wave of retail buying. The revived price enables another round of insider selling. This cycle can continue until retail stops responding.

### 3.  The Prerequisites Combined

162.     Each prerequisite is necessary and none alone is sufficient. Supply control without demand manufacturing leaves insiders holding worthless tokens. Demand manufacturing without supply control allows anyone to capture the gains. And without the managed exit, insiders compete against each other, collapsing the price before the Enterprise is able to sell their tokens.

163.     Together, these three prerequisites turn exit liquidity gambling into a rigged game: a one-way pipeline funneling wealth from the public to the Enterprise. Outcomes are no longer determined by chance but by structural position within the scheme. The bargained-for exchange—participation in a game of chance—never occurred. What Plaintiffs received was a rigged game where outcomes were predetermined by conditions the Enterprise created and controlled.

### C.  Repeatable Operational Tactics of Rigged Exit Liquidity Gambling

164.     The Enterprise executed rigged exit liquidity gambling through a repeatable operational sequence. Each phase of the sequence produced one or more of the structural

36

prerequisites described in Section II.B.

165.   The operational sequence consisted of six phases: target selection and campaign planning; bundling and pre-positioning; lead KOL promotion; secondary KOL and F&F amplification; leadership signal; and exit.

### 1.  Phase One: Target Selection and Campaign Planning

166.   Each campaign began with the identification of a token that could be promoted and the construction of a promotional narrative designed to induce retail participation.

167.   Leadership originated campaigns independently and received pitches from Operations Command. When a promising target memecoin was identified, Leadership authorized the campaign.

168.   Operations Command translated Leadership decisions into campaign assignments: which KOLs would participate, the promotional calendar, content themes, and narrative framing.



*Figure 5:A member of the public, replying to a Pump.fun KOL, identifies coordinated promotion by a Pump.fun-affiliated account, accusing the platform's 'intern / article writer' of pushing ordained tokens to drive retail demand.*

169.    Operations Command prepared and disseminated content assets for downstream deployment, including scripts, talking points, and visual assets designed to convey the idea of the narrative.



*Figure 6: A collage of posts from Pump.fun's official account, the account of COO Alon Cohen, and the account of a KOL—all hyping the 'Movers' feature within days of each other. 'Movers' is a platform feature that algorithmically surfaces tokens showing price momentum. This is one instance of the coordinated promotional apparatus in action.*

170.    By the time any promotional activity reached the public, the Enterprise had already

determined what would be promoted, when, by whom, and who would be positioned to

Profit.

### 2.   Phase Two: Bundling and Pre-Positioning

171.   Before promotion began, Enterprise participants established supply control by accumulating token positions.

172.   As campaign directives propagated from Leadership downward, so did buy orders. Each tier acquired tokens before the tier below received the address needed to transact.

173.   Enterprise participants bundled across multiple wallets, disguising concentrated holdings as organic distribution.

174.   By controlling supply early, the Enterprise ensured that retail buyers would purchase at prices already marked for loss.

### 3.   Phases Three Through Five: Promotional Deployment

#### a)      Lead KOL Promotion

175.   Lead KOLs initiated public promotional pushes, converting cultivated credibility into demand for the target token.



*Figure 7: An example of one form in which a KOL can promote a token. On December 1, 2025, Bastille (@BastilleBtc), a Pump.fun KOL (as indicated by the pill-shaped affiliate badge on his X profile), reposts the address for purchasing a Pump.fun meme coin.*



*Figure 8: In another post on the same day, Bastille posts the same address and suggests that "$BUBBLE" is "the coin," inviting their followers to join his bet on the token.*



*Figure 9: Following these posts, Bastille reminds followers that he is a profitable KOL, suggesting that the coins he picks have been profitable in the past. When the Enterprise backs a token, dozens of KOLs will make similar posts to induce a wave of participants to get behind a token.*

176.    Promotion followed the narrative constructed in campaign planning but was never disclosed as coordinated Enterprise activity.

177.    Lead KOL promotion created initial price movement that would be cited as evidence of organic interest in subsequent promotional waves.

### b)    Secondary KOL and F&F Amplification

178.    Secondary KOLs extended reach beyond lead KOL audiences, creating the

appearance of multiple independent sources validating the same opportunity according to a Confidential Whistleblower ("CW") described further in the complaint.

179. Secondary KOLs activated their F&F distribution networks. Information flowed through each tier with calibrated delays, as described in Section II.A.

180. By the time promotional activity reached general retail, it emanated from thousands of apparently independent sources rather than from the top of a coordinated Enterprise.

### c)      Leadership Signal

181. Leadership issued high-visibility public statements that framed campaigns and functioned as market signals.



*Figure 10: Defendant Cohen on November 10, 2024 signaling to the market value in 'Fwog' token by using a popular marketing catchphrase for the token: "just a fwog."*



*Figure 11: A screenshot of the price chart for Fwog token showing when Defendant Cohen made the above statement. Three hours following Cohen's post, the coin reached a 'local' market high. The Fwog token went on to peak at around a $700 million market within 72 hours before sell offs began.*

182.    Retail participants interpreted Leadership communications as impartial institutional endorsement. Insiders recognized them as signals that the selling window had opened.

### 4.  Phase Six: Managed Exit

183.    After demand was manufactured, Enterprise participants liquidated their positions through sequenced selling timed to coincide with peak demand.

184.    Command tiers typically sold first because any substantial token sale had the risk of triggering market collapse.

185.    The sequenced selling would inevitably cause near-total price collapse. Retail participants were left holding depreciated tokens while Enterprise participants captured the proceeds.

### 5.  Repeatability

186.    The cycle could repeat. After the initial round of insider selling, promotional activity often resumed to induce a second wave of retail buying, enabling subsequent rounds of insider selling from the same token.

187. The scheme also generated the transaction volume from which Defendants derived platform revenue. The series of false statements and omissions induced buy orders which paid fees to Pump.fun. Every on-chain transfer paid network fees to Solana and increased demand for SOL tokens held by Solana Labs and the Solana Foundation. Every priority bundle paid tips to Jito validators.

188. As such, the Enterprise did not profit solely from the tokens insiders sold but also from every transaction the scheme induced.

189. The Enterprise executed this playbook hundreds of times over two years of operation. With each campaign, defendants refined the technical infrastructure to guarantee insider priority, sharpened the marketing apparatus to induce retail participation, and expanded the mechanisms to profit from every transaction. Defendants studied what worked, discarded what did not, and optimized relentlessly for one outcome: maximum profit from retail participants who believed they had a fair chance.

### D. Communications: How the Enterprise Coordinated in Private, Promoted in Public, and Enforced Compliance

#### 1. The Communication System

190. The Enterprise kept coordination secret because exposure would have ended the scheme. Defendants understood that if retail participants saw the coordination, they would recognize the campaigns as fraudulent, understand they could only lose, and refuse to participate.

191. Telegram served as the primary channel for command-level communications. Leadership and Operations Command used private group chats to coordinate which tokens to promote, what narratives to deploy, and how to time sales.

192. Public platforms, including Twitter/X, YouTube, and TikTok, served as the visible

interface between Enterprise operations and retail targets: the stage on which coordinated promotions were performed for an audience who believed they were watching organic market activity.

## 2. The Tools

193.    The Enterprise deployed automated accounts on social media platforms to manufacture the appearance of organic enthusiasm for promoted tokens. Automated accounts (or "bots," short for robot) flooded comment sections with positive sentiment, amplified KOL posts through coordinated reposting, and created the impression that a token was trending (a sign to the public to buy-in) when the interest was fabricated.

194.    The Enterprise used Telegram bots to circulate token addresses through automated channels, reaching millions of potential buyers beyond F&F groups or Twitter audiences.

195.    Defendants and their KOLs fabricated token provenance and history, generating false narratives about a token's origins, trading activity, and community support. They deployed these fabrications across every available medium: in Telegram groups, in Twitter posts, in YouTube videos, and in TikTok content.



*Figure 12:  The tweet advertises a 9999X return on $ALON, the official eponymous token endorsed by Defendant Alon Cohen. Even when such returns were real, they were almost certainly achieved by insider wallets with advance notice and priority execution. Posts like this induced retail participants to believe these results reflected opportunity available to all. They reflected an outcome only available to insiders.*

### 3.  Information as Control

196.   Ultimately, downstream Enterprise members wanted to be accepted into Pump.fun's inner circle. They wanted proximity to the people who had made millions. Cohen, for example, understood that people wanted to make money and become famous– he used control over information access to exploit that urge.

197.   Information from the top of the Enterprise was worth more than any salary. Knowing which tokens would be backed and when meant the ability to acquire those tokens and

make significant sums. The closer a participant was to Leadership, the earlier they learned, the more they made.

198.    The effect of this structure was the understanding that staying in the Enterprise's favor meant staying in the money.



*Figure 13: A September 19, 2025 post, reposted by Defendant Cohen, from Lead KOL @SOLJakey explaining that Pump.fun will both publicly and privately support creators with resources.*

### 4. Mutual Dependence: What Bound KOLs to the Enterprise

199.    For KOLs, their digital audience was their primary asset. The Enterprise needed KOLs because audiences bring in transaction volume (*i.e.* people who would buy meme coins on the word of a promoter). When a KOL told followers to buy, followers bought. That volume enabled insiders to sell at profit. The value a KOL could generate for the Enterprise on a single campaign could reach hundreds of thousands or millions of dollars.

200.    At the same time, KOLs needed the Enterprise. A KOL's audience was only profitable if the KOL knew which tokens to promote and when. That knowledge came from the Enterprise who decided which tokens to back with the full institutional force of

Pump.fun and Solana. Without access to the information cascading from the top, a KOL could not reliably position before their own audience or coordinate their exit timing with other insiders.

201.    KOLs could not replicate the scheme independently. The Enterprise provided the system: the technical infrastructure that guaranteed priority execution, the network upgrades that made the Enterprise profitable at scale, the campaign coordination, the wallet assignments, the timing and the organization. The KOL provided the audience.

202.    A KOL's audience was only valuable to the Enterprise if the audience believed the KOL was independent. An audience that knew the KOL was paid to promote would distrust the promotion and refuse to transact.

203.    Standard Pump.fun agreements confirmed that the public needed to have a certain perception of KOLs in order for the scheme to work. Agreements required KOLs to make one promotional Twitter thread per week and one post per week "organically utilizing the pump fun app."[4] The agreements also prohibited KOLs from disclosing the existence of the agreements themselves. Promotion staged to appear organic was, in fact, contractually mandated. Disclosure of that mandate was contractually forbidden. KOLs made paid advertisements presented as independent endorsements.



---

[4]A copy of one such Pump.fun KOL agreement was provided to Plaintiffs by CW-2. CW-2 is a prominent KOL who had direct communications with Defendant Cohen and Lead KOLs in the Pump.fun Enterprise, and who was offered and accepted a contract by the Enterprise to act as a KOL during the relevant period.

*Figure 14: Post by Alon Cohen promoting "organic community coins," echoing the language of KOL Agreements sent by Pump.fun to promoters. The agreements required "organic" promotion while prohibiting disclosure of the agreements' existence.*

204. The agreement provided by CW-2 has terms concerning scripts, script ideas, and project proposals, confirming that purportedly organic promotional content was coordinated with Pump.fun.

205. Followers believed they were following someone who could pick winners. They were buying from someone who already knew the fix was in.

### 5. Enforcement: The Power to Destroy What Made Participants Valuable

206. The same asset that made KOLs valuable to the Enterprise was the vulnerability that made them controllable: their audience.

207. A KOL's audience was the source of subscription revenue, promotional opportunities, and reputation-based income. The Enterprise understood that destroying a KOL's reputation meant destroying the audience that earned them their livelihood.

208. The first consequence of perceived disloyalty was exclusion from the information cascade. Exclusion transformed a participant's structural position from someone who extracted to someone who was extracted from. Without early information, a former insider became a net loser.

209. Internal communications show the Enterprise in operation: Leadership exercising centralized control over who participated, what they received, and what they owed in return.

210. The following exchange shows Leadership exercising control over downstream Enterprise participants. A TikTok influencer bought more tokens than Leadership had authorized during the pre-positioning phase of one campaign. His cap (*i.e.* the amount he

was permitted to purchase at early prices) was reduced (or "size[d] down").

211.    Access to the Enterprise was thus not a right but a lever. The Enterprise could reduce it as punishment and condition its restoration on compliance. The message was clear: your position in the hierarchy depends on your usefulness to the people above you.



*Figure 15: Sapijuju (Tweedale) shares a link to the TikTok profile of a KOL on April 6, 2024.*

51



*Figure 16: Alon (Cohen) and Sapijuju (Tweedale) discuss the TikToker on April 6, 2024.*



*Figure 17: Alon (Cohen) and Sapijuju (Tweedale) further discuss the TikToker on April 6, 2024.*

212.    Beyond exclusion, the Enterprise maintained the capability to destroy livelihoods. The same communication infrastructure that coordinated promotional campaigns could

coordinate attack campaigns. The same bot networks that manufactured enthusiasm could manufacture harassment.

213.    The Enterprise's response to perceived disloyalty was swift, public, and disproportionate. Participants who supported competitors or declined participation faced sustained coordinated attacks visible to the entire network.



*Figure 18: Scooter, @imperooterxbt, a Lead KOL, posted on January 7, 2026 to over 100,000 followers. In this post, scooter acknowledges the existence of so-called "FUD" ("Fear, Uncertainty, Doubt") campaigns. When waged, these campaigns are meant to instill fear, uncertainty, and/or doubt in the public concerning a KOL. In practice, Lead KOLs would direct and participate in such campaigns against both Enterprise defectors and competitors. Here, scooter threatens other KOLs with such livelihood-destroying campaigns if they do not include him on the profits from future scam launches.*

214.    The visibility served a function: it demonstrated to every other participant what would happen if they deviated. For an influencer, coordinated reputational attack meant the destruction of the audience that constituted their economic existence. The accusations persist, searchable and permanent, attached to their identity.

215.    Participants remained aligned not only because alignment was profitable, but because the alternative was ruin.

**E. The Technical and Marketing Infrastructure Underlying the Enterprise's Operations**

**1. Only Possible on Solana**

216.    In 2023, Solana debuted a foreboding marketing slogan: "Only Possible on Solana."[5] Indeed, the Enterprise that defrauded Plaintiffs was, in fact, only possible on Solana. This campaign was marketed by Solana Labs, the Solana Foundation, and their respective principals. The Solana X account, which is maintained by the Solana Foundation, is filled with posts to this effect.

217.    No other blockchain had the combination of network speed, transaction-ordering infrastructure, and coordinated support from ecosystem leadership that made the Pump–Solana Enterprise work. Defendant Cohen essentially acknowledged as much publicly.

218.    On January 19, 2025, he posted: "for years, we were chewing glass with nothing to show for it... then we discovered Solana."



*Figure 19:January 19, 2025 X post by Defendant Cohen marking one year since Pump.fun launched.*

---

[5] Solan's current iteration of the "Possible" campaign can be seen at https://solana.com/possible (last visited January 7, 2025).

219. Cohen was not speaking metaphorically. Before March 2024, Pump.fun had attempted to launch on other blockchains and failed. Even after launching on Solana, Pump.fun failed to get off the ground. Congestion issues imperiled the platform as documented in internal chats provided by CW-1[6].

220. According to chat logs provided by CW-1, the Pump.fun leadership was discussing Solana congestion which was preventing users from buying and selling tokens on Pump.fun's platform.

221. According to CW-1, during this period the Pump.fun executive team, including Cohen, Kerler, and Tweedale, met frequently with Solana's leadership, including at least Yakovenko and Gokal, concerning investment and technical support.

222. According to CW-1, Tweedale bragged that Gokal was constantly messaging Pump.fun directly, offering support to keep the team building on Solana.

223. According to CW-1, Gokal offered to help the Pump.fun team with introductions as they navigated needs for product support and investment capital.



___

[6] CW-1 is the confidential whistleblower who provided Plaintiffs internal chat logs with the Pump.fun team included as Figures throughout this complaint. CW-1 obtained access to these chatlogs as a member of the Pump.fun team and participated in chats during the relevant period.

*Figure 20: Alon (Cohen) in the Pump Team Chat on April 6, 2024.*

224. This is corroborated by a message from Alon in the Pump.fun team chat provided by CW-1. This internal communication identifies fundraising from Solana co-founders Anatoly Yakovenko and Raj Gokal as an item on the daily task list in writing "raise: toly/raj."

225. In or around the time of those meetings, Solana Labs announced network changes specifically to address critical congestion issues caused by increased network volume which was inhibiting Pump.fun's adoption. In or around the time of those meetings, Solana launched those updates in April. Also, in or around the time of those meetings, Jito Labs launched a major update to its validator software.

226. Following those updates, by the end of 2024, the Enterprise had generated billions of dollars in revenue.

227. Yakovenko publicly took credit for Pump.fun's success, displaying the platform's pill-shaped logo and offering to help other companies "scale their revenue" as he had with Pump.fun. This was part of Solana's broader marketing responsibility to lend credibility to the Enterprise.



*Figure 21: X post from Defendant Yakovenko on August 19, 2025.*

228.    On July 12, 2025, Pump.fun launched a public sale of its own token, $PUMP. The sale raised $400 million in thirteen minutes. Gokal posted: "where else can you raise $400m in 13 minutes?" Cohen replied: "only on solana!" Defendants were celebrating; the Enterprise was only possible on Solana, and its architects knew it.



*Figure 22: X post exchange between Defendant Gokal (@rajgokal) and Defendant Cohen (@a1lon9) on July 12, 2025.*

### 2.  Coordination

229.    Internal communications provided by CW-1 demonstrate that Pump.fun and Solana operated not as separate companies but as a coordinated enterprise. Leadership from both entities shared technical guidance, optimized execution systems, and worked together to increase transaction volume and sustain the revenue that flowed from it. The communications that follow illustrate this coordination.

230.    A member of the Pump.fun core team maintained a private channel with Jon Cinque, a Solana Core Developer. The contents were shared with the Pump.fun executive team.

231.    On or about May 14, 2024, a Pump.fun developer contacted Cinque about eliminating a third-party per-token fee on Solana. Cinque explained what was feasible and where ecosystem support was missing. When the developer said Pump.fun was building a replacement for the third-party provider, Cinque continued assisting. The developer reported Cinque's guidance to Dylan Kerler, who set next steps for the team.

