**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIEGO AGUILAR, KENDALL CARNAHAN and MICHAEL OKAFOR on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BATON CORPORATION LTD, d/b/a PUMP.FUN, ALON COHEN, DYLAN KERLER, NOAH BERNHARD HUGO TWEEDALE, SOLANA LABS INC., SOLANA FOUNDATION, ANATOLY YAKOVENKO, RAJ GOKAL, DAN ALBERT, AUSTIN FEDERA, LILY LIU and LEAD KOL DOES 1-25 <br><br> Defendants. | Case No.: 1:25-cv-00880-CM-BCM |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS**</u>

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT**...............................................................................4

**FACTUAL BACKGROUND**................................................................................ 5

    I. Overview of the Token-'Meta' Intimidation Strategy............................................ 5

    II. Affiliate Relationships, Authorization, and Attribution to Pump.fun.................... 8

    III. Primary Influencers and Execution of the Intimidation Campaign.................... 11

    IV. Harassment and Intimidation Directed at Counsel's Family............................13

    V. Physical-World Intimidation: Visits to Office and Neighborhood..................... 16

    VI. Targeted Harassment Through Plaintiff-Specific Tokenization....................... 18

    VII. Intimidation By Impersonation: Tokens Targeting Counsel and Related Parties............19

    VIII. Conduct of Defense Counsel and Related Representations............................. 19

**ARGUMENT**.....................................................................................................22

    I. Sanctions Warranted Under the Court's Inherent Authority and Applicable Rules........... 22

    II. Sustained Campaign of Litigation Intimidation Constituting Bad Faith.............23

    III. Sanctions Needed to Cure Prejudice, Deter Recurrence, and Protect the Proceedings..... 24

        A. Fees and Costs Are Appropriate and Must Be Awarded........................25

        B. Preclusion of the Section 230 Defense Is a Proper Sanction........................ 25

        C. Immediate Protective and Compliance Relief to Stop Ongoing Intimidation.............. 26

    IV. The Sanctions Are Proportionate and Necessary to Protect Litigation Integrity...............27

**CONCLUSION**................................................................................................ 27

# TABLE OF AUTHORITIES

## Cases

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)..................................................................................................26, 27

*DLC Mgmt. Corp. v. Town of Hyde Park*,
  163 F.3d 124 (2d Cir. 1998)..................................................................................22

*Enmon v. Prospect Cap. Corp.*,
  675 F.3d 138 (2d Cir. 2012)..................................................................................25

*Frumkin v. Mayo Clinic*,
  965 F.2d 620 (8th Cir. 1992)................................................................................24

*FTC v. LeadClick Media, LLC*,
  838 F.3d 158 (2d Cir. 2016)..................................................................................25

*Goodyear Tire & Rubber Co. v. Haeger*,
  581 U.S. 101 (2017) ..............................................................................................25

*Ha v. Conn*,
  2022 WL 18457302 (D. Vt. Aug. 25, 2022)..........................................................24

*Luv N' Care, Ltd. v. Shiboleth LLP*,
  2017 WL 3671039 (S.D.N.Y. Aug. 8, 2017)..........................................................22

*Rossbach v. Montefiore Med. Ctr.*,
  81 F.4th 124 (2d Cir. 2023)..................................................................................22

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010)........................................................................24, 26, 27

*Shepherd v. American Broadcasting Companies*,
  62 F.3d 1469 (D.C. Cir. 1995)..............................................................................25

## Statutes

28 U.S.C. §. 1927…………………………………………………………………………..22
47 U.S.C. §. 230 (c)………………………………………………………………………..28

## PRELIMINARY STATEMENT

Since the initiation of this action, Defendants, their affiliates, and individuals publicly associated with Pump.fun have engaged in an escalating campaign of harassment and intimidation directed at Plaintiffs, Plaintiffs' counsel and family members, and counsel's law firms and staff. That campaign has not been episodic or incidental. Instead, it has been sustained, coordinated, and ongoing throughout the pendency of this litigation, and it continues today.

What Plaintiffs describe in this motion is a memetic marketing campaign specifically designed to amplify harassment and intimidation. The campaign was executed by Pump.fun's own affiliates. Affiliates are individuals who often hold platform-issued badges, operate under both formal and informal agreements, and receive payment for promotional activity on behalf of Pump.fun. Plaintiffs will demonstrate below how these campaigns are coordinated in practice; identify the specific operators who conducted this intimidation campaign; and supply corroborating evidence from a confidential witness formerly active within Pump.fun's affiliate network, including a contract formalizing that relationship created by Pump.fun's General Counsel Alex Golubitsky and signed by Defendant Cohen.

The campaign resulted in surveillance and physical visits to locations associated with counsel's workplace and neighborhood; photographing and publication of those locations to demonstrate proximity and access; harassment directed at counsel's mother and disabled sister; threats directed at Plaintiffs, firm staff, and interns; the impersonation of counsel through platform-hosted tokens; and the repeated embedding of violent and degrading language into persistent, publicly indexed platforms designed to ensure harassment targets could not escape.

The harassment and intimidation occurred contemporaneously with major events in this litigation, ceased briefly after Plaintiffs raised the issue with Defendants, and then resumed more

aggressively thereafter. The record demonstrates a pattern: Defendants and those within their ecosystem have treated this litigation as an opportunity to apply pressure outside the courtroom, through intimidation, persistence, and escalation, rather than defend themselves within it.

