**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIEGO AGUILAR, KENDALL CARNAHAN and MICHAEL OKAFOR on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BATON CORPORATION LTD, d/b/a PUMP.FUN, ALON COHEN, DYLAN KERLER, NOAH BERNHARD HUGO TWEEDALE, SOLANA LABS INC., SOLANA FOUNDATION, ANATOLY YAKOVENKO, RAJ GOKAL, DAN ALBERT, AUSTIN FEDERA, LILY LIU and LEAD KOL DOES 1-25<br><br>Defendants. | Case No.: 1:25-cv-00880-CM-BCM |

**PLAINTIFFS' AMENDED RICO CASE STATEMENT PURSUANT TO THE COURT'S RICO STANDING ORDER**

Pursuant to the Court's RICO Case Standing Order, Plaintiffs Diego Aguilar, Kendall Carnahan, and Michael Okafor on behalf of themselves and all others similarly situated (collectively, "Plaintiffs") hereby submit this RICO Case Statement in support of their action against Defendants in the above captioned matter.

1.  **State whether the alleged unlawful conduct is in violation of 18 U.S.C. 1962(a), (b), (c), and/or (d).**

    1.  Plaintiffs allege violations of 18 U.S.C. § 1962 (c) and § 1962(d).

    2.  Plaintiffs expressly incorporate by reference and preserve all allegations set forth in the Second Amended Consolidated Class Action Complaint ("SAC") [ECF No. 129], and nothing in this RICO Statement, including any omission of facts,

1

allegations, or theories, shall be construed as a waiver, narrowing, or limitation of those allegations.

**2. List each defendant and state the alleged misconduct and basis of liability of each defendant.**

3. For organizational clarity, Defendants are grouped as follows: (i) Pump.fun Defendants; (ii) Solana Defendants; and (iii) Lead KOL Doe Defendants. As alleged, each Defendant either operated the Pump.fun platform developed, supported and maintained Solana infrastructure and a volume-driven economic posture that enabled and profited from Pump.fun's operations, or acted as a paid promoter who concealed compensation and insider pre-positioning to induce retail participation. (SAC ¶¶ 547–554.)[1] Unless otherwise specified below, Plaintiffs allege each Defendant is liable under 18 U.S.C. § 1962(c) for conducting and participating in the Enterprise's affairs through a pattern of racketeering activity comprised (at minimum) of wire fraud, illegal gambling, and illegal money transmitting, and is also liable under 18 U.S.C. § 1962(d) for knowingly agreeing with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 555, 594, 600.)

**A. Pump.fun Defendants**

  **i.    Defendant Baton Corporation, LTD d/b/a Pump.fun ("Pump.fun")**

4. Pump.fun is a private company organized under the laws of England and Wales. It operates the Pump.fun web application, which mass-produces "memecoins,"

---

[1]References to specific paragraphs in the Second Amended Complaint are cited herein as "SAC ___".

imposes a 1% transaction rake, and routes every order to Solana's priority-fee market. (SAC   70.)

5. Pump.fun participated in the conduct of the Enterprise's affairs, including by: designing and operating the Pump.fun platform, creating the bonding-curve pricing mechanism that guarantees first buyers the lowest prices and increases token price as supply is purchased (SAC ¶¶ 137–139, 513); operating without KYC/AML, sanctions screening, age verification, or meaningful consumer safeguards (SAC ¶¶ 438–442); collecting a one-percent transaction fee on each buy and sell (SAC   70); retaining and compensating KOLs under agreements requiring concealed, "organic"-seeming promotion (SAC ¶203); implementing platform features and mechanics designed to maximize addictive engagement and trading volume (SAC ¶¶ 385–403); and maintaining centralized enforcement and moderation mechanisms to protect Enterprise interests rather than users (SAC ¶¶ 467, 476–479). (SAC   547.)

6. Plaintiffs allege Pump.fun is liable under 18 U.S.C. § 1962(c) because it conducted and participated in the Enterprise's affairs through a pattern of racketeering activity including wire fraud, illegal gambling, and illegal money transmitting based on the misconduct described herein. (SAC ¶¶ 547, 555, 588(a).) Plaintiffs further allege Pump.fun is liable under 18 U.S.C. § 1962(d) because it knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 597, 600.)

   ii.    **Defendant Alon Cohen**

7. Cohen participated in the conduct of the Enterprise's affairs, including by: directing Pump.fun platform strategy and token campaign approvals and controlling early token-address distribution and access to promotional opportunities in the KOL network; transmitting public statements portraying Pump.fun as an "even playing field" and "fair launch" platform (SAC ¶¶ 377–379); making public statements normalizing and encouraging casino-like participation (SAC ¶¶ 405–407); and internally acknowledging that the platform was "gambling" with low odds for users (SAC ¶¶ 388, 563). (SAC   548.)

8. Plaintiffs allege Cohen is liable under 18 U.S.C. § 1962(c) because, as a Leadership-tier participant, he directed and participated in the Enterprise's pattern of racketeering activity (including wire fraud, illegal gambling, and illegal money transmitting) based on the misconduct described herein. (SAC ¶¶ 548, 555, 588.) Plaintiffs further allege Cohen is liable under 18 U.S.C. § 1962(d) because he knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 597, 600.)

### iii.    Defendant Dylan Kerler

9. Kerler is Pump.fun's Chief Technology Officer and has a documented history of prior "rug-pull" schemes. (SAC ¶¶ 70, 80.)

10. Kerler participated in the conduct of the Enterprise's affairs, including by: developing and maintaining technical integration and execution metrics used for insider-first execution, including measuring "land rate" (the percent of transactions that landed or succeeded); integrating and optimizing priority

4

pathways relied upon by insiders; and directing the team's response to Solana technical guidance.  (SAC ¶¶ 231–232, 549.)

11. Plaintiffs allege Kerler is liable under 18 U.S.C. § 1962(c) because, as a Leadership-tier participant, he directed and participated in the Enterprise's pattern of racketeering activity, including wire fraud, illegal gambling, and illegal money transmitting, based on the misconduct described above. (SAC ¶¶ 549, 555, 588(a).) Plaintiffs further allege Kerler is liable under 18 U.S.C. § 1962(d) because he knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 597, 600.)

### iv.    Defendant Noah Tweedale

12. Tweedale participated in the conduct of the Enterprise's affairs, including by: coordinating platform operations and KOL management; directing concealment efforts reflecting consciousness of wrongdoing; and taking deliberate steps to keep platform operations from public scrutiny. (SAC ¶¶ 481, 550.)

13. Plaintiffs allege Tweedale is liable under 18 U.S.C. § 1962(c) because, as a Leadership-tier participant, he directed and participated in the Enterprise's pattern of racketeering activity, including wire fraud, illegal gambling, and illegal money transmitting, based on the misconduct described herein. (SAC ¶¶ 550, 555, 588(a).) Plaintiffs further allege Tweedale is liable under 18 U.S.C. § 1962(d) because he knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 597, 600.)

### B.  Solana Defendants

#### i.    Defendant Solana Labs, Inc.

14. Solana Labs authored and maintains the Solana blockchain, the SPL Token Program, and the core validator and network systems on which Pump.fun operates. (SAC 68.)

15. Solana Labs participated in the conduct of the Enterprise's affairs, including by: authoring and maintaining the SPL Token Program and core validator/network systems that made Pump.fun token creation and high-frequency trading feasible (SAC ¶¶ 239–240); implementing Solana network updates in April 2024 addressing congestion that enabled Pump.fun's successful launch immediately thereafter (SAC ¶¶ 225, 244–245); providing direct technical support and guidance to Pump.fun (SAC ¶¶ 230–232); and publicly promoting Pump.fun-driven activity to increase network usage and fee capture. (SAC 551.)

