# Exhibit 1

**UNITED STATES DISTRICT COURT ~~FOR THE~~**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **DIEGO AGUILAR, KENDALL CARNAHAN ~~and~~AND MICHAEL OKAFOR, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BATON CORPORATION LTD, d/b/a PUMP.FUN, ALON COHEN, DYLAN KERLER, ~~and~~ NOAH BERNHARD HUGO TWEEDALE, SOLANA LABS INC., SOLANA FOUNDATION, ANATOLY YAKOVENKO, RAJ GOKAL, DAN ALBERT, AUSTIN FEDERA, LILY LIU and LEAD KOL DOES 1-25**<br><br>**Defendants.** | **Case No.: 1:25-cv-00880- (CM ~~BCM~~)**<br><br>SECOND AMENDED CONSOLIDATED ~~AMENDED~~<br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 5

PARTIES ........................................................................................................................... 11

JURISDICITION AND VENUE......................................................................................... 15

BACKGROUND ................................................................................................................ 16

I.      BLOCKCHAINS, SOLANA, THE ROLE OF THE SOL TOKEN AND CRYPTO WALLETS ........................................................................................................................ 16

      A.    Introduction to Blockchain .................................................................................. 16

      B.    The Solana Blockchain & The SOL Token ......................................................... 17

      C.    Crypto Wallets and Accessing Blockchain Software .......................................... 18

      D.    Solana's History of Regulatory Evasion:............................................................. 20

      a.    Arbitrage in the Crypto Industry......................................................................... 20

      E.    Solana's Dual-Entity Structure: Labs and Foundation ........................................ 21

      F.    Avoiding Securities Laws from Day One ............................................................ 21

      G.    How This Setup Enabled FTX, NFTs, and Pump.fun ......................................... 22

      H.    Legal Relevance: Foreseeability, Enterprise Intent, and Continuity .................. 23

II. SOLANA'S HISTORY OF SPECULATIVE SCHEMES AND RETAIL HARM ................. 23

      A.    The 2021 NFT Boom and Bust: A Precursor to Pump.fun's Model .................... 23

      B.    The FTX/Alameda Collapse and Solana's Role .................................................. 25

      C.    A Pattern of Conduct and Systemic Incentives................................................... 27

III. THE MEMECOIN MACHINE ........................................................................................ 28

      A.    Introduction to Pump.fun ..................................................................................... 28

      B.    Pump.fun's Retail Trading Interface.................................................................... 30

      C.    Pump.fun's Meme coin Marketing: Venture Like Investments............................ 36

      D.    Pump.fun and Pump.fun's Founders Describe Pump.fun as a Casino.................. 39

      E.    Pump.fun Marketing: Celebrity Meme Coins...................................................... 40

      F.    Anonymous Access and the Pseudonymous Casino: No KYC, No Oversight, No Accountability....................................................................................................................... 43

      G.    Meme coin Slot Machine: Exit Liquidity Gambling ........................................... 45

IV. THE FALSE "FAIR LAUNCH" NARRATIVE AND WIRE FRAUD SCHEME ............... 46

V. INTELLECTUAL PROPERTY THEFT AND PLATFORM-AIDED IMPERSONATION . 49

      A.    Impersonation of Registered Publicly Traded Companies and Privately Held Corporations ....................................................................................................................... 49

      B.    Unlicensed Use of Celebrity and Politician Meme coins .................................... 52

      C.    Pump.fun Launches, Sells, and Exchanges Counterfeit Digital Assets.............. 53

      D.    Pump.fun Launched, Exchanged and Managed Meme Coins That Harass Law Firms, Lawyers, Plaintiffs, And Act To Intimidate Lawyers' Families ................................... 54

1

E.    Pump.fun's Trademark Policy and Knowing Facilitation of Infringement ............. 56

VI. PUMP.FUN, JITO LABS, AND SOLANA LABS OPERATE AN UNLICENSED MONEY TRANSMISSION BUSINESS ................................................................................................... 57

A.    Use of Pump.fun to Launder Sanctioned Funds by the Lazarus Group................... 57

B.    Unlicensed Operation of Money-Transmitting Business....................................... 59

VII. OPERATION OF AN ILLEGAL GAMBLING ENTERPRISE ........................................... 61

VIII. THE ROLES OF SOLANA LABS AND JITO LABS IN THE RICO ENTERPRISE ...... 63

A. Solana Labs and the Solana Foundation: ................................................................. 63

I. Organizational Structure and Purpose ..................................................................... 63

II. Solana's SPL Token Standard ................................................................................... 64

III. Interdependence Between Solana Labs, Jito Labs, and Pump.fun ............................ 65

B. Defendant Jito Labs, Inc.............................................................................................. 66

I.    The Role of Jito Labs in the Pump Enterprise: Formation, Control, and Alignment with Solana Labs.............................................................................................................. 66

II.    Jito Labs' Infrastructure and MEV Execution Engine............................................ 67

III. Integration with and Enablement of Pump.fun ........................................................ 68

IV. Revenues and Profits from Pump.fun-Related Activity ............................................. 69

V. Co-Dependence on Solana Labs and Participation in the Enterprise.......................... 69

C.    A Coordinated and Profitable Racketeering Enterprise.......................................... 70

IX. THE PROFITEERS AND THE VICTIMS.......................................................................... 71

A. Investor Losses............................................................................................................. 71

B. Solana Labs and the Solana Foundation: Direct Financial Gains ............................... 72

C. Jito Labs: MEV Extraction and Windfall Profits........................................................ 73

D. Pump.fun: Platform Revenues and Windfall Profits.................................................... 75

E. Solana Insiders: Who Profited and How ..................................................................... 77

F. Retail Trader Estimated Losses ................................................................................... 79

X. PUMP.FUN SOLD CERTAIN UNREGISTERED SECURITIES ....................................... 83

A. Pump.fun's Role as Issuer and Seller.......................................................................... 83

B. Plaintiffs Do Not Contend That All Pump.fun Issued Tokens Are Securities............ 83

C. Pump.fun Sold as Investment Contract Securities ...................................................... 84

D. Pump.fun's Fees, and Structural Exploitation ............................................................ 85

CLASS ACTION ALLEGATIONS........................................................................................... 87

CAUSES OF ACTION .............................................................................................................. 90

COUNT I .............................................................................................................................. 90

Violation of Section 12(a)(1) of the Securities Act of 1933 (Against Defendants Pump.fun Alon Cohen, Dylan Kerler, and Noah Bernhard Hugo Tweedale) on Behalf of the Pump Tokens Subclass............................................................................................................... 90

A.    No Exemption from Registration is Applicable................................................... 96

COUNT II ............................................................................................................................. 97

Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) & 1962(d) (Against All Defendants As To All Tokens and the Class, And In The Alternative, With Respect To The Pump Tokens and the Pump Tokens Subclass).. 97

COUNT III ................................................................................................................. 108

Violation of New York General Business Law §§ 349 & 350 (Deceptive Acts and False Advertising) (Against All Defendants on Behalf of New York Residents of the Class) 108

PRAYER FOR RELIEF .................................................................................................... 109

Appointment of a Federal Equity Receiver ............................................................... 110

Injunctive & Declaratory Relief ................................................................................ 112

Ancillary Relief ......................................................................................................... 113

JURY DEMAND ............................................................................................................. 113

Plaintiffs Diego Aguilar, Kendall Carnahan, and Lead Plaintiff Michael Okafor (collectively, the "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsels' investigation, which includes, without limitation, review and analysis of press releases, news articles, websites, blockchain forensic analysis, and other publicly available information concerning the Defendants (as defined herein), the platform Pump.fun, and cryptocurrency meme coins or tokens that were issued by, promoted by, or sold by the certain of the defendants through Pump.fun, or for which certain of the defendants solicited the sale of through Pump.fun (collectively, the "Tokens").

## NATURE OF THE ACTION

1. This action is brought by, and on behalf of, victims of a coordinated racketeering enterprise designed to simulate the functions of a digital casino operated illegally under the guise of meme coin creation and trading. At the center of this enterprise is Pump.fun, a platform presented to users as a fair and decentralized system for launching and trading meme coins on the Solana blockchain. In truth, Pump.fun is merely the front-facing slot machine cabinet, operated as part of a broader illegal gambling and money transmission scheme engineered and maintained jointly by Pump.fun, Jito Labs, Inc. ("Jito Labs"), Jito Foundation, Solana Labs, Inc. ("Solana Labs"), and the Solana Foundation (collectively, with the Individual Defendants set forth below, the "Meme Coin Casino" or the "Pump.fun Casino").

2. The Meme Coin Casino, with certain exceptions described below, was not investment opportunity, nor financial innovation—it was gambling.

3. Exit liquidity gambling is a digital wagering scheme in which users buy speculative meme coins not for their underlying value, but in hopes of reselling them at a higher price before the price collapses. The game depends entirely on timing: participants who enter early may sell at a profit to later buyers, while those who enter late are left holding worthless tokens. The token's

4

price increases as more users buy in and collapses when early holders "exit" by selling, making the new entrants the "liquidity" for those exits. These transactions typically occur within minutes of a token's launch, and in nearly all cases the token's value evaporates within 24 hours.

4.      The structure mimics a rigged slot machine where the first few players win by dumping their tokens on later ones. There is no underlying project, product, or revenue—only a fast-moving cycle of buying, dumping, and collapse. Platforms like Pump.fun automate this dynamic through bonding-curve pricing, anonymous wallet access, and priority trading for insiders and bots, turning the process into a form of unlicensed, zero-sum gambling where the odds are overwhelmingly against the average participant.

5.      Each defendant contributed technology and business expertise to the Meme Coin Casino.[1]

6.      Pump.fun built and operated the interactive, user-facing slot machine—the public interface that allowed users to "pull the handle" by depositing SOL currency in exchange for newly launched tokens. Pump.fun designed their prize to be a non-deterministic, nearly-impossible-to-predict outcome, most often resulting in their initial wager becoming valueless. Pump.fun designed the gambling mechanics to be structurally exploitable, and Jito Labs served the role of rigging the games.

7.      Jito Labs monitored the spins and intercepted profitable transactions – the "winning spins" – and sent them to whoever bribed them the most.

8.      Solana Labs and the Solana Foundation provided the venue—the Solana blockchain itself—and monetized each wager through the sale of block space, validator fees, and SOL token appreciation.

9.      The entire Solana ecosystem is monetized not on utility or economic productivity but on driving transaction volume. More transactions mean more bribing opportunities, higher

---

[1] https://defillama.com/chain/solana

SOL prices, and more speculative capital inflows. Defendants thus created a business model premised on flooding the crypto market with junk assets designed only to provoke speculative trading and churn. The Pump.fun Casino was the most efficient implementation of this vision to date.

10. As of July 2025, the top 19 revenue-generating apps on Solana are operated by Pump.fun, Jito Labs, or are trading tools, bots, or wallets that exist to facilitate exit liquidity gambling in Pump.fun meme coins.

11. Pump.fun has generated $722.85 million from the illegal gambling enterprise.

12. The illegal casino has earned more than $3.18 billion in revenue across the Solana technologies responsible for facilitating the gambling operation. *Id.* Pump.fun and Jito Labs have become the dominant economic engines of the Solana blockchain.

13. In contradiction to public narratives, during 2024 82% of all tokens traded on the Solana blockchain software were attributed to the Pump.fun Casino operations. At times earning Pump.fun more than $5 million per day in fees.[2]

14. Jito's front-running technology, aka, MEV-enabled validator client, captured over $633 million in user-paid tips—of which Jito retained 5%-6%—as traders paid bribes to prioritize their transactions amid the gambling frenzy.

15. Pump.fun and Jito earn revenue by charging fees on trades or swaps enabling the exit liquidity gambling, making their business models directly dependent on the volume and velocity of Pump.fun meme coin trading.

16. Similar to branded slot machines in casino, Pump.fun offered, at a minimum four recurring categories: (i) certain tokens (specified herein) that amounted to unregistered securities, promising or implying profit-sharing or investment return; (ii) celebrities or influencers meme coins, often created and monetized without their consent or disclosure; (iii) tokens that blatantly

---

[2] https://cointelegraph.com/news/solana-dex-volume-record-high-sol-price-to-300

infringed on intellectual property rights, using copyrighted content, trademarks, and brand likenesses to attract attention; and (iv) tokens marketed as pure speculative "memes".

17. Transaction volume is critically important to Solana Labs and the Solana Foundation because it directly determines the value of blockspace on the Solana network, which in turn drives demand for SOL, the network's native token. All transactions on Solana require users to pay fees in SOL to access blockspace—a finite and monetized resource allocated to validators.

18. As transaction volume rises, so does competition for blockspace, increasing the fees paid to validators and boosting staking yields. Solana Labs and the Solana Foundation benefit financially from this mechanism: they control large SOL reserves, operate validators, and earn direct rewards and appreciation as SOL becomes more valuable. Higher blockspace demand not only increases protocol revenues but also inflates the market price of SOL, enabling these Defendants to extract outsized returns from retail activity, even when such activity involves unregistered securities, scams, or gambling mechanics.

19. Creating artificial transaction volume to inflate the value of blockspace and drive SOL demand is not new for the Solana Defendants. In 2021, Solana Labs and the Solana Foundation orchestrated the NFT boom on Solana by promoting a frenzy of tokenized JPEGs they branded as "art" or "community" assets.

20. In substance, these NFTs operated as pseudo-securities: investors bought them based on promotional promises of future value, exclusive benefits, or roadmap-based gains—classic hallmarks of an investment contract. Yet Solana avoided regulatory scrutiny by rebranding them as culture or collectibles. The result was a manufactured secondary market that exploded in volume, enriched Solana insiders through validator fees and token appreciation, and collapsed as quickly as it rose. Just like with meme coins, Solana Labs and the Foundation made a killing by selling blockspace; and just like with meme coins, retail investors lost their shirts.

21. The illegal nature of the scheme is not limited to its gambling operations. Defendants also violated multiple state and federal laws in executing their enterprise. Pump.fun routinely facilitated the creation and sale of unregistered securities, as defined under the Howey test and described below, without registration statements, risk disclosures, or compliance with securities laws. The interface misrepresented the fairness of launches and concealed the economic mechanics of token distributions, including the risks and asymmetries built into the system.

The transactional routing model employed by

## Table of Contents

**PRELIMINARY STATEMENT** ...................................................................................................**5**

**PARTIES** ...............................................................................................................................**15**

**JURISDICTION AND VENUE**...............................................................................................**20**

**FACTUAL ALLEGATIONS**....................................................................................................**22**

    **I. THE SOLANA-PUMP.FUN RACKETEERING ENTERPRISE** ..............................**22**

        A. The Enterprise Operated Through a Chain of Command with Defined Roles, Layered Information Access, and Centralized Control......................................................**22**

            1. Leadership....................................................................................................**24**

2. Operations Command ...........................................................................................25

3. Operational Cells ...............................................................................................25

4. Operators...........................................................................................................26

5. Associates: Friends and Family Networks.........................................................26

B. The Game: Rigged Exit Liquidity Gambling..........................................................28

1. Exit Liquidity Gambling: The Underlying Game ..............................................28

2. What Makes It Rigged: The Structural Prerequisites for Guaranteed Insider Profit .....30

3. The Prerequisites Combined ..............................................................................36

C. Repeatable Operational Tactics of Rigged Exit Liquidity Gambling .........................37

1. Phase One: Target Selection and Campaign Planning........................................37

2. Phase Two: Bundling and Pre-Positioning ........................................................40

3. Phases Three Through Five: Promotional Deployment.......................................40

4. Phase Six: Managed Exit ...................................................................................44

5. Repeatability .....................................................................................................44

D. Communications: How the Enterprise Coordinated in Private, Promoted in Public, and Enforced Compliance................................................................................................45

1. The Communication System...............................................................................45

2. The Tools ...........................................................................................................46

3. Information as Control........................................................................................47

4. Mutual Dependence: What Bound KOLs to the Enterprise................................48

5. Enforcement: The Power to Destroy What Made Participants Valuable ...............50

E. The Technical and Marketing Infrastructure Underlying the Enterprise's Operations .54

1. Only Possible on Solana ....................................................................................54

2. Coordination ......................................................................................................58

3. The Solana Network ...........................................................................................60

4. Jito Labs ............................................................................................................62

II. THE NOSTALGIA CAMPAIGN AND COPE TOKEN CASE STUDY ....................64

A. The Operations Structure in Action ........................................................................64

1. Leadership Identified COPE as a Profit Opportunity and Authorized the Campaign ...............................................................................................................64

2. The Developer Was Directed to Curate a False History Before Promotion Began ....................................................................................................................65

3. Operations Command Translated the Directive into Wallet Assignments and Coordinated Pre-Positioning...................................................................................66

B. The Rigged Game in Action.....................................................................................67

1. Supply Control: Insiders Bundled COPE Before Any Public Promotional Activity ..................................................................................................................67

2. Demand Manufacturing: Coordinated Promotion Created the Appearance of Organic Discovery ................................................................................................67

C. The COPE Campaign Demonstrates the Enterprise's Core Fraud .............................81

**III. THE PREDICTABLE RESULT: PLAINTIFFS WERE INJURED TO THE TUNE OF BILLIONS ...............................................................................................................82**

A. From Case Study to Systemic Fraud.................................................................82

B. Plaintiffs' Transactions Were the Enterprise's Only Revenue Source...........................83

C. Retail Suffered Billions in Losses...................................................................84

D. Billions Were Made as a Result of the Scheme....................................................87

    1. Pump.fun Collected Hundreds of Millions in Platform Fees and Moved Those Funds Off Chain...................................................................................87

    2. Solana's Token Holdings and Revenue Surged into the Billions.............................88

    3. Jito Made Hundreds of Millions in Tips.......................................................89

**IV. THE COPE CAMPAIGN DOESN'T STAND ALONE: THE ENTERPRISE'S PATTERN OF FRAUD, MISREPRESENTATION, AND DELIBERATE DESIGN ....90**

A. The Enterprise Made Consistent Misrepresentations and Omissions That Induced Participation ..............................................................................................90

    1. Marketing Promised Impossible Wealth Opportunities While the Enterprise's Design Guaranteed Retail Would Lose.............................................................91

    2. "Fair Launch" and "Rug-Pull Proof" Representations Were Pervasive While the Bundling System Made Fair Launches Structurally Impossible...............................100

B. The Enterprise's Senior Operators Designed the Platform to Operate as a Rigged Casino .....................................................................................................103

C. Internal Team Chats Reveal the Platform Was Deliberately Designed to Maximize Addictive Trading and Fee Revenue...................................................................104

    1. The Slot Machine Variants .....................................................................107

    2. Leadership Publicly Acknowledged the Platform Was a Casino .........................109

    3. Solana Leadership Embraced the Gambling Narrative.....................................111

    4. Pump.fun's Bounty System Incentivized Explosive Short-Term Speculation.......114

D. The Trading Terminal Façade Disguised the Rigged Casino as a Regulated Market 114

E. The Interface Simulated Institutional Trading Platforms...........................................114

F. The Interface Displayed Market Data That Mimicked Regulated Securities Markets115

    1. The Interface Provided Due-Diligence Metrics That Simulated Institutional Analysis..............................................................................................115

    2. The Order Execution Interface Mirrored Sophisticated Equities Platforms..........116

    3. In Contrast to a Sophisticated Equities Platform, Pump.fun Offers No Meaningful Protections.............................................................................116

**V. DELIBERATE COMPLIANCE FAILURES ENABLED THE ENTERPRISE'S ILLEGAL OPERATIONS.........................................................................................117**

A. Pump.fun Operated Without KYC/AML, Sanctions Screening, or Age Verification by Design ...................................................................................................117

    1. Anonymous Wallet-Based Access Required No Identity Verification.................117

2. Minors Played on Pump.fun Without Age Checks ............................................118

B. The Platform Hosted Unverified Pornographic Content Without Age-Gating or Identity Controls ..........................................................................................118

C. High-Profile Laundering Episodes Demonstrated Capacity to Intervene and Choice Not To ..................................................................................................124

D. Defendants Possessed Moderation Capabilities and Chose Not to Protect Users ......125

E. Internal Communications Expose Leadership's Knowledge and Intent.....................129

1. Leadership Designed the Livestream Feature to Incentivize Dangerous Behavior ..........................................................................................129

2. Leadership Developed and Implemented Features which Resembled a Multi-Level Marketing Scheme ..............................................................132

3. Miscellaneous Evidence of Scienter from Team Chats .........................135

**VI. PUMP.FUN SOLD CERTAIN UNREGISTERED SECURITIES.........................137**

A. Pump.fun's Role as Issuer and Seller.................................................................137

B. Plaintiffs Do Not Contend That All Pump.fun Issued Tokens Are Securities............137

C. Pump.fun Sold as Investment Contract Securities ..............................................138

D. Pump.fun's Fees, and Structural Exploitation ...................................................139

**CLASS ACTION ALLEGATIONS ...............................................................................141**

**CAUSES OF ACTION ................................................................................................144**

COUNT I: Conduct of Enterprise Affairs Through a Pattern of Racketeering Activity (18 U.S.C. § 1962(c)).....................................................................................144

COUNT II: Conspiracy to Violate RICO (18 U.S.C. § 1962(d)) .......................................168

COUNT III: Violation of Section 12(a)(1) of the Securities Act of 1933 ...........................172

COUNT IV: Control Person Liability Under Section 15 of the Securities Act of 1933 .......180

COUNT V: Unjust Enrichment ...........................................................................182

**PRAYER FOR RELIEF ...............................................................................................182**

**JURY DEMAND.........................................................................................................186**

## PRELIMINARY STATEMENT



1.  The Solana-Pump.Fun Racketeering Enterprise is a coordinated criminal organization that constructed and operated a rigged, unlicensed gambling operation under the guise of a legitimate "memecoin" marketplace, secretly predetermined who would win and who would lose, and extracted enormous profits from retail participants who never had a fair opportunity to succeed.

2.  Plaintiffs are not 'crying in the casino.' Rather, their injuries are the result of a calculated and deliberate scheme.

3. Through meticulous planning, the defendants built the perception of an open and decentralized ecosystem in which anyone could participate and potentially profit.

4. In reality, defendants created a closed and centrally controlled rigged casino, which controlled the supply of tokens, manufactured artificial demand and timed their exits to maximize gains from unsuspecting victims.

5. The enterprise at the center of this case bears all the hallmarks of a traditional organized crime syndicate. Like modern corporate criminal enterprises routinely prosecuted under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), it was hierarchical, role-driven, and purpose-built to generate illicit profits through coordinated unlawful conduct. Also like modern criminal enterprises, defendants promoted violence, sexual violence, race-based discrimination, and drug use. It is unsurprising then that when Defendants appeared in public to promote this platform, for example on podcasts, they did so donning masks to conceal their identities or with requirements that their faces be blurred.

6. At the top of the enterprise sat a small group of decision-makers who designed the system, controlled its infrastructure, and determined which tokens would be promoted, and monetized. Beneath them operated layers of management and execution, including operational coordinators, wallet operators, promoters, and enforcement actors, each with defined responsibilities and access to information calibrated to their role.

7. The enterprise functioned through division of labor, information asymmetry, and strict control of timing. Strategic decisions flowed downward. Profits flowed upward. Participants at each level understood their function within the broader scheme, even as the public was presented with a façade of decentralization, spontaneity, and organic market activity.

8. The enterprise existed for a single overriding purpose: to operate an unlicensed rigged gambling operation disguised as a fair and open memecoin marketplace, and to extract wealth from retail participants by secretly controlling every material aspect of the game.

9. The Enterprise leadership team made executive decisions determining the key business operations for the enterprise, including selection of winning tokens, retention and management of personnel, and the marketing narratives.

10. Lower-tiered members of the organization conducted sequenced marketing operations, recruited other promoters, managed online communities, and deployed tools to promote tokens across multiple internet platforms.

11. The Solana Defendants coordinated with and directly supported the Pump.fun leadership, built the technical infrastructure for rigged memecoin gambling, shaped the public narrative, and shared in the profits.

12. Beyond direct coordination, both Pump.fun and Solana were financially dependent on the other.

13. Solana was a languishing blockchain that had been severely damaged by the November 2022 collapse of FTX—a major cryptocurrency exchange whose affiliated entities had been among Solana's largest investors and supporters—and needed a new source of blockspace sales.

14. While marketing themselves as the future of finance, few beyond speculators supported Solana's technology; it was not until their relationship with Pump.fun that their technology found, in the words of the Solana founder, product-market fit.

15. Similarly, Pump.fun needed a blockchain with execution speed and specific functionalities like one-click purchases to operate its exit liquidity gambling scheme. Solana executives shifted development priorities to meet Pump.fun's needs.

16. Defendants publicly framed their activities as part of an emerging, decentralized financial ecosystem—one characterized by open access, spontaneous market interest, and speculative risk knowingly accepted by participants.

17. In practice, however, the enterprise functioned as a highly centralized and rigged casino. Tokens were created, launched, promoted, and abandoned in rapid succession, each cycle inviting participants to wager capital on short-term price movements driven not by independent market forces, but by the enterprise's own decisions.

18. The primary game offered by the casino was not the memecoins themselves; it was exit liquidity gambling, a combination of multi-level marketing and musical chairs.

19. The purpose, often called PvP or player vs. player, is to lure the next unsuspecting victim onto the merry-go-round, where each investor purchases at a higher price in the hope that another will follow.

20. Simple in form, this game produced dramatic returns for early investors.

21. Exit-liquidity gambling is plainly, on its face, gambling. However, operation of an unlicensed gambling business alone is not the gravamen of this action. The existence of a speculative or even unlawful wagering environment is not, by itself, the direct cause of Plaintiffs' injuries.

22. What matters is not merely that defendants ran a casino, but that they secretly controlled the conditions of play while representing to the public that outcomes were governed by chance and open competition. Participants believed they were engaging in risky but fair

15

speculation, where losses were possible but wins were attainable on equal footing. That belief was essential to the enterprise's success—and it was false.

23. The unlicensed gambling operation provided the entry point. The rigging of that operation, and the false representations used to sustain it, are what caused the harm.

24. The Enterprise rigged the game through three interlocking mechanisms.

25. First, the enterprise exercised supply control. Tokens were accumulated by insiders before public promotion, at prices and quantities unavailable to retail participants.

26. Leadership determined which tokens would be supported, when they would be introduced to the public, and how much circulating supply would be released at any given time. This advance positioning guaranteed insiders a structural advantage before any retail participation began.

27. Second, the enterprise engaged in demand manufacturing. What appeared to be organic interest—viral promotion, influencer enthusiasm, and spontaneous community excitement—was in fact coordinated, scripted, and often paid.

28. Promotional narratives were deployed according to plan, not passion, creating artificial momentum that induced retail participants to enter positions under the false belief that they were responding to genuine market demand.

29. Third, the enterprise executed timed and managed exits. Insiders did not sell haphazardly or independently. Sales were sequenced to avoid triggering immediate price collapse, allowing profits to be extracted gradually while maintaining the illusion of stability. By the time retail participants perceived downward movement, insiders had already exited or substantially reduced their exposure.

30. Together, these mechanisms ensured that outcomes were not uncertain to those running

the operation. Insiders knew when tokens would be promoted, when demand would peak, and when exits would occur. Retail participants knew none of this. They entered transactions believing they were wagering in a high-risk but fair environment, when in fact they were providing liquidity to a pre-orchestrated extraction scheme.

31. Separate and apart from the rigging of the gambling operation, defendants engaged in a sustained campaign of material misrepresentations and omissions designed to induce public participation in the enterprise.

32. These false statements were not peripheral marketing puffery; they went to the core question any reasonable participant faced before engaging in memecoin trading—whether the system was fair, whether insiders possessed undisclosed advantages, and whether retail participants had a genuine opportunity to profit.

33. Pump.fun marketed itself as the solution to the abuses that had plagued memecoin markets: insider trading, coordinated rug pulls, and sudden liquidity withdrawals. Defendants promised 'fair launches,' equal access, and protection from manipulation. Instead, the Enterprise industrialized the very practices it claimed to eliminate.

34. Defendants affirmatively represented that their launches were "fair," that insiders did not receive preferential access, that tokens were not subject to manipulation or coordinated dumping, and that the platform eliminated the very abuses that had made memecoin untrustworthy.

35. These representations were repeated across promotional materials, social media, influencer campaigns, and community communications, and they were central to the narrative that distinguished defendants' operation from prior scams.

36. Those representations were false. As described above, insiders did receive preferential

17

access. Supply was accumulated in advance. Promotion was coordinated. Exits were managed.

37. The very practices defendants claimed to have eliminated were embedded into the design of the system itself. The enterprise did not mitigate insider advantage; it institutionalized it.

38. These misrepresentations were material. A reasonable participant deciding whether to purchase a newly launched memecoin would consider it highly significant whether insiders controlled supply, coordinated promotion, and planned exits in advance.

39. Defendants' assurances of fairness, transparency, and equal opportunity were not ancillary; they were the reason participants believed engagement was worth the risk.

40. Plaintiffs and class members relied on these representations in entering transactions they otherwise would not have entered, or would not have entered on the same terms. The misstatements created a false sense of legitimacy and safety that masked the true nature of the operation and encouraged repeated participation across multiple token launches.

41. Importantly, this scheme does not depend on characterizing memecoin trading as gambling or on proving that the activity was unlawful per se.

42. Even if the enterprise had operated within a lawful speculative market, the deliberate misrepresentation of insider control, fairness, and launch mechanics independently constitutes actionable fraud. Participants were entitled to truthful information about whether the playing field was level. They were denied that truth.

43. The resulting harm flowed directly from that deception. Plaintiffs paid transaction fees, provided liquidity, and suffered losses in reliance on defendants' false assurances that the system was not rigged and that insiders were not exploiting undisclosed advantages.

18

44. Those losses were not the product of informed risk-taking; they were the foreseeable consequence of a scheme that depended on deception to function.

45. The enterprise did not rely solely on deception to sustain itself. Like traditional organized criminal operations, it employed intimidation, harassment, and coercive tactics to maintain discipline, suppress dissent, and protect the flow of profits.

46. As the operation scaled, the enterprise became increasingly dependent on secrecy and compliance. Insiders, promoters, and operational actors possessed information that, if disclosed, would have exposed the rigging of the system and undermined public participation.

47. Critics, whistleblowers, and dissatisfied participants likewise posed a threat to the enterprise's continued profitability. The response to those threats was not transparency or reform, but enforcement.

48. Defendants and their agents engaged in coordinated campaigns to silence or punish individuals who questioned the fairness of token launches, raised concerns about insider activity, or attempted to disclose internal practices.

49. These efforts included harassment, public shaming, doxxing, threats, and organized online attacks designed to intimidate critics into silence and to deter others from speaking out.

50. These enforcement actions were not isolated or spontaneous. They followed recognizable patterns, were executed by individuals associated with the enterprise, and were deployed when criticism risked disrupting ongoing or future token launches.

51. The timing and coordination of these actions demonstrate that they were undertaken in furtherance of the enterprise's objectives, not as personal disputes or unrelated misconduct.

19

52. The intimidation served multiple functions. It discouraged internal defections by signaling the consequences of disloyalty. It suppressed external scrutiny by making critics targets. And it reinforced the false public narrative that the enterprise was legitimate, fair, and free from manipulation. In this way, coercion operated as the enforcement arm of the scheme, ensuring that deception could continue uninterrupted.

53. Such conduct mirrors the enforcement mechanisms historically associated with racketeering enterprises. While the tools differed—digital harassment instead of physical violence—the purpose was the same: to maintain control, preserve secrecy, and protect illicit revenue streams.

54. The use of intimidation and harassment further distinguishes this case from ordinary market misconduct. Legitimate businesses do not need to silence critics through coordinated attacks. Fair markets do not require threats to function. The presence of these enforcement mechanisms underscores that the enterprise understood its activities to be wrongful and took affirmative steps to prevent exposure.

55. These acts of intimidation constitute additional racketeering activity and form part of the pattern of unlawful conduct that gives rise to liability in this action.

56. The enterprise's core design choices—anonymity, lack of oversight, absence of safeguards, and deliberate evasion of regulatory constraints—did not merely enable the rigged gambling scheme described above. They also created an environment in which additional criminal conduct was foreseeable, recurrent, and, in some instances, affirmatively exploited by the enterprise.

57. Defendants chose to operate without meaningful identity verification, age restrictions, or

20

content controls. They facilitated anonymous participation at scale, encouraged rapid and repeated transactions, and prioritized growth and volume over compliance or user protection. These decisions were not incidental. They were essential to the enterprise's ability to attract liquidity, avoid scrutiny, and maintain operational flexibility.

58. As a predictable result, the platform became a vehicle for additional unlawful activity. Minors were able to participate in gambling-like transactions without restriction or oversight. Illicit and exploitative content circulated within channels associated with the enterprise, including content involving minors, without effective intervention despite defendants' knowledge and ability to act.

59. Financial flows through the system were structured to obscure source and destination, enabling money laundering and the movement of funds for illicit purposes, including support for criminal and terrorist organizations.

60. These activities were not aberrations committed by isolated bad actors operating at the margins of an otherwise legitimate system. They were the natural consequences of an enterprise that rejected safeguards as incompatible with its profit model. An operation designed to conceal insider control, suppress scrutiny, and evade regulation predictably becomes attractive to—and protective of—other forms of criminal conduct.

61. Moreover, the same mechanisms that sustained the core scheme sustained these additional crimes. Anonymity shielded wrongdoers. Intimidation discouraged reporting.

62. The absence of governance ensured that misconduct could persist without accountability. Where intervention occurred, it was selective and self-serving, aimed at preserving the enterprise rather than protecting participants or the public.

63. This broader pattern of criminal activity further demonstrates that defendants were not

operating a legitimate marketplace that occasionally failed to prevent misuse. They were running a system in which illegality was not a bug, but a feature—one that allowed the enterprise to grow rapidly, extract profits efficiently, and insulate itself from external control.

64. The presence of these additional crimes reinforces the existence of a cohesive racketeering enterprise, the continuity of its unlawful conduct, and the knowing participation of defendants in a scheme that extended well beyond mere market manipulation. It also underscores the need for comprehensive relief, including injunctive measures designed to dismantle the enterprise's infrastructure and prevent its reconstitution under a different name.

22.     Jito Labs qualifies as an unlicensed money transmission system under federal and state law. Funds were received from users, transferred via smart contracts and validator systems, and delivered to project creators, LP pools, or early sellers—without registration as a money transmitter and without compliance with Bank Secrecy Act obligations.

23.     Defendants operated an illegal gambling business under federal law, offering a game of chance—meme coin outcomes—where users paid for the chance to profit, and the Defendants took rake in the form of launch fees, transaction fees, validator fees, and ecosystem incentives. This conduct meets the statutory elements of illegal gambling under 18 U.S.C. § 1955.

24.     Plaintiffs and class members were funneled into an exploitative gambling mechanism disguised as innovation or, in certain instances, legitimate securities. They contributed real value—SOL, brand equity, and platform engagement—into a system designed to extract maximum fees while offering no transparency, no protections, and no meaningful chance of gain.

25.     Defendants' actions were not isolated or accidental. The Pump.fun Casino enterprise operated continuously across hundreds of millions of transactions and tens of millions

of discrete token launches, with each Defendant entity contributing infrastructure, marketing support, technological development, and economic routing essential to the scheme. This constitutes a continuous pattern of racketeering activity under 18 U.S.C. § 1961(5).

26.    Plaintiffs now seek to hold Defendants accountable. This action alleges violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c) and (d)), through operation of an unlicensed money transmitting business (18 U.S.C. § 1960), illegal gambling (18 U.S.C. § 1955), wire fraud (18 U.S.C. § 1343), false advertising, copyright and trademark infringement, and right of publicity violations, as well as the sale of certain unregistered securities, and deceptive acts and practices under New York law all unjustly enriching the Defendants.

27.    The conduct at issue here is not just a failure of crypto regulation—it is the reintroduction of casino gambling under the false pretense of decentralized technology. Defendants sold that illusion to the public, and they must now answer for it.

### PARTIES[3]

28.65.    Lead Plaintiff Michael Okafor purchased and sold multiple ""fair-launch"" tokens created on the Pump.fun platform, including but not limited to the GRIFFAIN Token, between March 2024 and January 2025, in the United States. Lead Plaintiff Okafor suffered substantial monetary losses when those tokens collapsed within days or weeks of issuance, and paid for priority blockspace via transaction and bundling fees (""priority fees"") charges that flowed to Defendants Solana Labs, Pump.fun, and Jito

---

[3] The factual allegations contained in Plaintiffs' Second Amended Consolidated Class Action Complaint are made upon information and belief, based on the investigation of counsel, except as to allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, counsels' investigation, which includes, without limitation, review and analysis of press releases, news articles, websites, blockchain forensic analysis, information and materials provided by three confidential whistleblowers, and other publicly available information concerning the Defendants (as defined herein), the platform Pump.fun, and cryptocurrency memecoins or tokens that were issued by, promoted by, or sold by certain of the Defendants through Pump.fun, or for which certain of the Defendants solicited the sale of through Pump.fun (collectively, the "Tokens.")

~~Labs.~~. Lead Plaintiff Okafor is a natural person and resident of the United States who purchased ~~"~~"Pump Tokens~~"~~" during the Class Period (both defined below) and suffered financial losses totaling approximately $242,076.74. ~~He brings this action individually and in a representative capacity on behalf of all others similarly situated.~~

~~29.~~66.    Plaintiff Diego Aguilar purchased and sold multiple ~~"~~"fair--launch~~"~~" tokens created on the Pump.fun platform, including the First Convicted Raccoon Token, the FWOG Token, and the GRIFFAIN Token, all of which are Pump Tokens, and was damaged thereby.

~~30.~~67.    Plaintiff Kendall Carnahan purchased and sold PNUT Tokens (among others) in the United States, which were created on the Pump.fun platform, and was damaged thereby.

68. Defendant Solana Labs,- Inc. ~~(~~"("Solana Labs~~"~~")") is a Delaware corporation formed in- 2018 with offices in New York and San Francisco. Solana Labs develops and licenses the core Solana validator and runtime software, sells ~~"~~"priority blockspace~~"~~" to order--flow partners such as Pump.fun and Jito Labs, and holds substantial reserves of the native SOL token. Defendants Anatoly Yakovenko (Chief Executive Officer) and Raj Gokal (President/Chief Operating Officer) are co--founders and controlling officers of Solana Labs. Solana Labs also directs and knowingly participates in the affairs of the ~~"~~"Pump

~~31.~~    Enterprise~~"~~" (defined below) at all relevant times hereto, as detailed herein.

~~32.~~69.    Defendant Solana Foundation is a not--for--profit foundation organized under the laws of the Canton of Zug, Switzerland, with its registered office at ~~Industriestrasse 47~~Industriestrasse 47, 6300 Zug. The Foundation funds companies that grow user demand for Solana blockspace, markets Solana blockspace, and stewards a multibillion--dollar SOL treasury. Defendants Dan Albert, Executive Director of the Foundation, Austin Federa, former Head of Strategy of the Foundation, and Lily Liu,

24

President of the Management of the Foundation, are each named in their individual capacity for directing and supervising the ~~Foundation's~~Foundation's grants, marketing campaigns, and relationships with Pump.fun, Jito Labs, and Solana Labs. Solana Foundation also directs and knowingly participates in the affairs of the Solana-Pump.Fun Racketeering Enterprise at all relevant times hereto, as detailed ~~herein.~~

herein.

~~33.~~70.    Defendant Baton Corporation, LTD ~~("~~("Pump.fun~~")~~") is a private company organized under the laws of England and Wales (Company No. 14743013), with its registered office at 82A James Carter Road, Mildenhall, Bury St Edmunds, Suffolk IP28 7DE, United Kingdom, and its principal place of business in Brighton & Hove, United Kingdom. Pump.fun operates the eponymous web application that mass--produces ~~"meme-coins,"~~"memecoins," imposes a 1% transaction rake, and routes every order to ~~Solana's~~Solana's priority--fee market. Pump.fun also directs and knowingly participates in the affairs of the Solana-Pump.Fun Racketeering Enterprise at all relevant times hereto, as detailed herein. Its three co--founders are:

- Defendant Alon Cohen~~,~~ (a/k/a "Alon," "a1lon9"), a resident of London, United Kingdom and Pump.~~fun's~~fun's public--facing Chief Executive;

- Defendant Noah Tweedale~~,~~ (a/k/a "Sapijiju"), a resident of Brighton & Hove, United Kingdom; and

- Defendant Dylan Kerler (a/k/a "~~Dylan Phoon"),~~Out," "Dylan Phoon"), a resident of London,

25

- United Kingdom, who has a documented history of prior ""rug--pull"" schemes.4

34.71.    Each founder exercised operational control over Pump.fun and personally promoted the platform as a trading venue and casino, thereby luring retail users into unlawful wagering.

35.    Defendant Jito Labs, Inc. ("Jito Labs") is a Delaware corporation formed in 2021 with offices in Arlington, Virginia and Austin, Texas. Jito Labs builds the "Jito-Solana Block Engine," an off-chain order-routing system that sells preferential block-inclusion rights and captures maximal-extractable-value ("MEV") on behalf of Solana stakers. Jito Labs also directs and knowingly participates in the affairs of the Pump Enterprise at all relevant times hereto, as detailed herein. Defendant Lucas Bruder, a resident of Austin, Texas, is Jito Labs' Chief Executive Officer and co-founder.

36.    Defendant Jito Foundation is a Cayman Islands foundation company with its registered office at Harbour Centre, 159 Mary Street, George Town, Grand Cayman KY1-9006. The Foundation holds the intellectual property for Jito's validator fork, administers the native governance token ("JTO"), and finances grants that expand Jito-controlled MEV infrastructure. Jito Foundation also directs and knowingly participates in the affairs of the Pump Enterprise at all relevant times hereto, as detailed herein. Defendant Brian Smith, a resident of the United States, is the former Chief Operating Officer of Jito Labs, Inc. and the current Executive Director of Jito Foundation.

37.72.    Plaintiffs also name the following officers and directors (collectively, the ""Individual Defendants")."), each of whom directed and exercised decision--making

---

4 https://protos.com/pump-fun-co-founder-dylan-kerler-linked-to-2017-ico-scams-report/ A "rug pull" is a scheme in which a token creator promotes a new cryptocurrency to attract buyers, then sells off their holdings once the price rises, causing the token's value to collapse. Investors who purchased the token are left holding a near-worthless asset while the creator exits with the profits.

authority over the Solana-Pump.Fun Racketeering Enterprise that gave effect to the racketeering scheme alleged herein:

73.    Defendant Anatoly Yakovenko is, and at all times relevant to this complaint was, the Chief Executive Officer of Solana Labs. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

74.    Defendant Raj Gokal is, and at all times relevant to this complaint was, the President and Chief Operating Officer of Solana Labs. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

75.    Defendant Dan Albert is, and at all times relevant to this complaint was, the Executive Director of Solana Foundation. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

76.    Defendant Austin Federa is, and at all times relevant to this complaint was, the former Head of Strategy of Solana Foundation. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

77.    Defendant Lily Liu is, and at all times relevant to this complaint was, the President of the Management of Solana Foundation. She also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

78.    Defendant Alon Cohen is, and at all times relevant to this complaint was, the Chief Executive Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

27

44.79.    Defendant Noah Tweedale is, and at all times relevant to this complaint was, the Chief ~~Product Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.~~

Product Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

45.80.    Defendant Dylan Kerler is, and at all times relevant to this complaint was, the Chief ~~Technology Officer of Pump.fun. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.~~

~~Defendant Lucas Bruder is, and at all times relevant to this complaint was, the Chief Executive~~Technology Officer of ~~Jito Labs~~Pump.fun. He also directed and knowingly participated in the

46.    affairs of the Solana-Pump.Fun Racketeering Enterprise as detailed below.

47.    ~~Defendant Brian Smith is, and at all times relevant to this complaint was, the former Chief Operating Officer of Jito Labs, and current Executive Director of Jito Foundation. He also directed and knowingly participated in the affairs of the Pump Enterprise as detailed below.~~

48.81.    Each Individual Defendant is sued in both his/her individual and official capacities for acts undertaken in the course and scope of the Enterprise.

82. ~~JURISDICITION~~Defendants Does 1 through 25 (the "Lead KOL Doe Defendants") are individuals and entities whose identities and addresses are presently unknown to Plaintiffs. Some are known to Plaintiffs only by their online pseudonyms, social media handles, and associated cryptocurrency wallets. Plaintiffs sue the Lead KOL Doe Defendants by fictitious names and will seek leave to amend this Complaint to substitute their true names and capacities when discovered.

83. As alleged herein, the Lead KOL Doe Defendants served as lead key opinion leaders and token promoters for the Solana-Pump.fun Racketeering Enterprise. They were retained, directed, and compensated, directly or indirectly, by Pump.fun and other Enterprise participants to promote selected Pump.fun tokens to retail purchasers in the United States, including New York, while concealing their compensation, coordination, and pre-positioning. They received early token addresses and other nonpublic information through private channels, acquired token positions before their promotional pushes, coordinated promotional narratives, timing, and posting cadence with Enterprise leadership and operations, activated downstream secondary promoters and friends and family distribution networks, and executed managed exits into the retail demand their promotions generated. Each Lead KOL Doe Defendant knowingly directed and participated in the affairs of the Solana-Pump.fun Racketeering Enterprise at all relevant times, as detailed herein.

**JURISDICTION AND VENUE**

84. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962–1964, and, in the alternative, the Securities Act of 1933, 15 U.S.C. § 77l(a)(1).

49.85.    This Court has personal jurisdiction over Defendants Solana Labs, Inc. ("Solana Labs") and the Solana Foundation both(the "Foundation") because they are found in, regularly transact business in, and maintain continuous operations within this District. Solana Labs and the Foundation maintain a physical presence at 141 East Houston Street, New York, NY, located inNew York within the Southern District of New York.

50.    ~~In or around 2022,~~ Solana Labs ~~signed~~entered into a ~~10-year~~long-term commercial lease for ~~the 6th through 9th floors of~~ substantial space at 141 East Houston Street~~, converting the former Sunshine Cinema~~ and converted that location into its New York headquarters~~.~~

51.    ~~The Solana~~, from which it conducts ongoing business activities. The Foundation operates from the same location and publicly refers to ~~its~~that presence as the "Solana Event Space~~.~~" ~~On August 6, 2024, the Foundation hosted its "DePIN Day" event on the 8th floor of the building and issued a press advisory listing Executive Director Defendant Dan Albert as host, alongside elected officials from New York City.~~

~~52.~~86.    ," including hosting in-person events there. Multiple ~~business~~ publications~~,~~ ~~including Crain's New York Business, Decrypt, and Empire Report, confirm that both Solana Labs and the Solana Foundation operate and maintain regular business activities from this location~~ have reported on Solana Labs' and the Foundation's New York operations.

53.    ~~In addition to occupying office space in Manhattan,~~Solana Labs' New York operations are not incidental. Solana Labs employs a ~~large team of~~ substantial engineering workforce in New York, and open-source contribution records reflect that New York-based Solana Labs engineers ~~working from New York. Open-source analysis of Solana Labs' public GitHub repository reveals that at least 32 Solana Labs engineers list New York as their employment location and collectively~~ authored ~~over 8,100 Git commits, accounting for 39%~~a significant portion of the ~~total~~Solana protocol's code contributions ~~to the Solana protocol.~~

54.    ~~GitHub is a platform used by software engineers to host code repositories and track updates to open-source~~ ; this operation is~~software. A "Git commit" is a time-stamped and cryptographically verifiable record of code written or updated by a contributor.~~

55.87.    ~~These commit records confirm that a substantial portion of Solana's protocol development is performed by engineers employed by Solana Labs and~~ physically located in the Southern District ~~of New York.~~

of New York.

88. Because Solana Labs and the Solana Foundation both operate, maintain staff, host events, ~~56.~~ and manage infrastructure from New York City, a substantial portion of the enterprise alleged herein was conducted within this judicial district. Accordingly, Solana Labs and the Foundation are subject to personal jurisdiction in this District and are "found" here and "transact [their] affairs" here within the meaning of 18 U.S.C. § 1965(a).

89. This Court also has personal jurisdiction over all Defendants for Plaintiffs' RICO claims pursuant to 18 U.S.C. § 1965(a)–(b). At least Solana Labs and the Foundation are found in and transact their affairs in this District, and the "ends of justice" require that the remaining Defendants—who are alleged to have participated in a single, coordinated enterprise and course of racketeering conduct—be brought before one court in a single action to avoid piecemeal litigation, inconsistent judgments, and the practical impossibility of litigating an integrated enterprise across multiple districts and countries.

90. Independently and in the alternative, this Court has specific personal jurisdiction over Defendants under New York's long-arm statute, N.Y. C.P.L.R. § 302(a), because Defendants (a) transacted business in New York by operating, promoting, and monetizing the Pump.fun platform and related infrastructure that was accessed by New York residents; (b) committed tortious acts causing injury in New York by transmitting into New York misrepresentations and omissions concerning 'fair launches,' 'even playing fields,' and purportedly organic promotions; and (c) derived substantial revenue from interstate and

31

international commerce, including fees and other proceeds generated from transactions initiated by users located in New York and this federal district.

91. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because (i) Defendants Solana Labs and the Foundation reside in this District for venue purposes and are subject to personal jurisdiction here; and (ii) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including (a) the operation and management of Solana Labs' and the Foundation's New York offices and personnel; (b) enterprise-enabling protocol development and infrastructure support conducted by Solana Labs engineers working from New York; (c) New York-based events and promotional activities that supported and legitimized the enterprise; and (d) transactions and fee extraction from New York users who accessed Pump.fun from within this District.

92. Venue is independently proper under 18 U.S.C. § 1965(a) because this is a civil RICO action and at least Solana Labs and the Foundation are found in and transact their affairs from this District. Venue is also independently proper under 15 U.S.C. § 77v(a) because Defendants transacted business in this District and the challenged offers, solicitations, and sales were made to persons located in this District and/or were consummated through transactions initiated here.

## FACTUAL ALLEGATIONS

## I.    THE SOLANA-PUMP.FUN RACKETEERING ENTERPRISE

### A.  The Enterprise Operated Through a Chain of Command with Defined Roles, Layered Information Access, and Centralized Control

93. Like other modern criminal organizations, the Solana-Pump.fun Racketeering Enterprise (the "Enterprise") operated through a hierarchical command structure designed to

concentrate the proceeds of the fraud at the top while distributing the work of execution downward.[5]

94. Pump.fun; its founders Alon Cohen, Dylan Kerler, and Noah Tweedale; Solana Labs; the Solana Foundation; their principals Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu collectively constituted an association-in-fact enterprise.

95. Defendants unfairly and unlawfully engineered a rigged game through a three part methodology: supply capture, demand manufacturing, and managed exits. A detailed explanation of these functions is provided in Section I.B.  The result of this fraud was billions in losses for millions of people.

96. At the most basic level, the leaders of the Enterprise identified a memecoin that would receive marketing support to create demand.

97. Following the identification of what would become a winning token, leadership circulated contract addresses or technical token information within the Enterprise before any public announcement, allowing members of the organization to purchase tokens at launch prices no retail participant would ever see.

98. Upon acquiring sufficient supply, Defendants orchestrated complex, multi-strategy marketing campaigns utilizing paid influencers.

99. The influencers' support and marketing appeared organic; their compensation was not disclosed to the public.

100.      The result was the appearance of seemingly independent discoveries, producing purchasers willing to pay inflated prices in an act of massive demand manufacturing.

---

[5] In support of the factual allegations set forth in this Second Amended Consolidated Class Action Complaint, Plaintiffs submit the attached Exhibits A - K, incorporated herein by reference.

33

101.    As demand increased, so did price. Defendants then sold in coordinated sequence, controlling liquidations to prevent the demand curve from collapsing.

102.    Simply put, Defendants determined the winners, convinced the public to buy these assets through calculated deception, and then carefully sold their inflated holdings to the public.

103.    Predictably, after Defendants maximized their profits, these token prices collapsed, leaving investors with worthless assets.

104.    In effect, the Enterprise were counterparties to their own customers, selling tokens to people who did not know they were buying from the very individuals who had rigged the market– who simultaneously were charging them a service fee for being defrauded.

105.    Defendants also charged Plaintiffs fees for the service of defrauding them. Pump.fun collected a one-percent fee on every transaction through which retail participants were defrauded. Solana collected network fees on every transfer. Every dollar Defendants received originated in a retail participant's wallet.

### 1. Leadership

106.    Leadership functioned as the core decision makers and lead strategists. Conceptually, leadership split into two distinct camps that functioned in unison to coordinate key operations.

107.    The leaders of the Pump.fun organization managed marketing campaigns, engaged with lower-level contributors, and made product and feature decisions regarding the user interface.

108.    Solana leadership designed the blockchain infrastructure to function according to the specifications required for memecoin trading at scale. They ensured transactions were executed, and the network could handle the casino's operational load.

109.    Both the Solana and Pump.fun leaders used their social cache to move public sentiment towards tokens they had determined to be winners.

110.    Leadership also received informational advantages from their lower tiered operators ensuring they had superior information, which informed decision making.

111.    Those at the top of the organization also determined who within the organization would be punished for a failure to comply, and how they would be punished.

112.    Leadership possessed total visibility. Information flowed upward from Operators and across entities through private channels. Leadership maintained direct lines of communication, exchanged technical guidance, met frequently concerning investment and operational support, and publicly endorsed one another's platforms. From this position of shared knowledge, Leadership devised a scheme to defraud by means of materially false representations transmitted via wire communication in interstate and foreign commerce.

### 2.  Operations Command

113.    Like Operations Command in a traditional criminal organization, this tier translated Leadership's direction into coordinated promotional and trading operations, serving as the bridge between strategic decisions and tactical execution.

114.    This tier directly recruited and managed downstream KOLs through direct compensation and access to inside information, creating a network of promoters dependent on continued Enterprise favor.

35

115.    Operations Command directed content themes, posting cadence, and narrative selection; coordinated pre-positioning and exit timing; and enforced compliance through harassment, intimidation, and reputational attacks on defectors.

### 3.  Operational Cells

116.    The Enterprise operated through small, persistent crews called Operational Cells. Cells launched tokens, ran direct to audience promotional pushes designed to create false impressions of buying interest.

117.    These campaigns often circulated fabricated screenshots depicting fictitious trading profits, such as claims of transforming nominal investments into six- or seven-figure returns, to induce retail buying; deployed automated programs and fake accounts to simulate organic interest and execute coordinated trades; and conducted harassment campaigns against competitors or defectors.

### 4.  Operators

118.    Lower-tier Key Opinion Leaders were the Operators. Their job was simple: tell followers to buy, then sell to them. Operators promoted tokens across Twitter/X, YouTube, and TikTok.

119.    What retail saw as strangers independently discovering a new token was a coordinated performance by the people selling them. Operators received instructions and early token addresses through Telegram, systematically concealed their identities through pseudonyms and multiple wallets, and maintained downstream distribution networks called Friends and Family groups.

### 5.  Associates: Friends and Family Networks

120.    Like the lowest tiers in a multi-level marketing scheme, Friends and Family networks served as the audience to whom insiders sold. But even here, hierarchy existed.

121.    Inner Friends and Family groups received information early enough to profit; they bought alongside the promoter and sold when the promoter sold.

122.    Outer Friends and Family groups, which included larger subscription groups and free

public feeds, received alerts only after insiders had already bought. Their function was to buy what insiders needed to sell.

123.    Each tier believed it held a privileged position, but everyone below Leadership was positioned to lose when those above them sold.



*Figure 1. Organizational structure of the Solana-Pump.Fun Racketeering Enterprise. The left column depicts the command hierarchy; the right column illustrates how that hierarchy operated in practice. Each tier is described in detail below. Note: This diagram is a simplified representation. In practice, the network may include dozens of Operational Cells, hundreds of Operators, and thousands of F&F (Friends & Family) groups operating simultaneously across various campaigns.*

### B.  The Game: Rigged Exit Liquidity Gambling

#### 1.   Exit Liquidity Gambling: The Underlying Game

124.      Exit liquidity gambling, played fairly, is a legitimate game of chance. But the game offered by the Enterprise in the Solana-Pump.fun Casino was not a fair game.

125.      The bargained-for exchange Plaintiffs sought was the opportunity to participate in a game of chance.

126.      Plaintiffs were injured because that bargained-for exchange was never completed: the Enterprise rigged the game by creating and maintaining three conditions that gave the Enterprise total control over the game's outcomes. But for these conditions, the game would not have been rigged. The Enterprise's creation and maintenance of these conditions was the but-for and proximate cause of Plaintiffs' injuries: the rigging ensured the Enterprise controlled who won and who lost. The winners were the Enterprise and its insiders. The losers were Plaintiffs and the data confirms this.



*Figure 2: The price pattern characteristic of exit liquidity gambling. The horizontal axis represents time; the vertical axis represents price. The entire sequence shown spans only a few hours. Participants who buy during the initial rise and sell before the peak (the left portion of the curve) extract profit. Participants who buy near or after the peak (the right portion of the curve) find no one to sell to. "Exit liquidity" is the colloquial term for these late buyers: the people whose money funded everyone else's winnings.*

39

127.        In exit liquidity gambling, the participant risks their money by buying a meme coin. The participant profits only if a later person buys at a higher price. That later person profits only if an even later person does the same. The chain continues until it breaks. Whoever is left holding assets at the end loses. The profits of those who 'exit' the market by selling before the crash derive profit, dollar for dollar, from the losses of those who cannot.

128.        In effect, exit liquidity gambling is a high-stakes game of musical chairs. Participants compete to sell before buyers disappear. Players still holding assets when the music stops have nowhere to go but the floor.

129.        "Exit liquidity" is a colloquial term which refers to the buyers whose purchases allow sellers to cash out. In exit liquidity gambling, the question is: who will be positioned to sell, and who will be positioned to buy from them and lose.



*Figure 3: Post from pump.fun's official Instagram account (@pumpdotfun_), dated November 24, 2024, captioned "some of us will make it." The image depicts working-class individuals in what appears to be a retail environment, overlaid with the text: "How do I turn these people into exit liquidity?" Defendants' were not only aware that exit liquidity was at the core of their product but actually joked about it publicly.*

## 2. What Makes It Rigged: The Structural Prerequisites for Guaranteed Insider Profit

130. The preceding paragraphs describe exit liquidity gambling as it might function in a fair market, a market in which outcomes depend on chance. Defendants did not operate such a game. Defendants operated a system designed to ensure that retail participants would lose and the Enterprise would win.

131. The Enterprise designed and operated the promotional infrastructure that manufactured demand: they coordinated campaigns, compensated endorsers, and fabricated success narratives that created the appearance of organic interest where none existed.

132. Solana Labs and Solana Foundation engineered and administered the network infrastructure and core functionalities that made this game playable.

133. Jito Labs developed the priority execution systems that guaranteed insiders favorable transaction ordering, ensuring insider purchases would settle before retail orders reached the network and insider sales would execute before retail ever understood that there was reason to sell.

134. The Enterprise rigged the game through the creation and maintenance of three structural prerequisites: supply control, demand manufacturing, and managed exits. Each was necessary; none alone was sufficient.

135. Each Defendant played a distinct role in creating and maintaining these conditions.

### a) Supply Control

41

136.    Supply control is both the ability and the act of acquiring disproportionate token supply before or at the moment of public availability, at lower prices than the general public will eventually pay.

137.    Pump.fun uses a bonding curve to price every token launched on its platform. A bonding curve is a pricing formula that starts tokens at a fixed, minimal price and increases the price automatically as each successive purchase is made. Without Solana's technology, the bonding curve could not function.

138.    The bonding curve was purpose-built for supply capture: insiders who bought first were guaranteed the lowest prices. The platform's no-KYC design allowed them to distribute these holdings across anonymous wallets.

139.    This distribution served two fraudulent purposes: it disguised coordinated insider accumulation, and it manufactured the appearance of organic buying interest. When retail participants saw what appeared to be many independent wallets accumulating a token, they interpreted this as a signal of genuine demand. In reality, this was insiders acquiring tokens early to sell them at higher prices later.



*Figure 4: An X post from Bubblemaps showing what can happen when insiders are able to control the supply: Here, a small group of connected wallets controlled over 25% of a token launched on Pump.fun, then sold their holdings for ~$500,000.*

140.    Supply control creates the foundation for guaranteed insider profit: insiders who control supply at the lowest prices can sell at any higher price the market reaches and capture the difference.

141.    That profit has one source: the retail participants who bought at higher prices. The insider's gain is the retail participant's loss.

142.    Supply control required technical infrastructure that Solana Labs and Solana Foundation did not merely build but actively maintained, optimized, and supported in direct coordination with Pump.fun as explained more fully in Section I.E.

b)    **Demand Manufacturing**

143.    Demand manufacturing is coordinated promotional activity designed to create the false appearance of organic interest, leading retail participants to believe they have discovered a live game with high-stakes and a real chance to win. If the chart is not going up, there is no exit liquidity game being played.

144.    Demand manufacturing served each defendant's financial interests. Each transaction generated platform fees for Pump.fun and network fees for Solana. Every revenue stream required retail participants to buy into a game of exit liquidity gambling.

145.    Key Opinion Leaders are the primary vector by which demand is manufactured. When a KOL posts about a token, their audience sees someone they trust organically sharing an exciting opportunity.

146.    In reality, the KOL received the address through a private channel hours earlier from a member of the Enterprise, has already acquired a position at prices their audience will never see, is posting on a schedule coordinated with other KOLs, and will sell into the purchases being generated by the Enterprise's campaign.

147.    Pump.fun contracted and compensated KOLs via formalized contracts, with defined

posting and operational schedules, tightly controlled.

148.    The public was not aware that these KOLs were members of the Solana-Pump.fun Racketeering Enterprise. The public believed that these individuals were skilled traders and subject-matter experts. As such, members of the public who wanted to capitalize on memecoin trading followed their buy recommendations, much as retail investors follow analysts in traditional finance.

149.    Unbeknownst to regular users, these KOLs succeeded on insider information fed to them by the Enterprise, the same information that would be used to deceive members of the public.

150.    The campaigns were carried out on a variety of platforms. For example, Lead KOLs hosted public town-hall-style conference calls with secondary KOLs, Associates, and the public on Twitter/X. Listeners heard what sounded like real-time consensus forming around a live game they were about to miss. In fact, they were listening to an organized performance.

151.    Demand manufacturing exploits the language and spirit of online communities. In 2021, retail investors openly coordinating on public internet forums drove up the price of GameStop stock, demonstrating that ordinary people acting collectively online could move markets. The Enterprise adopted that episode's language and spirit—the memes, the irreverence, the sense of collective action—but inverted its substance: coordination happened in private, among insiders, to manufacture buyers for their own profits.

152.    Victims join groups on Telegram and Discord believing they are entering spaces of shared interest, where subject matter experts will provide information and training to help them trade successfully.

153.    Groups are called "alpha groups," "inner circles," or "friends and family." Members

45

feel belonging and trust toward group operators. The leadership in the Solana-Pump.fun Racketeering Enterprise Pump.fun understood the victims desire for financial mobility and created a system to exploit this need using traditional Ponzi like methods and marketing language of financial and technologic innovation.

154.    Demand manufacturing invited the retail participants whose purchases provided exit liquidity for insiders. Supply control meant insiders held tokens at the lowest prices. Without demand manufacturing, the Enterprise would have no one to sell to and no sales earning fees. The coordination described above (*e.g.* tiered information cascades, promotional calendars, narrative seeding) ensured that retail arrived after insiders had positioned and at prices higher than insiders had paid.

155.    Because insiders manufactured the demand, they knew when buyers would arrive and could time their exits accordingly.

### c)    Managed Exit

156.    Managed exit is a term which can be defined as the coordinated and sequenced selling by insiders timed to coincide with the apex of manufactured demand.

157.    Due to the instability of demand curves and limited liquidity supporting tokens insider exits require careful management.

158.    If too many insiders sell simultaneously, market participants may perceive the token as rugging, triggering panic selling—or the sheer volume of insider sales may itself crash the price.

159.    If the price crashes too soon, all the efforts from the organization's demand creation will be lost. Consequently, managed sell-offs ensure demand and the associated higher

46

prices exist for long enough to exit.

160.    The managed exit was the vehicle by which insiders converted their once-worthless coins into windfall profits. Typically, senior insiders sell first, capturing the best prices and junior insiders sell later. The hierarchical sequence prevents insiders from competing with each other and crashing the price prematurely.

161.    The managed exit is repeatable, even within the context of a singular token. After the

initial wave of insider selling collapses the price, promotional activity can resume to induce a second wave of retail buying. The revived price enables another round of insider selling. This cycle can continue until retail stops responding.

### 3.    The Prerequisites Combined

162.    Each prerequisite is necessary and none alone is sufficient. Supply control without demand manufacturing leaves insiders holding worthless tokens. Demand manufacturing without supply control allows anyone to capture the gains. And without the managed exit, insiders compete against each other, collapsing the price before the Enterprise is able to sell their tokens.

163.    Together, these three prerequisites turn exit liquidity gambling into a rigged game: a one-way pipeline funneling wealth from the public to the Enterprise. Outcomes are no longer determined by chance but by structural position within the scheme. The bargained-for exchange—participation in a game of chance—never occurred. What Plaintiffs received was a rigged game where outcomes were predetermined by conditions the Enterprise created and controlled.

### C.  Repeatable Operational Tactics of Rigged Exit Liquidity Gambling

164.        The Enterprise executed rigged exit liquidity gambling through a repeatable operational sequence. Each phase of the sequence produced one or more of the structural prerequisites described in Section II.B.

165.        The operational sequence consisted of six phases: target selection and campaign planning; bundling and pre-positioning; lead KOL promotion; secondary KOL and F&F amplification; leadership signal; and exit.

### 1.  Phase One: Target Selection and Campaign Planning

166.        Each campaign began with the identification of a token that could be promoted and the construction of a promotional narrative designed to induce retail participation.

167.        Leadership originated campaigns independently and received pitches from Operations Command. When a promising target memecoin was identified, Leadership authorized the campaign.

168.        Operations Command translated Leadership decisions into campaign assignments: which KOLs would participate, the promotional calendar, content themes, and narrative framing.



*Figure 5:A member of the public, replying to a Pump.fun KOL, identifies coordinated promotion by a Pump.fun-affiliated account, accusing the platform's 'intern / article writer' of pushing ordained tokens to drive retail demand.*

169.    Operations Command prepared and disseminated content assets for downstream deployment, including scripts, talking points, and visual assets designed to convey the idea of the narrative.



*Figure 6: A collage of posts from Pump.fun's official account, the account of COO Alon Cohen, and the account of a KOL—all hyping the 'Movers' feature within days of each other. 'Movers' is a platform feature that algorithmically surfaces tokens showing price momentum. This is one instance of the coordinated promotional apparatus in action.*

170.    By the time any promotional activity reached the public, the Enterprise had already determined what would be promoted, when, by whom, and who would be positioned to Profit.

## 2. Phase Two: Bundling and Pre-Positioning

171.    Before promotion began, Enterprise participants established supply control by accumulating token positions.

172.    As campaign directives propagated from Leadership downward, so did buy orders. Each tier acquired tokens before the tier below received the address needed to transact.

173.    Enterprise participants bundled across multiple wallets, disguising concentrated holdings as organic distribution.

174.    By controlling supply early, the Enterprise ensured that retail buyers would purchase at prices already marked for loss.

## 3. Phases Three Through Five: Promotional Deployment

### a) Lead KOL Promotion

175.    Lead KOLs initiated public promotional pushes, converting cultivated credibility into demand for the target token.



*Figure 7: An example of one form in which a KOL can promote a token. On December 1, 2025, Bastille (@BastilleBtc), a Pump.fun KOL (as indicated by the pill-shaped affiliate badge on his X profile), reposts the address for purchasing a Pump.fun meme coin.*



*Figure 8: In another post on the same day, Bastille posts the same address and suggests that "$BUBBLE" is "the coin," inviting their followers to join his bet on the token.*



*Figure 9: Following these posts, Bastille reminds followers that he is a profitable KOL, suggesting that the coins he picks have been profitable in the past. When the Enterprise backs a token, dozens of KOLs will make similar posts to induce a wave of participants to get behind a token.*

176.    Promotion followed the narrative constructed in campaign planning but was never disclosed as coordinated Enterprise activity.

177.    Lead KOL promotion created initial price movement that would be cited as evidence of organic interest in subsequent promotional waves.

**b)    Secondary KOL and F&F Amplification**

52

178.    Secondary KOLs extended reach beyond lead KOL audiences, creating the appearance of multiple independent sources validating the same opportunity according to a Confidential Whistleblower ("CW") described further in the complaint.

179.    Secondary KOLs activated their F&F distribution networks. Information flowed through each tier with calibrated delays, as described in Section II.A.

180.    By the time promotional activity reached general retail, it emanated from thousands of apparently independent sources rather than from the top of a coordinated Enterprise.

c)    **Leadership Signal**

181.    Leadership issued high-visibility public statements that framed campaigns and functioned as market signals.



*Figure 10: Defendant Cohen on November 10, 2024 signaling to the market value in ‘Fwog’ token by using a popular marketing catchphrase for the token: “just a fwog.”*



*Figure 11: A screenshot of the price chart for Fwog token showing when Defendant Cohen made the above statement. Three hours following Cohen's post, the coin reached a 'local' market high. The Fwog token went on to peak at around a $700 million market within 72 hours before sell offs began.*

182.     Retail participants interpreted Leadership communications as impartial institutional endorsement. Insiders recognized them as signals that the selling window had opened.

### 4.  Phase Six: Managed Exit

183.     After demand was manufactured, Enterprise participants liquidated their positions through sequenced selling timed to coincide with peak demand.

184.     Command tiers typically sold first because any substantial token sale had the risk of triggering market collapse.

185.     The sequenced selling would inevitably cause near-total price collapse. Retail participants were left holding depreciated tokens while Enterprise participants captured the proceeds.

### 5.  Repeatability

186.     The cycle could repeat. After the initial round of insider selling, promotional activity often resumed to induce a second wave of retail buying, enabling subsequent rounds of insider selling from the same token.

187.	The scheme also generated the transaction volume from which Defendants derived platform revenue. The series of false statements and omissions induced buy orders which paid fees to Pump.fun. Every on-chain transfer paid network fees to Solana and increased demand for SOL tokens held by Solana Labs and the Solana Foundation. Every priority bundle paid tips to Jito validators.

188.	As such, the Enterprise did not profit solely from the tokens insiders sold but also from every transaction the scheme induced.

189.	The Enterprise executed this playbook hundreds of times over two years of operation. With each campaign, defendants refined the technical infrastructure to guarantee insider priority, sharpened the marketing apparatus to induce retail participation, and expanded the mechanisms to profit from every transaction. Defendants studied what worked, discarded what did not, and optimized relentlessly for one outcome: maximum profit from retail participants who believed they had a fair chance.

### D. Communications: How the Enterprise Coordinated in Private, Promoted in Public, and Enforced Compliance

#### 1. The Communication System

190.	The Enterprise kept coordination secret because exposure would have ended the scheme. Defendants understood that if retail participants saw the coordination, they would recognize the campaigns as fraudulent, understand they could only lose, and refuse to participate.

191.	Telegram served as the primary channel for command-level communications. Leadership and Operations Command used private group chats to coordinate which tokens to promote, what narratives to deploy, and how to time sales.

192.	Public platforms, including Twitter/X, YouTube, and TikTok, served as the visible

interface between Enterprise operations and retail targets: the stage on which coordinated promotions were performed for an audience who believed they were watching organic market activity.

### 2. The Tools

193.    The Enterprise deployed automated accounts on social media platforms to manufacture the appearance of organic enthusiasm for promoted tokens. Automated accounts (or "bots," short for robot) flooded comment sections with positive sentiment, amplified KOL posts through coordinated reposting, and created the impression that a token was trending (a sign to the public to buy-in) when the interest was fabricated.

194.    The Enterprise used Telegram bots to circulate token addresses through automated channels, reaching millions of potential buyers beyond F&F groups or Twitter audiences.

195.    Defendants and their KOLs fabricated token provenance and history, generating false narratives about a token's origins, trading activity, and community support. They deployed these fabrications across every available medium: in Telegram groups, in Twitter posts, in YouTube videos, and in TikTok content.



*Figure 12:  The tweet advertises a 9999X return on $ALON, the official eponymous token endorsed by Defendant Alon Cohen. Even when such returns were real, they were almost certainly achieved by insider wallets with advance notice and priority execution. Posts like this induced retail participants to believe these results reflected opportunity available to all. They reflected an outcome only available to insiders.*

### 3. Information as Control

196.    Ultimately, downstream Enterprise members wanted to be accepted into Pump.fun's inner circle. They wanted proximity to the people who had made millions. Cohen, for example, understood that people wanted to make money and become famous– he used control over information access to exploit that urge.

197.    Information from the top of the Enterprise was worth more than any salary. Knowing which tokens would be backed and when meant the ability to acquire those tokens

58

and make significant sums. The closer a participant was to Leadership, the earlier they learned, the more they made.

198.    The effect of this structure was the understanding that staying in the Enterprise's favor meant staying in the money.



*Figure 13: A September 19, 2025 post, reposted by Defendant Cohen, from Lead KOL @SOLJakey explaining that Pump.fun will both publicly and privately support creators with resources.*

### 4.  Mutual Dependence: What Bound KOLs to the Enterprise

199.    For KOLs, their digital audience was their primary asset. The Enterprise needed KOLs because audiences bring in transaction volume (*i.e.* people who would buy meme coins on the word of a promoter). When a KOL told followers to buy, followers bought. That volume enabled insiders to sell at profit. The value a KOL could generate for the Enterprise on a single campaign could reach hundreds of thousands or millions of dollars.

200.    At the same time, KOLs needed the Enterprise. A KOL's audience was only profitable if the KOL knew which tokens to promote and when. That knowledge came from the Enterprise who decided which tokens to back with the full institutional force of Pump.fun and Solana. Without access to the information cascading from the top, a KOL

59

could not reliably position before their own audience or coordinate their exit timing with other insiders.

201. KOLs could not replicate the scheme independently. The Enterprise provided the system: the technical infrastructure that guaranteed priority execution, the network upgrades that made the Enterprise profitable at scale, the campaign coordination, the wallet assignments, the timing and the organization. The KOL provided the audience.

202. A KOL's audience was only valuable to the Enterprise if the audience believed the KOL was independent. An audience that knew the KOL was paid to promote would distrust the promotion and refuse to transact.

203. Standard Pump.fun agreements confirmed that the public needed to have a certain perception of KOLs in order for the scheme to work. Agreements required KOLs to make one promotional Twitter thread per week and one post per week "organically utilizing the pump fun app."[6] The agreements also prohibited KOLs from disclosing the existence of the agreements themselves. Promotion staged to appear organic was, in fact, contractually mandated. Disclosure of that mandate was contractually forbidden. KOLs made paid advertisements presented as independent endorsements.



---

[6] A copy of one such Pump.fun KOL agreement was provided to Plaintiffs by CW-2. CW-2 is a prominent KOL who had direct communications with Defendant Cohen and Lead KOLs in the Pump.fun Enterprise, and who was offered and accepted a contract by the Enterprise to act as a KOL during the relevant period.

*Figure 14: Post by Alon Cohen promoting "organic community coins," echoing the language of KOL Agreements sent by Pump.fun to promoters. The agreements required "organic" promotion while prohibiting disclosure of the agreements' existence.*

204.    The agreement provided by CW-2 has terms concerning scripts, script ideas, and project proposals, confirming that purportedly organic promotional content was coordinated with Pump.fun.

205.    Followers believed they were following someone who could pick winners. They were buying from someone who already knew the fix was in.

### 5.  Enforcement: The Power to Destroy What Made Participants Valuable

206.    The same asset that made KOLs valuable to the Enterprise was the vulnerability that made them controllable: their audience.

207.    A KOL's audience was the source of subscription revenue, promotional opportunities, and reputation-based income. The Enterprise understood that destroying a KOL's reputation meant destroying the audience that earned them their livelihood.

208.    The first consequence of perceived disloyalty was exclusion from the information cascade. Exclusion transformed a participant's structural position from someone who extracted to someone who was extracted from. Without early information, a former insider became a net loser.

209.    Internal communications show the Enterprise in operation: Leadership exercising centralized control over who participated, what they received, and what they owed in return.

210.    The following exchange shows Leadership exercising control over downstream Enterprise participants. A TikTok influencer bought more tokens than Leadership had authorized during the pre-positioning phase of one campaign. His cap (*i.e.* the amount he

61

was permitted to purchase at early prices) was reduced (or "size[d] down").

211.    Access to the Enterprise was thus not a right but a lever. The Enterprise could reduce it as punishment and condition its restoration on compliance. The message was clear: your position in the hierarchy depends on your usefulness to the people above you.



*Figure 15: Sapijuju (Tweedale) shares a link to the TikTok profile of a KOL on April 6, 2024.*



*Figure 16: Alon (Cohen) and Sapijuju (Tweedale) discuss the TikToker on April 6, 2024.*



*Figure 17: Alon (Cohen) and Sapijuju (Tweedale) further discuss the TikToker on April 6, 2024.*

212.    Beyond exclusion, the Enterprise maintained the capability to destroy livelihoods.

The same communication infrastructure that coordinated promotional campaigns could

coordinate attack campaigns. The same bot networks that manufactured enthusiasm could manufacture harassment.

213.    The Enterprise's response to perceived disloyalty was swift, public, and disproportionate. Participants who supported competitors or declined participation faced sustained coordinated attacks visible to the entire network.

*Figure 18: Scooter, @imperooterxbt, a Lead KOL, posted on January 7, 2026 to over 100,000 followers. In this post, scooter acknowledges the existence of so-called "FUD" ("Fear, Uncertainty, Doubt") campaigns. When waged, these campaigns are meant to instill fear, uncertainty, and/or doubt in the public concerning a KOL. In practice, Lead KOLs would direct and participate in such campaigns against both Enterprise defectors and competitors. Here, scooter threatens other KOLs with such livelihood-destroying campaigns if they do not include him on the profits from future scam launches.*

214.    The visibility served a function: it demonstrated to every other participant what would happen if they deviated. For an influencer, coordinated reputational attack meant the destruction of the audience that constituted their economic existence. The accusations persist, searchable and permanent, attached to their identity.

215.    Participants remained aligned not only because alignment was profitable, but because the alternative was ruin.

### E. The Technical and Marketing Infrastructure Underlying the Enterprise's Operations

#### 1. Only Possible on Solana

216.    In 2023, Solana debuted a foreboding marketing slogan: "Only Possible on Solana."[7] Indeed, the Enterprise that defrauded Plaintiffs was, in fact, only possible on Solana. This campaign was marketed by Solana Labs, the Solana Foundation, and their respective principals. The Solana X account, which is maintained by the Solana Foundation, is filled with posts to this effect.

217.    No other blockchain had the combination of network speed, transaction-ordering infrastructure, and coordinated support from ecosystem leadership that made the Pump–Solana Enterprise work. Defendant Cohen essentially acknowledged as much publicly.

218.    On January 19, 2025, he posted: "for years, we were chewing glass with nothing to show for it... then we discovered Solana."



*Figure 19:January 19, 2025 X post by Defendant Cohen marking one year since Pump.fun launched.*

---

[7] Solan's current iteration of the "Possible" campaign can be seen at https://solana.com/possible (last visited January 7, 2025).

65

219.     Cohen was not speaking metaphorically. Before March 2024, Pump.fun had attempted to launch on other blockchains and failed. Even after launching on Solana, Pump.fun failed to get off the ground. Congestion issues imperiled the platform as documented in internal chats provided by CW-1[8].

220.     According to chat logs provided by CW-1, the Pump.fun leadership was discussing Solana congestion which was preventing users from buying and selling tokens on Pump.fun's platform.

221.     According to CW-1, during this period the Pump.fun executive team, including Cohen, Kerler, and Tweedale, met frequently with Solana's leadership, including at least Yakovenko and Gokal, concerning investment and technical support.

222.     According to CW-1, Tweedale bragged that Gokal was constantly messaging Pump.fun directly, offering support to keep the team building on Solana.

223.     According to CW-1, Gokal offered to help the Pump.fun team with introductions as they navigated needs for product support and investment capital.

---

[8] CW-1 is the confidential whistleblower who provided Plaintiffs internal chat logs with the Pump.fun team included as Figures throughout this complaint. CW-1 obtained access to these chatlogs as a member of the Pump.fun team and participated in chats during the relevant period.



*Figure 20: Alon (Cohen) in the Pump Team Chat on April 6, 2024.*

224.     This is corroborated by a message from Alon in the Pump.fun team chat provided by CW-1. This internal communication identifies fundraising from Solana co-founders Anatoly Yakovenko and Raj Gokal as an item on the daily task list in writing "raise: toly/raj."

225.     In or around the time of those meetings, Solana Labs announced network changes specifically to address critical congestion issues caused by increased network volume which was inhibiting Pump.fun's adoption. In or around the time of those meetings, Solana launched those updates in April. Also, in or around the time of those meetings, Jito Labs launched a major update to its validator software.

226.     Following those updates, by the end of 2024, the Enterprise had generated billions of dollars in revenue.

227.     Yakovenko publicly took credit for Pump.fun's success, displaying the platform's pill-shaped logo and offering to help other companies "scale their revenue" as he had with Pump.fun. This was part of Solana's broader marketing responsibility to lend credibility to the Enterprise.



*Figure 21: X post from Defendant Yakovenko on August 19, 2025.*

228.	On July 12, 2025, Pump.fun launched a public sale of its own token, $PUMP. The sale raised $400 million in thirteen minutes. Gokal posted: "where else can you raise $400m in 13 minutes?" Cohen replied: "only on solana!" Defendants were celebrating; the Enterprise was only possible on Solana, and its architects knew it.



*Figure 22: X post exchange between Defendant Gokal (@rajgokal) and Defendant Cohen (@a1lon9) on July 12, 2025.*

### 2. Coordination

229.    Internal communications provided by CW-1 demonstrate that Pump.fun and Solana operated not as separate companies but as a coordinated enterprise. Leadership from both entities shared technical guidance, optimized execution systems, and worked together to increase transaction volume and sustain the revenue that flowed from it. The communications that follow illustrate this coordination.

230.    A member of the Pump.fun core team maintained a private channel with Jon Cinque, a Solana Core Developer. The contents were shared with the Pump.fun executive team.

231.    On or about May 14, 2024, a Pump.fun developer contacted Cinque about eliminating a third-party per-token fee on Solana. Cinque explained what was feasible and where ecosystem support was missing. When the developer said Pump.fun was building a replacement for the third-party provider, Cinque continued assisting. The developer reported Cinque's guidance to Dylan Kerler, who set next steps for the team.

232.    In these communications, the Pump.fun engineer proposed lottery- and game-style mechanisms and received real-time technical guidance that such mechanisms would work. The discussions encouraged "lotteries" and "games" as adoption drivers and included cautions not to publicize certain mechanisms. Solana insiders understood the product was gambling and provided private assistance to expand its gambling functionality.

233.    The concealment served as an inducement. Had defendants disclosed what they were building and the extent to which they were coordinating, no one would have transacted. Defendants misrepresented and omitted this fact because honest disclosure would have ended the scheme. The fees, the tips, and the trading profits defendants captured are the proceeds of that fraud and the measure of what plaintiffs are entitled to recover.

234.    Pump.fun leadership maintained communication channels with Jito, and forwarded on optimizing execution performance. When a Pump.fun developer forwarded infrastructure specifications to the executive team, he did so by relaying a message from Bruder, establishing that both firms tracked execution metrics for the platform.



*Figure 23: Out (Kerler) message in Pump Team chat on April 6, 2024.*

70

### 3.   The Solana Network

235.      To understand how the technical infrastructure enabled the Enterprise, it is necessary to understand what Solana is.

236.      The Solana blockchain is a high-performance network designed to process transactions. It is meant to function as neutral infrastructure, processing transactions submitted by any user without preference or discrimination, similar to how the internet routes data packets without examining their contents.

237.      Every transaction on Solana requires payment in the Solana token (SOL), the network's native token. Fees for processing these transactions are distributed to validators, which are computers that process and confirm transactions. More transactions means more demand for SOL. More demand means a higher price.

238.      Solana Labs and the Solana Foundation together hold approximately 49 percent of the original SOL token supply. When SOL's price rises, Solana Labs and the Solana Foundation get richer.

239.      Solana Labs authored and maintains the Solana Program Library, including the SPL Token Program—the foundational smart contract infrastructure for all tokens on Solana. Without SPL, Pump.fun could not create tradeable tokens at all. But Solana's contribution to the rigged game went beyond providing generic infrastructure. Solana Labs built SPL in a way that permitted one-click token creation with automated bonding curve pricing and integrated fee taking—precisely the mechanics the Enterprise required for supply control. The bonding curve guaranteed that whoever bought first paid the lowest prices. Solana's infrastructure made "first" a matter of milliseconds.

71

240.    Solana Labs built the network-level systems that made those milliseconds decisive.[9] Solana created an execution environment where speed determined outcomes— an environment that structurally advantaged anyone with superior infrastructure and left ordinary users at the back of the line. Jito's bundling system, described below, used this speed advantage to guarantee insiders executed first.

241.    This speed, however, created its own problem for the Solana Network.

242.    Congestion is the term for what happens when a blockchain cannot process all submitted transactions quickly enough. Transactions do not merely slow down, instead, they fail entirely.

243.    For Defendants, this was an existential threat. A platform that cannot process transactions cannot retain users nor can it collect fees.

244.    Leading up to March 2024, the Solana network was experiencing degraded performance because of severe congestion, leading to failed transactions.

245.    When Solana Labs announced network changes specifically addressing congestion, it was not a neutral infrastructure improvement. It was a choice to enable the Enterprise's profit model. The congestion updates ensured the network could process the volume the Enterprise needed to generate fees, and ensured that the speed advantages built into Solana's design would actually function when it mattered. Without these updates, the rigged game could not operate.

246.    Fixing congestion meant the network could handle volume. But volume does not generate itself. Defendants needed predatory actors who would launch tokens, manufacture

---

[9] These features include Sealevel parallelism for processing transactions simultaneously, Gulf Stream for forwarding transactions before blocks finalized, and QUIC-based networking for faster data transmission.

demand, and induce retail participation. Those traders required infrastructure that guaranteed they would arrive first and exit first. Priority fees were that guarantee.

247.    Priority fees are payments users can add to their transactions to move to the front of the processing queue. When the network is congested, a transaction without a priority fee may fail or execute after other transactions have already moved the price. Priority fees create a pay-to-win execution environment. The more someone pays, the closer they move to the front of the line.

248.    For ordinary users, priority fees are a cost to ensure their transaction is actually recorded. For predatory traders, they are an investment. A trader who can guarantee first position can front-run every retail buyer who follows. By deliberately building a system that rewarded predatory trading, Defendants attracted predatory traders who would generate the volume required to make their own coins profitable. Every campaign creates transaction volume. Every transaction pays fees to Pump.fun and Solana. Priority fees were not incidental to the Enterprise. They were the lure that attracted the actors whose predation generated Defendants' revenue.

249.    The "fair launch" Defendants advertised, as described later in the Complaint, created the impression that participants would reach the market at approximately the same time and compete on equal terms. The priority fee infrastructure ensured the opposite. A participant with access to priority systems could guarantee execution before a participant using the platform's standard interface. Retail participants were not competing against other retail participants. They were being hunted by predators in the ecosystem.

## Jito LabsBACKGROUND

## I.    BLOCKCHAINS, SOLANA, THE ROLE OF THE SOL TOKEN AND CRYPTO WALLETS

### A.  Introduction to Blockchain

57.    Blockchain networks are decentralized digital ledgers that maintain a tamper resistant record of transactions across a distributed network of nodes. Each block of data is cryptographically linked to the prior block, forming a continuous chain of records that cannot be altered retroactively without invalidating the entire sequence.

58.    Unlike centralized databases, public blockchains achieve consensus through collective agreement among network participants. New transactions are verified, ordered, and confirmed according to an open consensus protocol, without the need for a central operator. Once a block is finalized, it becomes a permanent part of the blockchain's transaction history.

59.    Blockchains can be designed founders and developers to be "permissioned" or "permissionless", distinctions that fundamentally shape their accessibility and governance. Permissioned blockchains restrict participation to authorized entities, enabling networks with controlled access for enhanced compliance. In contrast, permissionless blockchains, such as Bitcoin, allow anyone to join as a user, validator, or developer without prior approval, targeting censorship resistance.

60.    Retail participants on a blockchain submit transactions using a cryptocurrency wallet ("wallet"). A wallet functions as the digital equivalent of a combined bank account and signature card, permitting the controller of the wallet to easily receive, hold, and transfer digital assets on a blockchain network.

### B.  The Solana Blockchain & The SOL Token

61.    The Solana blockchain is a high-performance, smart contract-enabled protocol built to support scalable software applications hosted on the Solana network. Solana was designed to be a permissionless blockchain where users do not require permissioning or

74

whitelisting to submit transaction to create applications, transfer assets, or validate transactions. Any person with an internet connection and compatible hardware can join the network, participate in consensus, or deploy smart contracts. This open-access architecture eliminates gatekeeping akin to traditional finance.

62.    Solana's native token, "SOL", is required for all core network functions. Introduced in March 2020, SOL serves as the primary medium for paying transaction fees, staking, and interacting with decentralized applications built on the network. Every transaction executed on Solana incurs a fee paid in SOL. These fees are distributed to validators as compensation for processing and confirming network activity. In addition, users may delegate their SOL to validators in Solana's PoS system, earning staking rewards while contributing to the network's security.

63.    SOL also functions as a unit of account across Solana's DeFi protocols, NFT marketplaces, and decentralized applications. It is used to settle trades, purchase digital assets, and post collateral. In some implementations, SOL may be used to participate in governance decisions, including votes on protocol upgrades and parameter adjustments.

64.    SOL's value is derived from its role as the gateway to blockspace. As more applications launch on Solana, and as transaction volume increases, demand for priority blockspace rises proportionally, as do the fees paid to holders of staked SOL. SOL's value is further reinforced by staking incentives, supply-limiting token burns, and a declining inflation schedule designed to reduce annual issuance over time.

**C.    Crypto Wallets and Accessing Blockchain Software**

65.    A cryptocurrency wallet functions as the digital equivalent of a combined bank account and signature card, permitting the holder to receive, hold, and transfer digital assets on a blockchain network.

66.    Creating a wallet on Solana is instantaneous. The process typically involves downloading a browser extension or mobile application (such as Phantom or Solflare), clicking

75

"Create Wallet," and saving a system-generated 12- or 24-word recovery phrase, also known as a seed phrase.

67.    This phrase functions as a master password; anyone who possesses it gains access and control over the associated wallet's pairs of private keys and public keys.

68.    There is no Know Your Customer ("KYC") screening, no age verification, and no record of real-world identity. A user can generate unlimited wallets pseudonymously, from any internet-connected device, with no oversight or restriction.

69.    Once created, a wallet acts as the user's digital identity on the blockchain. The public keys are used to receive funds—comparable to providing an account number and routing instructions—while the private key authorizes transfers, trades, and other transactions that are initiated by the wallet.

70.    On the Solana blockchain, wallets are the primary mechanism for retail investors to access and interact with the network and initiate any form of financial or transactional activity.

71.    Similar to using a Gmail account to log-in on a website, a wallet can be used to access "blockchain applications", like the Pump.fun slot machine.

72.    Minors using the Pump.fun software have launched tokens, receive SOL contributions from others, and extract value from the system without ever verifying their age, identity, or capacity to contract.

73.    Users can initiate trades, create tokens, or conduct financial transactions without any of the standard protections found in regulated finance.

74.    Platforms like Pump.fun rely on this system to operate at scale. Because wallet-based access requires no screening or documentation, anyone with a wallet can launch a token, contribute liquidity, or engage in speculative trading.

75.    Pump.fun does not verify who is using its services. It cannot distinguish between an adult investor, a minor, a convicted fraudster, or a foreign actor operating under a false identity. All users appear on-chain only as wallet addresses.

76

76. Pump.fun, Solana Labs, and Jito Labs together designed this system architecture. At no point did they implement, recommend, or require KYC checks, identity verification, or usage restrictions based on user status, jurisdiction, or legal capacity.

77. The consequence is that trillions of dollars in speculative token activity have flowed through wallet-based systems without oversight.

**D. Solana's History of Regulatory Evasion:**

**a. Arbitrage in the Crypto Industry**

78. From the earliest days of the blockchain industry, certain projects have deliberately exploited jurisdictional gaps in financial regulation to avoid scrutiny from U.S. authorities. Known as "regulatory arbitrage," this strategy involves structuring operations, token issuance, and fundraising activities to appear outside the reach of American securities laws—while still targeting American capital and investors.

79. These entities sought to insulate themselves from liability by formally separating the token-issuing foundation (offshore) from the development company (onshore), even though both worked toward the same commercial ends. The result was a legal fiction: U.S.-based teams marketing, developing, and profiting from token-based ecosystems, while claiming that the actual offering occurred outside the SEC's jurisdiction.

**E. Solana's Dual-Entity Structure: Labs and Foundation**

**4. Solana is architected with this playbook in mind. The project operates through two intertwined entities: Solana Labs, Inc.,**

250. Jito Labs built the infrastructure that allowed insiders to pay for guaranteed execution

80. priority over retail. Jito Labs is a Delaware registered corporation, and the Solana Foundation, a Swiss nonprofit based in Zug. From its inception, this bifurcated structure was designed not to decentralize power—but to create a legal buffer against U.S. securities regulation.

77

81. Solana Labs is responsible for most technical development, protocol upgrades, developer tooling, validator software, and network infrastructure. It employs the engineers, hosts the GitHub repositories, coordinates with validators, and oversees the economic design of Solana's native token, SOL.

82. Meanwhile, the Solana Foundation purports to "decentralize" the network, grow demand for blockspace, and manage the token supply. In practice, the Foundation serves as the nominal issuer of SOL tokens and the central node for fundraising and token allocation. The Foundation's Swiss jurisdiction, with historically lax crypto enforcement, enables Solana to sell or distribute tokens while claiming exemption from U.S. securities laws.

F. Avoiding Securities Laws from Day One. Jito Labs raised $10 million in its Series A, in part, from Solana Ventures, Yakovenko, and Austin Federa, the Solana

83. From the beginning, Solana's dual-entity model was used to raise capital, incentivize insiders, and distribute SOL to early investors without registering the tokens or complying with U.S. securities law. Solana sold substantial amounts of SOL to entities such as Alameda Research and Multicoin Capital, both based in or targeting the United States. These sales were structured to avoid triggering SEC oversight by routing the transactions through the Swiss-based Foundation.

84. Solana Labs and the Foundation worked in tandem to promote the value and adoption of SOL while disclaiming liability for its offering. This arrangement allowed Solana to extract capital from U.S. markets and investors—while arguing that any regulation of SOL fell outside the SEC's reach.

85. Solana's founders and executives knew or should have known that the economic reality of the SOL token—its centralization, promotional activity, and investment-driven marketing—meant that it would be treated as a security under U.S. law. Nevertheless, they proceeded to distribute, market, and facilitate trading of SOL while maintaining the legal fiction of foreign issuance.

### G. How This Setup Enabled FTX, NFTs, and Pump.fun

86. The consequences of this architecture were predictable and devastating. The same legal evasions that enabled Solana's early fundraising would later facilitate the rise of decentralized finance (DeFi) on Solana, the non-fungible token (NFT) boom, the FTX/Alameda Research ecosystem collapse, and the unchecked proliferation of fraudulent Pump.fun tokens.

87. The Solana Foundation's role as a token issuer allowed entities like FTX and Alameda to acquire massive SOL positions through opaque deals that were never registered or disclosed under U.S. law. Solana Labs' ongoing technical control meant that these entities could build on the network with privileged access, creating projects like Serum and Sollet that relied on Solana's infrastructure while amplifying risk to retail investors.

88. Likewise, Pump.fun leveraged this same structure: Solana Labs provided the token tooling, network speed, and validator integrations that made mass meme coin launches feasible. Yet because Solana's token environment remained unregulated, there were no investor protections, disclosure obligations, or legal accountability for the systemic losses that followed.

### H. Legal Relevance: Foreseeability, Enterprise Intent, and Continuity

89. Solana's architecture supports the elements of a civil Racketeer Influenced and Corrupt Organizations ("RICO") Act claim. It shows continuity of purpose: from initial fundraising to NFT wash trading to the Pump.fun rug-pull factory, Solana's operators have consistently built infrastructure designed to exploit U.S. markets while evading their legal protections. It shows knowledge and foreseeability: Solana's leadership knew how their tools would be used and embraced that usage as ahead of strategy for growth.

## II. SOLANA'S HISTORY OF SPECULATIVE SCHEMES AND RETAIL HARM

90. Pump.fun did not arise in a vacuum. It is the most recent and most sophisticated iteration of a pattern of conduct by Solana Labs and its ecosystem partners, who have repeatedly

promoted, enabled, and profited from speculative manias that disproportionately harm retail participants.

91.    Anatoly Yakovenko, the CEO and co-founder of Solana Labs discussed the role of Solana Labs in NFT and meme coin transactions: "As with NFTs...we're blessed to solve a whole bunch of engineering problems with meme coins. It just makes the network and all the systems more robust."

### A.    The 2021 NFT Boom and Bust: A Precursor to Pump.fun's Model

92.    Solana's first speculative asset frenzy centered on NFTs. Beginning in mid-2021, Solana positioned itself as a "fast, cheap alternative to Ethereum" and exploited this technical framing to fuel a rapid explosion in NFT trading volume.[10]

93.    Unlike genuine decentralized innovation, this boom served a singular institutional motive: to monetize block space. By encouraging high-frequency speculation in low-utility assets, Solana Labs and the Solana Foundation were able to extract increasing validator fees, grow their SOL token valuations, and justify inflated ecosystem metrics to investors and the public.

94.    This strategy was not theoretical. Solana Labs and its affiliated investment arm, Solana Ventures, directly financed and promoted the NFT ecosystem, including by taking significant equity stakes in the entities that would become central to NFT speculation.

95.    Chief among these was Magic Eden, the dominant NFT marketplace on Solana, and a portfolio company of both Solana Labs and the Solana Foundation.

96.    Similar to Pump.fun, Magic Eden served as the primary distribution and trading platform for NFTs launched on Solana, regularly accounting for over 95% of all NFT transaction volume on the network.

---

[10] https://www.theblock.co/post/329669/solanas-founder-on-how-memecoins-help-make-the-network-more-robust

97.    Solana Labs also supported Metaplex, which developed and maintained the dominant NFT minting protocol, responsible for over 99% of NFT deployments on Solana.

98.    Together, these platforms—financed, promoted, and controlled through Solana's core entities—created the conditions for a speculative explosion. NFTs were marketed as digital art, cultural community tokens, or early-access gaming assets.

99.    But in truth, they functioned as unregistered securities: assets whose value was derived entirely from speculative price movement, promoted with the promise of future profit, and backed by centralized development teams, roadmaps, and commercial narratives designed to encourage investment.

100.    Marketing campaigns for Solana-based NFTs borrowed heavily from traditional capital-raising tactics. Projects frequently released "whitepapers" that mimicked private placement memoranda, detailing the management team's qualifications, market opportunity, monetization strategies, and speculative upside.

101.    In many instances, project founders recruited marketers and influencers to amplify these messages in private investor chats, NFT alpha groups, and online communities, presenting these purchases not as collectibles but as early-stage investment opportunities.

102.    The result was a textbook asset bubble. NFT floor prices surged amid artificially inflated volume and aggressive promotional tactics. Then, as retail demand exhausted, floor prices collapsed, leaving most NFTs illiquid and valueless. By mid-2023, over 95% of Solana-based NFT collections were functionally worthless—despite having generated millions of dollars in block-space transaction fees and platform revenue during their ascent.

103.    Solana Labs' leadership publicly embraced the NFT boom during its ascent, touting it as proof of Solana's utility and speed, and promoting NFT collections through usage of the NFT intellectual properties as the profile pictures of their social media accounts. Yet when the market crashed, neither Solana Labs nor its backers offered meaningful disclosures or investor protections, despite having facilitated and directly benefited from the frenzy.

81

B.      The FTX/Alameda Collapse and Solana's Role

104.    Solana's exposure to FTX and Alameda Research deepened the chain's association with speculative abuse. Sam Bankman-Fried's firms were early and outsized investors in Solana, acquiring an initial stake of approximately 58 million SOL—over 11% of the token's supply. At the time of their bankruptcy, FTX and Alameda Research held approximately 47.5 million SOL.

105.    FTX, Alameda Research, and Solana entities and persons together used their influence and capital to develop projects on Solana, launch and promote corresponding tokens for those projects, allocate large or majority token allocations to their own wallets, and then sell those promoted tokens to unsuspecting retail investors. These tokens were colloquially known as "Sam-coins" by insiders of Solana. Examples include Solana-based projects like Serum, Sollet, Oxygen, Maps.me, Bonfida, Jet Protocol, and others.

106.    These projects, often tightly controlled by FTX personnel, were propped up through token supply manipulation, insider transactions, and mark-to-market accounting that artificially inflated their value. Alameda Research, as the developers and seed investors in many of these Sam-coins, would negotiate allocations often 50-95% of the total token supply.

107.    FTX, Alameda Research, and Solana entities and persons also developed and promoted bridged assets on-chain – soBTC and soETH – which were promoted as 1:1 backed assets via their token equivalents BTC and ETH. When FTX declared bankruptcy, soBTC and soETH de-pegged and became nearly worthless, as the promoted 1:1 backing behind these bridged assets turned out to be yet another lie by Solana.

108.    Solana Labs benefited from this ecosystem through token appreciation, retail investor inflows, and venture capital inflows. Meanwhile, retail participants were left holding assets that lost most of their value during the collapse.

109.    When FTX imploded in November 2022, SOL's price plummeted from over $30 to under $10 in a matter of weeks—more than a 90% decline from its prior high. Retail users on

82

Solana were devastated, particularly those who had been encouraged to buy into the ecosystem based on credibility derived from FTX's involvement.

110. Despite its deep integration with Alameda-backed infrastructure and its substantial exposure to the collapse, Solana Labs disclaimed responsibility and took no action to compensate harmed users, introduce safeguards, or correct the structural dependencies that had fueled the boom.

## C. A Pattern of Conduct and Systemic Incentives

111. The Pump.fun phenomenon is not an aberration—it is the predictable next phase in Solana's ecosystem evolution. Solana Labs and its technical partners, including Jito Labs, have continually architected their blockchain and ecosystem to maximize throughput, speculation, and transaction volume, knowing that these metrics drive SOL's price and public perception.

112. This design strategy, which prioritizes raw on-chain activity over user protections or fundamental value, has repeatedly enabled speculative cycles: first with NFTs, then with FTX-related DeFi tools, and now with meme coins. In each case, Solana Labs and its partners have reaped reputational, economic, and venture capital benefits from the surging activity—while distancing themselves from the inevitable fallout.

113. The harms caused by Pump.fun were entirely foreseeable given this history. Indeed, Solana's technical upgrades, such as the Solana Program Library (SPL) token program and validator optimizations, directly enabled the mass launch of meme coins at scale. Jito Labs' MEV tooling further allowed insiders to profit from extractive order flow at retail users' expense.

114. Neither Solana Labs nor Jito Labs took any steps to limit or mitigate the abuse. Despite prior experience with the NFT crash and FTX collapse, and despite full visibility into Pump.fun's operations via on-chain data and public discourse, they continued to promote and support the underlying infrastructure, prioritizing ecosystem growth over investor protection.

115.    In sum, the Pump Enterprise is not a deviation from Solana's prior behavior—it is its culmination. The tools have changed, but the tactics remain the same. In every case, Solana Labs built the rails, Jito Labs extracted the value, and retail users were left to absorb the losses.

## III. THE MEMECOIN MACHINE

### A.    Introduction to Pump.fun

116.    "Solana succeeded for the same reason that Pump.fun succeeded, they lowered the barrier to entry to create these (meme coins), play in this ecosystem; to buy and sell these coins" Defendant Alon Cohen, founder of Pump.fun.[11]

117.    At the heart of this gambling system is Pump.fun, which functions as the casino's public-facing slot machine cabinet. Its interface is sleek, colorful, and deceptively simple—designed to entice users to "pull the handle" by launching or buying a new token with a single click. Behind this simplicity, however, lies a complex and coordinated system powered by Solana Labs, Jito Labs, and the Solana Foundation—each playing a distinct role in running the house.

118.    Pump.fun is positioned as a "meme token launchpad," but in operation it performs the core function of a slot machine: it invites users to place value at risk (in the form of SOL) in exchange for a chance at rapid financial gain via a themed, randomized outcome. The "game" is not skill-based, and the outcomes are rigged by structural mechanics. Each token is effectively a different cabinet skin on the same house-favoring game engine.

119.    Technically, Pump.fun serves as the user interface of the casino—comparable to a gaming terminal at the front of a slot machine bank. But the machine itself only runs because of Jito Labs and Solana Labs. Jito Labs provides the back-end software: the validator infrastructure, transaction routing, and MEV optimization logic that determine how and when trades are executed. Solana Labs and the Solana Foundation provide the hardware—the Solana

---

[11] https://www.youtube.com/watch?v=u6lowwye4mo

blockchain—which processes every wager, every trade, and every payout, and monetizes each step by selling block space and collecting transaction fees.

120.    Pump.fun's defining product feature is its "one-click" token launch system. This is not a development tool—it is a gambling lever. With no knowledge of programming, no submission of identification, and no disclosure of intent, any user can spin up a fully tradable financial asset in under sixty seconds. This is made possible through the SPL smart contract standard, introduced by Solana Labs and deployed immediately prior to Pump.fun's January 2024 launch. That standard added modular token properties—such as programmable transfer fees and bonding curves—designed to maximize transactional complexity and speculative dynamics.

121.    Pump.fun exploits this upgraded smart contract system to create what amounts to programmable slot machine odds. Upon launch, each token is bound to a bonding curve, a pricing algorithm that rapidly increases the cost of the token with each purchase and decreases it upon sales. Ostensibly marketed as a liquidity solution, the curve in fact creates a volatile pump-and-dump structure where the earliest players are heavily advantaged, and late entrants are effectively guaranteed to lose.

122.    This architecture strongly favors bots, insiders, and entities using. Jito Labs' MEV tools, which can front-run token purchases and arbitrage bonding curve dynamics within milliseconds of launch. Retail users arriving even seconds later pay exponentially more for the same asset—often multiples higher—with no warning, recourse, or understanding of the speed-based asymmetry. The design ensures that the profitable "jackpots" are already claimed by the time most users participate, reproducing the house advantage inherent in traditional gambling systems.

123.    This pump-and-dump mechanism is not a byproduct—it is the central engine of the Pump.fun Casino. Between January 2024 and mid-2025, over 11 million tokens were launched on the platform. Of those, more than 98% lost virtually all value and liquidity within 24 hours. Yet each launch was a spin of the slot machine: a rush of trades, swaps, and fees generating activity

85

for the house. Over this period, Pump.fun processed tens of billions of dollars in transaction volume and extracted hundreds of millions of dollars in launch and platform fees.

124. Every trade, win or lose, consumed Solana block space, executed validator logic, and paid fees to the house. This was not innovation—it was an industrialized gambling circuit cloaked in financial pseudoscience. The result was a fully integrated, always-on, unlicensed casino offering slot-style games with branded wrappers and no oversight—designed not to deliver value to users, but to maximize throughput for the house and its operators.

**B.      Pump.fun's Retail Trading Interface**

125. The Pump.fun customer-facing slot machine is designed to simulate a trading terminal. The terminal is designed to look, feel, and function like the screen of a regulated online broker-dealer—only stripped of the disclosures, safeguards, and supervisory controls that govern traditional securities exchanges. A real-time candlestick chart dominates the center of the screen (See Ex. C-F)[12], complete with selectable intervals (1 m, 10 m, 1 h, 1 D) and color-coded volume bars.



126. This graphic visualization of price action is indistinguishable from the charting modules offered by FINRA-member platforms such as E*TRADE or TD Ameritrade and signals to

---

[12] Citations to Exhibits attached to this Consolidated Class Action Complaint ("CAC") are cited to herein as "Ex. ___."

the ordinary purchaser that he is viewing a bona fide market in which historical pricing, depth, and liquidity can be inferred and traded upon. The chart updates tick-for-tick as new blocks are confirmed on the Solana blockchain, reinforcing the fiction that the token enjoys a continuous secondary market supported by price discovery mechanisms analogous to those of the NYSE or Nasdaq.

127.    Flanking the chart is a "quote box" that reports Market Cap, Supply, and Holders in real time. *(See Ex. C-F).* Market Cap—calculated as outstanding supply times last price—mimics the public-company valuation metric familiar to any equity investor and is displayed down to the dollar. Supply is the total number of tokens outstanding, mimicking the share float of a traditional equity. Holders resembles the shareholder register, conveying how widely dispersed—or tightly concentrated—the float may be. By importing this lexicon verbatim from regulated equity markets, Pump.fun invites users to benchmark meme coins against listed securities and to treat the data as a reliable proxy for investment fundamentals.

128.    A perpetual ticker tape stretches across the very top of the Pump Advanced screen. Each scrolling symbol is color-flashed with its one-minute, ten-minute, and twenty-four-hour percentage moves, reproducing the ubiquitous Bloomberg or CNBC price crawl and priming users to chase momentum. Beneath that ribbon the page auto-sorts the universe of tokens into three league-table columns: **"Newly Created," "About to Graduate,"** and **"Graduated."** The taxonomy evokes the lifecycle of a corporate issuer—*seed*, *road-show*, *IPO/listing*—and supplies a running "pipeline" that permits users to toggle seamlessly between nascent offerings and those deemed mature enough for external DEX trading.

129.    Each row inside these columns contains a miniature due-diligence dashboard rendered through four badge-style indicators: **(i) total holders, (ii) sniper wallets still holding, (iii) developer-held percentage, and (iv) concentration of the top ten wallets.** Hover text discloses the meaning of each glyph ("Snipers Holding," "Dev Held," "Top 10 Holders %") and

87

converts them into quick-read risk metrics that parallel insider-ownership tables, float analyses, and institutional-ownership summaries found in SEC filings. A user can therefore—at a glance—"size up" a token's insider concentration, circulating float, and susceptibility to manipulation, just as one would consult Form 13F data before purchasing an equity.

130. Trade execution is initiated through the adjacent order ticket, which mirrors a modern equities blotter. The user sets Max Slippage %, selects a Speed tier (Fast, Turbo, Ultra—each with rising priority fees), toggles "front-running protection," and may optionally add a Tip to bribe validators for even earlier inclusion (*See* Ex. C-F). These parameters replicate the limit/market order types, ISO flags, and non-displayed liquidity settings of sophisticated equities venues, convincing retail participants that they possess the same execution quality enjoyed by professional traders.

131. Collectively, the interface furnishes every hallmark of a regulated securities market—live price discovery, market capitalization reporting, float analysis, holder concentration, and order-entry customization—while omitting the countervailing disclosures (issuer financials, audited statements, risk factors), surveillance (best-execution, FINRA Rule 5320), and investor protections (SIPC, customer asset segregation) that make those metrics meaningful in traditional finance. By cloaking speculative bonding-curve wagers in the analytic vernacular of traditional finance sales and trading, Pump.fun further induces retail users to transact as if they are putative shareholders analyzing ostensibly material market data—data that, in reality, is no more than a cosmetic façade affixed to an unregistered, insider-rigged casino.

132. Like any casino, the Pump Enterprise does not offer a single product, but rather a themed array of games that all function identically beneath the surface. Each "game" is a meme coin launch—visually distinct, sometimes marketed with its own narrative or imagery—but economically indistinguishable from the others. These tokens, regardless of theme, are pre-coded

88

with bonding curves, liquidity locks, and exit dynamics that mirror one another and offer the same essential proposition: deposit real value in exchange for a fleeting chance at speculative profit.

133.    In practice, each meme coin theme operates like a re-skinned slot machine cabinet. The branding changes, but the mechanism remains fixed. The bonding curve is the random number generator. The trading interface is the flashing lights. The payout odds are rigged through timing asymmetries, front-running bots, and manipulated liquidity conditions. No matter the aesthetic, the house retains the edge—and Defendants monetize every pull of the handle.

134.    Pump.fun does not conceal this strategy. On the contrary, it presents its casino floor openly. Users are encouraged to explore "trending" tokens, each with its own image, name, and theme—many deliberately designed to evoke a specific narrative, emotion, or cultural association. The only functional difference between them is marketing.

135.    These slot machine variants fall into several recurring categories:

136.    (1) The Venture-Investment Game (Unregistered Securities): These tokens are marketed using the language of traditional venture capital or startup investing. Creators imply or state that the token is part of a project with future upside, and that early buyers will benefit financially from development milestones, product releases, or network effects. They frequently feature "whitepapers," roadmaps, Discord announcements, and social campaigns that mimic startup launches. These tokens qualify as unregistered securities, as they are sold with a reasonable expectation of profit based on the efforts of others—without registration, disclosures, or regulatory compliance.

137.    (2) The Celebrity Endorsement Game: These tokens exploit the likeness, name, or public persona of celebrities, influencers, or media personalities. Sometimes these individuals are directly involved, receiving pre-allocated tokens or promotional deals. Other times, they are impersonated or used without consent. In both cases, the token's value proposition is derived from the public's familiarity with the individual and the assumption of their endorsement or

involvement. These tokens create false association, capitalize on parasocial trust, and often violate right-of-publicity laws.

138.    (3) The Nonsense Speculation Game (e.g., FartCoin): These tokens are openly marketed as valueless, chaotic, or absurd—examples include "FartCoin," "TwoToesToken," or "NothingBurger." The message is clear: there is no utility, no project, and no roadmap, only vibes. Yet despite this admission, users are encouraged to speculate, buy early, and chase temporary price spikes. The absence of pretense does not absolve the gambling structure; instead, it is embraced as part of the entertainment aesthetic, akin to novelty slots with clown or cartoon themes.

139.    (4) The Fortune 500 Lookalike Game: These tokens imitate or parody household brand names—e.g., "GoogleCoin," "NikeToken," "AmazonPay." The visual branding, ticker names, and social messaging create the false impression of affiliation with legitimate Fortune 500 companies. Whether framed as parody or homage, these tokens routinely exploit consumer confusion, dilute trademark value, and implicate false designation of origin under the Lanham Act.

140.    (5) The Stolen IP Game (Unauthorized Copyright/Trademark Use): These tokens incorporate protected intellectual property—characters from Disney, Nintendo, or anime franchises; logos of sports teams; copyrighted phrases or songs—without license or authorization. The goal is to piggyback on preexisting fanbases, draw speculative capital from collectors or enthusiasts, and convert attention into trading volume. These tokens violate intellectual property law, mislead consumers, and form the core of the meme coin enterprise's "artificial value via infringement" strategy.

141.    While each token category may appeal to a different demographic or psychological trigger—whether greed, nostalgia, humor, or trust—the economic mechanics are identical. The bonding curve structure, timing dynamics, and instant tradability are constant. The outcome is also constant: a temporary surge in on-chain volume, a transfer of value from late entrants to

early actors, and a guaranteed rake for the Defendants in the form of block space consumption, MEV extraction, and token launch fees.

142.   This engineered illusion of choice—presenting dozens of "different" token types that are all bound to the same game logic—is what gives the Pump.fun Casino Enterprise both its scalability and its legal character. These are not legitimate financial products. They are digital gambling instruments, skinned for marketing appeal, designed for maximum churn, and operated without regulation or oversight.

C.   Pump.fun's Meme coin Marketing: Venture Like Investments Labs develops and maintains the "

143.   Within the Pump.fun Casino Enterprise, one of the most aggressively marketed "slot machine variants" was the Venture Investment Game—a meme coin format packaged and promoted as early-stage startup equity. While identical in economic structure to every other token launched on the platform, these tokens were branded as investment opportunities, drawing in users with promises of outsized financial returns and narrative framing lifted from the world of venture capital and early-stage technology finance.

144.   Pump.fun's marketing strategy systematically updated and recontextualized its meme coin messaging to attract new waves of users, each drawn to different psychological triggers—including gambling, celebrity affiliation, and speculative investment. As relevant here, Pump.fun repeatedly characterized meme coins as startup-like investment vehicles capable of producing exponential returns. (*See* Ex. A.)

145.   These messages were distributed via viral marketing campaigns, visual memes, and Twitter/X posts that blurred the line between parody and investor solicitation. In one widely circulated campaign, Pump.fun asserted that its platform was "better than venture capital"—an invitation for retail users to bypass traditional startup investing and participate in speculative meme coin launches instead. (*See Exs.* A, C–E.)

146.    Many of these "venture coins" were promoted in association with celebrities or influencers—frequently without authorization, and often without disclosure of compensation or affiliation—further blurring the lines between endorsement, investment, and parody. This confusion resulted in widespread consumer misunderstanding, exacerbated intellectual property violations, and deepened investor losses when tokens collapsed shortly after launch.

147.    Pump.fun's marketing efforts were targeted toward a young, male, retail-speculation audience whose exposure to financial products is heavily shaped by internet culture and social media—paralleling the demographic surge seen during the GameStop and "meme stock" era. The primary medium for these campaigns was Crypto Twitter, a colloquial name for the Twitter/X subculture where most meme coin commentary, speculation, and promotion occurs.

148.    In its social posts, Pump.fun regularly framed its platform as a generator of "AI unicorns," "early-stage winners," and "billion-dollar meme coins." The rhetoric mimicked the language of Silicon Valley fundraising—replacing due diligence and SEC-compliant disclosures with gifs, emojis, and hyperbole. For example:

- "Pumpfun has incubated more AI Unicorns than your favorite VC"[13]. Unicorns are billion-dollar startups, no data supports these statements.[14]

- "Market is nuking but the trenches are HOT, there are endless opportunities on pump fun, no matter what the market says"[15]

149.    Pump.fun also celebrated specific tokens that had reached billion-dollar market capitalizations after launching through its platform, reinforcing the idea that users could discover "the next unicorn" by participating in meme coin launches:

---

[13] https://x.com/pumpdotfun/status/1876399475733725579
[14] https://x.com/pumpdotfun/status/1856655071922041327
[15] https://x.com/pumpdotfun/status/1877047824258331023

92

- "another day, another billion dollars 🤯peanut has just become the 2nd pump fun coin to hit $1bn marketcap after launching just 13 days ago 🤯memes are accelerating faster than ever - which coin is next[16]?"

- "congratulations to the $GOAT 🐐@truth_terminal is officially the first pump fun coin to hit a $1bn market cap 🤯that's around 222,222x in just 1 month!!!!this begs the question... who's next[17]?

- "remember when they told you that it's impossible to win in the meme coin trenches? that you're retarded for "gambling" when the winners were "already chosen"? since then 2 new coins went from 0 to $300m, over 50 went to $10m, and over 100 touched $5m I hope you didn't listen."[18]

150.    The narrative was clear: retail users could beat the market, bypass venture gatekeepers, and find "next-generation" technology projects by launching or buying Pump.fun tokens. Many tokens were accompanied by whitepaper-style narratives, roadmaps, and product-development claims. Users were told they were not just gambling—they were "early investors."

151.    In reality, these meme coins shared no meaningful distinction from gambling instruments. Most produced no products, had no revenue plans, and delivered no services. They were simply themed tickets to a digital slot machine designed to churn transactions and enrich the house. Nonetheless, these tokens were offered to the public without SEC registration, investor disclosures, or compliance with securities laws, despite satisfying the elements of an investment contract under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

152.    Every transaction—whether at launch or in secondary trading—was executed through the Solana blockchain and relied upon validator infrastructure developed and operated by Jito Labs and Solana Labs. Those entities directly benefited from the token's trading activity

---

[16] https://x.com/pumpdotfun/status/1856655071922041327
[17] https://x.com/pumpdotfun/status/1856362235574042774
[18] https://x.com/a1lon9/status/1846628249746477361

through validator rewards, MEV extraction, and rising network fees—all enabled by the speculative frenzy stoked by Pump.fun's venture-style messaging.

153.    In addition to unregistered securities, Pump.fun facilitated the sale of thousands of counterfeit publicly traded securities—tokens designed to mimic Apple, Microsoft, Tesla, Disney, and other Fortune 100 companies. (See Ex. F.) These tokens used official logos, stock tickers, and corporate language to simulate affiliation or endorsement, despite having no connection to the underlying businesses. The tokens offered no shareholder rights, dividends, or equity—but were branded to imply they were digital analogs of blue-chip investments.

154.    These knockoff securities were not mere parodies. They were deployed at scale, offered to the public through the same one-click token creation system, and monetized through the same launch-fee and transaction-fee infrastructure. For Defendants, they were just another skin on the same machine—another slot cabinet on the casino floor, designed to provoke trading volume and drive up block-space monetization.

**D.    Pump.fun and Pump.fun's Founders Describe Pump.fun as a Casino**

155.    Defendant Alon Cohen openly acknowledges that Pump.fun is a Casino. For example, on August 8, 2024 he tweeted "you guys came to the greatest CASINO in the world and are complaining when your txns RANDOMLY drop? what did you expect??? it's part of the experience, a rite of passage, a PRIVILEGE don't like it? LEAVE."[19]

156.    In an effort to bring multicultural users to the Pump.fun casino Defendant Cohen states "not an expert but I feel like trading shitcoins is HALAL; not gambling, but investing and contributing to the propagation of social trends imagine activating BILLIONS of people who couldn't gamble before, including the SAUDIS my lord we're all gonna get so rich."[20]

---

[19] https://x.com/a1lon9/status/1777395989479051772
[20] https://x.com/a1lon9/status/1778150960956678275

94

157.    Defendant Cohen explains that meme coin gambling is superior to traditional gambling due to its social nature. He states "meme coins are also far more socially engaging than gambling. most people just want to have fun with their friends, and meme coins can hit the right spot 100x better than gambling could ever."[21]

158.    Mert Mumtaz, the founder to Helius.Dev, a Solana contractor explains that Solana is built to simulate a Casino "few understand that the solana fee model is stochastic on purpose to naturally simulate a casino environment". Defendant Cohen agrees, stating that it is a "Gambling supercycle".[22]

### E.    Pump.fun Marketing: Celebrity Meme Coins

159.    Another major variant of the Pump.fun Casino was the Celebrity Slot Machine—a format where tokens were themed around real-world celebrities, using either direct endorsements or unauthorized likenesses to induce retail speculation. These tokens were central to Pump.fun's growth strategy and were repeatedly promoted by the platform, its executives, and its affiliates as legitimate opportunities for outsized returns.

160.    As part of this scheme, celebrities—including Caitlyn Jenner ($JENNER), Usher ($USHER), Hulk Hogan ($HULK), Doja Cat ($DOJA), Iggy Azalea ($MOTHER), and Andrew Tate ($DADDY)—launched, promoted, or were associated with tokens that traded through the Pump.fun platform. (See Ex. D.) These token launches were widely publicized across Crypto Twitter, incorporating memes, livestreams, tweets, and provocative marketing messages designed to attract attention and speculative capital.

161.    Pump.fun and its affiliated individuals actively supported these token launches. They tweeted to their audiences, featured the tokens prominently on the website's trending sections, and elevated celebrity-linked coins through their user interface and social engagement. (See Ex. A.) These efforts positioned celebrity tokens as elite slot machine variants on the

---

[21] https://x.com/a1lon9/status/1769476547658887435
[22] https://x.com/a1lon9/status/1861421412927356987

95

Pump.fun casino floor—branded experiences that appeared more "legitimate," more exciting, and more likely to pay out.

162. Defendant Cohen, one of Pump.fun's most prominent public promoters, personally supported the $MOTHER token linked to Iggy Azalea, describing it as a model for the "social token narrative" and defending alleged insider activity by calling the participants "Pump.fun sleuths." He tweeted:

- "this past week, there have been some wins for example, Iggy seems genuine in her intentions with $MOTHER. she actually gets it and is seriously kicking off the social token narrative. (also worth mentioning that the "insider wallets" were pump fun sleuths)."[23]

163. In a since-deleted promotional tweet, Pump.fun's official account directly advertised a livestream featuring Iggy Azalea, writing:

- "RT @IGGYAZALEA: GUYSSS I'm LIVE right now playing on Motherland on @pumpdotfun livestream!! Pull up, send me that good luck energy, or just…"[24]

164. Likewise, to promote the $JENNER token, Pump.fun published a meme-style tweet intended to challenge doubters and encourage engagement:

- "Caitlyn Jenner: launches pump fun coin you: too scared you: "surely she's hacked" Caitlyn Jenner: cope and seethe loser. Send it. Caitlyn Jenner: strong and beautiful you: WEAK AND POOR."[25]

165. These promotional tactics created the false appearance of validation, implying that the involvement of known celebrities elevated the legitimacy and investment potential of these tokens. This in turn drew thousands of new users to the Pump.fun interface, increased launch

---

[23] https://x.com/a1lon9/status/1796956472275877985
[24] https://twitter.com/pumpdotfun/status/1917668089447022900
[25] https://x.com/pumpdotfun/status/1794848499869343924

activity, and dramatically expanded transaction volume, thereby benefitting Defendants financially through fees, MEV extraction, and block space consumption.

166. The marketing surrounding celebrity tokens was materially misleading. By highlighting celebrity involvement, Pump.fun conveyed that these tokens were safer, more legitimate, or more likely to succeed than others—despite having the same structural characteristics, bonding curves, and near-total lack of investor protections. (*See* Exs. D, E.)

167. In reality, these celebrity-themed tokens performed no better than the rest. On average, they declined by over 99% from their peak market value. The presence of celebrity names did not alter the outcome; it only widened the pool of victims drawn into the gambling system.

168. Despite the attention given to celebrity coins, Pump.fun failed to implement any safeguards to prevent impersonation or counterfeit token launches. Any user—anonymous and unverified—could create a token with the same name, image, or branding as a celebrity. This allowed for widespread unauthorized token launches, including fake versions of high-profile names that were indistinguishable from the purportedly "official" ones. (*See* Ex. D.)

169. Counterfeit token operators took additional steps to create confusion, including launching copycat websites, social media pages, and marketing materials. Many retail users were unable to distinguish between legitimate and counterfeit celebrity tokens, and purchased the latter in error, paying launch fees and transaction costs to Pump.fun and its infrastructure partners—despite receiving valueless/counterfeit assets in return.

170. At any time, Pump.fun could have implemented basic technical controls to prevent the creation of tokens with identical tickers, metadata, or images—particularly where the same branding had been used by another token within the system. These controls are trivial to implement and are standard in regulated environments. Yet Pump.fun chose not to.

171. Similarly, Solana Labs and Jito Labs, who process every transaction and validate every token creation event, could have intervened to blacklist known counterfeits or delist

97

manipulated token metadata from public APIs and indexers. They did not. Their refusal to act was not accidental—it was consistent with the Enterprise's financial interest in maximizing churn, confusion, and total transaction count.

172. The result was a celebrity-branded gambling product line marketed through fraudulent association, launched without compliance, and allowed to flourish in an environment where fakes and real tokens were indistinguishable. Defendants profited from every spin of this machine—regardless of authenticity, legality, or harm to consumers.

### F.    Anonymous Access and the Pseudonymous Casino: No KYC, No Oversight, No Accountability

173. The Pump.fun Casino operates without traditional user accounts, identity verification, or onboarding procedures. Unlike regulated financial platforms—or even licensed gambling sites—there is no mechanism to establish who the user is, where they are located, or whether they are legally permitted to participate. The only requirement is a Solana-compatible crypto wallet, such as Phantom or Solflare.

174. A connected wallet serves as the user's slot card, payment method, and identity, all in one. When a user visits the Pump.fun website or mobile app, they are prompted to "connect wallet." Once connected, the user's public wallet address is automatically recognized as their "account," and all subsequent activity—including launching tokens, purchasing, selling, and interacting with the platform—is performed through cryptographic signatures from that wallet.

175.1.    No name, email address, government-issued ID, or other personal identifier is ever required. There are no KYC protocols, no geographic restrictions, and no technical guardrails to prevent minors, sanctioned individuals, or known bad actors from accessing the platform. Any user, anywhere in the world, can begin wagering in seconds, entirely anonymously.

176. Similarly, buying and selling tokens on Pump.fun occurs via wallet-authorized transactions. When a user "plays," by buying a token, their SOL is deducted, and tokens are

credited to their wallet. When they sell, tokens are returned to the platform's liquidity pool, and the resulting SOL—minus platform and validator fees—is sent back to their wallet. Pump.fun never takes custody of the funds; it simply routes and processes the wager through automated contracts and fee-splitting mechanisms.

177.    Any person with internet access and a wallet can engage in speculative trading or token creation with no friction, screening, or accountability.

178.    As a result, Pump.fun functions as a pseudonymous, permissionless financial casino—one where every spin of the slot machine is tied to a wallet address, not a person. Users are unverified, unlicensed, and untraceable, and Defendants have made no meaningful effort to impose oversight. By eliminating identity and compliance friction, Defendants maximized transaction count and platform volume, driving validator fees, MEV revenues, and ecosystem growth metrics. This system also renders all user restrictions unenforceable. Even when violations occur, Pump.fun's architecture makes it impossible to impose bans. A wallet suspected of abuse can simply be discarded, and a new wallet created moments later—reentering the casino with a fresh identity. This revolving-door system enables a wide range of abuses, including repeat IP infringement, counterfeit token launches, and underage gambling, without consequence or detection.

179.    Solana Labs and Jito Labs were equally aware of the consequences of this structure. Every Pump.fun token launch, transaction, and wallet interaction is processed and confirmed using validator software maintained by Jito Labs and Solana Labs. These entities could have implemented restrictions or safeguards—blacklisting bad actors, limiting access by region or age, or disabling illegal token metadata—but chose not to. Their validator infrastructure is optimized not for compliance, but for volume, throughput, and MEV profitability.

180.    In sum, the Defendants did not build a fair or transparent financial system. They built a high-frequency, high-throughput gambling machine, accessible to anyone with a wallet,

designed to monetize every possible transaction and extract maximum value from anonymity and chaos. The lack of identity controls was not an oversight—it was a feature of the casino.

G.    Meme coin Slot Machine: Exit Liquidity Gambling

181.    A core experience for many Pump.fun users is an illegal and unregistered form of gambling known as exit liquidity gambling. Functionally, the game of chance operates by purchasing the meme coin at a lower price, and as more user purchase the meme coin the price increases.  However, if holders of that same meme coin sell their token, the price can decrease.

182.    In nearly all cases, sudden and often random sell-offs initiate large decreases in the token price, triggering more sell-offs. The objective is to hold the meme coin and appreciate as much value as possible before the crash.

183.    Terming the meme coin experience as social networking or a communal experience pump.fun explains that users should invite their friends to participate with a chance to earn significant wealth. In reality, this is little more than a ponzi scheme dressed as social media. The new entrants buy at an increased price, presenting gains for the past purchasers. Since these meme coins do not generate revenue, sell products, offer services, or conduct any business their entire value is dependent on the past buyer, and decreases in value when sold.

IV. THE FALSE "FAIR LAUNCH" NARRATIVE AND WIRE FRAUD SCHEME

184.    At the core of the Pump.fun Casino Enterprise was a single unifying promise: that everyone had a fair shot at the game. The platform's defining marketing narrative centered on its "fair launch" model—an alleged innovation in meme coin tokenomics that guaranteed equality of opportunity, protection from insider manipulation, and a safeguard against rug pulls. This was not a secondary theme; it was the first message a user would encounter upon visiting the site and the most widely echoed phrase across Pump.fun's marketing channels.

185.    Pump.fun's homepage, interface design, and social media campaigns all emphasized "Fair Launch," reinforced by claims of "no presales," "no insider allocations," and

"rug-pull proof launches." These messages promised a transparent, level playing field—inviting users to believe that this digital casino, unlike those before it, was built to give everyone the same odds.

186.    The message was carefully timed and strategically deployed. In the months preceding Pump.fun's launch, retail participants in crypto markets had been repeatedly burned by fraudulent meme coin projects—tokens launched in Telegram groups or by anonymous developers who disappeared shortly after draining liquidity. These projects, often branded as "community tokens," became synonymous with financial harm. Pump.fun deliberately positioned itself as the solution, marketing its platform as a safe and transparent launchpad engineered to eliminate these risks.

187.    The promise of fairness was essential to attracting new players to the Pump.fun casino. Without it, the system would have looked like what it was: a high-speed meme coin slot machine designed to extract value through information asymmetry and transactional exploitation. Instead, the "fair launch" pitch gave the illusion of parity. It allowed users to believe they were participating in a democratized system where early engagement meant equal opportunity—not programmed losses.

188.    Despite marketing its interface as a fair launch environment, Pump.fun implemented no meaningful protections. There were no randomized entry windows, no anti-bot throttling, no guardrails for retail participation. The platform presented a single static screen to all users—while insiders used superior infrastructure to pull the handle first, every time.

189.    The deception was sustained and amplified through social media promotions, Discord threads, YouTube streams, and direct communications from Pump.fun's leadership. Developers and affiliated influencers repeatedly told the public that the system was fair, "anti-rug," and safe. These representations were material, specific, and knowingly false. They were designed to induce users to engage with the platform, to launch tokens, and to transact—thereby driving volume, validator fees, MEV capture, and launch charges for the Defendants.

101

190. These messages were transmitted via interstate wire communications, including public websites, smart contract interfaces, social media posts, Discord updates, and marketing videos—each of which constitutes a use of the wires for purposes of executing a fraudulent scheme under 18 U.S.C. § 1343. The fraud was continuous, systemic, and central to the business model of the Pump Enterprise.

191. In 2024, Pump.fun was banned by financial regulators in the United Kingdom, citing consumer deception, regulatory noncompliance, and the risks inherent in anonymous token issuance. Despite this international rebuke, the enterprise did not pause. Solana Labs and Jito Labs continued to support the platform, enabling all technical operations and continuing to process token launches without modification or restriction.

192. Rather than address the platform's misconduct, Defendants adopted a posture of open defiance. Executives and community leaders began to embrace the fraud narrative itself, adopting slogans like "Crime is Legal" and "It's Crime Season" on Twitter/X.[26] The false fair launch pitch evolved into a badge of cynicism, converting the original deception into a kind of insider joke—evidence not only of intent, but of deliberate normalization of wire fraud.

193. These facts establish a clear and continuous wire fraud scheme under 18 U.S.C. § 1343. Defendants knowingly devised and executed a plan to defraud users by misrepresenting the fairness and neutrality of their token launch system. They transmitted false statements through interstate communication channels with the intent and effect of securing money or property under false pretenses. The pattern was essential to the enterprise's success.

---

[26] https://x.com/SolJakey/status/1887969246807801893
https://x.com/tofushit888/status/1880452074972082417?s=46&t=88wYKdq6YFRbDy63IGfkFw

102

194. The conduct also constitutes conspiracy to commit wire fraud under 18 U.S.C. § 1349. Each Defendant played a necessary role: Pump.fun crafted the frontend illusion; Jito Labs enabled and monetized MEV exploitation; Solana Labs and the Solana Foundation processed, endorsed, and profited from the resulting volume. Each had both motive and capacity to intervene. None did.

195. Instead, the Defendants operated as a unified gambling enterprise, where fairness was a marketing tool, fraud was a feature, and the house always won.

## V. INTELLECTUAL PROPERTY THEFT AND PLATFORM-AIDED IMPERSONATION

### A. Impersonation of Registered Publicly Traded Companies and Privately Held Corporations

196. Pump.fun has enabled the creation and trading of hundreds of thousands of tokens that appropriate the names, branding, and messaging of publicly traded companies without authorization. These tokens often mirror the identity of real corporations—such as "Apple," "Tesla," "Meta," and others—and falsely imply affiliation, sponsorship, or endorsement by the underlying business entity. (*See* Ex. F).

197. Many of these tokens explicitly claim to be the "official" or "community" token of a given company. They adopt corporate brand elements including product imagery, slogans, logos, and ticker symbols, and are marketed on the Pump.fun interface in a manner designed to create the impression of legitimacy or corporate backing. Id.

198. Despite the clear and repeated misuse of trademarked names and proprietary assets, Pump.fun has taken no meaningful steps to prevent the creation or circulation of these counterfeit tokens. On the contrary, Pump.fun actively amplifies such misuse through its search and recommendation functions, which suggest similar tokens based on the entered brand name— further confirming the platform's capacity to detect and algorithmically process infringing content.

199.    Pump.fun's automated interface allows any wallet to launch tokens instantly, without any identity verification, review, or moderation.

200.    The scale and visibility of this activity are such that Solana Labs and Jito Labs, as critical infrastructure providers to Pump.fun, knew or should have known that the platform was systematically enabling intellectual property theft. Solana Labs developed the token programs and transaction execution environment that make these tokens tradable on-chain, while Jito Labs facilitated transaction bundling, validator execution, and order routing for the tokens at issue.

201.    Rather than restrict or intervene in the proliferation of these unauthorized brand tokens, Solana Labs and Jito Labs continued to support and profit from the technical infrastructure that allowed these tokens to launch, gain liquidity, and be traded. Their ongoing support enabled Pump.fun to operate at scale while routinely hosting tokens that misappropriate brand identity and confuse the public.

202.    Pump.fun has also enabled the launch and circulation of counterfeit tokens impersonating Pump.fun itself. Multiple "Pump.fun" or "Pump" tokens have been created and traded on the platform, falsely implying official affiliation with the platform's developers or representing themselves as the legitimate native token of the site. These imitation tokens use the Pump.fun name and branding, sometimes directly copying the platform's logo or promotional language.

203.    In the weeks and days preceding the launch of Pump.fun's own official token, the platform permitted the proliferation of pre-sale tokens and unofficial "Pump.fun" token variants. These tokens capitalized on the anticipation surrounding the official token drop, misled users into believing they were gaining early access, and extracted funds from buyers under false pretenses. Pump.fun's own infrastructure facilitated the marketing and sale of these tokens, while offering no warnings or disclaimers to distinguish genuine platform assets from fakes.

**B.  Misappropriation and Unlicensed Use of Brands**

204. In addition to enabling the creation of counterfeit tokens mimicking publicly traded companies, Pump.fun has systematically allowed users to launch tokens that infringe upon widely recognized intellectual property rights. These include tokens branded as the "official" Batman token, Superman token, Barbie token, and numerous others. These tokens exploit the social cachet and global brand recognition of iconic fictional characters and entertainment franchises, often using the associated names, images, or themes to imply endorsement or affiliation with the IP holder. (*See* Ex. D.) These tokens are frequently titled and marketed as if they were the legitimate digital extensions of copyrighted characters or product lines.

205. Pump.fun also facilitates the unauthorized creation and trading of tokens that misuse the names and reputations of major academic institutions. Tokens bearing names such as "Harvard," "Harvard Blockchain," "Stanford Blockchain," "NYU Philanthropy," and similar identifiers have been launched and promoted through the Pump.fun platform. (*See* Ex. E).These tokens falsely suggest endorsement, sponsorship, or official affiliation with the named universities, and have been sold to the public for speculative purposes.

206. In each of these cases, there is no indication that the token creators have any actual connection to the university, organization, or intellectual property they purport to represent. Nonetheless, these tokens are allowed to circulate freely on Pump.fun's platform, leveraging the prestige, trust, and identity of the real-world entities they impersonate in order to generate trading volume and platform fees.

**B. Unlicensed Use of Celebrity and Politician Meme coins**

207. In addition to corporate brand and institutional impersonation, Pump.fun has facilitated the large-scale misappropriation of celebrity names, likenesses, and persona-related intellectual property. The platform has hosted and promoted hundreds of thousands—if not millions—of tokens falsely associated with well-known public figures. These tokens are often explicitly branded as the "official" meme coin of a celebrity, despite having no endorsement, involvement, or consent from the individual in question. (*See* Ex. D; Ex. E).

105

208.    These counterfeit celebrity tokens frequently use the celebrity's full name, stage name, or recognizable nickname in the token title. Many also feature profile pictures, publicity images, logos, or thematic references drawn directly from the celebrity's brand, public identity, or known affiliations. In some cases, they include fabricated promotional language suggesting direct involvement—for example, "endorsed by," "backed by," or "launched in collaboration with" a specific celebrity.

209.    For example, the Defendants launched two tokens titled "JUDGE KAPLAN ($JUDGE)" and "Lewis A. Kaplan (JUDGE)" through the Pump.fun platform, each using Judge Kaplan's full name, and images of him. (See Ex. E at 2-3.) The associated promotional language included statements such as "we like the judge," "SBF bad," and "judges have big chin. SBF have small one," in an apparent attempt to draw attention to the tokens by referencing a sitting federal judge.

210.    These tokens were publicly listed, priced, and traded through Pump.fun's interface, accompanied by real-time charts and user commentary, and were marketed using Judge Kaplan's identity as a selling point reflecting a broader pattern of the Defendants using the names and likenesses of public figures to attract investor interest, generate trading activity, and profit from token sales.

211.    These impersonations span across categories of public figures, including musicians, athletes, actors, internet personalities, and political figures. The range is indiscriminate and vast—any name with cultural relevance, fan attention, or social media reach is a potential target for tokenization on the platform.

212.    In many cases, Pump.fun has allowed near-identical clones of actual celebrity tokens to proliferate across the site, often within days or even hours of the original launch, creating confusion among users and enabling bad actors to divert capital under false pretenses.

C. Pump.fun Launches, Sells, and Exchanges Counterfeit Digital Assets

213. Pump.fun has also enabled the creation and circulation of counterfeit versions of existing digital assets, including well-established cryptocurrencies and blockchain projects.

214. These fake tokens use the names and symbols of widely recognized crypto assets—such as "Ethereum," "Bitcoin," and "Solana"—in ways that create the clear impression of official affiliation. (*See* Ex. C).

215. Some of these tokens adopt tickers that closely resemble the originals (e.g., "ETH," "SOL," "BTC") and replicate the logos, branding colors, or technical language used in connection with the real asset. In some cases, the tokens claim to be the "next generation" or "official v2" of the authentic asset, further misleading users into believing they are participating in a legitimate crypto project. (*See* Ex. C at 13-18).

216. Beyond simply copying well-known tokens, Pump.fun has also enabled the launch of fraudulent tokens that falsely appear to be affiliated with official Solana-branded ventures. These include tokens purporting to represent "Solana Phone," "Solana Email," and other Solana ecosystem products or infrastructure. These tokens are launched with no relation to the actual Solana Foundation or its affiliates, yet trade freely and are marketed as though they are sanctioned or backed by the Solana network.

217. Retail users are unable to distinguish between genuine and spoofed assets on Pump.fun's pseudonymous and unregulated platform.

218. As with the other categories of impersonation, Pump.fun has taken no meaningful action to prevent, flag, or remove these tokens. Despite the ease with which the platform could detect naming conflicts with existing top-market crypto assets, it has allowed such tokens to proliferate, drawing volume and trading activity that directly generate platform fees.

D. Pump.fun Launched, Exchanged and Managed Meme Coins That Harass Law Firms, Lawyers, Plaintiffs, And Act To Intimidate Lawyers' Families

107

219. Following the initial filing of federal complaints against Pump.fun, a disturbing pattern emerged. Users began creating tokens that targeted not only the law firms involved in this litigation but also the individual attorneys and plaintiffs. (*See* Exs. E, G, H & I).

220. These tokens were created using full names, likenesses, and in some cases, photographs extracted from personal sources. The impersonations were not limited to name usage—they often included defamatory, threatening, or mocking content. (*See* Exs. G, H & I).

221. Specifically, tokens were launched by Pump.fun that included the images, names, and personal information of the plaintiffs. *Id*.

222. Additionally, tokens were launched impersonating the lead counsel in this case, Max Burwick, as well as members of his immediate family. These included his mother and his cognitively disabled sister, whose likeness and personal medical history were exploited for apparent ridicule and retaliation. (*See* Ex. I).

223. Users went so far as to upload images taken from a legitimate fundraising campaign created by the Burwick family, including photos of the sister's mobility aids and a family dog. Pump.fun users then minted tokens purporting to be fake fundraisers for the disabled family member, further compounding the harm. *Id*.

224. These actions were not isolated. Tokens impersonating Burwick Law and Wolf Popper continued to appear on Pump.fun into June 2025—months after public notice and legal action had been initiated. In January 2025, both law firms issued a joint press release regarding ongoing impersonation on Pump.fun and delivered cease-and-desist letters to the platform. Nonetheless, Pump.fun continued to allow the infringing tokens to be listed, traded, and monetized. (*See* Ex. H).

225. Pump.fun's refusal to remove infringing content—despite repeated notices and ongoing misuse of real-world names, identities, and protected marks—constitutes willful blindness, if not active facilitation. Rather than take any meaningful corrective action, Pump.fun

108

chose to leave infringing tokens active on the platform, continuing to collect trading fees on every transaction involving impersonated assets.

226. In response to cease-and-desist communications issued in January 2025 by Burwick Law and Wolf Popper, Pump.fun took limited and selective action. Among other things, Pump.fun removed certain visual metadata associated with impersonating tokens, including the token images that had been copied from personal family materials.

227. In doing so, Pump.fun demonstrated its technical ability to modify, suppress, or disable token content after deployment—refuting any claim that the platform was incapable of moderating abusive or infringing material. Despite this acknowledgment of control and capability, Pump.fun continued to allow the creation and promotion of new tokens impersonating Burwick Law, Max Burwick, and members of his family well into mid-2025. (*See* Ex. I).

228. These facts establish not only that Pump.fun had the means to prevent ongoing harm, but that it willfully chose not to act—continuing instead to monetize these abuses through trading fees, token listings, and engagement metrics.

**E. Pump.fun's Trademark Policy and Knowing Facilitation of Infringement**

229. Pump.fun is aware that trademark infringement is a recurring and systemic issue on its platform. In response to this ongoing problem, Pump.fun has published a trademark policy that provides general guidance to users regarding the avoidance of trademark misuse, outlines a basic takedown procedure for rights holders, and states that users who repeatedly engage in trademark violations may have their access to the platform revoked.

230. Notwithstanding the existence of this policy, Pump.fun openly acknowledges—both directly and through its operational structure—that it has no practical ability to prevent the ongoing distribution and trading of infringing tokens once they are deployed. When confronted with evidence of infringement, Pump.fun, along with infrastructure providers Solana Labs and Jito Labs, uniformly disclaims any capacity to halt the trading or visibility of such tokens, citing the immutability of the blockchain and the decentralized nature of smart contracts.

109

231. This disclaimer renders the trademark policy effectively meaningless. Pump.fun has full knowledge that once a token is launched using its interface, that token cannot be recalled, deactivated, or materially suppressed without coordinated technical intervention. By maintaining a policy that purports to deter infringement while simultaneously disclaiming the ability to meaningfully enforce it, Pump.fun misleads users and rights holders into believing that remedies are available when they are not.

232. Simple search filters, image similarity scans, or name-blocking protocols—tools that could be built by a single developer in a matter of hours or days—would be sufficient to eliminate the majority of known brand impersonations. Despite this, Pump.fun has never implemented such tools.

233. Yet despite their visibility and ability to act, none of the Defendants have taken meaningful steps to prevent or mitigate the launch and propagation of infringing tokens. The Defendants' inaction reflects a conscious choice: addressing trademark abuse would reduce platform volume, speculative activity, and ultimately, fee revenue. The economic interests of Pump.fun, Solana Labs, and Jito Labs are aligned in maintaining the current structure, even if it enables ongoing and systemic intellectual property violations.

## VI. PUMP.FUN, JITO LABS, AND SOLANA LABS OPERATE AN UNLICENSED MONEY TRANSMISSION BUSINESS

### A. Use of Pump.fun to Launder Sanctioned Funds by the Lazarus Group

234. In or around February 2025, the Lazarus Group—a cybercrime unit operating on behalf of the Democratic People's Republic of Korea and subject to U.S. sanctions—used the Pump.fun platform to launder proceeds from what remains the largest known cryptocurrency theft in history: the theft of approximately $1.5 billion in digital assets from the Bybit exchange.

235. Following the Bybit hack, Lazarus operatives bridged approximately $1.08 million in USDC from Ethereum to the Solana blockchain. They deposited approximately 60 SOL into a

110

newly created Solana wallet and used Pump.fun's automated token creation tools to deploy a new meme coin named "QinShihuang."

236. Using the Pump.fun interface, which requires no identity verification and imposes no restrictions on token creation, Lazarus was able to issue approximately 500,000 QinShihuang tokens and immediately inject liquidity. The platform's integration with Solana Labs' SPL token program and smart contract infrastructure enabled rapid minting and automated pricing using bonding curve mechanics.

237. To facilitate laundering, Lazarus injected tainted funds into the token's trading pool, stimulating organic interest from Pump.fun users. Over the course of several hours, the token reached a reported $26 million in total trading volume. This activity created a high-velocity market that effectively obscured the source of funds by blending illicit capital with that of retail traders.

238. Once the liquidity pool was active and substantial, Lazarus operatives sold their token holdings back into the market, exchanging them for SOL and dispersing the proceeds across a network of pseudonymous wallets. This series of transactions was executed through the Solana blockchain using validator infrastructure maintained by Solana Labs and Jito Labs.

239. Jito Labs' validator software—used by more than 80% of Solana validators—enabled insider wallets to prioritize transaction execution through the use of MEV (Maximal Extractable Value) bundling and tipping. The ability to insert high-priority transactions allowed the Lazarus-linked wallets to optimize their exit from the token while avoiding detection and slippage, maximizing the yield of the laundering scheme.

240. The scheme was uncovered on or about February 23, 2025, when on-chain analyst "ZachXBT" publicly identified suspicious wallet activity related to the Bybit hack. These findings were corroborated by blockchain investigators including "Atlas," as well as by forensic analytics firms such as Merkle Science and Arkham Intelligence. These parties confirmed that the Pump.fun token had been deployed by actors tied to Lazarus and used as a laundering vehicle.

241. Upon public disclosure, Pump.fun removed the QinShihuang token from its front-end platform. However, the proceeds had already been removed, dispersed, and rendered difficult to trace due to the high-frequency, pseudonymous transaction volume enabled by the platform.

242. Solana Labs provided the blockchain infrastructure necessary for this operation to occur, including the" validator client software, smart contract standards, and system programs that facilitated the execution of token issuance, price escalation, and transaction routing. Jito Labs enabled the bundling and prioritization of high-value transactions through its MEV-enabled validator infrastructure, which was instrumental in the efficient extraction of funds from the scheme.

243. The success of the laundering operation was made possible by the complete absence of identity verification, financial controls, or compliance infrastructure on Pump.fun; and it was materially facilitated by the technical tools and infrastructure provided by Solana Labs and Jito Labs, both of which had the capacity to intervene or restrict such activity and declined to do so.

**B.    Unlicensed Operation of Money-Transmitting Business**

244. At all relevant times, Pump.fun has offered a platform for receiving digital value (SOL) from users, converting it into newly minted tokens, and transmitting those tokens back to users or third-party wallets. Despite engaging in these money-transmitting activities on a global scale, Pump.fun has never applied for, held, or maintained a license from FinCEN or any state regulator authorizing it to operate as a money transmitter, nor has it instituted any KYC/AML or other regulatory compliance measures.

245. Solana Labs, Inc., the Delaware corporation that develops and deploys the Solana blockchain software, has similarly never applied for or held any money transmitter license from FinCEN or any state. Solana Labs has continuously maintained, promoted, and operated the validator software, token programs, and system infrastructure that enable Pump.fun's receipt,

conversion, and transmission of digital assets—but has done so without any registration or licensing as a money transmitter under federal or state law.

246. The Solana Foundation, a Swiss-based organization that plays an influential role in the development and governance of the Solana network alongside Solana Labs, likewise has no record of obtaining a U.S. money transmitter license. The Foundation's ongoing involvement in protocol governance and promotion of token issuance facilitated, but was not accompanied by, any licensing or regulatory compliance.

247. Jito Labs, Inc., which operates high-priority transaction bundling and MEV-enhanced validator infrastructure on the Solana network, also lacks any money transmitter license from FinCEN or any state authority. Jito Labs benefits financially—via bundler fees or tips—from transactions that involve money transmission through Pump.fun. Nevertheless, Jito Labs has never applied for or obtained any MSB registration or transmitter licensing to facilitate these value transfers.

248. None of Pump.fun, Solana Labs, the Solana Foundation, or Jito Labs have publicly represented that they are registered as money transmitters, nor have they disclosed any regulatory filings or compliance frameworks associated with such registration. Their public-facing web properties, documentation, and corporate disclosures are silent on any licensing or oversight.

249. Given that each of these entities plays a key role in a system for receiving convertible digital currency (SOL), converting it into other tokens, and transmitting those tokens to end users or third parties, the absence of any formal licensing or regulatory compliance is a material fact with respect to the unlicensed operation of a money-transmitting business.

## VII. OPERATION OF AN ILLEGAL GAMBLING ENTERPRISE

250. Pump.fun operates as an illegal gambling enterprise under both federal and New York law. The platform's design, economic mechanics, and reward structure closely mirror the core elements of a gambling operation: users stake value with the hope of winning outsized

returns based on chance outcomes, absent any underlying skill, utility, or discernible economic purpose. (*See* Ex. B).

251. The platform allows users to stake Solana's native cryptocurrency, SOL, in exchange for newly launched meme coins.

252. The SOL is held in custody by pump.fun, and the transactions are processed using both the Solana Blockchain and Jito Labs software.

253. These tokens are not issued pursuant to any disclosure-based registration, whitepaper, roadmap, or fundamental project value. Instead, they are launched anonymously, valued purely on speculation, and succeed or fail based entirely on whether they achieve virality on social media or briefly trend on the Pump.fun homepage.

254. For the overwhelming majority of users, the experience is functionally indistinguishable from slot-machine gambling. Users "buy in" by sending SOL into a bonding curve, with the hopes that others will join shortly afterward—driving the price upward and enabling early buyers to sell for a gain.

255. Tokens are not selected based on merit, and success is dictated by external market hype, memes, or randomness. Most tokens lose value within hours, and many go to zero before a user can exit.

256. The platform's economic incentives amplify this dynamic. Pump.fun provides financial rewards—denominated in SOL—to token creators who achieve short-term speculative milestones. For example, users who launch tokens that hit certain market capitalization thresholds receive direct bounties, often in the range of 0.5 SOL or more.

257. These creator incentives are not based on substance or project longevity but are awarded solely for inciting rapid, high-volume speculative behavior. This bounty system creates a feedback loop, where token launches are engineered to generate explosive, short-term hype in order to qualify for rewards. (*See* Ex. B).

114

258. Public statements by Pump.fun's founders and prominent Solana ecosystem executives have further normalized and embraced the platform's gambling nature. The term "Meme Coin Casino" is routinely used by both insiders and participants to describe the site, and memes such as "Crime is legal" and "It's crime season" are associated with the broader Pump.fun community.

259. Solana ecosystem leaders, including validators and core developers, have publicly praised the site's engagement metrics while knowingly ignoring the fact that the platform invites and rewards unregulated financial wagering.

260. The platform also permits minors to engage in this activity. There are no age verification mechanisms of any kind. Users as young as 13 have launched tokens, participated in trading, and accessed creator tools. In one documented case, a minor launched a token, extracted SOL profits, and boasted about the activity on social media. No action was taken to block this behavior or to retroactively remove the token, even after the minor's age became publicly known. (*See* Ex. D at 9).

261. Users are induced into wagering digital assets based on the illusion of access, fairness, and financial opportunity. In reality, the overwhelming majority of participants lose their funds within minutes or hours, and only a handful of early entrants or insiders profit. The platform's reliance on random hype cycles, misleading branding, and attention-based incentives strips users of any genuine investment opportunity and instead funnels their funds into a digital shell game operated for the benefit of its creators and infrastructure partners.

262. Pump.fun's operation of this illegal gambling business is not incidental to its core functionality—it is its core functionality. The business model is premised on speculative wagering and the monetization of rapid trading volume. All of it occurs in violation of federal and state gambling statutes and without any of the compliance obligations that would otherwise attach to a licensed gaming or trading platform.

115

## VIII. THE ROLES OF SOLANA LABS AND JITO LABS IN THE RICO ENTERPRISE

263.    Solana Labs and Jito Labs were not passive infrastructure providers to Pump.fun—they were integral participants in the racketeering enterprise described in this Complaint. Through technical development, infrastructure management, profit-sharing arrangements, and public promotion, these entities enabled, facilitated, and benefited from Pump.fun's systemic fraud, unlicensed financial operations, gambling violations, intellectual property theft, and wire fraud. Their conduct constitutes direct participation in a racketeering enterprise, as well as contributory liability for the predicate acts committed through the platform.

### A. Solana Labs and the Solana Foundation:

### I. Organizational Structure and Purpose

264.    Defendant Solana Labs, Inc. ("Solana Labs") is a Delaware corporation and the primary engineering and software development entity responsible for designing, maintaining, and upgrading the Solana blockchain protocol.

265.    Solana Labs was co-founded by Anatoly Yakovenko, who serves as its Chief Executive Officer, and Raj Gokal, who serves as its Chief Operating Officer. Yakovenko is the lead architect of Solana's core design features, including its consensus mechanism, validator software, account model, and token infrastructure.

266.    Solana Labs developed and currently maintains the Solana validator client, the Solana Program Library ("SPL"), the system and token programs used in every Solana transaction, and the smart contract architecture upon which all token creation and trading is executed on the network.

267.    Defendant The Solana Foundation (the "Foundation") is a Swiss nonprofit organization based in Zug, Switzerland, formed to promote decentralization, validator expansion, and developer engagement on the Solana blockchain.

116

268. ~~The Solana Foundation claims to operate independently from Solana Labs. However, in practice, the Foundation and Solana Labs operate in tight coordination. Solana Labs builds and maintains the network infrastructure, while the Solana Foundation allocates funds, distributes SOL tokens, and manages grant-based ecosystem development.~~

269. ~~The Foundation is led by Dan Albert, who serves as Executive Director and has appeared in public events and press releases representing the Foundation's operations in the United States.~~

270. ~~Together, Solana Labs and the Solana Foundation control and manage the Solana blockchain, including the design of its core architecture, the development of its token programs, and the distribution and monetization of its native token, SOL.~~

### ~~II. Solana's SPL Token Standard~~

271. ~~Solana Labs authored and maintains the SPL Token Program, which serves as the foundational infrastructure for all fungible and non-fungible tokens on the Solana blockchain.~~

272. ~~They also enabled Pump.fun to implement a "one-click" token factory that allowed any user to launch a token with automated bonding curve pricing and integrated fee extraction. Pump.fun's core functionality relies on the SPL token program to generate tokens that trade in the Pump.fun bonding curve.~~

### ~~III. Interdependence Between Solana Labs, Jito Labs, and Pump.fun~~

273. ~~Solana Labs is a known early investor in Jito Labs. Its CEO, Anatoly Yakovenko, personally backed the company and has publicly promoted its infrastructure as essential to Solana's validator ecosystem.[27]~~

274. ~~Jito Labs' flagship product, the Jito-Solana validator client, is,~~ a modified version of Solana ~~Labs'~~ Labs' core validator software. ~~It would not function without Solana Labs' base code, runtime environment, and transaction architecture~~ This is the software run by the computers that validate transactions.

---

[27] ~~https://www.jito.wtf/blog/announcing-our-10m-raise/~~

117

275. Pump.fun tokens are created using Solana Labs' SPL token program and are executed through Solana's transaction pipeline. Every transaction on Pump.fun invokes Solana Labs' System Program, Token Program, and associated loader programs.

276. Solana Labs' CEO has publicly supported and engaged with Pump.fun activity. Yakovenko has tweeted in response to Pump.fun memes, commented on specific token launches, and shared promotional content related to the platform.

277. Solana Labs also built the network-level enhancements—Sealevel parallelism, Gulf Stream transaction forwarding, and QUIC-based networking—that made low-latency, high-throughput meme coin speculation on Pump.fun feasible.

278. Together, Solana Labs, Jito Labs, and Pump.fun operate as a coordinated ecosystem in which Solana Labs supplies the infrastructure, Jito Labs controls transaction priority, and Pump.fun monetizes speculative token issuance.

279. Each entity depends on the others for technical feasibility, economic scalability, and financial success. Their interdependence is not incidental—it is deliberate, designed, and profitable.

a. B. Defendant Jito Labs, Inc.

I. **The Role of Jito Labs in the Pump Enterprise: Formation, Control, and Alignment with Solana Labs**

280. Defendant Jito Labs, Inc. ("Jito Labs") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the United States. Jito Labs is a software development firm that designs and operates transaction execution infrastructure for the Solana blockchain.

281. Jito Labs was founded in or around 2021 by Lucas Bruder and Zanyar Sherwani. From its inception, Jito Labs was funded by entities and individuals closely associated with Solana Labs, including Solana Ventures and Anatoly Yakovenko, the co-founder and CEO of Solana Labs.

118

282.    Jito Labs raised approximately $10 million in early venture capital to develop MEV ("Maximal Extractable Value") infrastructure for the Solana ecosystem. The company publicly stated that its objective was to "democratize MEV," but in practice it built software systems that enabled insiders, validators, and automated bots to manipulate transaction sequencing in exchange for monetary compensation.

283.    Jito Labs operates exclusively within the Solana ecosystem. Its validator software runs only on Solana's blockchain. Its MEV products are engineered to work with the Solana transaction pipeline. Its revenue model is entirely dependent on the volume of transactions occurring on the Solana network, including those initiated through Pump.fun.

284.    Throughout the relevant period, Jito Labs maintained a close financial and strategic relationship with Solana Labs. Solana Labs contributed code, funding, and ecosystem support to Jito's operations. Jito Labs' technology stack is a derivative of the validator software authored and maintained by Solana Labs. The companies' founders and core engineers maintained direct lines of communication, and coordinated on the technical development of the Solana network.

### II.  Jito Labs' Infrastructure and MEV Execution Engine

285.251.    Jito Labs is the developer and maintainer of the "Jito-Solana" validator client—a modified version of the Solana Labs core validator software. Jito-Solana introduces custom functionality that enables Solanaallows validators to reorder transactions, process private transaction bundlestransactions in groups, and receive additional fees known as "called "tips"" in exchange for transaction priority.

286.252.    Jito-Solana incorporates Jito's system has three core components: (i). First, a bundling system that allows up to five transactions to be executed automatically; (ii)packaged together and executed atomically, meaning either all execute or none do. Second, a tip mechanism that allows the submitter of a transaction bundle to include a

119

monetary incentivepayment to the block producer; and (iii)validator who processes it. Third, an off-chain "Block Engine" auction platform" that simulates incoming transaction bundles and forwards the most profitable bundle to the validator node for execution.

253.    Jito's bundling system operated on top of Solana's foundational infrastructure. Without Solana's network speed, priority fee system, and the March 2024 congestion updates that enabled memecoin trading at scale, Jito's bundling would have had nothing to optimize. Without Jito's bundling, the speed and priority infrastructure Solana built would not have translated into guaranteed execution advantage. Together, they created a two-tier execution environment: sophisticated users with access to bundling could guarantee transaction ordering; retail users submitting through Pump.fun's standard interface could not. The former controlled outcomes and the latter absorbed losses.

254.    By December 2024, over 93 percent of Solana validators were running Jito's software. This near-universal adoption meant the two-tier execution environment was not a niche advantage—it was the default state of the Solana network. Retail users were systematically disadvantaged on virtually every transaction they submitted. Validators running Jito reported staking yields 15 to 30 percent higher than baseline validators. At certain periods, earnings from Jito's tip system exceeded Solana's own validator rewards. Both Solana and Jito were materially enriched by the execution environment they built and maintained.

255.    Maximal Extractable Value, or MEV, is profit extracted by reordering transactions within a block. On Pump.fun, MEV was the mechanism through which supply control operated. Insiders used Jito's bundling to guarantee their buy transactions executed first, capturing supply at the lowest prices. Solana's speed made millisecond-level reordering

decisive. Jito's bundling made it reliable. Together, they eliminated chance from outcomes and gave insiders control.

256.     In 2023, total tips paid through Jito's system amounted to approximately $3.5 million.

In 2024, that figure exceeded $674 million, a 200-fold increase driven by Pump.fun activity.

## II.    THE NOSTALGIA CAMPAIGN AND COPE TOKEN CASE STUDY

257.     The following allegations derive from publicly verifiable evidence and information provided by CW-2.

### A.  The Operations Structure in Action

#### 1.  Leadership Identified COPE as a Profit Opportunity and Authorized the Campaign

258.     A developer on Solana had been publicly promoting a small, languishing memecoin called COPE on social media daily for approximately 17 months. Despite the developer's persistent promotion, the price of the coin remained stable and low.

259.     Enterprise leadership identified COPE as an ideal candidate for the Enterprise's scheme because it could be presented to the public as a triumphant success story for long-suffering memecoin investors.

260.     The name "COPE" was part of the appeal. In internet vernacular, "cope" refers to the comforting lies people tell themselves to manage their own disappointment. The developer's relentless belief in his failing coin embodied the idea of cope. The token was never going to succeed absent a miracle.

261.     The Pump.fun community would be that miracle. According to the narrative the Enterprise would go on to construct, the digital world would organically come together to

121

reward the tireless developer who had never made a dime after years of effort. Everyone would get rich along the way.

262.    The COPE campaign is a case study in how the Enterprise creates and capitalizes on

the three structural conditions for rigging the game.

### 2.   The Developer Was Directed to Curate a False History Before Promotion Began

263.    Complicating what would be the Enterprise's narrative was the fact that the COPE developer had been dishonest in how he told his story. The developer had in fact launched multiple iterations of the COPE token over the years. Whenever enough people had purchased the coin, he sold his shares and relaunched the token soon after under a new token address.

264.    The Enterprise approached the developer and directed him to delete all previous iterations of the token contract to allow them to create the false appearance that COPE had been a single and continuously unsuccessful project.

265.    The developer complied, erasing posts which showed that COPE had been successively relaunched.

### 3.   Operations Command Translated the Directive into Wallet Assignments and Coordinated Pre-Positioning

266.    The COPE token was one component of a larger operation. Leadership launched what it called a "streaming and creator capital markets" narrative, framing Pump.fun as a legitimate platform for content creators to monetize their audiences. This narrative served two functions: it provided cover for coordinated promotion and it primed the market to buy into tokens associated with creators.

122

267. Operations Command sent directives downstream to prime the Enterprise for the pump. This included instructions on how and when to promote the token; assignments for which KOLs would be responsible for promotion; distribution of the contract address to insiders so they could acquire COPE at low cost; and direction on when participants would be permitted to sell.

268. As campaign directives propagated from Leadership downward, so did buy orders. Each tier acquired COPE before the tier below received the contract address needed to transact.

269. According to CW-2, standard practice in the Enterprise is that whoever launches a token shares it with their inner circle first. It then propagates outward through private Telegram groups before any public awareness forms.

270. Another confidential witness ("CW-3"), a prominent Key Opinion Leader operating primarily outside the Pump.fun ecosystem but with direct contacts within it, provided information corroborating the Enterprise's insider pre-positioning practices.

271. CW-3 reported that a KOL with over 50,000 followers on X, known for hosting large X Spaces discussions and maintaining longstanding personal relationships with the Pump.fun team, confirmed that Pump.fun itself acquires early positions in tokens launched on its platform and sells those positions into retail demand.

272. This pre-positioning established supply control.

### B.  The Rigged Game in Action

#### 1.  Supply Control: Insiders Bundled COPE Before Any Public Promotional Activity

273. Social media evidence shows no mentions of COPE on Twitter or Telegram during the approximately seventeen-month period prior to the coordinated pump beyond posts from the developer himself.

274. By mid-August 2025, insiders had accumulated their positions. Enterprise participants used multiple wallets to accumulate supply while disguising concentrated holdings as organic distribution. By the time promotion began, insiders controlled the supply at the lowest prices. Retail buyers would purchase at prices already marked for loss.

### 2. Demand Manufacturing: Coordinated Promotion Created the Appearance of Organic Discovery

#### a) Seeding the Narrative

#### (Mid-August 2025)

275. The next phase was demand manufacturing.

276. Cohen seeded this narrative in the month preceding COPE's peak trading price. He posted repeatedly that "dead" or dormant Pump.fun tokens with no trading volume should be bought because they were about to surge. These posts were not predictions but announcements. Leadership had already selected which tokens would be promoted, and Cohen was indicated to his audience to buy when the signal came.

277. Solana's leadership participated in this priming. Yakovenko publicly promoted the upcoming streaming campaign on Pump.fun of which COPE was apart, lending the credibility of the Solana network to what was, in substance, a coordinated pump.

278. On August 19, 2025, Solana CEO Anatoly Yakovenko publicly endorsed Pump.fun as a legitimate enterprise with mainstream livestreaming potential, posting "pump dot fun has a shot at building a global streaming platform" to 239,200 views. This endorsement of the Pump.fun platform by the CEO of Solana Labs was reposted by Defendant Cohen.

124

SolJakey, a Lead KOL in the Enterprise, immediately responded inviting Yakovenko to the "BASEDD house," a content creator house funded by Pump.fun. Yakovenko expressed interest in visiting this nascent content house in the future.



*Figure 24: X Post from Defendant Yakovenko on August 19, 2025.*

279.    On August 18, 2025, Cohen posted a public signal to the market: "bottom on my memes or I chop it off" to 339,300 views. In market parlance, Cohen was signaling that tokens he backed had bottomed in price and were about to rise.



*Figure 25: X post from Defendant Cohen on August 18, 2025.*

280.    On August 22, 2025, as COPE and other "nostalgia" tokens surged in price, Cohen reposted this tweet with the caption "did you fade my fucking call you fucking bitch." Cohen publicly characterized his earlier post as a market "call," gloating that those who ignored the post missed the coordinated price surge while encouraging followers to trust his signals in the future.



*Figure 26: X post from Defendant Cohen on August 22, 2025.*

281.    SolJakey replied to Defendant Cohen's post: "Drop the tg invite lil bro." This was a public acknowledgment that the real information driving these price movements flowed through private Telegram channels where Cohen decided who was in and who was out.



*Figure 27: X post from SOLJakey (a Lead KOL) on August 22, 2025.*

282.     On August 25, 2025, Cohen signaled that he was accumulating positions in anticipation of promotional activity, tweeting "the lion doubles down on his bags at a discount" to 331,700 views.



*Figure 28: X Post from Defendant Cohen on August 25, 2025.*

283.     On August 27, 2025, Cohen issued a statement designed to prime the market with greater specificity. He posted: "it's wild to me how people can doubt the longevity of the onchain trenches after previously being called 'dead' so many times. this cycle's biggest innovation succeeded for a reason. however, I believe that things have to radically change for the ecosystem to 100x. let me cook."



*Figure 29: X post from Defendant Cohen on August 27, 2025.*

284.    Cohen was telling the market: be on the lookout for long-suffering "dead" coins stuck in the "trenches." Something soon would change to bring these back to life at prices 100 times their current value.

285.    With the market primed, the Enterprise was now ready to execute on COPE.

**b)    The Coordinated Pump and Dump (Late August 2025)**

286.    On August 27, 2025, the Enterprise launched the formal promotional for COPE and the token's price responded immediately.

287.    For example, at approximately 7:39 PM, Orange, a Pump.fun KOL, posted: "Haven't been excited about a coin in a long time. This is a real success story, showing that the grind pays off. A dev who kept pushing for 17 months while his coin didn't even migrate. One of the most beautiful things I've seen in the trenches. Don't $cope later." The post received 25,900 views.

128



*Figure 30: X post by @OrangeSBS, a Pump.fun affiliate, on August 27, 2025.*

288.　　The Enterprise's COPE story was now public. Chart data shows COPE began its dramatic price increase within minutes of this post and those like it.



*Figure 31: Publicly available chart of $COPE price showing that within minutes of the post by @OrangeSBS the price of $COPE more than doubled.*

289.    Within 24 hours, COPE's market capitalization surged approximately 489 percent, reaching around $17 million.

290.    By the end of August, the token had lost almost all of its value.



*Figure 32: Price chart of $COPE coin showing price before and after the Enterprise's campaign.*

291.    According to CW-2, the Enterprise's standard pattern is to let the community hold supply, pump the price up, then exit quickly, producing a fast spike followed by a sustained bleed down.

292.    Mitch, a Lead KOL and Operations Command member of the Enterprise, publicly sold his COPE position early in the price cycle. According to CW-2, the narrative of Mitch "selling early" and "coping" about it was itself part of the manufactured story.

293.    Mitch posted lamenting his early exit, telling others not to make a similar mistake. This served a dual purpose: publicly downplaying his sophistication while inducing others to hold longer, knowing that the longer someone stayed, the more certain it was that the Enterprise would take their money.



*Figure 33: A post circulated by "pumpfunnews" and "pumpdotfun_" circulating the narrative that Mitch sold early and missed out on massive financial gains.*

131

294.     Post-mortem reporting attributed COPE's rise to organic social media enthusiasm, exactly as the Enterprise had intended. Bitget News characterized the rally as "retail-driven crypto volatility" driven by "social media hype" and "community-driven narratives."[28]

295.     On August 21, 2025, AB, another Pump.fun KOL who, according to CW-2 was responsible for overseeing art and branding for these coins, posted "me and the gang after rugging the entire chain," a public joke about the fraud that was about to be perpetrated with COPE and other so-called 'Nostalgia' coins.



_____

[28] Bitget News, "The Explosive Surge of Meme Coin COPE: A Case Study in Retail-Driven Crypto Volatility," https://www.bitget.com/news/detail/12560604939531 (last visited January 7, 2025).

*Figure 34: User @torqqqsol, aka AB, X post on August 21, 2025.*

### c) Post-Peak Promotion and Narrative Reinforcement (September 2025 - Present)

296.    For the Pump.fun Enterprise, this was a massive success. Insiders made millions selling to the public after the promotional push and could now tout the story of an overnight millionaire, something any Pump.fun customer could become.

297.    Enterprise-affiliated content creators conducted staged interviews with the COPE developer to propagate the fabricated '17 months of struggle' story as authentic.

298.    On September 4, 2025, Barton posted a video interview with the COPE developer captioned: "17-month grind for a memecoin that is pre-bonded is next level dedication. Jakey talks to $Cope dev about his grind and motivation behind the project for the last year and a half." The post received 21,300 views. The @BartonPumpClips account is paid by Pump.fun to post promotional videos.

133



*Figure 35: Post by user @BartonPumpClips, an account paid by Pump.fun to post promotional videos on September 4, 2025.*

299.    The COPE official account repeated the fabricated narrative and credited Pump.fun and Cohen for the manufactured success.

300.    On September 4, 2025, the COPE official account replied to the interview video: "it's been a journey full of cope and resilience of trenching 17 months with just a dream."



*Figure 36: Interaction between @CopeCoping (the $COPE developer) and @BartonPumpClips (a Pump.fun promoter) on September 4, 2025.*

301.    On September 13, 2025, the COPE official account posted: "Just wanted to give a big congratulations to @a1lon9 for the journey. Thank you sir you have changed the game and everyone is witnessing it in real time @pumpdotfun can't be stopped. Big streamers to little streamers have a big chance to become successful quick with the creator rewards program. Even tho I grind for 17 months straight I made it and it's possible with pumpfun. It's only getting started. Cope Harder."



*Figure 37: Post by @CopeCoping (the $COPE developer) on September 13, 2025.*

302.    With the Enterprise's operation successful, they turned their sights forward and began priming the pump once more. On September 29, 2025, Cohen issued yet another public signal priming the market for renewed activity on dormant tokens. Cohen posted to 440,700 views: "the pump fun trenches are clearly PRIMED for a runner. time to pay attention for good fresh narratives and communities that never stopped grinding."

303.     The COPE official account reposted this message, signaling continued coordination between Leadership and token promoters as they prepared for the next campaign.



*Figure 38: Post by Defendant Cohen on September 29, 2025.*

## C.  The COPE Campaign Demonstrates the Enterprise's Core Fraud

304.     The COPE campaign was never just about extracting profits from a single token. It was about manufacturing a success story that would drive platform volume and induce subsequent retail participants to chase the illusory promise of significant wealth.

305.     The Enterprise required success stories. For Pump.fun and Solana transaction volume entirely depends on retail participants believing wealth creation is possible. COPE would be proof.

306.     The COPE campaign executed every phase of the Enterprise's operational playbook as described in Section II.C: target selection based on exploitable narrative, supply control through silent accumulation, coordinated promotional deployment, leadership signals that served dual audiences, and coordinated asset sales that left retail holding worthless tokens.

307.     The COPE campaign is the model Every element demonstrates how the Enterprise

creates the three conditions that rigged the game: how supply control is established through silent accumulation, how demand is manufactured through coordinated promotion, and how managed exits take profits from retail participants who arrive after insiders are positioned. Retail participants were the exit liquidity from the moment they sat down at the table.

## III. THE PREDICTABLE RESULT: PLAINTIFFS WERE INJURED TO THE TUNE OF BILLIONS

287. From Validators running Jito's software are able to process "Jito bundles" submitted by third parties. Each bundle may include multiple transactions from multiple wallets, all executed in the same block. These bundles are prioritized based on the amount of SOL included as a "tip" to the validator.

288. These features allow sophisticated users to pay for front-of-line access to Solana blockspace, enabling them to front-run retail users and extract value from public transactions. The result is a fee-for-priority model of block production in which access to early trades is auctioned off to the highest bidder.

### III. Integration with and Enablement of Pump.fun

289. Jito Labs' validator infrastructure was essential to the operation of Pump.fun. Pump.fun integrated Jito's bundling and tip system as a core component of its meme coin launch platform.

290. Pump.fun allows any user to create a token on Solana using a simplified web interface. Upon creation of the token, the Pump.fun platform automatically launches a bonding curve pricing mechanism, in which the token price increases as more tokens are purchased. Early buyers receive the token at the lowest price, and prices escalate rapidly within seconds of launch.

291. To guarantee early access to the bonding curve, token creators are instructed—via official documentation, third-party tutorials, and developer guides—to construct Jito bundles that include preloaded transactions from insider wallets. These bundles are submitted at the exact

138

moment of token creation, and are accompanied by a Jito tip—described in developer guides as a "bribe"—to ensure validator inclusion.

292.    Jito's infrastructure guarantees that these insider transactions are included in the block before any public purchases. As a result, token creators and affiliated wallets obtain a disproportionate share of the token supply at the minimum price, before other users are even able to interact with the token.

293.    Pump.fun's economic model depends on this mechanism. The ability to front-run public participants and capture the bonding curve spread is the central profit engine for token creators, and is only available through the use of Jito's validator software.

294.    Jito Labs had actual knowledge of this integration. Pump.fun tokens constituted a dominant share of all Jito bundle activity on the network. Public documentation and API endpoints made explicit reference to the use of Jito bundling for Pump.fun tokens. Jito Labs took no steps to restrict or moderate this usage.

**IV. Revenues and Profits from Pump.fun-Related Activity**

295.    Jito Labs earned substantial revenues from the use of its infrastructure to facilitate Pump.fun token launches. These revenues were derived from validator tips attached to transaction bundles submitted through the Jito-Solana client and prioritized by the Jito Block Engine.

296.    In July 2024 alone, validators running the Jito-Solana client earned over $36 million in MEV tips, including $3.2 million in a single day. These fees were paid primarily by users attempting to gain early access to Pump.fun token launches.

297.    By mid-2025, Pump.fun tokens accounted for more than 90% of transaction volume on the Solana blockchain. Because Jito's validator client was in use on over 80% of network stake, the overwhelming majority of its fee revenue during this period was derived from Pump.fun token activity.

298.    Jito Labs became one of the most profitable entities in the Solana ecosystem, with earnings rivaling decentralized exchanges. These earnings came directly from MEV tips paid by insiders and token creators launching and front-running Pump.fun tokens.

299.    At no point did Jito Labs implement safeguards, moderation tools, or access controls to prevent the use of its software for these purposes. Jito Labs knowingly enabled and monetized the use of its infrastructure to execute front-running trades on a platform that issued unregistered, anonymous, and valueless tokens in violation of federal securities laws.

### V. Co-Dependence on Solana Labs and Participation in the Enterprise

300.    Jito Labs' software products are entirely dependent on the base infrastructure authored and maintained by Solana Labs. The Jito-Solana client is a fork of Solana Labs' validator code. It uses the transaction pipeline, memory model, rent mechanism, and system programs developed by Solana Labs.

301.    The tokens launched on Pump.fun are created using the Solana Program Library token program, a smart contract framework designed and released by Solana Labs for advanced token programmability. Jito's bundling engine depends on this standard to function properly.

302.    Jito Labs and Solana Labs operate in economic and technical coordination. They share investors, co-develop infrastructure, and rely on the same transaction volume and speculative mania to drive their revenue. The success of Pump.fun, and the resulting surge in MEV tip volume, directly increased the market value of SOL, from which Solana Labs and its affiliates derived substantial financial benefit.

303.    Jito Labs had actual knowledge of how its software was being used. It had the capacity to restrict or disable MEV tips or bundle auctions for Pump.fun tokens. It did not do so. Instead, it chose to profit from transaction ordering that systemically disadvantaged retail users.

304.    Jito Labs was not a neutral infrastructure provider. It was a central actor in the execution layer of the Pump Enterprise. It built and maintained the tools necessary to front-run

140

~~meme coin launches, earned millions in fees by facilitating those trades, and aligned itself with the same ecosystem actors who designed, promoted, and profited from the scheme.~~

~~C.     A Coordinated and Profitable Racketeering Enterprise~~

~~A.~~  ~~Pump.fun, Solana Labs, and Jito Labs together formed an association-in-fact enterprise within the meaning of~~Case Study to Systemic Fraud

308.     Ultimately, what made COPE most valuable to the Enterprise was the story. The Enterprise's business model depended on generating a continuous supply of participants willing to transact.

309.     Participants had to believe that wealth creation was possible for anyone. The retail public had to believe that someone like them could win and COPE was engineered to engrain that belief.

310.     The Enterprise's narrative of a developer who spent months in obscurity before finally achieving tremendous success gave retail participants reason to think that they too could produce extraordinary returns.

311.     The aggregate result of running this playbook at scale was billions of dollars in retail losses flowing directly into the Defendants' hands.

312.     Plaintiffs were injured through two distinct mechanisms.

313.     First, Plaintiffs paid for a bargained-for exchange that never occurred: the opportunity to participate in a game of chance. The Enterprise rigged the game through supply control, demand manufacturing, and managed exits. These conditions eliminated chance and gave the Enterprise control over outcomes. But for these conditions, the game would not have been rigged. The Enterprise's creation and maintenance of these conditions was the but-for and proximate cause of Plaintiffs' injuries.

314.    Second, the Enterprise induced Plaintiffs to participate through misrepresentations and omissions. Both mechanisms caused injury and both are independently actionable. The paragraphs that follow address each in turn.

**B.  Plaintiffs' Transactions Were the Enterprise's Only Revenue Source**

315.    Plaintiffs paid to participate in a game of chance. What they received was a rigged game. Supply control guaranteed insiders acquired tokens at the lowest prices before retail could act. Demand manufacturing created the retail buyers whose purchases provided exit liquidity. Managed exits allowed insiders to sell in coordinated sequence at peak prices. The game was rigged before Plaintiffs arrived and the bargained-for exchange never occurred.

316.    Pump.fun collected one percent of every transaction executed through its platform. Solana collected network fees on every on-chain transfer and benefited from SOL price appreciation driven by transaction volume.

317.    The structural conditions were the but-for and proximate cause of Plaintiffs' losses. But for supply control, insiders could not have acquired tokens at prices retail would never see. But for demand manufacturing, insiders would have had no exit liquidity. But for managed exits, insiders could not have sold in coordinated sequence at peak prices to achieve maximum profit.

318.    Absent these manufactured conditions, the game would not have been rigged. Outcomes would have been determined by chance. The Enterprise created and maintained these conditions. The fees Defendants collected and the trading profits insiders extracted all flowed from a game rigged by the Enterprise.

319.    The misrepresentations were independently a but-for and proximate cause of Plaintiffs' participation. Defendants represented that Pump.fun offered fair launches without insider advantages, safety protections against rug pulls, and genuine opportunities for wealth creation. Defendants concealed that promotional campaigns were coordinated performances, that insiders had acquired supply at prices retail would never see, that the execution environment guaranteed insiders priority, and that success stories were manufactured by the same Enterprise that profited from every induced transaction. Had Plaintiffs known these facts, they would not have transacted. Every fee Defendants collected was extracted from a transaction induced by these misrepresentations.

320.    Both theories of injury lead to the same damages. Under the first theory, the rigged game was the but-for and proximate cause of Plaintiffs' losses: the Enterprise created conditions that eliminated chance and guaranteed retail would lose. Under the second theory, the misrepresentations were the but-for and proximate cause of Plaintiffs' participation: Plaintiffs would not have transacted had they known the truth. The fees are the measure of both injuries. What Defendants took is what Plaintiffs lost.

### C. Retail Suffered Billions in Losses

321.    Aggregate retail losses on Pump.fun and post-graduation trading are estimated between $4 billion and $5.5 billion.

305.    18 U.S.C. § 1961(4). Their actions were not isolated or incidental—they were coordinated, economically symbiotic, and sustained over a period of years. Pump.fun provided the interface and deceptive marketing; Solana Labs provided the token programs, throughput, and developer infrastructure; and Jito Labs provided the MEV tooling and validator execution necessary to scale the operation.

306.    Each entity benefited financially from the racketeering scheme. Pump.fun extracted fees on every trade and token launch. Solana Labs profited from increased token velocity and appreciation in SOL's price. Jito Labs extracted MEV from high-traffic launches and earned commissions on validator throughput. All three had the capacity to halt or limit the abuse and did not—because doing so would have interrupted their revenue streams and the public perception of Solana's "ecosystem growth."

307.    The relationship between these parties satisfies the criteria for a RICO enterprise: a common purpose (the growth and monetization of Solana-based speculative activity), continuity of structure and operation, and the commission of multiple predicate acts in furtherance of the enterprise. At every level—from token design to fee extraction, to infrastructure maintenance and validator orchestration—Solana Labs and Jito Labs were knowing, intentional participants in the conduct at issue. They are not bystanders to fraud. They are its architects, beneficiaries, and co-conspirators.

## IX. THE PROFITEERS AND THE VICTIMS

### A. Investor Losses

308.    The Pump Enterprise generated extraordinary profits for its creators and infrastructure partners, even as it inflicted catastrophic losses on retail participants like Plaintiffs. This disparity was not incidental—it was intrinsic to the platform's design. Pump.fun, Solana Labs, and Jito Labs created and maintained a financial system where insiders extracted hundreds of millions of dollars, while ordinary users, misled by false representations and structural asymmetries, lost substantial sums at scale.

### B. Solana Labs and the Solana Foundation: Direct Financial Gains

309.    Between January 2024 and mid-2025, Solana Labs and the Solana Foundation experienced a substantial financial windfall as a result of the spike in on-chain activity driven by the launch and usage of Pump.fun.

310. The Solana blockchain's native token, SOL, appreciated significantly during this period. After falling below $10 in late 2022 following the collapse of FTX, SOL recovered and surged in value throughout 2024. By the end of that year, SOL had risen to over $120, reflecting an increase of more than 1,000% from its 2022 lows.

311. This price appreciation directly benefited both Solana Labs and the Solana Foundation. As of April 2020, Solana Labs held approximately 50 million SOL, and the Solana Foundation controlled approximately 240 million SOL, representing roughly 49% of the genesis token supply.

312. In addition to gains on their token holdings, Solana Labs and the Foundation also benefited from a dramatic increase in network fee revenue. Solana's fee model includes a base transaction fee, half of which is burned and half of which is paid to validators. Solana Labs and the Foundation each maintain substantial validator operations and earn significant rewards through direct staking and validator commissions.

313. In early 2024, Solana's base transaction fees averaged approximately 60,000 SOL per day. By October 2024, daily fee volume had climbed to more than 150,000 SOL, an increase of 150% in less than a year. At prevailing market prices, this translated to several million dollars per day in fee income distributed across the validator set, of which Solana Labs and the Foundation are major beneficiaries.

314. During a single 30-day window in late 2024, Solana recorded approximately $88.2 million in transaction fees, compared to just a fraction of that amount months earlier.

315. The fee spike corresponded directly with the rise of Pump.fun and meme coin speculation, which drove transaction volume and congestion on the network.

316. Solana Labs and the Solana Foundation did not merely benefit from this activity— they actively supported and enabled it. Neither entity took any steps to restrict or moderate the tools, standards, or infrastructure being used to facilitate the launch of speculative tokens at scale. On the contrary, both entities promoted the resulting "growth" as a sign of ecosystem success.

145

317.    As a result, Solana Labs and the Solana Foundation realized nine-figure gains through token appreciation, validator rewards, and increased transaction fees, all of which were tied to retail speculation and user losses occurring through the Pump.fun platform.

## C. Jito Labs: MEV Extraction and Windfall Profits

318.    Jito's software allows block-producing validators on Solana to accept "bundled" transactions submitted off-chain and prioritized based on user-submitted "tips"—monetary incentives paid by searchers and traders to ensure early execution. These tips are a direct source of profit for validators and for Jito Labs, which takes a percentage cut of each tip executed through its system.

319.    In 2023, total MEV tips paid to Solana validators through Jito's infrastructure amounted to approximately $3.5 million. This figure represented negligible activity compared to Ethereum and highlighted the limited adoption of MEV strategies on Solana during that year.

320.    In 2024, following the rise of meme coin and DeFi trading activity—driven in large part by Pump.fun—MEV extraction on Solana exploded. By year-end, total MEV tips paid to Solana validators through Jito's infrastructure exceeded $674 million, an increase of nearly 200× year-over-year.

321.    Jito Labs' own revenues, derived from its share of MEV tips, increased at a similar pace. In May 2024, Jito Labs collected approximately $39.5 million in fee revenue. By October 2024, Jito's revenue had doubled to $78.9 million for that month alone. In November 2024, Jito reached a peak of $210 million in monthly revenue, making it one of the highest-earning protocols in all of crypto during that period[29].

322.    During the fourth quarter of 2024, Jito Labs facilitated over $400 million in validator tip payouts, reflecting a 504% increase over the previous quarter. These revenues were tied

---

[29] https://defillama.com/protocol/jito-mev-tips?groupBy=monthly

146

directly to speculative retail trading activity, especially in connection with meme coins launched and traded via the Pump.fun platform.

323. By December 2024, over 93% of Solana validators were running Jito's MEV-optimized software client. Jito became the de facto infrastructure standard for the Solana network, with Solana Labs formally integrating Jito's bundle relay into the official validator client beginning in 2023.

324. This integration resulted in nearly all Solana blocks including MEV bundles. Validators running Jito's software reported staking yields 15–30% higher than baseline. In certain periods of extreme on-chain activity, MEV earnings exceeded even Solana's native inflation-based rewards.

325. Jito's success generated growing concerns within the Solana community about validator centralization, equity, and extractive economics. Nevertheless, Jito Labs retained control over a supermajority of validator coordination, while continuing to earn substantial monthly revenues from retail-driven trading surges.

326. By year-end 2024, Jito's infrastructure was responsible for facilitating over $700 million in MEV tip volume, positioning it as a top revenue-generating actor in the Solana ecosystem and the primary extraction mechanism for transaction-level value across the chain.

327. These earnings were made possible by the speculative token launches and transaction velocity enabled by Pump.fun and executed using infrastructure built by Solana Labs. Jito did not merely facilitate this activity; it monetized and scaled it, taking a percentage of every priority trade that front-ran retail users and converted high-frequency trading into validator and protocol profit.

328. At no time did Jito Labs implement restrictions on the use of its infrastructure to exploit meme coin launches. On the contrary, it promoted its product as the essential execution engine for capturing "value" from Solana's rapid-fire token economy. This economic model depended entirely on continued retail trading , from which Jito extracted revenue at scale.

147

### D. Pump.fun: Platform Revenues and Windfall Profits

329. Solana's low base transaction costs allowed Pump.fun to structure this 1% platform fee as a turnkey model for massive on-chain fee extraction. Every trade on Pump.fun incurred the fee, regardless of token quality, project validity, or user experience.

330. As the meme coin craze accelerated in 2024, Pump.fun experienced exponential growth in transaction volume and fee revenue. By year-end, over 5.3 million new tokens had been launched through the platform.

331. During the 2024 calendar year, Pump.fun generated over $400 million in fee revenue, entirely from speculative token creation and trading activity. This figure was confirmed by on-chain analytics, which reported that the platform had accrued more than 2 million SOL in total fees since inception as of January 1, 2025.

332. The majority of this revenue was earned in the second half of the year. As of mid-2024, Pump.fun's cumulative revenue was only approximately $47 million, but a parabolic surge in token activity during Q3 and Q4 drove that number more than eightfold, reaching over $400 million by year-end.

333. Average daily revenue on Pump.fun rose from approximately $900,000/day in Q3 2024 to roughly $2.5 million/day in Q4. On peak trading days, Pump.fun earned in excess of $10 million in platform fees in a single 24-hour period, driven by rapid token launches and speculative buying frenzies.

334. This revenue was collected automatically and non-discriminatorily, meaning Pump.fun extracted fees whether or not the underlying token was a scam, impersonation, or rug pull. Every token launched and traded on the platform generated fees for the protocol and its operators.

335. By late 2024, Pump.fun had become one of the highest-earning decentralized applications in the crypto ecosystem. During its peak month, Pump.fun's revenue exceeded that

of major Ethereum protocols such as Uniswap, which earned approximately $100 million/month during the same period.

336.    Analysts and media outlets widely noted the phenomenon, with some referring to Pump.fun as having gone "from memes to $500M in revenue."[30] Others criticized the platform for "plundering" the Solana ecosystem by extracting massive fees without contributing to sustainable growth or user protections.[31]

337.    The revenue generated by Pump.fun was made possible only because of infrastructure built and maintained by Solana Labs (including the Solana Library token program) and because of priority execution mechanisms provided by Jito Labs' validator bundling engine.

### E. Solana Insiders: Who Profited and How

338.    The Pump.fun scheme generated billions of dollars in transactional fees and validator tips. Much of that value ultimately accrued to Solana's inner circle—including the Solana Foundation, Solana Labs, and its executive leadership (*i.e.*, the Individual Defendants), who collectively controlled the largest SOL token holdings and staking infrastructure on the network.

339.    The Solana Foundation, based in Switzerland, was allocated approximately 10.46% of all SOL tokens at genesis, with discretionary control over an additional 38.9% designated as community reserves. Combined, the Foundation controlled tens of millions of SOL tokens throughout the relevant period.

340.    At SOL's late-2024 price of approximately $190, the Foundation's treasury was valued at over $18 billion, making it one of the wealthiest entities in the crypto industry. At that valuation, the Solana Foundation held more than ten times the liquid treasury of the Ethereum Foundation.

---

[30] https://www.forbes.com/sites/boazsobrado/2025/02/22/from-memes-to-500-million-in-revenue-the-pumpfun-phenomenon/
[31] https://www.aicoin.com/en/news-flash/2428912

149

341. In addition to unrealized token gains, the Foundation earned annual staking rewards of approximately 4 million SOL based on public staking yields and reported treasury size—translating to $700–$800 million in recurring annual income during 2024–2025.

342. These gains coincided directly with the meme coin explosion on Pump.fun. The surge in network usage drove transaction fee volume to over 150,000 SOL per day, boosting SOL demand, raising token prices, and inflating the value of the Foundation's holdings. The Foundation did not intervene to slow or restrict the activity. It profited from it.

343. Solana Labs, a privately held company, likewise saw enormous financial upside. In June 2021, Solana Labs raised $314 million from a private token sale. The company retained significant SOL reserves and equity stakes in ecosystem projects built on Solana—including those that benefited from the Pump.fun trading frenzy.

344. As SOL appreciated in 2024, Solana Labs' treasury and investment portfolio ballooned in value. The company earned indirect revenues through its validator positions and direct token holdings, which appreciated 10× from their 2022 lows as Pump.fun drove record on-chain activity.

345. The executives and co-founders of Solana Labs—including defendants CEO Anatoly Yakovenko and COO Raj Gokal—also realized or stood to realize extraordinary personal wealth. Yakovenko's estimated net worth reached $500 million to $1 billion in 2024, largely based on SOL holdings and early token allocations. Gokal's net worth was estimated in the nine-figure range.[32]

346. While some executive holdings were subject to vesting, many early insiders had already liquidated significant positions during prior cycles and retained enough tokens to see renewed upside during the 2024 price rally.[33]

---

[32] https://www.valuewalk.com/net-worth/anatoly-yakovenko/
[33] https://solana.messari.io/token-unlocks

347. This wealth was not generated from product revenue, long-term value creation, or ecosystem fundamentals. It was driven by a Meme Coin Casino operated through Pump.fun, using infrastructure maintained by Solana Labs and monetized by Jito Labs. The more scams, pump-and-dumps, and speculative trades launched on Pump.fun, the higher the transaction volume, SOL price, and validator rewards.

348. The Foundation, Solana Labs, and their executives did not act to stop it. They benefited from it—passively by holding appreciating assets, and actively by continuing to operate, promote, and support the underlying infrastructure without restriction.

349. These defendant insiders—through token allocations, validator commissions, staking yields, and protocol-linked price action—extracted billions of dollars in direct and indirect value from a system that inflicted widespread losses on ordinary retail users through directing the Pump Enterprise.

### F. Retail Trader Estimated Losses

350. While the Solana Foundation, Solana Labs, Jito Labs, and Pump.fun collectively realized billions of dollars in platform fees, token appreciation, staking rewards, and validator commissions, the vast majority of individual users who interacted with the Pump.fun ecosystem lost money—and in many cases, suffered severe and unrecoverable financial losses.

322. Between January and December 2024, more than 4.25 million unique wallets traded at least ten tokens through the Pump.fun platform. Public blockchain data and Dune Analytics reports confirmconfirms that over 60% of those wallets ended in a net negative position.

323. Approximately 2.4 million wallets posted losses of up to $1,000, with estimated 351. average losses of $500 each, resulting in approximately $1.2 billion in aggregate losses across that bracket alone.

151

352.324.   Another 221,800 wallets suffered losses between $1,000 and $10,000. Applying, and applying a conservative average of $5,500 per wallet, users in this category incurred approximately $1.22 billion in total losses. An additional 30,000 wallets lost between $10,000 and $100,000. Based on an average estimated loss of $55,000 per wallet, this bracket accounted for another $1.65 billion in losses.[34]

325.     An additional 30,000 wallets lost between $10,000 and $100,000, accounting for another $1.65 billion based on an average estimated loss of $55,000 per wallet.

326.     At the higher end, 1,700 wallets experienced losses in excess of $100,000, with conservative estimates placing average losses at $200,000, for a combined loss of $340 million.

353.327.   At least 46 wallets reported losses exceeding $1 million, resulting in a minimum of $46 million in additional realized losses, not including those whose losses exceeded that figure substantially. These figures derive from realized outcomes based on closed trading positions and on-chain settlement history, not speculative projections.

354.   In total, aggregate user losses across Pump.fun's core platform and related trading venues are estimated between $4 billion and $5.5 billion. These losses were not speculative projections but based on realized outcomes from closed trading positions and on-chain settlement history.

355.   As the tokens themselves were designed to fail, the vastBy contrast, very few users profited. Fewer than 5,000 wallets generated profits in excess of $100,000, and only 311 wallets realized more than $1 million in cumulative gains. A user who earned more than $10,000 in profit on Pump.fun ranked in the top 0.412% of all users. The overwhelming majority of wallets—well over 95%—never cleared $10,000 in gains.

---

[34] https://beincrypto.com/pump-fun-trading-data-majority-lose-money/

356.   These disparities highlight the core extraction dynamic built into the Pump.fun platform. While trading activity was framed as open and democratized, in practice, profits were reserved for a small cohort of early insiders and high-frequency traders, while retail users consistently absorbed losses.

328.   Losses were not limited to token purchases made on the Pump.fun interface. After token " majority lost value within hours of launch, and most went to zero before a user could exit.

357.   After "graduation," most assets ," tokens were listed on decentralized exchanges such as Raydium, where prices collapsed almost immediately. Between 81% and 97% of all tokens launched through Pump.fun lost more than half their value post-graduation, withand many fallingfell 90% or more. This secondary phase of speculation driven by liquidity pulls, insider dumping, and thin markets produced an additional estimated $1.2 billion to $2 billion in retail losses.

358.   These outcomes occurred in the absence of any safeguards. The Pump.fun platform implemented no KYC, no disclosures, and no restrictions on token creation or relisting. There were no fraud filters, verification processes, or enforcement mechanisms. Each token launched regardless of legitimacy or design was subject to the same monetization pipeline: transaction fees to Pump.fun, validator tips to Jito Labs, network load to Solana Labs, and upward pressure on SOL token value.

359.   Pump.fun earned an estimated $600 to $700 million in platform fees during the same time period. This figure is dwarfed by the losses borne by users confirming that user capital not only funded the platform, but also operated as the exit liquidity for insiders who designed and benefited from the system. Those insiders earned millions while retail participants were left holding valueless tokens.

329.   At every stage launch, in the post-graduation phase alone.

153

330. By contrast, very few users profited. Fewer than 5,000 wallets generated profits in excess of $100,000, and only 311 wallets realized more than $1 million in cumulative gains. , secondary listing

331. A user who earned more than $10,000 in profit ranked in the ~~financial design~~top 0.412% of ~~Pump.fun ensured~~ all participants, meaning that ~~each transaction extracted value from retail users and rerouted it through validator commissions, fee flows, and token appreciation to~~ out of every thousand people who used the ~~benefit~~platform, roughly four cleared that threshold while over 95% did not.

332. The structure of the rigged game explains this distribution. Consistent profitability required the advantages that flowed from the three structural conditions. Supply control required access to contract addresses before public awareness and priority execution to acquire at the lowest prices. Demand manufacturing required advance notice of which tokens would be promoted and when. Managed exit required knowledge of when to sell before retail demand collapsed. These advantages were available only to insiders. Retail participants entered a game where the conditions for winning were reserved for those who rigged it.

333. Wallets that consistently profited at this level belonged to Enterprise insiders: Leadership, Operations Command, KOLs, and their Friends and Family networks. The pattern of returns matches the pattern of access. Defendants possess records identifying which wallets received early contract addresses, which wallets were controlled by KOLs, and which wallets transacted in coordination with promotional campaigns.

334. The platform processed millions of participants, and virtually none achieved the returns that Defendants' marketing promised.

335.    These outcomes were not the product of ordinary market risk or bad luck. For value to exist in this system, someone must profit when they sell, yet the metrics establish that almost no one did.

336.    These losses were the foreseeable consequence of the rigged game. The Enterprise required a continuous supply of retail participants whose transactions could be taxed and whose purchases could provide exit liquidity for insiders. Supply control ensured insiders held tokens at the lowest prices. Demand manufacturing ensured retail arrived to buy at higher prices. Managed exits ensured insiders sold before collapse. Plaintiffs' losses funded Defendants' revenues. The game was designed to produce exactly this result.

### D. Billions Were Made as a Result of the Scheme

#### 1. Pump.fun Collected Hundreds of Millions in Platform Fees and Moved Those Funds Off Chain

337.    During the 2024 calendar year, Pump.fun generated over $400 million in fee revenueand their affiliates from speculative token creation and trading activity. On-chain analytics confirm that the platform had accrued more than two million SOL in total fees from inception to January 1, 2025. As of mid-2024, Pump.fun's cumulative revenue was only approximately $47 million, but a parabolic surge in token activity during the third and fourth quarters drove that number more than eightfold.

360.338.    Average daily revenue rose from approximately $900,000 per day in the third quarter to roughly $2.5 million per day in the fourth quarter, and on peak trading days, Pump.fun earned in excess of $10 million in platform fees in a single 24-hour period. By late 2024, Pump.fun had become one of the highest-earning decentralized applications in the cryptocurrency ecosystem. Forbes reported Pump.fun as having gone "from memes to $500M in revenue," and during its peak month, Pump.fun's revenue exceeded that of

155

Uniswap, a major Ethereum protocol, which earned approximately $100 million per month in the same period.

339.     Between January 2024 and mid-2025, Pump.~~fun's~~fun's founders and insiders moved over

$700 million in profits off-chain, ~~with~~funneling large portions ~~funneled~~ to centralized exchanges such

~~361.~~ as Kraken during peak market periods. These funds were accumulated through the ~~platform's fee mechanisms—primarily a 1% transaction tax applied to every buy and sell across tens of millions of tokens—and from early access trading strategies deployed through bots, developer wallets, and privileged smart contract interactions~~platform's one percent fee mechanism, which extracted value from every transaction Plaintiffs executed.

~~362.   The imbalance between gains and losses further underscores the fraudulent and unjust nature of the enterprise. While retail users were induced into transacting based on false promises and asymmetric information, the Defendants engineered a system in which they were always guaranteed to win. Fees accrued whether a token succeeded or failed. Bots and MEV infrastructure gave insiders early access to every token. Solana Labs and Jito Labs extracted validator and MEV rewards from the resulting trading activity—capturing systemic value from every transaction, regardless of outcome.~~

### 2.  ~~The scale of Pump.fun's dominance on the Solana blockchain confirms its centrality to the economic engine of the ecosystem.~~

### Solana's Token Holdings and Revenue Surged into the Billions

~~363.~~340.   By ~~Q2~~ mid-2025, Pump.fun tokens accounted for more than 90~~%~~ percent of ~~all~~ transaction volume on the Solana blockchain. ~~This volume included both primary bonding curve trades and secondary DEX transactions, much of which passed through validator~~

nodes running Jito Labs software. As a result, Jito Labs collected a substantial portion of MEV rewards, validator tips, and staking commissions derived from Pump.fun's speculative activity., and Jito's validator client was in use on over 80 percent of the network.

341.    Solana Labs also and the Foundation benefited enormously. The directly from the dramatic increase in network fee revenue driven by Pump.fun trading activity.

342.    In early 2024, Solana's base transaction throughput and user activity drove demand for SOL, the fees averaged approximately 60,000 SOL per day, but by October 2024, daily fee volume had climbed to more than 150,000 SOL, an increase of 150 percent in less than a year. During a single 30-day window in late 2024, Solana recorded approximately $88.2 million in transaction fees, and this fee spike corresponded directly with the rise of Pump.fun and memecoin speculation.

343.    Pump.fun's launch and growth also produced a substantial financial windfall for Solana Labs and the Solana Foundation by driving appreciation in the value of their SOL token holdings.

344.    Solana Labs and the Solana Foundation together control roughly 49 percent of the original SOL token supply, representing approximately 290 million SOL. The Solana Foundation was directly allocated approximately 10.46 percent of all SOL tokens at genesis and has discretionary control over an additional 38.9 percent designated as community reserves.

345.    The Solana blockchain's native token of the Solana network. As SOL became the required medium for, SOL, appreciated over 1,000 percent from its 2022 lows as a result of Pump.fun's rise. After falling below $10 in late 2022 following the collapse of FTX, SOL surged in value throughout 2024, and by the end of 2024, the price had risen to over $120 per SOL.

157

346.    The Solana Foundation's treasury was valued at over $18 billion at SOL's late-2024 price, more than ten times the liquid treasury of the Ethereum Foundation.

347.    In addition to unrealized token gains, the Foundation earned annual staking rewards of approximately four million SOL, translating to $700 to $800 million in recurring annual income during 2024-2025.

348.    The executives and co-founders of Solana Labs realized or stood to realize extraordinary personal wealth from the scheme. Yakovenko's estimated net worth reached $500 million to $1 billion in 2024, and Gokal's net worth was similarly estimated to be in the nine-figure range.

### 3.  Jito Made Hundreds of Millions in Tips

349.    In July 2024 alone, validators running the Jito-Solana client earned over $36 million in tips, including $3.2 million in a single day. These tips were paid primarily by users attempting to gain early access to Pump.fun token launches.

350.    Jito experienced a 200-fold year-over-year increase in tip revenue following the rise of Pump.fun. In 2023, total tips paid to Solana validators through Jito's infrastructure amounted to approximately $3.5 million, but by year-end 2024, total MEV tips paid through Jito's infrastructure exceeded $674 million.

351.    Jito became one of the highest-earning software protocols in cryptocurrency.

352.    In May 2024, Jito Labs collected approximately $39.5 million in fee revenue; by October 2024, Jito's monthly revenue had doubled to $78.9 million; and in November 2024, Jito reached a peak of $210 million in monthly revenue.

353.    During the fourth quarter of 2024, Jito Labs facilitated over $400 million in validator tip payouts, a 504 percent increase over the previous quarter.

## IV. THE COPE CAMPAIGN DOESN'T STAND ALONE: THE ENTERPRISE'S PATTERN OF FRAUD, MISREPRESENTATION, AND DELIBERATE DESIGN

### A. The Enterprise Made Consistent Misrepresentations and Omissions That Induced Participation

354. The figures above reflect an operation far larger than any single campaign. Billions in retail losses and hundreds of millions in fees are not the product of one coordinated pump. They are the product of a system designed to drive volume across thousands of tokens throughout the Class Period.

355. The Enterprise's marketing apparatus made sustained misrepresentations and omissions that induced retail participation.

356. These misrepresentations were disseminated across Telegram groups, Discord servers threads, YouTube streams, Instagram posts and Reels, and posts on X, the same channels the Enterprise used to manufacture demand for tokens insiders had already acquired.

357. The misrepresentations were uniform in character: they promised wealth opportunities, safety guarantees, and fairness protections that did not exist and could not exist given the Enterprise's operational design.

358. The omissions were equally uniform: they concealed insider pre-positioning, paid coordination, and the structural advantages that made catastrophic retail losses inevitable.

#### 1. Marketing Promised Impossible Wealth Opportunities While the Enterprise's Design Guaranteed Retail Would Lose

359. Pump.fun repeatedly characterized memecoins as startup-like investment vehicles capable of producing exponential returns, when they were in fact profit-taking vehicles through which insiders systematically transferred retail capital to themselves.

159

360.    Pump.fun framed its platform as a generator of "AI unicorns," "early-stage winners," and "billion-dollar meme coins." A unicorn is generally considered a billion-dollar startup. This framing implied that retail participants could access institutional-quality returns when in reality retail functioned as the exit liquidity from which those returns were extracted.



*Figure 39: Post by Pump.fun on January 6, 2025.*

361.    No corroborating data was made available to support this proposition because none exists.

362.    Cohen personally endorsed this framing. On February 7, 2025, Cohen retweeted a post stating: "People finally waking up to the fact that pumpfun isn't just this little memecoin launchpad but a new novel form of capital formation."



*Figure 40: Defendant Cohen reposting @WestieCapital's message from January 29, 2025.*

363.    The same day, Cohen retweeted a post from a Pump.fun KOL stating: "Hear me out: @pumpdotfun > @ycombinator." Y Combinator is widely regarded as the most successful startup accelerator in history, having backed companies like Airbnb, Stripe, Dropbox, and Coinbase. These are firms that have collectively created hundreds of billions of dollars in value through actual products and services. In contrast, Pump.fun is an unlicensed and rigged meme coin casino where the vast majority of players lose money. Still, Pump.fun had again found a narrative, and was again using its network to propagate it.



*Figure 41: Defendant Cohen reposting @daumernxyz's message from January 29, 2025.*

364.    On January 19, 2025, Cohen tweeted in a sprawling post that Pump.fun had "became one of the most successful startups ever" and that "startups are launching on pump fun to tap into the massive amounts of liquidity and users."[35] In the post, Cohen even thanked his Enterprise partners: "[f]or years, we were chewing glass with nothing to show for it… then we discovered Solana."

---

[35] In the post, Cohen also references "3,000+ cold DMs." These were direct and unprompted solicitations made by Cohen to X/Twitter users asking them to come play on the platform. An example of one such direct message is included in this Complaint.



**alon** @a1lon9

pump fun launched exactly one year ago.

it changed my life and the crypto space forever. here's how it came to be:

before pump fun, @sapijiju @outdoteth and I were trying to get traction for various ideas we built on the EVM. we built in NFTs, SocialFi, DeFi - anywhere we saw opportunity. For years, we were chewing glass with nothing to show for it

then we discovered Solana

it felt different. while the UX of onchain trading was still in its infancy, it felt refreshing to get a swap through instantly with no unnecessary steps. more importantly, though, everyone's bags were pumping, and it felt like the start of a new wave

after playing around with it for a while, we noticed that the ecosystem was headed in an extremely dangerous direction. presales were the meta: random KOLs you never heard of were raising millions, and more often than not, ran away with the funds, leaving bagholders with nothing.

the "trenches" weren't a thing - there simply weren't that many people that were stupid enough to ape new pairs when most coins rugged their liquidity pool, honeypotted, or worse. the only people that were winning were the nefarious actors behind these schemes

we saw an opportunity to build a system that is safer, more fair, and more fun. we truly believed that memecoins presented the next big growth opportunity for crypto because they provide a simple and entertaining experience for users, and allow any creator to truly own their success in an increasingly hostile creator economy. thus, pump fun was born

a few months, 3,000+ cold DMs, and hundreds of PRs later, it was finally starting to get traction. the way it blew up was something none of us could have predicted. seeing celebs like @IGGYAZALEA launch their own coins was not on my bingo card!

the mindset quickly shifted from extreme frugality to growth at all costs. the pump fun ecosystem grew from a few guys to 30+ engineers, 50+ site moderators and support, and various other roles.

fast forward to today:

> more than 6 million coins created
> more than $5bn in combined market cap
> Tier 1 exchange listings for assets like Fartcoin, PNUT, GOAT, and many more
> the #1 destination for non-crypto native users across all chains, with millions of users overall
> more than $1bn of SOL locked in pump fun liquidity pools
> the most trusted name in memecoins

the path didn't come without setbacks, though

> multiple coordinated FUD attacks
> a hack
> numerous pullbacks on majors and leading memecoins
> the live streaming feature was taken down

but no matter what, the community stood by us. that's why this year, we're committed to giving back

looking forward, pump fun is the largest crypto social network and is looking to bring the huge amounts of opportunity (financial and non-financial) and fun that the crypto space provides to the mainstream.

pump fun is also no longer just about memecoins: startups are launching on pump fun to tap into the massive amounts of liquidity and users that are looking to experiment with new products. over 70% of the top 50 coins launched on pump fun are AI projects, with many other kinds of projects launching every day

in 2025, pump fun will take onchain experiences to the masses

big things are coming.

3:19 PM · Jan 19, 2025 · **733.5K** Views

729    438    2.5K    490

*Figure 42: Post by Defendant Cohen on January 19, 2025.*

365.    Pump.fun's marketing targeted a young, unsophisticated, and predominantly male audience entering the space in the wake of the GameStop "meme stock era," an audience primed to believe that retail investors could win against institutional players.

366.    Pump.fun solicited this audience with explicit promises of gains that were impossible for structurally disadvantaged outsiders to achieve.

367.    On December 10, 2024, Cohen tweeted an image with the text "Stop being poor" and caption "Download the Pump Fun App™ Now!"



*Figure 43: Post by Defendant Cohen on June 27, 2025.*

368.    On January 17, 2025, Cohen tweeted that "our job as a platform is to grow the eco for our space to grow 100x" and promised that the platform would "make it easy & fun for ALL users to WIN."

163



*Figure 44: Post by Defendant Cohen on August 11, 2025.*

369.    On January 25, 2025, Cohen tweeted that "now there's a 9 figure runner EVERY DAY."



*Figure 45: Post by Defendant Cohen on January 25, 2025.*

370.    On September 5, 2024, Cohen tweeted that "small ports [portfolios] tend to chase 1000x+" to frame memecoin speculation by undersized investors as sustainable and rational behavior.



*Figure 46: Post by Defendant Cohen on September 3, 2024.*

371.     Even when markets declined for "shitcoins", Cohen induced continued participation. On June 23, 2024, Cohen posted a dismissal of warnings about Pump.fun and urged users to "stop hearing what other people want to hear when their bags are down and focus on winning."



*Figure 47: Post by Defendant Cohen on June 23, 2024.*

165

372.    Pump.fun celebrated specific tokens that reached billion-dollar market capitalizations,

using these as inducements for new participation. Pump.fun tweeted: "another day, another billion dollars peanut has just become the 2nd pump fun coin to hit $1bn marketcap."



*Figure 48: Post by Pump.fun on November 13, 2024.*

373.    Pump.fun tweeted: "congratulations to the $GOAT @truth_terminal is officially the first pump fun coin to hit a $1bn market cap that's around 222,222x in just 1 month!!!! this begs the question... who's next?"

166



*Figure 49: Post by Pump.fun on November 12, 2024.*

374.    In reality, these memecoins were not investment vehicles but exit liquidity gambling instruments, games in which profits for early sellers come directly from losses absorbed by the public. Every fee Defendants collected from these instruments came from a participant who transacted in reliance on Defendants' representations.

## 2. "Fair Launch" and "Rug-Pull Proof" Representations Were Pervasive While the Bundling System Made Fair Launches Structurally Impossible

375.    Pump.fun's marketing relied on a single core promise: its "fair launch" model supposedly gave everyone an equal chance by preventing insider manipulation and rug pulls. This promise was false by design.

376.    This was the first and most repeated message users saw across the platform and its promotions. Pump.fun's social media expressly promised a "fair launch," "no presales," "no insider allocations," and "rug-pull proof launches." Pump.fun's homepage and interface made the same promises.

377.    Cohen personally represented these claims. On September 25, 2024, Cohen retweeted a screenshot of a DM where he directly solicited a user unknown to him by stating that "pumpdotfun - unruggable fair launch platform."

168



*Figure 50: Post by user @valueandtime on October 3, 2024, re-posted by Defendant Cohen.*

378.    On October 4, 2024, Cohen tweeted "pump fun is as much of an even playing field as it gets IMO."



*Figure 51: Post by Defendant Cohen on October 15, 2024.*

379.    On October 12, 2024, Cohen tweeted "retail's already up massively because it's so easy for them to get involved and the playing field is as fair as ever."



*Figure 52: Post by Defendant Cohen on November 20, 2024.*

380.    Pump.fun deliberately positioned itself as a solution to prior fraudulent projects that had harmed retail participants. In the months preceding Pump.fun's launch, retail participants had been repeatedly burned by tokens launched in Telegram groups or by anonymous developers who would disappear after selling off their supplies.. Pump.fun marketed itself as a safe and transparent launchpad which eliminated those risks, while providing the infrastructure for a more organized, industrialized version of the same

170

predatory machine.

381.    Defendants implemented no meaningful protections that would make the "fair launch" statements true because such protections would undermine the supply control that made profit-taking possible.

382.    No Defendant created guardrails for retail participation. No Defendant implemented randomized entry windows that would make it harder for bots or insiders to position first. No Defendant blocked automated trading bots from participating on the platform.

383.    Defendants' failure to implement basic protections was deliberate. Protection would eliminate the supply control advantage that made the Enterprise's rigged exit liquidity gambling profitable for insiders.

384.    The gap between fair launch marketing and actual execution conditions was the central mechanism of the Enterprise's deception. Retail participants entered believing they competed on equal terms when they were structurally positioned as exit liquidity from the moment they arrived.

### B. The Enterprise's Senior Operators Designed the Platform to Operate as a Rigged Casino

385.    The Enterprise did not hide the casino they built. In internal communications, defendants designed a gambling operation and optimized it for addiction. In public, they called it a casino. In most cases, intent must be inferred. Here, defendants documented it. Internal communications obtained through whistleblower disclosures show Leadership discussing the platform as a gambling operation, acknowledging that most users would lose, and optimizing for addiction. Defendants then said the same things in public.

171

**C. Internal Team Chats Reveal the Platform Was Deliberately Designed to Maximize Addictive Trading and Fee Revenue**

386.    Internal team communications obtained through whistleblower disclosures reveal that the platform was deliberately designed to maximize addictive engagement patterns characteristic of slot machines.

387.    The Enterprise treated retail participation as repeat wagering that generated fee revenue regardless of retail outcomes. The Enterprise profited whether retail won or lost. The platform was tuned to ensure users never experienced a moment of boredom and internal communications corroborate this fact.

388.    Leadership explicitly admitted the platform was gambling. In internal communications, Cohen took credit for creating the market for low-value tokens ("shitcoins") that did not exist before, stating that the platform removed natural barriers protecting retail from "really really low odds." Cohen abandoned all pretense of investing and called the game what it is: "gambling." He admitted the goal was to make users "happier (even though most lose)," revealing a design philosophy that understood the product was engineered to bankrupt most users.

*Figure 53: Alon (Cohen) message in Pump Team Chat on April 27,2024.*

172

389.    Leadership was aware of the addictive behaviors the platform encouraged. Cohen circulated a user's comparison of the app to "crack [cocaine]" in an internal team chat—evidence that executives understood the product's function as a dopamine-driven engagement tool.



*Figure 54: Alon (Cohen) message in Pump Team Chat on May 1, 2024.*



*Figure 55: Out (Kerler) laughs at a post describing Pump.fun as "4chan but with gambling" shared by Alon (Cohen) on April 10, 2024. 4chan is an anonymous imageboard notorious for unmoderated and offensive content. Defendants' amused reaction demonstrates their awareness of, and indifference to, the platform's toxic culture.*

390.    Internal communications show the team moved toward active curation, deciding what users should see based on their data profile. The technical goal was to present "new

content every two seconds," a pacing model comparable to that used in slot machines or TikTok.

391.    Internal communications reference calibrating the interface to prioritize threshold excitement and ensure constant stimulation. The team explicitly requested the product use "flashing lights," "constant animation," and "action." Leadership suggested consulting "someone at a web2 company," like an "Instagram guy" to understand their "tactics," confirming the team sought to import aggressive behavioral engineering methods from social media.

> from these indications we can construct a feed that is both contextually relevant and exciting. these are both at odds with each other. if we imagine a list of all the content on pump ranked by their contextual relevance to a particular user then if we were to start from the top of the list, work our way downwards, and start serving content, each consecutive thing that is shown to the user would become less and less contextually relevant — but new content is obviously exciting and so we should continue down the list.
>
> just some thoughts i had before going to bed.
>
> i think for each user, we need a list of content ranked by contextual relevance (where the parameters are things like recency, who they follow, what coins they've bought in the past) combined with a threshold of excitement. i.e. at least one new piece of content has to be shown to a user every 2 seconds, and so if no "good" content is there for a user and 2 seconds has passed, we sample some content from lower down in the list.



*Figure 56: Messages between Alon (Cohen), Out (Kerler), and Sapijuju (Tweedale) on April 26,2024.*

### 1.   The Slot Machine Variants

392.       Leadership said they wanted flashing lights, constant stimulation, and new content every two seconds. Defendants built exactly that. The platform's design prioritized rapid, repeated wagering over any form of informed decision-making.

393.       Regardless of the variant, the economic mechanics of every token were identical: tokens were designed to create a value spike that would draw in retail participants, who would then absorb the losses when insiders executed their managed exit.

394.       Many tokens were sold using the language of traditional venture capital or startup investing. Creators of these tokens published "whitepapers," roadmaps, and Discord announcements that mimicked startup launches.

395.    Many tokens exploited the likeness, name, or persona of celebrities, influencers, or social media personalities. Sometimes these individuals were actually involved in the launch and received pre-allocated tokens. Other times, celebrities were impersonated or their intellectual property used without consent. In either case, the token's value derived from the public's inference of celebrity endorsement. The Enterprise promoted tokens linked to Caitlyn Jenner, Usher, Hulk Hogan, Doja Cat, Iggy Azalea, and Andrew Tate.

396.    Cohen personally supported the token linked to Iggy Azalea, describing it as a model for the "social token narrative."

397.    Many tokens were openly sold as valueless, chaotic, or absurd, with users encouraged to speculate and chase elusive price spikes. Examples include FartCoin, TwoToesToken, and NothingBurger.

398.    Many tokens imitated household brand names, creating the false impression of affiliation with legitimate Fortune 500 companies. Examples include GoogleCoin, NikeToken, and AmazonPay.

399.    Many tokens incorporated protected intellectual property, using characters from Disney, Nintendo, sports team logos, or copyrighted phrases.

400.    For example, the Defendants launched tokens titled, for example, "JUDGE KAPLAN ($JUDGE)" and "Lewis A. Kaplan (JUDGE)" through the Pump.fun platform, each using Judge Kaplan's full name, and images of him. (See Ex. E at 2-3.)

401.    Internal discussions proposed and refined additional gambling-style mechanics designed to simulate jackpot dynamics and induce repeated high-risk participation.

402.    In internal product discussion, team members described adding "randomness" by using multiple "game modes" (*i.e.* the slot machine variants).



*Figure 57: Alon (Cohen) on April 6, 2024.*

403.     In other internal proposals, engineers described "battle" interfaces and additional Token-2022-enabled mechanics designed to turn participation into escalating "games of chicken," including burn-based contests structured to compel users to risk increasing amounts to obtain a payout or advantage. These proposals further confirm that the platform's "variants" were engineered gambling mechanics, not investment products.

**2.   Leadership Publicly Acknowledged the Platform Was a Casino**

404.     Enterprise leaders knew they were running an unlicensed casino, as demonstrated by their public statements.

405.     On August 8, 2024, Cohen tweeted: "you guys came to the greatest CASINO in the world and are complaining when your txns [transactions] RANDOMLY drop? what did you expect??? it's part of the experience. don't like it? LEAVE".



*Figure 58: Post from Defendant Cohen on April 8, 2024.*

406.    On September 18, 2024, Cohen tweeted: "'pump fun' is insane because it appears to be one of the most legitimately dangerous apps with the potential to gigafry your brain but is exclusively used by literal turbonormies who unironically want to like 'build generational wealth' and basically get oneshotted by it." Cohen acknowledged that users were being compelled toward financial destruction chasing "generational wealth" and yet continued to operate the platform.



*Figure 59: Post from Defendant Cohen on September 24, 2024.*

407.     On October 14, 2024, Cohen tweeted: "remember when they told you that it's impossible to win in the memecoin trenches? that you're retarded for 'gambling' when the winners were 'already chosen'? since then 2 new coins went from 0 to $300m, over 50 went to $10m, and over 100 touched $5m I hope you didn't listen." Cohen acknowledged the gambling characterization while citing extreme returns to induce continued participation.



*Figure 60: Post from Defendant Cohen on October 16, 2024.*

408.     These admissions served as inducements by encouraging gambling behavior on the rigged platform.

### 3.  Solana Leadership Embraced the Gambling Narrative

409.     Solana Labs' leadership publicly supported and engaged with Pump.fun activity on major communications channels. Yakovenko tweeted in response to Pump.fun memes, commented on specific token launches, and shared promotional content related to the platform. This public engagement lent legitimacy to Pump.fun and drove transaction volume that benefited the entire Enterprise.

179

410.    For example, Yakovenko publicly equated "memecoins" with "lootboxes," a random-reward mechanic commonly associated with gambling, corroborating that the enterprise marketed and operated chance-based wagering rather than utility tokens.



*Figure 61: Post from Defendant Yakovenko on March 13, 2024.*

411.    Solana's leadership embraced the speculative frenzy as a strategy for growth while knowing how their tools would be used. Yakovenko stated: "As with NFTs...we're blessed to solve a whole bunch of engineering problems with meme coins. It just makes the network and all the systems more robust."[36]

412.    Gokal publicly acknowledged "casino" activity on Solana in a post on X, evidencing knowledge of and participation in the gambling mechanics described in the Complaint.

---

[36] "Solana's founder on how memecoins help make the network more robust," The Block, February 27, 2025, https://www.theblock.co/post/329669/solanas-founder-on-how-memecoins-help-make-the-network-more-robust (last accessed on January 7, 2026).



*Figure 62: Post from Defendant Gokal on December 17, 2023.*

413.        In a tweet on January 29, 2025, Gokal effectively admitted to and reduced the scheme to a sequence while branding it as "permissionless finance 🚀": more throughput, more transactions, call it 'capital markets,' invite permissionless founders, apps, and tokens, then cash in on the volume.



*Figure 63: Post from Defendant Gokal on January 29, 2025.*

181

#### 4.  Pump.fun's Bounty System Incentivized Explosive Short-Term Speculation

414.      Pump.fun provided financial rewards to token creators who achieved short-term speculative milestones. Users who launched tokens that hit certain market capitalization thresholds received direct payments called "bounties," often in the range of 0.5 SOL or more. These incentives were awarded for inciting rapid, high-volume speculative behavior.

415.      The bounty structure rewarded behavior that increased transaction volume, which increased Enterprise profit.

### D.  The Trading Terminal Façade Disguised the Rigged Casino as a Regulated Market

416.      Pump.fun presented a trading-terminal façade designed to mimic regulated markets and induce trust, concealing the gambling mechanics by trading on a veneer of institutional legitimacy.

### E.  The Interface Simulated Institutional Trading Platforms

417.      The Pump.fun customer-facing interface is designed to simulate a professional trading terminal.

418.      A real-time candlestick chart dominates the center of the screen, complete with selectable intervals and color-coded volume bars. This visualization of price action is indistinguishable from charting modules offered by FINRA-member platforms such as E*TRADE or TD Ameritrade. The chart updates tick-for-tick as new transactions are confirmed on the Solana blockchain. (*See Exs. C–D*).

419.      This creates the impression for users that tokens enjoy a continuous secondary market

182

supported by price discovery mechanisms analogous to those of the NYSE or NASDAQ.

**F.  The Interface Displayed Market Data That Mimicked Regulated Securities Markets**

420.    The interface displays market data that mimics regulated securities markets.

421.    Flanking the chart is a quote box that reports "Market Cap," "Supply," and "Holders" in real time. Market Cap mimics the public-company valuation metric familiar to any equity investor. Supply is the total number of tokens outstanding, mimicking the share float of a traditional equity. Holders resembles a shareholder register and conveys how widely dispersed or concentrated the float may be.

422.    A perpetual ticker tape stretches across the top of the screen, with each scrolling symbol displaying its percentage moves across multiple time intervals. This reproduces the ubiquitous Bloomberg or CNBC price crawl.

423.    The interface categorizes tokens using language that evokes traditional capital markets. Tokens are sorted into columns labeled "Newly Created," "About to Graduate," and "Graduated." This taxonomy evokes the lifecycle of a corporate issuer: seed, roadshow, IPO. (*See Ex. C-F*).and [37]

**1.  The Interface Provided Due-Diligence Metrics That Simulated Institutional Analysis**

424.    The interface provides due-diligence metrics that simulate institutional-grade analysis.

425.    Each token listing contains a miniature dashboard rendered through badge-style indicators displaying Total Holders, Sniper Wallets Still Holding, Developer-Held Percentage, and Concentration of the Top Ten Wallets.

---

[37] Citations to the Exhibits attached to this Complaint are cited herein as "Ex__".

426.    A user can therefore assess, at a glance, a token's insider concentration, circulating float, and susceptibility to manipulation, similar to how one would consult Form 13F data before purchasing an equity.

### 2. The Order Execution Interface Mirrored Sophisticated Equities Platforms

427.    The order execution interface mirrors sophisticated equities trading platforms.

428.    Trade execution is initiated through an order ticket which mirrors a modern equities blotter. The user sets maximum slippage percentage, selects a speed tier (Fast, Turbo, or Ultra, each incurring a rising fee), can toggle "front-running protection," and may add a tip to validators for earlier transaction inclusion.

429.    These customizable parameters replicate features offered in sophisticated equities venues and create the impression Pump.fun is such a venue.

### 3. In Contrast to a Sophisticated Equities Platform, Pump.fun Offers No Meaningful Protections

430.    The interface contains every hallmark of a regulated market but conceals the absence of corresponding protections.

431.    The interface displays live price discovery, market capitalization reporting, float analysis, holder concentration, and order-entry customization.

432.    Absent are the disclosures that make those metrics meaningful: issuer financials, audited statements, and risk factors.

433.    Absent is any meaningful market surveillance: best-execution obligations, FINRA Rule 5320 compliance, or transaction monitoring.

434.    Absent are any investor protections: no SIPC coverage, no customer asset segregation, no regulatory recourse.

184

## V.    DELIBERATE COMPLIANCE FAILURES ENABLED THE ENTERPRISE'S ILLEGAL OPERATIONS

### A. Pump.fun Operated Without KYC/AML, Sanctions Screening, or Age Verification by Design

435.    The Enterprise avoided licensing, KYC/AML controls, and consumer safeguards because such protections would reduce transaction volume. Transaction volume was the only source of revenue. Every compliance failure was a business decision to maximize fee revenue earned from participants who would not have transacted had they understood they would not receive the benefit of the bargain.

#### 1.   Anonymous Wallet-Based Access Required No Identity Verification

436.    The Pump.fun platform operates without traditional user accounts, identity verification, or onboarding procedures.

437.    When a user visits the Pump.fun website or mobile app, they are prompted to "connect wallet." The user's public wallet address is automatically recognized as their account. No name is required. No email address is required. No government-issued identification is required.

438.    There are no KYC protocols. There are no geographic restrictions.

439.    There are no technical guardrails to prevent minors, sanctioned individuals, or known malevolent actors from accessing the platform. Any user, anywhere in the world, can begin wagering in seconds, entirely anonymously.

440.    A wallet suspected of abuse can simply be discarded. A new wallet can be created seconds later.

441.    Defendants did not meaningfully restrict use by sanctioned actors, fraudsters, or repeat abusers.

442.	Pump.fun does not verify who is using its services and cannot distinguish between an adult investor, a minor, a convicted fraudster, or a foreign actor operating under a false identity.

### 2. Minors Played on Pump.fun Without Age Checks

443.	Pump.fun permits minors to engage in gambling activity. Users as young as 13 are known to have launched tokens, ~~its price surged, hitting multi-year highs in early 2025.~~participated in trading, and accessed creator tools.

444.	Minors using Pump.fun have launched tokens, received SOL, and extracted value from the system without ever verifying their age, identity, or capacity to contract.

445.	In one documented case, a minor launched a token, extracted profits, and boasted about the activity on social media.[38] No action was taken by any Defendant to block this behavior or to retroactively remove the token, even after the minor's age became publicly known.

446.	At no point did Pump.fun or Solana ~~Labs~~recommend, or require KYC checks, identity verification, or usage restrictions based on user status, jurisdiction, or legal capacity.

447.	Pump.fun foregoes age-gating because it would reduce participation and ~~its affiliated entities,~~volume.

### B. The Platform Hosted Unverified Pornographic Content Without Age-Gating or Identity Controls

448.	The Enterprise had actual notice that the platform was facilitating sexual exploitation and yet did nothing to moderate their platform.

---

[38] "A Kid Made $50,000 Dumping Crypto He'd Created. Then Came the Backlash," Wired, December 6, 2024, https://www.wired.com/story/memecoin-kid-backlash/ (last accessed on January 7, 2026).

449.    Internal communications establish that the Pump.fun executive team, including Cohen and Tweedale, knew that people, including children, were being sexually exploited on the platform to pump tokens.

450.    On May 4, 2024, Tweedale shared a link to a live-stream channel in the Pump.fun Team Chat. Another team member, "Danay D," explained that the user would livestream sexual content to attract buyers, rug the coin, and restart with a new token. Cohen and Tweedale responded with laughing emojis.









*Figure 64: Pump Team Chat between Danay D, Alon (Cohen), and Sapijiju (Tweedale) on May 4, 2024.*

188

451.    Subsequent to this exchange, another Pump team member flagged that there was liability risk associated with not requiring KYC for customers if the platform were to continue to engage with pornographic content, putting the executive team on notice of their obligations to prevent the proliferation of exploitation on their platform. The team did nothing.

452.    This is particularly chilling given that only two days earlier, on May 2, 2024, the executive team had circulated information concerning the token $LIVEMOM. Kerler shared a link to a Tweet describing a child "sexually exploiting his mom" to launch a coin. Cohen shared a list of market cap "goals" concerning the token that escalates in inappropriate content between a child and his mother as the token makes more money (*e.g.* at $100,000, "mom slaps me across the face; at $500,000, "pour milk on my mom's chest," and more).





*Figure 65: Pump Team Chat on May 2, 2024.*

453.	The team understood that users were engaging in conduct that would result in permanent bans from accountable platforms like Twitch (a popular internet livestreaming platform). Twitch enforces policies against this kind of sexual content and protects minors from exploitation. Pump.fun had the same capacity to enforce and yet it chose not to.

454.	In effect, Pump.fun positioned itself as a sanctuary: a place where sexual content, financial speculation, and the exploitation of children could continue without interference because interference would reduce the transaction volume that generated revenue for the Enterprise.

455.	Plaintiffs have documented an array of explosive and dangerous content being tokenized by Pump.fun. Plaintiffs have attached and incorporated by reference Exhibit K.

191

456. For one coin, the token's picture shows a masked man holding a knife to throat of a man sitting in a chair with the caption: "kidnapped and torturing this black monkey until he fucking dies or we hit 10m MC [market cap]."

457. Another coin features a picture of a duct-tape bound child with a threat that if the token does not reach $1 million in market cap, the child in the photo will die.

458. For a coin called "TORTURE," which collectively hold a was promoted using Pump.fun's livestreaming feature, a woman is livestreamed tied to a chair in lingerie with a man brandishing rope with the promist of "LIVESTREAMED TORTURE AND SEXUAL ACTS" if the token hits a $100,000 market cap.

459. Thousands of similar coins were launched promoting violence, sexual violence, race-based discrimination, and drug use. (See Exhibit K).

### C. High-Profile Laundering Episodes Demonstrated Capacity to Intervene and Choice Not To

460. The platform's anonymous design enabled criminals to conceal and move illicit proceeds by blending them with retail volume.

461. Pump.fun was used by at least one state-sanctioned group to launder illicit funds.

462. The Lazarus Group is a cybercrime unit operating on behalf of the Democratic People's Republic of Korea and is subject to United States sanctions.

463. In or around February 2025, the Lazarus Group used the Pump.fun platform to launder proceeds from what remains the largest known cryptocurrency theft in history: approximately $1.5 billion in digital assets stolen from the Bybit exchange.

464. The group deposited approximately 60 SOL into a newly created Solana wallet and used Pump.fun to deploy a memecoin named "QinShihuang."

192

465. Over the course of several hours, the token reached a reported $26 million in total trading volume.

364.466. Once the liquidity pool was sufficiently large ~~share of~~, the ~~SOL~~group sold their remaining token ~~supply, realized enormous paper gains~~holdings into the market and ~~liquid profits from this appreciation~~dispersed the proceeds pseudonymously.

~~365. This was not the first time Solana Labs had profited from a retail-driven speculative boom. During the 2021–2022 NFT bubble, Solana Labs and its investment vehicle, Solana Ventures, backed Magic Eden, the primary marketplace for NFT speculation. That boom saw similar structural patterns: artificial hype, rapid asset inflation, insider trading advantages, and a devastating collapse that wiped out retail value while enriching core infrastructure participants. Pump.fun represents the continuation of that same model, now repackaged for meme coins instead of NFTs. The result is the same: retail investors suffer; Solana and its closest partners prosper.~~

~~366. These dynamics support both the intent and continuity elements of the civil RICO claims asserted in this Complaint. The enterprise created by Pump.fun, Solana Labs, and Jito Labs was not a short-lived fraud—it was the second iteration of a proven playbook. By leveraging viral marketing, architectural complexity, and structural opacity, these entities created a self-sustaining machine for wealth extraction—one that depended on the consistent sacrifice of retail participants to generate exponential returns for the insiders.~~

467. ~~X.~~ When exposed publicly, Pump.fun demonstrated its capacity to intervene. Pump.fun removed the "QinShihuang" token from its front-end platform following revelations of the laundering.

468. But removing a single token after the damage was done did nothing to address the infrastructure that made the laundering possible. The same features that enabled Lazarus to launder $26 million in hours are the features that enable the Enterprise's core fraud:

193

anonymity, speed, no identity verification, and unrestricted wallet creation. Defendants cannot implement meaningful AML safeguards without dismantling the system that generates their profits.

469.     Defendants chose not to build AML safeguards because those safeguards would eliminate the conditions that make the core fraud work. The anonymity that enabled Lazarus is the anonymity that allows insiders to disguise coordinated accumulation as organic buying. The speed that enabled Lazarus is the speed that guarantees insiders execute before retail. The lack of identity verification that enabled Lazarus is what allows KOLs to hide their positions across unlimited wallets.

### D. Defendants Possessed Moderation Capabilities and Chose Not to Protect Users

470.     Pump.fun's permissive listing model enabled counterfeit, impersonation, and brand-mimicking tokens to proliferate.

471.     Pump.fun's architecture leaves retail users unable to distinguish legitimate from fraudulent offerings. Pump.fun allows multiple tokens to be launched and traded under the same ticker. As a result, consumers are induced to purchase assets they never intended to buy (*e.g.* there are multiple versions of the $JENNER coin, launched by celebrity Caitlyn Jenner, causing confusion and erroneous purchases by buyers seeking to acquire the 'real' coin).



*Figure 66: Posts from Defendant Cohen on January 21, 2025. Following accusations that insider wallets had purchased the coin in his name ($ALON) at low prices for later sale, Cohen's tweet certified the authentic $ALON address and the coin went on to reach hundreds of millions in market capitalization. At the same time, Cohen acknowledged that there were multiple versions of $ALON in circulation. Rather than seeking to prevent this and protect buyers from purchasing a coin they did not intend to, he proposed a system allowing creators like himself or Jenner to take a cut of the imitation tokens described above– encouraging their proliferation.*

472.     Pump.fun could have implemented basic technical controls to prevent the creation

of tokens with identical tickers, metadata, or images. Solana and Jito, who process every

transaction and validate every token creation event, could have imposed similar blacklists. Neither Pump.fun, Solana, nor Jito intervened.

473.     The Enterprise possessed the technical capability to ban users and control platform access but selectively chose not to protect users.

474.     The Enterprise possessed but seldom exercised centralized editorial control over platform content and user visibility.

475.     Internal communications and screenshots show the existence of a centralized moderation interface and granular editorial tools. Pump.fun personnel referenced a dedicated "moderation" dashboard that could mark tokens as NSFW and manage visibility, and discussed functionality to ban specific terms and retroactively delete large volumes of prior messages.

right now moderators can access a panel at:
https://www.pump.fun/moderation

if their address is listed as an admin in the admins table in the db then they can mark coins as NSFW, delete messages, and also ban people by ip address (when somebody gets banned, the previous 10 messages posted from their address is deleted). the bans are tracked in the bans table in the db. there is also a "banned terms" section that lets them add a term to the ban list. this will prevent anyone from creating a future reply with that term.

*Figure 67: Pump Fun Team Chat message from Out (Kerler) on April 7, 2024.*

476.     Internal messages further demonstrate Pump.fun's ability to ban users, including through IP-based enforcement, and to reverse certain actions through administrative controls. These capabilities confirm centralized editorial control over platform content and user visibility.

477.     Internal communications show the team explicitly chose to deprioritize "random"

creators in favor of "highly followed" ones, abandoning any pretense of a level playing field. This divided the user base into two classes: the "highly followed" who received algorithmic promotion, and ordinary users who remained invisible.



*Figure 68: Pump Fun Team Chat on April 27, 2024.*

478.    Defendants' moderation decisions prioritized volume and fee revenue over legality and consumer protection.

479.    Defendants intervened primarily when publicity threatened platform growth rather than when illegality harmed users.

### E.   Internal Communications Expose Leadership's Knowledge and Intent

480.    Internal communications obtained through whistleblower disclosures reveal that Leadership knew the platform caused harm and chose to operate it anyway. The following are select highlights.

481.    Internal communications further show that Leadership treated Pump.fun's code and operational details as highly sensitive and took deliberate steps to keep them from public scrutiny. Team members warned that "reporters" were attempting to "dig up" internal information.



*Figure 69: Sapijiju (Tweedale) on April 6, 2024.*

### 1. Leadership Designed the Livestream Feature to Incentivize Dangerous Behavior

482.    The livestream feature was designed to incentivize dangerous and extreme behavior to drive trading volume.

483.    Internal communications prove Leadership was aware of high-risk behavior (which drew attention, which drove volume, which drove token price) occurring on the platform.



*Figure 70: Pump Team Chat post by Alon (Cohen) on May 01, 2024.*

484.    Cohen observed that livestreamers were naturally "coming up with their own targets," this observation led to a specific product decision: to hard-code these targets into the app, institutionalizing the gamification of self-destructive behavior.



*Figure 71: Pump Team Chat post by Alon (Cohen) on May 04, 2024.*

485.    Internal communications show the team intentionally sought to make it "far more difficult" for users to shy away from commitments, designing the system to hold users to their most impulsive, high-risk promises. Cohen enthusiastically agreed that the "options are limitless" for these coercive features.

486.    Streaming was long understood by the Pump.fun team to be a revenue opportunity because sensational behavior drove volume and volume drove price. A Pump.fun core dev shared the screenshot below: "whoever builds a streaming service with pump dot fun

AMM is going to print…" Alon reacted with a heart.



*Figure 72: Pump Team Chat May 6, 2024.*

### 2. Leadership Developed and Implemented Features which Resembled a Multi-Level Marketing Scheme

487.     Leadership explicitly endorsed modeling the platform's growth after a Multi-Level Marketing scheme.

488.     Similarly, Pump.fun personnel discussed implementing "referrer" discounts expressed in basis points as part of fee architecture—reducing costs for referred users and embedding recruitment incentives directly into the protocol's economic design.

200



*Figure 73: Pump Team Chat post by Out (Kerler).*

489.    The Enterprise designed social features to pressure unsophisticated users while sophisticated predators evaded them.

490.    Cohen pushed to implement a "shame" leaderboard, a design feature which would discourage users from not holding onto tokens long enough for insiders to profit.





*Figure 74: Alon (Cohen), Sapijiju (Tweedale), and Laddoy on May 6, 2024.*

### 3. Miscellaneous Evidence of Scienter from Team Chats

491.    Internal communications show Pump.fun had a practice of deploying code before security audits were complete, despite having retained auditors.

202



*Figure 75: Pashov (outside auditor) on May 5, 2024.*

492.    Leadership was aware that rug-pulls were endemic to the platform and treated user losses as entertainment.

493.    Leadership circulated a post from a Pump.fun user (@BastilleBTC), who was later brought on as a Lead KOL, describing how to spot "rugs" evincing awareness that the platform was used to rug tokens. A team member commented that the "social layer is not strong enough," implying platform survival depended on social distraction. They needed a "stronger social layer" to keep users coming back even after losing money.



*Figure 76: Pump Fun Team Chat between Out (Kerler) and Alon (Cohen) on April 28, 2024.*

494.        After being shared in the team chat by Alon, the official Pump.fun account publicly corrected a prominent influencer's estimate of "100x" returns to "10000x," explicitly marketing the platform as a provider of extreme variance using the exact language of lottery marketing. By accepting the premise that the only options were "10000x or 0," Leadership admitted the assets had no intrinsic value.





*Figure 77: Pump Fun Team Chat May 9, 2024.*

## VI.    PUMP.FUN SOLD CERTAIN UNREGISTERED SECURITIES

### A. ~~A.~~ Pump.fun's Role as Issuer and Seller

~~367.~~495.    Pump.fun does not operate as a passive token launch exchange where users independently deploy tokens. Instead, people who want to create tokens submit code through the Pump.fun interface. That code is stored on Pump.~~fun's~~fun's smart contracts and

is not live on the blockchain. Only when another user purchases the code does Pump.fun execute the launch. At that point, Pump.fun mints the token, creates the liquidity pool, and manages trading through its bonding-curve system. Pump.fun controls this entire process—it executes the launch, sets the economics, and routes fees. It is not a passive platform. Consequently, Pump.Fun is the issuer of the non-registered security.

## B. Plaintiffs Do Not Contend That All Pump.fun Issued Tokens Are Securities

368.496.   Pump.fun has launched more than eleven million tokens. Many were joke coins, memes, or impersonations of celebrities and companies without consent. These included tokens using corporate logos, stock tickers, and public figures'figures' names, often with no functionality or roadmap. Plaintiffs do not claim that all of these tokens were securities.

369.497.   The tokens: StakeCoin ("("STC"),"), QuStream ("("QST"),"), BunkerCoin ("("BUNKER"),"), DeepCore AI ("("DPCORE"),"), AgentPy (APY), Apex AI (APEX), Verse World (VERSE), BAYC AI (BAYCI), Alchemist AI (ALCH), CINO (CINO), Swarms (SWARMS), Collaterallize (SCOLLAT), XSPA (XSPA), Hive AI (BUZZ), SwarmNode.ai (SNAI), Codec Flow (CODEC), PVS (PVS), Convergent (CVGT), First Convicted Raccoon (FRED), and GRIFFAIN (GRIFFAIN) (collectively, the ""Pump Securities")") are securities and were promoted as having real-world utility and value tied to the future success of specific projects.

370.498.   They included references to revenue-generating platforms, tokenized assets, artificial intelligence tools, and staking systems. Purchasers were invited to ""get in early,"," before the projects were built or released, and profit from future developments. These are the _offerings that form the basis of Plaintiffs'Plaintiffs' securities claims. The

broader class of tokens launched on Pump.fun remains relevant to the RICO and other claims in this Complaint.

## C. Pump.fun Sold as Investment Contract Securities

371.499.    Each of the Pump Tokens was offered and sold as an investment contract. Across all twenty tokens, the following characteristics were present:.

372.500.    Investment of Money: Purchasers used SOL to buy the tokens directly from Pump.fun'sfun's system. These were paid transactions through bonding-curve contracts.

373.501.    Common Enterprise: The tokens were structured so that users'users' funds were pooled. The price increased or decreased depending on the total level of participation. Every buyer'sbuyer's outcome depended on the success of the project as a whole establishing horizontal or vertical commonality.

374.502.    Expectation of Profits: Buyers were told that the token would increase in value over time as future steps were completed. This included promises of platform launches, product rollouts, or integration into larger ecosystems. The tokens were described as reasonable opportunities for return on investment.

375.503.    Efforts of Others: The future value of the token depended on the issuer or platform doing work after the sale. This included building apps, launching services, completing integrations, or managing staking systems. Purchasers were not buying completed products—they were investing in projects that had yet to be built.

504.        These common features show that the Pump Tokens were not digital collectibles or 376.    memes. They were positioned as financial assets sold to the public with the promise of future gains.

206

### D. Pump.~~fun's~~fun's Fees, and Structural Exploitation

~~377.~~505.    At the center of Pump.~~fun's~~fun's economic model is a platform-wide 1% fee applied to every transaction. This fee is collected automatically from all buys and sells conducted through the bonding curve, as well as from tokens that ~~"~~"graduate~~"~~" to external decentralized exchanges (DEXs). Graduation occurs when a token achieves sufficient trading volume and meets arbitrary platform-defined thresholds. While framed as a reward for success, graduation has itself become a vector for exploitation: tokens that graduate are often used to promote the ~~platform's~~platform's viability, while simultaneously being dumped by insiders who received early allocations or exploited the bonding curve for artificial gains.

506.    ~~Pump.fun's revenue extraction model is structurally predatory.~~Because the fixed 1% transaction fee received by Pump.fun is a percentage, Pump.fun receives more money as the price of the memecoin increases.  A transaction at $100 would have a $1 fee to Pump.Fun but a transaction at $1,000 would have a $10 fee.  In other words, Pump.fun's fortune is tied to the performance of the token price. This supports vertical commonality.

507.    The funds Pump.fun receives as the 1% transaction fee are used by Defendants, at least in part, to develop the Pump.Fun ecosystem.

~~378.~~508.    Pump.fun's revenue model is structurally predatory. The platform, which has no age restrictions, KYC checks or AML protocols, is not merely a tool for token deployment; it is a financial product whose primary function is to manufacture and capitalize on rapid ~~cycles of speculative buying and collapse.~~

cycles of speculative buying and collapse.

509. Every token launched generates fee income for Pump.fun, regardless of whether it retains value, fulfills any stated purpose, or results in investor loss. In this respect, Pump.fun is economically aligned with volatility, not long-term value creation.

510. Solana Labs and Jito Labs played indispensable roles in enabling this scheme. Solana Labs developed and maintained the SPL token program and the validator infrastructure that allows Pump.fun to operate at scale. Jito Labs, for its part, provided the tools for maximum extractable value (MEV) harvesting, enabling early buyers and bundle-senders to front-run new token launches.

511. Together, their infrastructure facilitated real-time token creation, instantaneous liquidity, and arbitrage opportunities that insiders could exploit before retail users even had the chance to transact.

512. Pump.fun exercises comprehensive control over every token launched on its platform. All tokens are built using standardized smart contract templates authored or controlled by Pump.fun, with no deviation allowed from the platform's design choices.

513. Pump.fun sets the economic parameters for token issuance, manages the bonding curve liquidity pools, governs graduation conditions, and profits directly from every trade. Token creators are not independent developers—they are participants in a turnkey system entirely operated by Pump.fun and its corporate parent.

514. As such, Pump.fun qualifies as both the issuer and the statutory seller of every token generated through its platform. Its direct role in designing, deploying, marketing, and monetizing the tokens, combined with its collection of fees on every transaction and its central control over the underlying smart contract infrastructure, renders it liable under federal securities laws. Far from being a neutral tool provider, Pump.fun actively solicits

208

~~investment, facilitates token speculation, and profits from the unlawful offering and sale of unregistered securities.~~

investment, facilitates token speculation, and profits from the unlawful offering and sale of unregistered securities.

## CLASS ACTION ALLEGATIONS

~~385.~~515.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, and seek certification of the following Class and Pump Tokens Subclass.

~~386.~~516.    Plaintiffs seek to represent the following "Class" and "Pump Tokens Subclass" (collectively, "the Classes~~"):~~"):.

517.        ~~(1)~~    The Class: All persons who purchased any Tokens sold through Pump.fun during the "Class Period" (from March 1, 2024 through the date of this Complaint) and had an out-of-pocket loss on their investment in Pump.fun Tokens.

518.        ~~(2)~~    Pump Tokens Subclass: All persons who purchased the twenty Pump Tokens.

~~387.~~519.    Plaintiffs reserve the right to modify or refine the definitions of the Class or Pump Tokens Subclass based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

~~388.~~520.    Excluded from the Classes are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

~~389.~~521.    The members of the Class and Subclass are so numerous that joinder of all members is impracticable. While the exact number of Class and Subclass members is unknown to

Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class and tens of thousands of members in the Subclass. For example, several blockchain analysis websites show that more than 174,000 crypto wallets hold just the First Convicted Raccoon Token and the GRIFFAIN Token.[39]

390.522.    Members of the Class and Subclass are readily ascertainable and identifiable. Members of the Class and Subclass may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or their agents. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions or by sending notice directly to the wallets themselves.

391.523.    Plaintiffs' claims are typical of the claims of the Class and Subclass members as all Class and Subclass members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein. Plaintiffs do not have any interests that are in conflict with the interests of the members of the Class or the Subclass.

392.524.    Plaintiffs and members of the Class and Subclass sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

393.525.    Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and Subclass and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to those of the Class and Subclass.

---

[39] See https://solscan.io/token/CNvitvFnSM5ed6K28RUNSaAjqqz5tX1rA5HgaBN9pump https://solscan.io/token/A8C3xuqscfmyLrte3VmTqrAq8kgMASius9AFNANwpump https://solscan.io/token/KENJSUYLASHUMfHyy5o4Hp2FdNqZg1AsUPhfH2kYvEP. (Last accessed July 22, 2025).

394.526.    Common questions and answers of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class and Subclass, including, but not limited to, the following:

(a) a)——Whether the Tokens are securities under the Securities Act; 268;

(b) b)——Whether Defendants' offerings and sales of the Tokens violated the Securities Act;

(c) c)——Whether the Defendants violated RICO;

d)    Whether Defendants violated NY G.B.L. §§349 and 350;

(d) e)——Whether Defendants were unjustly enriched;

(e) f)——Whether the members of the Classes have sustained damages and, if so, the proper measure of damages; and

(f) g)——Whether the Class and Subclass are entitled to injunctive relief, restitution and/or rescission.

395.527.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some of the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class and Subclass to individually redress the wrongs done to them.

396.528.    Class treatment will also permit the adjudication of claims by many Class and Subclass members who could not afford individually to litigate claims such as those asserted in this Complaint. –The cost to the court system of adjudication of such individualized litigation would be substantial. –The prosecution of separate actions by individual members of the Class and Subclass would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

397 529.    Plaintiffs are unaware of any significant difficulties that are likely to be encountered in the management of this action as a class action.

CAUSES OF ACTION

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF 18 U.S.C. § 1962(c)
### (Conduct of Enterprise Affairs Through a Pattern of Racketeering Activity)
### Against All Defendants

530.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

## Statutory Framework and Standing

531.    Section 1962(c) makes it unlawful for any person employed by or associated with an enterprise engaged in, or affecting, interstate or foreign commerce to conduct or participate (directly or indirectly) in the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). Section 1964(c) authorizes any person injured in business or property "by reason of" a § 1962 violation to recover treble damages, costs, and reasonable attorneys' fees.

532.    Plaintiffs and Class members were injured in their business or property by Defendants' violations of § 1962(c). Plaintiffs' injuries arise from two distinct but related mechanisms. First, Plaintiffs paid for a bargained-for exchange that never occurred: the opportunity to participate in a game of chance offered by the Solana-Pump.fun Racketeering Enterprise. The Enterprise rigged the game through supply control, demand manufacturing, and managed exits. These conditions eliminated chance and gave the Enterprise control over outcomes.

533. Second, Plaintiffs were induced to participate through material misrepresentations and omissions regarding, but not limited to, fair launches and equal access. Both mechanisms caused injury. Plaintiffs' concrete injuries include: (a) losses from purchasing tokens at prices inflated by rigged market conditions and coordinated insider activity; (b) platform fees extracted by Pump.fun on every transaction; and (c) network fees paid on the Solana blockchain. Plaintiffs seek treble damages, costs, and reasonable attorneys' fees under § 1964(c).

**The Defendants Are "Persons" Under RICO**

534. Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3), capable of

holding a legal or beneficial interest in property.

**The Solana-Pump.Fun Racketeering Enterprise Is an "Enterprise" Under RICO**

535. An "enterprise" includes any group of individuals or entities associated in fact. 18 U.S.C. § 1961(4). An association-in-fact enterprise requires only a purpose, relationships among those associated, and longevity sufficient to permit pursuit of the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009).

*Association-in-Fact Enterprise*

536. The "Solana-Pump.fun Racketeering Enterprise" is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of: Pump.fun; its founders Alon Cohen, Dylan Kerler, and Noah Tweedale; Solana Labs; the Solana Foundation; their principals Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu; the Lead KOL Doe Defendants, and other coordinated participants who functioned as an ongoing organization with systematic linkages to accomplish the Enterprise's common purpose

213

*Common Purpose*

537.    The Enterprise's common purpose was to enrich its members by operating a rigged gambling operation that extracted billions from retail participants. The Enterprise accomplished this through two mechanisms:

538.    First, the Enterprise rigged the game through three structural conditions:

a.    Supply control: insiders acquired disproportionate token supply at the lowest prices before retail could act;

b.    Demand manufacturing: coordinated promotions created retail buyers whose purchases provided exit liquidity for insiders who had already positioned; and

c.    Managed exits: insiders sold in coordinated sequence at peak prices into the demand their own promotion generated.

539.    Second, the Enterprise induced participation through fraudulent misrepresentations and omissions. Defendants made materially false claims of "fair launches" and an "even playing field" while concealing insider pre-positioning, paid coordination, and the priority execution advantages that made retail losses inevitable.

*Relationships and Structure*

540.    The Enterprise operated through a hierarchical structure with defined roles and controlled information access, including:

a.    Leadership Tier (Cohen, Kerler, Tweedale, Yakovenko, Gokal, Albert, Federa, Liu): Controlled platform architecture, campaign approvals, and early access to token addresses. Leadership retained and supervised promoters, determined which tokens would be promoted and when.

214

b.  Operations Command Tier: Recruited/managed KOLs, controlled narratives and posting cadence, coordinated insider pre-positioning and exit timing, and administered compensation (cash and/or early access).

c.  Operational Cells: Small persistent crews that executed campaign orders by launching tokens, running coordinated social media campaigns to create false impressions of organic interest, deploying bot networks to amplify content and simulate engagement, and conducting harassment campaigns against competitors or defectors.

d.  Operators: Influencers who promoted tokens across social media platforms, received instructions and early token addresses through private channels, and maintained downstream "Friends and Family" distribution networks through which promotional information cascaded.

541.    The Enterprise's relationships were maintained through:

a.  Binding KOL agreements requiring "organic" promotion while concealing compensation;

b.  Information control over early token addresses;

c.  Aligned financial incentives tied to volume and fee capture; and,

d.  Coercive enforcement (exclusion, retaliation, reputational attacks) against defectors and competitors.

*Longevity*

542.    The Enterprise has operated continuously from at least early 2024 through the present repeating the same playbook across numerous narrative campaigns (*e.g.* the 'Nostalgia' campaign featuring the COPE token as discussed herein).

215

543.      During this period, the Enterprise generated billions of dollars of proceeds from Plaintiffs as described in this Complaint's factual allegations Section III.

*Distinctness*

544.      The Solana-Pump.Fun Racketeering Enterprise is distinct from each Defendant. It is an association-in-fact comprising multiple persons; no single Defendant is the Enterprise itself. Each Defendant was employed by or associated with the Enterprise and conducted or participated in its affairs. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).

*Effect on Interstate and Foreign Commerce*

545.      The Enterprise engaged in, and its activities affected, interstate and foreign commerce by, among other things: operating Pump.fun over the internet; transmitting promotions and solicitations across U.S. and foreign users; coordinating through Telegram/Discord; routing and settling transactions over Solana's globally distributed network; and moving proceeds to centralized exchanges and foreign structures while continuing to market to U.S. users.

**Each Defendant Conducted or Participated in the Enterprise's Affairs**

546.      Section 1962(c) requires that a defendant "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." The Supreme Court has held that this requires "some part in directing the enterprise's affairs," which may be satisfied by participation in the "operation or management" of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 185 (1993).

*Pump.fun Defendants*

547.     Baton Corporation Ltd. d/b/a Pump.fun participated by designing and operating the platform and bonding-curve mechanics that structurally reward first movers; permitting anonymous access without KYC/AML/sanctions screening or age verification; extracting a 1% fee on every buy and sell; retaining and compensating KOLs under agreements requiring concealed "organic" promotion; providing features designed to maximize addictive engagement and trading volume; and exercising centralized control to protect Enterprise interests rather than users.

548.     Cohen participated by directing enterprise strategy and campaign approvals; controlling early token-address distribution and KOL access; coercing promoters through allocation control (including conditioning allocation restoration on bringing in additional influencers); and making material representations and omissions while internally acknowledging Pump.fun's casino-like nature and that "most lose."

549.     Kerler participated by directing technical development and execution integration, including implementing tooling to measure and optimize preferred participants' execution "land rate" and integrating priority pathways essential to insider-first execution.

550.     Tweedale participated by coordinating operations and KOL management, and by directing concealment efforts, reflecting consciousness of wrongdoing.

*Solana Defendants*

551.     Solana Labs participated by authoring and maintaining the SPL Token Program and core validator/network systems that made Pump.fun token creation and high-frequency trading feasible; implementing network updates in April 2024 that enabled Pump.fun's successful launch after prior failures; providing direct technical support; and publicly promoting Pump.fun-driven activity to increase network usage and fee revenue.

217

552.     Solana Foundation participated by coordinating with Solana Labs on ecosystem strategy and regulatory posture (including foreign foundation wrappers), directing resources and ecosystem coordination enabling Pump.fun, and benefiting from network economics tied to transaction volume, including control of a substantial portion of the original SOL supply (approximately 49% between direct allocation and reserves) and large staking rewards (approximately four million SOL annually during 2024–2025, valued roughly $700–$800 million).

553.     Individual Solana Defendants participated by lending credibility, support, and strategic alignment to the Enterprise, including:

a.  Yakovenko publicly endorsed Pump.fun ("pump dot fun has a shot at building a global streaming platform") on August 19, 2025, and equated memecoins with gambling "lootboxes" on March 13, 2024, evidencing knowledge of the chance-based wagering dynamic intrinsic to a facet of the Enterprise's product.

b.  Gokal publicly framed Pump.fun token launches as rapid fundraising ("where else can you raise $400m in 13 minutes?") on July 12, 2025, and admitted the throughput-to-volume monetization sequence ("more throughput… then cash in on the volume") on January 29, 2025.

c.  Albert, Federa, and Liu directed strategy/resources supporting the infrastructure and volume-driven economic posture on which the Enterprise relied, including promoting foreign-structure strategies to limit U.S. exposure while continuing to solicit U.S. users and flow.

*Lead KOL Doe Defendants*

218

554.    The Lead KOL Doe Defendants participated by receiving early token addresses through private channels; pre-positioning at lower prices; coordinating promotional narratives, timing, and posting cadence with enterprise leadership/operations; activating and directing downstream "friends & family" distribution networks; concealing compensation and coordination; and executing managed exits into the retail demand their promotions generated.

**Through a Pattern of Racketeering Activity**

555.    Defendants conducted and participated in the Enterprise's affairs through a pattern of
racketeering activity within 18 U.S.C. §§ 1961(1) and 1961(5), including (at minimum): wire fraud (18 U.S.C. § 1343), illegal gambling business (18 U.S.C. § 1955), state-law gambling felonies (18 U.S.C. § 1961(1)(A)), and illegal money transmitting (18 U.S.C. § 1960).

556.    The predicate acts are related and amount to, and pose a threat of, continued criminal activity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

*Relatedness and Continuity*

562.    The predicate acts described below were related to each other in that they had the same or similar:

    a. **Purposes:** Each predicate act was committed to extract value from retail participants by inducing them to transact based on false representations of fair access and organic discovery, while insiders who controlled supply, manufactured demand, and managed exits captured the proceeds;

219

b. **Results:** Each predicate act resulted in retail losses and insider profits, with Plaintiffs and Class members paying prices inflated by fraudulent promotion and absorbing losses when insiders executed their managed exits;

c. **Participants:** Each predicate act was committed by or at the direction of the same core group of Enterprise participants—Leadership (the Pump.fun Defendants), Infrastructure Providers (the Solana Defendants), and Promoters (the Lead KOL Doe Defendants)—operating through the same hierarchical command structure;

d. **Victims:** Each predicate act targeted the same class of victims—retail users of the Pump.fun platform, including New York consumers, who were induced to participate based on false representations and were structurally positioned as exit liquidity from the moment they arrived;

e. **Methods of Commission:** Each predicate act was committed using the same operational playbook: target selection and campaign planning; bundling and pre-positioning; coordinated promotional deployment through Lead KOLs, secondary KOLs, and F&F networks; leadership signals; and managed profit taking.

557. The pattern satisfies continuity: (a) closed-ended continuity because the scheme operated repeatedly from at least early 2024 through the present; and (b) open-ended continuity because the predicate acts are the regular way the Enterprise conducted, and continues to conduct, its business.

### First Predicate Act: Wire Fraud (18 U.S.C. § 1343)

558. Defendants committed, caused, and knowingly facilitated multiple acts indictable under 18 U.S.C. § 1343 by devising a scheme to obtain money or property through

220

materially false pretenses, representations, and omissions, and transmitting (or causing the transmission of) communications by interstate and foreign wires to execute that scheme.

559.     The elements of wire fraud are: (1) a scheme or artifice to defraud; (2) money or property as the object of the scheme; (3) use of interstate wires in furtherance of the scheme; and (4) the defendant's knowing and willful participation in the scheme with intent to defraud.

### 1. The Scheme to Defraud

560.     Defendants devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and omissions. The wire-fraud scheme operated through:

   a. **Supply Control:** insiders acquired disproportionate token supply at the lowest prices using advance knowledge, bundling across wallets, and paid priority execution that ensured insider orders executed first.

   b. **Demand Manufacturing:** coordinated promotions created a false appearance of organic, independent discovery through lead KOL pushes, secondary amplification, friends & family cascades, leadership signals, and engagement/bot amplification.

   c. **Managed Exits:** insiders sold into induced demand through sequenced exits timed to coincide with peak retail inflows, while promotion continued even after senior insiders exited.

   d. The scheme depended on concealment. Reasonable consumers would not have transacted had they known "fair launch" claims were false; promotions were paid and centrally coordinated; insiders pre-positioned at unavailable prices; and transaction ordering could be purchased to guarantee insider-first execution.

## 2.  Material Misrepresentations and Omissions[40]

### a.   The "Fair Launch" Misrepresentations:

- **Who:** Defendant Cohen, on behalf of Pump.fun.

- **What:** On September 25, 2024, Cohen retweeted a screenshot of a direct message he sent to a prospective user stating that Pump.fun was an "unruggable fair launch platform."

- **Where:** The statement was disseminated on X/Twitter and viewable by Cohen's followers and the public.

- **When:** September 25, 2024.

- **How it was Misleading:** The representation that Pump.fun was "unruggable" and offered "fair launches" was false because: (i) the bundling system allowed insiders to package multiple buy transactions and execute them at or before token launch, capturing supply before anyone else could act; (ii) the bonding-curve design guaranteed that insiders who bought first received the lowest prices; (iii) the platform's no-KYC design allowed insiders to disguise coordinated accumulation across anonymous wallets; (iv) priority execution systems allowed insiders to pay for guaranteed transaction ordering; and (v) Defendants implemented no meaningful protections that would make "fair launch" claims true because such protections would undermine the supply control that made profit possible.

- **Scienter:** Cohen knew these representations were false because he directed the Enterprise's operations, controlled access to early information as a

---

[40] Plaintiffs note this is not an exhaustive list of Defendants' material misrepresentations and omissions.

"lever" of coercive power, and acknowledged in internal communications that the platform was a "casino" where users were "gambling" with "really really low odds" and the goal was to make them "happier (Even though most lose)."

b. **The "Level Playing Field" Misrepresentations:**

- **Who:** Defendant Cohen, on behalf of Pump.fun.

- **What:** On October 4, 2024, Cohen posted on X/Twitter: "pump fun is as much of an even playing field as it gets IMO."

- **Where:** X/Twitter, viewable by Cohen's followers and the public.

- **When:** October 4, 2024.

- **How Misleading:** The representation that Pump.fun was "an even playing field" was false because the Enterprise systematically advantaged insiders through: (i) early access to token addresses before any public promotional activity; (ii) priority execution that allowed insiders to pay for first position; (iii) coordination through private Telegram channels; and (iv) managed exits that ensured insiders sold before the price collapsed. The playing field was structurally rigged against retail participants.

- **Scienter:** Cohen knew the playing field was not "even" because he determined who received access to opportunities and when, personally directed promotional campaigns, and controlled the enforcement mechanisms that kept subordinate participants in line.

c. **The 'Retail is Winning' Misrepresentations:**

- **Who:** Defendant Cohen, on behalf of Pump.fun.

223

- **What:** On October 12, 2024, Cohen posted on X/Twitter: "retail's already up massively because it's so easy for them to get involved and the playing field is as fair as ever."

- **Where:** X/Twitter, viewable by Cohen's followers and the public.

- **When:** October 12, 2024.

- **How Misleading:** The representation that "retail's already up massively" was false because: (i) the vast majority of wallets that transacted on Pump.fun ended in net negative positions; (ii) a user who earned more than $10,000 in profit ranked in the top 0.412% of all users; (iii) over 95% of wallets never cleared $10,000 in gains; (iv) the 'success stories' cited to induce participation represented insider gains, not retail gains; and (v) the platform was designed to ensure that retail losses funded insider profits.

- **Scienter:** Cohen knew retail was not "up massively" because he designed the platform to extract value from retail, acknowledged in internal communications that "most lose."

d. **The "Organic Promotion" Misrepresentations:**

- **Who:** Enterprise participants including Cohen, Lead KOL Doe Defendants, and other KOLs acting at the direction of Operations Command.

- **What:** KOL promotions of tokens across X/Twitter, YouTube, TikTok, and X Spaces that presented the appearance of independent, organic discovery of investment opportunities, including: (i) Orange's post on August 27, 2025, stating "Haven't been excited about a coin in a long time... Don't $cope later"; (ii) staged interviews with the COPE developer propagating

224

the fabricated "17-month grind" narrative; (iii) coordinated promotional threads timed to coincide with insider positioning.

- **Where:** Social media platforms including X/Twitter, YouTube, TikTok, and Telegram, viewable by KOL audiences and the public.

- **When:** Throughout the Class Period, including specific instances on August 27, 2025 (COPE launch promotion), and September 4, 2025 (staged developer interview).

- **How Misleading:** The promotions appeared to be independent, organic endorsements when they were in fact: (i) centrally coordinated by Operations Command; (ii) compensated through direct payment and/or early access to token positions; (iii) timed according to a promotional calendar designed to maximize insider profit; and (iv) required to appear "organic" under standard Pump.fun KOL agreements. The concealment of compensation and coordination was material because audiences reasonably believed they were receiving independent analysis rather than paid advertisements from people who had already positioned themselves to profit from their purchases.

- **Scienter:** The Lead KOL Doe Defendants knew their promotions were misleading because they received early token addresses through private channels, pre-positioned before promoting, and executed managed exits into the retail demand their promotions generated.

e. **Material Omissions**

225

- **Omission of Paid Coordination:** Defendants failed to disclose that promotional activity appearing organic was in fact paid and coordinated. This information was material because a reasonable retail participant would have wanted to know that the person urging them to buy had already positioned at lower prices and would be selling to them.

- **Omission of Insider Pre-Positioning:** Defendants failed to disclose that Enterprise insiders acquired supply at the lowest prices before promotional activity began, and that retail participants were structurally positioned to purchase only after insiders had positioned. This information was material because it negated the "fair launch" and "level playing field" representations.

- **Omission of Priority Execution Advantages:** Defendants failed to disclose that insiders could pay for guaranteed priority execution, ensuring their orders executed before retail orders could. This information was material because it revealed that the execution environment was pay-to-win, not fair.

- **Omission of Managed Exit Coordination:** Defendants failed to disclose that insiders coordinated their selling to occur at peak demand, with senior insiders exiting first while promotional activity continued to induce new retail buying. This information was material because it would have revealed that the promotional campaigns were for the purpose of generating sufficient retail demand for insiders to sell at favorable prices before engineered price declines.

226

- **Omission of Structural Losses:** Defendants failed to disclose that the vast majority of Pump.fun users lost money, that over 95% of wallets never cleared $10,000 in gains, and that the platform was designed to ensure retail losses funded insider profits. This information was material because it directly contradicted representations, for example, that retail was "up massively" and could "win."

**Use of Interstate and Foreign Wires**

561.    Defendants and Enterprise participants used interstate and foreign wires, including: Pump.fun's website/app communications; social-media posts and videos; Telegram/Discord coordination; on-chain transaction routing and settlement across a globally distributed validator network; and direct solicitations (including Cohen's "3,000+ cold DMs").

562.    Representative wire fraud acts include:

- On September 25, 2024, Cohen transmitted or caused to be transmitted a retweet via X/Twitter containing his direct message claiming Pump.fun was an "unruggable fair launch platform," which was false for the reasons stated above;

- On October 4, 2024, Cohen transmitted or caused to be transmitted a post via X/Twitter stating "pump fun is as much of an even playing field as it gets," which was false for the reasons stated above;

- On October 12, 2024, Cohen transmitted or caused to be transmitted a post via X/Twitter stating "retail's already up massively because it's so easy for them to get involved and the playing field is as fair as ever," which was

227

false for the reasons stated above;

- On August 18, 2025, Cohen transmitted or caused to be transmitted a post via X/Twitter stating "bottom on my memes or I chop it off" to prime the market for the COPE campaign, knowing insiders had already positioned;

- On August 27, 2025, a Lead KOL transmitted or caused to be transmitted a post via X/Twitter stating "Haven't been excited about a coin in a long time... Don't $cope later," launching the coordinated COPE promotional campaign while omitting his insider position and compensation;

- On each date that Cohen sent one of his "3,000+ cold DMs" soliciting participation in the Pump.fun platform, Cohen transmitted or caused to be transmitted a wire communication soliciting investment in the fraudulent scheme.

- On July 18-19, 2025, Defendants Liu and Federa transmitted or caused to be transmitted posts via X/Twitter discussing the Enterprise's strategy of routing token launches through foreign foundations to obtain favorable tax and regulatory treatment, which communications furthered the scheme by articulating and coordinating the Enterprise's compliance avoidance posture.

**Scienter**

563.    Defendants acted knowingly and with intent to defraud as shown, among other things, by: (i) internal acknowledgments characterizing Pump.fun as "gambling" with low odds; (ii) public statements describing Pump.fun as a "casino"; (iii) deliberate operation

228

without KYC/AML/sanctions screening despite foreseeability of misuse; (iv) concealment steps taken when scrutiny increased; and (v) continued inducement of retail participation after learning of predatory conduct and retail losses.

**Knowing Facilitation by Solana Defendants**

564.    The Solana Defendants knowingly participated in the wire fraud scheme by managing and directing the operations of the Enterprise that enabled insider-first execution and high-frequency profit taking, while profiting from the resulting surge in transaction volume, fees, and tips—and while the Enterprise continued to market "fair launches" and "organic" discovery narratives contradicted by the pay-to-win execution environment and insider pre-positioning.

*Second Predicate Act: Illegal Gambling Business (18 U.S.C. § 1955)*

565.    Defendants conducted, financed, managed, supervised, directed, and/or owned an illegal gambling business through Pump.fun. Users staked SOL, something of value, on whether they could sell before demand disappeared—risking something of value on a future contingent event outside their control in exchange for the chance to receive something of value.

566.    Section 1955 provides that whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be guilty of a federal offense.

567.    Section 1955(b)(1) defines "illegal gambling business" as a gambling business which: (i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially

continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 or more in any single day.

568.    The gambling business violated state law, including  the laws of New York. Pump.fun users in New York staked SOL on whether subsequent buyers would appear and expected SOL proceeds if they sold before buyers disappeared.

569.    The business involved at least five persons and operated continuously for well over thirty days while generating gross revenue far exceeding $2,000 in single-day periods, including peak fee days exceeding $10 million, in violation of Section 1955(b)(1).

**Violation of State Law**

570.    The illegal gambling business violated the laws of states in which it was conducted, including New York.

571.    New York Penal Law § 225.00(2) defines "gambling" as staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the actor's control or influence, upon an agreement or understanding that the person will receive something of value in the event of a certain outcome.

572.    Pump.fun users in New York staked SOL (something of value) upon the outcome of whether subsequent buyers would emerge to purchase tokens at higher prices (a future contingent event not under the user's control), upon the understanding that they would receive SOL proceeds (something of value) if they sold before buyers disappeared.

573.    New York Penal Law § 225.10 (Promoting Gambling in the First Degree) provides that a person is guilty when he knowingly advances or profits from unlawful gambling

activity by engaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars.

574.    Defendants knowingly advanced gambling activity by operating the Pump.fun platform through which New York residents placed wagers, and profited from such activity by collecting fees on each transaction. On peak trading days, Pump.fun earned in excess of $10 million in platform fees, representing wagers far exceeding the statutory threshold.

575.    New York Penal Law § 225.05 (Promoting Gambling in the Second Degree) provides that a person is guilty when he knowingly advances or profits from unlawful gambling activity. Defendants knowingly advanced and profited from unlawful gambling activity by New York residents through the operation of the Pump.fun platform, as described herein.

**Continuous Operation and Revenue**

576.    The illegal gambling business has operated in continuous operation since its launch in early 2024 through the present—a period exceeding eighteen months.

577.    The illegal gambling Pump.fun operation generated over $400 million in platform fee revenue during 2024 alone. Average daily revenue rose from approximately $900,000 per day in the third quarter of 2024 to roughly $2.5 million per day in the fourth quarter. On peak trading days, Pump.fun earned in excess of $10 million in platform fees in a single 24-hour period.

*Third Predicate Act: Illegal Money Transmitting Business (18 U.S.C. § 1960)*

578.    Defendants committed multiple acts indictable under 18 U.S.C. § 1960 (illegal money transmitting business).

231

579.    Section 1960 provides that whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business shall be guilty of a federal offense.

580.    Section 1960(b)(1) defines "unlicensed money transmitting business" as a money transmitting business which: (a) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law; (b) fails to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330; or (c) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

581.    The Solana-Pump.fun Racketeering Enterprise knowingly operated a money transmitting business by receiving cryptocurrency (SOL) from buyers on Pump.fun and transmitting it to sellers through its bonding-curve contracts and platform infrastructure.

582.    This activity constitutes "money transmission" under federal law, which includes "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." 31 C.F.R. § 1010.100(ff)(5)(i)(A).

583.    Pump.fun operated without required state money-transmitter licensing, including in

New York (N.Y. Banking Law Art. 13-B, §§ 641, 650), and failed to register as an MSB with FinCEN as required by 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380.

584.    Neither Baton Corporation nor Pump.fun has obtained a money transmitter license from the New York State Department of Financial Services.

232

585.	Operating as an unlicensed money transmitter in New York is a criminal offense. N.Y. Banking Law § 650.

586.	Alternatively, the money transmitting business involved the transportation or transmission of funds that Defendants knew were derived from criminal offenses or intended to promote unlawful activity.

587.	Defendants knew that the funds transmitted through Pump.fun were derived from and

intended to promote:

a.	**Wire Fraud:** The SOL transmitted through Pump.fun was obtained through the fraudulent scheme described above, in which retail participants were induced to purchase tokens based on false representations and material omissions;

b.	**Illegal Gambling:** The SOL transmitted through Pump.fun represented wagers in an illegal gambling operation, with payouts to winners derived from stakes placed by losers;

c.	**Money Laundering by Criminal Organizations:** In or around February 2025, the Lazarus Group—a North Korean state-sponsored cybercrime unit subject to U.S. sanctions—used Pump.fun to launder proceeds from approximately $1.5 billion stolen from the Bybit exchange by deploying a memecoin named "QinShihuang," achieving $26 million in trading volume before dispersing proceeds.

588.	Each Defendant knowingly conducted, controlled, managed, supervised, directed, and/or owned all or part of the unlicensed money transmitting business:

a.	**The Pump.fun Defendants** designed, implemented, and operated the money transmission platform; received and transmitted cryptocurrency through its smart

233

contracts and infrastructure; and deliberately avoided licensing, KYC/AML, and registration requirements.

b. **The Solana Defendants** provided and maintained the blockchain infrastructure through which money transmission occurred; and knew that Pump.fun was transmitting funds without required safeguards.

c. **The Individual Solana Defendants** knowingly conducted, controlled, managed, supervised, directed, and/or owned all or part of the unlicensed money transmitting business by:

    i.    Yakovenko, as CEO of Solana Labs, directed the development and operation of the infrastructure and SPL Token Program through which Pump.fun received, converted, and transmitted cryptocurrency, with knowledge that no money transmitter licenses had been obtained;

    ii.    Gokal, as President and COO of Solana Labs, directed operations of the infrastructure through which money transmission occurred, with knowledge of the compliance failures that enabled unlicensed transmission at scale;

    iii.    Albert, as Executive Director of the Solana Foundation, directed Foundation resources supporting the infrastructure through which unlicensed money transmission occurred;

    iv.    Federa, as Head of Strategy of the Solana Foundation, directed strategic initiatives supporting the money transmission infrastructure and developed the regulatory avoidance strategy that enabled continued unlicensed operation;

234

v.    Liu, as President of the Management of the Solana Foundation, directed Foundation governance decisions supporting the infrastructure through which unlicensed money transmission occurred

**Injury and Causation**

589.    Plaintiffs and Class members suffered injury to their business or property "by reason of" Defendants' § 1962(c) violations. Plaintiffs were the immediate and intended victims of the wire-fraud inducements, the illegal gambling profits, and the unlicensed transmission that moved their funds to insiders.

590.    Plaintiffs' injuries include, without limitation:

a.    **Transactional losses:** purchases at fraud-inflated prices followed by collapses after insider exits, leaving Plaintiffs holding depreciated or worthless tokens. Between approximately 81% and 97% of tokens launched through Pump.fun lost more than half their value post-graduation, producing estimated retail losses of $1.2 to $2 billion in the post-graduation phase alone.

b.    **Platform fees:** Pump.fun and Solana fees charged on fraud-induced buys and sells.

c.    **Execution harms:** inferior fills, slippage, and related value losses caused by the pay-to-win priority execution environment that advantaged insiders over retail.

d.    Plaintiffs would not have transacted on Pump.fun, or would not have done so on the same terms, had Defendants disclosed the true nature of the scheme. There is no independent, superseding cause of Plaintiffs' injuries; Plaintiffs' losses flowed directly from the scheme's design.

**I. Prayer for Relief (Count I)**

591.     WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

demand judgment against Defendants, jointly and severally, for: (a) treble damages under 18 U.S.C. § 1964(c); (b) reasonable attorneys' fees and costs under § 1964(c); (c) pre- and post-judgment interest; and (d) such other and further relief as the Court deems just and proper.

## COUNT II

### VIOLATION OF 18 U.S.C. § 1962(d)
### (Conspiracy to Violate RICO)
### Against All Defendants

592.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

## Statutory Framework

593.     Section 1962(d) makes it unlawful for any person to conspire to violate § 1962(c). A plaintiff must plead that the defendant knew about and agreed to facilitate a scheme that, if completed, would satisfy § 1962(c). No overt act is required. *Salinas v. United States*, 522 U.S. 52, 63–66 (1997).

## The Conspiracy

594.     Defendants knowingly and intentionally conspired to violate § 1962(c) by agreeing among themselves and with other Enterprise participants that at least one conspirator would conduct or participate in the conduct of the Solana-Pump.Fun Racketeering Enterprise's affairs through a pattern of racketeering activity, including at least two predicate acts.

595.     The object of the conspiracy was to enrich conspirators by operating the Enterprise's

236

rigged, unlicensed gambling platform and profiting billions from retail through wire fraud, illegal gambling, and unlicensed money transmission, monetized through platform fees, network/validator economics, and MEV/priority tips.

## Knowledge and Agreement

596.    Each Defendant knew the essential nature of the scheme and agreed to further it, as demonstrated by their roles, communications, coordinated integration and support, aligned financial incentives, and conduct described above.

597.    Pump.fun Defendants' knowledge and agreement are shown by their control of the platform and promotional apparatus; deliberate operation without KYC/AML/safeguards; KOL agreements requiring concealed "organic" promotion; internal and public casino/gambling admissions; and concealment efforts. This includes:

   a.  Their positions as founders and operators of the platform at the center of the scheme;

   b.  Cohen's acknowledgment in internal communications that Pump.fun was "gambling" designed to make users "happier (Even though most lose)";

   c.  Cohen's public statements characterizing the platform as "the greatest CASINO in the world";

   d.  The Pump.fun Defendants' deliberate design choices to operate without KYC/AML, sanctions screening, or consumer safeguards;

   e.  The Pump.fun Defendants' binding agreements with KOLs requiring concealed, organic-seeming promotional activity;

   f.  The Pump.fun Defendants' control over the information cascade that determined who profited and who lost;

598.    Solana Defendants' knowledge and agreement are shown by coordinated technical support and timing enabling Pump.fun's launch and scaling; public endorsements and normalization of casino-like volume; promotion of a volume-monetization posture; financial benefit tied to Pump.fun activity; and dissemination of foreign-structure strategies to limit U.S. exposure while continuing to attract U.S. users and fees. This includes:

a.    Meetings between Pump.fun leadership and Solana leadership (Yakovenko and Gokal) concerning investment and technical support, according to CW-1;

b.    Coordinated timing of Solana network updates in April 2024 that enabled Pump.fun's successful launch immediately afterward;

c.    Direct technical support provided through communications between Solana Core Developer Jon Cinque and a Pump.fun developer;

d.    Gokal's offer to help Pump.fun with introductions as they navigated product support and investment needs, according to CW-1;

e.    Yakovenko's public endorsement of Pump.fun as having "a shot at building a global streaming platform" and his comparison of memecoins to gambling "lootboxes";

f.    Yakovenko's public claim of credit for Pump.fun's revenue and offer to help other companies "scale their revenue" the same way;

g.    Gokal's public acknowledgment of "casino" activity on Solana;

h.    The Solana Defendants' deliberate regulatory posture of routing token launches through foreign foundation wrappers while extracting U.S. user flow and fees;

i.    The Solana Defendants' financial interest in Pump.fun's success, including holdings of approximately 49% of SOL token supply and staking rewards of $700-$800 million annually driven by platform activity.

238

j.  Albert's direction of Foundation resources toward ecosystem development supporting Pump.fun operations, and his contributions to Solana Labs' core codebases demonstrating functional integration between Labs and Foundation;

k.  Federa's public articulation of the Enterprise's regulatory avoidance strategy (as Head of Strategy of Solana Foundation);

l.  Liu's public statements articulating the economic model aligning Enterprise participants' incentives around transaction volume, and her participation in discussions regarding foreign foundation structures to shield U.S. liability.

599.    Lead KOL Doe Defendants' knowledge and agreement are shown by:

a.  Their receipt of early token addresses through private Telegram channels before promotional activity, enabling pre-positioning;

b.  Their coordination with Leadership and Operations Command regarding promotional content, posting cadence, and narrative selection;

c.  Their contractual agreements with Pump.fun requiring concealed, "organic" promotional activity;

d.  Their activation of downstream "Friends and Family" distribution networks according to centralized campaign plans;

e.  Their execution of managed exits by selling into the retail demand generated by their own promotional activity;

f.  Their participation in coordinated harassment campaigns against defectors or competitors who threatened the scheme.

## Scope of the Conspiracy

600.    The conspiracy encompassed agreement on the essential mechanics of the scheme,

including: (a) presenting coordinated promotions as organic; (b) insider pre-positioning and supply control; (c) using priority execution infrastructure to secure insider-first ordering; (d) managed exits timed to promotional pushes; and (e) operating without licensing, KYC/AML, sanctions screening, and consumer safeguards to preserve anonymity and maximize volume and fees.

## Overt Acts (Alleged Though Not Required)

601.    Although no overt act is required, Defendants committed numerous overt acts in furtherance of the conspiracy, including those alleged above and incorporated herein.

## Injury and Causation

602.    Plaintiffs and Class members suffered injury to business or property by reason of Defendants' § 1962(d) conspiracy. The conspiracy achieved its object, coordinated profit-making from retail participants, and proximately caused the injuries alleged in Count I.

## Prayer for Relief (Count II)

603.    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendants, jointly and severally, for: (a) treble damages under 18 U.S.C. § 1964(c); (b) reasonable attorneys' fees and costs under § 1964(c); (c) pre- and post-judgment interest; and (d) such other and further relief as the Court deems just and proper.

## COUNT III

### SECURITIES ACT VIOLATIONS
### (Pled in the Alternative)
**(Violation of Section 12(a)(1) of the Securities Act of 1933 ()**
**Against DefendantsDefendant Baton Corporation d/b/a Pump.fun Alon Cohen, Dylan Kerler, and Noah Bernhard Hugo Tweedale)**
**on Behalf of the Pump Tokens Subclass**

Plaintiffs incorporate by reference the allegations in the proceeding paragraphs 1 through 397.

240

398.604.    This Count is asserted on behalf of Plaintiffs and the Pump Token Subclass against Defendants Defendant Baton Corporation, which conducts business and operates as Pump.fun, pursuant to Section Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §77l(a)(1).

399.605.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that the Defendant named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(1) claim.

400.    This Count is asserted against Defendant Baton Corporation, who conducts business and operates as Pump.fun, and is based upon Sections 5 and 12(a)(1) of the Securities Act.

401.606.    The Pump Tokens are, and were, securities as defined by the Securities Act.

402.607.    The Pump Tokens were never registered as securities with the SEC, and no registration statement has ever been filed with the SEC for the Pump Tokens.

403.608.    Baton Corporation is a statutory seller of the Tokens because Pump.fun, which it owns, controls, and does business as, sold, promoted, or solicited the sale of the Pump Tokens and/or passed titled to the Pump Tokens to the Plaintiffs and the Subclass.

404.609.    Baton Corporation and Pump.fun began operating and issuing Tokens on January 19, 2024. Baton Corporation has issued, offered, promoted, sold, and/or solicited the sale of Pump Tokens within the last year. For example, Baton Corporation and Pump.fun began offering the FRED Token and the GRIFFAIN Token for sale on October 31, and November 2, 2024, respectively.

November 2, 2024, respectively.

405.610.   Baton Corporation is therefore liable to the Plaintiffs and the Class for rescission and/or rescissory or compensatory damages in an amount to be determined at trial for Plaintiff and the Subclass'sSubclass's purchases of the Pump Tokens.

406.611.   Plaintiffs and the Subclass hereby tender their Pump Tokens back to Baton Corporation and/or Pump.fun.

407.612.   Each of the Pump Tokens was offered and sold as an investment contract. Across all twenty tokens, the following characteristics were present:

(a) A.   **Investment of Money:** Purchasers used SOL to buy the tokens directly from Pump.fun'sfun's system. These were paid transactions through bonding-curve contracts.

(b) B.   **Common Enterprise:** The tokens were structured so that users'users' funds were pooled. The price increased or decreased depending on the total level of participation. Every buyer'sbuyer's outcome depended on the success of the project as a whole establishing horizontal or vertical commonality.

(c) C.   **Expectation of Profits:** Buyers were told that the Pump Tokens would increase in value over time as future steps were completed. This included promises of platform launches, product rollouts, or integration into larger ecosystems. The Pump Tokens were described as reasonable opportunities for return on investment.

(d) D.   **Efforts of Others:** The future value of the Pump Tokens depended on the issuer or platform doing work after the sale. This included building apps, launching services, completing integrations, or managing staking systems. Purchasers were not buying completed products—they were investing in projects that had yet to be built.

built.

242

(e) These common features show that the Pump Tokens were not digital collectibles or memes. They were positioned as financial assets sold to the public with the promise of future gains.

## D. Pump Tokens are Unregistered Securities Under Howey

613. StakeCoin ("STC") — Real-World-Asset pass-through. A screenshot of this token's trading page on Pump.fun describes StakeCoin as "integrating Real World Assets with blockchain to bridge TraFi and DeFi." Investors purchased STC using SOL through a bonding-curve mechanism, with returns allegedly tied to revenue from tokenized off-chain assets. The roadmap includes the tokenization of real-estate deeds, which are to be managed by the issuer. (See Ex. C at 2).

614. QuStream ("QST") — Quantum-Safe L1. QST is marketed as a Layer-1 blockchain utilizing "patented post-quantum encryption." Launch materials indicate that future validator staking rewards will be distributed, and purchasers are led to expect that appreciation in token value will follow successful research and deployment of the referenced technology. Proceeds are pooled in a genesis contract. (See Ex. C at 2).

615. BunkerCoin ("BUNKER") — Crisis-Shelter Finance. BUNKER marketing claims ownership of "the world's biggest private bunker near Berlin" and discusses future sales of panic-room memberships and additional developments in The Gambia. Purchasers contribute funds with the expectation that the issuer will construct, operate, and monetize these facilities and related services. (See Ex. C at 3).

616. DeepCore AI ("DPCORE") — Web3 AI Agent Hub. DPCORE materials describe a platform for "MCP-powered next-gen AI agents," and promote token staking to earn rewards from agent-task transactions. The projected token value is presented as

243

dependent on the ~~issuer's~~issuer's ability to deliver a functioning marketplace and AI infrastructure. (See Ex. C at 3).

~~413.~~617.    AgentPy ~~("APY")~~("APY") — Python AI-on-Solana Framework. APY purports to serve as a connector between AI agents and Solana-based applications, offering ~~"~~"early adopter token rewards~~"~~" upon full launch. The commercial viability of the token is directly tied to the successful development and implementation of the ~~issuer's~~issuer's software product. (See Ex. ~~C at 4).~~

C at 4).

~~414.~~618.    Apex AI ~~("APEX")~~("APEX") — Medical-Diagnostics Coin. APEX is presented as a token for early detection of gastrointestinal cancers using high-accuracy diagnostic tools. Token value is linked to pending FDA approvals and future integration with healthcare providers, all controlled by the issuer. (See Ex. C at 4).

~~415.~~619.    Verse World ~~("VERSE")~~("VERSE") — Hyper-Realistic Metaverse. VERSE is marketed as the native token of an ~~"~~"evolutionary metaverse~~"~~" offering: land parcels, storefronts, and creator monetization. Investors contribute SOL and rely on the ~~issuer's~~issuer's future development and hosting of the platform to derive potential returns. No registration statement or exemption has been filed. (See Ex. C at 5).

~~416.~~620.    BAYC AI ~~("BAYCI")~~("BAYCI") — Mars-Ape Storyline Token. BAYCI purports to tie its value to a comic-themed metaverse and ~~"~~"time-space portal~~"~~" game narrative built around mutated ape NFTs. These creative and gaming assets are under the exclusive control of the issuer. Promotional materials use BAYC imagery without authorization (see ~~Counterfeit section). (See Ex. C at 5).~~

Counterfeit section). (See Ex. C at 5).

244

621.     Alchemist AI ("("ALCH")") — No-Code AI-App Builder. ALCH promotes the concept

417. that users will be able to "("manifest any idea into a living application"") through its no-code AI framework. Marketing suggests future profit-sharing mechanisms for stakers. The anticipated value of the token is based on the successful launch of the platform. (See Ex. C at 6).

418.622.   CINO ("("CINO")") — Private-Aviation Finance Coin. CINO'sCINO's promotional materials state that the token will finance private jet acquisitions and distribute charter profits to holders. The investment is structured around a pro-rata share in future operational income ~~from a proposed jet fleet. (See Ex. C at 6).~~

from a proposed jet fleet. (See Ex. C at 6).

419.623.   Swarms ("("SWARMS")") — Agentic Payments Coin. Swarms is marketed as the "("default payment currency"") for an emerging on-chain "("agent ecosystem."." The token is designed to facilitate transactions within that ecosystem, implying future utility contingent on development of the broader platform. (See Ex. C at 7).

420.624.   Collaterallize ("("SCOLLAT")") — RWA App Token. SCOLLAT promotes itself as a project to "("bring RWAs to the masses,"," directing users to download an app from a mobile store. The issuer'sissuer's roadmap and control over RWA integration suggest reliance on its efforts for token value appreciation. (See Ex. C at 7).

421.625.   XSPA ("("XSPA")") — AI Blockchain Platform Token. XSPA is described as a next-generation token powering a decentralized AI platform. The whitepaper outlines ~~amulti~~a multi-phase roadmap including smart contract deployment, an AI marketplace, DAO governance, and cross-chain functionality. Token value is linked to the

245

issuer'sissuer's ability to execute on these milestones, including monetization of AI models, staking programs, and strategic partnerships. The public sale is scheduled for September 2025. (See Ex. C at 8). Hive AI (("BUZZ")") — DeFi Automation Token. BUZZ is promoted as a solution to ""simplify DeFi through on-chain agents."." The platform'splatform's functionality, and any value derived by token holders, depends on future deployment and agent activity controlled by the issuer. (See Ex. C at 8).

422.626.    SwarmNode.ai (("SNAI")") — Serverless AI Infrastructure Token. SNAI markets itself as a token for ""serverless AI infra,"," suggesting a planned infrastructure layer for AI operations. Token value appears tied to delivery of technical functionality not yet available to purchasers. (See Ex. C at 9).

423.627.    Codec Flow (("CODEC")") — AI Desktop Infrastructure Token. CODEC advertises itself as powering on-demand ""cloud desktops for AI agents"" using MCP and trusted execution environments (TEE). Purchasers rely on issuer-delivered infrastructure to give the token value or utility. (See Ex. C at 9).

424.628.    PVS (("PVS")") — Paraverse Utility Token. PVS is presented as the utility token for the ""Paraverse"" ecosystem, used to pay for rendering services, receiving airdrops, and access to 3D applications. Value to purchasers is tied to the development and rollout of that ecosystem under issuer control. (See Ex. C at 10).

425.629.    Convergent (("CVGT")") — Collateralized Stablecoin Protocol Token. CVGT is described as the governance and fee-share token for a protocol that allows users to mint the stablecoin $USV by depositing staked Solana ($JitoSOL) collateral. The platform promises yield retention and liquidity access, while distributing all protocol fees to CVGT stakers. Purchasers rely on the issuer'sissuer's technical development and ongoing operations. (See Ex. C at 10).

246

operations. (See Ex. C at 10).

426.630.    The ""First Convicted Raccoon"" Token (ticker: FRED). Launched on Pump.fun on 31 October 2024, FRED promised investors ""222,222× upside"" and featured a five-step ""Road-Map"" culminating in centralized exchange (("CEX")") listings and branded merchandise. Buyers paid SOL into the bonding-curve pool, and their profit prospects depended entirely on the ~~promoter's~~promoter's promised listings and influencer marketing.

427.631.    The GRIFFAIN Token. Marketed as ""AI-driven trading in meme form~~,~~."" GRIFFAIN debuted on Pump.fun on December 5, 2024. Promotional tweets embedded in the token tile claimed ""0 → \$10 M in 24 h"" and teased future staking rewards of 300% APY—features wholly dependent on smart-contract code the promoter controlled. ~~Purchasers clearly expected passive returns from the issuer's technical efforts.~~

Purchasers clearly expected passive returns from the issuer's technical efforts.

428.632.    All Pump Tokens created on the Pump.fun platform necessarily postdate its founding on January 19, 2024.

A.    ———No Exemption from Registration is Applicable

429.633.    In each of the token launches listed above—including STC, QST, BUNKER, DPCORE, APY, APEX, VERSE, BAYCI, ALCH, CINO, SWARMS, SCOLLAT, XSPA, BUZZ, SNAI, CODEC, PVS, and CVGT—and as reflected on Pump.~~fun's~~fun's trading platform, purchasers contributed capital in the form of SOL, in exchange for digital tokens whose value was represented as dependent on the managerial or entrepreneurial efforts of the issuer.

247

430.634.    Each purchase sent SOL into a bonding-curve contract that automatically minted tokens; when sold, the contract burned the tokens and returned SOL—pooling funds and linking returns to the ~~token's~~token's market activity.

431.635.    These offerings uniformly involved the pooling of investor funds, promises of future functionality or profit-sharing, and an expectation that token value would increase based on development milestones under the ~~issuer's~~issuer's exclusive control.

432.636.    Under the Supreme ~~Court's~~Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), these Pump Tokens constitute ~~"~~"investment contracts~~"~~" and therefore qualify as securities. None of the Pump Tokens were registered with the SEC, and no valid exemption from registration was claimed.

433.637.    Absent an applicable exemption, the Securities Act prohibits the offer and sale of securities unless a registration statement is filed or in effect. At the time of each Pump ~~Token's~~Token's launch, no such registration statement had been filed or was in effect with respect ~~to the offer or sale of these Pump Tokens.~~

to the offer or sale of these Pump Tokens.

434.638.    Accordingly, Defendant Pump.fun offered and sold the Pump Tokens identified in violation of 12(a)(1) of the Securities Act of 1933, without registering the offerings or qualifying for any exemption.

435.639.    Pump.fun acted as the issuer and statutory seller of each Pump Token by executing the token launches, setting the economic structure, and transferring tokens directly to purchasers through its platform.

436.640.    Plaintiffs purchased Pump Tokens directly from Pump.fun.

437.641.   Plaintiffs are entitled to rescission or damages under Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. §~~77l~~ 77l(a)(1).

~~COUNT II~~
~~Violation~~COUNT IV

**SECURITIES ACT VIOLATIONS**
**(Pled in the Alternative)**
**(Control Person Liability Under Section 15 of the** ~~Racketeer Influenced and Corrupt Organizations~~**Securities Act**~~, 18 U.S.C. §§ 1962(c) & 1962(d) (~~ **of 1933)**
**_____Against** ~~All~~ **Defendants Cohen, Kerler and Tweedale**

642.       This ~~As To All Tokens and the Class, And In The Alternative, With Respect To The Pump Tokens~~Count is asserted on behalf of Plaintiffs and the Pump ~~Tokens~~Token Subclass~~)~~ against Defendants Alon Cohen, Dylan Kerler and Noah Tweedale, pursuant to Section 15 of the Securities Act of 1933.

Plaintiffs incorporate by reference the allegations ~~in~~of Count III and the relevant preceding paragraphs ~~1 through 397.~~

~~438.    This Count is asserted against all Defendants regarding all tokens sold on Pump.fun and, with respect to the Pump Tokens in the event the Court determines that the Pump Tokens sold through Pump.fun are not "Securities" within the meaning of the federal securities laws, in the alternative to Count I.~~

~~439.    Plaintiffs seek relief under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§1961 et seq.  Nothing contained in this Count shall be construed to incorporate or adopt any allegation that the twenty Pump Tokens are "Securities".  If the Court finds that the Tokens are Securities, Count I (Section 12(a)(1)) fully states Plaintiffs' entitlement to relief and this RICO Count need not be reached as to the Pump Tokens Subclass.~~

~~440.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3). From January 2024 to the present, Pump.fun Inc., Solana Labs Inc., Solana Foundation, and Jito Labs Inc. formed an association-in-fact enterprise (the "Pump Enterprise") with the common~~

249

purpose of launching, promoting, and profiting from "Pump Tokens." Defendants directed, conducted, and participated, directly and indirectly, in the affairs of the Pump Enterprise through a pattern of racketeering activity—including repeated acts of wire fraud (18 U.S.C. § 1343), and operation of an unlicensed money-transmitting business (18 U.S.C. § 1960)—that affected interstate and foreign commerce.

441.    The racketeering acts were related and continuous, occurring on thousands of occasions over an eighteen-month period, and directly caused Plaintiffs and the Class to purchase Pump Tokens at artificially inflated prices and suffer millions of dollars in losses when prices collapsed.

442.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, costs of suit, and reasonable attorneys' fees. In furtherance of the same unlawful purpose, each Defendant agreed that members of the Pump Enterprise would commit at least two predicate acts; all Defendants are therefore also liable for RICO conspiracy under 18 U.S.C. § 1962(d).

### *The Enterprise*

643.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 397 of the Complaint as though fully set forth herein.

443.    At all relevant times, Defendants Pump.fun, Solana Labs, the Solana Foundation, and Jito Labs constituted an association-in-fact enterprise (the "Pump Enterprise") within the meaning of 18 U.S.C. § 1961(4). This Pump Enterprise was formed and operated for the common purpose of deploying a pseudonymous online gambling system disguised as a decentralized token-launch platform, monetizing that system through high-frequency speculative activity, and extracting maximum fee-based and validator-derived revenue from retail participants while evading financial regulation, intellectual property protections, and consumer safeguards.

444.    Pump.fun provided the public-facing interface of the enterprise, designed to simulate a digital slot machine through which users could gamble SOL in exchange for

algorithmically priced tokens. Through its "one-click" token launch mechanism and bonding-curve liquidity model, Pump.fun enabled anonymous users to instantly mint tradable digital assets, priced to reward early entry and engineered to collapse shortly after launch. Every token launch was automatically routed through Pump.fun's smart contract system, and every trade incurred a fixed 1% platform fee payable to Pump.fun and its insiders. Solana Labs and the Solana Foundation, acting in concert, supplied the core infrastructure upon which the Pump Enterprise operated. Solana Labs authored and maintained the SPL Token Program and the Token-2022 upgrade, which formed the technical basis for every token issued through Pump.fun.

445.    These system programs, validated by Solana's global network of validators and executed through the Solana runtime environment, enabled instantaneous token creation, programmable pricing curves, and wallet-based distribution—all without oversight, age verification, or know-your-customer procedures. Solana Labs also authored the system-level validator software that processed each transaction, collected validator commissions, and monetized block space through the network's high-throughput architecture. Together with the Solana Foundation—which controlled more than 240 million SOL and maintained a significant validator presence—Solana Labs profited from the speculative activity initiated through Pump.fun by capturing validator fees, increasing SOL demand, and inflating the perceived usage of the Solana network.

446.    Jito Labs served as the execution layer of the enterprise, providing the modified validator software (Jito-Solana) and block-bundling infrastructure that enabled early buyers, bots, and insiders to manipulate transaction ordering and extract value from retail participants. The Jito validator client, installed on over 90% of Solana's consensus stake, allowed private users to submit transaction bundles accompanied by "tips" that guaranteed block inclusion and execution priority. This mechanism allowed insider wallets to insert transactions milliseconds ahead of the public—acquiring tokens at the lowest bonding-curve price and immediately flipping them at a profit once retail demand materialized. Jito Labs collected a cut of each tip paid to its validator

251

clients, earning hundreds of millions of dollars in MEV-derived revenue during the height of Pump.fun's activity.

447.    The enterprise's structure was unified and interdependent. Pump.fun could not operate without Solana Labs' validator framework and token infrastructure. Jito Labs could not profit without Pump.fun's token launches and speculative traffic. Solana Labs could not sustain SOL's appreciation or justify its ecosystem metrics without the throughput driven by Pump.fun and Jito. Each Defendant had a defined role, a share in the proceeds, and visibility into the conduct of the others.

644.    All three coordinated their operations to facilitate, promote, and extract value from the high-frequency launch and churn of valueless digital tokens, while disclaiming responsibility and avoiding licensing obligations. As alleged in Count III, Defendant Baton Corp. d/b/a Pump.fun violated Sections 5 and 12(a)(1) of the Securities Act by offering and selling the Pump Securities without an effective registration statement and without a valid exemption.

645.    At all relevant times, Defendants Cohen, Kerler, and Tweedale (the "Pump.fun Control Person Defendants") were "control persons" of Pump.fun within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77o.

646.    The Pump.fun Control Person Defendants, by virtue of their positions and authority, had the power and influence to cause Pump.fun to engage in the unlawful conduct alleged, including the offer and sale of the Pump Securities through Pump.fun's launch and bonding-curve mechanism.

647.    Specifically:

a. Cohen was Pump.fun's co-founder and Chief Executive Officer, and exercised operational control over Pump.fun's business, including platform operations, marketing, and promotion.

b. Tweedale was Pump.fun's co-founder and Chief Product Officer and exercised operational control over product design, platform features, and user-facing mechanics through which the Pump Securities were offered and sold.

c. Kerler was Pump.fun's co-founder and Chief Technology Officer and exercised operational control over the technical architecture and implementation of the token-launch and sale mechanics through which the Pump Securities were offered and sold.

648. By virtue of the foregoing, the Pump.fun Control Person Defendants are liable, jointly and severally, with Pump.fun for Pump.fun's violations of Sections 5 and 12(a)(1), pursuant to Section 15 of the Securities Act.

448.

449. This enterprise functioned continuously from at least January 2024 through the present, operating through a stable set of relationships, shared infrastructure, and repeat conduct that spanned tens of millions of transactions, billions of dollars in trading volume, and thousands of token launches. It operated across national borders, used interstate wire facilities, and inflicted widespread and foreseeable losses on retail participants, who were misled into believing they were engaging in decentralized finance or early-stage investing, when in fact they were wagering in an unlicensed, rigged, and extractive gambling system. This structure satisfies the statutory definition of an enterprise under 18 U.S.C. § 1961(4).

*Pattern Of Racketeering Activity*

253

450.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 397 of the Complaint as though fully set forth herein.

451.    From at least January 2024 through the present, Defendants Pump.fun, Solana Labs, the Solana Foundation, and Jito Labs conducted and participated in the affairs of the Pump.fun Casino Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). This pattern comprises numerous acts indictable under federal and state law, including predicate offenses specifically enumerated in § 1961(1), each committed with the common purpose of operating a pseudonymous gambling platform disguised as a decentralized token launchpad, laundering the proceeds of that scheme, and systematically deceiving retail participants into funding it.

452.    First, Defendants conducted, financed, managed, and profited from an illegal gambling business in violation of 18 U.S.C. § 1955. The enterprise operated without any gaming license and involved far more than five individuals, including the Individual Defendants, and Pump.fun's founders and engineers, Solana Labs' developers and executives, and Jito Labs' validator and MEV infrastructure teams. Operating continuously since January 2024, the enterprise generated gross revenues in excess of $2 million per day by inducing users to wager SOL in exchange for valueless meme coins, whose outcomes and market performance were dictated by the platform's bonding-curve mechanics and backend routing logic.

453.    These operations also violated New York Penal Law § 225.10, which criminalizes promotion of gambling in the first degree. Pump.fun's system allowed users—including minors and anonymous actors—to stake funds for chance-based outcomes, rewarded token creators for reaching speculative milestones, and distributed bounties and platform fees based solely on user participation in games of chance.

454.    Second, Defendants transmitted wagering information and executed gambling transactions via interstate wires, in violation of 18 U.S.C. § 1084 (Wire Act). These included use of Solana's blockchain relay network, Pump.fun's hosted smart contract interfaces, and validator

254

bundles processed through Jito's off-chain auction infrastructure. Each token launch, trade execution, and bonding-curve price movement was facilitated through wire-based communications and smart contract logic, constituting thousands of discrete violations. Additionally, Defendants knowingly accepted payments in connection with unlawful internet gambling in violation of the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361–5367. Pump.fun processed restricted transactions in SOL from U.S. users in furtherance of its wagering activities, without implementing any AML or compliance protocols.

455. Third, Defendants operated an unlicensed money-transmitting business in violation of 18 U.S.C. § 1960. Pump.fun received SOL from users, converted that value into meme coins, and transmitted those tokens or returned SOL through automated smart contract pathways—constituting classic money transmission. Neither Pump.fun nor its infrastructure providers held a license from FinCEN or the New York Department of Financial Services ("DFS"). Solana Labs and Jito Labs knowingly facilitated these unlicensed transmissions through their maintenance of the system programs, validator software, transaction relays, and block producers responsible for every value transfer. The enterprise also violated New York Banking Law § 641 and 23 NYCRR Part 200, which independently require licensure to transmit or issue digital assets to New York residents.

456. Fourth, Defendants knowingly conducted financial transactions involving criminally derived property in excess of $10,000, with the intent to conceal the nature, source, and ownership of those funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and § 1957. In February 2025, the North Korean Lazarus Group laundered proceeds from a $1.5 billion hack through the Pump.fun platform using a counterfeit meme coin and high-frequency trading to disguise the origin and recipients of stolen funds.[41] Jito Labs enabled the laundering by prioritizing the exit transactions through MEV bundling, while Solana Labs' infrastructure validated the trades. These

---

[41] https://x.com/solanafloor/status/1893737113327214863?s=46&t=7iQfScb60VP7ELsXUj2Bbg

255

acts also satisfy the international transportation prong of § 1956(a)(2)(B)(i), as the criminal proceeds were bridged into the United States and routed through domestic validator nodes.

457. Fifth, Defendants committed repeated acts of wire fraud in violation of 18 U.S.C. § 1343. Through social media posts, platform banners, Discord announcements, and token metadata, Defendants misrepresented that Pump.fun token launches were "fair," "anti-rug," and free from insider manipulation. In reality, bonding-curve launches were front-run through Jito bundles, insiders captured token supply at minimal cost, and users were misled about their odds and rights. These deceptive communications were transmitted across state lines and induced the transfer of billions of dollars in SOL under false pretenses. Defendants acted with intent to defraud, and each wire transmission in furtherance of that scheme constitutes a separate predicate act.

458. Sixth, Defendants committed trademark counterfeiting in violation of 15 U.S.C. § 1114(1), a predicate offense under 18 U.S.C. § 2320. Pump.fun hosted and monetized tokens that used exact replicas or colorable imitations of registered trademarks—including those belonging to Apple, Tesla, Meta, Microsoft, and others—without license or authorization. These tokens appeared in search results and trending lists, often styled as the "official" or "community" tokens of the referenced brands. Pump.fun's interface algorithmically clustered similar tokens together, reinforcing the likelihood of confusion. Defendants profited from transaction fees and validator tips generated by these counterfeit-mark-bearing tokens, knowingly facilitating the trafficking and sale of spurious goods in violation of § 2320(a)(1).

459. Seventh, Defendants engaged in false designation of origin and passing off in violation of 15 U.S.C. § 1125(a), which constitutes an additional RICO predicate under § 2320. Pump.fun enabled the launch and trading of tokens that impersonated well-known universities (e.g., Harvard, NYU), blockchain infrastructure projects (*e.g.*, Solana Phone), and high-profile public figures. These tokens falsely implied sponsorship or affiliation with the named entities, creating consumer confusion and misappropriating goodwill. Pump.fun's failure to restrict use of

256

such marks, combined with its promotion of these tokens through its platform and social feeds, supports liability for knowing facilitation of Lanham Act violations.

460.   Eighth, Defendants diluted the value of famous marks through tarnishment and blurring in violation of 15 U.S.C. § 1125(c), thereby committing another predicate act under § 2320. Tokens launched through Pump.fun routinely exploited the brand equity of globally recognized marks, including Barbie, Batman, Harvard, and Apple, associating them with gambling, pump-and-dump schemes, or defamatory token themes. These uses diminished the distinctiveness and reputation of the marks and caused reputational injury to the rights holders. Defendants made no effort to prevent or remove such uses and continued to profit from their circulation.

461.   Ninth, Defendants trafficked in counterfeit labels and documentation in violation of 18 U.S.C. § 2318, a distinct predicate act. Tokens launched via Pump.fun carried digital metadata that included copied brand logos, impersonated celebrity photos, and fake ticker symbols that functioned as counterfeit "labels" designating origin. These were hosted on IPFS, Arweave, and other metadata stores, and served to falsely represent the tokens as affiliated with real-world individuals or companies. Defendants knowingly enabled the creation, hosting, and propagation of these digital identifiers and profited from their use.

462.   Tenth, Defendants engaged in identity theft and false personation in violation of 18 U.S.C. § 1028(a)(7) and N.Y. Penal Law §§ 190.78–.85. Pump.fun users launched tokens impersonating named Plaintiffs and their counsel, including Max Burwick, his law firm, and members of his immediate family. These impersonations included names, likenesses, and personal images—some derived from private family fundraising campaigns and social media accounts. Tokens included false claims of affiliation, defamatory branding, and invasive personal references. Despite receiving formal notice, Defendants refused to remove the impersonating tokens, and continued to monetize their trading. The use of these identities, coupled with commercial intent and deliberate refusal to act, constitutes knowing and repeated violations of

257

both federal and state identity theft statutes and forms part of the racketeering pattern alleged herein.

463.    Eleventh, Defendants conspired to commit wire fraud in violation of 18 U.S.C. § 1349. This conspiracy involved a coordinated plan to misrepresent Pump.fun's token launch mechanics as "fair," conceal the role of MEV bundles and validator prioritization, and induce users to transmit SOL through a system rigged in favor of insiders. Overt acts in furtherance of the scheme included website claims, promotional tweets, Discord messages, smart contract deployments, and bundling protocols designed to front-run retail purchases. Each Defendant played a necessary role: Pump.fun crafted and disseminated the false "fair launch" narrative; Jito Labs engineered and monetized the priority-tipping architecture that defeated fairness; Solana Labs validated, processed, and promoted the resulting transaction flow, profiting from its scale and frequency.

464.    Twelfth, Defendants conspired to operate an unlicensed money-transmitting business in violation of 18 U.S.C. § 371 and § 1960. The enterprise integrated Pump.fun's token-launch interface with Solana Labs' system programs and validator software, and routed all payments through Jito Labs' tip-based execution engine—all without state licensure or FinCEN registration. Defendants knew the business involved the receipt, conversion, and transmission of digital value across user wallets and smart contracts, and they agreed to continue operating it without compliance. Overt acts included launching the "no KYC" interface, deploying unlicensed token-factory contracts, validating SOL-to-token conversions, and monetizing the value flow through automated fee extraction and priority-tip payments.

### *Injury And Causation*

465.    Plaintiffs and the Class have been injured in their business and property by reason of Defendants' pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). These injuries were not incidental to the enterprise—they were its central objective. The Meme Coin Casino Enterprise was designed to extract value from retail participants by facilitating unlawful gambling

258

transactions, laundering proceeds of unlawful activity, deploying counterfeit and fraudulent tokens, and processing unlicensed transmissions of digital value at scale. Defendants knowingly engineered, enabled, and profited from this structure, and the losses of Plaintiffs and the Class are the direct and foreseeable result of the predicate acts alleged herein.

466.    These harms flowed directly from Defendants' predicate acts. The wire fraud scheme induced users to deposit funds under false pretenses of fair launch and equal access. The illegal gambling enterprise extracted value from each token spin while structurally disadvantaging late participants. The operation of an unlicensed money transmitting business stripped users of regulatory protections and facilitated widespread transactional loss. Counterfeit branding, identity misappropriation, and impersonation tactics created additional vectors for financial loss and confusion, enabling the circulation of fake or manipulated tokens that siphoned user capital. And the use of Jito Labs' MEV infrastructure ensured that privileged actors could repeatedly extract risk-free gains at the expense of unaware retail users.

467.    The causation between these unlawful acts and Plaintiffs' injuries is direct. Every SOL-based transaction processed through Pump.fun's smart contracts, validator relays, and token factory infrastructure was orchestrated by Defendants acting in concert. Their monetization strategy was predicated on volume, volatility, and information asymmetry—each of which increased user losses. Pump.fun earned more than $600 million in protocol fees during the Class Period; Solana Labs and the Solana Foundation earned validator commissions and staking income tied to the same transaction flow; and Jito Labs earned hundreds of millions in MEV tips extracted from front-run token trades. Each dollar of profit realized by the Defendants was made possible only because Plaintiffs and the Class incurred corresponding losses.

468.649.    Defendants' racketeering activity was thus the proximate cause of the economic harm to Plaintiffs and the Class. Under 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover treble and the Subclass seek rescission and/or rescissory damages,

259

interest, costs, and ~~attorneys' fees, as well as equitable relief including restitution, disgorgement, and the imposition of a constructive trust over enterprise-derived proceeds~~such other relief as the Court deems just and proper.

~~**COUNT III**~~
~~**Violation of New York General Business Law §§ 349 & 350 (Deceptive Acts and False Advertising) (Against All Defendants on Behalf of New York Residents of the Class)**~~

**COUNT V**

**UNJUST ENRICHMENT**
**(Pled in the Alternative)**
**Against All Defendants**

650.        Plaintiffs incorporate by reference the allegations in the preceding paragraphs ~~1 through 468~~.

~~469.    In the course of business, Defendants engaged in consumer-oriented deceptive acts and practices, and disseminated materially false advertisements, by marketing Pump Tokens as "fair-launch," officially endorsed, and immune from manipulation, while concealing their ability to control liquidity, extract MEV profits, and dump tokens. The deception and false advertising originated from, and were disseminated through, Defendants' operations in New York, including content pushed from their SoHo headquarters and servers.~~

~~470.    Plaintiffs and Class Members reasonably relied on Defendants' misrepresentations, purchased Tokens, and suffered monetary injury when token prices collapsed.~~

~~471.    Under GBL §§ 349(h) and 350-d, Plaintiffs seek statutory or actual damages, treble damages for willful violations, injunctive relief, and attorneys' fees.~~

~~**COUNT IV**~~

~~**Unjust Enrichment (Against All Defendants on Behalf of the Class)**~~

260

~~Plaintiffs incorporate by reference the allegations in the preceding Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 through 471.~~

651.    Defendants were unjustly enriched by retaining platform fees, ~~MEV~~ profits, and token

~~472.~~    allocations generated at the expense of Plaintiffs and the Class through deceptive and unlawful conduct.

~~473.~~652.    It would be inequitable for Defendants to retain these ill-gotten gains.

~~474.~~653.    Plaintiffs are entitled to restitution or disgorgement in an amount to be determined at trial, together with interest.

## ~~PRAYER FOR RELIEF~~

## ——PRAYER FOR RELIEF

WHEREFORE, ~~Plaintiffs~~ Plaintiffs individually and on behalf of the Class respectfully request that judgment be entered in their favor and against all Defendants, and that the Court grant the following relief:

~~475.~~654.    Class Certification. ~~Certify~~ Certify, pursuant to Fed. ~~R~~ R. ~~Civ~~ Civ. ~~P~~ P. ~~23~~ 23(b)(2) and (b)(3), a nationwide damages, injunctive- relief, and equitable- relief class of all persons and entities that purchased or otherwise acquired Pump.fun tokens on or ~~after 1 January 2024~~after 1 January 2024 and suffered a net loss; appoint the named Plaintiffs as class representatives and their counsel as class counsel.

~~476.~~655.    Compensatory Damages. ~~Award~~ Award the Class compensatory damages in an amount to be proven at trial—including: the difference between the consideration paid for Tokens and their value at the time of sale or collapse of the Tokens purchased together with pre- and post- judgment interest.

477.656.    Treble Damages. ~~Treble~~ Treble all compensatory damages under ~~18 U~~18 U.S.C. ~~§ 1964~~ § 1964(c) for ~~Defendants'~~Defendants' violations of ~~18 U~~18 U.S.C. ~~§§ 1962~~ §§ 1962(c)–(d).

478.657.    Statutory & Exemplary Damages.

~~a.    N.Y. GBL §§ 349–350 compensatory/statutory/treble damages. and~~

658.        Disgorgement & Restitution. ~~Order~~ Order equitable disgorgement of, and impose a

479.    constructive trust over, all ill-~~-~~gotten gains—including platform fees, validator MEV tips, SOL-~~-~~denominated appreciation, and any digital or fiat proceeds traceable to the racketeering enterprise.

659.    Accounting. ~~Direct~~ Direct Defendants to make a full and complete accounting of (i) every Pump.fun wallet address, fee wallet, and validator tip address; (ii) every smart-~~-~~contract deployment; and (iii) every fiat off-~~-~~ramp or CEX account used to cash-~~-~~out enterprise

480.    proceeds, from ~~January 2024~~January 2024 to the date of judgment.

*Appointment of a Federal Equity Receiver*

481.660.    Receivership Authority. ~~Pursuant~~ Pursuant to ~~18 U~~18 U.S.C. ~~§ 1964~~ § 1964(a), Fed. ~~R~~ R. ~~Civ~~ Civ. ~~P~~ P. ~~66~~ 66, and this ~~Court's~~Court's inherent equitable powers, appoint a qualified, independent receiver (the ~~"~~"Receiver~~")~~") over Defendants Pump.~~fun Inc., Solana Labs Inc.,~~fun Inc. and ~~Jito Labs Inc.~~Solana Labs Inc. (collectively, the ~~"Receiver Entities").~~"Receiver Entities").

482.661.    Scope of Control. ~~The~~ The Receiver shall take exclusive custody, control, and possession of all assets, digital wallets (including hardware wallets and seed phrases), validator keys, smart-~~-~~contract deployment keys, domain names, servers (on-~~-~~prem and cloud), source-~~-~~code repositories, books, and records of the ~~Receiver Entities~~Receiver

262

Entities, wherever located, and shall marshal, secure, and safeguard the same against dissipation or concealment.

483.662.    Operational Mandate. ~~The~~ The Receiver is empowered to:

a.(a)        Maintain or wind down operations as necessary to preserve asset value;

b.(b)        Suspend token launches, validator MEV--tip auctions, and fee withdrawals pending further order;

(c) -Implement AML/KYC controls, obtain all missing state and federal money--transmitter and gaming licences, and bring business practices into

c.        compliance with applicable law;

d.(d)        ~~Retain~~Retain blockchain--forensics experts, auditors, and information-- security personnel;

e.(e)        ~~Identify~~Identify, trace, and, where appropriate, repatriate digital assets transferred to insiders, affiliates, or third--party wallets;

f.(f)        ~~Commence~~Commence, defend, or settle legal actions in the name of the ~~Receiver Entities~~Receiver Entities to recover voidable transfers or fraudulent conveyances; and

g.(g)        -Prepare and file periodic reports with the Court and distribute interim relief to victims pursuant to a Court--approved claims process.

484.663.    Asset Freeze & Turnover. ~~Issue~~ Issue a preliminary and permanent injunction freezing the assets of the ~~Receiver Entities~~Receiver Entities and compelling Defendants and all persons in active concert with them to deliver the above--described assets, passwords, seed phrases, cold--storage devices, and two--factor--authentication devices to the Receiver forthwith.

485.664.    Co-operationCooperation    Order. Order    Order    Defendants,    their    officers, employees, agents, accountants, auditors, attorneys, and service providers to cooperate fully with the Receiver—including by executing any documents, providing sworn financial statements, and granting access to premises and servers—to facilitate immediate control and preservation of assets.

665.    Stay of Other Proceedings. Enter Enter an order staying, for the duration of the receivership, all civil litigation, arbitration, or administrative proceedings against the Receiver Entities

486.    Receiver Entities, except with leave of Court, to prevent waste of receivership assets.

487.666.    Receiver'sReceiver's Fees. Authorize Authorize the Receiver to pay reasonable fees and expenses, subject to Court approval, from receivership assets.

*Injunctive & Declaratory Relief*

667.    Permanent Injunction (Gambling & MSB). Enjoin Enjoin Defendants from operating

488.    Pump.fun or any substantially similar platform unless and until they (i) obtain all required New-York and federal money-transmitter and gaming licenses, (ii) implement robust AML/KYC and age-verification procedures, and (iii) subject the platform to independent audit and regulatory oversight.

489.668.    IP-Based Injunction. Enjoin Enjoin Defendants from minting, listing, validating, or otherwise facilitating any token, metadata, or promotional material that infringes Plaintiffs'Plaintiffs' or third-party intellectual-property rights; require takedown of existing infringing smart contracts and metadata, and transfer of contract authority to the Receiver or a court-appointed escrow.

669.        Consumer-~Protection Notice. ~~Order~~ Order the publication—on Pump.~~fun's~~fun's website, Discord, and social-~media channels—of corrective statements disclosing the true historical failure rate of Pump.fun tokens, the existence of insider MEV front-~running, and the pendency ~~490.~~ of this action.~~-~~

~~491.~~670.    Declaratory Judgment. ~~Declare~~ Declare that ~~Defendants'~~Defendants' conduct constitutes (i) racketeering under ~~18 U~~18 U.S.C. ~~§§ 1961~~ §§ 1961-1964; (ii) operation of an illegal gambling business under ~~18 U~~18 U.S.C. ~~§ 1955~~ § 1955; (iii) operation of an unlicensed money-~transmitting business under ~~18 U~~18 U.S.C. ~~§ 1960; (iv) violations of the Lanham Act, Copyright Act, DMCA, and N.Y. GBL §§ 349-350.~~ § 1960.

*Ancillary Relief*

~~492.~~671.    Pre-~judgment Interest. ~~Award~~ Award pre-~judgment interest at the maximum lawful rate.

~~493.~~672.    Post-~judgment Interest. ~~Award~~ Award post-~judgment interest pursuant to ~~28 U~~28 U.S.C. ~~§ 1961~~ § 1961.

~~494.~~673.    ~~Attorneys'~~Attorneys' Fees & Costs. ~~Award~~ Award reasonable ~~attorneys'~~attorneys' fees, expert-~witness fees, and costs of suit as authorized by ~~18 U~~18 U.S.C. ~~§ 1964~~ § 1964(c), ~~15 U~~15 U.S.C. ~~§ 1117~~ § 1117(a), ~~17 U~~17 U.S.C. ~~§ 505~~ § 505, ~~N.Y. GBL § 349(h),~~ and other applicable statutes.~~-~~

~~495.~~674.    Such Other Relief. ~~Grant~~ Grant such other and further legal or equitable relief—including interim asset freezes, expedited discovery, provisional process, or writs of attachment—as the Court deems just and proper in the circumstances.

265

## ~~JURY DEMAND~~JURY DEMAND

~~496.~~675.    Plaintiffs demand a trial by jury on all issues so triable.——

DATED: ~~July 22, 2025~~——————————January 7, 2026
          New York, New York

Respectfully submitted,
——

**BURWICK LAW PLLC**
By: /s/ Max Burwick
Max Burwick
Luis Munoz
1 World Trade Center, 84th Fl.
New York, NY ——————10007
(646) 762-1080
max@burwick.law
luis@burwick.law

**WOLF POPPER LLP**
By: ~~/s/ Chet B. Waldman~~
Chet B. Waldman
Terrence Zhang
845 3rd Avenue – 12th Floor
New York, NY 10022
212-759-4600
cwaldman@wolfpopper.com
tzhang@wolfpopper.com


~~BURWICK LAW, PLLC~~
~~Max Burwick~~
~~43 West 43rd Street, Ste.~~
~~114~~
~~New York, NY 10036~~
~~maxb@burwick.law~~


*~~Co-Lead Counsel for~~*
*~~Plaintiffs and the Proposed~~*
*~~Class~~*

266