**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIEGO AGUILAR, KENDALL CARNAHAN, AND MICHAEL OKAFOR on behalf of themselves and all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　　　v.<br><br>BATON CORPORATION LTD, d/b/a PUMP.FUN, ALON COHEN, DYLAN KERLER, NOAH BERNHARD HUGO TWEEDALE, SOLANA LABS, INC., SOLANA FOUNDATION, JITO LABS INC., JITO FOUNDATION, ANATOLY YAKOVENKO, RAJ GOKAL, DAN ALBERT, AUSTIN FEDERA, LILY LIU, LUCAS BRUDER, BRIAN SMITH,<br><br>　　　　　Defendants. | Case No. 1:25-cv-00880-CM-BCM<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS SOLANA LABS, INC., SOLANA FOUNDATION, ANATOLY YAKOVENKO, RAJ GOKAL, DAN ALBERT, AUSTIN FEDERA, AND LILY LIU'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

Gregory N. Wolfe
Joseph W. Baier (*pro hac vice*)
NAGY WOLFE APPLETON LLP
31 East 62nd Street
New York, New York 10065

*Counsel for Defendants Solana Labs, Inc., Solana Foundation, Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 3

I.      YEARS BEFORE THE ALLEGED ENTERPRISE, THE BLOCKCHAIN DEFENDANTS ALLEGEDLY LAUNCHED THE OPEN-SOURCE SOLANA BLOCKCHAIN .................................. 3

II.     IN APRIL 2024, THE ALLEGED ENTERPRISE COMMENCED WHEN LABS IMPLEMENTED A CODE UPDATE TO ALLEVIATE NETWORK CONGESTION ON THE BLOCKCHAIN................... 4

III.    PLAINTIFFS UNDERSTOOD THEY WERE SPECULATING, THAT MEME TOKEN PRICE IS DEPENDENT ON EXTERNAL FACTORS, AND THAT THEY COULD SELL AT ANY TIME ......... 4

IV.     THE SAC FAULTS THE BLOCKCHAIN DEFENDANTS FOR IMPLEMENTING INSUFFICIENT "GUARDRAILS," WHICH ALLOWED SOPHISTICATED USERS TO PAY FOR HIGH-SPEED TRADING USING SOFTWARE CREATED BY JITO, A NON-RICO PARTICIPANT .................... 5

V.      THE LKOLS ARE NOT ALLEGED TO HAVE MADE ANY 2024 FALSE STATEMENTS............. 6

ARGUMENT ...................................................................................................................... 6

I.      PLAINTIFFS' KITCHEN SINK SECTION 1962(C) CLAIMS FAIL ............................................. 7

        A.    Baton's Use Of Open-Source Code Does Not Show Enterprise ........................... 7

        B.    Baton's Use Of Open-Source Code Does Not Show Conducting ......................... 10

        C.    The SAC Fails To Sufficiently Allege Two Or More Predicate Acts .................. 10

              1.    *Wire Fraud Is Insufficiently Alleged* ............................................... 11

              2.    *No Section 1955 Violation Is Sufficiently Alleged* ..................................... 14

              3.    *No Section 1960 Violation Is Sufficiently Alleged* ................................... 16

        D.    Losses On Meme Token Speculation Do Not Constitute A RICO Injury ............ 16

        E.    Plaintiffs Have Failed To Sufficiently Allege Causation .................................... 18

        F.    Plaintiffs Have Not Sufficiently Alleged Domesticity ......................................... 22

        G.    RICO's Securities Fraud Bar Requires Dismissal Of The SAC .......................... 22

II.     PLAINTIFFS' CONCLUSORY SECTION 1962(D) CLAIM FAILS .............................................. 23

III.    ASIDE FROM FEDERA, THE SAC FAILS TO ALLEGE PERSONAL JURISDICTION WITH RESPECT TO THE COMMON LAW CLAIMS.................................................................24

IV.    THE UNJUST ENRICHMENT CLAIMS FAIL AS DERIVATIVE OF THE RICO CLAIMS ............25

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Adelphia Supply USA*,
  2017 WL 57802 (E.D.N.Y. Jan. 4, 2017) .................................................................................10

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)..................................................................................................................19

*Arzu v. City of New York*,
  2025 WL 437699 (S.D.N.Y. Feb. 7, 2025)..................................................................................6

*Baisch v. Gallina*,
  346 F.3d 366 (2d Cir. 2003)......................................................................................................19

*Bartman v. L'Officiel USA Inc.*,
  2022 WL 4085850 (S.D.N.Y. Sept. 2, 2022)...............................................................................6

*Bayshore Cap. Advisors v. Creative Wealth Media Fin.*,
  667 F. Supp. 3d 83 (S.D.N.Y. 2023)............................................................................................6

*Bermudez v. Colgate-Palmolive Co.*,
  667 F. Supp. 3d 24 (S.D.N.Y. 2023)..........................................................................................25

*Blank v. TriPoint Glob. Equities, LLC*,
  338 F. Supp. 3d 194 (S.D.N.Y. 2018)........................................................................................12

*Bongiorno v. Baquet*,
  2021 WL 4311169 (S.D.N.Y. Sept. 20, 2021)...........................................................................23

*Brickman v. Tyco Toys, Inc.*,
  722 F. Supp. 1054 (S.D.N.Y. 1989)...........................................................................................12

*Brill v. Postle*,
  2020 WL 2936688 (E.D. Cal. June 3, 2020) .......................................................................17, 18

*Callahan v. A.E.V., Inc.*,
  182 F.3d 237 (3d Cir. 1999).......................................................................................................22

*Chaset v. Fleer/Skybox Int'l*,
  300 F.3d 1083 (9th Cir. 2002) ...................................................................................................17

*Clune v. Barry*,
  2023 WL 2929388 (S.D.N.Y. Apr. 13, 2023).............................................................................23

iv

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013)..........................................................................................7

*D. Penguin Bros. v. City Nat. Bank*,
587 F. App'x 663 (2d Cir. 2014) ...................................................................................7

*Daly v. Castro Llanes*,
30 F. Supp. 2d 407 (S.D.N.Y. 1998)............................................................................11

*Demaree v. Castro*,
2023 WL 6465881 (S.D.N.Y. Oct. 4, 2023) ..........................................................10, 22

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
232 F.3d 173 (3rd Cir. 2000) .......................................................................................21

*Edmondson v. Raniere*,
751 F. Supp. 3d 136 (E.D.N.Y. 2024) .....................................................................11, 19

*In re Ethereummax*,
2022 WL 20804358 (C.D. Cal. Dec. 6, 2022) .........................................................17, 18

*FindTheBest.com v. Lumen View Tech.*,
20 F. Supp. 3d 451 (S.D.N.Y. 2014)........................................................................19, 20

*First Cap. Asset Mgmt. v. Satinwood*,
385 F.3d 159 (2d Cir. 2004)..........................................................................................10

*Flexborrow LLC v. TD Auto Fin. LLC*,
255 F. Supp. 3d 406 (E.D.N.Y. 2017) ................................................................10, 11, 23, 24

*In re Gen. Motors*,
2016 WL 3920353 (S.D.N.Y. July 15, 2016) ..............................................................7, 24

*Georgia Malone & Co. v. Rieder*,
19 N.Y.3d 511 (2012) ...................................................................................................25

*Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*,
341 F.3d 1292 (11th Cir. 2003) ....................................................................................20

*Gross v. Waywell*,
628 F. Supp. 2d 475 (S.D.N.Y. 2009)...........................................................................11

*Gurung v. MetaQuotes Ltd.*,
2024 WL 3849460 (E.D.N.Y. Aug. 16, 2024)...............................................................7, 9

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010).....................................................................................................18, 19

*Herrick v. Grindr, LLC*,
  306 F. Supp. 3d 579 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019).....................20

*Holberg v. Westchester Racing Ass'n*,
  53 N.Y.S.2d 490 (App. Term 1945) ........................................................................................15