232.    In these communications, the Pump.fun engineer proposed lottery- and game-style mechanisms and received real-time technical guidance that such mechanisms would

work. The discussions encouraged "lotteries" and "games" as adoption drivers and included cautions not to publicize certain mechanisms. Solana insiders understood the product was gambling and provided private assistance to expand its gambling functionality.

233. The concealment served as an inducement. Had defendants disclosed what they were building and the extent to which they were coordinating, no one would have transacted. Defendants misrepresented and omitted this fact because honest disclosure would have ended the scheme. The fees, the tips, and the trading profits defendants captured are the proceeds of that fraud and the measure of what plaintiffs are entitled to recover.

234. Pump.fun leadership maintained communication channels with Jito, and forwarded on optimizing execution performance. When a Pump.fun developer forwarded infrastructure specifications to the executive team, he did so by relaying a message from Bruder, establishing that both firms tracked execution metrics for the platform.



*Figure 23: Out (Kerler) message in Pump Team chat on April 6, 2024.*

### 3. The Solana Network

235.   To understand how the technical infrastructure enabled the Enterprise, it is necessary to understand what Solana is.

236.   The Solana blockchain is a high-performance network designed to process transactions. It is meant to function as neutral infrastructure, processing transactions submitted by any user without preference or discrimination, similar to how the internet routes data packets without examining their contents.

237.   Every transaction on Solana requires payment in the Solana token (SOL), the network's native token. Fees for processing these transactions are distributed to validators, which are computers that process and confirm transactions. More transactions means more demand for SOL. More demand means a higher price.

238.   Solana Labs and the Solana Foundation together hold approximately 49 percent of the original SOL token supply. When SOL's price rises, Solana Labs and the Solana Foundation get richer.

239.   Solana Labs authored and maintains the Solana Program Library, including the SPL Token Program—the foundational smart contract infrastructure for all tokens on Solana. Without SPL, Pump.fun could not create tradeable tokens at all. But Solana's contribution to the rigged game went beyond providing generic infrastructure. Solana Labs built SPL in a way that permitted one-click token creation with automated bonding curve pricing and integrated fee taking—precisely the mechanics the Enterprise required for supply control. The bonding curve guaranteed that whoever bought first paid the lowest prices. Solana's infrastructure made "first" a matter of milliseconds.

240. Solana Labs built the network-level systems that made those milliseconds decisive.[7] Solana created an execution environment where speed determined outcomes—an environment that structurally advantaged anyone with superior infrastructure and left ordinary users at the back of the line. Jito's bundling system, described below, used this speed advantage to guarantee insiders executed first.

241. This speed, however, created its own problem for the Solana Network.

242. Congestion is the term for what happens when a blockchain cannot process all submitted transactions quickly enough. Transactions do not merely slow down, instead, they fail entirely.

243. For Defendants, this was an existential threat. A platform that cannot process transactions cannot retain users nor can it collect fees.

244. Leading up to March 2024, the Solana network was experiencing degraded performance because of severe congestion, leading to failed transactions.

245. When Solana Labs announced network changes specifically addressing congestion, it was not a neutral infrastructure improvement. It was a choice to enable the Enterprise's profit model. The congestion updates ensured the network could process the volume the Enterprise needed to generate fees, and ensured that the speed advantages built into Solana's design would actually function when it mattered. Without these updates, the rigged game could not operate.

246. Fixing congestion meant the network could handle volume. But volume does not generate itself. Defendants needed predatory actors who would launch tokens, manufacture demand, and induce retail participation. Those traders required

---

[7] These features include Sealevel parallelism for processing transactions simultaneously, Gulf Stream for forwarding transactions before blocks finalized, and QUIC-based networking for faster data transmission.

infrastructure that guaranteed they would arrive first and exit first. Priority fees were that guarantee.

247.    Priority fees are payments users can add to their transactions to move to the front of the processing queue. When the network is congested, a transaction without a priority fee may fail or execute after other transactions have already moved the price. Priority fees create a pay-to-win execution environment. The more someone pays, the closer they move to the front of the line.

248.    For ordinary users, priority fees are a cost to ensure their transaction is actually recorded. For predatory traders, they are an investment. A trader who can guarantee first position can front-run every retail buyer who follows. By deliberately building a system that rewarded predatory trading, Defendants attracted predatory traders who would generate the volume required to make their own coins profitable. Every campaign creates transaction volume. Every transaction pays fees to Pump.fun and Solana. Priority fees were not incidental to the Enterprise. They were the lure that attracted the actors whose predation generated Defendants' revenue.

249.    The "fair launch" Defendants advertised, as described later in the Complaint, created the impression that participants would reach the market at approximately the same time and compete on equal terms. The priority fee infrastructure ensured the opposite. A participant with access to priority systems could guarantee execution before a participant using the platform's standard interface. Retail participants were not competing against other retail participants. They were being hunted by predators in the ecosystem.

### 4. Jito Labs

250.    Jito Labs built the infrastructure that allowed insiders to pay for guaranteed execution

priority over retail. Jito Labs is a Delaware corporation. Jito Labs raised $10 million in its Series A, in part, from Solana Ventures, Yakovenko, and Austin Federa, the Solana Foundation's head of strategy. Jito Labs develops and maintains the "Jito-Solana" validator client, a modified version of Solana Labs' core validator software. This is the software run by the computers that validate transactions.

251.    Jito-Solana introduces functionality that allows validators to reorder transactions, process private transactions in groups, and receive additional fees called "tips" in exchange for transaction priority.

252.    Jito's system has three core components. First, a bundling system that allows up to five transactions to be packaged together and executed atomically, meaning either all execute or none do. Second, a tip mechanism that allows the submitter of a bundle to include a payment to the validator who processes it. Third, an off-chain "Block Engine" that simulates incoming transaction bundles and forwards the most profitable bundle to the validator for execution.

253.    Jito's bundling system operated on top of Solana's foundational infrastructure. Without Solana's network speed, priority fee system, and the March 2024 congestion updates that enabled memecoin trading at scale, Jito's bundling would have had nothing to optimize. Without Jito's bundling, the speed and priority infrastructure Solana built would not have translated into guaranteed execution advantage. Together, they created a two-tier execution environment: sophisticated users with access to bundling could guarantee transaction ordering; retail users submitting through Pump.fun's standard interface could not. The former controlled outcomes and the latter absorbed losses.

254.    By December 2024, over 93 percent of Solana validators were running Jito's

software. This near-universal adoption meant the two-tier execution environment was not a niche advantage—it was the default state of the Solana network. Retail users were systematically disadvantaged on virtually every transaction they submitted. Validators running Jito reported staking yields 15 to 30 percent higher than baseline validators. At certain periods, earnings from Jito's tip system exceeded Solana's own validator rewards. Both Solana and Jito were materially enriched by the execution environment they built and maintained.

255.    Maximal Extractable Value, or MEV, is profit extracted by reordering transactions within a block. On Pump.fun, MEV was the mechanism through which supply control operated. Insiders used Jito's bundling to guarantee their buy transactions executed first, capturing supply at the lowest prices. Solana's speed made millisecond-level reordering decisive. Jito's bundling made it reliable. Together, they eliminated chance from outcomes and gave insiders control.

256.    In 2023, total tips paid through Jito's system amounted to approximately $3.5 million. In 2024, that figure exceeded $674 million, a 200-fold increase driven by Pump.fun activity.

## II.    THE NOSTALGIA CAMPAIGN AND COPE TOKEN CASE STUDY

257.    The following allegations derive from publicly verifiable evidence and information provided by CW-2.

### A.  The Operations Structure in Action

#### 1.  Leadership Identified COPE as a Profit Opportunity and Authorized the Campaign

258.    A developer on Solana had been publicly promoting a small, languishing memecoin

called COPE on social media daily for approximately 17 months. Despite the developer's persistent promotion, the price of the coin remained stable and low.

259.    Enterprise leadership identified COPE as an ideal candidate for the Enterprise's scheme because it could be presented to the public as a triumphant success story for long-suffering memecoin investors.

260.    The name "COPE" was part of the appeal. In internet vernacular, "cope" refers to the comforting lies people tell themselves to manage their own disappointment. The developer's relentless belief in his failing coin embodied the idea of cope. The token was never going to succeed absent a miracle.

261.    The Pump.fun community would be that miracle. According to the narrative the Enterprise would go on to construct, the digital world would organically come together to reward the tireless developer who had never made a dime after years of effort. Everyone would get rich along the way.

262.    The COPE campaign is a case study in how the Enterprise creates and capitalizes on the three structural conditions for rigging the game.

### 2. The Developer Was Directed to Curate a False History Before Promotion Began

263.    Complicating what would be the Enterprise's narrative was the fact that the COPE developer had been dishonest in how he told his story. The developer had in fact launched multiple iterations of the COPE token over the years. Whenever enough people had purchased the coin, he sold his shares and relaunched the token soon after under a new token address.

264.    The Enterprise approached the developer and directed him to delete all previous iterations of the token contract to allow them to create the false appearance that COPE

had been a single and continuously unsuccessful project.

265.  The developer complied, erasing posts which showed that COPE had been successively relaunched.

### 3.  Operations Command Translated the Directive into Wallet Assignments and Coordinated Pre-Positioning

266.  The COPE token was one component of a larger operation. Leadership launched what it called a "streaming and creator capital markets" narrative, framing Pump.fun as a legitimate platform for content creators to monetize their audiences. This narrative served two functions: it provided cover for coordinated promotion and it primed the market to buy into tokens associated with creators.

267.  Operations Command sent directives downstream to prime the Enterprise for the pump. This included instructions on how and when to promote the token; assignments for which KOLs would be responsible for promotion; distribution of the contract address to insiders so they could acquire COPE at low cost; and direction on when participants would be permitted to sell.

268.  As campaign directives propagated from Leadership downward, so did buy orders. Each tier acquired COPE before the tier below received the contract address needed to transact.

269.  According to CW-2, standard practice in the Enterprise is that whoever launches a token shares it with their inner circle first. It then propagates outward through private Telegram groups before any public awareness forms.

270.  Another confidential witness ("CW-3"), a prominent Key Opinion Leader operating primarily outside the Pump.fun ecosystem but with direct contacts within it, provided information corroborating the Enterprise's insider pre-positioning practices.

271.    CW-3 reported that a KOL with over 50,000 followers on X, known for hosting large X Spaces discussions and maintaining longstanding personal relationships with the Pump.fun team, confirmed that Pump.fun itself acquires early positions in tokens launched on its platform and sells those positions into retail demand.

272.    This pre-positioning established supply control.

### B.  The Rigged Game in Action

#### 1.  Supply Control: Insiders Bundled COPE Before Any Public Promotional Activity

273.    Social media evidence shows no mentions of COPE on Twitter or Telegram during the approximately seventeen-month period prior to the coordinated pump beyond posts from the developer himself.

274.    By mid-August 2025, insiders had accumulated their positions. Enterprise participants used multiple wallets to accumulate supply while disguising concentrated holdings as organic distribution. By the time promotion began, insiders controlled the supply at the lowest prices. Retail buyers would purchase at prices already marked for loss.

#### 2.  Demand Manufacturing: Coordinated Promotion Created the Appearance of Organic Discovery

##### a)    Seeding the Narrative (Mid-August 2025)

275.    The next phase was demand manufacturing.

276.    Cohen seeded this narrative in the month preceding COPE's peak trading price. He posted repeatedly that "dead" or dormant Pump.fun tokens with no trading volume should be bought because they were about to surge. These posts were not predictions but announcements. Leadership had already selected which tokens would be promoted, and

67

Cohen was indicated to his audience to buy when the signal came.

277.   Solana's leadership participated in this priming. Yakovenko publicly promoted the upcoming streaming campaign on Pump.fun of which COPE was apart, lending the credibility of the Solana network to what was, in substance, a coordinated pump.

278.   On August 19, 2025, Solana CEO Anatoly Yakovenko publicly endorsed Pump.fun as a legitimate enterprise with mainstream livestreaming potential, posting "pump dot fun has a shot at building a global streaming platform" to 239,200 views. This endorsement of the Pump.fun platform by the CEO of Solana Labs was reposted by Defendant Cohen. SolJakey, a Lead KOL in the Enterprise, immediately responded inviting Yakovenko to the "BASEDD house," a content creator house funded by Pump.fun. Yakovenko expressed interest in visiting this nascent content house in the future.



*Figure 24: X Post from Defendant Yakovenko on August 19, 2025.*

279.    On August 18, 2025, Cohen posted a public signal to the market: "bottom on my memes or I chop it off" to 339,300 views. In market parlance, Cohen was signaling that tokens he backed had bottomed in price and were about to rise.



*Figure 25: X post from Defendant Cohen on August 18, 2025.*

280.    On August 22, 2025, as COPE and other "nostalgia" tokens surged in price, Cohen reposted this tweet with the caption "did you fade my fucking call you fucking bitch." Cohen publicly characterized his earlier post as a market "call," gloating that those who ignored the post missed the coordinated price surge while encouraging followers to trust his signals in the future.



*Figure 26: X post from Defendant Cohen on August 22, 2025.*

281.    SolJakey replied to Defendant Cohen's post: "Drop the tg invite lil bro." This was a public acknowledgment that the real information driving these price movements flowed through private Telegram channels where Cohen decided who was in and who was out.



*Figure 27: X post from SOLJakey (a Lead KOL) on August 22, 2025.*

282.    On August 25, 2025, Cohen signaled that he was accumulating positions in anticipation of promotional activity, tweeting "the lion doubles down on his bags at a discount" to 331,700 views.



*Figure 28: X Post from Defendant Cohen on August 25, 2025.*

283.    On August 27, 2025, Cohen issued a statement designed to prime the market with greater specificity. He posted: "it's wild to me how people can doubt the longevity of the onchain trenches after previously being called 'dead' so many times. this cycle's biggest innovation succeeded for a reason. however, I believe that things have to radically change for the ecosystem to 100x. let me cook."



*Figure 29: X post from Defendant Cohen on August 27, 2025.*

284.  Cohen was telling the market: be on the lookout for long-suffering "dead" coins stuck in the "trenches." Something soon would change to bring these back to life at prices 100 times their current value.

285.  With the market primed, the Enterprise was now ready to execute on COPE.

**b)      The Coordinated Pump and Dump (Late August 2025)**

286.  On August 27, 2025, the Enterprise launched the formal promotional for COPE and the token's price responded immediately.

287.  For example, at approximately 7:39 PM, Orange, a Pump.fun KOL, posted: "Haven't been excited about a coin in a long time. This is a real success story, showing that the grind pays off. A dev who kept pushing for 17 months while his coin didn't even migrate. One of the most beautiful things I've seen in the trenches. Don't $cope later." The post received 25,900 views.



*Figure 30: X post by @OrangeSBS, a Pump.fun affiliate, on August 27, 2025.*

288.    The Enterprise's COPE story was now public. Chart data shows COPE began its dramatic price increase within minutes of this post and those like it.



*Figure 31: Publicly available chart of $COPE price showing that within minutes of the post by @OrangeSBS the price of $COPE more than doubled.*

289.    Within 24 hours, COPE's market capitalization surged approximately 489 percent, reaching around $17 million.

290.    By the end of August, the token had lost almost all of its value.



*Figure 32: Price chart of $COPE coin showing price before and after the Enterprise's campaign.*

291.    According to CW-2, the Enterprise's standard pattern is to let the community hold supply, pump the price up, then exit quickly, producing a fast spike followed by a sustained bleed down.

292.    Mitch, a Lead KOL and Operations Command member of the Enterprise, publicly sold his COPE position early in the price cycle. According to CW-2, the narrative of Mitch "selling early" and "coping" about it was itself part of the manufactured story.

74

293.    Mitch posted lamenting his early exit, telling others not to make a similar mistake. This served a dual purpose: publicly downplaying his sophistication while inducing others to hold longer, knowing that the longer someone stayed, the more certain it was that the Enterprise would take their money.



*Figure 33: A post circulated by "pumpfunnews" and "pumpdotfun_" circulating the narrative that Mitch sold early and missed out on massive financial gains.*

294.    Post-mortem reporting attributed COPE's rise to organic social media enthusiasm, exactly as the Enterprise had intended. Bitget News characterized the rally as "retail-driven crypto volatility" driven by "social media hype" and "community-driven

narratives."[8]

295.    On August 21, 2025, AB, another Pump.fun KOL who, according to CW-2 was responsible for overseeing art and branding for these coins, posted "me and the gang after rugging the entire chain," a public joke about the fraud that was about to be perpetrated with COPE and other so-called 'Nostalgia' coins.



*Figure 34: User @torqqqsol, aka AB, X post on August 21, 2025.*

---

[8] Bitget News, "The Explosive Surge of Meme Coin COPE: A Case Study in Retail-Driven Crypto Volatility," https://www.bitget.com/news/detail/12560604939531 (last visited January 7, 2025).

c)    **Post-Peak Promotion and Narrative Reinforcement**
**(September 2025 - Present)**

296.    For the Pump.fun Enterprise, this was a massive success. Insiders made millions selling to the public after the promotional push and could now tout the story of an overnight millionaire, something any Pump.fun customer could become.

297.    Enterprise-affiliated content creators conducted staged interviews with the COPE developer to propagate the fabricated '17 months of struggle' story as authentic.

298.    On September 4, 2025, Barton posted a video interview with the COPE developer captioned: "17-month grind for a memecoin that is pre-bonded is next level dedication. Jakey talks to $Cope dev about his grind and motivation behind the project for the last year and a half." The post received 21,300 views. The @BartonPumpClips account is paid by Pump.fun to post promotional videos.



*Figure 35: Post by user @BartonPumpClips, an account paid by Pump.fun to post promotional videos on September 4, 2025.*

299.   The COPE official account repeated the fabricated narrative and credited Pump.fun

and Cohen for the manufactured success.

300.   On September 4, 2025, the COPE official account replied to the interview video: "it's

been a journey full of cope and resilience of trenching 17 months with just a dream."



*Figure 36: Interaction between @CopeCoping (the $COPE developer) and @BartonPumpClips (a Pump.fun promoter) on September 4, 2025.*

301.    On September 13, 2025, the COPE official account posted: "Just wanted to give a big congratulations to @a1lon9 for the journey. Thank you sir you have changed the game and everyone is witnessing it in real time @pumpdotfun can't be stopped. Big streamers to little streamers have a big chance to become successful quick with the creator rewards program. Even tho I grind for 17 months straight I made it and it's possible with pumpfun. It's only getting started. Cope Harder."