Courts possess inherent authority to protect the integrity of their proceedings and the safety of litigants. That authority includes the power to impose sanctions where a party's bad faith conduct undermines the judicial process, multiplies proceedings, or renders adjudication impossible.

The conduct described in this motion meets that standard. Defendants' conduct has imposed substantial and unnecessary burdens on Plaintiffs and their counsel, required protective measures unrelated to the merits of the case, and treated the Court's process with contempt.

**FACTUAL BACKGROUND**

## I.    Overview of the Token-'Meta' Intimidation Strategy

Memetic marketing campaigns operate by seeding a narrative and engineering its viral spread. These campaigns are designed to appear organic but are deliberately manufactured. The process works through a series of conversions: speech is converted into repetition through coordinated reuse of the same phrase; repetition is converted into permanence through tokens and metadata automatically indexed across platforms; and permanence is converted into pressure by ensuring the target repeatedly encounters the same threatening narrative in multiple contexts over time. *See e.g.* Law Firm Tokens, attached as Ex. A, C. *See also* Tokens Threatening Sexual Violence, attached as Ex. D, and Plaintiff Tokens, attached as Ex. L.

Because each stage builds on the last, and because the systems involved are designed to preserve and propagate attention automatically, the conduct described below must be assessed as a single, continuous course of conduct, not a series of disconnected statements. The

5

harassment was planned, coordinated, foreseeable, persistent, and monetized.

Token-driven campaigns originate from a central, high-visibility account, often a key opinion leader (KOL) or influencer. The relevant influencers are Pump.fun affiliates; that relationship is discussed in greater detail below.

The influencer introduces the narrative. Here, @onchainrapist ("OCR"), a Pump.fun affiliate, was the first to introduce the 'Rape Max Burwick' narrative by directly targeting counsel by name, in temporal proximity to active litigation involving Pump.fun. To initiate the harassment, a short, highly repeatable phrase is introduced and circulated, a process known as 'narrative seeding.' The phrase is typically concise, emotionally charged, and easily reused verbatim. *See* Posts by OCR targeting Max Burwick, attached as Ex. B.

After the initial narrative is introduced, other Pump.fun affiliate accounts echo the same or similar phrase to their followers, expanding reach through ordinary platform mechanics: quoting, reposting, repeating verbatim, or remixing while preserving the core language.

Token-based systems convert attention into financial activity through a predictable sequence: visibility leads to trading, trading generates fees, and fees result in profit for the platform, token creator, or both.

As attention increases, third parties predictably create copycat or derivative tokens using the same or substantially similar phrase. This replication is foreseeable, not anomalous, once attention reaches a certain threshold. Indeed dozens of tokens denoting the theme "Rape Max Burwick" remain active and trading to the present day. *See* Ex. D.

Through repeated use across tokens, posts, and communities, the phrase begins to function independently of its original source, becoming a memetic shorthand that spreads without reference to the initial actor. This diffusion is not incidental; it is the mechanism's

design. The originators exploit this dynamic precisely because it obscures their role while ensuring the target cannot escape the harassment. That downstream attribution does not diminish responsibility of those who initiated the campaign with knowledge of how it would propagate.

Following token launch and replication, dedicated online communities formed around the targeted phrase on Twitter, Telegram, and Discord. These communities circulated and reinforced the language, promoted the tokens, sustained engagement, and recruited additional participants.

Once established, these communities became vectors for escalation. The closed environment reinforced fixation on the target, and the rhetoric intensified accordingly. The record reflects content that moved beyond repetition to increasingly aggressive posts and explicit discussions of violence. *See* Ex. D.

Once created, a token's name and metadata are automatically propagated across blockchain explorers, analytics dashboards, trading platforms, and search engines without further action by the creator.

The identifying phrase appears wherever the token is referenced. This propagation is automatic and requires no continued participation by the creator. Repeated indexing embeds the metadata in search results, permanently linking the target's name to the threatening language. That the harm becomes self-perpetuating is not a defense. The affiliates who initiated this campaign selected a mechanism designed to embed threatening language into automated systems, ensuring the harassment would persist indefinitely without further action on their part.

Here, repetition combined with automated indexing resulted in a durable association between counsel's name and language threatening sexual violence. The structure and execution of this conduct were designed to ensure the target repeatedly encounters the same narrative across multiple platforms. The predictable result is the target cannot escape the harassment and

intimidation, imposing a persistent burden outside the courtroom.

Sustained dissemination of violent, targeted content increases the likelihood that it reaches actors willing to act on it. Once rhetoric escalates to execution imagery and explicit threats of kidnapping, the concern is no longer reputational; it is physical safety. The record reflects that the conduct here crossed that threshold.

A Pump.fun affiliate operating under the handle @TwonXBT posted imagery depicting Mr. Burwick in an ISIS-style execution and issued threats to kidnap the firm's young female interns. See Post by @TwonXBT (a Pump.fun affiliate) depicting Mr. Burwick in ISIS-style execution and threatening the firm's young female interns, attached as Ex. E.

The conduct described was executed by Pump.fun affiliates: insiders who understand precisely how tokens propagate, replicate, and persist through coordinated amplification. They understood that seeding a violent narrative through these channels would predictably result in token creation, viral replication, and permanent indexing of the targeted language.

The actors involved therefore knew, or reasonably should have known, that the messaging would be visible not only to targets but also to those closely associated with them.