16. Plaintiffs allege Solana Labs is liable under 18 U.S.C. § 1962(c) because it conducted and participated in the Enterprise's affairs through a pattern of racketeering activity, including wire fraud, illegal gambling, and illegal money transmitting, by knowingly facilitating the scheme and profiting from the resulting transaction flow. (SAC ¶¶ 551, 555, 564, 588(b).) Plaintiffs further allege Solana Labs is liable under 18 U.S.C. § 1962(d) because it knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 598, 600.)

   ii.    **Defendant Solana Foundation**

17. Solana Foundation is a not-for-profit foundation organized under Swiss law that funds ecosystem companies, markets Solana blockspace, and stewards a multibillion-dollar SOL treasury. (SAC 69.)

18. Solana Foundation participated in the conduct of the Enterprise's affairs, including by: promoting the Solana ecosystem through marketing campaigns while benefiting from Pump.fun-driven transaction volume and staking economics (SAC ¶¶ 216, 552); coordinating strategy and resources supporting the infrastructure and volume-driven posture relied on by the Enterprise; and supporting a regulatory-avoidance posture, including foreign foundation wrappers, to limit U.S. exposure while continuing to attract U.S. user flow and fees. (SAC ¶¶ 552, 598.)

19. Plaintiffs allege Solana Foundation is liable under 18 U.S.C. § 1962(c) because it conducted and participated in the Enterprise's affairs through a pattern of racketeering activity, including wire fraud, illegal gambling, and illegal money transmitting, by promoting, funding, and directing strategy that enabled and monetized the scheme's transaction flow. (SAC ¶¶ 552, 555, 564, 588(b).) Plaintiffs further allege Solana Foundation is liable under 18 U.S.C. § 1962(d) because it knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 598, 600.)

### iii.    Defendant Anatoly Yakovenko

20. Yakovenko is Solana Labs' Chief Executive Officer. (SAC 73.) Yakovenko participated in the conduct of the Enterprise's affairs, including by: publicly endorsing Pump.fun as a legitimate enterprise (SAC ¶278); publicly comparing memecoin participation to gambling "lootboxes" (SAC ¶410); and publicly claiming credit for Pump.fun's success and offering to help other companies "scale their revenue" similarly (SAC ¶¶ 227, 553(a).)

7

21. Plaintiffs allege Yakovenko is liable under 18 U.S.C. § 1962(c) because, as a Leadership-tier participant, he directed and participated in the Enterprise's pattern of racketeering activity, including wire fraud, illegal gambling, and illegal money transmitting, based on the misconduct described above. (SAC ¶¶ 553(a), 555, 564, 588(c)(i).) Plaintiffs further allege Yakovenko is liable under 18 U.S.C. § 1962(d) because he knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 598, 600.)

### iv.    Defendant Raj Gokal

22. Gokal is Solana Labs' President and Chief Operating Officer. (SAC ¶74.) Gokal participated in the conduct of the Enterprise's affairs, including by: coordinating directly with Pump.fun leadership to support the platform's continued operation (SAC ¶¶ 222–223); publicly acknowledging "casino" activity on Solana (SAC ¶412); publicly articulating the Enterprise's volume-monetization model (SAC ¶413); and publicly celebrating Pump.fun's success on Solana (SAC ¶228). (SAC 553(b).)

23. Plaintiffs allege Gokal is liable under 18 U.S.C. § 1962(c) because, as a Leadership-tier participant, he directed and participated in the Enterprise's pattern of racketeering activity, including wire fraud, illegal gambling, and illegal money transmitting, based on the misconduct described herein. (SAC ¶¶ 553(b), 555, 564, 588(c)(ii).) Plaintiffs further allege Gokal is liable under 18 U.S.C. § 1962(d) because he knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 598, 600.)

8

### v.    Defendant Dan Albert

24. Albert is Solana Foundation's Executive Director. Albert participated in the conduct of the Enterprise's affairs, including by: directing Foundation strategy and resources supporting the infrastructure and volume-driven economic posture relied on by the Enterprise; and directing Foundation resources toward ecosystem development supporting Pump.fun operations. (SAC ¶¶ 553(c), 598(j).)

25. Plaintiffs allege Albert is liable under 18 U.S.C. § 1962(c) because, as a Leadership-tier participant, he directed and participated in the Enterprise's pattern of racketeering activity, including wire fraud, illegal gambling, and illegal money transmitting, based on the misconduct described above. (SAC ¶¶ 553(c), 555, 564, 588(c)(iii).) Plaintiffs further allege Albert is liable under 18 U.S.C. § 1962(d) because he knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 598, 600.)

### vi.    Defendant Austin Federa

26. Federa is Solana Foundation's former Head of Strategy. (SAC ¶76.) Federa participated in the conduct of the Enterprise's affairs, including by: together with Albert and Liu, directing strategy and resources supporting the infrastructure and volume-driven posture relied on by the Enterprise, including promoting foreign-structure strategies to limit U.S. exposure while continuing to solicit U.S. user flow and fees; publicly articulating the Enterprise's regulatory avoidance strategy; and, together with Liu, transmitting public posts on July 18–19, 2025 about routing token launches through foreign foundations to obtain favorable tax and regulatory treatment. (SAC ¶¶ 553(c), 598(k).)

27. Plaintiffs allege Federa is liable under 18 U.S.C. § 1962(c) because, as a Leadership-tier participant, he directed and participated in the Enterprise's pattern of racketeering activity, including wire fraud, illegal gambling, and illegal money transmitting, based on the misconduct described above. (SAC ¶¶ 553(c), 561–562, 564, 555, 558–588, 588(c)(iv).) Plaintiffs further allege Federa is liable under 18 U.S.C. § 1962(d) because he knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594–600.)

### vii.    Defendant Lily Liu

28. Liu is Solana Foundation's President of Management. (SAC ¶77.) Liu participated in the conduct of the Enterprise's affairs, including by: together with Albert and Federa, directing strategy and resources supporting the infrastructure and volume-driven posture relied on by the Enterprise, including promoting foreign-structure strategies to limit U.S. exposure while continuing to solicit U.S. user flow and fees; making public statements articulating an economic model aligning Enterprise participants' incentives around transaction volume; participating in discussions regarding foreign foundation structures to shield U.S. liability; and, together with Federa, transmitting public posts on July 18–19, 2025 about routing token launches through foreign foundations. (SAC ¶¶ 553(c), 598(l).)

29. Plaintiffs allege Liu is liable under 18 U.S.C. § 1962(c) because, as a Leadership-tier participant, she directed and participated in the Enterprise's pattern of racketeering activity, including wire fraud, illegal gambling, and illegal

money transmitting, based on the misconduct described above. (SAC ¶¶ 553(c), 555, 562 (Representative wire fraud acts), 564, 588(c)(v).) Plaintiffs further allege Liu is liable under 18 U.S.C. § 1962(d) because she knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 598, 600.)

## C. Lead KOL Doe Defendants 1–25

30. The Lead KOL Doe Defendants are individuals and/or entities whose identities and addresses are presently unknown; some are known only by online pseudonyms or handles and associated cryptocurrency wallets. Plaintiffs sue them under fictitious names and intend to amend the complaint when their identities are discovered. (SAC ¶82.) As alleged, the Lead KOL Doe Defendants served as lead key opinion leaders and token promoters for the Enterprise and were retained, directed, and compensated (directly or indirectly) by Pump.fun and other Enterprise participants to promote selected Pump.fun tokens to retail purchasers in the United States while concealing compensation, coordination, and pre-positioning. (SAC  83.)

31. The Lead KOL Doe Defendants participated in the conduct of the Enterprise's affairs, including by: receiving early token addresses and other nonpublic information through private channels prior to promotional activity, thereby enabling pre-positioning; coordinating promotional narratives, timing, and posting cadence with Leadership and Operations Command; entering into contracts requiring concealed, "organic"-seeming promotional activity (SAC ¶203); activating and directing downstream "Friends and Family" distribution networks

11

to cascade promotional information and create the appearance of independent validation and organic discovery (SAC ¶¶ 119–123); executing managed exits by selling into the retail demand their promotions generated; and participating in coordinated harassment and intimidation campaigns against critics, defectors, or competitors who threatened exposure or disruption of the scheme (SAC ¶¶ 45–55, 554.)