*Holmes v. Sec. Inv. Prot. Corp.*,
  503 U.S. 258, 269 (1992).................................................................................................21, 22

*Katzman v. Victoria's Secret Catalogue*, *aff'd*, 113 F.3d 1229 (2d Cir. 1997)
  167 F.R.D. 649 (S.D.N.Y. 1996) ...........................................................................................14

*Kerik v. Tacopina*,
  64 F. Supp. 3d 542 (S.D.N.Y. 2014)................................................................................16, 17

*Licht v. Binance Holdings*,
  2025 WL 625303 (D. Mass. Feb. 5, 2025) ............................................................................22

*Liss v. Manuel*,
  296 N.Y.S.2d 627 (Civ. Ct. 1968) .........................................................................................15

*Lopez v. Shopify, Inc.*,
  2017 WL 2229868 (S.D.N.Y. May 23, 2017) ........................................................................25

*In re MasterCard Int'l Inc.*,
  132 F. Supp. 2d 468 (E.D. La. 2001)......................................................................................21

*McLaughlin v. Anderson*,
  962 F.2d 187 (2d Cir. 1992)...................................................................................................11

*MLB Props. v. Price*,
  105 F. Supp. 2d 46 (E.D.N.Y 2000) .................................................................................17, 18

*Nelson v. MillerCoors, LLC*,
  246 F. Supp. 3d 666 (E.D.N.Y. 2017) ....................................................................................25

*In re Netflix Sec. Litig.*,
  2005 WL 1562858 (N.D. Cal. June 28, 2005) ........................................................................12

*Nygard v. Bacon*,
  2021 WL 3721347 (S.D.N.Y. Aug. 20, 2021).........................................................................19

*People v. Hua*,
  24 Misc. 3d 1142 (Crim. Ct. 2009)........................................................................................15

*People v. Shing*,
  83 Misc. 2d 462 (Crim. Ct. 1975)..........................................................................................16

*Price v. Pinnacle Brands, Inc.*,
　138 F.3d 602 (5th Cir. 1998) ...............................................................................17

*Reca v. Flashdot*,
　2025 WL 3187079 (S.D.N.Y. Nov. 13, 2025) (Cave, J.) ...............................7, 9, 19

*Risley v. Universal Navigation Inc.*,
　690 F. Supp. 3d 195 (S.D.N.Y. 2023)..............................................................3, 14

*Ritchie v. N. Leasing Sys.*,
　14 F. Supp. 3d 229 (S.D.N.Y. 2014)......................................................................8

*RJR Nabisco v. Eur. Cmty.*,
　579 U.S. 325 (2016)...........................................................................................22

*Rosner v. Bank of China*,
　528 F. Supp. 2d 419 (S.D.N.Y. 2007)..................................................................10

*Sandoval v. Uphold HQ Inc.*,
　2025 WL 1268291 (S.D.N.Y. May 1, 2025) ........................................................12

*Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*,
　2017 WL 4652758 (E.D. Cal. Oct. 17, 2017) ......................................................13

*Singh v. Illusory Sys., Inc.*
　727 F. Supp. 3d 500 (D. Del. 2024)....................................................................19

*Sperry v. Crompton Corp.*,
　8 N.Y.3d 204 (2007) .........................................................................................25

*In re Tether & Bitfinix Crypto Asset Litig.*,
　576 F. Supp. 3d 55 (S.D.N.Y. 2021)..............................................................19, 21

*Tyman v. Pfizer, Inc.*,
　2017 WL 6988936 (S.D.N.Y. Dec. 27, 2017) ......................................................25

*United States v. DiCristina*,
　726 F.3d 92 (2d Cir. 2013).................................................................................14

*United States v. Elfgeeh*,
　515 F.3d 100 (2d Cir. 2008)...............................................................................16

*United States v. Szur*,
　289 F.3d 200 (2d Cir. 2002)...............................................................................12

*Vicon Fiber Optics. v. Scrivo*,
　201 F. Supp. 2d 216 (S.D.N.Y. 2002).................................................................19

vii

*Villoldo v. BNP Paribas S.A.*,
   648 F. App'x 53 (2d Cir. 2016) ......................................................................................17

*Zanghi v. Ritella*,
   2021 WL 4392756 (S.D.N.Y. Sept. 24, 2021).................................................................23

**Statutes**

18 U.S.C. § 1955.................................................................................................................14, 16

18 U.S.C. § 1960.................................................................................................................16, 19

18 U.S.C. § 1962(c) .................................................................................................................11

18 U.S.C. § 1962(d) .................................................................................................................23

N.Y.P.L. § 222.05 .....................................................................................................................16

N.Y.P.L. § 225.00 ................................................................................................................14, 16

N.Y.P.L. § 225.05 ................................................................................................................14, 16

N.Y.P.L. § 225.10 .....................................................................................................................16

Solana Labs, Inc. and its officers Raj Gokal and Anatoly Yakovenko ("Labs Defendants"), and Solana Foundation and its agents Dan Albert and Lily Liu and former agent Austin Federa ("Foundation Defendants," and, collectively, "Blockchain Defendants") respectfully move to dismiss the SAC, as clarified by the Amended RICO Case Statement, Dkt. 149 ("RCS").[1]

**PRELIMINARY STATEMENT**

Using the Pump.fun website, Plaintiffs engaged in what they understood was "risky … speculation" by purchasing meme tokens in the hope of selling for "speculative" profit. SAC ¶¶ 21–22. The SAC characterizes the purchases as "gambling," but alleges the game was rigged because the token price fluctuated according to supply-and-demand dynamics; anyone could engage in marketing to influence these dynamics; and sophisticated purchasers used high-speed trading software ("Jito Software")—which was available to anyone to use and created by former defendant and now non-RICO member Jito Labs ("Jito")—to frontrun the less sophisticated.

Despite these allegations, Plaintiffs turned a profit on some transactions. Because they failed to profit on all transactions, they asserted Securities Act claims against Baton—and, now doubting their viability, have sought to transform those claims into a vague, internally inconsistent 675-paragraph RICO complaint against the Blockchain Defendants that fails at every level:

*First*, the SAC alleges an implausible enterprise: the Blockchain Defendants entered into a rimless hub-and-spoke enterprise with the Baton Defendants and John Doe promoters referred to as Lead KOLs (the "LKOLs") that acted at Baton's direction to promote Pump.fun, all to create an environment in which execution speed allowed sophisticated buyers to use Jito Software to frontrun the less sophisticated. But the SAC only pleads that the parties engaged in ordinary business activities, which is insufficient. In 2020, years before Baton even existed, the Blockchain

---

[1] The Blockchain Defendants join in the arguments for dismissal of the other Defendants. Emphases have been added. Exhibits are those appended to the SAC.

Defendants launched Solana, which is open-source blockchain code that, like the internet, anyone could access and use to develop software applications—including to create their own tokens—without prior approval from the Blockchain Defendants. As any other member of the public could, the Baton Defendants used the open-source code to create Pump.fun in 2024. The alleged defining event that begot the enterprise is humdrum: a generally beneficial congestion update implemented by Labs to the Solana code to address degraded code performance *for all Solana users and applications*—similar to how web browser Firefox or operating system Linux (both of which are free-to-download and open-source) or Google or Microsoft might update software to improve performance. Plaintiffs' Motion to Amend promised thousands of messages among Baton, Labs engineers, and Jito demonstrating technical coordination, but delivered nothing of the sort. Even if they had, such guidance and the update would show Labs acting in its own self-interest, as opposed to for the enterprise, which is fatal. And, beyond legal conclusions, Foundation is not alleged to have interacted with Baton, let alone plausibly participated in the enterprise's affairs.

*Second*, the SAC fails to allege the Blockchain Defendants did anything to conduct the purported enterprise's affairs, as they, at most, provided an inactionable service: software.