*Figure 37: Post by @CopeCoping (the $COPE developer) on September 13, 2025.*

302.    With the Enterprise's operation successful, they turned their sights forward and began priming the pump once more. On September 29, 2025, Cohen issued yet another public signal priming the market for renewed activity on dormant tokens. Cohen posted to 440,700 views: "the pump fun trenches are clearly PRIMED for a runner. time to pay attention for good fresh narratives and communities that never stopped grinding."

303.    The COPE official account reposted this message, signaling continued coordination between Leadership and token promoters as they prepared for the next campaign.



*Figure 38: Post by Defendant Cohen on September 29, 2025.*

### C.  The COPE Campaign Demonstrates the Enterprise's Core Fraud

304.    The COPE campaign was never just about extracting profits from a single token. It was about manufacturing a success story that would drive platform volume and induce subsequent retail participants to chase the illusory promise of significant wealth.

305.    The Enterprise required success stories. For Pump.fun and Solana transaction volume entirely depends on retail participants believing wealth creation is possible. COPE would be proof.

306.    The COPE campaign executed every phase of the Enterprise's operational playbook as described in Section II.C: target selection based on exploitable narrative, supply control through silent accumulation, coordinated promotional deployment, leadership signals that served dual audiences, and coordinated asset sales that left retail holding worthless tokens.

307.    The COPE campaign is the model Every element demonstrates how the Enterprise

creates the three conditions that rigged the game: how supply control is established through silent accumulation, how demand is manufactured through coordinated promotion, and how managed exits take profits from retail participants who arrive after insiders are positioned. Retail participants were the exit liquidity from the moment they sat down at the table.

### III.    THE PREDICTABLE RESULT: PLAINTIFFS WERE INJURED TO THE TUNE OF BILLIONS

#### A.  From Case Study to Systemic Fraud

308.    Ultimately, what made COPE most valuable to the Enterprise was the story. The Enterprise's business model depended on generating a continuous supply of participants willing to transact.

309.    Participants had to believe that wealth creation was possible for anyone. The retail public had to believe that someone like them could win and COPE was engineered to engrain that belief.

310.    The Enterprise's narrative of a developer who spent months in obscurity before finally achieving tremendous success gave retail participants reason to think that they too could produce extraordinary returns.

311.    The aggregate result of running this playbook at scale was billions of dollars in retail losses flowing directly into the Defendants' hands.

312.    Plaintiffs were injured through two distinct mechanisms.

313.    First, Plaintiffs paid for a bargained-for exchange that never occurred: the opportunity to participate in a game of chance. The Enterprise rigged the game through supply control, demand manufacturing, and managed exits. These conditions eliminated chance and gave the Enterprise control over outcomes. But for these conditions, the game would

not have been rigged. The Enterprise's creation and maintenance of these conditions was the but-for and proximate cause of Plaintiffs' injuries.

314.    Second, the Enterprise induced Plaintiffs to participate through misrepresentations and omissions. Both mechanisms caused injury and both are independently actionable. The paragraphs that follow address each in turn.

### B.    Plaintiffs' Transactions Were the Enterprise's Only Revenue Source

315.    Plaintiffs paid to participate in a game of chance. What they received was a rigged game. Supply control guaranteed insiders acquired tokens at the lowest prices before retail could act. Demand manufacturing created the retail buyers whose purchases provided exit liquidity. Managed exits allowed insiders to sell in coordinated sequence at peak prices. The game was rigged before Plaintiffs arrived and the bargained-for exchange never occurred.

316.    Pump.fun collected one percent of every transaction executed through its platform. Solana collected network fees on every on-chain transfer and benefited from SOL price appreciation driven by transaction volume.

317.    The structural conditions were the but-for and proximate cause of Plaintiffs' losses. But for supply control, insiders could not have acquired tokens at prices retail would never see. But for demand manufacturing, insiders would have had no exit liquidity. But for managed exits, insiders could not have sold in coordinated sequence at peak prices to achieve maximum profit.

318.    Absent these manufactured conditions, the game would not have been rigged. Outcomes would have been determined by chance. The Enterprise created and maintained these conditions. The fees Defendants collected and the trading profits

insiders extracted all flowed from a game rigged by the Enterprise.

319. The misrepresentations were independently a but-for and proximate cause of Plaintiffs' participation. Defendants represented that Pump.fun offered fair launches without insider advantages, safety protections against rug pulls, and genuine opportunities for wealth creation. Defendants concealed that promotional campaigns were coordinated performances, that insiders had acquired supply at prices retail would never see, that the execution environment guaranteed insiders priority, and that success stories were manufactured by the same Enterprise that profited from every induced transaction. Had Plaintiffs known these facts, they would not have transacted. Every fee Defendants collected was extracted from a transaction induced by these misrepresentations.

320. Both theories of injury lead to the same damages. Under the first theory, the rigged game was the but-for and proximate cause of Plaintiffs' losses: the Enterprise created conditions that eliminated chance and guaranteed retail would lose. Under the second theory, the misrepresentations were the but-for and proximate cause of Plaintiffs' participation: Plaintiffs would not have transacted had they known the truth. The fees are the measure of both injuries. What Defendants took is what Plaintiffs lost.

### C. Retail Suffered Billions in Losses

321. Aggregate retail losses on Pump.fun and post-graduation trading are estimated between $4 billion and $5.5 billion.

322. Between January and December 2024, more than 4.25 million unique wallets traded at least ten tokens through the Pump.fun platform. Public blockchain data confirms that over 60% of those wallets ended in a net negative position.

323. Approximately 2.4 million wallets posted losses of up to $1,000, with estimated

average losses of $500 each, resulting in approximately $1.2 billion in aggregate losses across that bracket alone.

324. Another 221,800 wallets suffered losses between $1,000 and $10,000, and applying a conservative average of $5,500 per wallet, users in this category incurred approximately $1.22 billion in total losses.

325. An additional 30,000 wallets lost between $10,000 and $100,000, accounting for another $1.65 billion based on an average estimated loss of $55,000 per wallet.

326. At the higher end, 1,700 wallets experienced losses in excess of $100,000, with conservative estimates placing average losses at $200,000 for a combined loss of $340 million.

327. At least 46 wallets reported losses exceeding $1 million, resulting in a minimum of $46 million in additional realized losses. These figures derive from realized outcomes based on closed trading positions and on-chain settlement history, not speculative projections.

328. As the tokens themselves were designed to fail, the vast majority lost value within hours of launch, and most went to zero before a user could exit.

329. After "graduation," tokens were listed on decentralized exchanges such as Raydium where prices collapsed almost immediately. Between 81% and 97% of tokens launched through Pump.fun lost more than half their value post-graduation, and many fell 90% or more. This secondary phase of speculation produced an additional estimated $1.2 to $2 billion in retail losses in the post-graduation phase alone.

330. By contrast, very few users profited. Fewer than 5,000 wallets generated profits in excess of $100,000, and only 311 wallets realized more than $1 million in cumulative

gains.

331.    A user who earned more than $10,000 in profit ranked in the top 0.412% of all participants, meaning that out of every thousand people who used the platform, roughly four cleared that threshold while over 95% did not.

332.    The structure of the rigged game explains this distribution. Consistent profitability required the advantages that flowed from the three structural conditions. Supply control required access to contract addresses before public awareness and priority execution to acquire at the lowest prices. Demand manufacturing required advance notice of which tokens would be promoted and when. Managed exit required knowledge of when to sell before retail demand collapsed. These advantages were available only to insiders. Retail participants entered a game where the conditions for winning were reserved for those who rigged it.

333.    Wallets that consistently profited at this level belonged to Enterprise insiders: Leadership, Operations Command, KOLs, and their Friends and Family networks. The pattern of returns matches the pattern of access. Defendants possess records identifying which wallets received early contract addresses, which wallets were controlled by KOLs, and which wallets transacted in coordination with promotional campaigns.

334.    The platform processed millions of participants, and virtually none achieved the returns that Defendants' marketing promised.

335.    These outcomes were not the product of ordinary market risk or bad luck. For value to exist in this system, someone must profit when they sell, yet the metrics establish that almost no one did.

336.    These losses were the foreseeable consequence of the rigged game. The Enterprise

required a continuous supply of retail participants whose transactions could be taxed and whose purchases could provide exit liquidity for insiders. Supply control ensured insiders held tokens at the lowest prices. Demand manufacturing ensured retail arrived to buy at higher prices. Managed exits ensured insiders sold before collapse. Plaintiffs' losses funded Defendants' revenues. The game was designed to produce exactly this result.

### D. Billions Were Made as a Result of the Scheme

#### 1. Pump.fun Collected Hundreds of Millions in Platform Fees and Moved Those Funds Off Chain

337. During the 2024 calendar year, Pump.fun generated over $400 million in fee revenue from speculative token creation and trading activity. On-chain analytics confirm that the platform had accrued more than two million SOL in total fees from inception to January 1, 2025. As of mid-2024, Pump.fun's cumulative revenue was only approximately $47 million, but a parabolic surge in token activity during the third and fourth quarters drove that number more than eightfold.

338. Average daily revenue rose from approximately $900,000 per day in the third quarter to roughly $2.5 million per day in the fourth quarter, and on peak trading days, Pump.fun earned in excess of $10 million in platform fees in a single 24-hour period. By late 2024, Pump.fun had become one of the highest-earning decentralized applications in the cryptocurrency ecosystem. Forbes reported Pump.fun as having gone "from memes to $500M in revenue," and during its peak month, Pump.fun's revenue exceeded that of Uniswap, a major Ethereum protocol, which earned approximately $100 million per month in the same period.

339. Between January 2024 and mid-2025, Pump.fun's founders and insiders moved over $700 million in profits off-chain, funneling large portions to centralized exchanges such

as Kraken during peak market periods. These funds were accumulated through the platform's one percent fee mechanism, which extracted value from every transaction Plaintiffs executed.

**2. Solana's Token Holdings and Revenue Surged into the Billions**

340. By mid-2025, Pump.fun tokens accounted for more than 90 percent of transaction volume on the Solana blockchain, and Jito's validator client was in use on over 80 percent of the network.

341. Solana Labs and the Foundation benefited directly from the dramatic increase in network fee revenue driven by Pump.fun trading activity.

342. In early 2024, Solana's base transaction fees averaged approximately 60,000 SOL per day, but by October 2024, daily fee volume had climbed to more than 150,000 SOL, an increase of 150 percent in less than a year. During a single 30-day window in late 2024, Solana recorded approximately $88.2 million in transaction fees, and this fee spike corresponded directly with the rise of Pump.fun and memecoin speculation.

343. Pump.fun's launch and growth also produced a substantial financial windfall for Solana Labs and the Solana Foundation by driving appreciation in the value of their SOL token holdings.

344. Solana Labs and the Solana Foundation together control roughly 49 percent of the original SOL token supply, representing approximately 290 million SOL. The Solana Foundation was directly allocated approximately 10.46 percent of all SOL tokens at genesis and has discretionary control over an additional 38.9 percent designated as community reserves.

345. The Solana blockchain's native token, SOL, appreciated over 1,000 percent from its

2022 lows as a result of Pump.fun's rise. After falling below $10 in late 2022 following the collapse of FTX, SOL surged in value throughout 2024, and by the end of 2024, the price had risen to over $120 per SOL.

346. The Solana Foundation's treasury was valued at over $18 billion at SOL's late-2024 price, more than ten times the liquid treasury of the Ethereum Foundation.

347. In addition to unrealized token gains, the Foundation earned annual staking rewards of approximately four million SOL, translating to $700 to $800 million in recurring annual income during 2024-2025.

348. The executives and co-founders of Solana Labs realized or stood to realize extraordinary personal wealth from the scheme. Yakovenko's estimated net worth reached $500 million to $1 billion in 2024, and Gokal's net worth was similarly estimated to be in the nine-figure range.

### 3. Jito Made Hundreds of Millions in Tips

349. In July 2024 alone, validators running the Jito-Solana client earned over $36 million in tips, including $3.2 million in a single day. These tips were paid primarily by users attempting to gain early access to Pump.fun token launches.

350. Jito experienced a 200-fold year-over-year increase in tip revenue following the rise of Pump.fun. In 2023, total tips paid to Solana validators through Jito's infrastructure amounted to approximately $3.5 million, but by year-end 2024, total MEV tips paid through Jito's infrastructure exceeded $674 million.

351. Jito became one of the highest-earning software protocols in cryptocurrency.

352. In May 2024, Jito Labs collected approximately $39.5 million in fee revenue; by October 2024, Jito's monthly revenue had doubled to $78.9 million; and in November

2024, Jito reached a peak of $210 million in monthly revenue.

353.    During the fourth quarter of 2024, Jito Labs facilitated over $400 million in validator tip payouts, a 504 percent increase over the previous quarter.

### IV. THE COPE CAMPAIGN DOESN'T STAND ALONE: THE ENTERPRISE'S PATTERN OF FRAUD, MISREPRESENTATION, AND DELIBERATE DESIGN

#### A. The Enterprise Made Consistent Misrepresentations and Omissions That Induced Participation

354.    The figures above reflect an operation far larger than any single campaign. Billions in retail losses and hundreds of millions in fees are not the product of one coordinated pump. They are the product of a system designed to drive volume across thousands of tokens throughout the Class Period.

355.    The Enterprise's marketing apparatus made sustained misrepresentations and omissions that induced retail participation.

356.    These misrepresentations were disseminated across Telegram groups, Discord servers threads, YouTube streams, Instagram posts and Reels, and posts on X, the same channels the Enterprise used to manufacture demand for tokens insiders had already acquired.

357.    The misrepresentations were uniform in character: they promised wealth opportunities, safety guarantees, and fairness protections that did not exist and could not exist given the Enterprise's operational design.

358.    The omissions were equally uniform: they concealed insider pre-positioning, paid coordination, and the structural advantages that made catastrophic retail losses inevitable.

#### 1. Marketing Promised Impossible Wealth Opportunities While the Enterprise's Design Guaranteed Retail Would Lose

359.    Pump.fun repeatedly characterized memecoins as startup-like investment vehicles

90

capable of producing exponential returns, when they were in fact profit-taking vehicles through which insiders systematically transferred retail capital to themselves.

360.    Pump.fun framed its platform as a generator of "AI unicorns," "early-stage winners," and "billion-dollar meme coins." A unicorn is generally considered a billion-dollar startup. This framing implied that retail participants could access institutional-quality returns when in reality retail functioned as the exit liquidity from which those returns were extracted.



*Figure 39: Post by Pump.fun on January 6, 2025.*

361.    No corroborating data was made available to support this proposition because none exists.

362.    Cohen personally endorsed this framing. On February 7, 2025, Cohen retweeted a post stating: "People finally waking up to the fact that pumpfun isn't just this little memecoin launchpad but a new novel form of capital formation."



*Figure 40: Defendant Cohen reposting @WestieCapital's message from January 29, 2025.*

363.    The same day, Cohen retweeted a post from a Pump.fun KOL stating: "Hear me out: @pumpdotfun > @ycombinator." Y Combinator is widely regarded as the most successful startup accelerator in history, having backed companies like Airbnb, Stripe, Dropbox, and Coinbase. These are firms that have collectively created hundreds of billions of dollars in value through actual products and services. In contrast, Pump.fun is an unlicensed and rigged meme coin casino where the vast majority of players lose money. Still, Pump.fun had again found a narrative, and was again using its network to propagate it.



*Figure 41: Defendant Cohen reposting @daumernxyz's message from January 29, 2025.*

364.    On January 19, 2025, Cohen tweeted in a sprawling post that Pump.fun had "became one of the most successful startups ever" and that "startups are launching on pump fun to tap into the massive amounts of liquidity and users."[9] In the post, Cohen even thanked his Enterprise partners: "[f]or years, we were chewing glass with nothing to show for it… then we discovered Solana."



*Figure 42: Post by Defendant Cohen on January 19, 2025.*

---

[9] In the post, Cohen also references "3,000+ cold DMs." These were direct and unprompted solicitations made by Cohen to X/Twitter users asking them to come play on the platform. An example of one such direct message is included in this Complaint.

365.    Pump.fun's marketing targeted a young, unsophisticated, and predominantly male audience entering the space in the wake of the GameStop "meme stock era," an audience primed to believe that retail investors could win against institutional players.

366.    Pump.fun solicited this audience with explicit promises of gains that were impossible for structurally disadvantaged outsiders to achieve.

367.    On December 10, 2024, Cohen tweeted an image with the text "Stop being poor" and caption "Download the Pump Fun App™ Now!"



*Figure 43: Post by Defendant Cohen on June 27, 2025.*

368.    On January 17, 2025, Cohen tweeted that "our job as a platform is to grow the eco for our space to grow 100x" and promised that the platform would "make it easy & fun for ALL users to WIN."



*Figure 44: Post by Defendant Cohen on August 11, 2025.*

369.    On January 25, 2025, Cohen tweeted that "now there's a 9 figure runner EVERY DAY."



*Figure 45: Post by Defendant Cohen on January 25, 2025.*

370.    On September 5, 2024, Cohen tweeted that "small ports [portfolios] tend to chase 1000x+" to frame memecoin speculation by undersized investors as sustainable and rational behavior.



*Figure 46: Post by Defendant Cohen on September 3, 2024.*

371.    Even when markets declined for "shitcoins", Cohen induced continued participation. On June 23, 2024, Cohen posted a dismissal of warnings about Pump.fun and urged users to "stop hearing what other people want to hear when their bags are down and focus on winning."



*Figure 47: Post by Defendant Cohen on June 23, 2024.*

372.    Pump.fun celebrated specific tokens that reached billion-dollar market capitalizations,

using these as inducements for new participation. Pump.fun tweeted: "another day, another billion dollars peanut has just become the 2nd pump fun coin to hit $1bn marketcap."



*Figure 48: Post by Pump.fun on November 13, 2024.*

373.    Pump.fun tweeted: "congratulations to the $GOAT @truth_terminal is officially the first pump fun coin to hit a $1bn market cap that's around 222,222x in just 1 month!!!! this begs the question... who's next?"



*Figure 49: Post by Pump.fun on November 12, 2024.*

374.    In reality, these memecoins were not investment vehicles but exit liquidity gambling instruments, games in which profits for early sellers come directly from losses absorbed by the public. Every fee Defendants collected from these instruments came from a participant who transacted in reliance on Defendants' representations.