## II.    Affiliate Relationships, Authorization, and Attribution to Pump.fun

Pump.fun cannot credibly claim ignorance of OCR's conduct. The platform operates a formal affiliate program; OCR was an approved participant in that program; and Pump.fun leadership personally vetted and authorized his participation. OCR's conduct is attributable to Pump.fun, and remedial relief should extend accordingly.

Pump.fun relies on affiliates to promote platform activity and drive user engagement. Affiliates are used to publicize tokens created on the platform, generate attention around specific launches, introduce narratives intended to circulate among users, and encourage participation by

directing traffic and discussion toward Pump.fun-hosted activity. Pump.fun intentionally designed the affiliate model to ensure memetic promotion, the systematic circulation of short, repeatable phrases engineered to drive engagement. Affiliates are selected and compensated precisely for their demonstrated ability to achieve widespread dissemination.

Pump.fun utilizes a badge system to identify official representatives of the company. See Posts by Defendant Alon Cohen identifying the badges worn by @onchainrapist and @TwonXBT as Pump.fun affiliate badges, attached as Ex. F.

A badge signals that the account has been vetted, approved, and authorized by Pump.fun. Consequently, badge holders are understood by the public to be official representatives of the platform, leveraging that status to amplify their reach and credibility.

A Pump.fun badge is issued to a specific social media account and is subject to authentication requirements. Badge holders are thus necessarily known to Pump.fun executives.

OCR displayed a Pump.fun badge on his social media account while threatening sexual violence against Plaintiffs' counsel. In the past 30 days alone, OCR has made at least 18 posts threatening, demeaning, or referencing Mr. Burwick. *See* Ex. B. The issuance of that badge required Pump.fun to vet and approve OCR to represent the platform. Any claim that Pump.fun did not know who OCR was cannot be reconciled with the mechanics of its own badge system.

Defendant Cohen has been identified as personally involved in providing badges to affiliates and individuals participating in Pump.fun's promotional activities. *See* Ex. F. This is corroborated by information obtained from CW-2 and an affiliate agreement signed by CW-2 and Defendant Cohen (whose role, access, and information is explained more fully below).

The whistleblower has identified Defendant Cohen as holding primary responsibility for Pump.fun's marketing operations, with authority over affiliate relationships, badge issuance, and

narrative promotion associated with token launches. The intimidation campaign described in this motion was conducted through the affiliate and badge systems Cohen oversees.

A recorded call obtained through the whistleblower corroborates this account. A senior Pump.fun team member identified as JSON stated that Cohen directly handles all marketing. JSON, a key operational figure at Pump.fun, has acknowledged that he frequently uses alternate, pseudonymous accounts to post disparaging content without attribution. *See* Ex. R.

The use of alt accounts is central to how affiliates operate within the Pump.fun ecosystem. Affiliates routinely maintain multiple accounts, posting promotional content and platform-related messaging interchangeably across them. Pump.fun benefits from that reach regardless of how it is deployed. When a Pump.fun affiliate launches a harassment campaign, that campaign drives attention, engagement, and trading activity on the platform. The mechanism is the same whether the affiliate is promoting a token or targeting opposing counsel.

Much of Plaintiffs' operational understanding of how these campaigns are coordinated and executed in practice derives from information provided by CW-2, as identified in the recently filed Second Amended Complaint (ECF No. 129). Plaintiffs have not submitted a declaration from CW-2 or disclosed the individual's identity for two reasons. First, the witness remains active in the cryptocurrency industry, and disclosure would compromise the witness's professional standing and ability to provide ongoing information. Second, given the nature and severity of threats documented in this motion (as well as those made privately to them), the witness has a sincere and well-founded concern for personal safety.

To corroborate CW-2's account, access, and role, Plaintiffs submit as a proffer: (1) a formal KOL agreement executed by CW-2 and signed by Defendant Cohen, *see* KOL Agreement, attached as Ex. P; and (2) an email from DocuSign showing that Alex Golubitsky

was the author and administrator of that agreement, attached as Ex. Q. These documents

substantiate the witness's position within the affiliate ecosystem and reliability of the information

provided. Moreover, these documents establish Mr. Golubitsky's role in creating and overseeing

the KOL affiliate program, a role difficult to reconcile with his subsequent representations to this

Court regarding Pump.fun's knowledge of affiliate operators. *See* Section VIII, infra.

### III. Primary Influencers and Execution of the Intimidation Campaign

OCR operated under the online persona "@onchainrapist" and served as the primary

initiator of the sexual-violence-based narrative targeting Mr. Burwick. The campaign expanded

to include threats against firm employees. As a Pump.fun badge holder, OCR operated within the

platform's promotional ecosystem. *See* Ex. B.

Twon, also a Pump.fun affiliate, was a significant participant in the same intimidation

campaign. Twon's activity followed OCR's and escalated the violent rhetoric. *See* Ex. E.

Twon created and disseminated imagery depicting Mr. Burwick in an ISIS-style

execution, alongside explicit threats to kidnap Burwick Law's female staff if Plaintiffs did not

cease their litigation against Pump.fun. *Id.* The firm convened an emergency HR session with its

interns, young professionals who should not have to assess whether their workplace has made

them targets for kidnapping.

OCR's posts coincided with filing dates and other court activity. The pattern indicates that

OCR monitored the litigation and timed his conduct accordingly.

Following OCR's introduction of the narrative, dozens of tokens embedding threats of

sexual violence against Mr. Burwick were created on Pump.fun. This is memetic replication in

practice: the tokens converted the harassment into permanent, tradeable records that propagated

automatically and incentivized ongoing engagement with the threatening content. See Ex. C, D.