32. Plaintiffs allege the Lead KOL Doe Defendants are liable under 18 U.S.C. § 1962(c) because they conducted and participated in the Enterprise's affairs through a pattern of racketeering activity that includes multiple acts of wire fraud—transmitting (and causing the transmission of) promotional communications that were presented as "organic" while omitting material facts about compensation, coordination, and insider pre-positioning, thereby inducing retail participation and enabling insider exits. (SAC ¶¶ 203, 554, 555, 558, 560.) Plaintiffs further allege the Lead KOL Doe Defendants are liable under 18 U.S.C. § 1962(d) because they knowingly agreed with other Enterprise participants to pursue that same pattern and the essential mechanics of the scheme. (SAC ¶¶ 594, 599, 600.

**3. List the alleged victims and state how each victim was allegedly injured.**

**A. Named Plaintiffs**

33. Lead Plaintiff Michael Okafor purchased and sold multiple "fair-launch" tokens created on the Pump.fun platform, including but not limited to the GRIFFAIN Token, between March 2024 and January 2025, in the United States, induced through material misrepresentations and omissions regarding, but not limited to,

fair launches and equal access. Okafor suffered substantial monetary losses when those tokens collapsed within days or weeks of issuance, and he paid for priority blockspace via transaction and bundling fees ("priority fees") that flowed to Defendants. Okafor suffered financial losses totaling approximately $242,076.74. (SAC ¶¶ 65, 105, 533.)

34. Plaintiff Diego Aguilar purchased and sold multiple "fair-launch" tokens created on the Pump.fun platform, including the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token, all of which are Pump Tokens. Aguilar was damaged thereby, including through monetary losses on Pump Token transactions and transaction-related fees charged in connection with those transactions. Aguilar was induced through material misrepresentations and omissions regarding, but not limited to, fair launches and equal access. (SAC ¶¶ 66, 105, 532, 533.)

35. Plaintiff Kendall Carnahan purchased and sold PNUT Tokens (among others) in the United States, which were created on the Pump.fun platform. Carnahan was induced through material misrepresentations and omissions regarding, but not limited to, fair launches and equal access, and was damaged thereby, including through monetary losses on token transactions and transaction-related fees charged in connection with those transactions. (SAC ¶¶ 67, 105, 533.)

B. **Proposed Class and Pump Tokens Subclass**

36. Plaintiffs bring this action on behalf of themselves and all others similarly situated and seek to represent a Class and a Pump Tokens Subclass. (SAC 515.)

37. The Class is defined as: "All persons who purchased any Tokens sold through Pump.fun during the 'Class Period' (from March 1, 2024 through the date of this Complaint) and had an out-of-pocket loss on their investment in Pump.fun Tokens." (SAC ¶¶ 516-517.) The Pump Tokens Subclass is defined as: "All persons who purchased the twenty Pump Tokens." (SAC  518.)

## C. Classwide Injury

38. Plaintiffs and members of the Class and Subclass sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens, and Plaintiffs allege Defendants charged fees in connection with the transactions at issue, including Pump.fun's one-percent fee on every transaction and Solana network fees on every transfer. (SAC ¶¶ 105, 524, 533.)

## D. Victim Class Targeted by Predicate Acts (as alleged)

39. The predicate acts targeted the same class of victims, retail users of the Pump.fun platform, including New York consumers, who were induced to participate based on false representations and were structurally positioned as exit liquidity from the moment they arrived. (SAC  562(d).)

4. **Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.**

   a. **List the alleged predicate acts and the specific statutes that were allegedly violated.**

**Count I — 18 U.S.C. § 1962(c)**

40. Defendants conducted and participated in the Enterprise's affairs through a pattern of racketeering activity within 18 U.S.C. §§ 1961(1) and 1961(5), including (at

minimum): wire fraud in violation of 18 U.S.C. § 1343; illegal gambling business in violation of 18 U.S.C. § 1955; state-law gambling felonies constituting racketeering activity under 18 U.S.C. § 1961(1)(A); and illegal money transmitting in violation of 18 U.S.C. § 1960. (SAC   555.)

41. The state and regulatory statutes invoked as predicates or elements include:

   a. For the § 1955 illegal gambling business and state-law gambling predicates: New York Penal Law § 225.00(2) (definition of "gambling"), § 225.10 (Promoting Gambling in the First Degree), and § 225.05 (Promoting Gambling in the Second Degree). (SAC ¶¶ 571–575.)

   b. For the § 1960 illegal money transmitting predicate: N.Y. Banking Law Article 13-B, §§ 641 and 650 (money transmitter licensing and criminal penalties for unlicensed operation), 31 U.S.C. § 5330 (MSB registration requirements), 31 C.F.R. § 1022.380 (registration procedures), and 31 C.F.R. § 1010.100(ff)(5)(i)(A) (definition of "money transmission"). (SAC ¶¶ 580, 582–585.)

**Count II — 18 U.S.C. § 1962(d) (RICO Conspiracy)**

42. Defendants agreed that one or more conspirators would conduct or participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity, including agreement to the commission of at least two predicate acts among the same categories of racketeering activity alleged in Count I. (SAC ¶¶ 594–595.)

**b. If the RICO claim is based on the predicate offenses of wire fraud, or fraud in the sale of securities, the circumstances of fraud or mistake shall be stated in particularity.**

43. Defendants committed, caused, and knowingly facilitated multiple acts indictable under 18 U.S.C. § 1343 by devising a scheme to obtain money or property through materially false pretenses, representations, and omissions, and transmitting (or causing the transmission of) communications by interstate and foreign wires to execute that scheme. The elements of wire fraud are: (1) a scheme or artifice to defraud; (2) money or property as the object of the scheme; (3) use of interstate wires in furtherance of the scheme; and (4) the defendant's knowing and willful participation in the scheme with intent to defraud. (SAC ¶¶ 558–559.)

44. The wire-fraud scheme operated through four mechanisms.

45. First, Supply Control: insiders acquired disproportionate token supply at the lowest prices using advance knowledge, bundling across wallets, and paid priority execution that ensured insider orders executed first. (SAC   560.)

46. Second, Demand Manufacturing: coordinated promotional campaigns created a false appearance of organic, independent discovery through the Enterprise's Lead KOL pushes, secondary amplification, friends-and-family cascades, leadership signals, and engagement amplification. (SAC   560.)

47. Third, Managed Exits: insiders sold into induced demand through sequenced exits timed to coincide with peak retail inflows, while promotion continued even after senior insiders exited. (SAC   560.)

48. Fourth, concealment: the scheme depended on concealment because reasonable consumers would not have transacted had they known "fair launch" claims were false, promotions were paid and centrally coordinated, insiders were

16

pre-positioned at unavailable prices, and transaction ordering could be purchased to guarantee insider-first execution. (SAC 560.)

49. The COPE campaign, detailed at SAC ¶¶ 257–311, is pled as a case study in how the Enterprise executed this playbook; the same playbook was repeated across thousands of tokens throughout the Class Period, the full scope of which will be established through discovery. (SAC ¶¶ 262, 354, 542.)

50. Material Misrepresentations and Omissions: The following is a non-exhaustive list of Defendants' material misrepresentations and omissions. (SAC 560 n.13.)

51. The "Fair Launch" Misrepresentations:

    a.   Who: Defendant Cohen, on behalf of Pump.fun.

    b.   What: On September 25, 2024, Cohen retweeted a screenshot of a direct message he sent to a prospective user stating that Pump.fun was an "unruggable fair launch platform."

    c.   Where: X/Twitter, viewable by Cohen's followers and the public.

    d.   When: September 25, 2024.

    e.   How it was misleading: The representation was false because (i) the bundling system allowed insiders to package multiple buy transactions and execute them at or before Token launch, capturing supply before anyone else could act; (ii) the bonding-curve design guaranteed that insiders who bought first received the lowest prices; (iii) the platform's no-KYC design allowed insiders to disguise coordinated accumulation across anonymous wallets; (iv) priority execution systems allowed insiders to pay for guaranteed transaction ordering; and (v) Defendants implemented no

meaningful protections that would make "fair launch" claims true because such protections would undermine the supply control that made profit possible.

f.  Scienter: Cohen knew these representations were false because he directed the Enterprise's operations, controlled access to early information as a "lever" of coercive power, and acknowledged in internal communications that the platform was a "casino" where users were "gambling" with "really really low odds" and the goal was to make them "happier (Even though most lose)." (SAC   560(2)(a).)