*Third*, the predicate acts are even more deficient post-amendment. There is no allegation the Blockchain Defendants made any false statements, as required for wire fraud. The purchase and sale of tokens is not gambling at all. Accusations of illicit money transmissions fail because the Blockchain Defendants are not alleged to have conducted the transfer of any tokens.

*Fourth*, Plaintiffs have alleged inactionable injuries to expectancy interests, namely, their disappointment they did not sell their tokens before the price fell below their purchase price.

*Fifth*, there is no direct link between any predicate act and a purported injury, as required for proximate causation. Intervening non-RICO acts—Plaintiffs' choice to speculate, failure to

sell at the top of the market, non-RICO person actions, and so on—break any causal chain.

*Sixth*, Plaintiffs fail to sufficiently allege domestic injuries.

*Seventh*, the RICO counts remain foreclosed by the securities fraud bar.

*Finally*, the conspiracy claims fail because there is no plausible agreement to violate RICO and, independently, no underlying substantive violation.  On the latter, the Baton Defendants explain why the claim is lacking as to them.  And even if most of the elements were met as to them, they cannot be an enterprise unto themselves.  Throughout, the Blockchain Defendants explain why the claims also fail as to the unserved LKOLs, who are not alleged to have made any plausible false statement, let alone at a time they could have influenced Plaintiffs' purchases.

The unjust enrichment claim is derivative of RICO and fails too.  The Court has now given Plaintiffs two chances to amend, including by crediting a Motion to Amend that, charitably, failed to deliver on what Plaintiffs promised.  The SAC should be dismissed with prejudice.

## STATEMENT OF FACTS

**I.    YEARS BEFORE THE ALLEGED ENTERPRISE, THE BLOCKCHAIN DEFENDANTS ALLEGEDLY LAUNCHED THE OPEN-SOURCE SOLANA BLOCKCHAIN**

Years before Pump.fun existed, the Blockchain Defendants allegedly launched Solana, an "open-source" code "network designed to process transactions … submitted by any user … similar to how the internet" functions.  SAC ¶¶ 13, 87, 236, 239.  Because Solana is "open-source," anyone can review and download it, suggest changes to it, and use it to develop applications that create and use their own tokens without prior approval from any Blockchain Defendant.[2]  *Id.*  Numerous applications have launched using Solana, the goal of some of which is to allow users to raise money

---

[2] "Open source" code is universally understood to be "available free of charge to the public to use, copy, modify, sublicense, or distribute."  *Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195, 202 (S.D.N.Y. 2023) (quoting *Open-Source*, Dictionary.com)), *aff'd in part, vacated in part on other grounds*, 2025 WL 615185 (2d Cir. Feb. 26, 2025).

without resorting to traditional banks. *E.g.*, *id.* ¶ 413; Ex A at 6. "[T]ransaction[s]" on "Solana" require payment in SOL, "the network's native token." SAC ¶ 237. "Fees for processing … transactions" on Solana "are distributed to validators, which are computers" anyone can run "that process and confirm transactions." *Id.*; RCS ¶¶ 55, 81, 91. There is no allegation the Blockchain Defendants control these validators and thus receive these fees. Instead, the Blockchain Defendants allegedly want the blockchain to be successful because the attendant effect of success is the SOL tokens they hold may increase in value. RCS ¶ 81; SAC ¶¶ 81, 237–38.

## II. IN APRIL 2024, THE ALLEGED ENTERPRISE COMMENCED WHEN LABS IMPLEMENTED A CODE UPDATE TO ALLEVIATE NETWORK CONGESTION ON THE BLOCKCHAIN

By 2024, Labs was allegedly responsible for the code's maintenance in the sense it could suggest code updates and Foundation for "promoting the Solana ecosystem through" initiatives. RCS ¶¶ 14–18. The SAC alleges that "leading up to March 2024, the Solana network was experiencing degraded performance because of severe congestion" for all types of "transactions," which were "fail[ing]." SAC ¶¶ 240–44. "In April 2024," Labs "implement[ed] Solana network updates" to alleviate the issue *for all users* for all transactions and applications on Solana. RCS ¶ 15. Although Pump.fun was created in January 2024, the SAC alleges the April update clearing congestion "enable[d] Pump.fun's success[]" and begot the enterprise. *Id.*; SAC ¶ 609.

## III. PLAINTIFFS UNDERSTOOD THEY WERE SPECULATING, THAT MEME TOKEN PRICE IS DEPENDENT ON EXTERNAL FACTORS, AND THAT THEY COULD SELL AT ANY TIME

Pump.fun is a "web application" that enables users to create "memecoins" subject to an algorithmic "bonding curve" Baton "design[ed]," which "increases token price" with each purchase and decreases it upon sales—*i.e.*, the curve is another name for supply and demand. RCS ¶¶ 5, 76; SAC ¶¶ 137, 547. The SAC acknowledges Pump.fun users, including Plaintiffs, engaged in "risky … speculation" when trading meme tokens. SAC ¶¶ 22, 125, 128–29. Approximately 40% of "unique wallets" that "traded at least ten tokens" turned a profit. *Id.* ¶ 322. Sell-offs are

generally the trigger for price decreases, which trigger more sell-offs. *Id*. ¶¶ 29, 158.

The SAC pleads that token price is determined by external factors, in particular "marketing" and execution speed. *Id*. ¶¶ 27, 98–101, 143, 240, 355, 487. The SAC alleges those who buy earlier are advantaged but acknowledges early purchasers do not necessarily profit. *Id*. ¶¶ 20, 29, 138. Allegedly, sophisticated users pay for high-speed frequency trading Jito Software created by Jito to buy up tokens earlier, including by using automated "bots." *Id*. ¶¶ 133, 247–248, 428; RCS ¶ 107. As a result, as in other high-speed frequency trading contexts, execution speed can be decisive to profiting in meme token trading. SAC ¶¶ 240, 247–248, 253.

Plaintiffs allege the RICO scheme was to have sophisticated users take advantage of high-speed trading and marketing to frontrun the less sophisticated. *Id*. ¶¶ 253, 537. The SAC refers to these sophisticated users with the vague moniker "insider," but never explains what precisely makes someone an insider. *Id*. ¶¶ 133, 250, 255. Regardless, Plaintiffs admit the Pump.fun website interface discloses information that allows "a user" to "assess, at a glance, a token's insider's concentration" and a token's "susceptibility to manipulation." *Id*. ¶¶ 139, 425–26.

The SAC alleges Baton openly held Pump.fun out as a "casino," advising users: "don't like it? LEAVE." *Id*. ¶¶ 385, 405–07. Plaintiffs did not leave, however. Okafor purchased and sold tokens before any alleged false statement and long after this action was filed in January 2025. Ex. J. He also turned a profit on some transactions. *E.g.*, *id.* at 32–33 (reflecting that, on November 20, 2024, Okafor turned $9,641.31 profit on certain tokens). So too did Aguilar. *Id.* at 48.

There are millions of Pump.fun tokens. SAC ¶ 496. Plaintiffs allegedly purchased a tiny subset and make no specific allegations with respect to the bulk of that subset. *Id*. ¶¶ 65–67.

**IV.** **THE SAC FAULTS THE BLOCKCHAIN DEFENDANTS FOR IMPLEMENTING INSUFFICIENT "GUARDRAILS," WHICH ALLOWED SOPHISTICATED USERS TO PAY FOR HIGH-SPEED TRADING USING SOFTWARE CREATED BY JITO, A NON-RICO PARTICIPANT**

Beyond the congestion update, the SAC's gravamen against the Blockchain Defendants is

they failed to take steps to alter the Solana code to "create[] guardrails for retail participation," meaning users operated in an "execution environment where speed determined outcomes," which "structurally advantaged anyone with superior infrastructure." *Id.* ¶¶ 240, 381–83, 469. According to the SAC, it was not the congestion update itself, but the Jito Software that created a "two-tier execution environment" enabling "sophisticated users" to frontrun the less sophisticated, which made the purported scheme possible. *Id.* ¶¶ 240, 253–255, 510–511.