2.  **"Fair Launch" and "Rug-Pull Proof" Representations Were Pervasive While the Bundling System Made Fair Launches Structurally Impossible**

375. Pump.fun's marketing relied on a single core promise: its "fair launch" model supposedly gave everyone an equal chance by preventing insider manipulation and rug pulls. This promise was false by design.

376. This was the first and most repeated message users saw across the platform and its promotions. Pump.fun's social media expressly promised a "fair launch," "no presales," "no insider allocations," and "rug-pull proof launches." Pump.fun's homepage and interface made the same promises.

377. Cohen personally represented these claims. On September 25, 2024, Cohen retweeted a screenshot of a DM where he directly solicited a user unknown to him by stating that "pumpdotfun - unruggable fair launch platform."



*Figure 50: Post by user @valueandtime on October 3, 2024, re-posted by Defendant Cohen.*

378.    On October 4, 2024, Cohen tweeted "pump fun is as much of an even playing field as it gets IMO."



*Figure 51: Post by Defendant Cohen on October 15, 2024.*

379.    On October 12, 2024, Cohen tweeted "retail's already up massively because it's so easy for them to get involved and the playing field is as fair as ever."



*Figure 52: Post by Defendant Cohen on November 20, 2024.*

380.    Pump.fun deliberately positioned itself as a solution to prior fraudulent projects that had harmed retail participants. In the months preceding Pump.fun's launch, retail participants had been repeatedly burned by tokens launched in Telegram groups or by anonymous developers who would disappear after selling off their supplies.. Pump.fun marketed itself as a safe and transparent launchpad which eliminated those risks, while providing the infrastructure for a more organized, industrialized version of the same

predatory machine.

381. Defendants implemented no meaningful protections that would make the "fair launch" statements true because such protections would undermine the supply control that made profit-taking possible.

382. No Defendant created guardrails for retail participation. No Defendant implemented randomized entry windows that would make it harder for bots or insiders to position first. No Defendant blocked automated trading bots from participating on the platform.

383. Defendants' failure to implement basic protections was deliberate. Protection would eliminate the supply control advantage that made the Enterprise's rigged exit liquidity gambling profitable for insiders.

384. The gap between fair launch marketing and actual execution conditions was the central mechanism of the Enterprise's deception. Retail participants entered believing they competed on equal terms when they were structurally positioned as exit liquidity from the moment they arrived.

### B. The Enterprise's Senior Operators Designed the Platform to Operate as a Rigged Casino

385. The Enterprise did not hide the casino they built. In internal communications, defendants designed a gambling operation and optimized it for addiction. In public, they called it a casino. In most cases, intent must be inferred. Here, defendants documented it. Internal communications obtained through whistleblower disclosures show Leadership discussing the platform as a gambling operation, acknowledging that most users would lose, and optimizing for addiction. Defendants then said the same things in public.

### C. Internal Team Chats Reveal the Platform Was Deliberately Designed to Maximize Addictive Trading and Fee Revenue

386.    Internal team communications obtained through whistleblower disclosures reveal that the platform was deliberately designed to maximize addictive engagement patterns characteristic of slot machines.

387.    The Enterprise treated retail participation as repeat wagering that generated fee revenue regardless of retail outcomes. The Enterprise profited whether retail won or lost. The platform was tuned to ensure users never experienced a moment of boredom and internal communications corroborate this fact.

388.    Leadership explicitly admitted the platform was gambling. In internal communications, Cohen took credit for creating the market for low-value tokens ("shitcoins") that did not exist before, stating that the platform removed natural barriers protecting retail from "really really low odds." Cohen abandoned all pretense of investing and called the game what it is: "gambling." He admitted the goal was to make users "happier (even though most lose)," revealing a design philosophy that understood the product was engineered to bankrupt most users.



*Figure 53: Alon (Cohen) message in Pump Team Chat on April 27,2024.*

389.   Leadership was aware of the addictive behaviors the platform encouraged. Cohen circulated a user's comparison of the app to "crack [cocaine]" in an internal team chat—evidence that executives understood the product's function as a dopamine-driven engagement tool.



*Figure 54: Alon (Cohen) message in Pump Team Chat on May 1, 2024.*



*Figure 55: Out (Kerler) laughs at a post describing Pump.fun as "4chan but with gambling" shared by Alon (Cohen) on April 10, 2024. 4chan is an anonymous imageboard notorious for unmoderated and offensive content. Defendants' amused reaction demonstrates their awareness of, and indifference to, the platform's toxic culture.*

390.   Internal communications show the team moved toward active curation, deciding what users should see based on their data profile. The technical goal was to present "new

content every two seconds," a pacing model comparable to that used in slot machines or TikTok.

391.    Internal communications reference calibrating the interface to prioritize threshold excitement and ensure constant stimulation. The team explicitly requested the product use "flashing lights," "constant animation," and "action." Leadership suggested consulting "someone at a web2 company," like an "Instagram guy" to understand their "tactics," confirming the team sought to import aggressive behavioral engineering methods from social media.

from these indications we can construct a feed that is both contextually relevant and exciting. these are both at odds with each other. if we imagine a list of all the content on pump ranked by their contextual relevance to a particular user then if we were to start from the top of the list, work our way downwards, and start serving content, each consecutive thing that is shown to the user would become less and less contextually relevant — but new content is obviously exciting and so we should continue down the list.

just some thoughts i had before going to bed.

i think for each user, we need a list of content ranked by contextual relevance (where the parameters are things like recency, who they follow, what coins they've bought in the past) combined with a threshold of excitement. i.e. at least one new piece of content has to be shown to a user every 2 seconds, and so if no "good" content is there for a user and 2 seconds has passed, we sample some content from lower down in the list.



*Figure 56: Messages between Alon (Cohen), Out (Kerler), and Sapijuju (Tweedale) on April 26,2024.*

### 1.  The Slot Machine Variants

392.    Leadership said they wanted flashing lights, constant stimulation, and new content every two seconds. Defendants built exactly that. The platform's design prioritized rapid, repeated wagering over any form of informed decision-making.

393.    Regardless of the variant, the economic mechanics of every token were identical: tokens were designed to create a value spike that would draw in retail participants, who would then absorb the losses when insiders executed their managed exit.

394.    Many tokens were sold using the language of traditional venture capital or startup investing. Creators of these tokens published "whitepapers," roadmaps, and Discord announcements that mimicked startup launches.

395. Many tokens exploited the likeness, name, or persona of celebrities, influencers, or social media personalities. Sometimes these individuals were actually involved in the launch and received pre-allocated tokens. Other times, celebrities were impersonated or their intellectual property used without consent. In either case, the token's value derived from the public's inference of celebrity endorsement. The Enterprise promoted tokens linked to Caitlyn Jenner, Usher, Hulk Hogan, Doja Cat, Iggy Azalea, and Andrew Tate.

396. Cohen personally supported the token linked to Iggy Azalea, describing it as a model for the "social token narrative."

397. Many tokens were openly sold as valueless, chaotic, or absurd, with users encouraged to speculate and chase elusive price spikes. Examples include FartCoin, TwoToesToken, and NothingBurger.

398. Many tokens imitated household brand names, creating the false impression of affiliation with legitimate Fortune 500 companies. Examples include GoogleCoin, NikeToken, and AmazonPay.

399. Many tokens incorporated protected intellectual property, using characters from Disney, Nintendo, sports team logos, or copyrighted phrases.

400. For example, the Defendants launched tokens titled, for example, "JUDGE KAPLAN ($JUDGE)" and "Lewis A. Kaplan (JUDGE)" through the Pump.fun platform, each using Judge Kaplan's full name, and images of him. (See Ex. E at 2-3.)

401. Internal discussions proposed and refined additional gambling-style mechanics designed to simulate jackpot dynamics and induce repeated high-risk participation.

402. In internal product discussion, team members described adding "randomness" by using multiple "game modes" (*i.e.* the slot machine variants).



*Figure 57: Alon (Cohen) on April 6, 2024.*

403.    In other internal proposals, engineers described "battle" interfaces and additional Token-2022-enabled mechanics designed to turn participation into escalating "games of chicken," including burn-based contests structured to compel users to risk increasing amounts to obtain a payout or advantage. These proposals further confirm that the platform's "variants" were engineered gambling mechanics, not investment products.

**2.    Leadership Publicly Acknowledged the Platform Was a Casino**

404.    Enterprise leaders knew they were running an unlicensed casino, as demonstrated by their public statements.

405.    On August 8, 2024, Cohen tweeted: "you guys came to the greatest CASINO in the world and are complaining when your txns [transactions] RANDOMLY drop? what did you expect??? it's part of the experience. don't like it? LEAVE".



*Figure 58: Post from Defendant Cohen on April 8, 2024.*

406.    On September 18, 2024, Cohen tweeted: "'pump fun' is insane because it appears to be one of the most legitimately dangerous apps with the potential to gigafry your brain but is exclusively used by literal turbonormies who unironically want to like 'build generational wealth' and basically get oneshotted by it." Cohen acknowledged that users were being compelled toward financial destruction chasing "generational wealth" and yet continued to operate the platform.



*Figure 59: Post from Defendant Cohen on September 24, 2024.*

407.    On October 14, 2024, Cohen tweeted: "remember when they told you that it's impossible to win in the memecoin trenches? that you're retarded for 'gambling' when the winners were 'already chosen'? since then 2 new coins went from 0 to $300m, over 50 went to $10m, and over 100 touched $5m I hope you didn't listen." Cohen acknowledged the gambling characterization while citing extreme returns to induce continued participation.



*Figure 60: Post from Defendant Cohen on October 16, 2024.*

408.    These admissions served as inducements by encouraging gambling behavior on the rigged platform.

### 3.  Solana Leadership Embraced the Gambling Narrative

409.    Solana Labs' leadership publicly supported and engaged with Pump.fun activity on major communications channels. Yakovenko tweeted in response to Pump.fun memes, commented on specific token launches, and shared promotional content related to the platform. This public engagement lent legitimacy to Pump.fun and drove transaction volume that benefited the entire Enterprise.

410.  For example, Yakovenko publicly equated "memecoins" with "lootboxes," a random-reward mechanic commonly associated with gambling, corroborating that the enterprise marketed and operated chance-based wagering rather than utility tokens.



*Figure 61: Post from Defendant Yakovenko on March 13, 2024.*

411.  Solana's leadership embraced the speculative frenzy as a strategy for growth while knowing how their tools would be used. Yakovenko stated: "As with NFTs...we're blessed to solve a whole bunch of engineering problems with meme coins. It just makes the network and all the systems more robust."[10]

412.  Gokal publicly acknowledged "casino" activity on Solana in a post on X, evidencing knowledge of and participation in the gambling mechanics described in the Complaint.

---

[10] "Solana's founder on how memecoins help make the network more robust," The Block, February 27, 2025, https://www.theblock.co/post/329669/solanas-founder-on-how-memecoins-help-make-the-network-more-robust (last accessed on January 7, 2026).



*Figure 62: Post from Defendant Gokal on December 17, 2023.*

413.    In a tweet on January 29, 2025, Gokal effectively admitted to and reduced the scheme

to a sequence while branding it as "permissionless finance 🚀": more throughput, more

transactions, call it 'capital markets,' invite permissionless founders, apps, and tokens,

then cash in on the volume.



*Figure 63: Post from Defendant Gokal on January 29, 2025.*

**4. Pump.fun's Bounty System Incentivized Explosive Short-Term Speculation**

414.    Pump.fun provided financial rewards to token creators who achieved short-term speculative milestones. Users who launched tokens that hit certain market capitalization thresholds received direct payments called "bounties," often in the range of 0.5 SOL or more. These incentives were awarded for inciting rapid, high-volume speculative behavior.

415.    The bounty structure rewarded behavior that increased transaction volume, which increased Enterprise profit.

**D. The Trading Terminal Façade Disguised the Rigged Casino as a Regulated Market**

416.    Pump.fun presented a trading-terminal façade designed to mimic regulated markets and induce trust, concealing the gambling mechanics by trading on a veneer of institutional legitimacy.

**E. The Interface Simulated Institutional Trading Platforms**

417.    The Pump.fun customer-facing interface is designed to simulate a professional trading terminal.

418.    A real-time candlestick chart dominates the center of the screen, complete with selectable intervals and color-coded volume bars. This visualization of price action is indistinguishable from charting modules offered by FINRA-member platforms such as E*TRADE or TD Ameritrade. The chart updates tick-for-tick as new transactions are confirmed on the Solana blockchain. (*See Exs. C–D*).

419.    This creates the impression for users that tokens enjoy a continuous secondary market

114

supported by price discovery mechanisms analogous to those of the NYSE or NASDAQ.

### F. The Interface Displayed Market Data That Mimicked Regulated Securities Markets

420. The interface displays market data that mimics regulated securities markets.

421. Flanking the chart is a quote box that reports "Market Cap," "Supply," and "Holders" in real time. Market Cap mimics the public-company valuation metric familiar to any equity investor. Supply is the total number of tokens outstanding, mimicking the share float of a traditional equity. Holders resembles a shareholder register and conveys how widely dispersed or concentrated the float may be.

422. A perpetual ticker tape stretches across the top of the screen, with each scrolling symbol displaying its percentage moves across multiple time intervals. This reproduces the ubiquitous Bloomberg or CNBC price crawl.

423. The interface categorizes tokens using language that evokes traditional capital markets. Tokens are sorted into columns labeled "Newly Created," "About to Graduate," and "Graduated." This taxonomy evokes the lifecycle of a corporate issuer: seed, roadshow, IPO. (*See Ex. C-F*).[11]

### 1. The Interface Provided Due-Diligence Metrics That Simulated Institutional Analysis

424. The interface provides due-diligence metrics that simulate institutional-grade analysis.

425. Each token listing contains a miniature dashboard rendered through badge-style indicators displaying Total Holders, Sniper Wallets Still Holding, Developer-Held Percentage, and Concentration of the Top Ten Wallets.

---

[11] Citations to the Exhibits attached to this Complaint are cited herein as "Ex__".

426.    A user can therefore assess, at a glance, a token's insider concentration, circulating float, and susceptibility to manipulation, similar to how one would consult Form 13F data before purchasing an equity.

## 2. The Order Execution Interface Mirrored Sophisticated Equities Platforms

427.    The order execution interface mirrors sophisticated equities trading platforms.

428.    Trade execution is initiated through an order ticket which mirrors a modern equities blotter. The user sets maximum slippage percentage, selects a speed tier (Fast, Turbo, or Ultra, each incurring a rising fee), can toggle "front-running protection," and may add a tip to validators for earlier transaction inclusion.

429.    These customizable parameters replicate features offered in sophisticated equities venues and create the impression Pump.fun is such a venue.

## 3. In Contrast to a Sophisticated Equities Platform, Pump.fun Offers No Meaningful Protections

430.    The interface contains every hallmark of a regulated market but conceals the absence of corresponding protections.

431.    The interface displays live price discovery, market capitalization reporting, float analysis, holder concentration, and order-entry customization.

432.    Absent are the disclosures that make those metrics meaningful: issuer financials, audited statements, and risk factors.

433.    Absent is any meaningful market surveillance: best-execution obligations, FINRA Rule 5320 compliance, or transaction monitoring.

434.    Absent are any investor protections: no SIPC coverage, no customer asset segregation, no regulatory recourse.

## V.    DELIBERATE    COMPLIANCE    FAILURES    ENABLED    THE ENTERPRISE'S ILLEGAL OPERATIONS

### A.  Pump.fun Operated Without KYC/AML, Sanctions Screening, or Age Verification by Design

435.    The Enterprise avoided licensing, KYC/AML controls, and consumer safeguards because such protections would reduce transaction volume. Transaction volume was the only source of revenue. Every compliance failure was a business decision to maximize fee revenue earned from participants who would not have transacted had they understood they would not receive the benefit of the bargain.

#### 1.  Anonymous Wallet-Based Access Required No Identity Verification

436.    The Pump.fun platform operates without traditional user accounts, identity verification, or onboarding procedures.

437.    When a user visits the Pump.fun website or mobile app, they are prompted to "connect wallet." The user's public wallet address is automatically recognized as their account. No name is required. No email address is required. No government-issued identification is required.

438.    There are no KYC protocols. There are no geographic restrictions.

439.    There are no technical guardrails to prevent minors, sanctioned individuals, or known malevolent actors from accessing the platform. Any user, anywhere in the world, can begin wagering in seconds, entirely anonymously.

440.    A wallet suspected of abuse can simply be discarded. A new wallet can be created seconds later.

441.    Defendants did not meaningfully restrict use by sanctioned actors, fraudsters, or repeat abusers.

117

442. Pump.fun does not verify who is using its services and cannot distinguish between an adult investor, a minor, a convicted fraudster, or a foreign actor operating under a false identity.

## 2. Minors Played on Pump.fun Without Age Checks

443. Pump.fun permits minors to engage in gambling activity. Users as young as 13 are known to have launched tokens, participated in trading, and accessed creator tools.

444. Minors using Pump.fun have launched tokens, received SOL, and extracted value from the system without ever verifying their age, identity, or capacity to contract.

445. In one documented case, a minor launched a token, extracted profits, and boasted about the activity on social media.[12] No action was taken by any Defendant to block this behavior or to retroactively remove the token, even after the minor's age became publicly known.

446. At no point did Pump.fun or Solana recommend, or require KYC checks, identity verification, or usage restrictions based on user status, jurisdiction, or legal capacity.

447. Pump.fun foregoes age-gating because it would reduce participation and volume.

## B. The Platform Hosted Unverified Pornographic Content Without Age-Gating or Identity Controls

448. The Enterprise had actual notice that the platform was facilitating sexual exploitation and yet did nothing to moderate their platform.

449. Internal communications establish that the Pump.fun executive team, including Cohen and Tweedale, knew that people, including children, were being sexually exploited on the platform to pump tokens.

---

[12] "A Kid Made $50,000 Dumping Crypto He'd Created. Then Came the Backlash," Wired, December 6, 2024, https://www.wired.com/story/memecoin-kid-backlash/ (last accessed on January 7, 2026).

450.    On May 4, 2024, Tweedale shared a link to a live-stream channel in the Pump.fun Team Chat. Another team member, "Danay D," explained that the user would livestream sexual content to attract buyers, rug the coin, and restart with a new token. Cohen and Tweedale responded with laughing emojis.