For example, a token trading under the ticker '$RAPE' was subsequently created on Pump.fun, in explicit reference to OCR's threats to Mr. Burwick. The token spawned a dedicated X/Twitter community, where users wrote lengthy posts espousing the token's value as 'a permanent record of intimidation in crypto.' *See* Memetic Aftermath of Sexual Violence Threats, attached as Ex. S. Other users created vulgar and crude photoshopped images depicting sexual violence against Mr. Burwick; one such example is also included in Ex. S.

The campaign had become self-sustaining, which was precisely the point. Once tokens are created, the threatening language propagates to blockchain explorers, analytics platforms, and search engines beyond Pump.fun's control. At that point, no amount of moderation or disassociation with affiliates by Defendants can stop the harassment.

The conduct attributed to OCR did not cease after he was purportedly terminated by Baton or otherwise disclaimed. Threatening content and related imagery continued to appear after that point. *See* Ex. B.

Following the claimed disassociation, OCR created and disseminated digitally manipulated images depicting himself standing directly behind counsel inside counsel's office. The imagery conveyed an unmistakable message of proximity and access: OCR knew where counsel worked and could reach him there. *See* Ex. B.

New derivative tokens using the same or substantially similar language continue to be created. The repetition of the narrative has not ceased and remains active across token listings and related social references.

Online communities associated with the same narrative remain active on social platforms, including Twitter. Third-party websites and analytics services, such as DexScreener, continue to display token pages and related content referencing the same language. New images depicting

sexual violence directed at Mr. Burwick continue to circulate within these environments, reinforcing the persistence of the campaign. As of January 17th, 2026, at least 78 variations of the "Rape Max Burwick" tokens remain on Pump.fun's platform, as they have for in many instances weeks. *See* Ex. C, D.

Absent Court intervention, the conditions that enabled the campaign remain unchanged. Tokens embedding the relevant language remain live and tradable, associated communities continue to operate, and incentive structures rewarding attention and engagement remain active.

**IV. Harassment and Intimidation Directed at Counsel's Family**

The harassment extended to Mr. Burwick's immediate family, including his sister Rachel and his mother Neila, as a means of exerting pressure on counsel during active litigation. The conduct employed the same token-based, memetic mechanisms described above.

Rachel Burwick has a severe cognitive disability and limited mobility. She maintains only a small public presence. Due to her mobility limitations, social media is her primary means of interaction with the outside world, and her disability restricts her ability to assess threats, intent, or risk. Images of Rachel used in the conduct described below were taken from a GoFundMe fundraiser created to address her accessibility needs, specifically a bathroom redesign to accommodate her disability.

During the relevant period, those images were used to create tokens targeting Rachel. Tokens were also created using Neila's name and likeness, sourced from professional platforms including LinkedIn. Other tokens incorporated various combinations of Burwick family identifiers. *See* Burwick Family Harassment Tokens, attached as Ex. G. The list of tokens referenced in this motion is non-exhaustive. It reflects only tokens that were documented at the time the conduct was identified and preserved.

The creation of these family-targeted tokens occurred during active litigation and in close temporal proximity to filings and other court activity. That pattern is consistent with deliberate pressure on counsel, not coincidence.

In connection with the conduct described above, a fraudulent fundraiser was also created on Pump.fun using Rachel's image, without authorization from any family member. The fundraiser mimicked legitimate charitable fundraising and was presented in a manner that suggested authenticity. This token was promoted by Pump.fun on the top of their homepage as it received 'King of the Hill' status. *Id.* The individual or individuals responsible likely generated proceeds from the activity despite the absence of authorization or consent. *Id.*

Following the creation of the fundraiser and related tokens, the tokens were transferred to a wallet believed by the creator to belong to Mr. Burwick. This transfer had the effect of creating the appearance that Mr. Burwick was associated with the token activity.The transfer suggested endorsement or complicity and may reasonably be interpreted as an attempt to induce silence, create leverage, or imply a payoff. The conduct resulted in increased intimidation directed at Mr. Burwick and his family.

Similarly, tokens were created using Neila's name and likeness. The images used for these tokens were sourced from professional social media platforms, including LinkedIn. The use of such sources indicates intentional selection of identifiable personal material rather than incidental or publicly marketed imagery. *Id.*

In early February of 2025, Plaintiffs contacted defense counsel to give notice of this conduct and provided examples of the relevant tokens which were shared, along with descriptions of the impact on family members and requests for intervention. Plaintiffs sent a cease-and-desist letter to legal@pump.fun; alon@pump.fun (the email address of Defendant

Cohen); and noah@pump.fun (the email address of Defendant Tweedale). Plaintiffs also posted a press release on X/Twitter to a similar effect. *See* Cease and Desist Letter and Press Release, attached as Ex. H.

Subsequently, Counsel at Gibson Dunn replied to Plaintiffs' cease-and-desist letters. *See* Correspondence with Gibson Dunn, attached as Ex. I.

Gibson Dunn reviewed the materials provided and communicated the concerns to Pump.fun. On February 7, Gibson Dunn confirmed in writing the information had been passed on to Baton and that Pump.fun was aware of the harassment directed at Mr. Burwick's family. *Id*.

Following that communication, Pump.fun took action to remove certain tokens, take down images, and modify or remove associated metadata. Pump.fun's removal actions confirm that the platform was aware of both the existence of the tokens and has the capacity to remove threatening or intimidatory tokens from their platform.