52. The "Level Playing Field" Misrepresentations:

a.  Who: Defendant Cohen, on behalf of Pump.fun.

b.  What: On October 4, 2024, Cohen posted "pump fun is as much of an even playing field as it gets IMO."

c.  Where: X/Twitter, viewable by Cohen's followers and the public.

d.  When: October 4, 2024.

e.  How it was misleading: The representation that Pump.fun was "an even playing field" was false because the Enterprise systematically advantaged insiders through (i) early access to Token addresses before any public promotional activity; (ii) priority execution that allowed insiders to pay for first position; (iii) coordination through private Telegram channels; and (iv) managed exits that ensured insiders sold before the price collapsed. The playing field was structurally rigged against retail participants.

f.  Scienter: Cohen knew the playing field was not "even" because he determined who received access to opportunities and when, personally directed promotional campaigns, and controlled the enforcement mechanisms that kept subordinate participants in line. (SAC 560(2)(b).)

53. The "Retail is Winning" Misrepresentations:

a.  Who: Defendant Cohen, on behalf of Pump.fun.

b.  What: On October 12, 2024, Cohen posted "retail's already up massively because it's so easy for them to get involved and the playing field is as fair as ever."

c.  Where: X/Twitter, viewable by Cohen's followers and the public.

d.  When: October 12, 2024.

e.  How it was misleading: The representation that "retail's already up massively" was false because (i) the vast majority of wallets that transacted on Pump.fun ended in net negative positions; (ii) a user who earned more than $10,000 in profit ranked in the top 0.412% of all users; (iii) over 95% of wallets never cleared $10,000 in gains; (iv) the "success stories" cited to induce participation represented insider gains, not retail gains; and (v) the platform was designed to ensure that retail losses funded insider profits.

f.  Scienter: Cohen knew retail was not "up massively" because he designed the platform to extract value from retail and acknowledged in internal communications that "most lose." (SAC 560(2)(c).)

54. The "Organic Promotion" Misrepresentations:

19

a. Who: Enterprise participants including Cohen, Lead KOL Doe Defendants, and other KOLs acting at the direction of Operations Command.

b. What: KOL promotions of Tokens across X/Twitter, YouTube, TikTok, and X Spaces that presented the appearance of independent, organic discovery of investment opportunities, including (i) a Lead KOL's post on August 27, 2025, stating "Haven't been excited about a coin in a long time... Don't $cope later"; (ii) staged interviews with the COPE developer propagating the fabricated "17-month grind" narrative; and (iii) coordinated promotional threads timed to coincide with insider positioning.

c. Where: Social media platforms including X/Twitter, YouTube, TikTok, and Telegram, viewable by KOL audiences and the public. When: Throughout the Class Period, including specific instances on August 27, 2025 (COPE launch promotion) and September 4, 2025 (staged developer interview).

d. How it was misleading: The promotions appeared to be independent, organic endorsements when they were in fact (i) centrally coordinated by Operations Command; (ii) compensated through direct payment and/or early access to Token positions; (iii) timed according to a promotional calendar designed to maximize insider profit; and (iv) required to appear "organic" under standard Pump.fun KOL agreements. The concealment of compensation and coordination was material because audiences

reasonably believed they were receiving independent analysis rather than paid advertisements from people who had already positioned themselves to profit from their purchases.

    e.  Scienter: The Lead KOL Doe Defendants knew their promotions were misleading because they received early Token addresses through private channels, pre-positioned before promoting, and executed managed exits into the retail demand their promotions generated. (SAC 560(2)(d).)

    f.  Material Omissions. Defendants failed to disclose: (i) that promotional activity appearing organic was in fact paid and coordinated; (ii) that Enterprise insiders acquired supply at the lowest prices before promotional activity began, and that retail participants were structurally positioned to purchase only after insiders had positioned; (iii) that insiders could pay for guaranteed priority execution, ensuring their orders executed before retail orders; (iv) that insiders coordinated their selling to occur at peak demand, with senior insiders exiting first while promotional activity continued to induce new retail buying; and (v) that the vast majority of Pump.fun users lost money, that over 95% of wallets never cleared $10,000 in gains, and that the platform was designed to ensure retail losses funded insider profits. (SAC 560(2)(e).)

55. Defendants and Enterprise participants used interstate and foreign wires, including: Pump.fun's website/app communications; social-media posts and videos; Telegram/Discord coordination; on-chain transaction routing and

settlement across a globally distributed validator network; and direct solicitations (including Cohen's "3,000+ cold DMs"). (SAC 561.)

56. The SAC pleads multiple representative interstate wire communications used to execute the scheme, including:

a.   September 25, 2024: Cohen transmitted (or caused to be transmitted) a retweet via X/Twitter containing his direct message claiming Pump.fun was an "unruggable fair launch platform."

b.   October 4, 2024: Cohen transmitted (or caused to be transmitted) a post via X/Twitter stating "pump fun is as much of an even playing field as it gets."

c.   October 12, 2024: Cohen transmitted (or caused to be transmitted) a post via X/Twitter stating "retail's already up massively because it's so easy for them to get involved and the playing field is as fair as ever."

d.   August 18, 2025: Cohen transmitted (or caused to be transmitted) a post via X/Twitter stating "bottom on my memes or I chop it off" to prime the market for the COPE campaign, knowing insiders had already positioned.

e.   August 27, 2025: a Lead KOL transmitted (or caused to be transmitted) a post via X/Twitter stating "Haven't been excited about a coin in a long time... Don't $cope later," launching the coordinated COPE promotional campaign while omitting his insider position and compensation.

f.   On each date Cohen sent one of his "3,000+ cold DMs" soliciting participation in the Pump.fun platform: Cohen transmitted (or caused to be

22

transmitted) wire communications soliciting participation in the fraudulent scheme.

g. July 18–19, 2025: Defendants Liu and Federa transmitted (or caused to be transmitted) posts via X/Twitter discussing the Enterprise's strategy of routing Token launches through foreign foundations to obtain favorable tax and regulatory treatment, which communications furthered the scheme by articulating and coordinating the Enterprise's compliance-avoidance posture.

(SAC  562.)

57. Defendants acted knowingly and with intent to defraud as shown, among other things, by: (i) internal acknowledgments characterizing Pump.fun as "gambling" with low odds; (ii) public statements describing Pump.fun as a "casino"; (iii) deliberate operation without KYC/AML/sanctions screening despite foreseeability of misuse; (iv) concealment steps taken when scrutiny increased; and (v) continued inducement of retail participation after learning of predatory conduct and retail losses. (SAC  563.)

58. The Solana Defendants knowingly participated in the wire fraud scheme by managing and directing the operations of the Enterprise that enabled insider-first execution and high-frequency profit taking, while profiting from the resulting surge in transaction volume, fees, and tips—and while the Enterprise continued to market "fair launches" and "organic" discovery narratives contradicted by the pay-to-win execution environment and insider pre-positioning. (SAC  564.)

**c. Describe how the predicate acts form a "pattern of racketeering activity."**

59. The predicate acts are related and amount to, and pose a threat of, continued criminal activity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). (SAC ¶ 556.)