## V.    THE LKOLs ARE NOT ALLEGED TO HAVE MADE ANY 2024 FALSE STATEMENTS

The SAC alleges 25 "Doe" LKOLs were also part of the enterprise. It claims they could be identified by "online pseudonyms," but nowhere provides an identifying list, making it difficult to decipher who is alleged to have done what. *Id.* ¶ 82. Broadly, the SAC claims they "served as … token promoters" at the direction of Baton, but does not identify LKOL statements that could remotely have been made in support of the alleged enterprise until January 23, 2025—*i.e.*, after this action was filed. *Id.* ¶¶ 82–83, 168–69, 175, 198, 213, 281, 287, 292–95, 363.

## ARGUMENT

In addition to the familiar *Twombly/Iqbal* plausibility standard under Rule 8(a), all aspects of Plaintiffs' claims that allege fraud must meet the heightened pleading standard of Rule 9(b), including claims that might not be ordinarily subject to Rule 9(b). *Bayshore Cap. Advisors v. Creative Wealth Media Fin.*, 667 F. Supp. 3d 83, 125 (S.D.N.Y. 2023). Throughout, the SAC engages in "group pleading" impermissible under both Rules by failing "to differentiate" between Defendants. *Arzu v. City of New York*, 2025 WL 437699, at *3 (S.D.N.Y. Feb. 7, 2025). Moreover, the bloated 675-allegation SAC is vague and internally inconsistent. The Court need only credit the well-pleaded, internally consistent allegations that sufficiently identify what each Defendant did. *Bartman v. L'Officiel USA Inc.*, 2022 WL 4085850, at *2 (S.D.N.Y. Sept. 2, 2022). Plaintiffs' claims are not plausible under Rule 8(a) and certainly cannot meet Rule 9(b)'s heightened standard.

6

I.    **PLAINTIFFS' KITCHEN SINK SECTION 1962(C) CLAIMS FAIL**

A.    **Baton's Use Of Open-Source Code Does Not Show Enterprise**

For an association-in-fact to be an enterprise, the members "must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013). "[I]ndividuals or entities whose activities sometimes intersect do not form an enterprise." *In re Gen. Motors*, 2016 WL 3920353, at *12 (S.D.N.Y. July 15, 2016). A "complaint[]" must be dismissed when it "fail[s] to provide a plausible basis for inferring that" defendants acted "'on behalf of the *enterprise* as opposed to on behalf of [themselves] in their individual capacities, to advance their individual self-interests.'" *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (emphasis in original).

"Courts in this Circuit" have rejected the existence of a common purpose predicated on a company "providing software support" even where the company allegedly "knew about criminal activity" and the "software was essential" to the purported enterprise. *Gurung v. MetaQuotes Ltd.*, 2024 WL 3849460, at *9–10 (E.D.N.Y. Aug. 16, 2024), *appeal noticed*, No. 25-328 (2d. Cir.); *see also Reca v. Flashdot*, 2025 WL 3187079, at *3, *17 (S.D.N.Y. Nov. 13, 2025) (Cave, J.) (allegations software company "knew about 'suspicious activities'" and provided software essential to purported scheme insufficient for enterprise even though company "reaped substantial financial benefits" from other enterprise member), *report and recommendation adopted as to RICO claims*, 2026 WL 82702 (S.D.N.Y. Jan. 12, 2026) (Woods, J.).

Here, Defendants were allegedly acting in their own self-interest both before and after the alleged enterprise. To promote their own self-interest, before Pump.fun even existed, the Blockchain Defendants contributed to Solana, which is "open-source" code. To promote its self-interest, Labs continued to openly update that code pre- and post-Pump.fun, including in 2024 to address degraded performance and alleviate user congestion, a benefit for all Solana users and

7

applications. To promote its self-interest, the Foundation, pre- and post-Pump.fun, contributed to initiatives designed to encourage adoption of Solana. To promote their own self-interest, the Baton Defendants accessed and used the Solana code to create the Pump.fun website in 2024—just as any member of the public could, without needing permission from any Blockchain Defendant.

The enterprise allegedly includes "LKOLs" and "other coordinated participants" (RCS ¶ 68) but the SAC's identification of the LKOLs is at best confused and it does not identify the coordinated participants. Both groups should be disregarded. *See Ritchie v. N. Leasing Sys.*, 14 F. Supp. 3d 229, 237 (S.D.N.Y. 2014) (plaintiffs must "allege specific facts" related to Does). In any event, neither group is plausibly alleged to have coordinated with the Blockchain Defendants.

At most, the SAC alleges Labs acted in its own self-interest in interacting with Baton while Baton was using Solana for its own benefit, which is insufficient to establish enterprise (the Foundation Defendants are not alleged to have interacted with the Baton Defendants, let alone plausibly furthered the enterprise). The SAC references tweets and alleges the Labs Defendants met with Baton "concerning investment and technical support" and offered to make "introductions" to help it raise money, but never explains how—even if true—this shows they acted for the enterprise, as opposed to their own purposes. SAC ¶¶ 221–23. As to the tweets, one predated the alleged enterprise. *Id.* ¶ 412. Another did not reference Baton, but instead stated that improving the blockchain would encourage Solana's adoption. *Id.* ¶ 413. Another retweeted a post by another user discussing revenues for seemingly all Solana applications. *Id.* ¶ 227. Another highlighted that Baton in 2025 had raised hundreds of millions of dollars through a "public" token "sale" on major exchanges. *Id.* ¶ 228. Although some tweets may have highlighted the successes of companies—such as Baton—that used Solana, nothing in the SAC shows that any Blockchain Defendant acted outside of its "ordinary business" to do anything criminal, let alone form an

8

enterprise to defraud retail Pump.fun users. *Reca*, 2025 WL 3187079, at *2–3, *17 (rejecting that defendants publicly touting business "partnership" established enterprise).

To secure amendment, Plaintiffs promised to bolster the Amended Complaint ("AC") with "5,000 internal chat logs … involving members of the Pump.fun team, *Solana Labs engineers*, Jito Labs, and third-parties," including "*Solana Labs engineers* … in direct contact with Pump.fun personnel, discussing and providing technical guidance concerning integration of key components implicated in the alleged enterprise." Dkt. 103 at 6, 8. The SAC, however, references no chat involving Jito and *one* alleged troubleshooting chat between a Baton developer and a vaguely titled "Solana Core Developer," who is not alleged to have been employed by any Blockchain Defendant at the time. SAC ¶ 231. This alleged chat from May 2024 (after the purportedly pivotal April update) was innocuous: it involved discussions around "eliminating a third party per token fee on Solana," with the Solana Core Developer explaining "what was feasible and where ecosystem support was missing." *Id.* There is no explanation how this conversation was relevant to the enterprise. In an oddly worded paragraph, the SAC alleges the Pump.fun engineer then discussed "lottery- and game-style mechanisms and received real-time technical guidance," but these discussions appear to have been internal to Pump.fun. *Id.* ¶ 232. Even if the discussions were with the Solana Core Developer, there is no allegation these discussions were relevant to meme token trading. More significantly, even if Labs were providing relevant technical guidance to Baton, it would be doing nothing more than "providing software support," which is insufficient. *Gurung*, 2024 WL 3849460, at *9. The SAC identifies a single post-Pump.fun code update to the open-source code: the April 2024 update, which benefitted all Solana applications. It is implausible it was done to benefit the enterprise, as opposed to Labs' ordinary business interests.

Independently, as Baton's brief explains, the SAC impermissibly alleges (1) a hub-and-

9

spoke enterprise (2) that is not distinct from the predicate acts.  Each deficiency is also fatal.