*Figure 64: Pump Team Chat between Danay D, Alon (Cohen), and Sapijiju (Tweedale) on May 4, 2024.*

120

451.    Subsequent to this exchange, another Pump team member flagged that there was liability risk associated with not requiring KYC for customers if the platform were to continue to engage with pornographic content, putting the executive team on notice of their obligations to prevent the proliferation of exploitation on their platform. The team did nothing.

452.    This is particularly chilling given that only two days earlier, on May 2, 2024, the executive team had circulated information concerning the token $LIVEMOM. Kerler shared a link to a Tweet describing a child "sexually exploiting his mom" to launch a coin. Cohen shared a list of market cap "goals" concerning the token that escalates in inappropriate content between a child and his mother as the token makes more money (*e.g.* at $100,000, "mom slaps me across the face; at $500,000, "pour milk on my mom's chest," and more).





*Figure 65: Pump Team Chat on May 2, 2024.*

453.    The team understood that users were engaging in conduct that would result in permanent bans from accountable platforms like Twitch (a popular internet livestreaming platform). Twitch enforces policies against this kind of sexual content and protects minors from exploitation. Pump.fun had the same capacity to enforce and yet it chose not to.

454.    In effect, Pump.fun positioned itself as a sanctuary: a place where sexual content, financial speculation, and the exploitation of children could continue without interference because interference would reduce the transaction volume that generated revenue for the Enterprise.

455.    Plaintiffs have documented an array of explosive and dangerous content being tokenized by Pump.fun. Plaintiffs have attached and incorporated by reference Exhibit K.

456. For one coin, the token's picture shows a masked man holding a knife to throat of a man sitting in a chair with the caption: "kidnapped and torturing this black monkey until he fucking dies or we hit 10m MC [market cap]."

457. Another coin features a picture of a duct-tape bound child with a threat that if the token does not reach $1 million in market cap, the child in the photo will die.

458. For a coin called "TORTURE," which was promoted using Pump.fun's livestreaming feature, a woman is livestreamed tied to a chair in lingerie with a man brandishing rope with the promist of "LIVESTREAMED TORTURE AND SEXUAL ACTS" if the token hits a $100,000 market cap.

459. Thousands of similar coins were launched promoting violence, sexual violence, race-based discrimination, and drug use. (See Exhibit K).

### C. High-Profile Laundering Episodes Demonstrated Capacity to Intervene and Choice Not To

460. The platform's anonymous design enabled criminals to conceal and move illicit proceeds by blending them with retail volume.

461. Pump.fun was used by at least one state-sanctioned group to launder illicit funds.

462. The Lazarus Group is a cybercrime unit operating on behalf of the Democratic People's Republic of Korea and is subject to United States sanctions.

463. In or around February 2025, the Lazarus Group used the Pump.fun platform to launder proceeds from what remains the largest known cryptocurrency theft in history: approximately $1.5 billion in digital assets stolen from the Bybit exchange.

464. The group deposited approximately 60 SOL into a newly created Solana wallet and used Pump.fun to deploy a memecoin named "QinShihuang."

465.    Over the course of several hours, the token reached a reported $26 million in total trading volume.

466.    Once the liquidity pool was sufficiently large, the group sold their remaining token holdings into the market and dispersed the proceeds pseudonymously.

467.    When exposed publicly, Pump.fun demonstrated its capacity to intervene. Pump.fun removed the "QinShihuang" token from its front-end platform following revelations of the laundering.

468.    But removing a single token after the damage was done did nothing to address the infrastructure that made the laundering possible. The same features that enabled Lazarus to launder $26 million in hours are the features that enable the Enterprise's core fraud: anonymity, speed, no identity verification, and unrestricted wallet creation. Defendants cannot implement meaningful AML safeguards without dismantling the system that generates their profits.

469.    Defendants chose not to build AML safeguards because those safeguards would eliminate the conditions that make the core fraud work. The anonymity that enabled Lazarus is the anonymity that allows insiders to disguise coordinated accumulation as organic buying. The speed that enabled Lazarus is the speed that guarantees insiders execute before retail. The lack of identity verification that enabled Lazarus is what allows KOLs to hide their positions across unlimited wallets.

### D. Defendants Possessed Moderation Capabilities and Chose Not to Protect Users

470.    Pump.fun's permissive listing model enabled counterfeit, impersonation, and brand-mimicking tokens to proliferate.

125

471.    Pump.fun's architecture leaves retail users unable to distinguish legitimate from fraudulent offerings. Pump.fun allows multiple tokens to be launched and traded under the same ticker. As a result, consumers are induced to purchase assets they never intended to buy (*e.g.* there are multiple versions of the $JENNER coin, launched by celebrity Caitlyn Jenner, causing confusion and erroneous purchases by buyers seeking to acquire the 'real' coin).



*Figure 66: Posts from Defendant Cohen on January 21, 2025. Following accusations that insider wallets had purchased the coin in his name ($ALON) at low prices for later sale, Cohen's tweet certified the authentic $ALON address and the coin went on to reach*

*hundreds of millions in market capitalization. At the same time, Cohen acknowledged that there were multiple versions of $ALON in circulation. Rather than seeking to prevent this and protect buyers from purchasing a coin they did not intend to, he proposed a system allowing creators like himself or Jenner to take a cut of the imitation tokens described above– encouraging their proliferation.*

472. Pump.fun could have implemented basic technical controls to prevent the creation of tokens with identical tickers, metadata, or images. Solana and Jito, who process every transaction and validate every token creation event, could have imposed similar blacklists. Neither Pump.fun, Solana, nor Jito intervened.

473. The Enterprise possessed the technical capability to ban users and control platform access but selectively chose not to protect users.

474. The Enterprise possessed but seldom exercised centralized editorial control over platform content and user visibility.

475. Internal communications and screenshots show the existence of a centralized moderation interface and granular editorial tools. Pump.fun personnel referenced a dedicated "moderation" dashboard that could mark tokens as NSFW and manage visibility, and discussed functionality to ban specific terms and retroactively delete large volumes of prior messages.



right now moderators can access a panel at:
https://www.pump.fun/moderation

if their address is listed as an admin in the admins table in the db then they can mark coins as NSFW, delete messages, and also ban people by ip address (when somebody gets banned, the previous 10 messages posted from their address is deleted). the bans are tracked in the bans table in the db. there is also a "banned terms" section that lets them add a term to the ban list. this will prevent anyone from creating a future reply with that term.

*Figure 67: Pump Fun Team Chat message from Out (Kerler) on April 7, 2024.*

476.    Internal messages further demonstrate Pump.fun's ability to ban users, including through IP-based enforcement, and to reverse certain actions through administrative controls. These capabilities confirm centralized editorial control over platform content and user visibility.

477.    Internal communications show the team explicitly chose to deprioritize "random" creators in favor of "highly followed" ones, abandoning any pretense of a level playing field. This divided the user base into two classes: the "highly followed" who received algorithmic promotion, and ordinary users who remained invisible.



*Figure 68: Pump Fun Team Chat on April 27, 2024.*

478.    Defendants' moderation decisions prioritized volume and fee revenue over legality and consumer protection.

479.    Defendants intervened primarily when publicity threatened platform growth rather than when illegality harmed users.

### E. Internal Communications Expose Leadership's Knowledge and Intent

480. Internal communications obtained through whistleblower disclosures reveal that Leadership knew the platform caused harm and chose to operate it anyway. The following are select highlights.

481. Internal communications further show that Leadership treated Pump.fun's code and operational details as highly sensitive and took deliberate steps to keep them from public scrutiny. Team members warned that "reporters" were attempting to "dig up" internal information.



*Figure 69: Sapijiju (Tweedale) on April 6, 2024.*

#### 1. Leadership Designed the Livestream Feature to Incentivize Dangerous Behavior

482. The livestream feature was designed to incentivize dangerous and extreme behavior to drive trading volume.

483. Internal communications prove Leadership was aware of high-risk behavior (which drew attention, which drove volume, which drove token price) occurring on the platform.



*Figure 70: Pump Team Chat post by Alon (Cohen) on May 01, 2024.*

484.    Cohen observed that livestreamers were naturally "coming up with their own targets,"

this observation led to a specific product decision: to hard-code these targets into the app,

institutionalizing the gamification of self-destructive behavior.



*Figure 71: Pump Team Chat post by Alon (Cohen) on May 04, 2024.*

485.    Internal communications show the team intentionally sought to make it "far more difficult" for users to shy away from commitments, designing the system to hold users to their most impulsive, high-risk promises. Cohen enthusiastically agreed that the "options are limitless" for these coercive features.

486.    Streaming was long understood by the Pump.fun team to be a revenue opportunity because sensational behavior drove volume and volume drove price. A Pump.fun core dev shared the screenshot below: "whoever builds a streaming service with pump dot fun AMM is going to print…" Alon reacted with a heart.

131



*Figure 72: Pump Team Chat May 6, 2024.*

### 2. Leadership Developed and Implemented Features which Resembled a Multi-Level Marketing Scheme

487.    Leadership explicitly endorsed modeling the platform's growth after a Multi-Level Marketing scheme.

488.    Similarly, Pump.fun personnel discussed implementing "referrer" discounts expressed in basis points as part of fee architecture—reducing costs for referred users and embedding recruitment incentives directly into the protocol's economic design.



*Figure 73: Pump Team Chat post by Out (Kerler).*

489. The Enterprise designed social features to pressure unsophisticated users while sophisticated predators evaded them.

490. Cohen pushed to implement a "shame" leaderboard, a design feature which would discourage users from not holding onto tokens long enough for insiders to profit.





*Figure 74: Alon (Cohen), Sapijiju (Tweedale), and Laddoy on May 6, 2024.*

### 3. Miscellaneous Evidence of Scienter from Team Chats

491.    Internal communications show Pump.fun had a practice of deploying code before security audits were complete, despite having retained auditors.



*Figure 75: Pashov (outside auditor) on May 5, 2024.*

492.    Leadership was aware that rug-pulls were endemic to the platform and treated user losses as entertainment.

493.    Leadership circulated a post from a Pump.fun user (@BastilleBTC), who was later brought on as a Lead KOL, describing how to spot "rugs" evincing awareness that the platform was used to rug tokens. A team member commented that the "social layer is not strong enough," implying platform survival depended on social distraction. They needed a "stronger social layer" to keep users coming back even after losing money.



*Figure 76: Pump Fun Team Chat between Out (Kerler) and Alon (Cohen) on April 28, 2024.*

494.    After being shared in the team chat by Alon, the official Pump.fun account publicly corrected a prominent influencer's estimate of "100x" returns to "10000x," explicitly marketing the platform as a provider of extreme variance using the exact language of lottery marketing. By accepting the premise that the only options were "10000x or 0," Leadership admitted the assets had no intrinsic value.





*Figure 77: Pump Fun Team Chat May 9, 2024.*

## VI.    PUMP.FUN SOLD CERTAIN UNREGISTERED SECURITIES

### A. Pump.fun's Role as Issuer and Seller

495.    Pump.fun does not operate as a passive token launch exchange where users independently deploy tokens. Instead, people who want to create tokens submit code through the Pump.fun interface. That code is stored on Pump.fun's smart contracts and is not live on the blockchain. Only when another user purchases the code does Pump.fun execute the launch. At that point, Pump.fun mints the token, creates the liquidity pool, and manages trading through its bonding-curve system. Pump.fun controls this entire process—it executes the launch, sets the economics, and routes fees. It is not a passive platform. Consequently, Pump.Fun is the issuer of the non-registered security.

### B. Plaintiffs Do Not Contend That All Pump.fun Issued Tokens Are Securities

496.    Pump.fun has launched more than eleven million tokens. Many were joke coins, memes, or impersonations of celebrities and companies without consent. These included tokens using corporate logos, stock tickers, and public figures' names, often with no functionality or roadmap. Plaintiffs do not claim that all of these tokens were securities.

497.    The tokens: StakeCoin ("STC"), QuStream ("QST"), BunkerCoin ("BUNKER"), DeepCore AI ("DPCORE"), AgentPy (APY), Apex AI (APEX), Verse World (VERSE), BAYC AI (BAYCI), Alchemist AI (ALCH), CINO (CINO), Swarms (SWARMS), Collaterallize (SCOLLAT), XSPA (XSPA), Hive AI (BUZZ), SwarmNode.ai (SNAI), Codec Flow (CODEC), PVS (PVS), Convergent (CVGT), First Convicted Raccoon (FRED), and GRIFFAIN (GRIFFAIN) (collectively, the "Pump Securities") are securities and were promoted as having real-world utility and value tied to the future success of specific projects.

498. They included references to revenue-generating platforms, tokenized assets, artificial intelligence tools, and staking systems. Purchasers were invited to "get in early," before the projects were built or released, and profit from future developments. These are the offerings that form the basis of Plaintiffs' securities claims. The broader class of tokens launched on Pump.fun remains relevant to the RICO and other claims in this Complaint.

### C. Pump.fun Sold as Investment Contract Securities

499. Each of the Pump Tokens was offered and sold as an investment contract. Across all twenty tokens, the following characteristics were present.

500. Investment of Money: Purchasers used SOL to buy the tokens directly from Pump.fun's system. These were paid transactions through bonding-curve contracts.

501. Common Enterprise: The tokens were structured so that users' funds were pooled. The price increased or decreased depending on the total level of participation. Every buyer's outcome depended on the success of the project as a whole establishing horizontal or vertical commonality.

502. Expectation of Profits: Buyers were told that the token would increase in value over time as future steps were completed. This included promises of platform launches, product rollouts, or integration into larger ecosystems. The tokens were described as reasonable opportunities for return on investment.

503. Efforts of Others: The future value of the token depended on the issuer or platform doing work after the sale. This included building apps, launching services, completing integrations, or managing staking systems. Purchasers were not buying completed products—they were investing in projects that had yet to be built.

504. These common features show that the Pump Tokens were not digital collectibles or

memes. They were positioned as financial assets sold to the public with the promise of future gains.

### D. Pump.fun's Fees, and Structural Exploitation

505.    At the center of Pump.fun's economic model is a platform-wide 1% fee applied to every transaction. This fee is collected automatically from all buys and sells conducted through the bonding curve, as well as from tokens that "graduate" to external decentralized exchanges (DEXs). Graduation occurs when a token achieves sufficient trading volume and meets arbitrary platform-defined thresholds. While framed as a reward for success, graduation has itself become a vector for exploitation: tokens that graduate are often used to promote the platform's viability, while simultaneously being dumped by insiders who received early allocations or exploited the bonding curve for artificial gains.

506.    Because the fixed 1% transaction fee received by Pump.fun is a percentage, Pump.fun receives more money as the price of the memecoin increases.  A transaction at $100 would have a $1 fee to Pump.Fun but a transaction at $1,000 would have a $10 fee.  In other words, Pump.fun's fortune is tied to the performance of the token price. This supports vertical commonality.

507.    The funds Pump.fun receives as the 1% transaction fee are used by Defendants, at least in part, to develop the Pump.Fun ecosystem.

508.    Pump.fun's revenue model is structurally predatory. The platform, which has no age restrictions, KYC checks or AML protocols, is not merely a tool for token deployment; it is a financial product whose primary function is to manufacture and capitalize on rapid cycles of speculative buying and collapse.

509. Every token launched generates fee income for Pump.fun, regardless of whether it retains value, fulfills any stated purpose, or results in investor loss. In this respect, Pump.fun is economically aligned with volatility, not long-term value creation.

510. Solana Labs developed and maintained the SPL token program and the validator infrastructure that allows Pump.fun to operate at scale. Jito Labs, for its part, provided the tools for maximum extractable value (MEV) harvesting, enabling early buyers and bundle-senders to front-run new token launches.

511. Together, their infrastructure facilitated real-time token creation, instantaneous liquidity, and arbitrage opportunities that insiders could exploit before retail users even had the chance to transact.

512. Pump.fun exercises comprehensive control over every token launched on its platform. All tokens are built using standardized smart contract templates authored or controlled by Pump.fun, with no deviation allowed from the platform's design choices

513. Pump.fun sets the economic parameters for token issuance, manages the bonding curve liquidity pools, governs graduation conditions, and profits directly from every trade. Token creators are not independent developers—they are participants in a turnkey system entirely operated by Pump.fun and its corporate parent.

514. As such, Pump.fun qualifies as both the issuer and the statutory seller of every token generated through its platform. Its direct role in designing, deploying, marketing, and monetizing the tokens, combined with its collection of fees on every transaction and its central control over the underlying smart contract infrastructure, renders it liable under federal securities laws. Far from being a neutral tool provider, Pump.fun actively solicits investment, facilitates token speculation, and profits from the unlawful offering and sale

of unregistered securities.

## CLASS ACTION ALLEGATIONS

515.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, and seek certification of the following Class and Pump Tokens Subclass.

516.    Plaintiffs seek to represent the following "Class" and "Pump Tokens Subclass" (collectively, "the Classes").

517.    The Class: All persons who purchased any Tokens sold through Pump.fun during the "Class Period" (from March 1, 2024 through the date of this Complaint) and had an out-of-pocket loss on their investment in Pump.fun Tokens.

518.    Pump Tokens Subclass: All persons who purchased the twenty Pump Tokens.

519.    Plaintiffs reserve the right to modify or refine the definitions of the Class or Pump Tokens Subclass based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

520.    Excluded from the Classes are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

521.    The members of the Class and Subclass are so numerous that joinder of all members is impracticable. While the exact number of Class and Subclass members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class and tens of thousands of members in the Subclass. For example, several blockchain

141

analysis websites show that more than 174,000 crypto wallets hold just the First Convicted Raccoon Token and the GRIFFAIN Token.

522. Members of the Class and Subclass are readily ascertainable and identifiable. Members of the Class and Subclass may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or their agents. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions or by sending notice directly to the wallets themselves.

523. Plaintiffs' claims are typical of the claims of the Class and Subclass members as all Class and Subclass members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein. Plaintiffs do not have any interests that are in conflict with the interests of the members of the Class or the Subclass.

524. Plaintiffs and members of the Class and Subclass sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

525. Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and Subclass and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to those of the Class and Subclass.