During a subsequent call, Gibson Dunn stated that it would not be representing Pump.fun in this matter. Gibson Dunn, upon reviewing the materials, apologized for the conduct and acknowledged its harm. In contrast, when Plaintiffs' raised similar issues of harassment before this Court only weeks ago, current Defense counsels' response was to threaten a gag order, sanctions, and seek an admonishment.

As a result of the perceived threat arising from the conduct described above, the family implemented a formal action plan. The plan included limiting Rachel Burwick's online access, changing social media permissions across family accounts, removing last names from family profiles to reduce traceability, and implementing identity and privacy management protocols.

The reduction of Rachel Burwick's access to social media caused emotional distress, disruption of routine, and increased dysfunction. These effects were particularly acute given her

cognitive disability and reliance on social media as a primary means of interaction due to mobility limitations.

Neila contacted the Palm Beach Sheriff's Office. As with an earlier report to the New York Police Department, law enforcement was uncertain how to address the conduct, and no resolution followed.

The family continues to monitor threats, manage online presence, and adjust protective protocols. Neila regularly coordinates with the Head of Operations at Burwick Law to manage and implement these measures for both herself and Rachel. The action plan remains in effect due to the continued risk posed by ongoing online activity.

### V. Physical-World Intimidation: Visits to Office and Neighborhood

The conduct was not limited to online harassment. Individuals visited locations associated with counsel's workplace and neighborhood, photographed themselves there, and amplified those images through online platforms. The visits occurred immediately after the filing of the first complaint. The locations were selected deliberately. The purpose was to demonstrate access: to show counsel that they could find him, and to broadcast that proof to others.

The physical visits followed the same pattern as the online harassment: escalation tied to litigation events. The visits occurred immediately after the second complaint was filed.

Individuals visited what they believed to be Burwick Law's office; in fact it was the New York City Bar. The conduct involved physical presence at the location and the delivery of letters intended to threaten or intimidate. *See* In-Person Targeting and Harassment, attached as Ex. J.

The individuals photographed themselves leaving letters at the office and captured images of the surrounding area. The visit was staged: physical presence performed for the camera, then weaponized online. *Id*.

The same individuals, or actors associated with them, then traveled to what they believed to be Mr. Burwick's residential neighborhood and photographed identifiable surroundings. The escalation from office to home conveyed a clear message: we know where you live. *Id*. *See also* Burwick Doxxing by Mike Dudas and Followers attached as Ex. K.

Photographs and related materials from both the office location and the residential neighborhood were later compiled into a dedicated website titled "savepumpfun.com".

The website and associated imagery were promoted by key opinion leaders associated with Pump.fun. The manner of promotion followed the same memetic amplification patterns described in this motion, including repetition, reposting, and circulation to wider audiences.

Mike Dudas, an early investor in Pump.fun, engaged in online conduct related to the materials described above, including publicly identifying information associated with Max Burwick's address. *See* Ex. K. Mike Dudas is believed to be domiciled in New York City, creating physical proximity to the behaviors described in this section. Stephen Palley, counsel for Defendants, has publicly represented Dudas in prior crypto-related litigation, stating to CoinDesk: "Along with my colleagues at Brown Rudnick, we are proud to represent Mike Dudas." *See* Ex. T. Plaintiffs raised this relationship with Mr. Palley prior to the January 13 hearing, inquiring whether Brown Rudnick currently represents Dudas in connection with this litigation given the potential for conflict. *Id.* Mr. Palley responded but did not disclose whether Dudas remains a client. The existence of this relationship from the outset of litigation raises the question whether Brown Rudnick was on notice of Dudas's conduct, and whether counsel's posture throughout these proceedings should be understood in that light.

The record contains multiple circumstantial indicators relevant to attribution of the

physical-world conduct described above. These include: timing of the activity immediately following the filing of the first complaint, the geographic proximity of individuals involved to the locations photographed, demonstrated knowledge of the litigation, familiarity with memetic amplification systems, and subsequent online amplification of threats and imagery from visits.

**VI. Targeted Harassment Through Plaintiff-Specific Tokenization**

Plaintiffs Kendall Carnahan and Diego Aguilar were targeted through the same mechanism. Tokens were created embedding their names, professional identifiers, and location information into metadata that is automatically republished across blockchain explorers, analytics platforms, and search engines. *See* Ex. L. The result was predictable: harassing phone calls, pretextual business inquiries, and impersonation attempts interfering with their daily lives.

Plaintiff-specific tokens referencing Kendall Carnahan and Diego Aguilar were created at the outset of the litigation and in close temporal proximity to the filing of the complaint. *Id*. The timing of these token launches coincided with early litigation activity and mirrors other retaliatory or escalatory actions described elsewhere in this motion.

The tokens incorporated metadata identifying the plaintiffs, including their names and other personal and professional identifiers. In certain instances, the embedded information included business identifiers, educational background, location indicators, and references to social media accounts. *See* Ex. L. This information was embedded directly into token metadata; as a result, it automatically republished on multiple platforms that index and display token data.

The structure described above predictably resulted in direct downstream effects, including harassing phone calls, false or pretextual business inquiries made for the purpose of harassment, impersonation attempts, and other forms of interference with daily activities.

As of the date of this filing, tokens specifically referencing plaintiffs Kendall Carnahan

and Diego Aguilar remain available on the Pump.fun platform. These tokens continue to be displayed and accessible through Pump.fun's interface and through third-party services that index and present token data. *See* Ex. L.