**Relatedness**

60. The predicate acts were related to each other in that they shared the same or similar purposes, results, participants, victims, and methods of commission. As to purposes, each predicate act was committed to extract value from retail participants by inducing them to transact based on false representations of fair access and organic discovery, while insiders who controlled supply, manufactured demand, and managed exits captured the proceeds. As to results, each predicate act resulted in retail losses and insider profits, with Plaintiffs and Class members paying prices inflated by fraudulent promotion and absorbing losses when insiders executed their managed exits. As to participants, each predicate act was committed by or at the direction of the same core group of Enterprise participants operating through the same hierarchical command structure. As to victims, each predicate act targeted the same class of victims, retail users of the Pump.fun platform, including New York consumers, who were induced to participate based on false representations and were structurally positioned as exit liquidity from the moment they arrived. As to methods, each predicate act was committed using the same operational playbook: target selection and campaign planning; bundling and pre-positioning; coordinated promotional deployment through Lead KOLs, secondary KOLs, and friends-and-family networks; leadership signals; and managed profit taking. (SAC ¶ 562.)

24

**Continuity**

61. The pattern satisfies continuity through both closed-ended and open-ended continuity. Closed-ended continuity is satisfied because the scheme operated repeatedly from at least early 2024 through the present. Open-ended continuity is satisfied because the predicate acts are the regular way the Enterprise conducted, and continues to conduct, its business. (SAC   557.)

**d. State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe.**

62. The predicate acts relate to each other as part of a single, integrated plan to enrich Enterprise members by operating a rigged gambling operation that extracted value from retail participants through coordinated inducement, execution advantages, and concealed insider exits, with the platform's business model and infrastructure designed to monetize the resulting transaction flow. (SAC   537.)

63. Wire fraud supplied the inducement and concealment layer. Defendants marketed "fair launches," an "even playing field," claims that "retail is winning," and "organic" discovery narratives, while omitting that promotions were paid and coordinated, that insiders were pre-positioned, that priority execution advantages were purchasable, and that insiders coordinated managed exits. These misrepresentations and omissions induced retail participation and provided the liquidity necessary for the scheme to function. (SAC ¶¶ 558–564.)

64. The illegal gambling business describes the underlying operation through which value was extracted. Users staked SOL on whether they could sell before demand

disappeared, risking something of value on a future contingent event outside their control in exchange for the chance to receive something of value. The gambling business violated state law, including New York Penal Law §§ 225.00(2), 225.05, and 225.10, involved at least five persons, and operated continuously for well over thirty days while generating gross revenue far exceeding $2,000 in single-day periods, including peak fee days exceeding $10 million. (SAC ¶¶ 565–577.)

65. Illegal money transmitting supplied the operational payment rail for the scheme. The Enterprise received cryptocurrency (SOL) from buyers on Pump.fun and transmitted it to sellers through its bonding-curve contracts and platform infrastructure, activity constituting money transmission under 31 C.F.R. § 1010.100(ff)(5)(i)(A). Pump.fun operated without required state money-transmitter licensing (including in New York under N.Y. Banking Law Art. 13-B, §§ 641, 650, where operating as an unlicensed money transmitter is a criminal offense) and without MSB registration with FinCEN. Alternatively, the money transmitting business involved the transportation or transmission of funds that Defendants knew were derived from wire fraud (SOL obtained through the fraudulent scheme), illegal gambling (SOL representing wagers with payouts derived from losers' stakes), and money laundering by criminal organizations (including the state-sanctioned Lazarus Group's use of Pump.fun in February 2025 to launder approximately $1.5 billion stolen from the Bybit exchange). (SAC ¶¶ 578–588.)

66. For Count II, Defendants agreed to pursue the same common plan, enriching conspirators through a rigged, unlicensed gambling platform and associated unlawful transmission activity, through a pattern of racketeering activity that included wire fraud inducements and related predicate conduct. (SAC ¶¶ 594–595.)

5. **Describe in detail the alleged enterprise for each RICO claim. A description of the enterprise shall include the following information:**

67. For Count I (18 U.S.C. § 1962(c)) and Count II (18 U.S.C. § 1962(d)), Plaintiffs allege a single association-in-fact enterprise: the "Solana-Pump.fun Racketeering Enterprise" (the "Enterprise"). (SAC ¶¶ 535–536, 592, 594.)

**a. State the names of the individuals, partnerships, corporations, associations, or other legal entities that allegedly constitute the enterprise.**

68. Plaintiffs allege the Enterprise consists of: Pump.fun (Baton Corporation, Ltd. d/b/a Pump.fun); its founders and principals Alon Cohen, Dylan Kerler, and Noah Tweedale; Solana Labs, Inc.; the Solana Foundation; their principals Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu; the Lead KOL Doe Defendants; and other coordinated participants who functioned as an ongoing organization with systematic linkages to accomplish the Enterprise's common purpose. (SAC ¶536.) Pump.fun is a private company organized under the laws of England and Wales; Solana Labs is a Delaware corporation; and the Solana Foundation is a Swiss not-for-profit foundation. (SAC ¶¶ 68–70.) Plaintiffs further allege the Lead KOL Doe Defendants (Does 1–25) are individuals and entities who served as lead key opinion leaders and token promoters and were

27

retained, directed, and compensated (directly or indirectly) to promote selected Pump.fun Tokens to retail purchasers (including in the United States) while concealing compensation, coordination, and pre-positioning. (SAC ¶¶ 82–83.)

**b. Describe the structure, purpose, function and course of conduct of the enterprise.**

69. Plaintiffs allege that the Enterprise is an association-in-fact enterprise, i.e., a group of individuals or entities associated in fact, requiring only a purpose, relationships among those associated, and longevity sufficient to permit pursuit of the Enterprise's purpose. (SAC ¶535.) The Enterprise's alleged common purpose was to enrich its members by operating a rigged gambling operation that extracted billions from retail participants. (SAC ¶537.) Plaintiffs allege the Enterprise pursued this purpose through two coordinated mechanisms: (i) rigging the "game" through supply control, demand manufacturing, and managed exits; and (ii) inducing participation through fraudulent misrepresentations and omissions, including materially false claims of "fair launches" and an "even playing field" while concealing insider pre-positioning, paid coordination, and execution advantages. (SAC ¶¶ 537–539.)

70. Plaintiffs further allege the Enterprise functioned as an ongoing organization with systematic linkages and operated through a hierarchical structure with defined roles and controlled information access, including: a leadership tier; an operations command tier; operational cells; and operators/influencers who promoted tokens across social-media platforms and received instructions and early token addresses through private channels. (SAC ¶540.) Plaintiffs allege the Enterprise's relationships were maintained through, among other things, binding KOL

agreements requiring "organic" promotion while concealing compensation; information control over early token addresses; aligned financial incentives tied to volume and fee capture; and coercive enforcement (including exclusion, retaliation, and reputational attacks) against defectors and competitors. (SAC ¶541.)

71. As to course of conduct and longevity, Plaintiffs allege the Enterprise operated continuously from at least early 2024 through the present, repeating the same playbook across numerous narrative campaigns (e.g., the "Nostalgia" campaign featuring the COPE token), and generating billions of dollars of proceeds from Plaintiffs during the alleged period. (SAC ¶¶ 542–543.)

## c. State whether any defendants are employees, officers or directors of the enterprise.

72. Because the Enterprise is alleged as an association-in-fact comprising multiple entities and individuals, Plaintiffs allege the Enterprise acted through the founders, officers, directors, and principals of the constituent entities, who directed and exercised decision-making authority over the Enterprise. (SAC ¶¶ 70–72, 535–536.) Specifically, Plaintiffs allege: Anatoly Yakovenko (Chief Executive Officer of Solana Labs) and Raj Gokal (President and Chief Operating Officer of Solana Labs); Dan Albert (Executive Director of the Solana Foundation), Austin Federa (former Head of Strategy of the Solana Foundation), and Lily Liu (President of the Management of the Solana Foundation); and Alon Cohen (Chief Operating Officer of Pump.fun), Noah Tweedale (Chief Executive

Officer of Pump.fun), and Dylan Kerler (Chief Technology Officer of Pump.fun). (SAC ¶¶ 73–80.) [Note: Defendants' use of titles is, at times, fluid].