### B.    Baton's Use Of Open-Source Code Does Not Show Conducting

Even if an enterprise were properly alleged (and it is not), "simply establishing the presence of an enterprise is not enough"—a defendant must also "conduct[]" the "enterprise's affairs" through "a pattern of racketeering" by "participat[ing] in the operation or management of the enterprise." *First Cap. Asset Mgmt. v. Satinwood*, 385 F.3d 159, 175–76 (2d Cir. 2004).  "Under this standard, a person may not be held liable merely for taking directions and performing tasks that are 'necessary and helpful to the enterprise,' or for providing 'goods and services that ultimately benefit the enterprise.'" *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 415 (E.D.N.Y. 2017).  Even allegations of "regular[] communicat[ion]" or a "long-standing relationship" between the enterprise members, without more, are insufficient to plead conducting. *Abbott Lab'ys v. Adelphia Supply USA*, 2017 WL 57802, at *7–8 (E.D.N.Y. Jan. 4, 2017).

Conducting poses a higher bar than enterprise.  Because the enterprise allegations are insufficient, it necessarily follows the conducting allegations are insufficient as well.  As for the April 2024 congestion update, "[c]ourts reject such RICO allegations, in which the conduct alleged was taken only for the defendants' benefit, not a separate enterprise's." *Id.*  And even if Labs offered Baton technical support, "[r]egardless of how indispensable or essential such services may have been, rendering a professional service by itself does not qualify as participation in a RICO enterprise." *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007).  Likewise, passively "[f]ailing to act" by not changing the code to protect retail participants is insufficient. *Demaree v. Castro*, 2023 WL 6465881, at *10 (S.D.N.Y. Oct. 4, 2023).

### C.    The SAC Fails To Sufficiently Allege Two Or More Predicate Acts

Plaintiffs have failed to allege that any Blockchain Defendant committed any predicate act, let alone "that each defendant 'personally committed' two or more predicate acts," as required to

10

state the claim. *Edmondson v. Raniere*, 751 F. Supp. 3d 136, 160 (E.D.N.Y. 2024) (cleaned up).

### 1. *Wire Fraud Is Insufficiently Alleged*

To successfully plead wire fraud, Plaintiffs must allege fraudulent statements with particularity—*i.e.*, who, what, when, why. *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992). Plaintiffs do not allege any Blockchain Defendant made any false statement, which is fatal. RCS ¶¶ 43–58. The RCS broadly alleges Defendants made false statements (*id.* ¶ 43), but "lumping the defendants into collective allegations results in a failure to demonstrate the elements of § 1962(c) with respect to each defendant individually." *Gross v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009). The RCS alleges non-Blockchain Defendants made false statements, but "[m]erely pleading a close relationship with another entity that is alleged to have made particular misleading statements is insufficient to satisfy Rule 9(b)." *Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) (dismissing defendant not alleged to have made false statement).

Under the rubric of "interstate wire communications used to execute the scheme," the RCS (¶ 56(g)) alleges that on July 18–19, 2025, Liu and Federa "transmitted … posts … discussing the Enterprise's strategy of routing Token launches through foreign foundations to obtain favorable tax and regulatory treatment, which … furthered the scheme by articulating and coordinating the Enterprise's compliance-avoidance posture," but does not claim these statements were actually false. Setting aside that deficiency, it is not clear how this disclosure could have furthered the alleged scheme to have sophisticated users frontrun the less sophisticated. RCS ¶¶ 44–48.

Nor does the SAC plausibly plead intent or a scheme. Mere "allegations" a defendant stands to "gain economically from" a "fraud" do "not satisfy the heightened pleading requirements of Rule 9(b)." *Flexborrow*, 255 F. Supp. 3d at 423. Here, there is not even a plausible allegation the Blockchain Defendants would even benefit economically from the purported scheme. There is no allegation that "insider" profits flowed to the Blockchain Defendants, let alone coherent

11

allegation as to who the "insiders" are. *Brickman v. Tyco Toys, Inc.*, 722 F. Supp. 1054, 1061 (S.D.N.Y. 1989) ("[T]he term 'insider' is conclusory and inexact."). Moreover, there is no plausible motive for the Blockchain Defendants to lie to retail users: fleecing users would plausibly discourage use of Solana, harming the Blockchain Defendants' interests.

Nor are the elements of wire fraud satisfied with particularity as to the Baton or LKOL Defendants. Initially, Plaintiffs include an omissions theory (RCS ¶ 54.f), but "when dealing with a claim of fraud based on material omissions, it is settled that a duty to disclose arises only when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) (cleaned up). Plaintiffs have identified no such relationship.

Accordingly, Plaintiffs must identify a false or misleading affirmative statement, which they have failed to do. Baton's CEO allegedly stated Pump.fun was an "unruggable fair launch platform," was "as much of an even playing field as it gets [in my opinion]," and "retail's already up massively because it's so easy for them to get involved and the playing field is as fair as ever." RCS ¶¶ 51–53. These statements cannot give rise to wire fraud for several, independent reasons.

First, they constitute inactionable "puffery" and are analogous to statements to the effect that a product is "recession proof" or "can't lose," which courts have "consistently held to be inactionable." *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 212 (S.D.N.Y. 2018); *Sandoval v. Uphold HQ Inc.*, 2025 WL 1268291, at *6 (S.D.N.Y. May 1, 2025) (statements investment were "safe" and "secured" were puffery). It is impossible to assess "fairness," what "retail" means, or the scope of "already up." *See In re Netflix Sec. Litig.*, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005) ("consumers love our service" was inactionable puffery).

Second, no statement could be materially false. The SAC *alleges* Pump.fun's interface

12

allowed "a user" to "*assess, at a glance, a token's insider's concentration*" and a token's "*susceptibility to manipulation*."  SAC ¶¶ 139, 425–26.  Beyond that, Plaintiffs' explanations for why statements are false are incoherent.  They allege falsity because users could use Jito Software to buy up tokens quickly (RCS ¶¶ 51–53), but anyone could use that software—Pump.fun's interface even allowed users to "select[] a speed tier" and to "toggle 'front-running protection.'"  SAC ¶ 428.  Plaintiffs allege "retail is already up" must have been false because "95% of wallets never cleared $10,000 in gains" (RCS ¶ 53), but never explain how this makes the statement false.

Third, relatedly, the "provision of" truthful "information to the public by way of disclosures negates an inference that" any Defendant "acted with an intent to defraud."  *Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, 2017 WL 4652758, at *5 (E.D. Cal. Oct. 17, 2017).

The alleged false LKOL statements (which are from 2025, after this action was filed, *see* RCS ¶¶ 54, 56) are deficient for the foregoing reasons—for example, if Pump.fun was disclosing a token's "susceptibility to manipulation," then no exhortation to purchase can be material.  They are also deficient for independent reasons.  The RCS references an LKOL statement—"Haven't been excited about a coin in a long time... Don't $cope later"—but that is at most puffery.  It also references a developer's statement he went on a "17-month grind" to promote a token, but does not allege he was part of the enterprise.  Nor do Plaintiffs explain how the statement could be false: the "developer … had been publicly promoting" the "small, languishing memecoin … on social media … for approximately 17 months."  SAC ¶ 258.  The remaining statements are allegedly "coordinated promotional threads timed to coincide with insider positioning," which are not identified with sufficient particularity.  *Id*. ¶ 560.  In any event, the principal complaint is the LKOLs purportedly failed to identify their association with Pump.fun, but they allegedly included "pill-shaped affiliate badge[s]" identifying them as associated with Pump.fun.  *Id*. ¶¶ 168–69, 175.

13

Moreover, Plaintiffs identify no duty to disclose "promotional practices." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 656 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997).

### 2.    No Section 1955 Violation Is Sufficiently Alleged

Section 1955 applies to one who "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business." The alleged gambling business is Pump.fun. RCS ¶ 86. Plaintiffs make no effort to explain how any Blockchain Defendant conducted, financed, managed, supervised, directed, or owned Pump.fun, which alone means this predicate act is insufficiently alleged. The Solana code existed before Pump.fun existed and the only alleged update to it post-Pump.fun is the April 2024 congestion update. "It defies logic that a drafter of computer code underlying a particular software platform could be liable … for a third-party's misuse of that platform." *Risley*, 690 F. Supp. 3d at 215 (analyzing issue under securities laws).