526. Common questions and answers of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class and Subclass, including, but not limited to, the following:

   (a) Whether the Tokens are securities under the Securities Act;

142

(b) Whether Defendants' offerings and sales of the Tokens violated the Securities Act;

(c) Whether the Defendants violated RICO;

(d) Whether Defendants were unjustly enriched;

(e) Whether the members of the Classes have sustained damages and, if so, the proper measure of damages; and

(f) Whether the Class and Subclass are entitled to injunctive relief, restitution and/or rescission.

527.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some of the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class and Subclass to individually redress the wrongs done to them.

528.   Class treatment will also permit the adjudication of claims by many Class and Subclass members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class and Subclass would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

529.   Plaintiffs are unaware of any significant difficulties that are likely to be encountered in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF 18 U.S.C. § 1962(c)
### (Conduct of Enterprise Affairs Through a Pattern of Racketeering Activity)
### Against All Defendants

530.  Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

**Statutory Framework and Standing**

531.  Section 1962(c) makes it unlawful for any person employed by or associated with an enterprise engaged in, or affecting, interstate or foreign commerce to conduct or participate (directly or indirectly) in the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). Section 1964(c) authorizes any person injured in business or property "by reason of" a § 1962 violation to recover treble damages, costs, and reasonable attorneys' fees.

532.  Plaintiffs and Class members were injured in their business or property by Defendants' violations of § 1962(c). Plaintiffs' injuries arise from two distinct but related mechanisms. First, Plaintiffs paid for a bargained-for exchange that never occurred: the opportunity to participate in a game of chance offered by the Solana-Pump.fun Racketeering Enterprise. The Enterprise rigged the game through supply control, demand manufacturing, and managed exits. These conditions eliminated chance and gave the Enterprise control over outcomes.

533.  Second, Plaintiffs were induced to participate through material misrepresentations and omissions regarding, but not limited to, fair launches and equal access. Both mechanisms caused injury. Plaintiffs' concrete injuries include: (a) losses from

purchasing tokens at prices inflated by rigged market conditions and coordinated insider activity; (b) platform fees extracted by Pump.fun on every transaction; and (c) network fees paid on the Solana blockchain. Plaintiffs seek treble damages, costs, and reasonable attorneys' fees under § 1964(c).

## The Defendants Are "Persons" Under RICO

534. Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3), capable of holding a legal or beneficial interest in property.

## The Solana-Pump.Fun Racketeering Enterprise Is an "Enterprise" Under RICO

535. An "enterprise" includes any group of individuals or entities associated in fact. 18 U.S.C. § 1961(4). An association-in-fact enterprise requires only a purpose, relationships among those associated, and longevity sufficient to permit pursuit of the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009).

*Association-in-Fact Enterprise*

536. The "Solana-Pump.fun Racketeering Enterprise" is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of: Pump.fun; its founders Alon Cohen, Dylan Kerler, and Noah Tweedale; Solana Labs; the Solana Foundation; their principals Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu; the Lead KOL Doe Defendants, and other coordinated participants who functioned as an ongoing organization with systematic linkages to accomplish the Enterprise's common purpose

*Common Purpose*

537. The Enterprise's common purpose was to enrich its members by operating a rigged gambling operation that extracted billions from retail participants. The Enterprise accomplished this through two mechanisms:

538. First, the Enterprise rigged the game through three structural conditions:

    a. Supply control: insiders acquired disproportionate token supply at the lowest prices before retail could act;

    b. Demand manufacturing: coordinated promotions created retail buyers whose purchases provided exit liquidity for insiders who had already positioned; and

    c. Managed exits: insiders sold in coordinated sequence at peak prices into the demand their own promotion generated.

539. Second, the Enterprise induced participation through fraudulent misrepresentations and omissions. Defendants made materially false claims of "fair launches" and an "even playing field" while concealing insider pre-positioning, paid coordination, and the priority execution advantages that made retail losses inevitable.

*Relationships and Structure*

540. The Enterprise operated through a hierarchical structure with defined roles and controlled information access, including:

    a. Leadership Tier (Cohen, Kerler, Tweedale, Yakovenko, Gokal, Albert, Federa, Liu): Controlled platform architecture, campaign approvals, and early access to token addresses. Leadership retained and supervised promoters, determined which tokens would be promoted and when.

    b. Operations Command Tier: Recruited/managed KOLs, controlled narratives and posting cadence, coordinated insider pre-positioning and exit timing, and administered compensation (cash and/or early access).

    c. Operational Cells: Small persistent crews that executed campaign orders by launching tokens, running coordinated social media campaigns to create false

impressions of organic interest, deploying bot networks to amplify content and simulate engagement, and conducting harassment campaigns against competitors or defectors.

d. Operators: Influencers who promoted tokens across social media platforms, received instructions and early token addresses through private channels, and maintained downstream "Friends and Family" distribution networks through which promotional information cascaded.

541.  The Enterprise's relationships were maintained through:

a. Binding KOL agreements requiring "organic" promotion while concealing compensation;

b. Information control over early token addresses;

c. Aligned financial incentives tied to volume and fee capture; and,

d. Coercive enforcement (exclusion, retaliation, reputational attacks) against defectors and competitors.

*Longevity*

542.  The Enterprise has operated continuously from at least early 2024 through the present repeating the same playbook across numerous narrative campaigns (*e.g.* the 'Nostalgia' campaign featuring the COPE token as discussed herein).

543.  During this period, the Enterprise generated billions of dollars of proceeds from Plaintiffs as described in this Complaint's factual allegations Section III.

*Distinctness*

544.  The Solana-Pump.Fun Racketeering Enterprise is distinct from each Defendant. It is an association-in-fact comprising multiple persons; no single Defendant is the Enterprise

147

itself. Each Defendant was employed by or associated with the Enterprise and conducted or participated in its affairs. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).

*Effect on Interstate and Foreign Commerce*

545.   The Enterprise engaged in, and its activities affected, interstate and foreign commerce by, among other things: operating Pump.fun over the internet; transmitting promotions and solicitations across U.S. and foreign users; coordinating through Telegram/Discord; routing and settling transactions over Solana's globally distributed network; and moving proceeds to centralized exchanges and foreign structures while continuing to market to U.S. users.

**Each Defendant Conducted or Participated in the Enterprise's Affairs**

546.   Section 1962(c) requires that a defendant "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." The Supreme Court has held that this requires "some part in directing the enterprise's affairs," which may be satisfied by participation in the "operation or management" of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 185 (1993).

*Pump.fun Defendants*

547.   Baton Corporation Ltd. d/b/a Pump.fun participated by designing and operating the platform and bonding-curve mechanics that structurally reward first movers; permitting anonymous access without KYC/AML/sanctions screening or age verification; extracting a 1% fee on every buy and sell; retaining and compensating KOLs under agreements requiring concealed "organic" promotion; providing features designed to maximize addictive engagement and trading volume; and exercising centralized control to protect

Enterprise interests rather than users.

548. Cohen participated by directing enterprise strategy and campaign approvals; controlling early token-address distribution and KOL access; coercing promoters through allocation control (including conditioning allocation restoration on bringing in additional influencers); and making material representations and omissions while internally acknowledging Pump.fun's casino-like nature and that "most lose."

549. Kerler participated by directing technical development and execution integration, including implementing tooling to measure and optimize preferred participants' execution "land rate" and integrating priority pathways essential to insider-first execution.

550. Tweedale participated by coordinating operations and KOL management, and by directing concealment efforts, reflecting consciousness of wrongdoing.

*Solana Defendants*

551. Solana Labs participated by authoring and maintaining the SPL Token Program and core validator/network systems that made Pump.fun token creation and high-frequency trading feasible; implementing network updates in April 2024 that enabled Pump.fun's successful launch after prior failures; providing direct technical support; and publicly promoting Pump.fun-driven activity to increase network usage and fee revenue.

552. Solana Foundation participated by coordinating with Solana Labs on ecosystem strategy and regulatory posture (including foreign foundation wrappers), directing resources and ecosystem coordination enabling Pump.fun, and benefiting from network economics tied to transaction volume, including control of a substantial portion of the original SOL supply (approximately 49% between direct allocation and reserves) and

large staking rewards (approximately four million SOL annually during 2024–2025, valued roughly $700–$800 million).

553.    Individual Solana Defendants participated by lending credibility, support, and strategic alignment to the Enterprise, including:

a.    Yakovenko publicly endorsed Pump.fun ("pump dot fun has a shot at building a global streaming platform") on August 19, 2025, and equated memecoins with gambling "lootboxes" on March 13, 2024, evidencing knowledge of the chance-based wagering dynamic intrinsic to a facet of the Enterprise's product.

b.    Gokal publicly framed Pump.fun token launches as rapid fundraising ("where else can you raise $400m in 13 minutes?") on July 12, 2025, and admitted the throughput-to-volume monetization sequence ("more throughput… then cash in on the volume") on January 29, 2025.

c.    Albert, Federa, and Liu directed strategy/resources supporting the infrastructure and volume-driven economic posture on which the Enterprise relied, including promoting foreign-structure strategies to limit U.S. exposure while continuing to solicit U.S. users and flow.

*Lead KOL Doe Defendants*

554.    The Lead KOL Doe Defendants participated by receiving early token addresses through private channels; pre-positioning at lower prices; coordinating promotional narratives, timing, and posting cadence with enterprise leadership/operations; activating and directing downstream "friends & family" distribution networks; concealing compensation and coordination; and executing managed exits into the retail demand their promotions generated.

150

**Through a Pattern of Racketeering Activity**

555.    Defendants conducted and participated in the Enterprise's affairs through a pattern of racketeering activity within 18 U.S.C. §§ 1961(1) and 1961(5), including (at minimum): wire fraud (18 U.S.C. § 1343), illegal gambling business (18 U.S.C. § 1955), state-law gambling felonies (18 U.S.C. § 1961(1)(A)), and illegal money transmitting (18 U.S.C. § 1960).

556.    The predicate acts are related and amount to, and pose a threat of, continued criminal activity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

*Relatedness and Continuity*

562.    The predicate acts described below were related to each other in that they had the same or similar:

    a.    **Purposes:** Each predicate act was committed to extract value from retail participants by inducing them to transact based on false representations of fair access and organic discovery, while insiders who controlled supply, manufactured demand, and managed exits captured the proceeds;

    b.    **Results:** Each predicate act resulted in retail losses and insider profits, with Plaintiffs and Class members paying prices inflated by fraudulent promotion and absorbing losses when insiders executed their managed exits;

    c.    **Participants:** Each predicate act was committed by or at the direction of the same core group of Enterprise participants—Leadership (the Pump.fun Defendants), Infrastructure Providers (the Solana Defendants), and Promoters (the Lead KOL Doe Defendants)—operating through the same hierarchical command structure;

d. **Victims:** Each predicate act targeted the same class of victims—retail users of the Pump.fun platform, including New York consumers, who were induced to participate based on false representations and were structurally positioned as exit liquidity from the moment they arrived;

e. **Methods of Commission:** Each predicate act was committed using the same operational playbook: target selection and campaign planning; bundling and pre-positioning; coordinated promotional deployment through Lead KOLs, secondary KOLs, and F&F networks; leadership signals; and managed profit taking.

557. The pattern satisfies continuity: (a) closed-ended continuity because the scheme operated repeatedly from at least early 2024 through the present; and (b) open-ended continuity because the predicate acts are the regular way the Enterprise conducted, and continues to conduct, its business.

### *First Predicate Act: Wire Fraud (18 U.S.C. § 1343)*

558. Defendants committed, caused, and knowingly facilitated multiple acts indictable under 18 U.S.C. § 1343 by devising a scheme to obtain money or property through materially false pretenses, representations, and omissions, and transmitting (or causing the transmission of) communications by interstate and foreign wires to execute that scheme.

559. The elements of wire fraud are: (1) a scheme or artifice to defraud; (2) money or property as the object of the scheme; (3) use of interstate wires in furtherance of the scheme; and (4) the defendant's knowing and willful participation in the scheme with intent to defraud.

**1. The Scheme to Defraud**

560.    Defendants devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and omissions. The wire-fraud scheme operated through:

a. **Supply Control:** insiders acquired disproportionate token supply at the lowest prices using advance knowledge, bundling across wallets, and paid priority execution that ensured insider orders executed first.

b. **Demand Manufacturing:** coordinated promotions created a false appearance of organic, independent discovery through lead KOL pushes, secondary amplification, friends & family cascades, leadership signals, and engagement/bot amplification.

c. **Managed Exits:** insiders sold into induced demand through sequenced exits timed to coincide with peak retail inflows, while promotion continued even after senior insiders exited.

d. The scheme depended on concealment. Reasonable consumers would not have transacted had they known "fair launch" claims were false; promotions were paid and centrally coordinated; insiders pre-positioned at unavailable prices; and transaction ordering could be purchased to guarantee insider-first execution.

**2. Material Misrepresentations and Omissions**[13]

a. **The "Fair Launch" Misrepresentations:**

- **Who:** Defendant Cohen, on behalf of Pump.fun.

---

[13] Plaintiffs note this is not an exhaustive list of Defendants' material misrepresentations and omissions.

- **What:** On September 25, 2024, Cohen retweeted a screenshot of a direct message he sent to a prospective user stating that Pump.fun was an "unruggable fair launch platform."

- **Where:** The statement was disseminated on X/Twitter and viewable by Cohen's followers and the public.

- **When:** September 25, 2024.

- **How it was Misleading:** The representation that Pump.fun was "unruggable" and offered "fair launches" was false because: (i) the bundling system allowed insiders to package multiple buy transactions and execute them at or before token launch, capturing supply before anyone else could act; (ii) the bonding-curve design guaranteed that insiders who bought first received the lowest prices; (iii) the platform's no-KYC design allowed insiders to disguise coordinated accumulation across anonymous wallets; (iv) priority execution systems allowed insiders to pay for guaranteed transaction ordering; and (v) Defendants implemented no meaningful protections that would make "fair launch" claims true because such protections would undermine the supply control that made profit possible.

- **Scienter:** Cohen knew these representations were false because he directed the Enterprise's operations, controlled access to early information as a "lever" of coercive power, and acknowledged in internal communications that the platform was a "casino" where users were "gambling" with "really really low odds" and the goal was to make them

154

"happier (Even though most lose)."

b. **The "Level Playing Field" Misrepresentations:**

- **Who:** Defendant Cohen, on behalf of Pump.fun.

- **What:** On October 4, 2024, Cohen posted on X/Twitter: "pump fun is as much of an even playing field as it gets IMO."

- **Where:** X/Twitter, viewable by Cohen's followers and the public.

- **When:** October 4, 2024.

- **How Misleading:** The representation that Pump.fun was "an even playing field" was false because the Enterprise systematically advantaged insiders through: (i) early access to token addresses before any public promotional activity; (ii) priority execution that allowed insiders to pay for first position; (iii) coordination through private Telegram channels; and (iv) managed exits that ensured insiders sold before the price collapsed. The playing field was structurally rigged against retail participants.

- **Scienter:** Cohen knew the playing field was not "even" because he determined who received access to opportunities and when, personally directed promotional campaigns, and controlled the enforcement mechanisms that kept subordinate participants in line.

c. **The 'Retail is Winning' Misrepresentations:**

- **Who:** Defendant Cohen, on behalf of Pump.fun.

- **What:** On October 12, 2024, Cohen posted on X/Twitter: "retail's already up massively because it's so easy for them to get involved and the playing field is as fair as ever."

155

- **Where:** X/Twitter, viewable by Cohen's followers and the public.

- **When:** October 12, 2024.

- **How Misleading:** The representation that "retail's already up massively" was false because: (i) the vast majority of wallets that transacted on Pump.fun ended in net negative positions; (ii) a user who earned more than $10,000 in profit ranked in the top 0.412% of all users; (iii) over 95% of wallets never cleared $10,000 in gains; (iv) the 'success stories' cited to induce participation represented insider gains, not retail gains; and (v) the platform was designed to ensure that retail losses funded insider profits.

- **Scienter:** Cohen knew retail was not "up massively" because he designed the platform to extract value from retail, acknowledged in internal communications that "most lose."

d. **The "Organic Promotion" Misrepresentations:**

- **Who:** Enterprise participants including Cohen, Lead KOL Doe Defendants, and other KOLs acting at the direction of Operations Command.

- **What:** KOL promotions of tokens across X/Twitter, YouTube, TikTok, and X Spaces that presented the appearance of independent, organic discovery of investment opportunities, including: (i) Orange's post on August 27, 2025, stating "Haven't been excited about a coin in a long time... Don't $cope later"; (ii) staged interviews with the COPE developer propagating the fabricated "17-month grind" narrative; (iii) coordinated promotional threads timed to coincide with insider positioning.

156

- **Where:** Social media platforms including X/Twitter, YouTube, TikTok, and Telegram, viewable by KOL audiences and the public.

- **When:** Throughout the Class Period, including specific instances on August 27, 2025 (COPE launch promotion), and September 4, 2025 (staged developer interview).

- **How Misleading:** The promotions appeared to be independent, organic endorsements when they were in fact: (i) centrally coordinated by Operations Command; (ii) compensated through direct payment and/or early access to token positions; (iii) timed according to a promotional calendar designed to maximize insider profit; and (iv) required to appear "organic" under standard Pump.fun KOL agreements. The concealment of compensation and coordination was material because audiences reasonably believed they were receiving independent analysis rather than paid advertisements from people who had already positioned themselves to profit from their purchases.

- **Scienter:** The Lead KOL Doe Defendants knew their promotions were misleading because they received early token addresses through private channels, pre-positioned before promoting, and executed managed exits into the retail demand their promotions generated.

e. **Material Omissions**

- **Omission of Paid Coordination:** Defendants failed to disclose that promotional activity appearing organic was in fact paid and coordinated. This information was material because a reasonable retail participant

would have wanted to know that the person urging them to buy had already positioned at lower prices and would be selling to them.

- **Omission of Insider Pre-Positioning:** Defendants failed to disclose that Enterprise insiders acquired supply at the lowest prices before promotional activity began, and that retail participants were structurally positioned to purchase only after insiders had positioned. This information was material because it negated the "fair launch" and "level playing field" representations.

- **Omission of Priority Execution Advantages:** Defendants failed to disclose that insiders could pay for guaranteed priority execution, ensuring their orders executed before retail orders could. This information was material because it revealed that the execution environment was pay-to-win, not fair.