There has been no comprehensive remediation to remove or disable Plaintiff-specific tokens, prevent their continued display, or limit republication of the metadata across platforms.

### VII. Intimidation By Impersonation: Tokens Targeting Counsel and Related Parties

Following the commencement of this litigation, tokens began appearing that referenced Burwick Law, Mr. Burwick, Penny (counsel's dog and firm mascot), and Wolf Popper LLP. The appearance of these tokens coincided with early litigation activity and increased following subsequent filings. *See* Ex. A, C.

Token metadata incorporated the firm's name, branding, website, and social media profiles, and in multiple instances explicitly described the tokens as 'Official Burwick Law' tokens. The effect was to create the appearance that Burwick Law had created or endorsed them.

Burwick Law requested that these tokens be taken down and advised that the conduct would be reported to relevant authorities, including the bar where a report was made. *See* January 2025 Report to NYSBA, attached as Exhibit M. Despite these requests, the tokens continued to appear—along with accompanying Twitter posts advertising them and purporting to speak for Burwick Law. Each subsequent filing was followed by additional tokens referencing Burwick Law, Mr. Burwick, Penny, or co-counsel. Many remain live on Pump.fun today.

### VIII. Conduct of Defense Counsel and Related Representations

In the period immediately preceding Burwick Law's letter to the Court, the conduct escalated. Counsel filed the letter to place the threats on the record and seek guidance from the Court. The filing may have been procedurally imperfect, but it was motivated by immediate

safety concerns and the absence of any other effective recourse.

Defense counsel initially characterized the allegations as baseless and promised sanctions against Burwick Law while seeking an admonishment from the Court. Burwick Law responded privately to opposing counsel with a detailed written submission addressing each assertion and citing supporting evidence. *See* Correspondence with Brown Rudnick, attached as Ex. N. The request was modest: withdrawal of sanction threats and remediation of the identified harassment.

Defense counsel thereafter filed additional submissions reflecting counsel's chosen posture: continued adversarial attack rather than any effort to address the documented safety concerns. No attorney representing defendants contacted Burwick Law to acknowledge the threats, offer assistance, or coordinate on safety concerns before the conference with the Court.

Mr. Golubitsky submitted a declaration stating that he serves as General Counsel of Pump.fun. The declaration does not identify when his employment began, nor does it describe the scope or duration of his role. Publicly available information reflects that Mr. Golubitsky recently performed significant work for World Liberty Financial, work that appears contemporaneous with Pump.fun's period of operation. There is no public disclosure indicating he held the General Counsel role at Pump.fun during this period, and his LinkedIn profile does not list Pump.fun as an employer.

There are serious inconsistencies in regard to Mr. Golubitsky's claims regarding the identity of OCR. The Golubitsky Declaration stated that the OCR operator's identity was unknown to Baton and that OCR was not an employee, agent, or contractor. At the January 13 hearing, however, Mr. Golubitsky admitted OCR received Baton's permission to use the affiliate badge, that the badge was Baton-approved, and Baton terminated the affiliation after the threats against Mr. Burwick.

These admissions directly contradict the declaration's representation that the OCR operator's identity was unknown to Baton. The inconsistency is fundamental: Mr. Golubitsky cannot attest that OCR is not a contractor if he does not know the identity of OCR. Confirming the absence of a contractual relationship requires knowing the identity of the person in question.

The contradictions are compounded by Mr. Golubitsky's documented role in administering the very affiliate program at issue. As described above, documentary evidence reflects that Mr. Golubitsky served as the author and administrator of formal KOL agreements executed with Pump.fun affiliates. *See* Exs. P, Q. An individual who personally creates and oversees KOL contracts is necessarily aware of who operates within the affiliate ecosystem. Mr. Golubitsky's representation that the OCR operator was unknown cannot be reconciled with his direct involvement in the mechanics of affiliate onboarding and contract administration. At minimum, his declaration omitted facts material to this Court's assessment of Defendants' knowledge of, and relationship to, the individuals executing the intimidation campaign.

In Defendants' January 8 response, defense counsel disputed the legitimacy of the affiliate badge worn by the Pump.fun affiliates in Plaintiffs' exhibits. *See* ECF No. 128. Mr. Golubitsky's subsequent testimony that the badge was approved by Baton contradicts that representation as well.

The Golubitsky Declaration also stated Plaintiffs had not previously requested removal of tokens referencing Plaintiff Carnahan before December 22, 2025. Plaintiffs' February 5, 2025 cease-and-desist letter, however, expressly demanded removal of "all materials related to active litigation, including images of plaintiffs or related tokens." *See* Ex. H. On February 7, 2025, Gibson Dunn confirmed by email: "I have forwarded your communication to Baton." *See* Ex. I.

Mr. Golubitsky's declaration does not describe Pump.fun's moderation team structure,

moderation policies, escalation protocols, or any audit or record-keeping systems. It does not explain how harassment complaints are tracked, how prior notices are logged, or how reports of abusive content are reviewed internally. The omissions and contradictions raise questions about the reliability of Defendants' representations to this Court.

Despite appearing before this Court on January 13, 2026, Defendants' conduct has not abated; threatening and intimidating tokens remain on the platform and Defendants continue to post. On January 15, 2026, the day before this motion was filed, Defendant Alon Cohen publicly posted "I'm prepared to go to war" on Twitter. Within minutes, accounts responded by invoking "WAR MODE" and "BURWICK LAW," with one Lead KOL calling to "assemble the trenchers immediately." *See* Recent Pump.fun Posts, attached as Ex. O.