**d. State whether any defendants are associated with the enterprise.**

73. Plaintiffs allege that each Defendant is a RICO "person" and was employed by or associated with the Enterprise, and that each conducted or participated in the Enterprise's affairs. (SAC ¶¶ 534, 544.) For Count II, Plaintiffs further allege Defendants knowingly and intentionally conspired by agreeing among themselves and with other Enterprise participants that at least one conspirator would conduct or participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity. (SAC   594.)

**e. State whether you allege that the defendants are separate from the enterprise. If so, explain.**

74. Plaintiffs allege the Enterprise is distinct from each Defendant because it is an association-in-fact comprising multiple persons and entities; no single Defendant is the Enterprise itself. Plaintiffs allege that each Defendant was employed by or associated with the Enterprise and conducted or participated in its affairs. (SAC ¶544.)

6. **Describe the alleged relationship between the activities of the enterprise and how the pattern of racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

75. The Solana-Pump.fun Racketeering Enterprise operated through a defined hierarchy and repeated operational playbook to run and scale the Pump.fun platform on Solana. The pattern of racketeering activity was executed through,

rather than apart from, the Enterprise's routine activities: operating the Pump.fun platform, manufacturing demand through coordinated promotions and misleading communications, controlling information and execution advantages, and extracting transaction-based revenue at high volume. (SAC ¶¶ 93–198, 540–541.)

## The Usual and Daily Activities of the Enterprise

76. Pump.fun operated the web application that mass-produces memecoins, imposed a one-percent transaction rake, and routed orders into Solana's speed-and-priority-fee execution environment, an environment where transaction ordering and speed determined outcomes. (SAC ¶¶ 70, 235–240.)

77. The Enterprise executed a standardized operational sequence designed to create rigged exit-liquidity gambling: target selection and campaign planning (Phase One); bundling and pre-positioning to acquire supply control (Phase Two); coordinated promotion and demand manufacturing through lead KOL pushes, secondary amplification, and friends-and-family cascades (Phases Three through Five); and timed, managed exits into induced retail demand (Phase Six). This sequence was carried out repeatedly and at scale. (SAC ¶¶ 164–189.)

78. The Enterprise used a hierarchical command structure, Leadership, Operations Command, Operational Cells, Operators, and friends-and-family networks, with controlled information flow, tiered access to Token addresses, and instructions propagating from higher to lower tiers. Each tier believed it held a privileged position, but everyone below Leadership was positioned to lose when those above them sold. (SAC ¶¶ 93–123.)

79. Lead KOLs and other promoters seeded narratives, drove public interest, and amplified campaigns through controlled information flow in private channels and through agreements requiring "organic" promotion while concealing compensation. The public was not aware that these KOLs were members of the Enterprise. The public believed these individuals were skilled traders and subject-matter experts when, in fact, they succeeded on insider information fed to them by the Enterprise. (SAC ¶¶ 145–149, 541, 554.)

80. Defendants marketed the system as "fair" and "rug-pull proof" while creating and profiting from systemically engineered insider advantage. The platform employed features, including a bounty system rewarding short-term speculative milestones and a "trading terminal" façade mimicking regulated markets, to stimulate short-term speculation, increase engagement, and maximize trading volume. The very practices Defendants claimed to have eliminated were embedded into the design of the system itself; the Enterprise did not mitigate insider advantage but institutionalized it. (SAC ¶¶ 32–40, 375–400.)

81. Pump.fun extracted a one-percent fee on every buy and sell. Solana transactions required fees paid in SOL and distributed to validators. Higher transaction volume increased demand for SOL, benefiting Solana Labs and Solana Foundation's holdings. Defendants profited from gambling activity by operating the platform through which wagers were placed and by collecting fees on each transaction, including on peak trading days exceeding $10 million. Every dollar Defendants received originated in a retail participant's wallet. (SAC ¶¶ 70, 105, 237–238, 574.)

82. Coordinated enforcement actions, including harassment, doxxing, threats, and organized online attacks, were used to suppress dissent, deter disclosure, and protect the flow of profits. These enforcement actions were not isolated or spontaneous; they followed recognizable patterns, were executed by individuals associated with the Enterprise, and were deployed when criticism risked disrupting ongoing or future token launches. The intimidation served to discourage internal defections by signaling the consequences of disloyalty, suppress external scrutiny by making critics targets, and reinforce the false public narrative that the Enterprise was legitimate, fair, and free from manipulation. (SAC ¶¶ 45–55.)

83. Solana Labs maintained the SPL Token infrastructure necessary for Token creation and built network-level systems that made speed decisive. Solana Labs' congestion updates in April 2024 were a choice to enable the Enterprise's profit model by ensuring the network could process the necessary volume. Solana-side marketing and credibility lending supported Pump.fun's adoption, including public endorsements from Solana leadership. (SAC ¶¶ 216–228, 235–245.)

**The Relationship Between Those Activities and the Pattern of Racketeering**

**Activity**

84. The predicate acts were committed through the same operational mechanics used to run the platform and campaigns. The Enterprise's recurring activities,  token selection and launch mechanics, tiered early access, coordinated promotions, and managed exits, were the mechanisms by which participants were induced to enter transactions that supplied liquidity and generated fee revenue, while insiders

possessed structural advantages not disclosed to retail participants. (SAC ¶¶ 125–189, 237.)

85. The Enterprise's "fairness" narrative and coordinated promotional communications are part of the racketeering pattern. The wire-fraud predicates were executed through a sustained campaign of material misrepresentations and omissions about fairness, insider advantages, and manipulation, disseminated through promotional materials, influencer campaigns, and community communications, to induce participation and repeated trading. (SAC ¶¶ 32–42, 354–385, 560–562.)

86. Operating the Pump.fun platform was the vehicle for the gambling-related predicates. Defendants advanced gambling activity by operating the platform through which wagers were placed and profited from that activity by collecting fees on each transaction. Users staked SOL in order to play a game of exit liquidity gambling, and Defendants knowingly advanced and profited from this unlawful gambling activity. (SAC ¶¶ 565, 574–575.)

87. The platform's routine receipt and processing of transactions and fee flows are part of the racketeering pattern. The money-transmitting predicates were executed through the Enterprise's receipt of SOL from buyers and transmission to sellers through bonding-curve contracts and platform infrastructure, without required state licensing or federal MSB registration. Plaintiffs' transactions and the Enterprise's fee extraction were central revenue sources. (SAC ¶¶ 578–588.)

**How the Racketeering Activity Differs from the Enterprise's Usual and Daily Activities, If at All**

88. The racketeering pattern does not materially differ from the Enterprise's actual day-to-day operations as conducted. The predicate acts are the regular way the Enterprise conducted, and continues to conduct, its business, through repeated campaigns, recurring promotional communications, platform design choices, and fee-driven volume generation. The SAC expressly frames the predicate acts as the Enterprise's "regular way" of conducting business for purposes of open-ended continuity: the "pattern" is the normal operational mode. (SAC 557.)

89. To the extent any "difference" exists, it lies in the contrast between the Enterprise's public-facing portrayal and its internal operational reality. Publicly, the Enterprise portrayed decentralization, fairness, and open competition: marketing "fair launches," an "even playing field," and protection from the manipulation that had plagued prior memecoin markets. Internally, the Enterprise operated through centralized coordination, information control, structural execution advantages, and managed exits that removed genuine uncertainty for insiders while inducing retail participation through misleading narratives and interface design. The difference is between what the Enterprise told the public and what the Enterprise actually did. (SAC ¶¶ 32–40, 93–123, 375–403.)