Independently, it is not enough for the SAC to characterize conduct as gambling—Section 1955 only "criminalizes the act of running a gambling business that ... operates in violation of the law of the state in which the business is conducted." *United States v. DiCristina*, 726 F.3d 92, 98–99 (2d Cir. 2013). The SAC alleges the violation of NYPL § 225.05, which prohibits "knowingly advance[ing] or profit[ing] from unlawful gambling activity." The theory fails.

"A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." NYPL § 225.00. To try to cram their theory into the gambling rubric, Plaintiffs allege (1) "users in New York staked SOL"; (2) "upon the outcome of whether subsequent buyers would emerge to purchase tokens at higher prices," which they characterize as "a future contingent event not under the user's control"; (3) "upon the understanding that they would receive SOL proceeds (something of value) if they sold before buyers disappeared." SAC ¶ 572.

14

This is sophistry. As to the second element, far from a contingent event not under the user's influence, the SAC is loaded with allegations that the user *influences* whether additional buyers emerge through "demand manufacturing" via marketing and promotional narratives and then must use trading acumen and high-speed trading software to turn a profit. *E.g.*, *id*. ¶¶ 27–28, 95–100, 143–46, 154–55, 257–307. Independently, as to the third, there is no plausible allegation of an amorphous shared understanding that users would "receive SOL proceeds … if they sold before buyers disappeared"—users could sell at any time for a price of their choosing, irrespective of whether "buyers disappeared," whatever that means. Indeed, Plaintiffs' data shows that an individual token has many price peaks and valleys. *Id.* ¶¶ 126, 288; Ex. B at 1–2, 8; Ex. C.

At bottom, where, as here, "a party has a genuine personal stake in the outcome of future events, as when he has an ... investment" or "a contract involving goods" or "commodities," that is a "business" transaction "and regardless of risk, not a bet, wager or illegal gamble." *Liss v. Manuel*, 296 N.Y.S.2d 627, 631 (Civ. Ct. 1968); *accord Holberg v. Westchester Racing Ass'n*, 53 N.Y.S.2d 490, 495 (App. Term 1945) ("Business may involve speculation" without becoming "gambling"). The SAC establishes it is a user's skill in, among other things, buying low—perhaps quickly and in bulk—and selling high that controls ability to turn a profit. Engaging in arbitrage or high-speed trading is not gambling. Nor is buying watches, collectibles, and other commodities in the hope supply and demand or other factors will cause their value to go up. So too with tokens.

Plaintiffs concede they are not alleging a "game of chance." SAC ¶¶ 163, 130, 255, 313, 532. Regardless, any game of chance theory would fail for the reasons stated above, as a game of chance is "dominat[ed]" by "chance," not "skill." *People v. Hua*, 24 Misc. 3d 1142, 1145 (Crim. Ct. 2009) (dismissing indictment failing to establish card game was game of chance).

Apart from the absence of any gambling, there is no plausible allegation the Blockchain

15

Defendants knowingly profited or advanced any gambling. "A person 'profits from gambling activity' when … he accepts or receives money … pursuant to an … understanding with any person whereby he participates or is to participate in the proceeds of gambling activity." NYPL § 225.00. No plausible understanding is alleged and the Blockchain Defendants are not alleged to have received any property. "A person 'advances gambling activity' when … he engages in conduct which materially aids … gambling activity." *Id.*; *People v. Shing*, 83 Misc. 2d 462, 464 (Crim. Ct. 1975) (materially aids requires that assistance be "to a great extent; substantially; considerably"). No Blockchain Defendant materially aided gambling for the reasons discussed.

The SAC also alleges a violation of § 225.10, which imposes additional elements beyond § 222.05. Because the § 225.05 violation is not properly stated, the § 225.10 violation also fails.

### 3. No Section 1960 Violation Is Sufficiently Alleged

Section 1960 makes it improper to "knowingly conduct[], control[], manage[], supervise[], direct[], or own[] all or part of an unlicensed money transmitting business"—in the main, a business that "transfer[s] funds on behalf of the public." As with Section 1955, the alleged money transmitting business is Pump.fun. SAC ¶¶ 583–84. Indeed, there is no allegation any Blockchain Defendant transfers any tokens on behalf of the public, functions as an exchange, or takes custody or exercises dominion over customer funds. At most, Labs is alleged to have periodically updated the open-source "blockchain" while Foundation "directed … initiatives supporting" the blockchain. *Id.* ¶ 588. Independently, although the SAC alleges Pump.fun required a license, there is no plausible allegation any Blockchain Defendant "knew" Pump.fun was unlicensed, which also requires dismissal. *United States v. Elfgeeh*, 515 F.3d 100, 133 (2d Cir. 2008).

### D.    Losses On Meme Token Speculation Do Not Constitute A RICO Injury

"[T]o plead standing under RICO, the plaintiff must allege that he incurred a cognizable injury to his 'business or property.'" *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 556, 560 (S.D.N.Y.

16

2014). The Second Circuit has "made clear that a mere 'expectation' cannot constitute 'business or property' under RICO." *Villoldo v. BNP Paribas S.A.*, 648 F. App'x 53, 55 (2d Cir. 2016); *accord Kerik*, 64 F. Supp. 3d at 560. Because gambling losses represent an injury to a mere expectancy interest, courts across the country have concluded that "'[p]rivate plaintiffs alleging injuries resulting from their own gambling cannot establish "injury to business or property" under RICO.'" *Brill v. Postle*, 2020 WL 2936688, at *9 (E.D. Cal. June 3, 2020) (collecting cases).

Plaintiffs who purchase speculative assets "received exactly what they bargained and paid for" even if they ultimately realize a loss instead of a profit and thus "do not meet the 'injury' requirements of RICO." *MLB Props. v. Price*, 105 F. Supp. 2d 46, 53 (E.D.N.Y 2000); *accord Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083, 1087 (9th Cir. 2002); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998). Similar to here, in *Ethereummax*, plaintiffs alleged promoters had committed wire fraud by urging token purchases and failing to disclose paid promotions to "artificially inflate[]" and "periodically pump up" token price to "provide exit liquidity for Defendants." 2022 WL 20804358, at *2–4. The complaint, however, showed that "consumer[s] … purchase[d]" the "inherently volatile and novel" tokens hoping they would "one day" be "worth more than the price for which the consumer paid for them." *Id.* at *13. The court thus held plaintiffs "lack standing" because "their injury is nothing more than disappointment over what their [tokens] are worth today—not what they were worth at the time of their purchase." *Id.*

As in the foregoing cases, Plaintiffs have alleged inactionable injuries predicated on expectancy interests. Although they concede they engaged in "risky … speculation" by purchasing tokens, Plaintiffs allege they suffered injuries when they failed to sell before price "collapses" left "[them] holding depreciated or worthless tokens" and due to "inferior fills, slippage, and related value losses caused by the pay-to-win priority execution," and "fees" they paid to purchase their

17

tokens.  SAC ¶¶ 22, 590.  But failure to sell before a price drop is not actionable.  Illustratively, more than in *Ethereummax*—where it was merely "plausible … that Plaintiffs could have received *far more* than what they paid for the Tokens had they sold them at the right time" (2022 WL 20804358, at \*12)—Plaintiffs here *turned* a profit on some of their transactions.

Fees paid at the point of sale likewise do not constitute an injury.  As in *Ethereummax*, even though they claim token prices were inflated by wire fraud, "Plaintiffs cannot claim that they paid more than fair market value for the … Tokens because the Tokens *inherently have no value* outside of what the market is willing to pay in real-time."  *Id.*  Plaintiffs even calculate harm as "net" investment "losses" (Ex. J at 46; SAC ¶ 65) and seek to represent only users who "had an out-of-pocket loss in their investment in Pump.fun Tokens" (SAC ¶ 517).  In any speculation case, the plaintiff parts with money at the point of sale, whether when paying to play blackjack (*see Brill*), buy baseball cards (*see MLB Props.*), or, as here, buy tokens (*see Ethereummax*).  In each instance, the plaintiff has purchased a "chance" to profit and, "having paid for it and received it, … has not suffered any … RICO property injury."  *MLB Props.*, 105 F. Supp. 2d at 51.