- **Omission of Managed Exit Coordination:** Defendants failed to disclose that insiders coordinated their selling to occur at peak demand, with senior insiders exiting first while promotional activity continued to induce new retail buying. This information was material because it would have revealed that the promotional campaigns were for the purpose of generating sufficient retail demand for insiders to sell at favorable prices before engineered price declines.

- **Omission of Structural Losses:** Defendants failed to disclose that the vast majority of Pump.fun users lost money, that over 95% of wallets never cleared $10,000 in gains, and that the platform was designed to

ensure retail losses funded insider profits. This information was material because it directly contradicted representations, for example, that retail was "up massively" and could "win."

**Use of Interstate and Foreign Wires**

561. Defendants and Enterprise participants used interstate and foreign wires, including: Pump.fun's website/app communications; social-media posts and videos; Telegram/Discord coordination; on-chain transaction routing and settlement across a globally distributed validator network; and direct solicitations (including Cohen's "3,000+ cold DMs").

562. Representative wire fraud acts include:

- On September 25, 2024, Cohen transmitted or caused to be transmitted a retweet via X/Twitter containing his direct message claiming Pump.fun was an "unruggable fair launch platform," which was false for the reasons stated above;

- On October 4, 2024, Cohen transmitted or caused to be transmitted a post via X/Twitter stating "pump fun is as much of an even playing field as it gets," which was false for the reasons stated above;

- On October 12, 2024, Cohen transmitted or caused to be transmitted a post via X/Twitter stating "retail's already up massively because it's so easy for them to get involved and the playing field is as fair as ever," which was false for the reasons stated above;

- On August 18, 2025, Cohen transmitted or caused to be transmitted a post via X/Twitter stating "bottom on my memes or I chop it off" to prime the market for the COPE campaign, knowing insiders had already positioned;

- On August 27, 2025, a Lead KOL transmitted or caused to be transmitted a post via X/Twitter stating "Haven't been excited about a coin in a long time... Don't $cope later," launching the coordinated COPE promotional campaign while omitting his insider position and compensation;

- On each date that Cohen sent one of his "3,000+ cold DMs" soliciting participation in the Pump.fun platform, Cohen transmitted or caused to be transmitted a wire communication soliciting investment in the fraudulent scheme.

- On July 18-19, 2025, Defendants Liu and Federa transmitted or caused to be transmitted posts via X/Twitter discussing the Enterprise's strategy of routing token launches through foreign foundations to obtain favorable tax and regulatory treatment, which communications furthered the scheme by articulating and coordinating the Enterprise's compliance avoidance posture.

**Scienter**

563.    Defendants acted knowingly and with intent to defraud as shown, among other things, by: (i) internal acknowledgments characterizing Pump.fun as "gambling" with low odds; (ii) public statements describing Pump.fun as a "casino"; (iii) deliberate operation without KYC/AML/sanctions screening despite foreseeability of misuse; (iv) concealment steps taken when scrutiny increased; and (v) continued inducement of retail

participation after learning of predatory conduct and retail losses.

**Knowing Facilitation by Solana Defendants**

564.     The Solana Defendants knowingly participated in the wire fraud scheme by managing and directing the operations of the Enterprise that enabled insider-first execution and high-frequency profit taking, while profiting from the resulting surge in transaction volume, fees, and tips—and while the Enterprise continued to market "fair launches" and "organic" discovery narratives contradicted by the pay-to-win execution environment and insider pre-positioning.

### *Second Predicate Act: Illegal Gambling Business (18 U.S.C. § 1955)*

565.     Defendants conducted, financed, managed, supervised, directed, and/or owned an illegal gambling business through Pump.fun. Users staked SOL, something of value, on whether they could sell before demand disappeared—risking something of value on a future contingent event outside their control in exchange for the chance to receive something of value.

566.     Section 1955 provides that whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be guilty of a federal offense.

567.     Section 1955(b)(1) defines "illegal gambling business" as a gambling business which: (i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 or more in any single day.

568.     The gambling business violated state law, including the laws of New York. Pump.fun

161

users in New York staked SOL on whether subsequent buyers would appear and expected SOL proceeds if they sold before buyers disappeared.

569. The business involved at least five persons and operated continuously for well over thirty days while generating gross revenue far exceeding $2,000 in single-day periods, including peak fee days exceeding $10 million, in violation of Section 1955(b)(1).

**Violation of State Law**

570. The illegal gambling business violated the laws of states in which it was conducted, including New York.

571. New York Penal Law § 225.00(2) defines "gambling" as staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the actor's control or influence, upon an agreement or understanding that the person will receive something of value in the event of a certain outcome.

572. Pump.fun users in New York staked SOL (something of value) upon the outcome of whether subsequent buyers would emerge to purchase tokens at higher prices (a future contingent event not under the user's control), upon the understanding that they would receive SOL proceeds (something of value) if they sold before buyers disappeared.

573. New York Penal Law § 225.10 (Promoting Gambling in the First Degree) provides that a person is guilty when he knowingly advances or profits from unlawful gambling activity by engaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars.

574. Defendants knowingly advanced gambling activity by operating the Pump.fun platform through which New York residents placed wagers, and profited from such activity by collecting fees on each transaction. On peak trading days, Pump.fun earned in

162

excess of $10 million in platform fees, representing wagers far exceeding the statutory threshold.

575.    New York Penal Law § 225.05 (Promoting Gambling in the Second Degree) provides that a person is guilty when he knowingly advances or profits from unlawful gambling activity. Defendants knowingly advanced and profited from unlawful gambling activity by New York residents through the operation of the Pump.fun platform, as described herein.

**Continuous Operation and Revenue**

576.    The illegal gambling business has operated in continuous operation since its launch in early 2024 through the present—a period exceeding eighteen months.

577.    The illegal gambling Pump.fun operation generated over $400 million in platform fee revenue during 2024 alone. Average daily revenue rose from approximately $900,000 per day in the third quarter of 2024 to roughly $2.5 million per day in the fourth quarter. On peak trading days, Pump.fun earned in excess of $10 million in platform fees in a single 24-hour period.

### Third Predicate Act: Illegal Money Transmitting Business (18 U.S.C. § 1960)

578.    Defendants committed multiple acts indictable under 18 U.S.C. § 1960 (illegal money transmitting business).

579.    Section 1960 provides that whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business shall be guilty of a federal offense.

580.    Section 1960(b)(1) defines "unlicensed money transmitting business" as a money transmitting business which: (a) is operated without an appropriate money transmitting

163

license in a State where such operation is punishable as a misdemeanor or a felony under State law; (b) fails to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330; or (c) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

581.    The Solana-Pump.fun Racketeering Enterprise knowingly operated a money transmitting business by receiving cryptocurrency (SOL) from buyers on Pump.fun and transmitting it to sellers through its bonding-curve contracts and platform infrastructure.

582.    This activity constitutes "money transmission" under federal law, which includes "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." 31 C.F.R. § 1010.100(ff)(5)(i)(A).

583.    Pump.fun operated without required state money-transmitter licensing, including in New York (N.Y. Banking Law Art. 13-B, §§ 641, 650), and failed to register as an MSB with FinCEN as required by 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380.

584.    Neither Baton Corporation nor Pump.fun has obtained a money transmitter license from the New York State Department of Financial Services.

585.    Operating as an unlicensed money transmitter in New York is a criminal offense. N.Y. Banking Law § 650.

586.    Alternatively, the money transmitting business involved the transportation or transmission of funds that Defendants knew were derived from criminal offenses or intended to promote unlawful activity.

587.    Defendants knew that the funds transmitted through Pump.fun were derived from and

164

intended to promote:

    a. **Wire Fraud:** The SOL transmitted through Pump.fun was obtained through the fraudulent scheme described above, in which retail participants were induced to purchase tokens based on false representations and material omissions;

    b. **Illegal Gambling:** The SOL transmitted through Pump.fun represented wagers in an illegal gambling operation, with payouts to winners derived from stakes placed by losers;

    c. **Money Laundering by Criminal Organizations:** In or around February 2025, the Lazarus Group—a North Korean state-sponsored cybercrime unit subject to U.S. sanctions—used Pump.fun to launder proceeds from approximately $1.5 billion stolen from the Bybit exchange by deploying a memecoin named "QinShihuang," achieving $26 million in trading volume before dispersing proceeds.

588. Each Defendant knowingly conducted, controlled, managed, supervised, directed, and/or owned all or part of the unlicensed money transmitting business:

    a. **The Pump.fun Defendants** designed, implemented, and operated the money transmission platform; received and transmitted cryptocurrency through its smart contracts and infrastructure; and deliberately avoided licensing, KYC/AML, and registration requirements.

    b. **The Solana Defendants** provided and maintained the blockchain infrastructure through which money transmission occurred; and knew that Pump.fun was transmitting funds without required safeguards.

    c. **The Individual Solana Defendants** knowingly conducted, controlled, managed,

165

supervised, directed, and/or owned all or part of the unlicensed money transmitting business by:

    i.    Yakovenko, as CEO of Solana Labs, directed the development and operation of the infrastructure and SPL Token Program through which Pump.fun received, converted, and transmitted cryptocurrency, with knowledge that no money transmitter licenses had been obtained;

    ii.    Gokal, as President and COO of Solana Labs, directed operations of the infrastructure through which money transmission occurred, with knowledge of the compliance failures that enabled unlicensed transmission at scale;

    iii.    Albert, as Executive Director of the Solana Foundation, directed Foundation resources supporting the infrastructure through which unlicensed money transmission occurred;

    iv.    Federa, as Head of Strategy of the Solana Foundation, directed strategic initiatives supporting the money transmission infrastructure and developed the regulatory avoidance strategy that enabled continued unlicensed operation;

    v.    Liu, as President of the Management of the Solana Foundation, directed Foundation governance decisions supporting the infrastructure through which unlicensed money transmission occurred

**Injury and Causation**

589.    Plaintiffs and Class members suffered injury to their business or property "by reason of" Defendants' § 1962(c) violations. Plaintiffs were the immediate and intended victims

166

of the wire-fraud inducements, the illegal gambling profits, and the unlicensed transmission that moved their funds to insiders.

590.    Plaintiffs' injuries include, without limitation:

    a.    **Transactional losses:** purchases at fraud-inflated prices followed by collapses after insider exits, leaving Plaintiffs holding depreciated or worthless tokens. Between approximately 81% and 97% of tokens launched through Pump.fun lost more than half their value post-graduation, producing estimated retail losses of $1.2 to $2 billion in the post-graduation phase alone.

    b.    **Platform fees:** Pump.fun and Solana fees charged on fraud-induced buys and sells.

    c.    **Execution harms:** inferior fills, slippage, and related value losses caused by the pay-to-win priority execution environment that advantaged insiders over retail.

    d.    Plaintiffs would not have transacted on Pump.fun, or would not have done so on the same terms, had Defendants disclosed the true nature of the scheme. There is no independent, superseding cause of Plaintiffs' injuries; Plaintiffs' losses flowed directly from the scheme's design.

## I. Prayer for Relief (Count I)

591.    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendants, jointly and severally, for: (a) treble damages under 18 U.S.C. § 1964(c); (b) reasonable attorneys' fees and costs under § 1964(c); (c) pre- and post-judgment interest; and (d) such other and further relief as the Court deems just and proper.

## COUNT II

### VIOLATION OF 18 U.S.C. § 1962(d)
### (Conspiracy to Violate RICO)
### Against All Defendants

592.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

**Statutory Framework**

593.   Section 1962(d) makes it unlawful for any person to conspire to violate § 1962(c). A plaintiff must plead that the defendant knew about and agreed to facilitate a scheme that, if completed, would satisfy § 1962(c). No overt act is required. *Salinas v. United States*, 522 U.S. 52, 63–66 (1997).

**The Conspiracy**

594.   Defendants knowingly and intentionally conspired to violate § 1962(c) by agreeing among themselves and with other Enterprise participants that at least one conspirator would conduct or participate in the conduct of the Solana-Pump.Fun Racketeering Enterprise's affairs through a pattern of racketeering activity, including at least two predicate acts.

595.   The object of the conspiracy was to enrich conspirators by operating the Enterprise's rigged, unlicensed gambling platform and profiting billions from retail through wire fraud, illegal gambling, and unlicensed money transmission, monetized through platform fees, network/validator economics, and MEV/priority tips.

**Knowledge and Agreement**

596.   Each Defendant knew the essential nature of the scheme and agreed to further it, as demonstrated by their roles, communications, coordinated integration and support,

168

aligned financial incentives, and conduct described above.

597.   Pump.fun Defendants' knowledge and agreement are shown by their control of the platform and promotional apparatus; deliberate operation without KYC/AML/safeguards; KOL agreements requiring concealed "organic" promotion; internal and public casino/gambling admissions; and concealment efforts. This includes:

    a.   Their positions as founders and operators of the platform at the center of the scheme;

    b.   Cohen's acknowledgment in internal communications that Pump.fun was "gambling" designed to make users "happier (Even though most lose)";

    c.   Cohen's public statements characterizing the platform as "the greatest CASINO in the world";

    d.   The Pump.fun Defendants' deliberate design choices to operate without KYC/AML, sanctions screening, or consumer safeguards;

    e.   The Pump.fun Defendants' binding agreements with KOLs requiring concealed, organic-seeming promotional activity;

    f.   The Pump.fun Defendants' control over the information cascade that determined who profited and who lost;

598.   Solana Defendants' knowledge and agreement are shown by coordinated technical support and timing enabling Pump.fun's launch and scaling; public endorsements and normalization of casino-like volume; promotion of a volume-monetization posture; financial benefit tied to Pump.fun activity; and dissemination of foreign-structure strategies to limit U.S. exposure while continuing to attract U.S. users and fees. This includes:

169

a.  Meetings between Pump.fun leadership and Solana leadership (Yakovenko and Gokal) concerning investment and technical support, according to CW-1;

b.  Coordinated timing of Solana network updates in April 2024 that enabled Pump.fun's successful launch immediately afterward;

c.  Direct technical support provided through communications between Solana Core Developer Jon Cinque and a Pump.fun developer;

d.  Gokal's offer to help Pump.fun with introductions as they navigated product support and investment needs, according to CW-1;

e.  Yakovenko's public endorsement of Pump.fun as having "a shot at building a global streaming platform" and his comparison of memecoins to gambling "lootboxes";

f.  Yakovenko's public claim of credit for Pump.fun's revenue and offer to help other companies "scale their revenue" the same way;

g.  Gokal's public acknowledgment of "casino" activity on Solana;

h.  The Solana Defendants' deliberate regulatory posture of routing token launches through foreign foundation wrappers while extracting U.S. user flow and fees;

i.  The Solana Defendants' financial interest in Pump.fun's success, including holdings of approximately 49% of SOL token supply and staking rewards of $700-$800 million annually driven by platform activity.

j.  Albert's direction of Foundation resources toward ecosystem development supporting Pump.fun operations, and his contributions to Solana Labs' core codebases demonstrating functional integration between Labs and Foundation;

k.  Federa's public articulation of the Enterprise's regulatory avoidance strategy (as

170

Head of Strategy of Solana Foundation);

l. Liu's public statements articulating the economic model aligning Enterprise participants' incentives around transaction volume, and her participation in discussions regarding foreign foundation structures to shield U.S. liability.

599. Lead KOL Doe Defendants' knowledge and agreement are shown by:

a. Their receipt of early token addresses through private Telegram channels before promotional activity, enabling pre-positioning;

b. Their coordination with Leadership and Operations Command regarding promotional content, posting cadence, and narrative selection;

c. Their contractual agreements with Pump.fun requiring concealed, "organic" promotional activity;

d. Their activation of downstream "Friends and Family" distribution networks according to centralized campaign plans;

e. Their execution of managed exits by selling into the retail demand generated by their own promotional activity;

f. Their participation in coordinated harassment campaigns against defectors or competitors who threatened the scheme.

**Scope of the Conspiracy**

600. The conspiracy encompassed agreement on the essential mechanics of the scheme, including: (a) presenting coordinated promotions as organic; (b) insider pre-positioning and supply control; (c) using priority execution infrastructure to secure insider-first ordering; (d) managed exits timed to promotional pushes; and (e) operating without licensing, KYC/AML, sanctions screening, and consumer safeguards to preserve

anonymity and maximize volume and fees.

**Overt Acts (Alleged Though Not Required)**

601.    Although no overt act is required, Defendants committed numerous overt acts in furtherance of the conspiracy, including those alleged above and incorporated herein.

**Injury and Causation**

602.    Plaintiffs and Class members suffered injury to business or property by reason of Defendants' § 1962(d) conspiracy. The conspiracy achieved its object, coordinated profit-making from retail participants, and proximately caused the injuries alleged in Count I.

**Prayer for Relief (Count II)**

603.    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendants, jointly and severally, for: (a) treble damages under 18 U.S.C. § 1964(c); (b) reasonable attorneys' fees and costs under § 1964(c); (c) pre- and post-judgment interest; and (d) such other and further relief as the Court deems just and proper.

**COUNT III**

**SECURITIES ACT VIOLATIONS**
**(Pled in the Alternative)**
**(Violation of Section 12(a)(1) of the Securities Act of 1933)**
**Against Defendant Baton Corporation d/b/a Pump.fun**
**on Behalf of the Pump Tokens Subclass**

604.    This Count is asserted on behalf of Plaintiffs and the Pump Token Subclass against Defendant Baton Corporation, which conducts business and operates as Pump.fun, pursuant to Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §77l(a)(1).

605.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that the Defendant named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(1) claim.

606.    The Pump Tokens are, and were, securities as defined by the Securities Act.

607.    The Pump Tokens were never registered as securities with the SEC, and no registration statement has ever been filed with the SEC for the Pump Tokens.

608.    Baton Corporation is a statutory seller of the Tokens because Pump.fun, which it owns, controls, and does business as, sold, promoted, or solicited the sale of the Pump Tokens and/or passed titled to the Pump Tokens to the Plaintiffs and the Subclass.

609.    Baton Corporation and Pump.fun began operating and issuing Tokens on January 19, 2024. Baton Corporation has issued, offered, promoted, sold, and/or solicited the sale of Pump Tokens within the last year. For example, Baton Corporation and Pump.fun began offering the FRED Token and the GRIFFAIN Token for sale on October 31, and November 2, 2024, respectively.

610.    Baton Corporation is therefore liable to the Plaintiffs and the Class for rescission and/or rescissory or compensatory damages in an amount to be determined at trial for Plaintiff and the Subclass's purchases of the Pump Tokens.