## ARGUMENT

### I.    Sanctions Warranted Under the Court's Inherent Authority and Applicable Rules

"A federal court may 'exercise its inherent power to sanction a party or an attorney who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 141 (2d Cir. 2023). In addition, "under § 1927, '[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.'" *Luv N' Care, Ltd. v. Shiboleth LLP*, 2017 WL 3671039, at *12 (S.D.N.Y. Aug. 8, 2017) (citing 28 U.S.C. § 1927). The "bad faith must be shown by (1) 'clear evidence' or (2) 'harassment or delay or ... other improper purposes." *Id.* (quotation marks and citation omitted). *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998). Defendants' campaign of harassment and intimidation intended to have a chilling effect on this litigation, as described herein, meets the bad faith standard and is sanctionable conduct.

## II.    Sustained Campaign of Litigation Intimidation Constituting Bad Faith

The factual record (set forth in detail in the background section) establishes sanctionable bad faith.  Defendants have engaged in a coordinated and escalating course of conduct that weaponizes Defendants' token-creation ecosystem and affiliated amplification channels to impose pressure outside the courtroom, including: (i) threats and harassment invoking sexual violence; (ii) repeated targeting of Plaintiffs, Plaintiffs' counsel, and the law firm; (iii) targeted attacks on counsel's disabled sister and mother; (iv) threats directed at young female staff and interns; and (v) real-world intimidation designed to communicate surveillance and access.

The objective is coercion: to force Plaintiffs and counsel to retreat, incur safety costs, and litigate under intimidation. This conduct bears a direct nexus to active federal litigation. As described in the record, major escalations track litigation events and filings, and the harassment abates only when judicial attention or formal legal intervention is applied, then returns when pressure subsides. That pattern supports a finding of intent to influence the litigation process.

The targets selected underscore bad faith. The campaign does not confine itself to public-facing litigants; it reaches into counsel's family, exploiting disability and vulnerability, and into the law firm itself, including threats directed at young female personnel.

Finally, Defendants' response posture supports sanctions. The record reflects notice, partial takedowns in some instances, and continued persistence of intimidatory content notwithstanding notice and Court involvement. Where a party has the ability to remediate but allows intimidation mechanisms to persist, sanctions are necessary to protect the Court's authority and prevent further prejudice. *See* Fed. R. Civ. P. 16(f), 37(b).

In *Ha v. Conn*, the district court noted that, bad faith abusive litigation practices warrant

sanctions, which as here, "include intimidating or harassing individuals involved in the litigation and may be addressed with an appropriate order from the presiding court." 2022 WL 18457302, at *1 (D. Vt. Aug. 25, 2022) (citing *Frumkin v. Mayo Clinic*, 965 F.2d 620, 627 (8th Cir. 1992) (upholding sanctions after a party harassed another party's witnesses and noting relief "was well within the district court's discretion to craft an appropriate remedy")). The court in *Ha* found:

> [C]lear evidence that Defendant has engaged in abusive litigation practices and that Plaintiffs face harm in the absence of a restraining order …[where] Plaintiffs produced a video from Facebook in which Defendant makes comments about Plaintiffs dying in connection with their continued involvement in this litigation. As a result, Plaintiffs are faced with concerns about their safety and well-being. Because this litigation is ongoing and Defendant's comments relate to Plaintiffs continued involvement in this case, these harms are imminent and require Court intervention.

*Ha*, 2022 WL at *1 (enjoining defendant "from using social media, or any other means, to threaten any person involved in this litigation" and "from making comments that connect this litigation with the death or ill-fate of any person involved in the litigation" and noting additional sanctions would apply if misconduct persisted, including monetary sanctions).

## III.    Sanctions Needed to Cure Prejudice, Deter Recurrence, and Protect the Proceedings

Sanctions in the present case should be calibrated to: (i) compensate Plaintiffs for costs imposed by the misconduct, (ii) remove any advantage gained by intimidation, and (iii) impose enforceable constraints sufficient to stop the conduct and prevent recurrence. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 149 (2d Cir. 2010).

### A.  Fees and Costs Are Appropriate and Must Be Awarded

An award of attorneys' fees is appropriate where bad-faith misconduct forces the opposing party to incur expenses it would not otherwise have incurred. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 104 (2017); *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143–45

24

(2d Cir. 2012). Here, the intimidation campaign necessitated extraordinary work outside merits litigation: evidence preservation, emergency Court engagement, blockchain investigation and forensic tracing, internal safety response, staff counseling and risk management, and repeated attempts to secure remediation. The fee request is therefore compensatory and should be awarded for amounts incurred "but for" Defendants' intimidation and failures to remediate. *See e.g. Goodyear*, 581 U.S. at 108–10.

### B. Preclusion of the Section 230 Defense Is a Proper Sanction

First, as a substantive matter, Section 230 does not immunize a platform that materially contributes to the development of the unlawful content at issue. *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 174–76 (2d Cir. 2016). The record supports a finding that Defendants' conduct exceeded neutral hosting through an affiliate/badge ecosystem that confers platform-recognized status, drives amplification, monetizes attention, and enables persistent replication. Defendants had notice and demonstrated capacity to remove or restrict content, yet continued intimidation efforts. On this record, Defendants should not be permitted to characterize themselves as passive intermediaries while benefiting from and failing to halt an intimidation apparatus. *See Shepherd v. American Broadcasting Companies,* 62 F.3d 1469, 1475 (D.C. Cir. 1995) (holding that sanctions under the court's inherent power can "include . . . drawing adverse evidentiary inferences or precluding the admission of evidence").