7. **Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

90. The Enterprise engaged in, and its activities affected, interstate and foreign commerce by, among other things: operating Pump.fun over the internet; transmitting promotions and solicitations across U.S. and foreign users; coordinating through Telegram/Discord; routing and settling transactions over

Solana's globally distributed network; and moving proceeds to centralized exchanges and foreign structures while continuing to market to U.S. users. (SAC ¶545.) Pump.fun imposed no KYC protocols and no geographic restrictions, enabling anonymous participation by users anywhere in the world. (SAC ¶¶ 438–439.) Plaintiffs further allege Pump.fun generated over $400 million in fee revenue during 2024 and that, between January 2024 and mid-2025, Pump.fun's founders and insiders moved over $700 million in profits off-chain, including by funneling large portions to centralized exchanges such as Kraken, and that Defendants derived substantial revenue from interstate and international commerce, including fees and other proceeds generated from transactions initiated by users located in New York. (SAC ¶¶ 90, 337–339)

91. Pump.fun tokens accounted for more than 90% of Solana transaction volume by mid-2025 and drove increases in Solana network fee revenue, and because every Solana transaction requires payment in SOL and transaction fees are distributed to validators, the Enterprise's volume affected commerce through network-wide fee flows and SOL demand. (SAC ¶¶ 237, 340–342.)

8. N/A

9. N/A

10. **If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

   **a. State who is employed by or associated with the enterprise.**

   92. The SAC alleges that each Defendant is a RICO "person" and was employed by or associated with the Solana-Pump.fun Racketeering Enterprise and conducted or

participated in its affairs. (SAC ¶¶ 534, 536, 544.) The Enterprise is alleged as an association-in-fact consisting of: Pump.fun and its founders Alon Cohen, Dylan Kerler, and Noah Tweedale; Solana Labs and the Solana Foundation and their principals Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu; the Lead KOL Doe Defendants; and other coordinated participants. (SAC ¶536.) The SAC further alleges the Enterprise operated through a hierarchical structure with defined roles and controlled information access, including a Leadership Tier consisting of Cohen, Kerler, Tweedale, Yakovenko, Gokal, Albert, Federa, and Liu. (SAC 540.)

b. **State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

93. The SAC alleges the Solana-Pump.fun Racketeering Enterprise is distinct from each Defendant; it is an association-in-fact comprising multiple persons, and no single Defendant is the Enterprise itself. (SAC ¶544.) Each Defendant is alleged as a separate RICO "person" within 18 U.S.C. § 1961(3), employed by or associated with the Enterprise, and to have conducted or participated in its affairs. (SAC ¶¶ 534, 544.)

11. **If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe the alleged conspiracy.**

94. Section 1962(d) makes it unlawful for any person to conspire to violate § 1962(c). A plaintiff must plead that the defendant knew about and agreed to facilitate a scheme that, if completed, would satisfy § 1962(c). No overt act is required. *Salinas v. United States,* 522 U.S. 52, 63–66 (1997). (SAC 593.)

37

95. The SAC alleges that Defendants knowingly and intentionally conspired to violate § 1962(c) by agreeing among themselves and with other Enterprise participants that at least one conspirator would conduct or participate in the conduct of the Solana-Pump.fun Racketeering Enterprise's affairs through a pattern of racketeering activity, including at least two predicate acts. (SAC ¶594.) The object of the conspiracy was to enrich conspirators by operating the Enterprise's rigged, unlicensed gambling platform and profiting billions from retail through wire fraud, illegal gambling, and unlicensed money transmission, monetized through platform fees, network/validator economics, and MEV/priority tips. (SAC  595.)

96. The scheme, and thus the conspiratorial agreement to execute it through repeated campaigns, operated repeatedly from at least early 2024 through the present and was coordinated through a hierarchical command structure with layered information access and centralized control, including private Telegram channels for command-level coordination and public-facing platforms as the stage for purportedly organic promotions. (SAC ¶¶ 93–105, 191–192, 557.)

97. Each Defendant knew the essential nature of the scheme and agreed to further it, as demonstrated by their roles, communications, coordinated integration and support, aligned financial incentives, and conduct described above. (SAC ¶596.) By way of example:

    a. Pump.fun Defendants: knowledge and agreement are shown by control of the platform and promotional apparatus; deliberate operation without KYC/AML/safeguards; KOL agreements requiring concealed "organic" promotion; internal and public casino/gambling admissions (including

Cohen's internal "gambling" acknowledgment and public "casino" statements); and concealment efforts/control over the information cascade determining who profited and who lost. (SAC 597.)

b.  Solana Defendants: knowledge and agreement are shown by coordinated technical support and timing enabling Pump.fun's launch and scaling; public endorsements and normalization of casino-like volume; promotion of a volume-monetization posture; financial benefit tied to Pump.fun activity; and dissemination of foreign-structure strategies to limit U.S. exposure while continuing to attract U.S. users and fees (including CW-1-reported leadership meetings; coordinated April 2024 network updates; public statements/endorsements framing the activity as gambling/casino-like; foreign foundation wrapper strategies; and Solana Defendants' financial interests tied to SOL supply and staking economics). (SAC 598.)

c.  Lead KOL Doe Defendants: knowledge and agreement are shown by receipt of early token addresses through private channels enabling pre-positioning; coordination with Leadership and Operations Command on promotional content, cadence, and narrative selection; concealed-promotion agreements; activation of downstream friends-and-family distribution networks under centralized campaign plans; managed exits timed to promotional pushes; and coordinated harassment campaigns against defectors/competitors. (SAC 599.)

98. The conspiracy encompassed agreement on the essential mechanics of the scheme, including presenting coordinated promotions as organic; insider pre-positioning and supply control; use of priority execution infrastructure to secure insider-first ordering; managed exits timed to promotional pushes; and operating without licensing, KYC/AML, sanctions screening, and consumer safeguards to preserve anonymity and maximize volume and fees. (SAC 600.)

99. Although no overt act is required for a § 1962(d) conspiracy, the SAC alleges that Defendants committed numerous overt acts in furtherance of the conspiracy, including those alleged throughout the SAC and incorporated into Count II. (SAC 601.)

**12. Describe the alleged injury to business or property.**

100.    Plaintiffs and Class members were injured in their business or property by Defendants' violations of § 1962(c) and the § 1962(d) conspiracy. Plaintiffs' injuries arise from their purchases and sales of Tokens through Pump.fun and related post-graduation trading, including out-of-pocket losses on Token transactions and fees paid to transact in the rigged environment. (SAC ¶¶ 65–67, 532–533, 590, 602.)

101.    Plaintiffs' injuries arise through two distinct but related mechanisms.

102.    First, Plaintiffs paid for a bargained-for exchange that never occurred: the opportunity to participate in a game of chance offered by the Solana-Pump.fun Racketeering Enterprise. The Enterprise rigged the game through supply control, demand manufacturing, and managed exits. These conditions eliminated chance and gave the Enterprise control over outcomes.

40

103.  Second, Plaintiffs were induced to participate through material misrepresentations and omissions regarding, among other things, fair launches and equal access. Both mechanisms caused injury. (SAC ¶¶ 532–533.)

104.  Plaintiffs suffered losses from purchasing tokens at prices inflated by rigged market conditions and coordinated insider activity, followed by price collapses after insider exits that left Plaintiffs holding depreciated or worthless Tokens. After "graduation," Tokens traded on decentralized exchanges (including Raydium) where prices collapsed almost immediately. Between approximately 81% and 97% of Tokens launched through Pump.fun lost more than half their value post-graduation, producing estimated retail losses of $1.2 to $2 billion in the post-graduation phase alone. Aggregate retail losses on Pump.fun and post-graduation trading are estimated between $4 billion and $5.5 billion. Lead Plaintiff Okafor suffered approximately $242,076.74 in losses on Pump.fun Tokens during the Class Period. (SAC ¶¶ 65–67, 321–331, 590(a).)

105.  Plaintiffs suffered injury in the form of fees paid on fraud-induced Token buys and sells. Pump.fun extracted a one-percent fee on every buy and sell. Solana collected network fees on every on-chain transfer. Every dollar Defendants received originated in a retail participant's wallet. These fees were charged on transactions that Plaintiffs would not have entered, or would not have entered on the same terms, had Defendants disclosed the true nature of the scheme. (SAC ¶¶ 70, 105, 319, 533, 590(b).)

106.  Plaintiffs paid priority fees and related bundling/transaction fees to obtain transaction ordering and execution advantages, or to ensure execution at all.