Plaintiffs also claim they were harmed through payment of priority fees to use Jito Software, but they got what they paid for:  high-speed trading in an effort to turn a profit on their tokens.  *Id*.  Same goes for the fee Pump.fun took on token purchases and fees Plaintiffs paid to validators to execute their transaction:  courts have rejected the notion that a "rake" can constitute an injury where, as here, it was baked into the purchase price.  *Brill*, 2020 WL 2936688, at \*9.

E.       **Plaintiffs Have Failed To Sufficiently Allege Causation**

It is not enough to plead predicate acts or injury; Plaintiffs must also allege the predicate acts were both the but-for cause and proximate cause of their injuries.  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 8 (2010).  RICO proximate cause is more exacting than at common law and requires "some direct relation between the injury asserted and the injurious conduct alleged…. A

18

link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Id*. at 9, 12. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460–61 (2006). The alleged injury must be personal to the named plaintiff, as opposed to a non-party. *Nygard v. Bacon*, 2021 WL 3721347, at *4 (S.D.N.Y. Aug. 20, 2021). The causal chain is broken if the alleged injury was caused by intervening acts, including "non-RICO violations committed by the defendants." *Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003).

As the growing majority of courts have held, "Plaintiffs must prove proximate and but-for causation as to *each* Defendant." *Reca*, 2025 WL 3187079, at *10 n.7; *accord In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 116 (S.D.N.Y. 2021); *Edmondson*, 751 F. Supp. 3d at 173. Although none are sufficiently alleged, the predicate acts against the Blockchain Defendants at best "merely further[ed]" or "permit[ed] … an injury that happened or could have happened independently of the act," which is insufficient to "proximately cause an injury," which is fatal. *Vicon Fiber Optics. v. Scrivo*, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002).

Even if causation were assessed against the alleged enterprise as a whole, causation still fails. Plaintiffs do not explain how any alleged Section 1960 violation caused harm. They cannot: illustratively, in *Singh v. Illusory Sys.*, the court dismissed RICO claims predicated on alleged Section 1960 violations in connection with transmissions of digital assets because plaintiffs did "not directly link the lack of regulatory licensing" to their losses, noting further that "speculat[ion] as to what government actors may or may not have required of Defendants had they been licensed" could "not support Plaintiffs' RICO claim." 727 F. Supp. 3d 500, 509 (D. Del. 2024).

On wire fraud, "reliance is an essential part of demonstrating causation between a defendant's misrepresentations and the plaintiff's injury." *FindTheBest.com v. Lumen View Tech.*,

19

20 F. Supp. 3d 451, 458 (S.D.N.Y. 2014). "Conclusory" and "naked assertions" of "reliance" are insufficient (*id.*), but that is all Plaintiffs offer (SAC ¶ 40). For example, Plaintiffs do not tie their reliance to alleged LKOL misrepresentations, which occurred after this action was initiated. The earliest alleged misrepresentation was made by Baton's CEO in September 2024. Illustrating that no alleged misrepresentation could have mattered, Okafor bought tokens *before* any alleged false statements were made and continued to do so *after* this action was filed. *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1305–06 (11th Cir. 2003) (dismissing RICO claim based on wire fraud as plaintiffs could not reasonably rely after they accused defendant of fraud).

Moreover, "[r]eliance is unreasonable as a matter of law where the alleged inference or misrepresentation is contradicted directly by another statement." *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 596 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019). As discussed, the SAC alleges Pump.fun disclosed each token's "susceptibility to manipulation" and allowed users to "select[] a speed tier" and "toggle 'front-running protection.'" SAC ¶¶ 426–28. Plaintiffs allege they were misled about matters apparent to any reasonable user: the pattern of "high-risk" tokens rising and dropping in price. *Id.* ¶¶ 30, 33, 126.

And causation fails on *all* predicate acts due to intervening, non-RICO acts. Plaintiffs' theory relies on Jito Software, which "caused" a "pay-to-win priority execution environment" that caused Plaintiffs to suffer "inferior fills, slippage, and related value losses," including because they could not "compete" with "bots" for "favorable execution." RCS ¶ 107. That is a non-RICO act by a non-RICO person and is but one example of how the chain breaks. In addition to competition from users and bots using Jito Software, (1) the alleged congestion update and failures to change the code to create guardrails (categorically non-RICO acts); (2) non-party users creating and selling tokens; and (3) "Plaintiffs' own acts of accessing the internet;" (4) "locating" Pump.fun;

20

(5) "entering their information;" (6) "playing electronic casino games" by purchasing meme tokens; and (7) supply and demand and external factors affecting the price of the token; (8) Plaintiffs not buying at the right moment; and (9) not selling at the right moment; whereas (10) independent actors did acquire and sell at the right time, driving the price down; "are all intervening causes that break the chain of causation with respect to the defendants' alleged activities, even if they were illegal." *In re MasterCard Int'l Inc.*, 132 F. Supp. 2d 468, 496 (E.D. La. 2001), *aff'd*, 313 F.3d 257 (5th Cir. 2002); *Tether*, 576 F. Supp. 3d at 116–22 (S.D.N.Y. 2021) (link to injuries from artificially inflated digital asset prices broken because "manipulation of cryptocommodity prices 'was directly caused by buy/sell decisions'" of "independent market actors" and prices were "intricate, uncertain, and contingent on numerous independent decisions made by other market participants, subject to other market forces").

Plaintiffs' alleged harm—losses due to alleged pump-and-dumps driven by marketing and high-speed trading—is complicated and implicates non-RICO acts by alleged enterprise members and non-members.  But Plaintiffs make no effort to plead any details about the tokens *they* allegedly purchased and lost money on—when they purchased and sold, what caused price spikes, why they lost money, and so on—to explain away these many intervening acts (which they cannot).

And no matter how they try to dress up their claims, Plaintiffs allege they believed they were gambling.  Accordingly, "[u]nlike an ordinary RICO victim," Plaintiffs "can avoid any injury simply by walking away from the alleged wrongdoers" by not purchasing meme tokens, which is fatal.  *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 187–88 (3rd Cir. 2000).

Reference to the *Holmes* factors further confirms the absence of causation.  First, intervening causes make it difficult "to ascertain the amount of [Plaintiffs'] damages attributable to the violation, as distinct from other, independent, factors."  503 U.S. 258, 269 (1992).  Second,

21

"apportioning damages" would be complicated, as numerous non-RICO token purchasers made money and would presumably have to return their profits in the event of liability. *Id.* There are winners and losers in purchasing speculative assets—RICO is not designed to compensate such losers for bad business decisions. Third, much of Plaintiffs' SAC boils down to alleged failures to comply with securities, gambling, and money transmission regulatory regimes, for which federal and state agencies "more generally are in a position to vindicate the public interest in the sense set forth in *Holmes*." *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 266 (3d Cir. 1999).

### F.    Plaintiffs Have Not Sufficiently Alleged Domesticity

"Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 354 (2016). Aguilar does not attempt to meet this burden, as Baton is alleged to be foreign and he alleges no information to domesticate his injuries. SAC ¶ 66; *Demaree*, 2023 WL 6465881, at *1 n.3 (it is unlikely that "foreigners who did business with a [foreign] corporation over a [foreign] website" could "ever allege a viable claim"). As for Okafor and Carnahan, they allege they were in the United States when they "purchased and sold" tokens. SAC ¶¶ 65, 67. But, as *Licht v. Binance Holdings* recently held, the fact that a plaintiff is "domestic" is not enough where the defendant that allegedly received and sent transmissions is foreign and there are no allegations that the affected cryptocurrencies "originated in the United States" and that the enterprise was "targeting United States-based victims." 2025 WL 625303, at *41–42 (D. Mass. Feb. 5, 2025), *report and recommendation adopted*, 2025 WL 624025 (D. Mass. Feb. 26, 2025). Baton is foreign. There are no allegations that the tokens that lost value originated in the U.S. or that the purported enterprise targeted U.S.-based victims. Each deficiency is fatal.