611.    Plaintiffs and the Subclass hereby tender their Pump Tokens back to Baton Corporation and/or Pump.fun.

612.    Each of the Pump Tokens was offered and sold as an investment contract. Across all twenty tokens, the following characteristics were present:

(a) **Investment of Money:** Purchasers used SOL to buy the tokens directly from Pump.fun's system. These were paid transactions through bonding-curve contracts.

(b) **Common Enterprise:** The tokens were structured so that users' funds were pooled. The price increased or decreased depending on the total level of participation. Every buyer's outcome depended on the success of the project as a whole establishing horizontal or vertical commonality.

(c) **Expectation of Profits:** Buyers were told that the Pump Tokens would increase in value over time as future steps were completed. This included promises of platform launches, product rollouts, or integration into larger ecosystems. The Pump Tokens were described as reasonable opportunities for return on investment.

(d) **Efforts of Others:** The future value of the Pump Tokens depended on the issuer or platform doing work after the sale. This included building apps, launching services, completing integrations, or managing staking systems. Purchasers were not buying completed products—they were investing in projects that had yet to be built.

(e) These common features show that the Pump Tokens were not digital collectibles or memes. They were positioned as financial assets sold to the public with the promise of future gains.

**Pump Tokens are Unregistered Securities Under Howey**

613.  StakeCoin ("STC") — Real-World-Asset pass-through. A screenshot of this token's trading page on Pump.fun describes StakeCoin as "integrating Real World Assets with

174

blockchain to bridge TraFi and DeFi." Investors purchased STC using SOL through a bonding-curve mechanism, with returns allegedly tied to revenue from tokenized off-chain assets. The roadmap includes the tokenization of real-estate deeds, which are to be managed by the issuer. (See Ex. C at 2).

614.    QuStream ("QST") — Quantum-Safe L1. QST is marketed as a Layer-1 blockchain utilizing "patented post-quantum encryption." Launch materials indicate that future validator staking rewards will be distributed, and purchasers are led to expect that appreciation in token value will follow successful research and deployment of the referenced technology. Proceeds are pooled in a genesis contract. (See Ex. C at 2).

615.    BunkerCoin ("BUNKER") — Crisis-Shelter Finance. BUNKER marketing claims ownership of "the world's biggest private bunker near Berlin" and discusses future sales of panic-room memberships and additional developments in The Gambia. Purchasers contribute funds with the expectation that the issuer will construct, operate, and monetize these facilities and related services. (See Ex. C at 3).

616.    DeepCore AI ("DPCORE") — Web3 AI Agent Hub. DPCORE materials describe a platform for "MCP-powered next-gen AI agents," and promote token staking to earn rewards from agent-task transactions. The projected token value is presented as dependent on the issuer's ability to deliver a functioning marketplace and AI infrastructure. (See Ex. C at 3).

617.    AgentPy ("APY") — Python AI-on-Solana Framework. APY purports to serve as a connector between AI agents and Solana-based applications, offering "early adopter token rewards" upon full launch. The commercial viability of the token is directly tied to the successful development and implementation of the issuer's software product. (See Ex.

C at 4).

618.    Apex AI ("APEX") — Medical-Diagnostics Coin. APEX is presented as a token for early detection of gastrointestinal cancers using high-accuracy diagnostic tools. Token value is linked to pending FDA approvals and future integration with healthcare providers, all controlled by the issuer. (See Ex. C at 4).

619.    Verse World ("VERSE") — Hyper-Realistic Metaverse. VERSE is marketed as the native token of an "evolutionary metaverse" offering: land parcels, storefronts, and creator monetization. Investors contribute SOL and rely on the issuer's future development and hosting of the platform to derive potential returns. No registration statement or exemption has been filed. (See Ex. C at 5).

620.    BAYC AI ("BAYCI") — Mars-Ape Storyline Token. BAYCI purports to tie its value to a comic-themed metaverse and "time-space portal" game narrative built around mutated ape NFTs. These creative and gaming assets are under the exclusive control of the issuer. Promotional materials use BAYC imagery without authorization (see Counterfeit section). (See Ex. C at 5).

621.    Alchemist AI ("ALCH") — No-Code AI-App Builder. ALCH promotes the concept that users will be able to "manifest any idea into a living application" through its no-code AI framework. Marketing suggests future profit-sharing mechanisms for stakers. The anticipated value of the token is based on the successful launch of the platform. (See Ex. C at 6).

622.    CINO ("CINO") — Private-Aviation Finance Coin. CINO's promotional materials state that the token will finance private jet acquisitions and distribute charter profits to holders. The investment is structured around a pro-rata share in future operational income

from a proposed jet fleet. (See Ex. C at 6).

623.    Swarms ("SWARMS") — Agentic Payments Coin. Swarms is marketed as the "default payment currency" for an emerging on-chain "agent ecosystem." The token is designed to facilitate transactions within that ecosystem, implying future utility contingent on development of the broader platform. (See Ex. C at 7).

624.    Collaterallize ("SCOLLAT") — RWA App Token. SCOLLAT promotes itself as a project to "bring RWAs to the masses," directing users to download an app from a mobile store. The issuer's roadmap and control over RWA integration suggest reliance on its efforts for token value appreciation. (See Ex. C at 7).

625.    XSPA ("XSPA") — AI Blockchain Platform Token. XSPA is described as a next-generation token powering a decentralized AI platform. The whitepaper outlines a multi-phase roadmap including smart contract deployment, an AI marketplace, DAO governance, and cross-chain functionality. Token value is linked to the issuer's ability to execute on these milestones, including monetization of AI models, staking programs, and strategic partnerships. The public sale is scheduled for September 2025. (See Ex. C at 8). Hive AI ("BUZZ") — DeFi Automation Token. BUZZ is promoted as a solution to "simplify DeFi through on-chain agents." The platform's functionality, and any value derived by token holders, depends on future deployment and agent activity controlled by the issuer. (See Ex. C at 8).

626.    SwarmNode.ai ("SNAI") — Serverless AI Infrastructure Token. SNAI markets itself as a token for "serverless AI infra," suggesting a planned infrastructure layer for AI operations. Token value appears tied to delivery of technical functionality not yet available to purchasers. (See Ex. C at 9).

177

627.    Codec Flow ("CODEC") — AI Desktop Infrastructure Token. CODEC advertises itself as powering on-demand "cloud desktops for AI agents" using MCP and trusted execution environments (TEE). Purchasers rely on issuer-delivered infrastructure to give the token value or utility. (See Ex. C at 9).

628.    PVS ("PVS") — Paraverse Utility Token. PVS is presented as the utility token for the "Paraverse" ecosystem, used to pay for rendering services, receiving airdrops, and access to 3D applications. Value to purchasers is tied to the development and rollout of that ecosystem under issuer control. (See Ex. C at 10).

629.    Convergent ("CVGT") — Collateralized Stablecoin Protocol Token. CVGT is described as the governance and fee-share token for a protocol that allows users to mint the stablecoin $USV by depositing staked Solana ($JitoSOL) collateral. The platform promises yield retention and liquidity access, while distributing all protocol fees to CVGT stakers. Purchasers rely on the issuer's technical development and ongoing operations. (See Ex. C at 10).

630.    The "First Convicted Raccoon" Token (ticker: FRED). Launched on Pump.fun on 31 October 2024, FRED promised investors "222,222× upside" and featured a five-step "Road-Map" culminating in centralized exchange ("CEX") listings and branded merchandise. Buyers paid SOL into the bonding-curve pool, and their profit prospects depended entirely on the promoter's promised listings and influencer marketing.

631.    The GRIFFAIN Token. Marketed as "AI-driven trading in meme form," GRIFFAIN debuted on Pump.fun on December 5, 2024. Promotional tweets embedded in the token tile claimed "0 → $10 M in 24 h" and teased future staking rewards of 300% APY—features wholly dependent on smart-contract code the promoter controlled.

178

Purchasers clearly expected passive returns from the issuer's technical efforts.

632.    All Pump Tokens created on the Pump.fun platform necessarily postdate its founding on January 19, 2024.

**No Exemption from Registration is Applicable**

633.    In each of the token launches listed above—including STC, QST, BUNKER, DPCORE, APY, APEX, VERSE, BAYCI, ALCH, CINO, SWARMS, SCOLLAT, XSPA, BUZZ, SNAI, CODEC, PVS, and CVGT—and as reflected on Pump.fun's trading platform, purchasers contributed capital in the form of SOL, in exchange for digital tokens whose value was represented as dependent on the managerial or entrepreneurial efforts of the issuer.

634.    Each purchase sent SOL into a bonding-curve contract that automatically minted tokens; when sold, the contract burned the tokens and returned SOL—pooling funds and linking returns to the token's market activity.

635.    These offerings uniformly involved the pooling of investor funds, promises of future functionality or profit-sharing, and an expectation that token value would increase based on development milestones under the issuer's exclusive control.

636.    Under the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), these Pump Tokens constitute "investment contracts" and therefore qualify as securities. None of the Pump Tokens were registered with the SEC, and no valid exemption from registration was claimed.

637.    Absent an applicable exemption, the Securities Act prohibits the offer and sale of securities unless a registration statement is filed or in effect. At the time of each Pump Token's launch, no such registration statement had been filed or was in effect with respect

to the offer or sale of these Pump Tokens.

638.    Accordingly, Defendant Pump.fun offered and sold the Pump Tokens identified in violation of 12(a)(1) of the Securities Act of 1933, without registering the offerings or qualifying for any exemption.

639.    Pump.fun acted as the issuer and statutory seller of each Pump Token by executing the token launches, setting the economic structure, and transferring tokens directly to purchasers through its platform.

640.    Plaintiffs purchased Pump Tokens directly from Pump.fun.

641.    Plaintiffs are entitled to rescission or damages under Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(1).

## COUNT IV

### SECURITIES ACT VIOLATIONS
#### (Pled in the Alternative)
#### (Control Person Liability Under Section 15 of the Securities Act of 1933)
#### Against Defendants Cohen, Kerler and Tweedale

642.    This Count is asserted on behalf of Plaintiffs and the Pump Token Subclass against Defendants Alon Cohen, Dylan Kerler and Noah Tweedale, pursuant to Section 15 of the Securities Act of 1933.

643.    Plaintiffs incorporate by reference the allegations of Count III and the relevant preceding paragraphs as though fully set forth herein.

644.    As alleged in Count III, Defendant Baton Corp. d/b/a Pump.fun violated Sections 5 and 12(a)(1) of the Securities Act by offering and selling the Pump Securities without an effective registration statement and without a valid exemption.

645.    At all relevant times, Defendants Cohen, Kerler, and Tweedale (the "Pump.fun Control Person Defendants") were "control persons" of Pump.fun within the meaning of

180

Section 15 of the Securities Act, 15 U.S.C. § 77o.

646.    The Pump.fun Control Person Defendants, by virtue of their positions and authority, had the power and influence to cause Pump.fun to engage in the unlawful conduct alleged, including the offer and sale of the Pump Securities through Pump.fun's launch and bonding-curve mechanism.

647.    Specifically:

a.  Cohen was Pump.fun's co-founder and Chief Executive Officer, and exercised operational control over Pump.fun's business, including platform operations, marketing, and promotion.

b.  Tweedale was Pump.fun's co-founder and Chief Product Officer and exercised operational control over product design, platform features, and user-facing mechanics through which the Pump Securities were offered and sold.

c.  Kerler was Pump.fun's co-founder and Chief Technology Officer and exercised operational control over the technical architecture and implementation of the token-launch and sale mechanics through which the Pump Securities were offered and sold.

648.    By virtue of the foregoing, the Pump.fun Control Person Defendants are liable, jointly and severally, with Pump.fun for Pump.fun's violations of Sections 5 and 12(a)(1), pursuant to Section 15 of the Securities Act.

649.    Plaintiffs and the Subclass seek rescission and/or rescissory damages, interest, costs, and such other relief as the Court deems just and proper.

## COUNT V

## UNJUST ENRICHMENT
### (Pled in the Alternative)
### Against All Defendants

650. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

651. Defendants were unjustly enriched by retaining platform fees, profits, and token allocations generated at the expense of Plaintiffs and the Class through deceptive and unlawful conduct.

652. It would be inequitable for Defendants to retain these ill-gotten gains.

653. Plaintiffs are entitled to restitution or disgorgement in an amount to be determined at trial, together with interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and on behalf of the Class respectfully request that judgment be entered in their favor and against all Defendants, and that the Court grant the following relief:

654. Class Certification. Certify, pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), a nationwide damages, injunctive-relief, and equitable-relief class of all persons and entities that purchased or otherwise acquired Pump.fun tokens on or after 1 January 2024 and suffered a net loss; appoint the named Plaintiffs as class representatives and their counsel as class counsel.

655. Compensatory Damages. Award the Class compensatory damages in an amount to be proven at trial—including: the difference between the consideration paid for Tokens and their value at the time of sale or collapse of the Tokens purchased together with pre- and post-judgment interest.

182

656. Treble Damages. Treble all compensatory damages under 18 U.S.C. § 1964(c) for Defendants' violations of 18 U.S.C. §§ 1962(c)–(d).

657. Statutory & Exemplary Damages.

658. Disgorgement & Restitution. Order equitable disgorgement of, and impose a constructive trust over, all ill-gotten gains—including platform fees, validator MEV tips, SOL-denominated appreciation, and any digital or fiat proceeds traceable to the racketeering enterprise.

659. Accounting. Direct Defendants to make a full and complete accounting of (i) every Pump.fun wallet address, fee wallet, and validator tip address; (ii) every smart-contract deployment; and (iii) every fiat off-ramp or CEX account used to cash-out enterprise proceeds, from January 2024 to the date of judgment.

*Appointment of a Federal Equity Receiver*

660. Receivership Authority. Pursuant to 18 U.S.C. § 1964(a), Fed. R. Civ. P. 66, and this Court's inherent equitable powers, appoint a qualified, independent receiver (the "Receiver") over Defendants Pump.fun Inc. and Solana Labs Inc. (collectively, the "Receiver Entities").

661. Scope of Control. The Receiver shall take exclusive custody, control, and possession of all assets, digital wallets (including hardware wallets and seed phrases), validator keys, smart-contract deployment keys, domain names, servers (on-prem and cloud), source-code repositories, books, and records of the Receiver Entities, wherever located, and shall marshal, secure, and safeguard the same against dissipation or concealment.

662. Operational Mandate. The Receiver is empowered to:

(a) Maintain or wind down operations as necessary to preserve asset value;

(b) Suspend token launches, validator MEV-tip auctions, and fee withdrawals pending further order;

(c) Implement AML/KYC controls, obtain all missing state and federal money-transmitter and gaming licences, and bring business practices into compliance with applicable law;

(d) Retain blockchain-forensics experts, auditors, and information-security personnel;

(e) Identify, trace, and, where appropriate, repatriate digital assets transferred to insiders, affiliates, or third-party wallets;

(f) Commence, defend, or settle legal actions in the name of the Receiver Entities to recover voidable transfers or fraudulent conveyances; and

(g) Prepare and file periodic reports with the Court and distribute interim relief to victims pursuant to a Court-approved claims process.

663. Asset Freeze & Turnover. Issue a preliminary and permanent injunction freezing the assets of the Receiver Entities and compelling Defendants and all persons in active concert with them to deliver the above-described assets, passwords, seed phrases, cold-storage devices, and two-factor-authentication devices to the Receiver forthwith.

664. Cooperation Order. Order Defendants, their officers, employees, agents, accountants, auditors, attorneys, and service providers to cooperate fully with the Receiver—including by executing any documents, providing sworn financial statements, and granting access to premises and servers—to facilitate immediate control and preservation of assets.

665. Stay of Other Proceedings. Enter an order staying, for the duration of the receivership, all civil litigation, arbitration, or administrative proceedings against the Receiver Entities, except with leave of Court, to prevent waste of receivership assets.

666.    Receiver's Fees. Authorize the Receiver to pay reasonable fees and expenses, subject to Court approval, from receivership assets.

*Injunctive & Declaratory Relief*

667.    Permanent Injunction (Gambling & MSB). Enjoin Defendants from operating Pump.fun or any substantially similar platform unless and until they (i) obtain all required New-York and federal money-transmitter and gaming licenses, (ii) implement robust AML/KYC and age-verification procedures, and (iii) subject the platform to independent audit and regulatory oversight.

668.    IP-Based Injunction. Enjoin Defendants from minting, listing, validating, or otherwise facilitating any token, metadata, or promotional material that infringes Plaintiffs' or third-party intellectual-property rights; require takedown of existing infringing smart contracts and metadata, and transfer of contract authority to the Receiver or a court-appointed escrow.

669.    Consumer-Protection Notice. Order the publication—on Pump.fun's website, Discord, and social-media channels—of corrective statements disclosing the true historical failure rate of Pump.fun tokens, the existence of insider MEV front-running, and the pendency of this action.

670.    Declaratory Judgment. Declare that Defendants' conduct constitutes (i) racketeering under 18 U.S.C. §§ 1961-1964; (ii) operation of an illegal gambling business under 18 U.S.C. § 1955; (iii) operation of an unlicensed money-transmitting business under 18 U.S.C. § 1960.

*Ancillary Relief*

671.    Pre-judgment Interest. Award pre-judgment interest at the maximum lawful rate.

672.    Post-judgment Interest. Award post-judgment interest pursuant to 28 U.S.C. § 1961.

673.    Attorneys' Fees & Costs. Award reasonable attorneys' fees, expert-witness fees, and costs of suit as authorized by 18 U.S.C. § 1964(c), 15 U.S.C. § 1117(a), 17 U.S.C. § 505, and other applicable statutes.

674.    Such Other Relief. Grant such other and further legal or equitable relief—including interim asset freezes, expedited discovery, provisional process, or writs of attachment—as the Court deems just and proper in the circumstances.

## JURY DEMAND

675.    Plaintiffs demand a trial by jury on all issues so triable.

DATED: January 7, 2026
New York, New York

Respectfully submitted,

**BURWICK LAW PLLC**
By: /s/ Max Burwick
Max Burwick
Luis Munoz
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
max@burwick.law
luis@burwick.law

**WOLF POPPER LLP**
Chet B. Waldman
Terrence Zhang
845 3rd Avenue – 12th Floor
New York, NY 10022
212-759-4600
cwaldman@wolfpopper.com
tzhang@wolfpopper.com