Second, and independently, the Court may preclude defenses as a sanction where necessary to remedy litigation misconduct and prevent a party from benefiting from bad faith. *Chambers*, 501 U.S. 32, 45–46 (1991); *S. New England Tel. Co.*, 624 F.3d at 144–49. Precluding Section 230 is particularly tailored here because the defense rests on a "neutral platform"

premise that Defendants have deployed while the intimidation campaign continues through systems they control, monetize, and can remediate. Allowing Defendants to invoke Section 230 rewards conduct that threatens litigation integrity and the safety of participants.

### C. Immediate Protective and Compliance Relief to Stop Ongoing Intimidation

Because the intimidation remains ongoing and systemically-enabled, monetary relief alone is insufficient. The Court should issue enforceable protective and compliance directives designed to stop recurrence, including: (i) mandatory removal and permanent disablement of all tokens, posts, and related metadata referencing Plaintiffs, Plaintiffs' counsel, counsel's family members, or Plaintiffs' law firms; (ii) prohibitions on the creation of any such tokens or posts on Defendants' platform or affiliated social media accounts; (iii) identification of all individuals who participated in the conduct described herein, including disclosure of any contractual, affiliate, or compensation relationships between those individuals and Defendants; (iv) production of all communications, records, and materials sufficient to establish the full scope of the campaign, including coordination among participants; (v) production of all KOL, affiliate, or promotional agreements currently or previously in effect; (vi) compliance certifications by an executive with personal knowledge of platform operations and affiliate relationships; and (vii) appointment of Adele Hogan, co-founding partner of Broadfield U.S., as a monitor to oversee compliance—including oversight of Defendants' affiliate program to ensure it is not used to continue or facilitate harassment of litigation participants.

### IV. The Sanctions Are Proportionate and Necessary to Protect Litigation Integrity

The Court should consider severity, persistence, and the ineffectiveness of lesser measures already attempted. *See Chambers*, 501 U.S. at 44–46; *S. New England Tel.*, 624 F.3d at

144–49. The conduct here involves threats (including sexual-violence threats), family targeting of vulnerable non-parties, intimidation of junior staff, and physical-world escalation, coupled with persistence and a record showing that informal measures have not stopped the conduct. In these circumstances, the requested sanctions (fees, Section 230 preclusion, and structural compliance relief) are the minimum adequate measures to stop the misconduct, deter recurrence, and preserve adjudication based on evidence and law rather than coercion.

Finally, Plaintiffs have noted that a corroborating whistleblower with firsthand knowledge of key aspects of the affiliate/narrative-promotion ecosystem has provided information consistent with and corroborative of the record described in this motion. This individual remains actively involved in operations within the industry, and disclosure of their identity at this stage would compromise ongoing investigations Plaintiffs are currently conducting. If the Court would find it helpful, whether to resolve any factual disputes relevant to sanctions, assess intent, or tailor remedial measures, Plaintiffs can promptly make that individual available for in camera questioning and/or submit a declaration on terms the Court deems appropriate to protect the integrity of those investigations and the whistleblower's safety.

## CONCLUSION

In light of the scope of this motion and the accompanying exhibits, Plaintiffs consent to an extended briefing schedule for Defendants' response, should Defendants or the Court deem additional time appropriate. For the reasons set forth above, Plaintiffs respectfully request that the Court grant this motion and enter an order:

1. Awarding Plaintiffs their reasonable attorneys' fees and costs incurred as a result of Defendants' litigation misconduct, including fees associated with evidence preservation,

forensic investigation, emergency filings, safety response measures, and the preparation of this motion;

2. Precluding Defendants from asserting any defense under Section 230 of the Communications Decency Act, 47 U.S.C. § 230;

3. Directing the immediate removal and permanent disablement of all tokens on Defendants' platform referencing Plaintiffs, Plaintiffs' counsel, counsel's family members, Burwick Law, or Wolf Popper, including all associated metadata;

4. Enjoining Defendants from permitting the creation of any tokens or metadata on their platform incorporating the names, likenesses, or identifiers of Plaintiffs, Plaintiffs' counsel, counsel's family members, or Plaintiffs' law firms;

5. Enjoining Defendants from posting or directing the posting of any threatening, harassing, or intimidating content referencing Plaintiffs, Plaintiffs' counsel, counsel's family members, or Plaintiffs' law firms on any social media platform, including but not limited to X (formerly Twitter) and Telegram—relief that is necessary because the foregoing token-related directives address only content on Defendants' platform, not Defendants' conduct on external platforms where much of the harassment campaign has been waged;

6. Requiring Defendants to submit sworn compliance certifications by an executive with personal knowledge of and authority over platform operations;

7. Appointing Adele Hogan as a compliance monitor to oversee implementation of the Court's directives;

8. Referring the conduct described in this motion to the United States Attorney for the Southern District of New York for investigation;

9. Granting such other and further relief as the Court deems just and proper.

DATED: January 17, 2026
New York, New York

Respectfully submitted,

**BURWICK LAW PLLC**
*By: /s/ Max Burwick*
Max Burwick
Luis Munoz
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
max@burwick.law
luis@burwick.law

**WOLF POPPER LLP**
Chet B. Waldman
Terrence Zhang
845 3rd Avenue – 12th Floor
New York, NY 10022
212-759-4600
cwaldman@wolfpopper.com
tzhang@wolfpopper.com