Priority fees create a pay-to-win execution environment: the more someone pays, the closer they move to the front of the processing queue. These charges flowed to Defendants in connection with fraud-induced transactions. Lead Plaintiff Okafor paid for priority blockspace via transaction and bundling fees that flowed to Defendants. (SAC ¶¶ 65, 247–248.)

107.   Plaintiffs suffered inferior fills, slippage, and related value losses caused by the pay-to-win priority execution environment that advantaged insiders over retail participants. In Solana's execution environment, users can add priority fees to move transactions toward the front of the processing queue. This created structural execution disadvantages for retail participants who did not pay, or could not afford to pay, the priority fees necessary to compete with insiders and bots for favorable execution. (SAC ¶¶ 247–248, 590(c).)

108.   Plaintiffs would not have transacted on Pump.fun, or would not have done so on the same terms, had Defendants disclosed the true nature of the scheme. Defendants represented that Pump.fun offered fair launches without insider advantages, safety protections against rug pulls, and genuine opportunities for wealth creation. Defendants concealed that promotional campaigns were coordinated performances, that insiders had acquired supply at prices retail would never see, that the execution environment guaranteed insiders priority, and that success stories were manufactured by the same Enterprise that profited from every induced transaction. Had Plaintiffs known these facts, they would not have transacted. There is no independent, superseding cause of Plaintiffs' injuries; Plaintiffs' losses flowed directly from the scheme's design. (SAC ¶¶ 319, 590(d).)

**13. Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

    **A. Direct Causal Relationship for the § 1962(c) Claim (Count I)**

109.    Plaintiffs and Class members suffered injury to their business or property "by reason of" Defendants' violation of § 1962(c) through conduct of the Enterprise's affairs via a pattern of racketeering activity. Plaintiffs were the immediate and intended victims of the wire-fraud inducements, the illegal gambling profits, and the unlicensed transmission that moved their funds to insiders. (SAC ¶ 589.)

110.    Plaintiffs' injuries flowed from the § 1962(c) violation through two distinct but related causal mechanisms, each independently sufficient to establish proximate causation. (SAC ¶¶ 532, 538–539.)

111.    The Enterprise rigged the game through three structural conditions that eliminated chance and gave the Enterprise control over outcomes: (a) supply control: insiders acquired disproportionate Token supply at the lowest prices before retail could act; (b) demand manufacturing: coordinated promotions created retail buyers whose purchases provided exit liquidity for insiders who had already positioned; and (c) managed exits: insiders sold in coordinated sequence at peak prices into the demand their own promotion generated. (SAC ¶ 538.)

112.    The structural conditions were the but-for and proximate cause of Plaintiffs' losses. But for supply control, insiders could not have acquired Tokens at prices retail would never see. But for demand manufacturing, insiders would have had no exit liquidity. But for managed exits, insiders could not have sold in coordinated sequence at peak prices to achieve maximum profit. Absent these

manufactured conditions, the game would not have been rigged. The Enterprise's creation and maintenance of these conditions was the but-for and proximate cause of Plaintiffs' injuries: the rigging ensured the Enterprise controlled who won and who lost. (SAC ¶¶ 313, 317–318.)

113.    Plaintiffs' losses were the foreseeable consequence of this design. The Enterprise required a continuous supply of retail participants whose transactions could be taxed and whose purchases could provide exit liquidity for insiders. Plaintiffs arrived as exit liquidity for pre-positioned insiders, and the game's structure ensured retail would lose while insiders would win. Plaintiffs' losses funded Defendants' revenues. (SAC   336.)

114.    The Enterprise induced participation through fraudulent misrepresentations and omissions. Defendants made materially false claims of "fair launches" and an "even playing field" while concealing insider pre-positioning, paid coordination, and the priority execution advantages that made retail losses inevitable. (SAC ¶539.)

115.    The misrepresentations were independently a direct and proximate cause of Plaintiffs' participation. Defendants represented that Pump.fun offered fair launches without insider advantages, safety protections against rug pulls, and genuine opportunities for wealth creation. Defendants concealed that promotional campaigns were coordinated performances, that insiders had acquired supply at prices retail would never see, that the execution environment guaranteed insiders priority, and that success stories were manufactured by the same Enterprise that profited from every induced transaction. Had Plaintiffs known these facts, they

44

would not have transacted. (SAC   319.)

116.    The transaction fees and other transaction-related harms were extracted from transactions induced by the Enterprise's false representations. Plaintiffs' fee payments and exposure to loss were not incidental market outcomes but the direct, intended consequence of induced participation in an insider-controlled, volume-driven mechanism. (SAC ¶¶ 319, 560, 590.)

117.    The § 1962(c) violation consisted of conducting the Enterprise's affairs through a pattern of racketeering activity including wire fraud, illegal gambling predicates (including 18 U.S.C. § 1955 and state-law gambling felonies), and illegal money transmitting. Plaintiffs were the immediate and intended victims of these predicates as executed through Pump.fun transactions and the associated transactional infrastructure, including the transmission mechanics that moved Plaintiffs' funds to insiders. (SAC ¶¶ 555, 589.)

118.    The same predicate-act execution that produced the Enterprise's proceeds also produced Plaintiffs' injury: induced transactions (wire fraud) and the platform's unlawful wagering and transmission mechanics and profit extraction resulted in the transactional losses, fees, and execution harms described above. There is no independent, superseding cause of Plaintiffs' injuries; Plaintiffs' losses flowed directly from the scheme's design. (SAC ¶¶ 589–590.)

**B.  Direct Causal Relationship for the § 1962(d) Claim (Count II)**

119.    Defendants conspired to violate § 1962(c), with the object of enriching conspirators by operating the rigged, unlicensed gambling platform and profiting from retail through wire fraud, illegal gambling, and unlicensed money

transmission. The conspiracy achieved its object—coordinated profit-making from retail participants—and proximately caused the injuries alleged in Count I. (SAC ¶¶ 595, 602.)

120.    Count II causation is tied directly to the same injury mechanisms and injury categories described above for Count I, transactional losses, transaction-based fee payments, and execution harms, because the conspiracy's objective and execution were coextensive with, and realized through, the racketeering conduct that directly produced Plaintiffs' injury. (SAC ¶¶ 589–590, 602.)

**14. Provide any additional information that you feel would be helpful to the Court in trying the RICO claim.**

121.    The acts of misconduct in connection with Defendants' intimidation campaign, documented in Plaintiffs' various notice letters to the Court [ECF Nos. 120, 127, 130], sanctions motion [ECF No. 137]  and related filings illustrates how the RICO Enterprise deploys its organizational structure, operational mechanics, and enforcement apparatus against perceived threats to its operations. The intimidation campaign directed at Plaintiffs' counsel, counsel's family members, and named Plaintiffs was not isolated misconduct by unaffiliated third parties, it was executed through the same hierarchical structure, affiliate relationships, and memetic amplification systems that constitute the Enterprise's core operations. The campaign employed identical operational mechanics described throughout this RICO Statement: token creation embedding targeted narratives, coordinated social amplification through affiliated accounts, community formation around organizing objects, and automated propagation

through blockchain indexing systems. This conduct reflects the Enterprise's use of coordinated harassment and intimidation campaigns against critics, defectors, or competitors who threatened exposure or disruption of the scheme. (SAC ¶¶ 45–55, 599), and demonstrates the enforcement function that maintains discipline, suppresses scrutiny, and protects revenue flows. These facts are relevant to the Court's assessment of the Enterprise's structure, the scope of its racketeering activity, and the ongoing threat it poses.

DATED: January 23, 2026
New York, New York

Respectfully submitted,

**BURWICK LAW PLLC**
By: */s/ Max Burwick*
Max Burwick
Luis Munoz
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
max@burwick.law
luis@burwick.law

**WOLF POPPER LLP**
Chet B. Waldman
Terrence Zhang
845 3rd Avenue – 12th Floor
New York, NY 10022
212-759-4600
cwaldman@wolfpopper.com
tzhang@wolfpopper.com