### G.    RICO's Securities Fraud Bar Requires Dismissal Of The SAC

Section 107 of the PSLRA "bar[s] civil RICO claims based on allegations of securities

fraud." *Bongiorno v. Baquet*, 2021 WL 4311169, at *13 (S.D.N.Y. Sept. 20, 2021). "[I]f a complaint alleges that a RICO enterprise is engaged in a single scheme of racketeering activity, then when 'any predicate act is barred by the PSLRA[,] it is fatal to the entire RICO claim.'" *Zanghi v. Ritella*, 2021 WL 4392756, at *16 (S.D.N.Y. Sept. 24, 2021). Plaintiffs allege tokens they purchased—which were allegedly promoted through wire fraud—are "investment contracts" and thus "unregistered securities" under the Securities Act. *E.g.*, SAC ¶¶ 514, 636. They expressly "incorporate" the securities allegations into the RICO counts without exception. *Id*. ¶¶ 530, 592.

The SAC is worse on this score than the AC, which included an albeit ineffective disclaimer that the RICO counts were not relying on securities allegations. *See* AC ¶ 438. The SAC does not even gesture at a disclaimer. The class allegations allege, without exception, that common questions include "[w]hether the Tokens are securities under the Securities Act" and "sales of the Tokens violated the Securities Act." SAC ¶ 526. Because Plaintiffs' pleading relies on allegations of securities fraud, the RICO counts should be dismissed.[3]

## II. PLAINTIFFS' CONCLUSORY SECTION 1962(D) CLAIM FAILS

Because no underlying substantive RICO violation is alleged, the Section 1962(d) claim necessarily fails. *E.g.*, *Flexborrow*, 255 F. Supp. 3d at 424. For the foregoing reasons, there are no viable claims against the Blockchain Defendants. This alone defeats the conspiracy claims, as

---

[3] In *Clune v. Barry*, Magistrate Judge McCarthy held that a plaintiff could not state securities fraud and RICO claims in the alternative even though the court may ultimately determine the instruments are not securities, because doing so would contravene the express language of the securities fraud bar and the congressional purpose to avoid a "'wait and see' approach" for RICO claims. 2023 WL 2929388, at *8 (S.D.N.Y. Apr. 13, 2023). Judge Roman sustained an objection to Magistrate Judge McCarthy's report and recommendation on the ground that the instruments may not ultimately qualify as securities. *See* 2024 WL 4266439 (S.D.N.Y. Sept. 23, 2024). Magistrate Judge McCarthy's reasoning is correct: as she discusses, courts routinely dismiss RICO claims that include securities fraud allegations even though the plaintiff may not be able to prove up every element of securities fraud and the defendant denies any securities fraud occurred. A plaintiff's pleading controls: there is no reason to treat the "security" element differently from the remaining elements of securities fraud.

23

the LKOLs are alleged to have been agents of Baton (SAC ¶ 83) and a "corporation" cannot form an enterprise "only through its agents and employees." *Gen. Motors*, 2016 WL 3920353, at \*12. Setting that aside, the SAC fails to identify the LKOLs with particularity or allege two predicate acts by a single LKOL—let alone a predicate act that could have even hypothetically proximately caused a cognizable injury. Accordingly, the conspiracy claims fail.

Independently, the conspiracy allegations are derivative of the substantiative allegations against the Blockchain Defendants and fail for the same reasons. To establish a RICO conspiracy, "a plaintiff must prove that (i) the defendants agreed to form and associate themselves with a RICO enterprise; (ii) the defendants agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise; and (iii) if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." *Flexborrow*, 255 F. Supp. 3d at 425. "[M]ere knowledge of the scheme … coupled with personal benefit, is not enough to impose liability for a RICO conspiracy"—and no knowledge is plausibly alleged here. *Id.* Moreover, no plausible agreement is alleged. As noted, the Foundation Defendants are not alleged to have interacted with the Baton Defendants. As for the Labs Defendants, the allegation they met with the Baton Defendants is insufficient to show they agreed to engage in a scheme whose primary purpose was allegedly to fleece retail users, a scheme antithetical to their purported interest in promoting Solana. *See id.* at 425 n.7 (even allegations of a "financing agreement" between defendants is insufficient to show they "agreed to violate RICO").

III.   **ASIDE FROM FEDERA, THE SAC FAILS TO ALLEGE PERSONAL JURISDICTION WITH RESPECT TO THE COMMON LAW CLAIMS**

The SAC does not allege Labs (allegedly domiciled in Delaware and California), Foundation (Switzerland), or the individual defendants aside from Federa are at home in New York, as required for general jurisdiction. Plaintiffs do not allege they have a connection to New

24

York or a long-arm basis for specific jurisdiction over the common law claims. At most, Plaintiffs allege Labs and Foundation have employees in New York, who contributed to the blockchain code. SAC ¶¶ 49–56. The mere fact code contributions occurred in New York is too attenuated to meet their burden. *Lopez v. Shopify, Inc.*, 2017 WL 2229868, at *8–9 (S.D.N.Y. May 23, 2017) (dismissing claims notwithstanding New York presence because contacts lacked "meaningful" nexus to claims), *report and recommendation adopted*, 2018 WL 481891 (S.D.N.Y. Jan. 17, 2018).

## IV.    THE UNJUST ENRICHMENT CLAIMS FAIL AS DERIVATIVE OF THE RICO CLAIMS

"Plaintiffs do not sufficiently distinguish their unjust enrichment claim from their other claims, which all relate to the same factual allegations." *Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 44 (S.D.N.Y. 2023). Instead, they breezily assert Defendants have been unjustly enriched "through deceptive and unlawful conduct" (SAC ¶¶ 650–53) and fail to "explain how their unjust enrichment claim is not merely duplicative of their other causes of action," meaning it should be dismissed. *Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017).

Independently, the claim requires a "sufficiently close relationship with the other party" and generally fails where "the pleadings failed to indicate a relationship between the parties that could have caused reliance or inducement." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516–17 (2012). There is no allegation, particularized or otherwise, to explain how the Blockchain Defendants unjustly benefitted at Plaintiffs' expense. *Tyman v. Pfizer, Inc.*, 2017 WL 6988936, at *10 (S.D.N.Y. Dec. 27, 2017) (subjecting unjust enrichment claims to Rule 9(b)). No Blockchain Defendant is alleged to have even interacted with any Plaintiff. The only benefit the Blockchain Defendants allegedly obtained was SOL token appreciation, which is far "too attenuated" to sustain the unjust enrichment claim. *See Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 216 (2007).

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice.

Dated:  March 6, 2026
      New York, New York

NAGY WOLFE APPLETON LLP


By: *Gregory N. Wolfe*
      Gregory N. Wolfe
      greg@nagylaw.com
      Joseph W. Baier (*pro hac vice*)
      jbaier@nagylaw.com
      31 East 62nd Street
      New York, New York 10065
      (646) 494-4900

      *Counsel for Defendants Solana Labs, Inc., Solana Foundation, Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document complies with the word count and page limit set forth in Local Civil Rule 7.1 because it contains 8,571 words, excluding the exempted portions of the brief.  In making this calculation, I have relied on the word count of the word-processing system used to prepare the document.

The foregoing document also complies with the typeface, margin, and spacing limitations provided in subsection (a)(4) of Local Civil Rule 7.1.

By: *Gregory N. Wolfe*
_____
Gregory N. Wolfe

*Counsel for Defendants Solana Labs, Inc., Solana Foundation, Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu*